

**Christopher C. Frost**
DIRECT 205.254.1186
EMAIL  CFrost@maynardcooper.com

August 1, 2022

**Via Email and Certified Mail, Return Receipt Requested**

Taylor Fortune Group Tennessee LLC or TFG Tennessee LLC
Attn: James Shelton
c/o Randy M. Hess
HESS BOWER ADAMS-HESS, PC
2105 S. Bascom Ave., Suite 200
Campbell, CA 95008
rhess@hbalawgroup.com

|  |  |  |
|---|---|---|
| Re: | Insured: | Taylor Fortune Group Tennessee, LLC d/b/a TFGroup, LLC ("TFGroup") |
|  | Insurer: | State Auto Property and Casualty Insurance Co. |
|  | Policy #: | PBP 2855775 00 ("Policy") |
|  | Claim #: | PR-368479 |
|  | Lawsuit: | *Kytch, Inc. v. Gamble, et al.*, Case No. RG21099155, Superior Court of the State of California for the County of Alameda ("Underlying Action") |

Dear Randy:

    I write to follow up on our correspondence and discussions on behalf of State Auto Property and Casualty Insurance Co. ("State Auto") in connection with the above-captioned matter as well as in connection with State Auto's Complaint for Declaratory Judgment in the United States District Court for the Eastern District of Louisiana, Case No. 2:21-cv-02174 ("Declaratory Judgment Action"). In response to your request that State Auto reconsider its position in light of the First Amended Complaint ("Underlying First Amended Complaint") filed in the Underlying Action, I am authorized to communicate State Auto's updated position, which will also serve to supplement State Auto's prior reservation of rights correspondence, including its July 9, 2021, reservation of rights letter, which is adopted and incorporated into this letter in full. Because you represent TFGroup, I trust you will communicate this position to Mr. Shelton and TFGroup.

    State Auto has been analyzing what, if any, effect the Underlying First Amended Complaint has on State Auto's obligations and coverage position. As you know, the Underlying First Amended Complaint was filed on April 29, 2022—after State Auto filed its Declaratory Judgment Action on November 23, 2021. As you also know, the publicly available version of the Underlying First Amended Complaint is heavily redacted, with the un-redacted version filed under seal, and we have not been provided with or otherwise been able to obtain an un-redacted copy. State Auto has nonetheless, of course, diligently continued to analyze the Underlying First Amended Complaint and what effect, if any, it has on State Auto's obligations and coverage position.



**EXHIBIT A**

August 1, 2022
Page 2

After a thorough assessment of the Policy and the Underlying First Amended Complaint, State Auto's conclusion remains that it owes no coverage to TFGroup for this matter. The basis for this decision is set out in State Auto's First Amended Complaint for Declaratory Judgment. (A copy of the First Amended Complaint for Declaratory Judgment, which State Auto has sought leave to file in the Declaratory Judgment Action, is attached.) Given the totality of the circumstances, the pending Declaratory Judgment Action, and TFGroup's request that State Auto defend TFGroup, however, State Auto is placing TFGroup's interests ahead of its own and is exercising its right under the Policy to participate in TFGroup's defense against the Underlying First Amended Complaint (even though State Auto has concluded it has no duty to do so), under a full and complete reservation of rights.

State Auto is making this reservation so that its investigation of this matter, and its litigation in the Declaratory Judgment Action, can continue without prejudice to either its or TFGroup's rights under the Policy. State Auto's willingness to consider any additional information shall not be considered a waiver or estoppel of its present coverage determination. To the contrary, State Auto continues to fully reserve all rights and defenses that it has or may have under the Policy, in equity, or under applicable law—including, without limitation, the right to withdraw from TFGroup's defense, disclaim defense and indemnity, seek reimbursement of sums paid, seek allocation, pursue judicial declarations, and deny coverage on any term, condition, exclusion, endorsement, or other provision of the Policy. State Auto further reserves the right to continue to investigate the coverage issues and to change or add to its coverage position as part of that process. No action taken by State Auto or any of its employees or representatives with regard to investigating liability or coverage, or in working with TFGroup or any attorney on TFGroup's behalf, shall be deemed a waiver of any term, condition, exclusion or limitation of the Policy. Moreover, the specific issues raised in this letter shall not be interpreted as limiting the scope of the rights reserved by State Auto. State Auto instead expressly reserves all its rights under the Policy and at law and in equity, whether now apparent or hereafter discovered.

If you have any questions, concerns, or comments regarding the above, or if you have additional facts or information that you would like State Auto to consider, please contact me at your earliest convenience.

Very truly yours,

Christopher C. Frost

CC:   Nicole S. Adams-Hess (nadamshess@hbalawgroup.com)
      Darren Le Montree (dlemontree@hbalawgroup.com)
      Tim M. Agajanian (tim.agajanian@ropers.com)
      David P. Vicknair (david@svlaw.law)
      Brad P. Scott (brad@svlaw.law)
      Caitlin B. Carrigan (caitlin@svlaw.law)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

STATE AUTO PROPERTY AND
CASUALTY INSURANCE CO.,

        Plaintiff,

    versus

TAYLOR FORTUNE GROUP
TENNESSEE, LLC,

        Defendant.

Civil Action No. 2:21-cv-02174-ILRL-DPC

Section B
District Judge Lemelle
Magistrate Judge Currault

**PLAINTIFF'S MOTION FOR LEAVE TO FILE A**
**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

NOW INTO COURT, through undersigned counsel, comes Plaintiff State Auto Property and Casualty Insurance Co. ("State Auto"), and respectfully moves this Court for leave to file the attached First Amended Complaint for Declaratory Judgment against Defendant Taylor Fortune Group Tennessee LLC ("Defendant"), for the reasons in the attached memorandum.

Plaintiff shows that this motion and proposed amendment are timely under the Court's Scheduling Order (Rec. Doc. 17) and that the granting of this motion and the filing of the proposed amended pleading will not delay this matter in any way. The undersigned counsel certifies that in accordance with Local Rule 7.6, counsel for State Auto contacted counsel for Defendant to obtain consent for the filing and granting of this motion. As of the filing of this motion, Defendant's counsel had not responded to the request for consent for the filing and granting of this motion.

Respectfully submitted this the 1st day of August, 2022,

**MAYNARD COOPER & GALE, P.C.**

/s/ *Christopher C. Frost*
CHRISTOPHER C. FROST (*pro hac vice*)
JOSHUA B. BAKER (*pro hac vice*)
CALEB C. WOLANEK (*pro hac vice*)
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
T: (205) 254-1000
F: (205) 254-1999
jbaker@maynardcooper.com
cfrost@maynardcooper.com
cwolanek@maynardcooper.com

**SCANDURRO & LAYRISSON, L.L.C.**
TIMOTHY D. SCANDURRO, Bar #18424
DEWEY M. SCANDURRO, Bar #23291, T.A.
607 St. Charles Avenue
New Orleans, LA 70130
T: (504) 522-7100
F: (504) 529-6199
tim@scanlayr.com
dewey@scanlayr.com

*Attorneys for Plaintiff*
*State Auto Property and Casualty Insurance Co.*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served on all counsel of record via CM/ECF,

this day, August 1, 2022.

<div align="center"><table><tr><td>/s/ <em>Christopher C. Frost</em><br>Of Counsel</td></tr></table></div>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

STATE AUTO PROPERTY AND
CASUALTY INSURANCE CO.,

    Plaintiff,

  versus

TAYLOR FORTUNE GROUP
TENNESSEE, LLC,

    Defendant.

Civil Action No. 2:21-cv-02174-ILRL-DPC

Section B
District Judge Lemelle
Magistrate Judge Currault

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR LEAVE TO FILE A**
**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff State Auto Property and Casualty Insurance Co. ("State Auto") respectfully submits this memorandum in support of its motion for leave to file the attached First Amended Complaint for Declaratory Judgment against Defendant Taylor Fortune Group Tennessee LLC ("Defendant").

**BACKGROUND**

State Auto filed this declaratory-judgment action on November 23, 2021, seeking a declaration of the parties' rights and obligations under an insurance policy issued by State Auto to Defendant ("the Policy"). (Rec. Doc. 1.) Specifically, Defendant has tendered a claim under the Policy for a lawsuit filed in California state court: *Kytch, Inc. v. Gamble, et al.*, No. RG21099155 (Cal. Super. Ct., Alameda Cnty.) That California case is known as "the Underlying Action." In this action, State Auto seeks a declaration that it has no duty to defend or indemnify Defendant in the Underlying Action.

When State Auto filed this action, it directed its initial complaint at the then-operative pleading in the Underlying Action. But on April 29, 2022, the plaintiff in the Underlying Action

filed a First Amended Complaint, referred to here as "the Underlying FAC." Counsel for State Auto has kept this Court informed of the likely need for an amendment to its own pleading under these circumstances and, accordingly, requested at the Court's last conference a window of time in which to assess and file any needed amendments in response to the Underlying FAC. State Auto now seeks leave to amend its pleading in this action within the time window the Court set out in its Scheduling Order. Counsel for State Auto contacted counsel for Defendant to obtain consent for the filing and granting of this Motion. As of the filing of this Motion, Defendant's counsel had not responded to the request for consent for the filing and granting of this Motion.

<div align="center">

**ARGUMENT**

</div>

Under Federal Rule of Civil Procedure 15, a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). That rule "evinces a bias in favor of granting leave to amend." *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (citation and internal quotation marks omitted); *accord, e.g.*, *Dynamic CRM Recruiting Sols. v. UMA Educ., Inc.*, 31 F.4th 914, 924 (5th Cir. 2022). "Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 872 (5th Cir. 2000) (citation and internal quotation marks omitted); *accord, e.g.*, *Dynamic*, 31 F.4th at 924. Here, justice requires leave to amend for at least two reasons.

***First***, the Underlying FAC is the relevant pleading for determining whether State Auto has a duty to defend Defendant. *See, e.g.*, *Maldonado v. Kiewit La. Co.*, 146 So. 3d 210, 219 (La. Ct. App. 2014) ("The most recently amended complaint provided to the insurer must be examined to determine whether there is a duty to defend."); *Donahue v. Republic Nat'l Distrib. Co.*, 489 F.

Supp. 3d 455, 468 (E.D. La. 2020).[1] Proceeding with this action without amending the pleadings to address the Underlying FAC would make no sense and would substantially prejudice State Auto.

**Second**, there is no valid reason for denying leave to amend. State Auto's amendment is timely, because this Court's Scheduling Order gave State Auto until August 1, 2022, in which to amend its pleading. (Rec. Doc. 17 at 1.) After the filing of the Underlying FAC, State Auto diligently analyzed the massive Underlying FAC—which is 105 pages long (excluding exhibits), contains 546 numbered paragraphs (excluding subparagraphs), and asserts ten causes of action. State Auto could not have addressed the Underlying FAC when it first filed this lawsuit, because the Underlying FAC did not exist then.

Further, Defendant has long been on notice that an amended complaint in this action would be needed. On April 7, 2022, the Scheduling Conference was continued given the likelihood of an amended pleading in the Underlying Action that, if allowed, would require State Auto to amend its pleading in *this* action to address any new underlying pleading. (*Cf.* Rec. Doc. 14; Rec. Doc. 15.) Following that initial conference, the Underlying FAC was allowed, necessitating a new pleading in this action. During the June 2, 2022, Scheduling Conference (*cf.* Rec. Doc. 16), counsel for State Auto explained that—in light of the Underlying FAC—State Auto was considering amendments it needed to make to its complaint in this action and, accordingly, requested a 60-day window within which to make that assessment and file any amendments to its pleadings. The Court granted that request as part of its Scheduling Order in this case.

---

[1]     The Policy was issued and delivered to Defendant in Louisiana. (Rec. Doc. 1, ¶¶ 15–16; Rec. Doc. 12, ¶¶ 15–16.) Louisiana substantive law therefore applies. *See, e.g.*, *Lamar Advert. Co. v. Cont'l Cas. Co.*, 396 F.3d 654, 659 (5th Cir. 2005).

Finally, this Motion is not made in bad faith or for the purpose of delay. State Auto has not previously amended its pleading in this action. It would not be futile to allow this amendment. And allowing this amendment would not unduly prejudice Defendant in any way.

<div align="center">

**CONCLUSION**

</div>

For these reasons, for good cause, and in the interest of justice, this Court should therefore grant State Auto leave to file the attached First Amended Complaint for Declaratory Judgment.

Respectfully submitted this the 1st day of August, 2022,

**MAYNARD COOPER & GALE, P.C.**

/s/ *Christopher C. Frost*
CHRISTOPHER C. FROST (*pro hac vice*)
JOSHUA B. BAKER (*pro hac vice*)
CALEB C. WOLANEK (*pro hac vice*)
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
T: (205) 254-1000
F: (205) 254-1999
jbaker@maynardcooper.com
cfrost@maynardcooper.com
cwolanek@maynardcooper.com

**SCANDURRO & LAYRISSON, L.L.C.**
TIMOTHY D. SCANDURRO, Bar #18424
DEWEY M. SCANDURRO, Bar #23291, T.A.
607 St. Charles Avenue
New Orleans, LA 70130
T: (504) 522-7100
F: (504) 529-6199
tim@scanlayr.com
dewey@scanlayr.com

*Attorneys for Plaintiff*
*State Auto Property and Casualty Insurance Co.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| STATE AUTO PROPERTY AND CASUALTY INSURANCE CO., | |
| Plaintiff, | |
| versus | Civil Action No. 2:21-cv-02174-ILRL-DPC |
| TAYLOR FORTUNE GROUP TENNESSEE, LLC, | Section B<br>District Judge Lemelle<br>Magistrate Judge Currault |
| Defendant. | |

## NOTICE OF SUBMISSION

Please take notice that Plaintiff State Auto Property and Casualty Insurance Co.'s Motion

for Leave to File a First Amended Complaint for Declaratory Judgment will be submitted to this

Court for decision under Local Rule 7.2 on August 17, 2022, at 11:00 a.m.

Respectfully submitted this the 1st day of August, 2022,

**MAYNARD COOPER & GALE, P.C.**

/s/ *Christopher C. Frost*
CHRISTOPHER C. FROST (*pro hac vice*)
JOSHUA B. BAKER (*pro hac vice*)
CALEB C. WOLANEK (*pro hac vice*)
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
T: (205) 254-1000
F: (205) 254-1999
jbaker@maynardcooper.com
cfrost@maynardcooper.com
cwolanek@maynardcooper.com

**SCANDURRO & LAYRISSON, L.L.C.**
TIMOTHY D. SCANDURRO, Bar #18424
DEWEY M. SCANDURRO, Bar #23291, T.A.
607 St. Charles Avenue
New Orleans, LA 70130
T: (504) 522-7100
F: (504) 529-6199
tim@scanlayr.com
dewey@scanlayr.com

*Attorneys for Plaintiff*
*State Auto Property and Casualty Insurance Co.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

STATE AUTO PROPERTY AND
CASUALTY INSURANCE CO.,

        Plaintiff,

    versus

TAYLOR FORTUNE GROUP
TENNESSEE, LLC,

        Defendant.

Civil Action No. 2:21-cv-02174-ILRL-DPC

    Section B
    District Judge Lemelle
    Magistrate Judge Currault

    **JURY DEMAND**

## FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff State Auto Property and Casualty Insurance Co. ("State Auto"), through counsel,

files this First Amended Complaint for Declaratory Judgment against Defendant Taylor Fortune

Group Tennessee LLC ("Defendant"), showing this Court as follows:

### NATURE OF THE ACTION

1.    State Auto brings this action under 28 U.S.C. §§ 2201–2202 and Federal Rule of

Civil Procedure 57 to obtain a declaration of the parties' rights and obligations under an insurance

policy issued by State Auto to Defendant ("the Policy"). Defendant has tendered a claim under the

Policy for a lawsuit filed in the Superior Court of the State of California for the County of Alameda

("the Underlying Action"). Based on the plain language of the Policy, State Auto denies it has any

duty to defend or indemnify Defendant in connection with the Underlying Action. The Underlying

Action does not fall within any of the Policy's coverage provisions, and even if it did, unambiguous

exclusions also eliminate any possibility of coverage. State Auto thus seeks a declaratory judgment

that it has no duty to defend or indemnify Defendant in connection with the Underlying Action.

## THE PARTIES

2. Plaintiff State Auto Property and Casualty Insurance Co. is incorporated in the State of Iowa and has its principal place of business in the State of Ohio.

3. Defendant Taylor Fortune Group Tennessee LLC is a limited liability company organized and existing under the laws of the State of Louisiana.

4. Defendant does business as "TFGroup LLC." TFGroup LLC is also the name of a separate limited liability company organized and existing under the laws of the State of Louisiana.

5. James Shelton is a registered agent for Defendant.

6. TFGroup LLC's registered agent is James Shelton.

7. Defendant's members are James Shelton and Matthew Martin.

8. TFGroup LLC's members are James Shelton and Matthew Martin.

9. James Shelton is domiciled in, and a citizen of, the State of Louisiana.

10. Matthew Martin is domiciled in, and a citizen of, the State of Louisiana.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). State Auto and Defendant are citizens of different States. State Auto is a citizen of Iowa and Ohio. Defendant is a citizen of Louisiana. The value of the matter in controversy exceeds $75,000, exclusive of interest and costs.

12. Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). An actual and ripe controversy has arisen between the parties about any coverage owed under the Policy.

13. Defendant is subject to personal jurisdiction in the State of Louisiana. Defendant is organized under the laws of the State of Louisiana, the insurance policy in question was issued and

delivered to Defendant in Metairie, Louisiana, and Defendant's members are citizens of the State of Louisiana. Defendant has also waived any argument challenging personal jurisdiction.

14.     This Court is the proper venue under 28 U.S.C. § 1391(b). Defendant's registered office address and mailing address is in Metairie, Louisiana, which is located within this District. A substantial part of the events or omissions giving rise to this claim occurred within this District. Defendant is subject to this Court's personal jurisdiction. Defendant has also waived any argument challenging venue.

<div align="center">

**BACKGROUND**

</div>

**I.     The Policy**

15.     In January 2020, State Auto issued a business insurance policy bearing policy number PBP 2855775 01 to Defendant for the policy period from February 5, 2020, to February 5, 2021 ("the Renewal Policy"). The Renewal Policy was issued and delivered to Defendant in Metairie, Louisiana. A true and correct copy of the Renewal Policy is attached to this Complaint as Exhibit A.

16.     The Renewal Policy renewed the business insurance policy bearing policy number PBP 2855775 00 that was issued in February 2019 by State Auto to Defendant for the policy period from February 5, 2019, to February 5, 2020 ("the Original Policy"). The Original Policy was issued and delivered to Defendant in Metairie, Louisiana. A true and correct copy of the Original Policy is attached to this Complaint as Exhibit B.

17.     In general, the Renewal Policy refers to and incorporates the terms of the Original Policy. Thus, this Complaint refers to the Renewal Policy and Original Policy collectively as "the Policy."

18.     Throughout the Policy, the terms "we," "us," and "our" refer to State Auto, and the terms "you" and "your" include Defendant.

19.     The Policy provides four forms of insurance: commercial general liability ("CGL") coverage, commercial property coverage, employment practice liability coverage, and commercial umbrella coverage. The Policy's commercial property coverage form and employment practice liability coverage form do not even potentially or arguably apply here; Defendant seeks defense and indemnity from State Auto for the Underlying Action under the Policy's CGL and umbrella coverage forms only. All insurance coverage, however, is subject to the Policy's terms, and State Auto has no duty to defend or indemnify Defendant in connection with the Underlying Action.

### A.     The Commercial General Liability Coverage Form

20.     Coverage A in Section I of the Policy's CGL form ("CGL Coverage A") provides coverage for "bodily injury" and "property damage" that is caused by an "occurrence," subject to the Policy's terms. Form CG0001 (04/13) at 1.

21.     As used in the CGL form, "Bodily injury" means "bodily injury, sickness or disease sustained by a person, including death, shock, mental anguish or mental injury sustained by that person at any time resulting from the bodily injury, sickness or disease." Form SL4000 (12/15) at 5; *cf.* Form CG0001 (04/13) at 12.

22.     The CGL form generally defines "Property damage" as follows:

"Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Form CG0001 (04/13) at 14.

23.  A separate (but similar) definition of "Property damage" applies when an insured seeks coverage under Part 12 of Form SL1202 (12/15):

"Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it.

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it; or

**c.** Loss of, loss of use of, damage to, corruption of, inability to access, or inability to properly manipulate "electronic data" resulting from physical injury to tangible property. All such loss of "electronic data" shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, "electronic data" is not tangible property.

Form SL1202 (12/15) at 5.

24.  As used in the CGL form, "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Form CG0001 (04/13) at 13.

25.  CGL Coverage A itself contains exclusions. *See* Form CG0001 (04/13) at 1–5.

26.     Exclusion 2(j) to CGL Coverage A is titled "Damage to Property." That exclusion

states:

> This insurance does not apply to:
> * * *
> **j.  Damage To Property**
>     "Property damage" to:
>     **(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;
>     **(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;
>     **(3)** Property loaned to you;
>     **(4)** Personal property in the care, custody or control of the insured;
>     **(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>     **(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>     Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** - Limits Of Insurance.
>     Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.
>     Paragraphs **(3), (4), (5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.
>     Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

Form CG0001 (04/13) at 4.

27.     Coverage B in Section I of the Policy's CGL form ("CGL Coverage B") provides

that State Auto "will pay those sums that the insured becomes legally obligated to pay as damages

because of 'personal and advertising injury' to which this insurance applies," subject to the

Policy's terms. Form CG0001 (04/13) at 5.

28.     Under CGL Coverage B, State Auto has "no duty to defend the insured against any

'suit' seeking damages for 'personal and advertising injury' to which this insurance does not

apply." Form CG0001 (04/13) at 5.

29.     The CGL form defines "Personal and advertising injury" as follows:

> "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
> **a.** False arrest, detention or imprisonment;
> **b.** Malicious prosecution;
> **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
> **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
> **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;
> **f.** The use of another's advertising idea in your "advertisement"; or
> **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

Form CG0001 (04/13) at 13–14.

30.     The CGL form defines "Advertisement" as follows:

> "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:
> **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and
> **b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

Form CG0001 (04/13) at 12.

31.     CGL Coverage B itself contains exclusions. *See* Form CG0001 (04/13) at 6–7.

32.     Exclusion 2(a) to CGL Coverage B is titled "Knowing Violation of Rights of

Another." That exclusion states:

> This insurance does not apply to:
> **a.   Knowing Violation Of Rights Of Another**
> "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

Form CG0001 (04/13) at 6.

33.     Exclusion 2(i) to CGL Coverage B is titled "Infringement Of Copyright, Patent,

Trademark Or Trade Secret." That exclusion states:

> This insurance does not apply to:
> * * *
> **i.   Infringement Of Copyright, Patent, Trademark Or Trade Secret**
> "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement". However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

Form CG0001 (04/13) at 6.

34.     Exclusion 2(f) to CGL Coverage B is titled "Breach of Contract." That exclusion

states:

> This insurance does not apply to:
> * * *
> **f.   Breach of Contract**
> "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

Form CG0001 (04/13) at 6.

35.     Exclusion 2(d) to CGL Coverage B is titled "Criminal Acts." That exclusion states:

> This insurance does not apply to:
> \* \* \*
> **d.  Criminal Acts**
> "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

Form CG0001 (04/13) at 6.

36.     The Policy contains other provisions that also limit coverage provided by the CGL form. *See* Form SL1202 (12/15); Form CG2106 (05/14).

37.     Form SL1202 (12/15) is an endorsement titled "Liability Plus Endorsement." Part 12(A) of that endorsement modifies CGL Coverage A, and it states:

> This insurance does not apply to:
> **p.  Access Or Disclosure of Confidential Or Personal Information And Data-related Liability**
> Damages arising out of:
> **(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or
> **(2)** The loss of , loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data" that does not result from physical injury to tangible property.
> However, this exclusion does not apply to liability for damage because of "bodily injury".

Form SL1202 (12/15) at 5.

38.     Part 12(B) of Form SL1202 (12/15) modifies CGL Coverage B, and it states:

This insurance does not apply to:

**Access Or Disclosure of Confidential Or Personal Information**

Damages arising out of:

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

Form SL1202 (12/15) at 5.

39.    Form CG2106 (05/14) is titled "Exclusion – Access or Disclosure of Confidential or Personal Information and Data-Related Liability – With Limited Bodily Injury Exception." Part A of that exclusion modifies CGL Coverage A, and it states:

This insurance does not apply to:

**p. Access Or Disclosure of Confidential Or Personal Information And Data-related Liability**
   **Damages arising out of:**

    **(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

    **(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph (1) or (2) above. However, unless Paragraph (1) above applies, this exclusion does not apply to damages because of "bodily injury". As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Form CG2106 (05/14) at 1.

    40.     Part B of Form CG2106 (05/14) modifies CGL Coverage B, and it states:

This insurance does not apply to:

**Access Or Disclosure of Confidential Or Personal Information**
"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

Form CG2106 (05/14) at 1.

**B.     The Commercial Umbrella Coverage Form**

41.     Coverage A in Section I of the Policy's Umbrella form ("Umbrella Coverage A")

provides coverage for "bodily injury" and "property damage" that is caused by an "occurrence,"

subject to the Policy's terms. Form CXS0001 (12/15) at 1.

42.     As used in the Umbrella form, "Bodily injury" means "bodily injury, sickness, or

disease sustained by a person, including death resulting from any of these at any time," and it

"includes mental anguish or other mental injury resulting from 'bodily injury'." Form CXS0001

(12/15) at 19.

43.     The Umbrella form defines "Property damage" as follows:

> "Property damage" means:
> **a.**   Physical injury to tangible property, including all resulting loss of
>         use of that property. All such loss of use shall be deemed to
>         occur at the time of the physical injury that caused it; or
> **b.**   Loss of use of tangible property that is not physically injured. All
>         such loss of use shall be deemed to occur at the time of the
>         "occurrence" that caused it.
> For the purposes of this insurance, electronic data is not tangible
> property.
> As used in this definition, electronic data means information, facts or
> programs stored as or on created or used on, or transmitted to or
> from computer software, including systems and application software,
> hard or floppy disks, CD-ROMs, tapes drives, cells, data processing
> devices or any other media which are used with electronically
> controlled equipment.

Form CXS0001 (12/15) at 22.

44.     The Umbrella form defines "Occurrence" as follows:

"Occurrence" means:

**a.** With respect to "bodily injury" or "property damage", an accident, including continuous or repeated exposure to substantially the same general harmful conditions. This does not apply to your liability (other than under a contract or agreement) for "bodily injury" to your "employees" arising out of and in the course of employment by you; or

**b.** With respect to your liability (other than under a contract or agreement) for "bodily injury" to your "employees" arising out of and in the course of employment by you, "bodily injury" caused by accident or disease.

Form CXS0001 (12/15) at 17.

45. Umbrella Coverage B itself contains exclusions.

46. Exclusion 2(j) in Umbrella Coverage A is titled "Damage to Property." That exclusion states:

This insurance does not apply to:
* * *
**j. Damage To Property**
  "Property damage" to:
  **(1)** Property:
  - **(a)** You own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration, or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property; or
  - **(b)** Owned or transported by the insured and arising out of the ownership, maintenance or use of a "covered auto".
  **(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;
  **(3)** Property loaned to you;
  **(4)** Personal property in the care, custody or control of any insured;
  **(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or
  **(6)** That particular part of any property that must be restored, repaired, or replaced because "your work" was incorrectly performed on it.

Paragraph **j.(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **j.(3), j.(4), j.(5)** and **j.(6)** of this exclusion do not apply to liability assumed under a railroad sidetrack agreement.

Paragraphs **j.(3),** and **j.(4)** of this exclusion do not apply to liability assumed under a written Trailer Interchange agreement.

Paragraph **j.(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

Form CXS0001 (12/15) at 5.

47.　　Coverage B in Section I of the Policy's Umbrella form ("Umbrella Coverage B")

provides coverage for "personal and advertising injury" to which the Policy applies, subject to the

Policy's terms. Form CXS0001 (12/15) at 9.

48.　　The Umbrella form defines "Personal and advertising injury" as follows:

"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement."

Form CXS0001 (12/15) at 21.

49.　　The Umbrella form defines "Advertisement" as follows:

- 14 -

"Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purpose of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporter is considered an advertisement.

Form CXS0001 (12/15) at 19.

50. Umbrella Coverage B itself contains exclusions.

51. Exclusion 2(a)(1) in Umbrella Coverage B is titled "Knowing Violation of Rights of Another." That exclusion states:

This insurance does not apply to:

**a.** "Personal and advertising injury"

**(1) Knowing Violation Of Rights of Another**
Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury"[.]

Form CXS0001 (12/15) at 10.

52. Exclusion 2(a)(6) in Umbrella Coverage B is titled "Breach of Contract." That exclusion states:

This insurance does not apply to:

**a.** "Personal and advertising injury"
* * *

**(6) Breach of Contract**
Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement"[.]

Form CXS0001 (12/15) at 10.

53. Exclusion 2(a)(9) in Umbrella Coverage B is titled "Infringement Of Copyright, Patent, Trademark Or Trade Secret." That exclusion states:

This insurance does not apply to:
**a.** "Personal and advertising injury"
* * *

> **(9) Infringement of Copyright, Patent, Trademark Or Trade Secret**
> Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

Form CXS0001 (12/15) at 10.

54.    Exclusion 2(a)(4) in Umbrella Coverage B is titled "Criminal Acts." That exclusion states:

This insurance does not apply to:
a.   "Personal and advertising injury"
* * *

> **(4) Criminal Acts**
> Arising out of a criminal act committed by or at the direction of the insured[.]

Form CXS0001 (12/15) at 10.

55.    The Policy contains other provisions that limit coverage provided by the Umbrella form. Form CXS 23 00 05 14 is an endorsement titled "Exclusion – Access or Disclosure of Confidential or Personal Information and Data-Related Liability." Part A of that endorsement modifies Umbrella Coverage A, and it states:

This insurance does not apply to:

**w.  Access Or Disclosure of Confidential Or Personal Information And Data-related Liability**
Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring

expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph (1) or (2) above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Form CXS 23 00 05 14 at 1.

56.  Part B of Form CXS 23 00 05 14 modifies Umbrella Coverage B, and it states:

This insurance does not apply to:
**Access Or Disclosure of Confidential Or Personal Information**
"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

Form CXS 23 00 05 14 at 1.

**II.  The Underlying Action**

57.  On May 10, 2021, Kytch, Inc. filed case number RG21099155, styled *Kytch, Inc.*

*v. Gamble, et al.*, in the Superior Court of the State of California for the County of Alameda ("the Underlying Action").

58.     On April 29, 2022, Kytch filed a First Amended Complaint in the Underlying Action. That pleading asserts causes of action against TFGroup LLC, Jonathan Tyler Gamble, and Taylor Commercial Foodservice, LLC. A true and correct copy of the publicly available First Amended Complaint in the Underlying Action is attached to this Complaint as Exhibit C.

59.     According to Kytch, the Underlying Action is a case about corporate espionage.

60.     Kytch alleges that Taylor Commercial Foodservice, LLC ("Taylor") manufactures the ice-cream and milkshake machines used in McDonald's restaurants. And according to Kytch, Taylor designed those machines so that only Taylor-certified technicians could service and repair those machines.

61.     Kytch, however, allegedly developed a device ("the Kytch Solution Device") and a related online system ("the Kytch Solution Platform") that modernized and demystified Taylor's machines, reducing the need for Taylor-certified technicians. Together, the Kytch Solution Device and the Kytch Solution Platform are referred to as "the Kytch Solution."

62.     The Kytch Solution is, according to Kytch, a novel invention that relies on confidential, proprietary, and trade-secret technology.

63.     Kytch allegedly launched the Kytch Solution in 2019, and McDonald's franchise operators began testing the Kytch Solution in their restaurants.

64.     In 2020, Jonathan Tyler Gamble allegedly expressed interest trying the Kytch Solution. According to Kytch, Gamble is a McDonald's franchisee in Tennessee and Mississippi.

65.     To allow Gamble's participation in a trial of the Kytch Solution while maintaining the confidentiality of Kytch's trade secrets, Kytch and Gamble allegedly executed a non-disclosure

- 18 -

agreement ("the NDA"). Among other things, the NDA allegedly:

(a)     Required Gamble to maintain the confidentiality of information about the Kytch Solution's features, specifications, functionality, and performance;

(b)     Provided that Gamble may not (and may not allow others) to "make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute, republish or download any part of" Kytch's products or services; and

(c)     Provided that Gamble may not (and may not allow others) to "access or use [Kytch's] services in order to build or support, and/or assist a third party in building or supporting," products or services competitive to Kytch.

66.     But according to Kytch, Gamble violated the NDA, stole Kytch's trade secrets, and shared Kytch's trade secrets with Kytch's competitors.

67.     TFGroup LLC allegedly helped misappropriate Kytch's trade secrets.

68.     More specifically, Kytch alleges that TFGroup LLC is a distributor that services Taylor ice-cream machines and participated in obtaining Kytch's trade secrets.

69.     Kytch alleges that Gamble impermissibly shared the Kytch Solution with TFGroup LLC—providing a Kytch Solution Device to TFGroup LLC and providing TFGroup LLC with his login credentials for the Kytch Solution Platform.

70.     Kytch also alleges TFGroup LLC unlawfully accessed the Kytch Solution Platform.

71.     Kytch further alleges that TFGroup LLC's principal and its employee, acting on behalf of TFGroup LLC, accepted Kytch's Terms of Service. Among other things, those Terms of Service allegedly:

(a)     Provide that TFGroup LLC could not use Kytch's trade secrets to "build or support, and/or assist a third party in building or supporting" a product or service that is

"competitive to Kytch";

(b)     Provide that TFGroup LLC could not "modify, make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute, republish or download" any part of the Kytch Solution;

(c)     Provide that TFGroup LLC could not "transfer," "distribute," or "disclose" any part of the Kytch Solution to "any third party"; and

(d)     Provide that TFGroup LLC could not "commercially exploit" any part of the Kytch Solution.

72.     According to Kytch, TFGroup LLC also attempted to reverse-engineer the Kytch Solution Device.

73.     Once TFGroup LLC gained access to Kytch's trade secrets, Kytch asserts, TFGroup LLC shared Kytch's confidential information with Taylor.

74.     Taylor is allegedly developing a product to directly compete with the Kytch Solution. TFGroup LLC allegedly helped Taylor develop a competing product.

75.     Kytch alleges that TFGroup LLC and Taylor knew that the Kytch information that TFGroup LLC obtained was subject to a secrecy agreement. Kytch also alleges TFGroup LLC and Taylor induced Gamble to breach his confidentiality obligations in order to gain access to Kytch's trade secrets.

76.     Taylor and McDonald's, however, allegedly could not timely develop a product to compete with the Kytch Solution. As a "stall tactic," Kytch alleges, Taylor and McDonald's made statements that the Kytch Solution Device risked serious injury to users. According to Kytch, those statements are false.

77.     In the First Amended Complaint in the Underlying Action, however, Kytch does

not seek to hold TFGroup LLC responsible for any allegedly false statement about Kytch or about the Kytch Solution. Kytch directs its allegations about false statements at Taylor and McDonald's, not TFGroup LLC.

78. Count One of the Underlying Action is a cause of action for "Breach of Written Contract" against Gamble only. Count One alleges that Gamble breached the NDA. Count One further alleges "misappropriation of Kytch's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive."

79. Count Two of the Underlying Action is a cause of action for "Tortious Interference of Contract" against TFGroup LLC, Taylor, and Gamble. Count Two alleges that "Defendants had knowledge" of the NDA, that Defendants "intentionally selected Kytch's customers to develop Taylor's competing product in breach of the NDA," and that "Defendants acted intentionally to interfere with and induce Gamble and the others … to breach [the NDA] by providing [them] with access to the Kytch Solution Device and Platform." Count Two further alleges that TFGroup LLC "pushed" others to breach the NDA. Those allegedly intentional actions allegedly damaged Kytch.

80. Count Three of the Underlying Action is a cause of action for "Violation of California Uniform Trade Secrets Act" against TFGroup LLC, Gamble, and Taylor. Count Three alleges that "Defendants have misappropriated" Kytch's trade secrets, that "Defendants knew or should have known" the misappropriated information was confidential trade-secret information, and that "Defendants acted willfully, maliciously, and fraudulently."

81. Count Four of the Underlying Action is a cause of action for "False Advertising" against Taylor only. TFGroup LLC is not named or referenced in this cause of action.

82. Count Five of the Underlying Action is a cause of action for "Trade Libel" against Taylor only. TFGroup LLC is not named or referenced in this cause of action.

83.     Count Six of the Underlying Action is a cause of action for "Intentional Interference with Business Expectancy" against TFGroup LLC, Gamble, and Taylor. Count Six alleges that "Defendants acted intentionally to induce Kytch's customers and prospective customers to discontinue their existing and prospective business relationships with Kytch." Count Six further alleges that "Defendants knew that their conduct was substantially certain to interfere with Kytch's economic interests, namely its ability to retain existing customers and obtain new customers," and that "Defendants acted knowingly and intentionally and with reckless disregard of the foreseeable consequences of its actions." Count Six alleges the "misappropriating [of] Kytch's trade secrets," as well.

84.     Count Seven of the Underlying Action is a cause of action for "Negligent Interference with Business Expectancy" against TFGroup LLC, Gamble, and Taylor. Count Seven alleges that "Defendants" induced Kytch's customers and prospective customers to discontinue their existing and prospective business relationships with Kytch. Count Seven also alleges the "misappropriating [of] Kytch's trade secrets."

85.     Count Eight of the Underlying Action is a cause of action for "Violation of the California Computer Data Access and Fraud Act" against TFGroup LLC, Gamble, and Taylor. Count Eight alleges that "Defendants knowingly and willfully took multiple specific acts to access the computer networks and data of Kytch without permission," in violation of a California criminal statute.

86.     Count Nine of the Underlying Action is a cause of action for "Deceptive Trade Practices" against TFGroup LLC, Gamble, and Taylor. Count Nine alleges that "Defendants' conduct was knowing, deliberate, willful, and intended to cause confusion, mistake or to deceive, all in blatant disregard of Kytch's rights."

87.     Count Ten of the Underlying Action is a cause of action for "Breach of Contract" against TFGroup LLC only. Count Ten alleges that TFGroup LLC, through its principal and an employee, agreed to Kytch's Terms of Service. Count Ten further alleges TFGroup LLC breached its contractual duties by "participating in the development of [a] competing device" developed by Taylor, "assisting in the disassembly, reverse engineering and distribution of [Kytch Solution Devices]," and "giving McDonald's and other third-parties access to the Kytch Solution Platform."

88.     In the Underlying Action, Kytch seeks compensatory damages, punitive damages, attorneys' fees, and other relief from TFGroup LLC and the other defendants.

## III.   The Parties' Positions

89.     Defendant tendered the defense of the Underlying Action to State Auto.

90.     Defendant contends the Policy provides coverage for the Underlying Action.

91.     State Auto contends there is no potential coverage for the Underlying Action under the Policy.

92.     As a result, a justiciable controversy exists between the parties as to their rights and obligations under the Policy.

## COUNT ONE: DECLARATORY JUDGMENT
## (NO COVERAGE PROVISION APPLIES)

93.     State Auto repeats and incorporates the allegations in paragraphs 1–92 as if fully set forth herein.

94.     The Underlying Action does not fall within the terms of any coverage provision of the Policy.

95.     The Underlying Action does not allege facts that implicate the Policy's commercial property coverage form, and the Policy's commercial property coverage form does not provide any coverage for the Underlying Action.

96.     The Underlying Action does not allege facts that implicate the Policy's employment practice liability coverage form, and the Policy's employment practice liability coverage form does not provide any coverage for the Underlying Action.

97.     The Policy's CGL Coverage A and Umbrella Coverage A do not provide coverage for the Underlying Action, since the Underlying Action does not allege or seek damage for "Bodily injury," "Property damage," or an "Occurrence," as those terms are defined in the Policy.

98.     The Underlying Action does not allege or seek damages for bodily injury, sickness, or disease.

99.     The Underlying Action does not allege or seek damages for physical injury to tangible property or for loss of use of tangible property.

100.    The Underlying Action does not allege or seek damages for loss of, loss of use of, damage to, corruption of, inability to access, or inability to properly manipulate electronic data resulting from physical injury to tangible property.

101.    If the Underlying Action did allege or seek damages for property damage (it does not), then Exclusion 2(j)(4) to CGL Coverage A and Exclusion 2(j)(4) to Umbrella Coverage A would exclude damage to property in Defendant's care, custody, or control.

102.    The Underlying Action does not allege or seek damages for an accident. Instead, the Underlying Action alleges that TFGroup LLC and other defendants to the Underlying Action acted intentionally.

103.    Further, the Policy's CGL Coverage B and Umbrella Coverage B do not provide coverage for the Underlying Action, because the Underlying Action does not seek to hold Defendant legally obligated to pay damages because of "personal and advertising injury," as that term is defined in the Policy.

104.    The Underlying Action does not allege or seek damages for false arrest, detention, or imprisonment; malicious prosecution; wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor; or the publication of material that violates a person's right of privacy.

105.    The Underlying Action does not allege or seek damages for any broadcast or publication by Defendant to the general public (or to specific market segments) about Defendant's goods, products, or services for the purpose of attracting customers or supporters. Nor does the Underlying Action allege or seek damages for the use of another's advertising idea, copyright, trade dress, or slogan in any "advertisement" by Defendant, as that term is defined in the Policy.

106.    The Underlying Action does not seek to hold Defendant legally obligated to pay damages because of injury arising out the publication of material that slanders or libels Kytch or disparages Kytch's goods, products, or services. The First Amended Complaint in the Underlying Action does not include allegations sufficient to show that Defendant (or TFGroup LLC) published slanderous, libelous, or disparaging material or is legally responsible for any such publication.

107.    No other coverages potentially or arguably apply.

108.    As a result, State Auto has no duty to defend or indemnify Defendant in connection with the Underlying Action.

109.    State Auto is entitled to a judicial declaration stating that State Auto has no duty to defend Defendant against the Underlying Action because no coverage provisions even potentially or arguably apply.

110.    State Auto is also entitled to a judicial declaration stating that State Auto has no duty to indemnify Defendant for any settlement on behalf of, or judgment rendered against,

Defendant in the Underlying Action, because no coverage provisions apply.

<div align="center">

**COUNT TWO: DECLARATORY JUDGMENT**
**(EXCLUSION FOR ACCESS OR DISCLOSURE OF CONFIDENTIAL INFORMATION)**

</div>

111.    State Auto repeats and incorporates the allegations in paragraphs 1–92 as if fully set forth herein.

112.    Assuming the Underlying Action alleged and sought damages for "personal and advertising injury" as defined in the Policy (it does not), unambiguous exclusions eliminate any possibility of coverage.

113.    The Underlying Action alleges and seeks damages for injury that arises out of the alleged access to or disclosure of Kytch's confidential or personal information, including Kytch's trade secret, processing methods, and/or other nonpublic information.

114.    Thus, under Form SL1202 (12/15), Form CG2106 (05/14), and Form CXS 23 00 05 14—the text of which is found in paragraphs 37–40 and 55–56 of this Complaint—the Policy unambiguously excludes any possibility of coverage for the Underlying Action, and State Auto has no duty to defend or indemnify Defendant in connection with the Underlying Action.

115.    State Auto is entitled to a judicial declaration stating that State Auto has no duty to defend Defendant against the Underlying Action because the Policy's exclusions for injuries that arise out of access to or disclosure of confidential or personal information unambiguously exclude any and all possibility of coverage.

116.    State Auto is also entitled to a judicial declaration stating that State Auto has no duty to indemnify Defendant for any settlement on behalf of, or judgment rendered against, Defendant in the Underlying Action, because the Policy's exclusions for injuries that arise out of access to or disclosure of confidential or personal information unambiguously exclude any and all coverage.

## COUNT THREE: DECLARATORY JUDGMENT
### (EXCLUSION FOR KNOWING VIOLATION OF RIGHTS OF ANOTHER)

117.    State Auto repeats and incorporates the allegations in paragraphs 1–92 as if fully set forth herein.

118.    Assuming the Underlying Action alleged and sought damages for "personal and advertising injury" as defined in the Policy (it does not), unambiguous exclusions eliminate any possibility of coverage.

119.    The Underlying Action alleges and seeks damages for injury allegedly caused by or at the direction of Defendant with the knowledge that the act would violate the rights of Kytch and would inflict injury.

120.    Thus, under Exclusion 2(a) in CGL Coverage B and Exclusion 2(a)(1) in Umbrella Coverage B—the text of which is found in paragraphs 32 and 51 of this Complaint—the Policy does not provide coverage for the Underlying Action, and State Auto has no duty to defend or indemnify Defendant in connection with the Underlying Action.

121.    State Auto is entitled to a judicial declaration stating that State Auto has no duty to defend Defendant against the Underlying Action because the Policy's exclusions for injuries caused by or at the direction of Defendant with the knowledge that the act would violate the rights of another unambiguously exclude any and all possibility of coverage.

122.    State Auto is also entitled to a judicial declaration stating that State Auto has no duty to indemnify Defendant for any settlement on behalf of, or judgment rendered against, Defendant in the Underlying Action, because the Policy's exclusions for injuries caused by or at the direction of Defendant with the knowledge that the act would violate the rights of another unambiguously exclude any and all coverage.

### COUNT FOUR: DECLARATORY JUDGMENT
### (EXCLUSION FOR INFRINGEMENT OF TRADE SECRETS)

123.    State Auto repeats and incorporates the allegations in paragraphs 1–92 as if fully set forth herein.

124.    Assuming the Underlying Action alleged and sought damages for "personal and advertising injury" as defined in the Policy (it does not), unambiguous exclusions eliminate any possibility of coverage.

125.    The Underlying Action alleges and seeks damages for injury that arises out of the alleged infringement of Kytch's trade secret or other intellectual property rights.

126.    Thus, under Exclusion 2(i) in CGL Coverage B and Exclusion 2(a)(9) in Umbrella Coverage B—the text of which is found in paragraphs 33 and 53 of this Complaint—the Policy does not provide coverage for the Underlying Action, and State Auto has no duty to defend or indemnify Defendant in connection with the Underlying Action.

127.    State Auto is entitled to a judicial declaration stating that State Auto has no duty to defend Defendant against the Underlying Action because the Policy's exclusions for injuries that arise out of the infringement of trade secret or other intellectual property rights unambiguously exclude any and all possibility of coverage.

128.    State Auto is also entitled to a judicial declaration stating that State Auto has no duty to indemnify Defendant for any settlement on behalf of, or judgment rendered against, Defendant in the Underlying Action, because the Policy's exclusions for injuries that arise out of the infringement of trade secret or other intellectual property rights unambiguously exclude any and all coverage.

### COUNT FIVE: DECLARATORY JUDGMENT
### (EXCLUSION FOR BREACH OF CONTRACT)

129.    State Auto repeats and incorporates the allegations in paragraphs 1–92 as if fully

set forth herein.

130. Assuming the Underlying Action alleged and sought damages for "personal and advertising injury" as defined in the Policy (it does not), unambiguous exclusions eliminate any possibility of coverage.

131. The Underlying Action alleges and seeks damages for injury arising out of alleged breaches of contract.

132. Thus, under Exclusion 2(f) in CGL Coverage B and Exclusion 2(a)(6) in Umbrella Coverage B—the text of which is found in paragraphs 34 and 52 of this Complaint—the Policy does not provide coverage for the Underlying Action, and State Auto has no duty to defend or indemnify Defendant in connection with the Underlying Action.

133. State Auto is entitled to a judicial declaration stating that State Auto has no duty to defend Defendant against the Underlying Action because the Policy's exclusions for injuries that arise out of breach of contract unambiguously exclude any and all possibility of coverage.

134. State Auto is also entitled to a judicial declaration stating that State Auto has no duty to indemnify Defendant for any settlement on behalf of, or judgment rendered against, Defendant in the Underlying Action, because the Policy's exclusions for injuries that arise out of breach of contract unambiguously exclude any and all coverage.

### COUNT SIX: DECLARATORY JUDGMENT
### (EXCLUSION FOR CRIMINAL ACTS)

135. State Auto repeats and incorporates the allegations in paragraphs 1–92 as if fully set forth herein.

136. Assuming the Underlying Action alleged and sought damages for "personal and advertising injury" as defined in the Policy (it does not), unambiguous exclusions eliminate any possibility of coverage.

137.     The Underlying Action alleges and seeks damages for injury arising out of a criminal act committed by or at the direction of Defendant.

138.     Thus, under Exclusion 2(d) in CGL Coverage B and Exclusion 2(a)(4) in Umbrella Coverage B—the text of which is found in paragraphs 35 and 54 of this Complaint—the Policy does not provide coverage for the Underlying Action, and State Auto has no duty to defend or indemnify Defendant in connection with the Underlying Action.

139.     State Auto is entitled to a judicial declaration stating that State Auto has no duty to defend Defendant against the Underlying Action because the Policy's exclusions for injuries that arise out of a criminal act unambiguously applies.

140.     State Auto is also entitled to a judicial declaration stating that State Auto has no duty to indemnify Defendant for any settlement on behalf of, or judgment rendered against, Defendant in the Underlying Action, because the Policy's exclusions for injuries that arise out of a criminal act unambiguously applies.

<div align="center">

**JURY DEMAND**

</div>

State Auto demands a trial by jury on all issues so triable.

<div align="center">

**RELIEF REQUESTED**

</div>

WHEREFORE, Plaintiff State Auto Property and Casualty Insurance Co. respectfully asks for the following relief:

A.     A declaration that there is no coverage for the Underlying Action under the Policy, or under any other policy of insurance issued by State Auto;

B.     A declaration that State Auto has no duty to defend Defendant against the Underlying Action;

C.     A declaration that State Auto has no duty to indemnify Defendant for any settlement on behalf of or judgment rendered against CCI in the Underlying Action;

D.    Attorneys' fees and costs of suit incurred in this action; and

E.    Such other, further, or different relief to which State Auto may be entitled.

Respectfully submitted this the 1st day of August, 2022,

**MAYNARD COOPER & GALE, P.C.**

/s/ *Christopher C. Frost*
CHRISTOPHER C. FROST (*pro hac vice*)
JOSHUA B. BAKER (*pro hac vice*)
CALEB C. WOLANEK (*pro hac vice*)
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
T: (205) 254-1000
F: (205) 254-1999
jbaker@maynardcooper.com
cfrost@maynardcooper.com
cwolanek@maynardcooper.com

**SCANDURRO & LAYRISSON, L.L.C.**
TIMOTHY D. SCANDURRO, Bar #18424
DEWEY M. SCANDURRO, Bar #23291, T.A.
607 St. Charles Avenue
New Orleans, LA 70130
T: (504) 522-7100
F: (504) 529-6199
tim@scanlayr.com
dewey@scanlayr.com

*Attorneys for Plaintiff*
*State Auto Property and Casualty Insurance Co.*

# Exhibit A

## Policy No. PBP 2855775 01

Case 3:21-cv-00711-L-SPC Document 84-4 Filed 08/01/22 Page 44 of 538

STATE AUTO
Insurance Companies

TO: INSURED

TAYLOR FORTUNE GROUP TENNESSEE
LLC DBA: AND TF GROUP LLC
4633 SANFORD ST
METAIRIE, LA 70006

Your Independent Agent

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

MAILER.DIRFLAT

Issue Date  01/14/2020        05:06:53 PM

0014223    Printed:
01/15/20   01:45:32

Case 3:21-cv-00242-JLS-DDC Document 84-24 Filed 08/01/22 Page 45 of 538

# STATE AUTO
### Insurance Companies

**PBP 2855775   01**

Acct. Number  CB00652901

**TO: INSURED**

**TAYLOR FORTUNE GROUP TENNESSEE
LLC DBA: AND TF GROUP LLC
4633 SANFORD ST
METAIRIE, LA 70006**

| **Your Independent Agent** |
| --- |

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

Thank you for insuring with State Auto Insurance Companies. Attached is information about your new business, renewal or policy change. Please contact your agent with any questions.

Your coverages are listed on the attached declarations pages. Any new or revised coverage forms are attached.

The State Auto Insurance Companies and your independent agent strive to provide overwhelming service to you. Please let us know how we can best serve your needs.

***ENCLOSED DOCUMENTS ARE POLICY INFORMATION ONLY. YOUR BILL WILL BE MAILED SEPARATELY, IF NEEDED.***

If you have questions concerning policy payment status, please call Customer Service at 833-724-3577 (833-SAHELPS).

Case 3:21-mc-90074-SPC Document 84-24 Filed 08/01/22 Page 46 of 538

# STATE AUTO
### Insurance Companies

**PBP  2855775   01**

Corporate Headquarters
518 East Broad Street
P.O. Box 182822
Columbus, OH 43218-2822
614-464-5000

## POLICY INFORMATION

| Insured | Independent Agent |
|---------|-------------------|
| TAYLOR FORTUNE GROUP TENNESSEE LLC DBA: AND TF GROUP LLC 4633 SANFORD ST METAIRIE, LA 70006 | ELITE INSURANCE SOLUTIONS 1894 GENERAL GEORGE PATTON DR FRANKLIN, TN 37067 |

Your policy documents are enclosed. Please contact your agent if you have any questions.
Your bill will be sent separately.

## STATEMENT OF ACCOUNT

| Total Premium | Policy Number | Due Date |
|---------------|---------------|----------|
| $▉▉▉▉▉ | PBP  2855775   01 | 02/05/2020 |

Thank you for letting us serve your insurance needs.

**PS0045 (10/19) Page 1 of 1**
*//*PS0045-201910

*d* 2019 State Automobile Mutual Insurance Company. All rights reserved.

Issue Date  01/14/2020          05:06:53 PM                    0014225    Printed:
                                                               01/15/20   01:45:32

# NEW PROTECTION AGAINST
# CYBER ATTACK AND CYBER EXTORTION
# NOW AVAILABLE

**Named Insured And Mailing Address:**

TAYLOR FORTUNE GROUP TENNESSEE
LLC DBA: AND TF GROUP LLC
4633 SANFORD ST
METAIRIE, LA 70006

**Agent Name And Address:**

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

(615) 371-5400

**CyberSecure Quotation For:**     PBP    2855775      01

**Policy Period:** 02/05/2020    **To:** 02/05/2021

Your professional independent insurance agent has designed your State Auto business insurance policy to protect you against the financial consequences of many unfortunate events.

However, your policy does not include a new coverage we've developed to guard against loss due to the ever increasing exposure of Computer Attacks. Businesses today depend increasingly upon computer technology to function, grow and prosper. Parties with ill intent are increasingly seeking to steal data, extort money, and disrupt your business operations through computer technologies.

Our new product includes coverage to:
*    Respond to Cyber Extortion and Denial of Service Attacks;
*    Restore or recreate lost data;
*    Pay to remediate damage to software;
*    Recover loss of income due to computer system downtime;
*    Develop a public relations strategy to minimize reputational risk;
*    Protect against legal actions alleging your lack of system security allowed damage to a third party; and
*    Protect against legal action stemming from information you've displayed on a website causing damages to a third party.

Your current policy **does not** provide coverage for these expenses.

State Auto had developed a new coverage option that can help your business deal with the financial consequences of a Cyber Attack or Cyber Extortion. It's called **CyberSecure**. It pays expenses described above and it defends your business against lawsuits resulting from a Cyber Attack or Cyber Extortion.

**CyberSecure at a $100,000 limit can be added to your business insurance policy during this policy term for an annual premium of $▮▮▮▮▮.**

**Higher limits may be available. A basic limit of $50,000 may also be available with some reduced coverage.**

Please contact your State Auto agent for more information, or to request that **CyberSecure** be attached to your policy.

**CY.QUOTE Page 1 of 1**
*//*CYQUOTE

Issue Date  01/14/2020        05:06:53 PM

Case 3:21-cv-02725-E  Document 84-24  Filed 08/01/22  Page 48 of 538

# STATE AUTO
### Insurance Companies

**PBP 2855775    01**

NAMED INSURED AND MAILING ADDRESS:

**TAYLOR FORTUNE GROUP TENNESSEE
LLC DBA: AND TF GROUP LLC
4633 SANFORD ST
METAIRIE, LA 70006**

AGENT NAME AND ADDRESS:

**ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067**

**(615) 371-5400**

*Dear Valued Customer,*

*Thank you for allowing us to provide your important insurance protection.  Your satisfaction with your insurance coverage is essential to us and we would like to keep you informed about changes to your policy.*

*Please take a moment and review the notices listed below.   These notices are intended to make you aware of important changes such as coverage broadenings, reductions or restrictions.  Your careful review is appreciated.*

*If you have any questions about these changes, please contact your insurance agency at the address and phone number shown above.*

*Again, thank you for placing your insurance with State Auto Insurance Companies!*

## POLICYHOLDER  INFORMATION

| | |
|---|---|
| CG 67 6  04 95 | Retain Original Policy Documents |
| PN 02 39 07 07 | If You Have a Claim |
| PS 00 33 03 14 | Legal Advice Policy Stuffer |
| PS 00 11 07 07 | Notice of Premium Audit |
| MC 78    03 91 | Contractors - Hiring Subcontractors - SAVE Information |
| PS 00 28 01 12 | Data Compromise Breach Helpline |
| PS 00 38 01 14 | Data Compromise Breach E-Risk Hub Stuffer |

Issue Date  01/14/2020          05:06:53 PM

0014227        Printed:
01/15/20      01:45:32

# POLICYHOLDER DISCLOSURE -
# NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act (Act), as amended, that you have a right to purchase insurance coverage for losses arising out of certified acts of terrorism. The term "certified act of terrorism" means any act that is certified by the Secretary of the Treasury - in accordance with the provisions of the federal Terrorism Risk Insurance Act - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that coverage provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States Government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 80% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is provided on the policy Declarations page and does not include any charges for the portion of loss covered by the federal government under the act.

LIMITATION ON PAYMENT OF TERRORISM LOSSES
You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurer's liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.
If you purchase this coverage on an umbrella policy, you must also purchase this coverage for underlying general liability policies.

In the context of a newly issued policy or renewal offer, this form becomes part of the application for this coverage.

**You may select terrorism insurance coverage as follows:**
The portion of your annual policy premium that is attributable to coverage for certified acts of terrorism is shown on the declarations page. If you wish to reject this coverage, please read and complete the form below.

**You may reject terrorism insurance coverage as follows:**
You may elect to decline coverage for certified acts of terrorism. However, if your policy covers property located in a state with a fire following statutory requirement, the terrorism exclusion makes an exception for fire losses to such covered property resulting from certified acts of terrorism. If you choose to decline coverage for certified acts of terrorism, that rejection is not applicable to fire losses to property in those states resulting from certified acts of terrorism, unless excepted by statute or other regulatory means. A separate premium is displayed on the declarations page for coverage for fire losses that result from certified acts of terrorism.

**PN0083 (01/15) Page 1 of 2**
*//*PN0083-201501

To reject coverage, you must 'X' the box below, sign your name, print your name, date this form and return it to the company within 30 days. If you choose not to reject this coverage, you do not need to return this form.

| | I hereby elect to exclude losses arising from certified acts of terrorism and understand that I will have no coverage for losses resulting from certified acts of terrorism. I understand that if I exclude certified acts of terrorism coverage, coverage will not be available until my next renewal. |
|---|---|

_____          State Auto Property and Casualty Insurance Co.
Policyholder/Applicant's Signature                              Insurance Company

_____          PBP   2855775   01
Print Name                                                            Policy Number

_____
Date

41    —  0005590

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

(615) 371-5400

**PN0083 (01/15) Page 2 of 2**
*//*PN0083-201501

Case 2:21-cv-02174-BRL-DPC Document 424 Filed 08/01/22 Page 51 of 538

# POLICYHOLDER DISCLOSURE -
# NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act (Act), as amended, that you have a right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury --, in concurrence with the Secretary of State, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that coverage provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States Government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is provided on the policy Declarations page and does not include any charges for the portion of loss covered by the federal government under the act.

LIMITATION ON PAYMENT OF TERRORISM LOSSES

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurer's liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

If you purchase this coverage on an umbrella policy, you must also purchase this coverage for any underlying liability policies.

In the context of a newly issued policy or renewal offer, this form becomes part of the application for this coverage.

**You may select terrorism insurance coverage as follows:**

The portion of your annual policy premium that is attributable to coverage for certified acts of terrorism is shown on the declarations page. If you wish to reject this coverage, please read and complete the form below.

**You may reject terrorism insurance coverage as follows:**

You may elect to decline coverage for certified acts of terrorism. However, if your policy covers property located in a state with a fire following statutory requirement, the terrorism exclusion makes an exception for fire losses to such covered property resulting from certified acts of terrorism. If you choose to decline coverage for certified acts of terrorism, that rejection is not applicable to fire losses to property in those states resulting from certified acts of terrorism, unless excepted by statute or other regulatory means. A separate premium is displayed on the declarations page for coverage for fire losses that result from certified acts of terrorism.

**PN 00 83 01 08 Page 1 of 2**
*//*PN0083-200801*

To reject coverage, you must 'X' the box below, sign your name, print your name, date this form and return it to the company within 30 days. If you choose not to reject this coverage, you do not need to return this form.

| X | I hereby elect to exclude losses arising from certified acts of terrorism and understand that I will have no coverage for losses resulting from certified acts of terrorism. I understand that if I exclude certified acts of terrorism coverage, coverage will not be available until my next renewal. |
|---|---|

_____
Policyholder/Applicant's Signature

_____
Print Name

_____
Date

State Auto Property and Casualty Insurance Co.
Insurance Company

PBP 2855775 01
Policy Number

41 - 0005590

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

(615) 371-5400

**PN 00 83 01 08 Page 2 of 2**
*//*PN0083-200801

Issue Date  01/14/2020        05:06:53 PM

# POLICYHOLDER DISCLOSURE -
# NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act (Act), as amended, that you have a right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury -- , in concurrence with the Secretary of State, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that coverage provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States Government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is provided on the policy Declarations page and does not include any charges for the portion of loss covered by the federal government under the act.

LIMITATION ON PAYMENT OF TERRORISM LOSSES

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurer's liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

If you purchase this coverage on an umbrella policy, you must also purchase this coverage for any underlying liability policies.

In the context of a newly issued policy or renewal offer, this form becomes part of the application for this coverage.

**You may select terrorism insurance coverage as follows:**

The portion of your annual policy premium that is attributable to coverage for certified acts of terrorism is shown on the declarations page. If you wish to reject this coverage, please read and complete the form below.

**You may reject terrorism insurance coverage as follows:**

You may elect to decline coverage for certified acts of terrorism. However, if your policy covers property located in a state with a fire following statutory requirement, the terrorism exclusion makes an exception for fire losses to such covered property resulting from certified acts of terrorism. If you choose to decline coverage for certified acts of terrorism, that rejection is not applicable to fire losses to property in those states resulting from certified acts of terrorism, unless excepted by statute or other regulatory means. A separate premium is displayed on the declarations page for coverage for fire losses that result from certified acts of terrorism.

**PN 00 83 01 08 Page 1 of 2**
*//*PN0083-200801

To reject coverage, you must 'X' the box below, sign your name, print your name, date this form and return it to the company within 30 days. If you choose not to reject this coverage, you do not need to return this form.

| X | I hereby elect to exclude losses arising from certified acts of terrorism and understand that I will have no coverage for losses resulting from certified acts of terrorism. I understand that if I exclude certified acts of terrorism coverage, coverage will not be available until my next renewal. |
|---|---|

_____
Policyholder/Applicant's Signature

_____
Print Name

_____
Date

State Auto Property and Casualty Insurance Co.
Insurance Company

PBP 2855775 01
Policy Number

41 - 0005590

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

(615) 371-5400

**PN 00 83 01 08 Page 2 of 2**
*//*PN0083-200801*

Case 2:21-cv-02744-JPM-atc   Document 34-2   Filed 06/03/22   Page 55 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775    01**

# YOUR  BUSINESS  POLICY  RENEWAL

## PLEASE  RETAIN  YOUR  ORIGINAL  POLICY  FOR
## A  COMPLETE  DESCRIPTION  OF  YOUR  COVERAGE

**STATE  AUTO  INSURANCE  COMPANIES**

**CG 676 04 95 Page** 1 of 1
*//*CG 676 04 95

Case 2:21-cv-02741-MSN-atc  Document 343-1  Filed 03/03/22  Page 56 of 538



**STATE AUTO**
Insurance Companies

**Thank you for allowing us to serve your insurance needs**

# STATE AUTO Claim Handlers:

Fair, Friendly and Fast

**State Auto is proud of the service we provide our policyholders when they have a claim. We hope you never have a claim but, if you do, we want to make it as painless and worry-free as possible. We're committed to providing service that's fast - as well as fair and friendly. In fact, we pledge to make an honest effort to contact you within two hours of the time we receive the report of your loss.\***

**Please notify your agent as soon as feasible if you have a claim. The sooner your agency knows about your loss, the sooner they can report it to us so we can begin working with you to handle the claim.**

\*   Although we always want to accomplish the two-hour contact time mentioned in our pledge - and we usually do call within that time period - we're sure you understand that may be impossible at certain unusual times such as when we're faced with a large weather-related catastrophe affecting many people in the same area.

**To report a claim:**
   *   **Call your agent or**
   *   **Call State Auto directly at 833-724-3577 (833-SAHELPS) or**
   *   **Report your claim on <u>StateAuto.com</u>**

**PN 02 39 07 07 Page 1 of 1**
*//*PN 02 39 07 07

0014235   Printed:
01/15/20   01:45:32

**STATE AUTO**
Insurance Companies

# LEGAL ADVICE LINE
# HELP FROM EMPLOYMENT ATTORNEYS IS A TOLL-FREE CALL AWAY

Making an employment decision that could put you at risk? Wondering how the new employment laws may affect you? Call **1-877-529-4375 (1-877-LAW-4EPL).**

The Legal Advice Line is a complimentary service exclusively for policyholders with our Employment Practices Liability (EPL) insurance program. Through this service, an experienced attorney - well-versed in federal and state employment laws - can give you general counsel on a range of employment issues, including:
*   Whether an employee may have a claim against you
*   Legal implications of decisions or actions you are considering
*   New employment laws and how they affect you
*   Other employment law-related questions

Prevention Is The Best Medicine.
Specialized employment defense lawyers can help you prevent employment-related claims and charges with advice on questions such as:
*   Hiring - essentials for every job applicant
*   Firing - what to do/not do
*   Discrimination - issues of age, race, gender or other forms of discrimination
*   Family and Medical Leave Act - who FMLA applies to
*   Sexual or other harassment - creating a harassment-free workplace
*   Performance reviews - what to cover

Call 1-877-529-4375 for Employment Legal Advice.
The Legal Advice Line **staff** will take note of your inquiry and **refer it** to an experienced employment attorney who will respond within the next business day. All communications are strictly confidential and subject to attorney-client privileges. There is no cost or obligation.

More Help Is Online.
Your EPL insurance program also provides you with complimentary access to StateAuto.EmployerProtection.net, an online employment-related website which features many resources to help you prevent employee charges and lawsuits.

Your Protection Against Conflict And Claims.
Today, you can't afford not to protect yourself from employee accusations and claims. The risks and stakes are too high. And, for you, the solution is simple. Use the materials at StateAuto.EmployerProtection.net. Give employees clear rules and procedures. Give your managers tools and training to treat employees fairly and consistently. And give yourself the proof of compliance and good faith efforts you'll need if an employee makes a claim.

Like most business owners, you're already worried about employee lawsuits.
Go to StateAuto.EmployerProtection.net.
Get help.
Get protection.
And get a better night's sleep.

This service is for general advice and guidelines on employment decisions but will not provide advice as to whether or not a personnel action should be taken regarding a particular person.

Case 2:21-cv-02741-JPM-atc  Document 34-1  Filed 05/03/22  Page 58 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775  01**

# ATTENTION POLICYHOLDER

### Notice of Premium Audit

When we issue a General Liability or Workers Compensation insurance coverage, we base its premiums on estimated values over the upcoming policy period, such as payroll, sales or the cost of work subcontracted to others. Throughout the policy period, the actual values may fluctuate from the amounts used to estimate the policy premium.

To determine the actual values developed over the policy period, we may conduct a premium audit at the end of the term by way of an accounting records review. This review may be by telephone, mail, or a physical examination of the business's accounting records by a State Auto representative.

Final premiums are then adjusted up or down, based on how the actual values compared to the originally estimated values.

**Here are some suggestions that can help make the premium audit process take as little of your time as possible, yet result in the most accurate calculation of your actual premium:**

1. Before your scheduled appointment with the auditor, have your payroll and sales records ready for review for the policy period being audited.

2. Payroll should include an itemized list of all employees and all labor used, and their payroll including overtime, commissions and bonuses for each job duty performed.

3. Sales include the total gross income from the sale and/or installation of goods you sold.

4. If you hire any subcontractors, be prepared to provide the names and the total cost of labor and materials used or delivered for use in the execution of work done by each contractor.

5. The auditor will also ask to review the liability certificates of insurance for the subcontractors doing work on your behalf.

We recommend you require certificates of insurance from all of your subcontractors and keep them on file. Not only can this practice help protect you from the financial consequences of losses caused by your subcontractors, it can also help you avoid potentially higher premium charges than if this important risk management control were not in place.

By maintaining proper accounting records and providing information as requested during the premium audit, you help to manage your overall insurance costs.

**Please contact your State Auto agent should you have any questions relating to your policy.**

Issue Date  01/14/2020         05:06:53 PM

0014237    Printed:
01/15/20   01:45:32

Case 2:21-cv-02474-JAR-TJJ   Document 34-2   Filed 03/03/22   Page 59 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775   01**

# ATTENTION CONTRACTORS - IT 'S TIME TO SAVE!

Protect yourself from needless costs and liabilities. Follow these important steps when working with subcontractors.

 **S** afety programs are essential for your subcontractors as well as your own employees.

For the safety of all workers on your job sites, it's essential that subcontractors observe the loss control regulations you've established for your business.

Make sure that the contracts you sign require your subcontractors to comply with all state safety requirements, as well as your own safety standards. The documents should also specify that if subcontractors in turn hire subcontractors, the latter must also comply.

Clearly state your own safety regulations within the contract. Be sure to describe the steps you will take if any subcontractor fails to correct an unsafe condition on the job. This way, everyone knows what's expected -- and what will happen if standards are not met.

 **A** greements with your subcontractors on their responsibilities should be entered into before work begins.

Hold-Harmless Agreements are an important form of protection for your business. When written in your favor, these legal documents confirm that your subcontractors will assume liability for Bodily Injury or Property Damage losses arising from their actions -- whether suffered by the public or by another contractor's employees on the job site.

Hold-Harmless Agreements are a vital supplement to Certificates of Insurance. These documents confirm that subcontractors are responsible for their own work -- as well as their own insurance protection. Make sure that both are received before your subcontractors begin their activities. Remember that these documents should certify protection for the full duration of the subcontractor's job.

 **V** erify insurance protection is secured by all subcontractors before work begins.

The subcontractors you hire should carry their own General Liability, Automobile Liability and Workers Compensation insurance. Their failure to do so can cost you in two ways:

' In many states, subcontractors who do not carry their own coverage are treated as your employees for insurance purposes. (Their employees would also be treated as part of your work force.) This may increase the cost of your General Liability and Workers Compensation insurance.

0014238   Printed:
01/15/20   01:45:32

' As general contractor, you may be held responsible for the work of your subcontractors. If they have no insurance, you may have to pay for Bodily Injury or Property Damage losses arising from their actions. State law may also require you to pay for injuries suffered by uninsured subcontractors or their employees, if these injuries occur on your job site.

Help prevent these problems by requiring that all subcontractors supply Certificates of Insurance for General Liability, Auto Liability and Workers Compensation coverages before they start work. File these documents in a secure place - - and check with subcontractors regularly to make certain coverage has not lapsed or been cancelled. Coverage must remain in force for the entire period your subcontractors will be on the job.

While we cannot suggest what limits will be adequate, the following may be used as a guideline. These are the minimum limits required to save you the cost of providing for your Subcontractors' protection under your coverage.

### Minimum General Liability Coverage

' $300,000  Products/Completed Operations Aggregate
' $300,000  General Aggregate
' $300,000  Any One Occurrence (Coverage A)
' $300,000  Any One Person or Organization (Coverage B)

**NOTE:** Your subcontractors' General Liability coverage must be written on an occurrence basis.

IF THE WORK BEING PERFORMED BY SUBCONTRACTORS IS UNUSUALLY HAZARDOUS, YOU SHOULD REQUIRE HIGHER GENERAL LIABILITY LIMITS. Your agent can help you establish the proper limits for greater-than-average exposures.

### Minimum Automobile Liability Coverage

$300,000  Each Accident

**NOTE:** Your subcontractors' Auto Liability coverage should be written to cover all owned and non-owned autos.

### Minimum Employers Liability Coverage
(Coverage "B" on the Workers Compensation Policy)

$100,000  Each Accident
$100,000  Each Employee for Injury by Disease
$500,000  Aggregate for Injury by Disease

**E** nter each job with the security of knowing you've protected yourself and your subcontractors.

Your agent will be glad to answer any questions you have about protection for you and your subcontractors. We encourage you to take these steps today to protect yourself and those who work for you.

Case 2:21-cv-02074-JPM-tmp   Document 34-1   Filed 06/03/22   Page 61 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775   01**

# IMPORTANT INFORMATION

This notice describes an additional benefit being provided to you as a State Auto policyholder with Data Compromise Plus coverage. Please review this document carefully and contact your agent if you have any questions.

### STATE AUTO INSURANCE IDENTITY RECOVERY HELP LINE

### 1-800-414-9783

This policy provides you access to the State Auto Insurance Identity Recovery Help Line. The identity recovery help line can provide individuals who qualify as an "identity recovery insured" with:

1) Information and advice for how to respond to a possible "identity theft"; and
2) Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.

An "identity recovery insured" means:
   a. An individual or sole proprietor when the policyholder is described as an Individual or Sole proprietor.
   b. The current partners when the policyholder is described as a partnership.
   c. All the individuals having 20% or more ownership interest for policyholders described as a corporation or other organization. However, if no one has an ownership position of 20% or more, then the" identity recovery insured" will be the chief executive officer or with respect to a religious institution, the senior ministerial employee.

**No coverage is provided by this notice nor can it be construed to replace any provision of your policy. This notice is only intended to bring more attention to this valuable service which is part of the Data Compromise Plus coverage you have elected to purcase. If there is any conflict between the policy and this summary, the provisions of the policy shall prevail.**

**Please refer to your policy for the actual terms, coverage amounts, conditions and exclusions. If you have any questions, or wish to increase or reduce your limits, please contact your independent State Auto Insurance agent.**

**PS 00 28 01 12 Page 1 of 1**
*//*PS0028-201201

**STATE AUTO**
Insurance Companies

**PBP  2855775   01**

## Be Prepared for a Data Breach!

## Check Out The eRisk Hub Risk Management Portal!

You've taken a great first step toward protecting your business from a data breach by purchasing a State Auto business insurance policy with our exclusive Data Compromise Plus coverage.

However, if your organization suffers a data breach, would you be prepared? As we all know from the news, even very large companies aren't always ready to respond. Yet, when a breach occurs, time is of the essence.

Now you can develop an effective data breach response plan in advance of a crisis that can help you be prepared, protect your customer relationships, and protect your business reputation.

As part of your Data Compromise Plus coverage, State Auto provides you an online data breach portal that equips you with a risk management tool to help you be prepared should a breach occur. There is no cost to you! This is a complimentary service to you as a State Auto Data Compromise Plus policyholder.

The portal is called **eRisk Hub**, and it's designed to help you better understand your risks and establish a response plan so you can minimize the financial effects of a data breach should one occur.

### Key Features of the eRisk Hub Portal

  * Incident Response Plan Roadmap - suggested steps to take following a data breach
  * Online Training Modules - ready-to-use training on privacy Best Practices and Red Flag Rules
  * Risk Management Tools - assist you in managing our cyber risk, including state notification laws
  * News Center - cyber risk and security news stories, helpful industry links, security blogs
  * Learning Center - Best Practices stories and webinars from leading cyber security experts
  * eRisk Resources - a directory to quickly find external resources on pre- and post-breach disciplines

### Register for eRisk Hub Now

To access the eRisk Hub portal, all you need to do is register and set up your unique User ID and Password. Just follow these steps:

  * Go to www.stateauto.com and click on Insurance at the top of the page. Next, select Business in the left menu box. Use the link on the right of the page titled **Data Compromise Plus**. From this page, click on the link **eRisk Hub** in the center of the page.
  * Complete the information in the center of the page, including your name and company. Please note that your User ID and Password are case-sensitive.
  * Enter your assigned **access code: 12116-4**.
  * Enter the challenge word on the screen and click "Submit".
  * You will get a "Registration Complete" message on the next screen. You can now login to the portal.

**PS 00 38 01 14  Page 1 of 1**
*//*PS0038-201401*

0014241    Printed:
01/15/20   01:45:32

Case 2:21-cv-02741-JTF-atc   Document 343-21   Filed 06/03/22   Page 63 of 538

**STATE AUTO**
Insurance Companies

PBP 2855775   01

## PREFERRED BUSINESS POLICY COMMON DECLARATIONS

| NAMED INSURED AND MAILING ADDRESS:<br>First Named Insured Is Specified To Be:<br><br>**TAYLOR FORTUNE GROUP TENNESSEE**<br>**LLC DBA: AND TF GROUP LLC**<br>**4633 SANFORD ST**<br>**METAIRIE, LA 70006** | AGENT NAME AND ADDRESS:<br>**ELITE INSURANCE SOLUTIONS**<br>**1894 GENERAL GEORGE PATTON DR**<br>**FRANKLIN, TN 37067** | |
|---|---|---|
| POLICY PERIOD:<br>**From: 02/05/2020   To: 02/05/2021** | AGENT TELEPHONE NUMBER:<br>**(615) 371-5400** | AGT. NO.<br>**0005590** |
| COVERAGE PROVIDED BY:<br>**State Auto Property and Casualty Insurance Co.** | A STATE AUTO INSURED SINCE:<br>**2019** | |
| AUDITABLE POLICY:<br>**Yes** | POLICY STATUS:<br>**Renewal** | AFTER-HOURS CLAIMS SERVICE:<br>**1-877-SA-CLAIM  or  www.stateauto.com** |

The coverage and these declarations are effective 12:01 AM Standard Time on **02/05/2020**   at the above mailing address.

| BUSINESS ENTITY TYPE:<br>**Ltd Liability Co** | BILLING ACCOUNT NUMBER:<br>**CB00652901**<br>**Eft Monthly** | BILLING QUESTIONS?<br>**Call 833-724-3577** |
|---|---|---|
| BUSINESS DESCRIPTION:   **Refrigeration** | | |

Upon valid payment of premium when due, these renewal declarations continue your policy for the period indicated. In return for the payment of the premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

### PREMIUM SUMMARY BY COVERAGE PARTS AND POLICIES

This policy consists of the following coverage parts or policies for which a premium is indicated. This premium may be subject to adjustment.

| COVERAGE PARTS | PREMIUMS |
|---|---|
| Commercial Property Coverage Part | $ |
| Commercial General Liability Coverage Part | $ |
| Employment Practices Liability Coverage Part | $ |

| SELF-CONTAINED POLICIES | |
|---|---|
| Commercial Umbrella Policy | $ |

| | |
|---|---|
| Terrorism (included in total below) | $ |
| POLICY TOTAL AT INCEPTION | $ |

These declarations together with the Common Policy Conditions and coverage form(s) and any endorsement(s) identified on these declarations and attached to your policy complete the above numbered policy.

**Countersigned** _____   **By** _____
(Date)                          (Authorized Representative)

Issue Date  01/14/2020        05:06:53 PM        **SI 50 00 (01/04)    Page 001 of 002**

**STATE AUTO**
Insurance Companies

# FORMS AND ENDORSEMENTS
## APPLICABLE TO ALL COVERAGE PARTS

| NEW | FORM OR ENDORSEMENT AND EDITION DATE | ENDORSEMENT TITLE (Only the endorsement titles are shown below, please review the form for a complete description of coverage.) |
|---|---|---|
| | SI 00 17 11 98 | Common Policy Conditions |
| | SI 10 08 01 16 | Common Policy Jacket |
| | SI 11 00 01 04 | Installment Payments |
| | IL 00 03 09 08 | Calculation of Premium |
| | IL 02 50 09 08 | Tennessee Changes - Cancellation and Nonrenewal |
| * | PN 00 83 01 15 | Notice of Terrorism Insurance Coverage |
| * | PN 00 83 01 08 | Notice of Terrorism Insurance Coverage |

*Indicates a new form has been added or a replacement form has been substituted for one of an earlier edition.  Please retain all forms.

Case 3:21-cv-00741-JPC   Document 343-4   Filed 03/03/22   Page 65 of 538

**STATE AUTO**
Insurance Companies

# COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

| DESCRIPTION OF PREMISES | Premises  0001      Building  001 |
|---|---|

| Building Address | Construction/Protection Class |
|---|---|
| 2940 Foster Creighton Dr<br>Nashville, TN 37204 | Construction: Modified Fire Resistive<br>Protection Class 04 |

| CLASS CODE | OCCUPANCY |
|---|---|
| 0567 | Contractor |

### COVERAGES PROVIDED

Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | DEDUCTIBLE | COINSURANCE % | LOSS PAYMENT BASIS | PREMIUM |
|---|---|---|---|---|---|---|
| Building | | | | | | |
| | $1,128,296<br>Inflation Guard:   4% | Special Form | $2,500 | 80% | Replacement Cost | $■ |
| | | Terrorism Insurance Coverage | | | | $■ |
| Business Personal Property | | | | | | |
| | $747,240<br>Inflation Guard:   4% | Special Form | $2,500 | 80% | Replacement Cost | $■ |
| | | Terrorism Insurance Coverage | | | | $■ |
| Business Income: Actual Loss Sustained; 12 month limitation | | | | | | |
| | | Special Form | | | | $■ |
| | Period of Restoration - 72 Hour Time Period is Eliminated | | | | | |
| | | Terrorism Insurance Coverage | | | | $■ |

Issue Date  01/14/2020          05:06:53 PM          **SP 50 01 (01/04)  Page  001  of 006**

Case 2:21-cv-02741-JPM-atc   Document 34-2   Filed 03/03/22   Page 66 of 538

# STATE AUTO
### Insurance Companies

**PBP  2855775    01**

# COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

| DESCRIPTION OF PREMISES | Premises  0002     Building  001 |
|---|---|

| Building Address | Construction/Protection Class |
|---|---|
| 5542 E Raines Rd<br>Memphis, TN 38115 | Construction: Joisted Masonry<br>Protection Class 02 |

| CLASS CODE | OCCUPANCY |
|---|---|
| 0567 | Contractor |

### COVERAGES PROVIDED

Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | DEDUCTIBLE | COINSURANCE % | LOSS PAYMENT BASIS | PREMIUM |
|---|---|---|---|---|---|---|
| Building | $1,060,409<br>Inflation Guard: 4% | Special Form | $2,500 | 80% | Replacement Cost | $█ |
|  |  | Terrorism Insurance Coverage |  |  |  | $█ |
| Business Personal Property | $663,728<br>Inflation Guard: 4% | Special Form | $2,500 | 80% | Replacement Cost | $█ |
|  |  | Terrorism Insurance Coverage |  |  |  | $█ |
| Business Income: Actual Loss Sustained; 12 month limitation |  | Special Form<br>Period of Restoration - 72 Hour Time Period is Eliminated |  |  |  | Included |

Issue Date  01/14/2020          05:06:53 PM          **SP 50 01 (01/04)  Page  002  of  006**

Case 3:21-cv-02741-HTW-LGI Document 34-2 Filed 06/03/22 Page 67 of 538

# STATE AUTO
## Insurance Companies

**PBP 2855775   01**

## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

| DESCRIPTION OF PREMISES | Premises 0003 | Building 001 |
|---|---|---|

### Building Address

517 Liberty Rd Ste 1
Flowood, MS 39232

### Construction/Protection Class

Construction: Joisted Masonry
Protection Class 03

| CLASS CODE | OCCUPANCY |
|---|---|
| 0567 | Contractor |

### COVERAGES PROVIDED

Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | DEDUCTIBLE | COINSURANCE % | LOSS PAYMENT BASIS | PREMIUM |
|---|---|---|---|---|---|---|
| Business Personal Property | $273,000 Inflation Guard: 4% | Special Form | $2,500 | 80% | Replacement Cost | $■ |
| | | Terrorism Insurance Coverage | | | | $■ |
| Business Income: Actual Loss Sustained; 12 month limitation | | Special Form Period of Restoration - 72 Hour Time Period is Eliminated | | | | Included |

| | |
|---|---|
| Terrorism (included in total below) | $■ |
| Total Property Premium | $■ |
| Premier Property Plus Endorsement | $■ |
| Total Commercial Property | $■ |

0014246    Printed:
01/15/20   01:45:32

STATE AUTO
Insurance Companies

PBP 2855775 01

# FORMS AND ENDORSEMENTS
## APPLICABLE TO THE COMMERCIAL PROPERTY COVERAGE PART

| NEW | FORM OR ENDORSEMENT AND EDITION DATE | ENDORSEMENT TITLE (Only the endorsement titles are shown below, please review the form for a complete description of coverage.) |
|---|---|---|
| | CP 00 90 07 88 | Commercial Property Conditions |
| | CP 01 40 07 06 | Exclusion of Loss Due to Virus or Bacteria |
| | CP 00 10 10 12 | Building and Personal Property Coverage Form |
| | IL 09 52 01 15 | Cap on losses from Certified Acts of Terrorism |
| | CP 10 30 10 12 | Causes of Loss-Special Form |
| | SP 10 07 10 16 | Premier Property Plus Endorsement |
| | CP 00 30 10 12 | Business Income (And Extra Expense) Coverage Form |
| | SP 00 15 01 05 | Business Income Changes |
| | CP 15 56 06 07 | Business Income Changes - Beginning Of The Period Of Restoration (No Waiting Period) |
| | IL 09 52 01 08 | Cap on losses from Certified Acts of Terrorism |
| | IL 02 82 09 08 | Mississippi Changes - Ca ncellation and Nonrenewal |
| | IL 01 19 10 12 | Mississippi Changes |
| * | IL 09 99 01 15 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| * | IL 09 96 01 07 | Conditional Exclusion of Terrorism |

*Indicates a new form has been added or a replacement form has been substituted for one of an earlier edition.  Please retain all forms.

Issue Date  01/14/2020          05:06:53 PM          **SP 50 01 (01/04)  Page  004  of  006**

0014247        Printed:
01/15/20     01:45:32

**STATE AUTO**
Insurance Companies

**PBP 2855775  01**

## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

The coverages provided are described in the coverage forms and endorsements attached to your policy and identified in these declarations.  The most we will pay for any one occurrence is the greatest of the applicable limit of insurance shown below. Higher limits shown below supersede limits for the same coverage described in the coverage forms and endorsements.

### Premier Property Plus Endorsement Schedule of Coverages Per SP 10 07

| OPTIONAL COVERAGES | LIMIT OF INSURANCE | PREMIUM |
|---|---|---|
| Accounts Receivable | $250,000 | Included |
| Additional Covered Property | Included | Included |
| Arson and Theft Reward | $50,000 | Included |
| Backup of Sewers and Drains | $500,000 | Included |
| Brands and Labels | Included | Included |
| Building Glass Damage - $500 deductible | Included | Included |
| Business Income and Extra Expense | $250,000 | Included |
| Business Income - Dependent Properties | $250,000 | Included |
| Business Personal Property - Seasonal Automatic Increase | 25% | Included |
| Claim Data Expense | $10,000 | Included |
| Computer Coverage | $50,000 | Included |
| Consequential Damage | $50,000 | Included |
| Credit Card Slips | $10,000 | Included |
| Debris Removal | $250,000 | Included |
| Difference in Value - Leased Equipment | Included | Included |
| Electronic Data | $25,000 | Included |
| Employee Theft | $25,000 | Included |
| Extended Business Income | 90 consecutive days | Included |
| (only if Business Income Coverage is endorsed) | | |
| Fine Arts (with breakage) | $50,000 | Included |
| Fire Department Service Charge | $50,000 | Included |
| Fire Extinguisher Recharge Expense | $10,000 | Included |
| Forgery or Alteration | $10,000 | Included |
| Inflation Guard - Buildings and Your Business Personal Property | 4% | Included |
| Lock Replacement | $10,000 | Included |
| Money Orders and Counterfeit Paper Currency | $10,000 | Included |
| Money and Securities | $25,000 In/$25,000 Out | Included |
| Newly Acquired or Constructed Property | | |
| (1) Building | $2,000,000 | Included |
| (2) Your Business Personal Property | $1,000,000 | Included |
| (3) Time Limitation | 90 Days | Included |
| Non Owned Detached Trailers | $50,000 | Included |
| Ordinance or Law: | | |
| Undamaged Portion (Coverage A) | Building Limit | Included |
| Debris Removal (Coverage B) | $500,000 | Included |
| Increased Cost of Construction (Coverage C) | $500,000 | Included |
| Outdoor Property - $2,500 for any one tree, shrub or plant: | $50,000 | Included |
| Outdoor Signs | $50,000 | Included |

(Continued On Next Page)

Issue Date  01/14/2020          05:06:53 PM                    SP 50 01 (01/04)  Page  005  of  006

0014248
01/15/20
01:45:32

**STATE AUTO**
Insurance Companies

**PBP 2855775   01**

# COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

The coverages provided are described in the coverage forms and endorsements attached to your policy and identified in these declarations. The most we will pay for any one occurrence is the greatest of the applicable limit of insurance shown below. Higher limits shown below supersede limits for the same coverage described in the coverage forms and endorsements.

### Premier Property Plus Endorsement Schedule of Coverages Per SP 10 07

| OPTIONAL COVERAGES | LIMIT OF INSURANCE | PREMIUM |
|---|---|---|
| Personal Effects and Property of Others | $50,000 | Included |
| Pollutant Clean Up and Removal | $100,000 | Included |
| Premises - Boundary | 1,000 feet | Included |
| Property Off-Premises | $100,000 | Included |
| Tenants Glass - $500 deductible | $15,000 | Included |
| Tenant Lease Obligation | $15,000 | Included |
| Utility Services - Direct Damage | $100,000 | Included |
| Utility Services - Time Element | $250,000 | Included |
| (only if Business Income Coverage is endorsed) | | |
| Valuation Provision | $5,000 or Less | Included |
| Valuable Papers and Records (Other Than Electronic Data) | $250,000 | Included |

**Terrorism (included in total below)**        **Included**
**Premier Property Plus Endorsement Premium**        $



Case 2:21-cv-02744-JPM-atc   Document 348-2   Filed 06/03/22   Page 29 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775   01**

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

| COMMERCIAL GENERAL LIABILITY COVERAGE LIMITS OF INSURANCE: |
|---|

| | | |
|---|---|---|
| Each Occurrence Limit | $1,000,000 | |
| Damage To Premises Rented To You Limit | $100,000 | Any One Premises |
| Medical Expense Limit | $5,000 | Any One Person |
| Personal And Advertising Injury Limit | $1,000,000 | Any One Person or Organization |
| General Aggregate Limit | $2,000,000 | |
| Products - Completed Operations Aggregate Limit | $2,000,000 | |

| AUDIT PERIOD |
|---|

Annual

0014250      Printed:
01/15/20   01:45:32

**STATE AUTO**
Insurance Companies

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

| SCHEDULE OF PREMISES - All Premises You Own, Rent or Occupy | PREMISES  0001 |
|---|---|

| Location Address | Territory |
|---|---|
| 2940 Foster Creighton Dr<br>Nashville, TN 37204 | 503 |

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 98636 | Refrigeration Systems Or Equipment-Dealers And Distributors And Installation, Servicing Or repair-Commercial |

| PREMIUM BASIS | $429,678 Payroll |
|---|---|

|  | Per | Premises/Operations | Products/Completed Operations |
|---|---|---|---|
| RATE | 1000 | $███ | $███ |
| ADVANCE PREMIUMS |  | $███ | $███ |

| SCHEDULE OF PREMISES - All Premises You Own, Rent or Occupy | PREMISES  0003 |
|---|---|

| Location Address | Territory |
|---|---|
| 517 Liberty Rd Ste 1<br>Flowood, MS 39232 | 001 |

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 98636 | Refrigeration Systems Or Equipment-Dealers And Distributors And Installation, Servicing Or repair-Commercial |

| PREMIUM BASIS | $120,000 Payroll |
|---|---|

|  | Per | Premises/Operations | Products/Completed Operations |
|---|---|---|---|
| RATE | 1000 | $███ | $███ |
| ADVANCE PREMIUMS |  | $███ | $███ |

0014251
01/15/20   01:45:32
Printed:



Case 22-cv-09274 HFB-SFC  Document 343-24  Filed 08/03/22  Page 73 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775   01**

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

| SCHEDULE OF PREMISES | Continued |
|---|---|

| LOCATION RATING CODE   9999 | TERRITORY   503 |
|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 49950 | Additional Insured - Owners, Lessees Or Contractors - Scheduled Person Or Organization |

| PREMIUM BASIS | 2 Addl Interest |
|---|---|

| | Per | Premises/Operations | Products/Completed Operations |
|---|---|---|---|
| RATE | 1 | $ ■ | |
| ADVANCE PREMIUMS | | $ ■ | |

| LOCATION RATING CODE   9999 | TERRITORY   503 |
|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 49950 | Notice Of Cancellation - Scheduled Party SI 10 21 |

| PREMIUM BASIS | 2 Addl Interest |
|---|---|

| | Per | Premises/Operations | Products/Completed Operations |
|---|---|---|---|
| RATE | 1 | $ ■ | |
| ADVANCE PREMIUMS | | $ ■ | |

| LOCATION RATING CODE   9999 | TERRITORY   503 |
|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 84000 | Liability Plus Endorsement (See SL 1202 Attached) |

| PREMIUM BASIS | % Of GL Premium | PREMIUM | $ ■ |
|---|---|---|---|



Case 22-31641-swe11 Doc 343-4 Filed 06/03/22 Page 74 of 538

**PBP 2855775   01**

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

| SCHEDULE OF PREMISES | Continued |
|---|---|

| LOCATION RATING CODE | 9999 | TERRITORY | 503 |
|---|---|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 84002 | Premier Liability Plus Endorsement (See SL 4000 Attached) |

| PREMIUM BASIS | % Of GL Premium | PREMIUM | $■ |
|---|---|---|---|

| LOCATION RATING CODE | 9999 | TERRITORY | 503 |
|---|---|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 84003 | Contractors Plus Endorsement (See SL 1011 Attached) |

| PREMIUM BASIS | % Of GL Premium | PREMIUM | $■ |
|---|---|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 25121 | Data Compromise Plus Coverage  $50,000 |

| PREMIUM BASIS | PER | RATE | ADVANCE PREMIUM |
|---|---|---|---|
| 1 Units | 1 | $■ | $■ |

| PREMIUM | |
|---|---|
| Terrorism (included in total below) | $■ |
| Total Advance Premium (Subject To Audit): | $■ |

**STATE AUTO**
Insurance Companies

PBP 2855775   01

# FORMS AND ENDORSEMENTS
## APPLICABLE TO THE COMMERCIAL GENERAL LIABILITY COVERAGE PART

| NEW | FORM OR ENDORSEMENT AND EDITION DATE | ENDORSEMENT TITLE (Only the endorsement titles are shown below, please review the form for a complete description of coverage.) |
|-----|--------------------------------------|--------------------------------------------------------------|
|     | IL 00 21 09 08 | Nuclear Energy Exclusion |
|     | CG 21 67 12 04 | Fungi or Bacteria Exclusion |
|     | CG 00 01 04 13 | Commercial General Liability Coverage Form |
|     | SL 20 04 01 06 | Exclusion - Lead Liability |
|     | SL 20 02 01 06 | Asbestos Exclusion |
|     | CG 24 26 04 13 | Amendment of Insured Contract Definition |
|     | CG 21 47 12 07 | Employment - Related Practices Exclusion |
|     | CG 21 06 05 14 | Exclusion - Access or Disclosure of Confidential or Personal Information And Data-related  Liability - With Limited Bodily Injury Exception Endorsement |
|     | IL 00 17 11 98 | Common Policy Conditions |
|     | CG 21 70 01 15 | Cap on Losses From Certified Acts of Terrorism |
|     | CG 21 76 01 15 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
|     | SL 20 51 12 11 | Amendment of Contractual Liability Exclusion |
|     | IL 02 82 09 08 | Mississippi Changes - Cancellation and Nonrenewal |
|     | SI 10 21 06 10 | Notice of Cancellation   And Nonrenewal Scheduled Party |
|     | SL 12 02 12 15 | Liability Plus Endorsement |
|     | SL 40 00 12 15 | Premier Liability Plus Endorsement |
|     | SL 10 11 12 15 | Contractors Plus Endorsement |
|     | SL 31 00 05 16 | Data Compromise Plus |
|     | CG 20 10 04 13 | Additional Insured - Owners, Lessees Or Contractors - Scheduled Person Or Organization |
| *   | IL 09 99 01 15 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| *   | CG 21 88 01 15 | Conditional Exclusion of Terrorism |

*Indicates a new form has been added or a replacement form has been substituted for one of an earlier edition.   Please retain all forms.



Case 3:21-cv-00741-L-BT  Document 43-24  Filed 06/03/22  Page 76 of 538

**PBP 2855775   01**

# ADDITIONAL  INTERESTS/INSUREDS
## COMMERCIAL GENERAL LIABILTY

| OTHER INTERESTS | TYPE | LOC/BLDG |
| --- | --- | --- |
| THE MERCHANTS COMPANY<br>MERCHANTS FOODSERVICE<br>P O BOX 1351<br>HATTIESBURG, MS 39403 | Notice of Cancellation - Scheduled Party | |
| WCP PROPERTIES,LLC<br>(SEE AML1) 1100 DR. MARTIN L<br>KING JR. BLVD, STE 300<br>NASHVILLE, TN 37203 | Notice of Cancellation - Scheduled Party | |
| THE MERCHANTS COMPANY<br>MERCHANTS FOODSERVICE<br>P O BOX 1351<br>HATTIESBURG, MS 39403 | Owners, Lessees, or Contractors | |
| CBRE INC<br>C/O GRMS<br>4447 N CENTRAL EXP STE 110-433<br>DALLAS, TX 75205 | Owners, Lessees, or Contractors | |

00142555
Printed:
01/15/20  01:45:32

**STATE AUTO**
Insurance Companies

**PBP 2855775   01**

# EMPLOYMENT PRACTICE LIABILITY COVERAGE PART DECLARATIONS

---

## NOTICE

**THIS IS A CLAIMS-MADE AND REPORTED POLICY. EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS EPL COVERAGE IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS OR SUITS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE EPL COVERAGE PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. VARIOUS PROVISIONS IN THIS EPL COVERAGE RESTRICT COVERAGE. PLEASE READ THE ENTIRE EPL COVERAGE FORM CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.**
**THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS UNDER THIS EPL COVERAGE SHALL BE REDUCED BY AMOUNTS INCURRED FOR DEFENSE COSTS. AMOUNTS INCURRED FOR DEFENSE COSTS SHALL BE APPLIED AGAINST THE DEDUCTIBLE AMOUNT.**

---

### EMPLOYMENT PRACTICES LIMITS OF INSURANCE

**THIS POLICY PROVIDES CLAIMS-MADE COVERAGE.  PLEASE READ THE ENTIRE POLICY CAREFULLY.**

| | | |
|---|---|---|
| Aggregate Limit | **$100,000** | Annual aggregate for all "loss" combined, including "defense costs". |
| Third Party Liability Coverage Premium (Optional): | **Included** | Coverage For "Third Party Violations Coverage" is Automatically Included. |
| Deductible Amount | **$2,500** | For "Loss" Arising From Claims or Suits Alleging The Same "Wrongful Employment Act" or "Related Wrongful Employment Acts". |

Employment Practices Coverage Retroactive Date: _____

If no date is shown above, "we" will consider the EPL Retroactive Date to be the date of organization of the "named insured".  The EPL Retroactive Date will remain the same through all subsequent renewals.  No change will be made to the EPL Retroactive Date unless at the sole request of the insured.

---

**STATE AUTO**
Insurance Companies

**PBP 2855775    01**

# EMPLOYMENT PRACTICE LIABILITY COVERAGE PART DECLARATIONS

| SCHEDULE OF PREMISES - All Premises You Own, Rent or Occupy | PREMISES  0001 |
|---|---|

| Location Address | Territory |
|---|---|
| 2940 Foster Creighton Dr<br>Nashville, TN 37204 | 503 |

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 24071 | Employment Practices Liability Insurance |

| PREMIUM BASIS | PER | ADVANCE PREMIUM |
|---|---|---|
| 20 Employees | 1 | $█████ |

| PREMIUM |
|---|
| Total Advance Premium:                              $█████ |

> This insurance does not apply to "loss" arising out of a "wrongful employment act" that arises out of incidents or circumstances of which "you" had knowledge prior to the effective date of this EPL Coverage or the first EPL Coverage Form issued by "us" of which this EPL Coverage is an uninterrupted renewal.

**STATE AUTO**
Insurance Companies

**PBP 2855775   01**

# FORMS AND ENDORSEMENTS
## APPLICABLE TO THE EMPLOYMENT PRACTICE LIABILITY COVERAGE PART

| NEW | FORM OR ENDORSEMENT AND EDITION DATE | ENDORSEMENT TITLE (Only the endorsement titles are shown below, please review the form for a complete description of coverage.) |
|---|---|---|
| | EP 24 12 01 14 | Employment Practices Risk Management Information |
| | EP 00 01 01 14 | Employment Practices Liability Insurance Coverage Part |
| | EP 40 04 03 14 | Nuclear Energy Liability and War Exclusion Endorsement |

0014258      Printed:
01/15/20    01:45:32

Case 2:21-cv-02474-JPM-atc   Document 34-1   Filed 06/03/22   Page 80 of 538

# STATE AUTO
## Insurance Companies

**PBP 2855775  01**

# COMMERCIAL UMBRELLA POLICY DECLARATIONS

| NAMED INSURED AND MAILING ADDRESS:<br>First Named Insured Is Specified To Be:<br>**TAYLOR FORTUNE GROUP TENNESSEE**<br>**LLC DBA: AND TF GROUP LLC**<br>**4633 SANFORD ST**<br>**METAIRIE, LA 70006** | AGENT NAME AND ADDRESS:<br>**ELITE INSURANCE SOLUTIONS**<br>**1894 GENERAL GEORGE PATTON DR**<br>**FRANKLIN, TN 37067** | |
|---|---|---|
| POLICY PERIOD:<br>**From: 02/05/2020   To: 02/05/2021** | AGENT TELEPHONE NUMBER:<br>**(615) 371-5400** | AGT. NO.<br>**0005590** |
| COVERAGE PROVIDED BY:<br>**State Auto Property and Casualty Insurance Co.** | A STATE AUTO INSURED SINCE:<br>**2019** | |

| AUDITABLE POLICY:<br>**No** | POLICY STATUS:<br>**Renewal** | AFTER-HOURS CLAIMS SERVICE:<br>**1-877-SA-CLAIM  or  www.stateauto.com** |
|---|---|---|

The coverage and these declarations are effective 12:01 AM Standard Time on **02/05/2020**    at the above mailing address.

| BUSINESS ENTITY TYPE:<br>**Ltd Liability Co** | BILLING ACCOUNT NUMBER:<br>**CB00652901**<br>**Eft Monthly** | BILLING QUESTIONS?<br>**Call 833-724-3577** |
|---|---|---|
| BUSINESS DESCRIPTION:  **Refrigeration** | | |

Upon valid payment of premium when due, these renewal declarations continue your policy for the period indicated. In return for the payment of the premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## PREMIUM SUMMARY BY COVERAGE PARTS AND POLICIES

This policy consists of the following coverage parts or policies for which a premium is indicated. This premium may be subject to adjustment.

| SELF-CONTAINED POLICIES | PREMIUMS |
|---|---|
| Commercial Umbrella Policy | $██████ |
| Terrorism (included in above amount) | **Included** |

These declarations together with the Common Policy Conditions and coverage form(s) and any endorsement(s) identified on these declarations and attached to your policy complete the above numbered policy.

**Countersigned** _____ **By** _____

(Date)                          (Authorized Representative)

Issue Date  01/14/2020          05:06:53 PM          **SU 50 00 (01/04)  Page 001 of 002**

0014260   Printed:
01/15/20  01:45:32

Case 3:21-cv-02674-JFC  Document 34-21  Filed 03/03/22  Page 82 of 538

**STATE AUTO**
Insurance Companies

# FORMS AND ENDORSEMENTS
## APPLICABLE TO ALL COMMERCIAL UMBRELLA POLICY

| NEW | FORM OR ENDORSEMENT AND EDITION DATE | ENDORSEMENT TITLE (Only the endorsement titles are shown below, please review the form for a complete description of coverage.) |
|---|---|---|
|  | CXS 00 01 12 15 | Commercial Umbrella Coverage Form |
|  | SI 10 08 01 16 | Common Policy Jacket |
|  | CXS 23 00 05 14 | Exclusion - Access or Disclosure of Confidential or Personal Information and Data-related Liab - Lmtd Bodily Except Not Incl |
|  | CXS 21 70 01 15 | Cap on Losses From Certified Acts of Terrorism |
|  | CXS 21 76 01 15 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
|  | CXS 00 41 07 98 | Tennessee Changes |
|  | CXS 30 01 07 98 | Following Form - Auto Liability |
|  | CXS 30 12 01 12 | Contractors Limitation |
| * | PN 00 83 01 15 | Notice of Terrorism Insurance Coverage |
| * | IL 09 99 01 15 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| * | CXS 21 88 01 15 | Conditional Exclusion of Terrorism |

*Indicates a new form has been added or a replacement form has been substituted for one of an earlier edition.  Please retain all forms.

0014261      Printed:
01/15/20  01:45:32

**PBP 2855775   01**

# COMMERCIAL UMBRELLA COVERAGE DECLARATIONS

## LIMIT OF INSURANCE:

| | |
|---|---|
| Policy Aggregate Limit | $2,000,000 |
| Self-Insured Retention | $0  Each Incident or Offense not Covered by Underlying Insurance |

## PREMIUM

\* Total Advance Premium (Subject To Audit):                                                                 $ 

Includes Terrorism Coverage Premium

## SCHEDULE OF UNDERLYING INSURANCE

### Auto Liability

Underlying Insurer:  State Auto Property and Casualty Insurance Co.

Policy Number:    BAP    2474813    01

Policy Period:    From: 02/05/2020    To:  02/05/2021

Limits of Liability

| Each Accident | $1,000,000 |
|---|---|

### General Liability

Underlying Insurer:  State Auto Property and Casualty Insurance Co.

Policy Number:    PBP    2855775    01

Policy Period:    From: 02/05/2020    To:  02/05/2021

Limits of Liability

| Each Occurrence | $1,000,000 |
|---|---|
| Personal and Advertising Injury | $1,000,000 |
| General Aggregate | $2,000,000 |
| Products/Completed Operations Aggregate | $2,000,000 |

0014262    Printed:
01/15/20  01:45:32


Insurance Companies

Case 2:21-cv-02744-JPR-SFC   Document 343-2   Filed 03/03/22   Page 84 of 538

**PBP 2855775  01**

# COMMERCIAL UMBRELLA COVERAGE DECLARATIONS

| SCHEDULE OF UNDERLYING INSURANCE | Continued |
|---|---|

**Employers Liability**

Underlying Insurer:  TRAVELERS

Policy Number:  UB-3K752335-18

Policy Period:  From: 02/05/2020    To:  02/05/2021

Limits of Liability

| | |
|---|---|
| Bodily Injury Each Accident | $1,000,000 |
| Bodily Injury By Disease Policy Limit | $1,000,000 |
| Bodily Injury By Disease Each Employee | $1,000,000 |

00142&3          Printed:
01/15/20  01:45:32

# STATE AUTO
## Insurance Companies

**PBP 2855775    01**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

**DISCLOSURE OF PREMIUM AND ESTIMATED PREMIUM
FOR CERTIFIED ACTS OF TERRORISM COVERAGE
(PURSUANT TO TERRORISM RISK INSURANCE ACT)**

**SCHEDULE**

---

**SCHEDULE - PART I**
**Terrorism Premium (Certified Acts)**
**(A) Premium through end of year (12/31/        ) $**
**(B) Estimated Premium beyond the date specified above  $ Included in (A) above**
(Refer to Paragraph **D**. in this endorsement.)
**This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):**

All Coverage Parts shown on the declarations for which a Terrorism Premium is shown.

**Additional information, if any, concerning the terrorism premium:**

The premium shown in (A) above includes the:

a. Premium from the Effective Date through 12/31/2020; and

b. 1/1/2021 through the Expiration Date.

---

**SCHEDULE - PART II**
**Federal share of terrorism losses  _81_  % Year: 20    19**
(Refer to Paragraph **B**. in this endorsement.)

**Federal share of terrorism losses  _80_  % Year: 20    20**
(Refer to Paragraph **B**. in this endorsement.)

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

---

**IL0999 (01/15) Page 1 of 2**
*//*IL0999-201501

*d*  Insurance Services Office, Inc., 2015

Issue Date  01/14/2020        05:06:53 PM

0014264    Printed:
01/15/20    01:45:32

STATE AUTO
Insurance Companies

**PBP 2855775 01**

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**D. Possibility Of Additional Or Return Premium**

The premium for certified acts of terrorism coverage is calculated based in part on the federal participation in payment of terrorism losses as set forth in the Terrorism Risk Insurance Act. The federal program established by the Act is scheduled to terminate at the end of the year specified in Part **I** of the Schedule of this endorsement, unless extended by the federal government. If the federal program terminates or if the level or terms of federal participation change, the estimated premium shown in **(B)** in Part **I** of the Schedule may not be appropriate.

If this policy contains a Conditional Exclusion, continuation of coverage for certified acts of terrorism, or termination of such coverage, will be determined upon disposition of the federal program, subject to the terms and conditions of the Conditional Exclusion. If this policy does not contain a Conditional Exclusion, coverage for certified acts of terrorism will continue. In either case, when disposition of the federal program is determined, we will recalculate the premium shown in **(B)** in Part **I** of the Schedule and will charge additional premium or refund excess premium, if indicated.

If we notify you of an additional premium charge, the additional premium will be due as specified in such notice.

**IL0999 (01/15) Page 2 of 2**

*//*IL0999-201501

*d* Insurance Services Office, Inc., 2015

**STATE AUTO**
Insurance Companies

**PBP  2855775    01**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DATA COMPROMISE PLUS

**RESPONSE EXPENSES
DEFENSE AND LIABILITY
IDENTITY RECOVERY**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Coverage under this endorsement is subject to the following:

### SCHEDULE

**SECTION 1 - RESPONSE EXPENSES**

| | |
|---|---|
| Data Compromise Response Expenses Limit: | $50,000    Annual Aggregate |

Sublimits:

| | |
|---|---|
| Named Malware (Sec. 1) | $50,000 Any one "Personal Data Compromise" |
| Forensic IT Review: | $ 5,000 Any one "Personal Data Compromise" |
| Legal Review: | $ 5,000 Any one "Personal Data Compromise" |
| PR Services: | $ 5,000 Any one "Personal Data Compromise" |
| Regulatory Fines And Penalties | $10,000 Any one "Personal Data Compromise" |
| PCI Fines And Penalties | $10,000 Any one "Personal Data Compromise" |
| Response Expenses Deductible: | $2,500 Any one "Personal Data Compromise" |

**SECTION 2 - DEFENSE AND LIABILITY**

| | |
|---|---|
| Data Compromise Defense and Liability Limit: | $50,000    Annual Aggregate |

Sublimit:

| | |
|---|---|
| Named Malware (Sec. 2) | $50,000 Any one "Personal Data Compromise" |
| Defense and Liability Deductible: | $2,500    Each "Data Compromise Suit" |

**SECTION 3 - IDENTITY RECOVERY**

| | |
|---|---|
| Case Management Service: | Service for any one "identity theft" for up to 12 months |
| Expense Reimbursement Limit: | $15,000 Annual Aggregate |
| Expense Reimbursement Deductible: | $250 Any one "identity recovery insured" |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** The following is added to **SECTION I - COVERAGES** as an Additional Coverage.
**SECTION 1 - RESPONSE EXPENSES**
**DATA COMPROMISE COVERED CAUSE OF LOSS**
Coverage under this Data Compromise Plus Coverage endorsement applies only if all of the following conditions are met:
**1.** There has been a "personal data compromise"; and
**2.** Such "personal data compromise" is first discovered by you during the policy period for which this Data Compromise Plus Coverage endorsement is applicable; and
**3.** Such "personal data compromise" is reported to us within 60 days after the date it is first discovered by you.

**COVERAGE - SECTION 1**
If the three conditions listed above in DATA COMPROMISE - COVERED CAUSE OF LOSS have been met, then we will provide coverage for the following expenses when they arise directly from the covered cause of loss and are necessary and reasonable. Coverages **4** and **5** apply only if there has been a notification of the "personal data compromise" to "affected individuals" as covered under coverage **3.**
Please note that service providers must be approved by us as described in Additional Condition **6. - Service Providers.**

**SL3100 (05/16) Page 1 of 11**
*//*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

Case 2:21-cv-02743-TLP-tmp   Document 43-24   Filed 03/03/22   Page 86 of 538

STATE AUTO
Insurance Companies

**PBP 2855775   01**

1. **Forensic Information Technology Review**
Professional information technologies review if needed to determine, within the constraints of what is possible and reasonable, the nature and extent of the "personal data compromise" and the number and identities of the "affected individuals".

This does not include costs to analyze, research or determine any of the following:
**a.** Vulnerabilities in systems, procedures or physical security;
**b.** Compliance with PCI or other industry security standards; or
**c.** The nature or extent of loss or damage to data that is not "personally identifying information" or "personally sensitive information".
If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for costs covered under Forensic Information Technology Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs.

2. **Legal Review**
Professional legal counsel review of the "personal data compromise" and how you should best respond to it.
If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for costs covered under Legal Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs.

3. **Notification to "Affected Individuals"**
We will pay your necessary and reasonable costs to provide notification of the "personal data compromise" to "affected individuals".

4. **Services to "Affected Individuals"**
We will pay your necessary and reasonable costs to provide the following services to "affected individuals".
**a.** The following services apply to any "personal data compromise".
   **1)** Informational Materials
   A packet of loss prevention and customer support information.
   **2)** Help Line
   A toll-free telephone line for "affected individuals" with questions about the "personal data compromise". Where applicable, the line can also be used to request additional services as listed in **b.1)** and **2)**
**b.** The following additional services apply to "personal data compromise" events involving "personally identifying information".
   **1)** Credit Report and Monitoring
   A credit report and an electronic service automatically monitoring for activities affecting an individual's credit records. This service is subject to the "affected individual" enrolling for this service with the designated service provider.
   **2)** Identity Restoration Case Management
   As respects any "affected individual" who is or appears to be a victim of an "identity theft" that may reasonably have arisen from the "personal data compromise", the services of an identity restoration professional who will assist that "affected individual" through the process of correcting credit and other records and, within the constraints of what is possible and reasonable, restoring control over his or her personal identity.

5. **PR Services**
Professional public relations firm review of and response to the potential impact of the "personal data compromise" on your business relationships.
This includes costs to implement public relations recommendations of such firm. This may include advertising and special promotions designed to retain your relationship with "affected individuals". However, we will not pay for promotions:
**a.** Provided to any of your directors or employees; or
**b.** Costing more than $25 per "affected individual".

6. **Regulatory Fines and Penalties**
Any fine or penalty imposed under state law, to the extent such fine or penalty is legally insurable.

*//*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

Issue Date  01/14/2020      05:06:53 PM

0014267   Printed:
01/15/20   01:45:32

**7. PCI Fines and Penalties**

Any Payment Card Industry (PCI) fine or penalty imposed under a contract to which you are a party. PCI Fines and Penalties do not include any increased transaction costs.

For the purpose of the **Section 1** coverage under this endorsement only, the following replaces **SECTION III - LIMITS OF INSURANCE**

**LIMITS - SECTION 1**

**1.** The most we will pay under Response Expenses coverage is the Data Compromise Response Expenses Limit indicated for this endorsement.

**2.** The Data Compromise Response Expenses Limit is an annual aggregate limit. This amount is the most we will pay for the total of all loss covered under **Section 1** arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events discovered by you during that period.

**3.** A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" will be subject to the Data Compromise Response Expenses Limit applicable to the policy period when the "personal data compromise" was first discovered by you.

**4.** The most we will pay under Response Expenses coverage for loss arising from any "malware-related compromise" is the Named Malware (Sec. 1) sublimit indicated for this endorsement. For the purpose of the Named Malware (Sec. 1) sublimit, all "malware-related compromises" that are caused, enabled or abetted by the same virus or other malicious code are considered to be a single "personal data compromise".

**5.** The most we will pay under Forensic IT Review, Legal Review, PR Services, Regulatory Fines and Penalties, PCI Fines and Penalties coverages for loss arising from any one "personal data compromise" is the applicable sublimit for each of those coverages indicated for this endorsement. These sublimits are part of, and not in addition to, the Data Compromise Response Expenses Limit. PR Services coverage is also subject to a limit per "affected individual" as described in **5. PR Services.**

**6.** Coverage for Services to "affected individuals" is limited to costs to provide such services for a period of up to one year from the date of the notification to the "affected individuals". Notwithstanding, coverage for Identity Restoration Case Management services initiated within such one year period may continue for a period of up to one year from the date such Identity Restoration Case Management services are initiated.

**DEDUCTIBLE - SECTION 1**

Response Expenses coverage is subject to the Response Expenses Deductible indicated for this endorsement. You will be responsible for such deductible amount as respects each "personal data compromise" covered under this endorsement.

**B.** The following is added to **SECTION I - COVERAGES** as an Additional Coverage.

**SECTION 2 - DEFENSE AND LIABILITY**

**DEFENSE AND LIABILITY COVERED CAUSE OF LOSS**

Coverage under **Section 1** and **Section 2** of this Data Compromise Plus Coverage endorsement applies only if all three of the conditions in DATA COMPROMISE - COVERED CAUSE OF LOSS are met.

Only with regard to **Section 2 - Defense and Liability** coverage, the following conditions must also be met:

**1.** You have provided notifications and services to "affected individuals" in consultation with us pursuant to Response Expenses coverage; and

**2.** You receive notice of a "data compromise suit" brought by one or more "affected individuals" or by a governmental entity on behalf of one or more "affected individuals"; and

**3.** Notice of such "data compromise suit" is received by you within two years of the date that the "affected individuals" are notified of the "personal data compromise"; and

**4.** Such "data compromise suit" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first received by you.

**COVERAGE - SECTION 2**

If all four of the conditions listed above in DEFENSE AND LIABILITY - COVERED CAUSE OF LOSS have been met, then we will provide coverage for "data compromise defense" and "data compromise liability" directly arising from the covered cause of loss.

For the purpose of the **Section 2** coverage under this endorsement only, the following replaces **SECTION III - LIMITS OF INSURANCE**

**SL3100 (05/16) Page 3 of 11**

*//*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**STATE AUTO**
Insurance Companies

## LIMITS - SECTION 2

1. The most we will pay under **Section 2** - Defense and Liability coverage (other than post-judgment interest) is the Data Compromise Defense and Liability Limit indicated for this endorsement.
2. The Data Compromise Defense and Liability Limit is an annual aggregate limit. This amount is the most we will pay for all loss covered under **Section 2** (other than post-judgment interest) arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events discovered by you during that period.
3. A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" (other than post-judgment interest) will be subject to the Data Compromise Defense and Liability Limit applicable to the policy period when the "personal data compromise" was first discovered by you.
4. The most we will pay under Defense and Liability coverage for loss arising from any "malware-related compromise" is the Named Malware (Sec. 2) sublimit indicated for this endorsement. For the purpose of the Named Malware (Sec. 2) sublimit, all "malware-related compromises" that are caused, enabled or abetted by the same virus or other malicious code are considered to be a single "personal data compromise". This sublimit is part of, and not in addition to, the Defense and Liability Limit.

## DEDUCTIBLE - SECTION 2

Defense and Liability coverage is subject to the Defense and Liability Deductible indicated for this endorsement. You will be responsible for such deductible amount as respects each "data compromise suit" covered under this endorsement.

For the purpose of the **Section 1** and **Section 2** coverage under this endorsement only, the following additional exclusions apply to Paragraph **2. Exclusions** under **SECTION I - COVERAGES:**

## EXCLUSIONS - SECTION 1 AND SECTION 2

We will not pay for cost arising from the following:

1. Your intentional or willful complicity in a "personal data compromise";
2. Any criminal, fraudulent or dishonest act, error or omission, or any intentional or knowing violation of the law by you;
3. Any "personal data compromise" occurring prior to the first inception of this Data Compromise Plus Coverage endorsement or any substantially similar to that described in this endorsement;
4. Cost to research or correct any deficiency. This includes, but is not limited to, any deficiency in your systems, procedure or physical security that may have contributed to a "personal data compromise";
5. Any fines or penalties imposed under federal law including, but not limited to, HIPAA fines and penalties;
6. Any criminal investigations or proceedings;
7. Any extortion or blackmail. This includes, but is not limited to, ransom payments and private security assistance;
8. Any "personal data compromise" involving data that is being transmitted electronically, unless such data is encrypted to protect the security of the transmission;
9. Your reckless disregard for the security of "personally identifying information" or "personally sensitive information" in your care, custody, or control;
10. That part of any "data compromise suit" seeking any non-monetary relief; or
11. "Bodily injury", "property damage" or "personal and advertising injury".
12. Any amount not insurable under applicable law.

For the purpose of the **Section 1** and **Section 2** coverage under this endorsement only, **SUPPLEMENTARY PAYMENTS** under **SECTION I - COVERAGES** do not apply.

For the purpose of the **Section 1** and **Section 2** coverage under this endorsement only, subparagraphs **2.b.** and **3.** of **SECTION II - WHO IS AN INSURED** do not apply.

For the purpose of the **Section 1** and **Section 2** coverage under this endorsement only, the following is added to **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:**

## ADDITIONAL CONDITIONS - SECTION 1 AND SECTION 2

1. **"Data Compromise Liability" Defense**
   a. We will have the right, and the duty to assume the defense of any applicable "data compromise suit" against you. You will give us such information and cooperation as we may reasonably require.
   b. You will not admit liability for or settle any "data compromise suit" or incur any defense costs without our prior written consent.

**SL3100 (05/16) Page 4 of 11**
*//*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

c. If you refuse to consent to any settlement recommended by us and acceptable to the claimant, we may then withdraw from your defense by tendering control of the defense to you. From that point forward, you will, at your own expense, negotiate or defend such "data compromise suit" independently of us. Our liability will not exceed the amount for which the claim or suit could have been settled if such recommendation was consented to, plus defense costs incurred by us, and defense costs incurred by you with our written consent, prior to the date of such refusal.

d. We will not be obligated to pay any damages or defense costs, or to defend or continue to defend any "data compromise suit" after the Data Compromise Defense and Liability Limit has been exhausted.

e. We shall pay all interest on that amount of any judgment within the Data Compromise Defense and Liability Limit which accrues:

1) after entry of judgment; and

2) before we pay, offer to pay or deposit in court that part of the judgment within the Data Compromise Defense and Liability Limit or, in any case, before we pay or offer to pay the entire Data Compromise Defense and Liability Limit.

These interest payments shall be in addition to and not part of the Data Compromise Defense and Liability Limit.

2. **Duties in the Event of a "Data Compromise Suit"**

a. If a "data compromise suit" is brought against you, you must:

(1) Immediately record the specifics of the "data compromise suit" and the date received;

(2) Provide us with written notice, as soon as practicable, but in no event more than 60 days after the date the "data compromise suit" is first received by you;

(3) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "data compromise suit";

(4) Authorize us to obtain records and other information;

(5) Cooperate with us in the investigation, settlement or defense of the "data compromise suit";

(6) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of loss to which this insurance may also apply; and

(7) Take no action, or fail to take any required action, that prejudices your rights or our rights with respect to such "data compromise suit".

b. You may not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our prior written consent.

c. If you become aware of a claim or complaint that may become a "data compromise suit", you will promptly inform us of such claim or complaint.

3. **Due Diligence**

You agree to use due diligence to prevent and mitigate costs covered under this endorsement. This includes, but is not limited to, complying with, and requiring your vendors to comply with, reasonable and industry-accepted protocols for:

a. Providing and maintaining appropriate physical security for your premises, computer systems and hard copy files;

b. Providing and maintaining appropriate computer and Internet security;

c. Maintaining and updating at appropriate intervals backups of computer data;

d. Protecting transactions, such as processing credit card, debit card and check payments; and

e. Appropriate disposal of files containing "personally identifying information" or "personally sensitive information" including shredding hard copy files and destroying physical media used to store electronic data.

4. **Legal Advice**

We are not your legal advisor. Our determination of what is or is not covered under this Data Compromise Plus Coverage endorsement does not represent advice or counsel from us about what you should or should not do.

5. **Pre-Notification Consultation**

You agree to consult with us prior to the issuance of notification to "affected individuals". We assume no responsibility under this Data Compromise Plus Coverage for any services promised to "affected individuals" without our prior agreement. If possible, this pre-notification consultation will also include the designated service provider(s) as agreed to under Additional Condition **6. Service Providers**. You must provide the following at our pre-notification consultation with you:

a. The exact list of "affected individuals" to be notified, including contact information;

b. Information about the "personal data compromise" that may appropriately be communicated with "affected individuals"; and

**SL3100 (05/16) Page 5 of** 11
*//*SL3100-201605

**d** 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

STATE AUTO
Insurance Companies

   c. The scope of services that you desire for the "affected individuals". For example, coverage may be structured to provide fewer services in order to make those services available to more "affected individuals" without exceeding the available Response Expenses Limit.

**6. Service Providers**

   **a.** We will only pay under this Data Compromise Plus Coverage for services that are provided by service providers approved by us. You must obtain our prior approval for any service provider whose expenses you want covered under this Data Compromise Plus Coverage. We will not unreasonably withhold such approval.

   **b.** Prior to the Pre-Notification Consultation described in Additional Condition **5.** above, you must come to agreement with us regarding the service provider(s) to be used for the notification to **"Affected Individuals"** and services to **"Affected Individuals"**. We will suggest a service provider; however, if you prefer to use an alternate service provider, our coverage is subject to the following limitations:

      **(1)** Such alternate service provider must be approved by us;

      **(2)** Such alternate service provider must provide services that are reasonably equivalent or superior in both kind and quality to the services that would have been provided by the service provider we had suggested; and

      **(3)** Our payment for services provided by any alternate service provider will not exceed the amount that we would have paid using the service provider we had suggested.

**7. Services**

The following conditions apply as respects any services provided to you or any "affected individual" by us, our designees or any service firm paid for in whole or in part under this Data Compromise Plus coverage:

   **a.** The effectiveness of such services depends on your cooperation and assistance;

   **b.** All services may not be available or applicable to all individuals. For example, "affected individuals" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions;

   **c.** We do not warrant or guarantee that the services will end or eliminate all problems associated with the covered events; and

   **d.** You will have a direct relationship with the professional service firms paid for in whole or in part under this coverage. Those firms work for you.

For the purpose of the **Section 1** and **Section 2** coverage under this endorsement only, the following is added to **SECTION V - DEFINITIONS:**

**DEFINITIONS - SECTION 1 AND SECTION 2**

**1.** "Affected individual" means any person who is your current, former or prospective customer, client, member, owner, director or employee and whose "personally identifying information" or "personally sensitive information" is lost, stolen, accidentally released or accidentally published by a "personal data compromise" covered under this endorsement. This definition is subject to the following provisions:

   **a.** "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual";

   **b.** An "affected individual" must have a direct relationship with your interests as insured under this policy. The following are examples of individuals who would not meet this requirement:

      **1)** If you aggregate or sell information about individuals as part of your business, the individuals about whom you keep such information do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours;

      **2)** If you store, process, transmit or transport records, the individuals whose "personally identifying information" or "personally sensitive information" you are storing, processing, transmitting or transporting for another entity do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours; or

      **3)** You may have operations, interests or properties that are not insured under this policy. Individuals who have a relationship with you through such other operations, interests or properties do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of the operation insured under this policy; and

   **c.** An "affected individual" may reside anywhere in the world.

**SL3100 (05/16) Page 6 of 11**

*/*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**2.** "Data Compromise Defense Costs" means expenses resulting solely from the investigation, defense and appeal of any "data compromise suit" against you. Such expenses must be reasonable and necessary. They will be incurred by us. They do not include your salaries or your loss of earnings. They do include premiums for any appeal bond, attachment bond or similar bond, but we have no obligation to apply for or furnish any such bond.

**3.** "Data Compromise Liability"

    **a.** "Data compromise liability" means the following, when they arise from a "data compromise suit":

        **1)** Damages, judgments or settlements to "affected individuals";

        **2)** Defense costs added to that part of any judgment paid by us, when such defense costs are awarded by law or by court order; and

        **3)** Pre-judgment interest on that part of any judgment paid by us.

    **b.** "Data compromise liability" does not mean:

        **1)** Damages, judgments or settlements to anyone who is not an "affected individual";

        **2)** Civil or criminal fines or penalties imposed by law;

        **3)** Punitive or exemplary damages;

        **4)** The multiplied portion of multiplied damages;

        **5)** Taxes; or

        **6)** Matters which may be deemed uninsurable under the applicable law.

**4.** "Data Compromise Suit"

    **a.** "Data Compromise Suit" means a civil proceeding in which damages to one or more "affected individuals" arising from a "personal data compromise" or the violation of a governmental statute or regulation are alleged. Such proceeding must be brought in the United States of America, Puerto Rico or Canada. "Data compromise suit" includes:

        **1)** An arbitration proceeding in which such damages are claimed, and to which you must submit or do submit with our consent;

        **2)** Any other alternative dispute resolution proceeding in which such damages are claimed, and to which you submit with our consent; or

        **3)** A written demand for money, when such demand could reasonably result in a civil proceeding as described in this definition.

    **b.** "Data compromise suit" does not mean any demand or action brought by or on behalf of someone who is:

        **1)** Your director or officer;

        **2)** Your owner or part-owner; or

        **3)** A holder of your securities;

    in their capacity as such, whether directly, derivatively, or by class action. "Data compromise suit" will include proceedings brought by such individuals in their capacity as "affected individuals", but only to the extent that the damages claimed are the same as would apply to any other "affected individual".

    **c.** "Data compromise suit" does not mean any demand or action brought by an organization, business, institution, or any other party that is not an "affected individual" or governmental entity. "Data compromise suit" does not mean any demand or action brought on behalf of an organization, business, institution, governmental entity or any other party that is not an "affected individual".

**5.** "Identity Theft" means the fraudulent use of "personally identifying information". This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts or commit crimes. "Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

**6.** "Malware-Related Compromise" means a "personal data compromise" that is caused, enabled or abetted by a virus or other malicious code that, at the time of the "personal data compromise", is named and recognized by the CERT*E* Coordination Center, McAfee*E*, Secunia, Symantec or other comparable third party monitors of malicious code activity.

**7.** "Personal Data Compromise" means the loss, theft, accidental release or accidental publication of "personally identifying information" or "personally sensitive information" as respects one or more "affected individuals". If the loss, theft, accidental release or accidental publication involves "personally identifying information", such loss theft, accidental release or accidental publication must result in, or have the reasonable possibility of resulting in, the fraudulent use of such information. This definition is subject to the following provisions:

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**a.** At the time of the loss, theft, accidental release or accidental publication, the "personally identifying information" or "personally sensitive information" need not be at the insured premises but must be in your direct care, custody or control of:
   **1)** You; or
   **2)** A professional entity with which you have a direct relationship and to which you (or an "affected individual" at your direction) have turned over (directly or via a professional transmission or transportation provider) such information for storage, processing, transmission or transportation of such information.

**b.** "Personal data compromise" includes disposal or abandonment of "personally identifying information" or "personally sensitive information" without appropriate safeguards such as shredding or destruction, subject to the following provisions:
   **1)** The failure to use appropriate safeguards must be accidental and not reckless or deliberate; and
   **2)** Such disposal or abandonment must take place during the time period for which this Data Compromise Plus Coverage endorsement is effective;

**c.** "Personal data compromise" includes situations where there is a reasonable cause to suspect that such "personally identifying information" or "personally sensitive information" has been lost, stolen, accidentally released or accidentally published, even if there is no firm proof; and

**d.** All incidents of "personal data compromise" that are discovered at the same time or arise from the same cause will be considered one "personal data compromise".

**8.** "Personally identifying information" means information, including health information, which could be used to commit fraud or other illegal activity involving the credit, access to health care, or identity of an "affected individual". This includes but is not limited to Social Security numbers or account numbers.
"Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses.

**9.** "Personally Sensitive Information" means private information specific to an individual the release of which requires notification of "affected individuals" under any applicable law.
"Personally sensitive information" does not mean or include "personally identifying information".

**C.** The following is added to **SECTION I - COVERAGES** as an Additional Coverage.

**SECTION 3 - IDENTITY RECOVERY COVERAGE**
**COVERAGE - SECTION 3**
We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met:

**1.** There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this policy; and

**2.** Such "identity theft" is first discovered by the "identity recovery insured" during the policy period for which this Identity Recovery Coverage is applicable; and

**3.** Such "identity theft" is reported to us within 60 days after the date it is first discovered by the "identity recovery insured".

If all three of the requirements listed above have been met, then we will provide the following to the "identity recovery insured":

**1. Case Management Service**
Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

**2. Expense Reimbursement**
Reimbursement of necessary and reasonable "identity recovery expenses" incurred as a direct result of the "identity theft".

For the purpose of the **Section 3** coverage under this endorsement only, the following is added to Paragraph **2. Exclusions** under **SECTION I - COVERAGES:**

**EXCLUSIONS - SECTION 3**
We do not cover loss or expense arising from any of the following:

**1.** The theft of a professional or business identity;

**2.** Any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured", whether acting alone or in collusion with others. However, this exclusion will not apply to the interests of an "identity recovery insured" who has no knowledge of or involvement in such fraud, dishonesty or criminal act; or

**3.** An "identity theft" that is not reported in writing to the police.

For the purpose of the **Section 3** coverage under this endorsement only, **SUPPLEMENTARY PAYMENTS** under **SECTION I - COVERAGES** do not apply:

For the purpose of the **Section 3** coverage under this endorsement only, the following replaces **SECTION III - LIMITS OF INSURANCE**

**SL3100 (05/16) Page 8 of 11**
*/*SL3100-201605

**d** 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

STATE AUTO
Insurance Companies

## LIMITS - SECTION 3
1. Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement Coverage.
2. Expense Reimbursement Coverage is subject to the Expense Reimbursement Limit indicated for this endorsement. The Expense Reimbursement Limit is an annual aggregate limit per "identity recovery insured". Regardless of the number of claims, this limit is the most we will pay for the total of all loss or expense arising out of all "identity thefts" to any one "identity recovery insured" which are first discovered by the "identity recovery insured" during a 12 month period starting with the beginning of the present annual policy
period. If an "identity theft" is first discovered in one policy period and continues into other policy periods, all loss and expense arising from such "identity theft" will be subject to the aggregate limit applicable to the policy period when the "identity theft" was first discovered.
3. Legal costs as provided under item **d.** of the definition of "identity recovery expenses" are part of, and not in addition to, the Expense Reimbursement Coverage limit.
4. Item **e.** (Lost Wages) and item **f.** (Child Elder Care Expenses) of the definition of "identity recovery expenses" are jointly subject to a sublimit of $5,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".
5. Item **g.** (Mental Health Counseling) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to counseling that takes place within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".
6. Item **h.** (Miscellaneous Unnamed Costs) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to costs incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".

## DEDUCTIBLE - SECTION 3
1. Case Management Service is not subject to a deductible.
2. Expense Reimbursement Coverage is subject to the Expense Reimbursement Deductible indicated for this endorsement. Any one "identity recovery insured" will be responsible for only one deductible under this Identity Recovery Coverage during any one policy period.

For the purpose of the coverage under **Section 3** under this endorsement only, **SECTION II - WHO IS AN INSURED** does not apply.
For the purpose of the **Section 3** coverage under this endorsement only, the following is added to **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

## ADDITIONAL CONDITIONS - SECTION 3
1. **Help Line**
   a. For assistance, the "identity recovery insured' should call the **Identity Recovery Help Line** at **1-800-414-9783.**
   b. The **Identity Recovery Help Line** can provide the "identity recovery insured" with:
      1) Information and advice for how to respond to a possible "identity theft; and
      2) Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.
      In some cases, we may provide Case Management Services at our expense to an "identity recovery insured" prior to a determination that a covered "identity theft" has occurred. Our provision of such services is not an admission of liability under this policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered "identity theft" has not occurred.
   c. As respects Expense Reimbursement Coverage the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records that support his or her claims for "identity recovery expenses".
2. **Services**
   The following conditions apply as respects any services provided by us or our designee to any "identity recovery insured" under this endorsement:
   a. Our ability to provide helpful services in the event of an "identity theft" depends on the cooperation, permission and assistance of the "identity recovery insured";

**SL3100 (05/16) Page 9 of** 11
*//*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

   **b.** All services may not be available or applicable to all individuals. For example, "identity recovery insureds" who are minors of foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions; and

   **c.** We do not warrant or guarantee that our services will end or eliminate all problems associated with an "identity theft" or prevent future "identity thefts".

For the purpose of the **Section 3** coverage under this endorsement only, the following is added to **SECTION V - DEFINITIONS:**

## DEFINITIONS - SECTION 3

1. "Identity Recovery Case Manager" means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured". This includes, with the permission and cooperation of the "identity recovery insured", written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.

2. "Identity Recovery Expenses" means the following when they are reasonable and necessary expenses that are incurred as a direct result of an "identity theft":

   **a.** Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft";

   **b.** Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft";

   **c.** Costs for credit reports from established credit bureaus;

   **d.** Fees and expenses for an attorney approved by us for the following:

     **1)** The defense of any civil suit brought against an "identity recovery insured";

     **2)** The removal of any civil judgment wrongfully entered against an "identity recovery insured";

     **3)** Legal assistance for an "identity recovery insured" at an audit or hearing by a governmental agency;

     **4)** Legal assistance in challenging the accuracy of the "identity recovery insured's" consumer credit report; and

     **5)** The defense of any criminal charges brought against an "identity recovery insured" arising from the actions of a third party using the personal identity of the "identity recovery insured";

   **e.** Actual lost wages of the "identity recovery insured" for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self-employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours;

   **f.** Actual costs for supervision of children or elderly or infirm relatives or dependents of the "identity recovery insured" during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured";

   **g.** Actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured"; and

   **h.** Any other reasonable costs necessarily incurred by an "identity recovery insured" as a direct result of the "identity theft".

     **1)** Such costs include:

     **(a)** Costs by the "identity recovery insured" to recover control over his or her personal identity; and

     **(b)** Deductibles or service fees from financial institutions.

     **2)** Such costs do not include:

     **(a)** Costs to avoid, prevent or detect "identity theft" or other loss;

     **(b)** Money lost or stolen; and

     **(c)** Costs that are restricted or excluded elsewhere in this endorsement or policy.

3. "Identity Recovery Insured" means the following:

   **a.** When the entity insured under this policy is a sole proprietorship, the "identity recovery insured" is the individual person who is the sole proprietor of the insured entity;

   **b.** When the entity insured under this policy is a partnership, the "identity recovery insureds" are the current partners; or

**SL3100 (05/16) Page 10 of 11**
*//*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**STATE AUTO**
Insurance Companies

   **c.** When the entity insured under this policy is a corporation or other organization, the "identity recovery insureds" are all the individuals having ownership position of 20% or more of the insured entity. However, if and only if there is no one who has such an ownership position, then the "identity recovery insured" will be:

     **1)** The chief executive of the insured entity; or

     **2)** As respects a religious institution, the senior ministerial employee.

An "identity recovery insured" must always be an individual person. The entity insured under this policy is not an "identity recovery insured".

**4.** "Identity Theft" means the fraudulent use of the social security number or other method of identifying an "identity recovery insured". This includes fraudulently using the personal identity of an "identity recovery insured" to establish credit accounts, secure loans, enter into contracts, or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

**SL3100 (05/16) Page 11 of 11**

*//*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

Issue Date  01/14/2020          05:06:53 PM

0014276          Printed:
01/15/20          01:45:32



**STATE AUTO**
Insurance Companies

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONDITIONAL EXCLUSION OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL OR CHEMICAL TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** Applicability Of The Provisions Of This Endorsement

1. The provisions of this endorsement become applicable commencing on the date when any one or more of the following first occurs. But if your policy (meaning the policy period in which this endorsement applies) begins after such date, then the provisions of this endorsement become applicable on the date your policy begins.

   **a.** The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Part or Policy; or

   **b.** A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:

   **(1)** Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or

   **(2)** Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or

   **(3)** Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

2. If the provisions of this endorsement become applicable, such provisions:

   **a.** Supersede any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to an incident(s) of terrorism (however defined) which results in injury or damage that occurs on or after the date when the provisions of this endorsement become applicable (for claims made policies, such an endorsement is superseded only with respect to an incident of terrorism (however defined) that results in a claim for injury or damage first being made on or after the date when the provisions of this endorsement become applicable); and

   **b.** Remain applicable unless we notify you of changes in these provisions, in response to federal law.

3. If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism" and/or "other acts of terrorism", will continue in effect unless we notify you of changes to that endorsement in response to federal law.

**B.** The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury or damage, are enclosed in quotation marks:

1. "Terrorism" means activities against persons, organizations or property of any nature:

   **a.** That involve the following or preparation for the following:

   **(1)** Use or threat of force or violence; or

**CG2188 (01/15) Page 1 of 2**
*//*CG2188-201501

Issue Date  01/14/2020          05:06:53 PM

0014277   Printed:
01/15/20   01:45:32

(2) Commission or threat of a dangerous act; or

(3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

b. When one or both of the following applies:

(1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

(2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

2. "Any injury or damage" means any injury or damage covered under any Coverage Part or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or Policy.

C. The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury or damage" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism".

"Any injury or damage" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

1. The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

3. The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

*d* Insurance Services Office, Inc., 2015

MOBDEC    PBP 2855775 01 01/14/2020 FO6 TAYL CPP * R    41ELIT0005590 070006
Case 3:21-cv-02241-DRC Doc #: 34-24 Filed: 08/01/22 Page: 100 of 538



**STATE AUTO**
Insurance Companies

**PBP 2855775   01**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONDITIONAL EXCLUSION OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL OR CHEMICAL TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN PROTECTION COVERAGE FORM
FARM COVERAGE PARTSTANDARD PROPERTY POLICY

## SCHEDULE

| The **Exception Covering Certain Fire Losses** (Paragraph **D.**) applies to property located in the following state(s), if covered under the indicated Coverage Form, Coverage Part or Policy: | |
|---|---|
| **State(s)** | **Coverage Form, Coverage Part Or Policy** |
| GA,IA,IL,MO,NC,WV,WI | Commercial Property |
| | |
| | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

## A. Applicability Of The Provisions Of This Endorsement

1. The provisions of this endorsement become applicable commencing on the date when any one or more of the following first occurs. But if your policy (meaning the policy period in which this endorsement applies) begins after such date, then the provisions of this endorsement become applicable on the date your policy begins.

   a. The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Form, Coverage Part or Policy; or

   b. A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:

   (1) Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or

   (2) Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or

   (3) Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

---

**IL0996 (01/07) Page 1 of 2**
*//*IL0996-200701

*d* ISO Properties, Inc., 2005

Issue Date  01/14/2020     05:06:53 PM

0014279  Printed:
01/15/20  01:45:32

**2.** If the provisions of this endorsement become applicable, such provisions:

  **a.** Supersede any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to loss or damage from an incident(s) of terrorism (however defined) that occurs on or after the date when the provisions of this endorsement become applicable; and

  **b.** Remain applicable unless we notify you of changes in these provisions, in response to federal law.

**3.** If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism" and/or "other acts of terrorism", will continue in effect unless we notify you of changes to that endorsement in response to federal law.

**B.** The following definition is added and applies under this endorsement wherever the term terrorism is enclosed in quotation marks.

"Terrorism" means activities against persons, organizations or property of any nature:

**1.** That involve the following or preparation for the following:

  **a.** Use or threat of force or violence; or

  **b.** Commission or threat of a dangerous act; or

  **c.** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

**2.** When one or both of the following applies:

  **a.** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

  **b.** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

**C.** The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for loss or damage caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism".

Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism"**:

**1.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**3.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials.

**D. Exception Covering Certain Fire Losses**

The following exception to the Exclusion Of Terrorism applies only if indicated and as indicated in the Schedule of this endorsement.

If "terrorism" results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to the Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

**E. Application Of Other Exclusions**

**1.** When the Exclusion Of Terrorism applies in accordance with the terms of **C.1.** or **C.2.**, such exclusion applies without regard to the Nuclear Hazard Exclusion in this Coverage Form, Coverage Part or Policy.

**2.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss or damage which would otherwise be excluded under this Coverage Form, Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

*d* ISO Properties, Inc., 2005

Case 3:21-cv-02211-BJD-PDB Document 84-24 Filed 08/04/22 Page 102 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775   01**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CONDITIONAL EXCLUSION OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL OR CHEMICAL TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA COVERAGE FORM

**A.** Applicability Of The Provisions Of This Endorsement

1. The provisions of this endorsement become applicable commencing on the date when any one or more of the following first occurs. But if your policy (meaning the policy period in which this endorsement applies) begins after such date, then the provisions of this endorsement become applicable on the date your policy begins.

   **a.** The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Part; or

   **b.** A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:

   **(1)** Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or

   **(2)** Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or

   **(3)** Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

2. If the provisions of this endorsement become applicable, such provisions:

   **a.** Supersede any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to an incident(s) of

terrorism (however defined) which results in injury or damage that occurs on or after the date when the provisions of this endorsement become applicable (for claims made policies, such an endorsement is superseded only with respect to an incident of terrorism (however defined) that results in a claim for injury or damage first being made on or after the date when the provisions of this endorsement become applicable); and

   **b.** Remain applicable unless we notify you of changes in these provisions, in response to federal law.

3. If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism" and/or "other acts of terrorism", will continue in effect unless we notify you of changes to that endorsement in response to federal law.

**B.** The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury or damage, are enclosed in quotation marks:

1. "Terrorism" means activities against persons, organizations or property of any nature:

   **a.** That involve the following or preparation for the following:

   **(1)** Use or threat of force or violence; or

   **(2)** Commission or threat of a dangerous act; or

   **(3)** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   **b.** When one or both of the following applies:

   **(1)** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

**CXS2188 (01/15) Page 1 of 2**

*//*CXS2188-201501*

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

Case 5:21-cv-00247-JPB-JPC Document 84-24 Filed 08/01/22 Page 103 of 538

**(2)** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

**2.** "Any injury or damage" means any injury or damage covered under any Coverage Part or underlying insurance to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or underlying insurance.

**C.** The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury or damage" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". "Any injury or damage" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage. But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":

**1.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**3.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

Issue Date  01/14/2020        05:06:53 PM

0014282   Printed:
01/15/20  01:45:32

# Exhibit B

**Policy No. PBP 2855775 00**

Case 3:21-cv-00741-JPB-RWC Document 84-25 Filed 08/04/22 Page 105 of 538

# STATE AUTO
## Insurance Companies

PBP  2855775   00

*S*

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

Acct. Number  CB00652901

| To:  Insured |
| --- |

| Your Independent Agent |
| --- |

TAYLOR FORTUNE GROUP TENNESSEE
LLC DBA: AND TF GROUP LLC
4633 SANFORD ST
METAIRIE, LA 70006

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

Thank you for insuring with State Auto Insurance Companies. Attached is information about your new business, renewal or policy change. Please contact your agent with any questions.

Your coverages are listed on the attached declarations pages. Any new or revised coverage forms are attached.

The State Auto Insurance companies and your independent agent strive to provide overwhelming service to you. Please let us know how we can best serve your needs.

***ENCLOSED DOCUMENTS ARE POLICY INFORMATION ONLY.***

***YOUR BILL WILL BE SENT SEPARATELY, IF NEEDED.***

If you have questions concerning policy payment status, please call Customer Service at 833-724-3577 (833-SAHELPS).

SAINSDB

Issue Date  02/28/2019        01:23:06 PM

0016724    Printed:
03/01/19  01:38:23

# NEW PROTECTION AGAINST
# CYBER ATTACK AND CYBER EXTORTION
# NOW AVAILABLE

**Named Insured And Mailing Address:**

TAYLOR FORTUNE GROUP TENNESSEE
LLC DBA: AND TF GROUP LLC
4633 SANFORD ST
METAIRIE, LA 70006

**Agent Name And Address:**

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

(615) 371-5400

**CyberSecure Quotation For:**     PBP     2855775        00

**Policy Period:** 02/05/2019     **To:** 02/05/2020

Your professional independent insurance agent has designed your State Auto business insurance policy to protect you against the financial consequences of many unfortunate events.

However, your policy does not include a new coverage we've developed to guard against loss due to the ever increasing exposure of Computer Attacks. Businesses today depend increasingly upon computer technology to function, grow and prosper. Parties with ill intent are increasingly seeking to steal data, extort money, and disrupt your business operations through computer technologies.

Our new product includes coverage to:
*    Respond to Cyber Extortion and Denial of Service Attacks;
*    Restore or recreate lost data;
*    Pay to remediate damage to software;
*    Recover loss of income due to computer system downtime;
*    Develop a public relations strategy to minimize reputational risk;
*    Protect against legal actions alleging your lack of system security allowed damage to a third party; and
*    Protect against legal action stemming from information you've displayed on a website causing damages to a third party.

Your current policy **does not** provide coverage for these expenses.

State Auto had developed a new coverage option that can help your business deal with the financial consequences of a Cyber Attack or Cyber Extortion. It's called **CyberSecure**. It pays expenses described above and it defends your business against lawsuits resulting from a Cyber Attack or Cyber Extortion.

**CyberSecure at a $100,000 limit can be added to your business insurance policy during this policy term for an annual premium of $███████.**

**Higher limits may be available. A basic limit of $50,000 may also be available with some reduced coverage.**

Please contact your State Auto agent for more information, or to request that **CyberSecure** be attached to your policy.

**CY.QUOTE Page 1 of 1**
*//*CYQUOTE

Issue Date  02/28/2019        01:23:06 PM

MOBDEC    PBP 2855775  00 02/28/2019  F6H  TAYL CPP * N    41ELIT0005590  070006

Case 20-14441-PDR  Document 84-25  Filed 03/04/22  Page 107 of 538

# STATE AUTO
Insurance Companies

**PBP 2855775   00**

NAMED INSURED AND MAILING ADDRESS:

**TAYLOR FORTUNE GROUP TENNESSEE
LLC DBA: AND TF GROUP LLC
4633 SANFORD ST
METAIRIE, LA 70006**

AGENT NAME AND ADDRESS:

**ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067**

**(615) 371-5400**

*Dear Valued Customer,*

*Thank you for allowing us to provide your important insurance protection.  Your satisfaction with your insurance coverage is essential to us and we would like to keep you informed about changes to your policy.*

*Please take a moment and review the notices listed below.   These notices are intended to make you aware of important changes such as coverage broadenings, reductions or restrictions.  Your careful review is appreciated.*

*If you have any questions about these changes, please contact your insurance agency at the address and phone number shown above.*

*Again, thank you for placing your insurance with State Auto Insurance Companies!*

## POLICYHOLDER  INFORMATION

| | |
|---|---|
| PN 02 39 07 07 | If You Have a Claim |
| PS 00 33 03 14 | Legal Advice Policy Stuffer |
| PS 00 11 07 07 | Notice of Premium Audit |
| MC 78    03 91 | Contractors - Hiring Subcontractors - SAVE Information |
| PS 00 28 01 12 | Data Compromise Breach Helpline |
| PS 00 38 01 14 | Data Compromise Breach E-Risk Hub Stuffer |

Issue Date  02/28/2019       01:23:06 PM

0016726      Printed:
03/01/19   01:38:23

# POLICYHOLDER DISCLOSURE -
# NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act (Act), as amended, that you have a right to purchase insurance coverage for losses arising out of certified acts of terrorism. The term "certified act of terrorism" means any act that is certified by the Secretary of the Treasury - in accordance with the provisions of the federal Terrorism Risk Insurance Act - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that coverage provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States Government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 80% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is provided on the policy Declarations page and does not include any charges for the portion of loss covered by the federal government under the act.

LIMITATION ON PAYMENT OF TERRORISM LOSSES
You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurer's liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.
If you purchase this coverage on an umbrella policy, you must also purchase this coverage for underlying general liability policies.

In the context of a newly issued policy or renewal offer, this form becomes part of the application for this coverage.

**You may select terrorism insurance coverage as follows:**
The portion of your annual policy premium that is attributable to coverage for certified acts of terrorism is shown on the declarations page. If you wish to reject this coverage, please read and complete the form below.

**You may reject terrorism insurance coverage as follows:**
You may elect to decline coverage for certified acts of terrorism. However, if your policy covers property located in a state with a fire following statutory requirement, the terrorism exclusion makes an exception for fire losses to such covered property resulting from certified acts of terrorism. If you choose to decline coverage for certified acts of terrorism, that rejection is not applicable to fire losses to property in those states resulting from certified acts of terrorism, unless excepted by statute or other regulatory means. A separate premium is displayed on the declarations page for coverage for fire losses that result from certified acts of terrorism.

**PN0083 (01/15) Page** 1 **of 2**
*//*PN0083-201501

To reject coverage, you must 'X' the box below, sign your name, print your name, date this form and return it to the company within 30 days. If you choose not to reject this coverage, you do not need to return this form.

| | I hereby elect to exclude losses arising from certified acts of terrorism and understand that I will have no coverage for losses resulting from certified acts of terrorism. I understand that if I exclude certified acts of terrorism coverage, coverage will not be available until my next renewal. |
|---|---|

 

_____    State Auto Property and Casualty Insurance Co.

Policyholder/Applicant's Signature            Insurance Company

_____    PBP    2855775    00
_____    _____

Print Name                    Policy Number

_____

Date

 

41    —  0005590

ELITE  INSURANCE  SOLUTIONS
1894  GENERAL  GEORGE  PATTON  DR
FRANKLIN,  TN  37067

(615)  371-5400

Case 2:21-cv-02174-JRI-DPC Document 84-25 Filed 08/01/22 Page 110 of 538

# POLICYHOLDER DISCLOSURE -
# NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act (Act), as amended, that you have a right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury - -, in concurrence with the Secretary of State, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that coverage provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States Government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is provided on the policy Declarations page and does not include any charges for the portion of loss covered by the federal government under the act.

LIMITATION ON PAYMENT OF TERRORISM LOSSES

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurer's liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

If you purchase this coverage on an umbrella policy, you must also purchase this coverage for any underlying liability policies.

In the context of a newly issued policy or renewal offer, this form becomes part of the application for this coverage.

**You may select terrorism insurance coverage as follows:**

The portion of your annual policy premium that is attributable to coverage for certified acts of terrorism is shown on the declarations page. If you wish to reject this coverage, please read and complete the form below.

**You may reject terrorism insurance coverage as follows:**

You may elect to decline coverage for certified acts of terrorism. However, if your policy covers property located in a state with a fire following statutory requirement, the terrorism exclusion makes an exception for fire losses to such covered property resulting from certified acts of terrorism. If you choose to decline coverage for certified acts of terrorism, that rejection is not applicable to fire losses to property in those states resulting from certified acts of terrorism, unless excepted by statute or other regulatory means. A separate premium is displayed on the declarations page for coverage for fire losses that result from certified acts of terrorism.

**PN 00 83 01 08 Page 1 of 2**
*//*PN0083-200801

To reject coverage, you must 'X' the box below, sign your name, print your name, date this form and return it to the company within 30 days. If you choose not to reject this coverage, you do not need to return this form.

| **X** | I hereby elect to exclude losses arising from certified acts of terrorism and understand that I will have no coverage for losses resulting from certified acts of terrorism. I understand that if I exclude certified acts of terrorism coverage, coverage will not be available until my next renewal. |
|---|---|

_____
Policyholder/Applicant's Signature

State Auto Property and Casualty Insurance Co.
Insurance Company

_____
Print Name

PBP 2855775 00
Policy Number

_____
Date

41 - 0005590

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

(615) 371-5400

**PN 00 83 01 08 Page 2 of 2**
*//*PN0083-200801

Issue Date  02/28/2019      01:23:06 PM

# POLICYHOLDER DISCLOSURE -
# NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act (Act), as amended, that you have a right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury -- , in concurrence with the Secretary of State, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that coverage provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States Government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is provided on the policy Declarations page and does not include any charges for the portion of loss covered by the federal government under the act.

LIMITATION ON PAYMENT OF TERRORISM LOSSES

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurer's liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

If you purchase this coverage on an umbrella policy, you must also purchase this coverage for any underlying liability policies.

In the context of a newly issued policy or renewal offer, this form becomes part of the application for this coverage.

**You may select terrorism insurance coverage as follows:**

The portion of your annual policy premium that is attributable to coverage for certified acts of terrorism is shown on the declarations page. If you wish to reject this coverage, please read and complete the form below.

**You may reject terrorism insurance coverage as follows:**

You may elect to decline coverage for certified acts of terrorism. However, if your policy covers property located in a state with a fire following statutory requirement, the terrorism exclusion makes an exception for fire losses to such covered property resulting from certified acts of terrorism. If you choose to decline coverage for certified acts of terrorism, that rejection is not applicable to fire losses to property in those states resulting from certified acts of terrorism, unless excepted by statute or other regulatory means. A separate premium is displayed on the declarations page for coverage for fire losses that result from certified acts of terrorism.

**PN 00 83 01 08 Page 1 of 2**
*//*PN0083-200801

To reject coverage, you must 'X' the box below, sign your name, print your name, date this form and return it to the company within 30 days. If you choose not to reject this coverage, you do not need to return this form.

| **X** | I hereby elect to exclude losses arising from certified acts of terrorism and understand that I will have no coverage for losses resulting from certified acts of terrorism. I understand that if I exclude certified acts of terrorism coverage, coverage will not be available until my next renewal. |
|---|---|

_____
Policyholder/Applicant's Signature

_____
Print Name

_____
Date

State Auto Property and Casualty Insurance Co.
_____
Insurance Company

PBP 2855775 00
_____
Policy Number

41 - 0005590

ELITE INSURANCE SOLUTIONS
1894 GENERAL GEORGE PATTON DR
FRANKLIN, TN 37067

(615) 371-5400

**PN 00 83 01 08 Page 2 of 2**
*//*PN0083-200801*



**Insurance Companies**

**PBP 2855775   00**

**Thank you for allowing us to serve your insurance needs**

# STATE AUTO Claim Handlers:

### Fair, Friendly and Fast

**State Auto is proud of the service we provide our policyholders when they have a claim. We hope you never have a claim but, if you do, we want to make it as painless and worry-free as possible. We're committed to providing service that's fast - as well as fair and friendly. In fact, we pledge to make an honest effort to contact you within two hours of the time we receive the report of your loss.***

**Please notify your agent as soon as feasible if you have a claim. The sooner your agency knows about your loss, the sooner they can report it to us so we can begin working with you to handle the claim.**

\*  Although we always want to accomplish the two-hour contact time mentioned in our pledge - and we usually do call within that time period - we're sure you understand that may be impossible at certain unusual times such as when we're faced with a large weather-related catastrophe affecting many people in the same area.

**To report a claim:**
  * **Call your agent or**
  * **Call State Auto directly at 833-724-3577 (833-SAHELPS) or**
  * **Report your claim on StateAuto.com**

**PN 02 39 07 07** Page 1 of 1

*//*PN 02 39 07 07

Case 3:21-cv-02174-WHO-SPC  Document 34-5  Filed 03/03/22  Page 115 of 538

# STATE AUTO
### Insurance Companies

**PBP 2855775   00**

## LEGAL ADVICE LINE
## HELP FROM EMPLOYMENT ATTORNEYS IS A TOLL-FREE CALL AWAY

Making an employment decision that could put you at risk? Wondering how the new employment laws may affect you? Call **1-877-529-4375 (1-877-LAW-4EPL)**.

The Legal Advice Line is a complimentary service exclusively for policyholders with our Employment Practices Liability (EPL) insurance program. Through this service, an experienced attorney - well-versed in federal and state employment laws - can give you general counsel on a range of employment issues, including:
* Whether an employee may have a claim against you
* Legal implications of decisions or actions you are considering
* New employment laws and how they affect you
* Other employment law-related questions

**Prevention Is The Best Medicine**.
Specialized employment defense lawyers can help you prevent employment-related claims and charges with advice on questions such as:
* Hiring -  essentials for every job applicant
* Firing -  what to do/not do
* Discrimination -  issues of age, race, gender or other forms of discrimination
* Family and Medical Leave Act -  who FMLA applies to
* Sexual or other harassment -  creating a harassment-free workplace
* Performance reviews -  what to cover

**Call 1-877-529-4375 for Employment Legal Advice.**
The Legal Advice Line **staff** will take note of your inquiry and **refer** it to an experienced employment attorney who will respond within the next business day. All communications are strictly confidential and subject to attorney-client privileges. There is no cost or obligation.

**More Help Is Online.**
Your EPL insurance program also provides you with complimentary access to StateAuto.EmployerProtection.net, an online employment-related website which features many resources to help you prevent employee charges and lawsuits.

**Your Protection Against Conflict And Claims.**
Today, you can't afford not to protect yourself from employee accusations and claims. The risks and stakes are too high. And, for you, the solution is simple. Use the materials at StateAuto.EmployerProtection.net. Give employees clear rules and procedures. Give your managers tools and training to treat employees fairly and consistently. And give yourself the proof of compliance and good faith efforts you'll need if an employee makes a claim.

Like most business owners, you're already worried about employee lawsuits.
Go to StateAuto.EmployerProtection.net.
Get help.
Get protection.
And get a better night's sleep.

This service is for general advice and guidelines on employment decisions but will not provide advice as to whether or not a personnel action should be taken regarding a particular person.

**PS 00 33 03 14 Page 1 of 1**
*//*PS0033-201403

Case 3:21-cv-02174-JFS-PBC   Document 34-5   Filed 03/01/22   Page 116 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

# ATTENTION POLICYHOLDER

### Notice of Premium Audit

When we issue a General Liability or Workers Compensation insurance coverage, we base its premiums on estimated values over the upcoming policy period, such as payroll, sales or the cost of work subcontracted to others. Throughout the policy period, the actual values may fluctuate from the amounts used to estimate the policy premium.

To determine the actual values developed over the policy period, we may conduct a premium audit at the end of the term by way of an accounting records review. This review may be by telephone, mail, or a physical examination of the business's accounting records by a State Auto representative.

Final premiums are then adjusted up or down, based on how the actual values compared to the originally estimated values.

**Here are some suggestions that can help make the premium audit process take as little of your time as possible, yet result in the most accurate calculation of your actual premium:**

1.  Before your scheduled appointment with the auditor, have your payroll and sales records ready for review for the policy period being audited.

2.  Payroll should include an itemized list of all employees and all labor used, and their payroll including overtime, commissions and bonuses for each job duty performed.

3.  Sales include the total gross income from the sale and/or installation of goods you sold.

4.  If you hire any subcontractors, be prepared to provide the names and the total cost of labor and materials used or delivered for use in the execution of work done by each contractor.

5.  The auditor will also ask to review the liability certificates of insurance for the subcontractors doing work on your behalf.

We recommend you require certificates of insurance from all of your subcontractors and keep them on file. Not only can this practice help protect you from the financial consequences of losses caused by your subcontractors, it can also help you avoid potentially higher premium charges than if this important risk management control were not in place.

By maintaining proper accounting records and providing information as requested during the premium audit, you help to manage your overall insurance costs.

**Please contact your State Auto agent should you have any questions relating to your policy.**

**PS 00  11  07 07  Page 1 of 1**
*//*PS 00 11 07 07

Case 22-Case 22-14-14 JER-SC    Document 34-25    Filed 03/01/22    Page 117 of 538

**STATE AUTO**
Insurance Companies

## ATTENTION CONTRACTORS - IT'S TIME TO SAVE!

Protect yourself from needless costs and liabilities. Follow these important steps when working with subcontractors.

 **S** afety programs are essential for your subcontractors as well as your own employees.

For the safety of all workers on your job sites, it's essential that subcontractors observe the loss control regulations you've established for your business.

Make sure that the contracts you sign require your subcontractors to comply with all state safety requirements, as well as your own safety standards. The documents should also specify that if subcontractors in turn hire subcontractors, the latter must also comply.

Clearly state your own safety regulations within the contract. Be sure to describe the steps you will take if any subcontractor fails to correct an unsafe condition on the job. This way, everyone knows what's expected - -  and what will happen if standards are not met.

 **A** greements with your subcontractors on their responsibilities should be entered into before work begins.

Hold-Harmless Agreements are an important form of protection for your business. When written in your favor, these legal documents confirm that your subcontractors will assume liability for Bodily Injury or Property Damage losses arising from their actions - -  whether suffered by the public or by another contractor's employees on the job site.

Hold-Harmless Agreements are a vital supplement to Certificates of Insurance. These documents confirm that subcontractors are responsible for their own work - -  as well as their own insurance protection. Make sure that both are received before your subcontractors begin their activities. Remember that these documents should certify protection for the full duration of the subcontractor's job.

 **V** erify insurance protection is secured by all subcontractors before work begins.

The subcontractors you hire should carry their own General Liability, Automobile Liability and Workers Compensation insurance. Their failure to do so can cost you in two ways:

' In many states, subcontractors who do not carry their own coverage are treated as your employees for insurance purposes. (Their employees would also be treated as part of your work force.) This may increase the cost of your General Liability and Workers Compensation insurance.

Case 3:21-cv-02174-MBC-PC  Document 34-5  Filed 03/03/22  Page 118 of 538

**PBP 2855775   00**

' As general contractor, you may be held responsible for the work of your subcontractors. If they have no insurance, you may have to pay for Bodily Injury or Property Damage losses arising from their actions. State law may also require you to pay for injuries suffered by uninsured subcontractors or their employees, if these injuries occur on your job site.

Help prevent these problems by requiring that all subcontractors supply Certificates of Insurance for General Liability, Auto Liability and Workers Compensation coverages before they start work. File these documents in a secure place -- and check with subcontractors regularly to make certain coverage has not lapsed or been cancelled. Coverage must remain in force for the entire period your subcontractors will be on the job.

While we cannot suggest what limits will be adequate, the following may be used as a guideline. These are the minimum limits required to save you the cost of providing for your Subcontractors' protection under your coverage.

### Minimum General Liability Coverage

' $300,000 Products/Completed Operations Aggregate
' $300,000 General Aggregate
' $300,000 Any One Occurrence (Coverage A)
' $300,000 Any One Person or Organization (Coverage B)

**NOTE:** Your subcontractors' General Liability coverage must be written on an occurrence basis.

IF THE WORK BEING PERFORMED BY SUBCONTRACTORS IS UNUSUALLY HAZARDOUS, YOU SHOULD REQUIRE HIGHER GENERAL LIABILITY LIMITS. Your agent can help you establish the proper limits for greater-than-average exposures.

### Minimum Automobile Liability Coverage

$300,000 Each Accident

**NOTE:** Your subcontractors' Auto Liability coverage should be written to cover all owned and non-owned autos.

### Minimum Employers Liability Coverage
(Coverage "B" on the Workers Compensation Policy)

$100,000 Each Accident
$100,000 Each Employee for Injury by Disease
$500,000 Aggregate for Injury by Disease

E nter each job with the security of knowing you've protected yourself and your subcontractors.

Your agent will be glad to answer any questions you have about protection for you and your subcontractors. We encourage you to take these steps today to protect yourself and those who work for you.

## STATE AUTO
Insurance Companies

**PBP 2855775  00**

# IMPORTANT INFORMATION

This notice describes an additional benefit being provided to you as a State Auto policyholder with Data Compromise Plus coverage. Please review this document carefully and contact your agent if you have any questions.

### STATE AUTO INSURANCE IDENTITY RECOVERY HELP LINE

### 1-800-414-9783

This policy provides you access to the State Auto Insurance Identity Recovery Help Line. The identity recovery help line can provide individuals who qualify as an "identity recovery insured" with:

1) Information and advice for how to respond to a possible "identity theft"; and
2) Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.

An "identity recovery insured" means:
   a. An individual or sole proprietor when the policyholder is described as an Individual or Sole proprietor.
   b. The current partners when the policyholder is described as a partnership.
   c. All the individuals having 20% or more ownership interest for policyholders described as a corporation or other organization. However, if no one has an ownership position of 20% or more, then the" identity recovery insured" will be the chief executive officer or with respect to a religious institution, the senior ministerial employee.

**No coverage is provided by this notice nor can it be construed to replace any provision of your policy. This notice is only intended to bring more attention to this valuable service which is part of the Data Compromise Plus coverage you have elected to purcase. If there is any conflict between the policy and this summary, the provisions of the policy shall prevail.**

**Please refer to your policy for the actual terms, coverage amounts, conditions and exclusions. If you have any questions, or wish to increase or reduce your limits, please contact your independent State Auto Insurance agent.**

**PS 00 28 01 12 Page 1 of 1**
*//*PS0028-201201

## Be Prepared for a Data Breach!

## Check Out The eRisk Hub Risk Management Portal!

You've taken a great first step toward protecting your business from a data breach by purchasing a State Auto business insurance policy with our exclusive Data Compromise Plus coverage.

However, if your organization suffers a data breach, would you be prepared? As we all know from the news, even very large companies aren't always ready to respond. Yet, when a breach occurs, time is of the essence.

Now you can develop an effective data breach response plan in advance of a crisis that can help you be prepared, protect your customer relationships, and protect your business reputation.

As part of your Data Compromise Plus coverage, State Auto provides you an online data breach portal that equips you with a risk management tool to help you be prepared should a breach occur. There is no cost to you! This is a complimentary service to you as a State Auto Data Compromise Plus policyholder.

The portal is called **eRisk Hub**, and it's designed to help you better understand your risks and establish a response plan so you can minimize the financial effects of a data breach should one occur.

### Key Features of the eRisk Hub Portal

* Incident Response Plan Roadmap - suggested steps to take following a data breach
* Online Training Modules - ready-to-use training on privacy Best Practices and Red Flag Rules
* Risk Management Tools - assist you in managing our cyber risk, including state notification laws
* News Center - cyber risk and security news stories, helpful industry links, security blogs
* Learning Center - Best Practices stories and webinars from leading cyber security experts
* eRisk Resources - a directory to quickly find external resources on pre- and post-breach disciplines

### Register for eRisk Hub Now

To access the eRisk Hub portal, all you need to do is register and set up your unique User ID and Password.  Just follow these steps:

* Go to www.stateauto.com and click on Insurance at the top of the page. Next, select Business in the left menu box. Use the link on the right of the page titled **Data Compromise Plus**. From this page, click on the link **eRisk Hub** in the center of the page.
* Complete the information in the center of the page, including your name and company. Please note that your User ID and Password are case-sensitive.
* Enter your assigned **access code: 12116-4**.
* Enter the challenge word on the screen and click "Submit".
* You will get a "Registration Complete" message on the next screen. You can now login to the portal.

**PS 00 38 01 14  Page 1 of 1**
*//*PS0038-201401



**PBP 2855775  00**

# PREFERRED  BUSINESS  POLICY

**State Auto Property and Casualty Insurance Co.**
**1300 Woodland Ave**
**West Des Moines, IA 50265**

HOME  OFFICE  518  EAST  BROAD  STREET  COLUMBUS  OHIO  43215-3976
TELEPHONE  614-464-5000

**SI1008  (01/16)  Page  1  of  2**
*//*SI1008-201601

STATE AUTO
Insurance Companies

**PBP 2855775   00**

## CONDITIONS APPLICABLE TO STATE AUTOMOBILE MUTUAL INSURANCE COMPANY

### DIVIDENDS
You are entitled to the proportionate part of any policyholder's dividend if declared by our Board of Directors in accordance with its By-Laws.

### NOTICE OF POLICYHOLDERS MEETINGS
While your policy is in force, you are one of our members and are entitled, in person or by proxy, to one vote at all meetings of the members. The annual meeting of the members is held at 9 o'clock A.M., Columbus time, on the first Friday of March of each year at our Home Office at 518 East Broad Street, Columbus, Ohio.

### NON-ASSESSABLE
This policy is non-assessable and the insured shall not be liable for the payment of any assessment nor for the payment of any premium other than that stated in this policy.

---

IN WITNESS WHEREOF, we have caused this policy to be signed by our Secretary and President at Columbus, Ohio, and countersigned on the Declarations page by an authorized agent of the State Auto Insurance Companies.

|          Secretary          |          President          |
|:---------------------------:|:---------------------------:|
|     Melissa A. Centers      |     Michael E. LaRocco      |

**SI1008 (01/16) Page 2 of 2**
*//*SI1008-201601

0016741     Printed:
03/01/19    01:38:23

**STATE AUTO**
Insurance Companies

PBP 2855775 00

# PREFERRED BUSINESS POLICY COMMON DECLARATIONS

| NAMED INSURED AND MAILING ADDRESS:<br>First Named Insured Is Specified To Be:<br><br>**TAYLOR FORTUNE GROUP TENNESSEE**<br>**LLC DBA: AND TF GROUP LLC**<br>**4633 SANFORD ST**<br>**METAIRIE, LA 70006** | AGENT NAME AND ADDRESS:<br>**ELITE INSURANCE SOLUTIONS**<br>**1894 GENERAL GEORGE PATTON DR**<br>**FRANKLIN, TN 37067** | |
|---|---|---|
| POLICY PERIOD:<br>**From: 02/05/2019  To: 02/05/2020** | AGENT TELEPHONE NUMBER:<br>**(615) 371-5400** | AGT. NO.<br>**0005590** |
| COVERAGE PROVIDED BY:<br>**State Auto Property and Casualty Insurance Co.** | A STATE AUTO INSURED SINCE:  **2019** | |
| AUDITABLE POLICY:<br>**Yes** | POLICY STATUS:<br>**New Business** | AFTER-HOURS CLAIMS SERVICE:<br>**1-877-SA-CLAIM  or  www.stateauto.com** |

The coverage and these declarations are effective 12:01 AM Standard Time on **02/05/2019** at the above mailing address.

| BUSINESS ENTITY TYPE:<br>**Ltd Liability Co** | BILLING ACCOUNT NUMBER:<br>**CB00652901**<br>**Direct Bill Insured 11-Pay** | BILLING QUESTIONS?<br>**Call 833-724-3577** |
|---|---|---|
| BUSINESS DESCRIPTION:  **Refrigeration** | | |

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## PREMIUM SUMMARY BY COVERAGE PARTS AND POLICIES

This policy consists of the following coverage parts or policies for which a premium is indicated. This premium may be subject to adjustment.

| COVERAGE PARTS | PREMIUMS |
|---|---|
| Commercial Property Coverage Part | $ ▇ |
| Commercial General Liability Coverage Part | $ ▇ |
| Employment Practices Liability Coverage Part | $ ▇ |

| SELF-CONTAINED POLICIES | |
|---|---|
| Commercial Umbrella Policy | $ ▇ |

| | |
|---|---|
| Terrorism (included in total below) | $ ▇ |
| POLICY TOTAL AT INCEPTION | $ ▇ |

These declarations together with the Common Policy Conditions and coverage form(s) and any endorsement(s) identified on these declarations and attached to your policy complete the above numbered policy.

**Countersigned** _____ **By** _____

(Date) (Authorized Representative)

Issue Date  02/28/2019        01:23:06 PM        **SI 50 00 (01/04)    Page 001 of 002**

0016742    Printed:
03/01/19   01:38:23

# STATE AUTO
Insurance Companies

**PBP 2855775  00**

# FORMS AND ENDORSEMENTS
## APPLICABLE TO ALL COVERAGE PARTS

| NEW | FORM OR ENDORSEMENT AND EDITION DATE | ENDORSEMENT TITLE (Only the endorsement titles are shown below, please review the form for a complete description of coverage.) |
|---|---|---|
| * | SI 00 17 11 98 | Common Policy Conditions |
| * | SI 10 08 01 16 | Common Policy Jacket |
| * | SI 11 00 01 04 | Installment Payments |
| * | IL 00 03 09 08 | Calculation of Premium |
| * | PN 00 83 01 15 | Notice of Terrorism Insurance Coverage |
| * | IL 02 50 09 08 | Tennessee Changes - Cancellation and Nonrenewal |
| * | PN 00 83 01 08 | Notice of Terrorism Insurance Coverage |

*Indicates a new form has been added or a replacement form has been substituted for one of an earlier edition.  Please retain all forms.

00I6743      Printed:
03/01/19   01:38:23

# STATE AUTO
### Insurance Companies

**PBP  2855775   00**

## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

| DESCRIPTION OF PREMISES | Premises  0001     Building  001 |
|---|---|

### Building Address

2940 Foster Creighton Dr
Nashville, TN 37204

### Construction/Protection Class

Construction: Modified Fire Resistive
Protection Class 04

| CLASS CODE | OCCUPANCY |
|---|---|
| 0567 | Contractor |

### COVERAGES PROVIDED

Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | DEDUCTIBLE | COINSURANCE % | LOSS PAYMENT BASIS | PREMIUM |
|---|---|---|---|---|---|---|
| Building | $1,084,900 Inflation Guard:    4% | Special Form | $2,500 | 80% | Replacement Cost | $▮ |
|  |  | Terrorism Insurance Coverage |  |  |  | $▮ |
| Business Personal Property | $718,500 Inflation Guard:    4% | Special Form | $2,500 | 80% | Replacement Cost | $▮ |
|  |  | Terrorism Insurance Coverage |  |  |  | $▮ |
| Business Income: Actual Loss Sustained; 12 month limitation |  | Special Form |  |  |  | $▮ |
|  | Period of Restoration - 72 Hour Time Period is Eliminated |  |  |  |  |  |
|  |  | Terrorism Insurance Coverage |  |  |  | $▮ |

**S/A STATE AUTO**
Insurance Companies

**PBP  2855775   00**

# COMMERCIAL  PROPERTY  COVERAGE  PART  DECLARATIONS

| DESCRIPTION OF PREMISES | Premises 0002    Building 001 |
|---|---|

| Building Address | Construction/Protection Class |
|---|---|
| 5542 E Raines Rd<br>Memphis, TN 38115 | Construction: Joisted Masonry<br>Protection Class 02 |

| CLASS CODE | OCCUPANCY |
|---|---|
| 0567 | Contractor |

### COVERAGES PROVIDED

Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | DEDUCTIBLE | COINSURANCE % | LOSS PAYMENT BASIS | PREMIUM |
|---|---|---|---|---|---|---|
| Building | $1,019,625<br>Inflation Guard:  4% | Special Form | $2,500 | 80% | Replacement Cost | $█ |
|  |  | Terrorism Insurance Coverage |  |  |  | $█ |
| Business Personal Property | $638,200<br>Inflation Guard:  4% | Special Form | $2,500 | 80% | Replacement Cost | $█ |
|  |  | Terrorism Insurance Coverage |  |  |  | $█ |

Business Income: Actual Loss Sustained; 12 month limitation
Special Form
Period of Restoration - 72 Hour Time Period is Eliminated

**Included**

Case 3:21-cv-00274-HTW-LGI    Document 34-5    Filed 03/03/22    Page 127 of 538

**STATE AUTO**
Insurance Companies

PBP  2855775    00

# COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

| DESCRIPTION OF PREMISES | Premises  0003     Building  001 |
|---|---|

**Building Address**

517 Liberty Rd Ste 1
Flowood, MS 39232

**Construction/Protection Class**

Construction: Joisted Masonry
Protection Class 03

| CLASS CODE | OCCUPANCY |
|---|---|
| 0567 | Contractor |

## COVERAGES PROVIDED

Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | DEDUCTIBLE | COINSURANCE % | LOSS PAYMENT BASIS | PREMIUM |
|---|---|---|---|---|---|---|
| Business Personal Property | $262,500 | Special Form | $2,500 | 80% | Replacement Cost | $▮ |
| Inflation Guard:   4% | | | | | | |
| | | Terrorism Insurance Coverage | | | | $▮ |
| Business Income: Actual Loss Sustained; 12 month limitation | | | | | | |
| | | Special Form | | | | Included |
| Period of Restoration - 72 Hour Time Period is Eliminated | | | | | | |



Terrorism (included in total below)                                $▮
Total Property Premium                                            $▮
Premier Property Plus Endorsement                                $▮
Total Commercial Property                                        $▮

0016746      Printed:
03/01/19     01:38:23

**STATE AUTO**
Insurance Companies

# FORMS AND ENDORSEMENTS
## APPLICABLE TO THE COMMERCIAL PROPERTY COVERAGE PART

| NEW | FORM OR ENDORSEMENT AND EDITION DATE | ENDORSEMENT TITLE (Only the endorsement titles are shown below, please review the form for a complete description of coverage.) |
|---|---|---|
| * | CP 00 90 07 88 | Commercial Property Conditions |
| * | CP 01 40 07 06 | Exclusion of Loss Due to Virus or Bacteria |
| * | CP 00 10 10 12 | Building and Personal Property Coverage Form |
| * | IL 09 52 01 15 | Cap on losses from Certified Acts of Terrorism |
| * | IL 09 85 01 15 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| * | IL 09 95 01 07 | Conditional Exclusion of Terrorism |
| * | IL 09 99 01 07 | Disclosure of Premium and Estimated Premium for Certified Acts of Terrorism Coverage |
| * | CP 10 30 10 12 | Causes of Loss-Special Form |
| * | SP 10 07 10 16 | Premier Property Plus Endorsement |
| * | CP 00 30 10 12 | Business Income (And Extra Expense) Coverage Form |
| * | SP 00 15 01 05 | Business Income Changes |
| * | CP 15 56 06 07 | Business Income Changes - Beginning Of The Period Of Restoration (No Waiting Period) |
| * | IL 09 52 01 08 | Cap on losses from Certified Acts of Terrorism |
| * | IL 09 85 01 08 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| * | IL 02 82 09 08 | Mississippi Changes - Ca ncellation and Nonrenewal |
| * | IL 01 19 10 12 | Mississippi Changes |

*Indicates a new form has been added or a replacement form has been substituted for one of an earlier edition.  Please retain all forms.

0016747      Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

**PBP 2855775  00**

# COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

The coverages provided are described in the coverage forms and endorsements attached to your policy and identified in these declarations.  The most we will pay for any one occurrence is the greatest of the applicable limit of insurance shown below. Higher limits shown below supersede limits for the same coverage described in the coverage forms and endorsements.

### Premier Property Plus Endorsement Schedule of Coverages Per SP 10 07

| OPTIONAL COVERAGES | LIMIT OF INSURANCE | PREMIUM |
|---|---|---|
| Accounts Receivable | $250,000 | Included |
| Additional Covered Property | Included | Included |
| Arson and Theft Reward | $50,000 | Included |
| Backup of Sewers and Drains | $500,000 | Included |
| Brands and Labels | Included | Included |
| Building Glass Damage - $500 deductible | Included | Included |
| Business Income and Extra Expense | $250,000 | Included |
| Business Income - Dependent Properties | $250,000 | Included |
| Business Personal Property - Seasonal Automatic Increase | 25% | Included |
| Claim Data Expense | $10,000 | Included |
| Computer Coverage | $50,000 | Included |
| Consequential Damage | $50,000 | Included |
| Credit Card Slips | $5,000 | Included |
| Debris Removal | $250,000 | Included |
| Difference in Value - Leased Equipment | Included | Included |
| Electronic Data | $25,000 | Included |
| Employee Theft | $25,000 | Included |
| Extended Business Income | 60 consecutive days | Included |
|    (only if Business Income Coverage is endorsed) | | |
| Fine Arts (with breakage) | $50,000 | Included |
| Fire Department Service Charge | $50,000 | Included |
| Fire Extinguisher Recharge Expense | $10,000 | Included |
| Forgery or Alteration | $10,000 | Included |
| Inflation Guard - Buildings and Your Business Personal Property | 4% | Included |
| Lock Replacement | $10,000 | Included |
| Money Orders and Counterfeit Paper Currency | $10,000 | Included |
| Money and Securities | $25,000 In/$25,000 Out | Included |
| Newly Acquired or Constructed Property | | |
|    (1) Building | $2,000,000 | Included |
|    (2) Your Business Personal Property | $1,000,000 | Included |
|    (3) Time Limitation | 90 Days | Included |
| Non Owned Detached Trailers | $50,000 | Included |
| Ordinance or Law: | | |
|    Undamaged Portion (Coverage A) | Building Limit | Included |
|    Debris Removal (Coverage B) | $500,000 | Included |
|    Increased Cost of Construction (Coverage C) | $500,000 | Included |
| Outdoor Property - $1,000 for any one tree, shrub or plant: | $50,000 | Included |
| Outdoor Signs | $50,000 | Included |

(Continued On Next Page)

**STATE AUTO**
Insurance Companies

PBP 2855775   00

# COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

The coverages provided are described in the coverage forms and endorsements attached to your policy and identified in these declarations.  The most we will pay for any one occurrence is the greatest of the applicable limit of insurance shown below. Higher limits shown below supersede limits for the same coverage described in the coverage forms and endorsements.

### Premier Property Plus Endorsement Schedule of Coverages Per SP 10 07

| OPTIONAL COVERAGES | LIMIT OF INSURANCE | PREMIUM |
|---|---|---|
| Personal Effects and Property of Others | $50,000 | Included |
| Pollutant Clean Up and Removal | $100,000 | Included |
| Premises - Boundary | 1,000 feet | Included |
| Property Off-Premises | $100,000 | Included |
| Tenants Glass - $500 deductible | $15,000 | Included |
| Tenant Lease Obligation | $15,000 | Included |
| Utility Services - Direct Damage | $100,000 | Included |
| Utility Services - Time Element | $250,000 | Included |
| (only if Business Income Coverage is endorsed) | | |
| Valuation Provision | $5,000 or Less | Included |
| Valuable Papers and Records (Other Than Electronic Data) | $250,000 | Included |

**Terrorism (included in total below)**                     **Included**
**Premier Property Plus Endorsement Premium**           $



**PBP  2855775    00**

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

| COMMERCIAL GENERAL LIABILITY COVERAGE LIMITS OF INSURANCE: |
|---|

| | | |
|---|---|---|
| Each Occurrence Limit | $1,000,000 | |
|    Damage To Premises Rented To You Limit | $100,000 | Any One Premises |
|    Medical Expense Limit | $5,000 | Any One Person |
| Personal And Advertising Injury Limit | $1,000,000 | Any One Person or Organization |
| General Aggregate Limit | $2,000,000 | |
| Products - Completed Operations Aggregate Limit | $2,000,000 | |

| AUDIT PERIOD |
|---|

Annual

0016750  Printed:
03/01/19  01:38:23

STATE AUTO
Insurance Companies

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

| SCHEDULE OF PREMISES - All Premises You Own, Rent or Occupy | PREMISES  0001 |
|---|---|

| Location Address | Territory |
|---|---|
| 2940 Foster Creighton Dr<br>Nashville, TN 37204 | 503 |

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 98636 | Refrigeration Systems Or Equipment-Dealers And Distributors And Installation, Servicing Or repair-Commercial |

| PREMIUM BASIS | $429,678 Payroll |
|---|---|

| | Per | Premises/Operations | Products/Completed Operations |
|---|---|---|---|
| RATE | 1000 | $■ | $■ |
| ADVANCE PREMIUMS | | $■ | $■ |

| SCHEDULE OF PREMISES - All Premises You Own, Rent or Occupy | PREMISES  0003 |
|---|---|

| Location Address | Territory |
|---|---|
| 517 Liberty Rd Ste 1<br>Flowood, MS 39232 | 001 |

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 98636 | Refrigeration Systems Or Equipment-Dealers And Distributors And Installation, Servicing Or repair-Commercial |

| PREMIUM BASIS | $120,000 Payroll |
|---|---|

| | Per | Premises/Operations | Products/Completed Operations |
|---|---|---|---|
| RATE | 1000 | $■ | $■ |
| ADVANCE PREMIUMS | | $■ | $■ |

**STATE AUTO**
Insurance Companies

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

| SCHEDULE OF PREMISES | Continued |
|---|---|

| LOCATION RATING CODE | 9999 | TERRITORY | 503 |
|---|---|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 49950 | Additional Insured - Owners, Lessees Or Contractors - Scheduled Person Or Organization |

| PREMIUM BASIS | 2 Addl Interest |
|---|---|

| | Per | Premises/Operations | Products/Completed Operations |
|---|---|---|---|
| RATE | 1 | $█████ | |
| ADVANCE PREMIUMS | | $████ | |

| LOCATION RATING CODE | 9999 | TERRITORY | 503 |
|---|---|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 49950 | Notice Of Cancellation - Scheduled Party SI 10 21 |

| PREMIUM BASIS | 1 Addl Interest |
|---|---|

| | Per | Premises/Operations | Products/Completed Operations |
|---|---|---|---|
| RATE | 1 | $█████ | |
| ADVANCE PREMIUMS | | $████ | |

| LOCATION RATING CODE | 9999 | TERRITORY | 503 |
|---|---|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 84000 | Liability Plus Endorsement (See SL 1202 Attached) |

| PREMIUM BASIS | % Of GL Premium | PREMIUM | $████ |
|---|---|---|---|

0016752          Printed:
03/01/19   01:38:23

Case 2:21-cv-02741-JPM-atc   Document 34-25   Filed 03/03/22   Page 134 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

| SCHEDULE OF PREMISES | Continued |
|---|---|

| LOCATION RATING CODE | 9999 | TERRITORY | 503 |
|---|---|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 84002 | Premier Liability Plus Endorsement (See SL 4000 Attached) |

| PREMIUM BASIS | % Of GL Premium | PREMIUM | $█ |
|---|---|---|---|

| LOCATION RATING CODE | 9999 | TERRITORY | 503 |
|---|---|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 84003 | Contractors Plus Endorsement (See SL 1011 Attached) |

| PREMIUM BASIS | % Of GL Premium | PREMIUM | $█ |
|---|---|---|---|

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 25121 | Data Compromise Plus Coverage  $50,000 |

| PREMIUM BASIS | PER | RATE | ADVANCE PREMIUM |
|---|---|---|---|
| 1 Units | 1 | $█ | $█ |

| PREMIUM | |
|---|---|
| Terrorism (included in total below) | $█ |
| Total Advance Premium (Subject To Audit): | $█ |

00016753      Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

**PBP 2855775 00**

# FORMS AND ENDORSEMENTS
### APPLICABLE TO THE COMMERCIAL GENERAL LIABILITY COVERAGE PART

| NEW | FORM OR ENDORSEMENT AND EDITION DATE | ENDORSEMENT TITLE (Only the endorsement titles are shown below, please review the form for a complete description of coverage.) |
|---|---|---|
| * | IL 00 21 09 08 | Nuclear Energy Exclusion |
| * | CG 21 67 12 04 | Fungi or Bacteria Exclusion |
| * | CG 00 01 04 13 | Commercial General Liability Coverage Form |
| * | SL 20 04 01 06 | Exclusion - Lead Liability |
| * | SL 20 02 01 06 | Asbestos Exclusion |
| * | CG 24 26 04 13 | Amendment of Insured Contract Definition |
| * | CG 21 47 12 07 | Employment - Related Practices Exclusion |
| * | CG 21 06 05 14 | Exclusion - Access or Disclosure of Confidential or Personal Information And Data-related Liability - With Limited Bodily Injury Exception Endorsement |
| * | IL 00 17 11 98 | Common Policy Conditions |
| * | CG 21 70 01 15 | Cap on Losses From Certified Acts of Terrorism |
| * | CG 21 76 01 15 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| * | IL 09 85 01 15 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| * | SL 20 51 12 11 | Amendment of Contractual Liability Exclusion |
| * | IL 02 82 09 08 | Mississippi Changes - Cancellation and Nonrenewal |
| * | SI 10 21 06 10 | Notice of Cancellation And Nonrenewal Scheduled Party |
| * | SL 12 02 12 15 | Liability Plus Endorsement |
| * | SL 40 00 12 15 | Premier Liability Plus Endorsement |
| * | SL 10 11 12 15 | Contractors Plus Endorsement |
| * | SL 31 00 05 16 | Data Compromise Plus |
| * | CG 20 10 04 13 | Additional Insured - Owners, Lessees Or Contractors - Scheduled Person Or Organization |

*Indicates a new form has been added or a replacement form has been substituted for one of an earlier edition. Please retain all forms.

0016754   Printed:
03/01/19  01:38:23

# STATE AUTO
Insurance Companies

**PBP 2855775   00**

## ADDITIONAL INTERESTS/INSUREDS
### COMMERCIAL GENERAL LIABILTY

| OTHER INTERESTS | TYPE | LOC/BLDG |
|---|---|---|
| THE MERCHANTS COMPANY<br>MERCHANTS FOODSERVICE<br>P O BOX 1351<br>HATTIESBURG, MS 39403 | Notice of Cancellation - Scheduled Party | |
| THE MERCHANTS COMPANY<br>MERCHANTS FOODSERVICE<br>P O BOX 1351<br>HATTIESBURG, MS 39403 | Owners, Lessees, or Contractors | |
| CBRE INC<br>C/O GRMS<br>4447 N CENTRAL EXP STE 110-433<br>DALLAS, TX 75205 | Owners, Lessees, or Contractors | |

00I6755      Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

# EMPLOYMENT PRACTICE LIABILITY COVERAGE PART DECLARATIONS

---

### NOTICE

**THIS IS A CLAIMS-MADE AND REPORTED POLICY. EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS EPL COVERAGE IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS OR SUITS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE EPL COVERAGE PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. VARIOUS PROVISIONS IN THIS EPL COVERAGE RESTRICT COVERAGE. PLEASE READ THE ENTIRE EPL COVERAGE FORM CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.**

**THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS UNDER THIS EPL COVERAGE SHALL BE REDUCED BY AMOUNTS INCURRED FOR DEFENSE COSTS. AMOUNTS INCURRED FOR DEFENSE COSTS SHALL BE APPLIED AGAINST THE DEDUCTIBLE AMOUNT.**

---

### EMPLOYMENT PRACTICES LIMITS OF INSURANCE

**THIS POLICY PROVIDES CLAIMS-MADE COVERAGE. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

| | | |
|---|---|---|
| Aggregate Limit | **$100,000** | Annual aggregate for all "loss" combined, including "defense costs". |
| Third Party Liability Coverage Premium (Optional): | **Included** | Coverage For "Third Party Violations Coverage" is Automatically Included. |
| Deductible Amount | **$2,500** | For "Loss" Arising From Claims or Suits Alleging The Same "Wrongful Employment Act" or "Related Wrongful Employment Acts". |

Employment Practices Coverage Retroactive Date: _____

If no date is shown above, "we" will consider the EPL Retroactive Date to be the date of organization of the "named insured". The EPL Retroactive Date will remain the same through all subsequent renewals. No change will be made to the EPL Retroactive Date unless at the sole request of the insured.

**STATE AUTO**
Insurance Companies

PBP 2855775   00

# EMPLOYMENT PRACTICE LIABILITY COVERAGE PART DECLARATIONS

| SCHEDULE OF PREMISES - All Premises You Own, Rent or Occupy | PREMISES 0001 |
|---|---|

| Location Address | Territory |
|---|---|
| 2940 Foster Creighton Dr<br>Nashville, TN 37204 | 503 |

| CLASS CODE | CLASSIFICATION DESCRIPTION |
|---|---|
| 24071 | Employment Practices Liability Insurance |

| PREMIUM BASIS | PER | ADVANCE PREMIUM |
|---|---|---|
| 20 Employees | 1 | $█████ |

| PREMIUM | |
|---|---|
| Total Advance Premium: | $█████ |

This insurance does not apply to "loss" arising out of a "wrongful employment act" that arises out of incidents or circumstances of which "you" had knowledge prior to the effective date of this EPL Coverage or the first EPL Coverage Form issued by "us" of which this EPL Coverage is an uninterrupted renewal.

0016757  Printed:
03/01/19  01:38:23



**PBP 2855775    00**

# FORMS AND ENDORSEMENTS
### APPLICABLE TO THE EMPLOYMENT PRACTICE LIABILITY COVERAGE PART

| NEW | FORM OR ENDORSEMENT AND EDITION DATE | ENDORSEMENT TITLE (Only the endorsement titles are shown below, please review the form for a complete description of coverage.) |
|---|---|---|
| * | EP 24 12 01 14 | Employment Practices Risk Management Information |
| * | EP 00 01 01 14 | Employment Practices Liability Insurance Coverage Part |
| * | EP 40 04 03 14 | Nuclear Energy Liability and War Exclusion Endorsement |

STATE AUTO
Insurance Companies

STATE AUTO
Insurance Companies

**PBP 2855775   00**

# COMMERCIAL UMBRELLA POLICY DECLARATIONS

| NAMED INSURED AND MAILING ADDRESS:<br>First Named Insured Is Specified To Be:<br><br>**TAYLOR FORTUNE GROUP TENNESSEE**<br>**LLC DBA: AND TF GROUP LLC**<br>**4633 SANFORD ST**<br>**METAIRIE, LA 70006** | AGENT NAME AND ADDRESS:<br><br>**ELITE INSURANCE SOLUTIONS**<br>**1894 GENERAL GEORGE PATTON DR**<br>**FRANKLIN, TN 37067** | |
|---|---|---|
| POLICY PERIOD:<br>**From: 02/05/2019  To: 02/05/2020** | AGENT TELEPHONE NUMBER:<br>**(615) 371-5400** | AGT. NO.<br>**0005590** |
| COVERAGE PROVIDED BY:<br>**State Auto Property and Casualty Insurance Co.** | A STATE AUTO INSURED SINCE:<br>**2019** | |
| AUDITABLE POLICY:<br>**No** | POLICY STATUS:<br>**New Business** | AFTER-HOURS CLAIMS SERVICE:<br>**1-877-SA-CLAIM  or  www.stateauto.com** |

The coverage and these declarations are effective 12:01 AM Standard Time on **02/05/2019**   at the above mailing address.

| BUSINESS ENTITY TYPE:<br>**Ltd Liability Co** | BILLING ACCOUNT NUMBER:<br>**CB00652901**<br>**Direct Bill Insured 11-Pay** | BILLING QUESTIONS?<br>**Call 833-724-3577** |
|---|---|---|
| BUSINESS DESCRIPTION:    **Refrigeration** | | |

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## PREMIUM SUMMARY BY COVERAGE PARTS AND POLICIES

This policy consists of the following coverage parts or policies for which a premium is indicated. This premium may be subject to adjustment.

| SELF-CONTAINED POLICIES | PREMIUMS |
|---|---|
| Commercial Umbrella Policy | $ |
| Terrorism (included in above amount) | **Included** |

These declarations together with the Common Policy Conditions and coverage form(s) and any endorsement(s) identified on these declarations and attached to your policy complete the above numbered policy.

**Countersigned** _____ **By** _____

(Date)                               (Authorized Representative)

Issue Date   02/28/2019          01:23:06 PM          **SU 50 00 (01/04)   Page 001 of 002**

0016760
03/01/19   Printed:
01:38:23

**STATE AUTO**
Insurance Companies

PBP 2855775   00

# FORMS AND ENDORSEMENTS
## APPLICABLE TO ALL COMMERCIAL UMBRELLA POLICY

| NEW | FORM OR ENDORSEMENT AND EDITION DATE | ENDORSEMENT TITLE (Only the endorsement titles are shown below, please review the form for a complete description of coverage.) |
|---|---|---|
| * | CXS 00 01 12 15 | Commercial Umbrella Coverage Form |
| * | SI 10 08 01 16 | Common Policy Jacket |
| * | CXS 23 00 05 14 | Exclusion - Access or Disclosure of Confidential or Personal Information and Data-related Liab - Lmtd Bodily Except Not Incl |
| * | CXS 21 70 01 15 | Cap on Losses From Certified Acts of Terrorism |
| * | CXS 21 76 01 15 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| * | PN 00 83 01 15 | Notice of Terrorism Insurance Coverage |
| * | IL 09 85 01 15 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| * | CXS 00 41 07 98 | Tennessee Changes |
| * | CXS 30 01 07 98 | Following Form - Auto Liability |
| * | CXS 30 12 01 12 | Contractors Limitation |

*Indicates a new form has been added or a replacement form has been substituted for one of an earlier edition.  Please retain all forms.

Issue Date  02/28/2019        01:23:06 PM        **SU 50 00 (01/04) Page  002  of  002**

**STATE AUTO**
Insurance Companies

PBP 2855775 00

# COMMERCIAL UMBRELLA COVERAGE DECLARATIONS

## LIMIT OF INSURANCE:

Policy Aggregate Limit $2,000,000
Self-Insured Retention $0 Each Incident or Offense not
Covered by Underlying Insurance

## PREMIUM

\* Total Advance Premium (Subject To Audit): $

Includes Terrorism Coverage Premium

## SCHEDULE OF UNDERLYING INSURANCE

**Auto Liability**

Underlying Insurer: State Auto Property and Casualty Insurance Co.

Policy Number: BAP 2474813 00

Policy Period: From: 02/05/2019 To: 02/05/2020

Limits of Liability

Each Accident $1,000,000

**General Liability**

Underlying Insurer: State Auto Property and Casualty Insurance Co.

Policy Number: PBP 2855775 00

Policy Period: From: 02/05/2019 To: 02/05/2020

Limits of Liability

Each Occurrence $1,000,000
Personal and Advertising Injury $1,000,000
General Aggregate $2,000,000
Products/Completed Operations Aggregate $2,000,000

0016762    Printed:
03/01/19  01:38:23

Case 2:21-cv-02174-JPM-atc   Document 34-5   Filed 03/01/22   Page 144 of 538

**STATE AUTO**
Insurance Companies

# COMMERCIAL UMBRELLA COVERAGE DECLARATIONS

| SCHEDULE OF UNDERLYING INSURANCE | Continued |
|---|---|

**Employers Liability**

Underlying Insurer:  TRAVELERS

Policy Number:  UB-3K752335-18

Policy Period:  From: 02/05/2019  To:  02/05/2020

Limits of Liability

| | |
|---|---|
| Bodily Injury Each Accident | $1,000,000 |
| Bodily Injury By Disease Policy Limit | $1,000,000 |
| Bodily Injury By Disease Each Employee | $1,000,000 |

**STATE AUTO**
Insurance Companies

# COMMON POLICY CONDITIONS

With the exception of any included Commercial Umbrella, Inland Marine or Automobile Policy or coverage parts, which contain their own Common Policy Conditions, all coverage parts included in your Preferred Business Policy, Special Account Policy, or Series One Contractor Policy are subject to the following common conditions. Subject to the laws of your state, some conditions may be changed by the attachment of a state amendatory endorsement.

**A. Cancellation**
1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.
2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:
   **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   **b.** 30 days before the effective date of cancellation if we cancel for any other reason.
3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.
4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.
5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.
6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**
This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**
We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**
1. We have the right to:
   **a.** Make inspections and surveys at any time;

   **b.** Give you reports on the conditions we find; and
   **c.** Recommend changes.
2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:
   **a.** Are safe or healthful; or
   **b.** Comply with laws, regulations, codes or standards.
3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.
4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**
The first Named Insured shown in the Declarations:
1. Is responsible for the payment of all premiums; and
2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**
Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

SI 00 17 11 98 Page 1 of 1
*//*SI 00 17 11 98

Copyright, Insurance Services Office, Inc., 1998

Case 3:21-cv-02174-JPC    Document 34-25    Filed 03/01/22    Page 146 of 538

**STATE AUTO**
Insurance Companies

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**
1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.
2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:
   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   b. 30 days before the effective date of cancellation if we cancel for any other reason.
3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.
4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.
5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.
6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**
This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**
We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**
1. We have the right to:
   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and
   c. Recommend changes.
2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:
   a. Are safe or healthful; or
   b. Comply with laws, regulations, codes or standards.
3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.
4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**
The first Named Insured shown in the Declarations:
1. Is responsible for the payment of all premiums; and
2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**
Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.
If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**IL 00 17 11 98    Page 1 of 1**
*//*IL 00 17 11 98

Copyright, Insurance Services Office, Inc., 1998

0016765    Printed:
03/01/19    01:38:23

**STATE AUTO**
Insurance Companies

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INSTALLMENT PAYMENTS

This endorsement modifies insurance provided under the following:

COMMON POLICY CONDITIONS

The policy is subject to the following condition:

If you have elected to pay the premium on this policy in installments and you fail to pay an installment when due, we will assume you no longer want the insurance. In such event we will issue you a notice of cancellation as set forth under the Common Policy Conditions. Such notice will specify the date and time of cancellation. If we receive an installment payment after the date of cancellation, we may, subject to the laws of your state, reinstate your policy, issue a new policy with a new policy period or return the late payment to you.

**SI 11 00 01 04 Page 1 of 1**
*//*SI 11 00 01 04

Case 3:21-cv-02741-FLW-TJB Document 34-25 Filed 03/01/22 Page 148 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775 00**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NOTICE OF CANCELLATION AND NONRENEWAL SCHEDULED PARTY

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE POLICY
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM
EMPLOYMENT PRACTICES LIABILITY INSURANCE COVERAGE FORM
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

### SCHEDULE

| | |
|---|---|
| **1.** | **Name:** <br> THE MERCHANTS COMPANY |
| **2.** | **Address:** <br> MERCHANTS FOODSERVICE <br> P O BOX 1351 <br> HATTIESBURG, MS 39403 |
| **3.** | **Optional Notification:** ___30___ **days** |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** We will mail the designated person or organization in the Schedule above at least 30 days' advance notice, or the number of days' advance notice shown in the Schedule above, if we cancel or nonrenew this policy for any reason other than nonpayment of premium, subject to statutorily permitted reasons.

**B.** We will mail the designated person or organization in the Schedule above at least 10 days' advance notice if we cancel this policy for nonpayment of premium.

**C.** The person or organization shown in the Schedule above will be mailed confirmation if you cancel this policy for any reason.

**D.** In no event will the action or timing of the named insured's election to cancel or modify the terms of this policy serve to extend the policy beyond the expiration date shown in the Declarations.

**E.** Failure to mail such notice shall impose no obligation or liability of any kind upon the company, its agents, or representatives.

**SI 10 21 06 10   (Page 1 of 1)**
*//*SI1021-201006

Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

0016767    Printed:
03/01/19  01:38:23

**STATE AUTO**
Insurance Companies

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUSINESS INCOME CHANGES -
# BEGINNING OF THE PERIOD OF RESTORATION

This endorsement modifies insurance provided under the following:

BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

## SCHEDULE

| |
|---|
| **Select Either A. Or B.** |
| **A.** ☐ **72-Hour Time Period Is Replaced By 24 Hours** |
| **B.** ☐ **72-Hour Time Period Is Eliminated** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** If the Schedule indicates that the 72-hour time period is replaced by 24 hours, then:

1. The 72-hour time period in the definition of "period of restoration" is replaced by 24 hours. Therefore, the period of restoration for Business Income Coverage begins 24 hours after the time of direct physical loss or damage, subject to all other provisions of the definition of "period of restoration"; and

2. The 72-hour time period in the Civil Authority Additional Coverage is replaced by 24 hours. Therefore, coverage under the Additional Coverage - Civil Authority begins 24 hours after the time of action of civil authority, subject to all other provisions of that Additional Coverage.

**B.** If the Schedule indicates that the 72-hour time period is eliminated, then:

1. The 72-hour time period in the definition of "period of restoration" is deleted. Therefore, the period of restoration for Business Income Coverage begins at the time of direct physical loss or damage, subject to all other provisions of the definition of "period of restoration"; and

2. The 72-hour time period in the Civil Authority Additional Coverage is deleted. Therefore, coverage under the Additional Coverage - Civil Authority begins at the time of action of civil authority, subject to all other provisions of that Additional Coverage.

**CP 15 56 06 07   Page 1 of 1**
*/*CP1556-200706

*d* ISO Properties, Inc., 2006

**STATE AUTO**
Insurance Companies

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in **1.** above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

**1.** We cover loss or damage commencing:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

**2.** The coverage territory is:

**a.** The United States of America (including its territories and possessions);

**b.** Puerto Rico; and

**c.** Canada.

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

**1.** Prior to a loss to your Covered Property or Covered Income.

**2.** After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

**a.** Someone insured by this insurance;

**b.** A business firm:

**(1)** Owned or controlled by you; or

**(2)** That owns or controls you; or

**c.** Your tenant.

This will not restrict your insurance.

**CP 00 90 07 88 Page 1 of 1**
*/*CP 00 90 07 88

Copyright, ISO Commercial Risk Services, Inc. 1983, 1987

**PBP 2855775   00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:
1. Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and
2. Additional Coverage - Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

**CP0140 (07/06) Page** 1 **of** 1
*//*CP0140-200607*

*d* ISO Properties, Inc., 2006

**STATE AUTO**
Insurance Companies

**PBP 2855775  00**

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H**. Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.,** and limited in **A.2.** Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

**a. Building**, meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery; and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire-extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

**c. Personal Property Of Others** that is:

**(1)** In your care, custody or control; and

**(2)** Located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

### 2. Property Not Covered

Covered Property does not include:

**a.** Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**CP0010 (10/12) Page 1 of 14**
*//*CP0010-201210

***d*** Insurance Services Office, Inc., 2011

0016771  Printed:
03/01/19  01:38:23

**STATE AUTO**
Insurance Companies

d. Bridges, roadways, walks, patios or other paved surfaces;

e. Contraband, or property in the course of illegal transportation or trade;

f. The cost of excavations, grading, backfilling or filling;

g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

   (1) The lowest basement floor; or

   (2) The surface of the ground, if there is no basement;

h. Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

i. Personal property while airborne or waterborne;

j. Bulkheads, pilings, piers, wharves or docks;

k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

l. Retaining walls that are not part of a building;

m. Underground pipes, flues or drains;

n. Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph, **n.**, does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system;

o. The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

p. Vehicles or self-propelled machines (including aircraft or watercraft) that:

   (1) Are licensed for use on public roads; or

   (2) Are operated principally away from the described premises.

   This paragraph does not apply to:

   (a) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

   (b) Vehicles or self-propelled machines, other than autos, you hold for sale;

   (c) Rowboats or canoes out of water at the described premises; or

   (d) Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers; or

q. The following property while outside of buildings:

   (1) Grain, hay, straw or other crops;

   (2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), all except as provided in the Coverage Extensions.

3. **Covered Causes Of Loss**

   See applicable Causes Of Loss form as shown in the Declarations.

4. **Additional Coverages**

   a. **Debris Removal**

      (1) Subject to Paragraphs **(2), (3)** and **(4)**, we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

*d* Insurance Services Office, Inc., 2011

Case 3:21-cv-02174-JR RTC   Document 33-25   Filed 03/01/22   Page 154 of 538

**PBP 2855775   00**

**(2)** Debris Removal does not apply to costs to:

**(a)** Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

**(b)** Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

**(c)** Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

**(d)** Remove property of others of a type that would not be Covered Property under this Coverage Form;

**(e)** Remove deposits of mud or earth from the grounds of the described premises;

**(f)** Extract "pollutants" from land or water; or

**(g)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4)**, the following provisions apply:

**(a)** The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

**(4)** We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

**(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

**(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(4)(a)** and/or **(4)(b)** applies, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

**(5)** **Examples**

The following examples assume that there is no Coinsurance penalty.

**Example 1**

| | | |
|---|---|---|
| Limit of Insurance: | $ | 90,000 |
| Amount of Deductible: | $ | 500 |
| Amount of Loss: | $ | 50,000 |
| Amount of Loss Payable: | $ | 49,500 |
| | ($50,000 − | $500) |
| Debris Removal Expense: | $ | 10,000 |
| Debris Removal Expense Payable: | $ | 10,000 |

($10,000 is 20% of $50,000.)

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

**Example 2**

| | | |
|---|---|---|
| Limit of Insurance: | $ | 90,000 |
| Amount of Deductible: | $ | 500 |
| Amount of Loss: | $ | 80,000 |
| Amount of Loss Payable: | $ | 79,500 |
| | ($80,000 − | $500) |
| Debris Removal Expense: | $ | 40,000 |
| Debris Removal Expense Payable | | |
| Basic Amount: | $ | 10,500 |
| Additional Amount: | $ | 25,000 |

*d*  Insurance Services Office, Inc., 2011

0016773  Printed:
03/01/19  01:38:23

STATE AUTO
Insurance Companies

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000, capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4)**. Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for service at each premises described in the Declarations, unless a higher limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by

or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth,

**CP0010 (10/12) Page 4 of 14**
*//*CP0010-201210

*d* Insurance Services Office, Inc., 2011

0016774 Printed:
03/01/19 01:38:23

proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced at the same or another premises; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment and Valuation Conditions and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

**f. Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data. This Additional Coverage does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes Of Loss - Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to

*d*  Insurance Services Office, Inc., 2011

STATE AUTO
Insurance Companies

the "specified causes of loss"
as defined in that form and
Collapse as set forth in that
form.

**(b)** If the Causes Of Loss - Broad
Form applies, coverage
under this Additional
Coverage, Electronic Data,
includes Collapse as set
forth in that form.

**(c)** If the Causes Of Loss form is
endorsed to add a Covered
Cause of Loss, the additional
Covered Cause of Loss does
not apply to the coverage
provided under this
Additional Coverage,
Electronic Data.

**(d)** The Covered Causes of Loss
include a virus, harmful code
or similar instruction
introduced into or enacted on
a computer system
(including electronic data)
or a network to which it
is connected, designed to
damage or destroy any part
of the system or disrupt its
normal operation. But there
is no coverage for loss or
damage caused by or
resulting from manipulation
of a computer system
(including electronic data)
by any employee, including
a temporary or leased
employee, or by an entity
retained by you or for you
to inspect, design, install,
modify, maintain, repair or
replace that system.

**(4)** The most we will pay under this
Additional Coverage, Electronic Data,
is $2,500 (unless a higher limit is
shown in the Declarations) for all
loss or damage sustained in any one
policy year, regardless of the
number of occurrences of loss or
damage or the number of premises,
locations or computer systems
involved. If loss payment on the
first occurrence does not exhaust
this amount, then the balance is
available for subsequent loss or
damage sustained in but not after
that policy year. With respect to an
occurrence which begins in one
policy year and continues or results
in additional loss or damage in a
subsequent policy year(s), all loss or
damage is deemed to be sustained
in the policy year in which the
occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following
Extensions apply to property located in or on
the building described in the Declarations or
in the open (or in a vehicle) within 100
feet of the described premises.

If a Coinsurance percentage of 80% or more,
or a Value Reporting period symbol, is
shown in the Declarations, you may extend
the insurance provided by this Coverage Part
as follows:

**a. Newly Acquired Or Constructed
Property**

**(1) Buildings**

If this policy covers Building, you
may extend that insurance to apply
to:

**(a)** Your new buildings while being
built on the described premises;
and

**(b)** Buildings you acquire at
locations, other than the
described premises, intended for:

**(i)** Similar use as the building
described in the
Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or
damage under this Extension is
$250,000 at each building.

**(2) Your Business Personal
Property**

**(a)** If this policy covers Your
Business Personal Property, you
may extend that insurance to
apply to:

**(i)** Business personal property,
including such property that
you newly acquire, at any
location you acquire other
than at fairs, trade shows
or exhibitions; or

**(ii)** Business personal property,
including such property that
you newly acquire, located
at your newly constructed or
acquired buildings at the
location described in the
Declarations.

The most we will pay for loss
or damage under this Extension
is $100,000 at each building.

**(b)** This Extension does not apply
to:

**(i)** Personal property of others
that is temporarily in your
possession in the course of
installing or performing work
on such property; or

**CP0010 (10/12) Page 6 of 14**
*//*CP0010-201210

*d* Insurance Services Office, Inc., 2011

STATE AUTO
Insurance Companies

**(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**
With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:
**(a)** This policy expires;
**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or
**(c)** You report values to us.
We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**
You may extend the insurance that applies to Your Business Personal Property to apply to:
**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.
**(2)** Personal property of others in your care, custody or control.
The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**
**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.
**(2)** If the Causes Of Loss - Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(3)** If the Causes Of Loss - Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.
**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and, therefore, coverage of such costs is not additional insurance.

**d. Property Off-premises**
**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:
**(a)** Temporarily at a location you do not own, lease or operate;
**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or
**(c)** At any fair, trade show or exhibition.
**(2)** This Extension does not apply to property:
**(a)** In or on a vehicle; or
**(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.
**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**
You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:
**(1)** Fire;
**(2)** Lightning;
**(3)** Explosion;

*d* Insurance Services Office, Inc., 2011

0016777  Printed:
03/01/19  01:38:23

(4) Riot or Civil Commotion; or
(5) Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

**f. Non-owned Detached Trailers**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

  (a) The trailer is used in your business;

  (b) The trailer is in your care, custody or control at the premises described in the Declarations; and

  (c) You have a contractual responsibility for loss or damage to the trailer.

(2) We will not pay for any loss or damage that occurs:

  (a) While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

  (b) During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

(3) The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

(4) This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

**g. Business Personal Property Temporarily In Portable Storage Units**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the building or structure described in the Declarations or within 100 feet of the premises described in the Declarations, whichever distance is greater.

(2) If the applicable Covered Causes of Loss form or endorsement contains a limitation or exclusion concerning loss or damage from sand, dust, sleet, snow, ice or rain to property in a structure, such limitation or exclusion also applies to property in a portable storage unit.

(3) Coverage under this Extension:

  (a) Will end 90 days after the business personal property has been placed in the storage unit;

  (b) Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the business personal property has been stored there for 90 or fewer days as of the time of loss or damage.

(4) Under this Extension, the most we will pay for the total of all loss or damage to business personal property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units. Such limit is part of, not in addition to, the applicable Limit of Insurance on Your Business Personal Property. Therefore, payment under this Extension will not increase the applicable Limit of Insurance on Your Business Personal Property.

(5) This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form or policy, and does not apply to loss or damage to the storage unit itself.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

*d* Insurance Services Office, Inc., 2011

Case 3:21-cv-02174-BJC-PPC   Document 34-25   Filed 03/31/22   Page 160 of 538

STATE AUTO
Insurance Companies

**PBP 2855775   00**

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage:

**1.** Fire Department Service Charge;

**2.** Pollutant Clean-up And Removal;

**3.** Increased Cost Of Construction; and

**4.** Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example 1**

(This example assumes there is no Coinsurance penalty.)

Deductible:                                   $    250
Limit of Insurance -  Building 1:             $ 60,000
Limit of Insurance -  Building 2:             $ 80,000
Loss to Building 1:                           $ 60,100
Loss to Building 2:                           $ 90,000

The amount of loss to Building 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building 1:

```
   $ 60,100
   -    250
   _____
   $ 59,850  Loss Payable - Building 1
```

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building 2. Loss payable for Building 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:

$59,850  +  $80,000 = $139,850

**Example 2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example 1.

Loss to Building 1:                           $  70,000
  (Exceeds Limit of Insurance plus Deductible)
Loss to Building 2:                           $  90,000
  (Exceeds Limit of Insurance plus Deductible)
Loss Payable -  Building 1:                   $  60,000
  (Limit of Insurance)
Loss Payable -  Building 2:                   $  80,000
  (Limit of Insurance)
Total amount of loss payable:                 $ 140,000

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage

**CP0010 (10/12) Page 9 of 14**
*//*CP0010-201210

*d*  Insurance Services Office, Inc., 2011

STATE AUTO
Insurance Companies

**PBP 2855775   00**

resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the

**CP0010 (10/12) Page 10 of 14**
*/|*CP0010-201210

*d* Insurance Services Office, Inc., 2011

property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

6. **Vacancy**

   a. **Description Of Terms**

      (1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

         (a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

         (b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

            (i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

            (ii) Used by the building owner to conduct customary operations.

      (2) Buildings under construction or renovation are not considered vacant.

   b. **Vacancy Provisions**

      If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

      (1) We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

         (a) Vandalism;

         (b) Sprinkler leakage, unless you have protected the system against freezing;

         (c) Building glass breakage;

         (d) Water damage;

         (e) Theft; or

         (f) Attempted theft.

      (2) With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

7. **Valuation**

   We will determine the value of Covered Property in the event of loss or damage as follows:

   a. At actual cash value as of the time of loss or damage, except as provided in **b.**, **c.**, **d.** and **e.** below.

   b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

      The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

      However, the following property will be valued at the actual cash value, even when attached to the building:

      (1) Awnings or floor coverings;

      (2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

      (3) Outdoor equipment or furniture.

   c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

   d. Glass at the cost of replacement with safety-glazing material if required by law.

   e. Tenants' Improvements and Betterments at:

      (1) Actual cash value of the lost or damaged property if you make repairs promptly.

      (2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

         (a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

         (b) Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

      If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

      (3) Nothing if others pay for repairs or replacement.

*d* Insurance Services Office, Inc., 2011

## F.  Additional Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

1. **Coinsurance**

   If a Coinsurance percentage is shown in the Declarations, the following condition applies:

   a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

   Instead, we will determine the most we will pay using the following steps:

   (1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

   (2) Divide the Limit of Insurance of the property by the figure determined in Step **(1)**;

   (3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2)**; and

   (4) Subtract the deductible from the figure determined in Step **(3)**.

   We will pay the amount determined in Step **(4)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example 1 (Underinsurance)**

When:   The value of the property is:  $ 250,000
        The Coinsurance percentage for it is:   80%
        The Limit of Insurance for it is:   $ 100,000
        The Deductible is:   $    250
        The amount of loss is:   $  40,000

Step **(1)**: $250,000 x 80% = $200,000
(the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2)**: $100,000 ÷ $200,000 = .50
Step **(3)**: $40,000 x .50 = $20,000
Step **(4)**: $20,000 - $250 = $19,750
We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example 2 (Adequate Insurance)**

When:   The value of the property is:  $ 250,000
        The Coinsurance percentage for it is:   80%
        The Limit of Insurance for it is:  $ 200,000
        The Deductible is:  $    250
        The amount of loss is:  $  40,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate, and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

b. If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example 3**

When:   The value of the property is:
        Building at Location 1:   $  75,000
        Building at Location 2:   $ 100,000
        Personal                 Property
        at Location 2:           $  75,000
                                 $ 250,000
        The Coinsurance percentage for it is:   90%
        The Limit of Insurance for Buildings and Personal Property at Locations 1 and 2 is:   $ 180,000
        The Deductible is:   $   1,000
        The amount of loss is:
        Building at Location 2:   $  30,000
        Personal                  Property
        at Location 2:            $  20,000
                                  $  50,000

Step **(1)**: $250,000 x 90% = $225,000
(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step **(2)**: $180,000 ÷ $225,000 = .80
Step **(3)**: $50,000 x .80 = $40,000
Step **(4)**: $40,000 - $1,000 = $39,000
We will pay no more than $39,000. The remaining $11,000 is not covered.

2. **Mortgageholders**

   a. The term mortgageholder includes trustee.

   b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

   c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

   d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

   (1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

   (2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

*d* Insurance Services Office, Inc., 2011

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item:

**1. Agreed Value**

**a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

**b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

**c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

**(1)** On or after the effective date of this Optional Coverage; and

**(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

**a.** The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

**b.** The amount of increase will be:

**(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

**(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

**(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example**

If:   The applicable Limit of Insurance is: $ 100,000
      The annual percentage increase is:       8%
      The number of days since the beginning of the policy year (or last policy change) is:       146
      The amount of increase is:

      $100,000 x .08 x 146 ÷ 365 =        $ 3,200

**3. Replacement Cost**

**a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

**b.** This Optional Coverage does not apply to:

**(1)** Personal property of others;

**(2)** Contents of a residence;

**(3)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

**(4)** "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

*d* Insurance Services Office, Inc., 2011

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:
   (1) Until the lost or damaged property is actually repaired or replaced; and
   (2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

   With respect to tenants' improvements and betterments, the following also apply:
   (3) If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and
   (4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

e. We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:
   (1) The Limit of Insurance applicable to the lost or damaged property;
   (2) The cost to replace the lost or damaged property with other property:
      (a) Of comparable material and quality; and
      (b) Used for the same purpose; or
   (3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

   If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

4. **Extension Of Replacement Cost To Personal Property Of Others**
   a. If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.
   b. With respect to replacement cost on the personal property of others, the following limitation applies:
      If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**
1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.
2. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.
3. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

*d* Insurance Services Office, Inc., 2011

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO
THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS
ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND
CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

## SCHEDULE

| SCHEDULE - PART I |
| --- |
| Terrorism Premium (Certified Acts)    $ |
| This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies): |
| The terrorism premium and applicable Coverages displayed on the declaration pages of this policy represent the charge for Terrorism Coverage for this policy term. |
| |
| Additional information, if any, concerning the terrorism premium: |
| |
| |

| SCHEDULE - PART II |
| --- |
| Federal share of terrorism losses _____ % Year:20 _____ See Below |
| (Refer to Paragraph **B.** in this endorsement.) |
| |
| Federal share of terrorism losses _____ % Year:20 _____ See Below |
| (Refer to Paragraph **B.** in this endorsement.) |

| Federal Share | Year |
| --- | --- |
| 85% | 2015 |
| 84% | 2016 |
| 83% | 2017 |
| 82% | 2018 |
| 81% | 2019 |
| 80% | 2020 |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
| --- |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**IL0985 (01/15) Page 1 of 1**
*//*IL0985-201501

*d*  Insurance Services Office, Inc., 2015

MOBDEC    PBP  2855775  00 02/28/2019  F6H  TAYL CPP* N    41ELIT0005590  070006

# CAUSES OF LOSS - SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.** Definitions.

**A. Covered Causes Of Loss**
When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

**B. Exclusions**
1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**
   The enforcement of or compliance with any ordinance or law:
   **(1)** Regulating the construction, use or repair of any property; or
   **(2)** Requiring the tearing down of any property, including the cost of removing its debris.
   This exclusion, Ordinance Or Law, applies whether the loss results from:
      **(a)** An ordinance or law that is enforced even if the property has not been damaged; or
      **(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**
   **(1)** Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;
   **(2)** Landslide, including any earth sinking, rising or shifting related to such event;
   **(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;
   **(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.
**(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.
Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:
   **(a)** Airborne volcanic blast or airborne shock waves;
   **(b)** Ash, dust or particulate matter; or
   **(c)** Lava flow.
With respect to coverage for Volcanic Action as set forth in **(5)(a)**, **(5)(b)** and **(5)(c)**, all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.
Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.
This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused.

   **c. Governmental Action**
   Seizure or destruction of property by order of governmental authority.
   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

   **d. Nuclear Hazard**
   Nuclear reaction or radiation, or radioactive contamination, however caused.
   But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

*/ /*CP1030-201210

*d* Insurance Services Office, Inc., 2011

Issue Date  02/28/2019    01:23:06 PM

0016786  Printed:
03/01/19  01:38:23

e. **Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

(1) Originates away from the described premises; or

(2) Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

f. **War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

g. **Water**

(1) Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

(2) Mudslide or mudflow;

(3) Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings; or

(5) Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **(1)** through **(5)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

h. **"Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

(1) When "fungus", wet or dry rot or bacteria result from fire or lightning; or

(2) To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from any of the following:

a. Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

(1) Electrical or electronic wire, device, appliance, system or network; or

*d* Insurance Services Office, Inc., 2011

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.** **(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

**(1)** Applies whether or not an act occurs during your normal hours of operation;

**(2)** Does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property:

**(1)** An abrupt falling down or caving in;

*d* Insurance Services Office, Inc., 2011

**(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.**, does not apply:

    **(a)** To the extent that coverage is provided under the Additional Coverage, Collapse; or

    **(b)** To collapse caused by one or more of the following:

        **(i)** The "specified causes of loss";

        **(ii)** Breakage of building glass;

        **(iii)** Weight of rain that collects on a roof; or

        **(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

    **(1)** Planning, zoning, development, surveying, siting;

    **(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

    **(3)** Materials used in repair, construction, renovation or remodeling; or

    **(4)** Maintenance;

of part or all of any property on or off the described premises.

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms:

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

    **(a)** Damage or destruction of "finished stock"; or

    **(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

    **(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

    **(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or

*d*   Insurance Services Office, Inc., 2011

cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.** Ordinance Or Law;

**(b)** Paragraph **B.1.c.** Governmental Action;

**(c)** Paragraph **B.1.d.** Nuclear Hazard;

**(d)** Paragraph **B.1.e.** Utility Services; and

**(e)** Paragraph **B.1.f.** War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated:

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

**a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**d.** Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

However, this limitation does not apply to:

**CP1030 (10/12) Page 5 of 9**
*//*CP1030-201210

*d* Insurance Services Office, Inc., 2011

Case 3:21-cv-02741-E-BT Document 348-25 Filed 03/03/22 Page 172 of 538

**(1)** Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

**(2)** Business Income Coverage or Extra Expense Coverage.

**e.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

**f.** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

**g.** Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

**(1)** Dampness or dryness of atmosphere or of soil supporting the vegetation;

**(2)** Changes in or extremes of temperature;

**(3)** Disease;

**(4)** Frost or hail; or

**(5)** Rain, snow, ice or sleet.

**2.** We will not pay for loss or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

**a.** Animals, and then only if they are killed or their destruction is made necessary.

**b.** Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

**(1)** Glass; or

**(2)** Containers of property held for sale.

**c.** Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

However, this limitation does not apply:

**(1)** If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

**(2)** To Business Income Coverage or to Extra Expense Coverage.

**3.** The special limit shown for each category, **a.** through **d.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are (unless a higher limit is shown in the Declarations):

**a.** $2,500 for furs, fur garments and garments trimmed with fur.

**b.** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

**c.** $2,500 for patterns, dies, molds and forms.

**d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

**4.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

**a.** Results in discharge of any substance from an automatic fire protection system; or

**b.** Is directly caused by freezing.

However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage - Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

**1.** For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**2.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

**a.** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**b.** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**c.** Use of defective material or methods in construction, remodeling or renovation if

**CP 1030 (10/12) Page 6 of 9**
*//*CP1030-201210

*d* Insurance Services Office, Inc., 2011

**STATE AUTO**
Insurance Companies

the abrupt collapse occurs during the course of the construction, remodeling or renovation.

**d.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

**(1)** A cause of loss listed in **2.a.** or **2.b.**;

**(2)** One or more of the "specified causes of loss";

**(3)** Breakage of building glass;

**(4)** Weight of people or personal property; or

**(5)** Weight of rain that collects on a roof.

**3.** This **Additional Coverage - Collapse** does **not** apply to:

**a.** A building or any part of a building that is in danger of falling down or caving in;

**b.** A part of a building that is standing, even if it has separated from another part of the building; or

**c.** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**4.** With respect to the following property:

**a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

**b.** Awnings, gutters and downspouts;

**c.** Yard fixtures;

**d.** Outdoor swimming pools;

**e.** Fences;

**f.** Piers, wharves and docks;

**g.** Beach or diving platforms or appurtenances;

**h.** Retaining walls; and

**i.** Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

**(1)** Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

**(2)** The property is Covered Property under this Coverage Form.

**5.** If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**a.** The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.**;

**b.** The personal property which collapses is inside a building; and

**c.** The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

**6.** This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**7.** This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

**8.** The term Covered Cause of Loss includes the Additional Coverage, Collapse, as described and limited in **D.1.** through **D.7.**

**E. Additional Coverage - Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

**1.** The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

**a.** A "specified cause of loss" other than fire or lightning; or

**b.** Flood, if the Flood Coverage Endorsement applies to the affected premises.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

**2.** We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

**a.** Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

**b.** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

**c.** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is

*d* Insurance Services Office, Inc., 2011

completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3.  The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.

4.  The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

    If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5.  The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss form or under the Additional Coverage, Collapse.

6.  The following, **6.a.** or **6.b.**, applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

    a.  If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or

expense sustained in a period of not more than 30 days. The days need not be consecutive.

    b.  If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**F.  Additional Coverage Extensions**

1.  **Property In Transit**

    This Extension applies only to your personal property to which this form applies.

    a.  You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

    b.  Loss or damage must be caused by or result from one of the following causes of loss:

        (1)  Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

        (2)  Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

        (3)  Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

    c.  The most we will pay for loss or damage under this Extension is $5,000.

    This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2.  **Water Damage, Other Liquids, Powder Or Molten Material Damage**

    If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance

*d*  Insurance Services Office, Inc., 2011

**STATE AUTO**
Insurance Companies

escapes. This Coverage Extension does not increase the Limit of Insurance.

**3. Glass**

   **a.** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

   **b.** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

   This Coverage Extension **F.3.** does not increase the Limit of Insurance.

**G. Definitions**

   **1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

   **2.** "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   **a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   **(1)** The cost of filling sinkholes; or

   **(2)** Sinking or collapse of land into man-made underground cavities.

   **b.** Falling objects does not include loss or damage to:

   **(1)** Personal property in the open; or

   **(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

   **c.** Water damage means:

   **(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and

   **(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

   But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

   To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss," such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground.

***d*** Insurance Services Office, Inc., 2011

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PREMIER PROPERTY PLUS ENDORSEMENT

This endorsement modifies insurance provided under the following:
BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CAUSES OF LOSS - SPECIAL FORM
BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

TABLE OF CONTENTS

| COVERAGE ENHANCEMENTS | LIMIT OF INSURANCE |
|---|---|
| BUILDING AND PERSONAL PROPERTY COVERAGE FORM CHANGES | |
| Amended Description - Fire Extinguishing Equipment | Included |
| Amended Description - Premises | "Within 1,000 feet" |
| Amended Coverage - Signs Not Attached to Buildings | Removed from "Property Not Covered" |
| Debris Removal | $250,000 |
| Fire Department Service Charge | $50,000 |
| Pollutant Clean Up And Removal | $100,000 |
| Electronic Data | $25,000 |
| Newly Acquired or Constructed Property - Building | $2,000,000 - Reporting Requirement Extended to 90 Days |
| Newly Acquired Property - Business Personal Property | $1,000,000 - Reporting Requirement Extended to 90 Days |
| Personal Effects and Property of Others | $50,000 |
| Valuable Papers and Records | $250,000 |
| Property Off Premises | $100,000 |
| Non-Owned Detached Trailers | $50,000 |
| Amended Valuation for Small Losses | Replacement Cost for losses up to $5,000 |
| Arson & Theft Information Reward | $50,000 |
| Brands and Labels | Included |
| Business Personal Property Limit - Seasonal Automatic Increase | 25% |
| Outdoor Signs | $50,000 |
| Fire Extinguisher Recharge | $10,000 |
| Inflation Guard | 4% |
| Tenant Lease Obligation - Damage to Leased Real Property | $15,000 |
| Outdoor Property - Including Broadened Causes of Loss | $50,000 but not more than $2,500 for any one tree, shrub or plant |
| Accounts Receivable | $250,000 |
| Back Up of Sewers or Drains | $500,000 |
| Business Income and Extra Expense | $250,000 |
| Business Income from Dependent Properties | $250,000 |
| Claim Data Expense | $10,000 |
| Consequential Damage | $50,000 |
| Credit Card Slips | $10,000 |
| Difference In Value - Leased Equipment | Included |
| Employee Theft | $25,000 |
| Fine Arts | $50,000 |
| Forgery or Alteration | $10,000 |
| Lock Replacement | $10,000 |
| Money and Securities | $25,000 Inside & Outside the Premises |

**SP1007 (10/16) Page 1 of 12**
*//*SP1007-201610

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**STATE AUTO**
Insurance Companies

| | |
|---|---|
| Money Orders and Counterfeit Money. | $10,000 |
| Ordinance or Law | |
|    Coverage A | Included in Building Limit |
|    Coverage B | $500,000 |
|    Coverage C | $500,000 |
| Tenant Glass | $15,000 |
| Computer Coverage | $50,000 |
| Additional Covered Property | Included |
|    *  Bridges, roadways, walks, patios or other paved surfaces | |
|    *  The cost of excavations, grading, backfilling or filling | |
|    *  Foundations, structures, machinery or boilers below ground | |
|    *  Bulkheads, pilings, piers, wharves or docks | |
|    *  Underground pipes, flues or drains | |
| Utility Services - Direct Damage | $100,000 |
| Exterior Building Glass Deductible | $500 |
| CAUSES OF LOSS - SPECIAL FORM | |
| Additional Coverage - "Fungus", Wet Rot, Dry Rot and Bacteria | $25,000 |
| Property in Transit | $100,000 |
| BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM OR BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM | |
| Definition of premises amended to "within 1,000 feet" | |
| Utility Services - Time Element | $250,000 |

## COVERAGE DESCRIPTION

**A.** BUILDING AND PERSONAL PROPERTY COVERAGE FORM is amended as shown:

  **1.** Paragraph A.1.a.(4)(a) is revised to read, "Fire detection and extinguishing equipment".

  **2.** The provision relating to "within 100 feet of the described premises" contained in sections A.1.a.(5)(b), A.1.b., A.1.c.(2), and the first paragraph of A.5. is revised to read "within 1,000 feet of the described premises."

  **3.** The following Additional Coverage, Coverage Extensions, Limits of Insurance, Loss Conditions and Optional Coverages in the BUILDING AND PERSONAL PROPERTY COVERAGE FORM are amended as shown:

| Section | Coverage Description | The most we will pay provision is increased to |
|---|---|---|
| A.4.a.(4) | Limits of Insurance - Debris Removal | $250,000 |
| A.4.c. | Fire Department Service Charge | $ 50,000 |
| A.4.d. | Pollutant Clean Up And Removal | $100,000 |
| A.4.f.(4) | Electronic Data | $25,000 |
| A.5.a.(1) | Newly Acquired or Constructed Property - Building | $2,000,000 |
| A.5.a.(2) | Newly Acquired or Constructed Property - Your Business Personal Property | $1,000,000 |
| A.5.a.(3)(b) | "30 days" is replaced by "90 days" | |
| A.5.b. | Personal Effects and Property of Others | $50,000 |
| A.5.c. (4) | Valuable Papers and Records (Other Than Electronic Data) | $250,000 |
| A.5.d. | Property Off Premises | |
| | This paragraph is deleted. | |
| A.5.d.(2) | This limit is increased to: | |
| A.5.d.(3) | | $100,000 |
| A.5.e. | Paragraph A.5.e. is amended; for coverage on Outdoor Property (A.5.e.) see the referenced paragraph in this endorsement. | |
| A.5.f. | Non-owned Detached Trailers | $50,000 |
| C. | Limits of Insurance - Outdoor Signs | $50,000 |
| E.7.b. | Valuation - This provision is changed to read "$5,000 or less" | |

**SP1007 (10/16) Page 2 of 12**
*//*SP1007-201610

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

STATE AUTO
Insurance Companies

**PBP 2855775 00**

**4.** The following coverages are added to Additional Coverages under section A.4.:

**g. Arson and Theft Information**. We will pay the expenses to provide a reward for information leading to:

**(1)** An arson conviction in connection with a covered fire; or

**(2)** A conviction in connection with theft of Your Business Personal Property.

Costs incurred in advertising the reward are included. The most we will pay under this provision is $50,000. This limit applies per occurrence regardless of the number of persons providing information. No deductible applies to this additional coverage.

**h. Brands and Labels**. If branded or labeled merchandise that is Covered Property is damaged by a Covered Cause of Loss, we may take all or any part of the property at an agreed or appraised value. If so, you may:

**(1)** Stamp "salvage" on the merchandise or its containers, if the stamp will not physically damage the merchandise; or

**(2)** Remove the brands and labels, if doing so will not physically damage the merchandise. You must re-label the merchandise or its containers to comply with the law.

We will pay reasonable costs you incur to perform the activity prescribed in h.(1) or h.(2) above. But the total we pay for these costs and the value of the damaged property will not exceed the applicable Limit of Insurance on such property.

**i. Business Personal Property Limit - Seasonal Automatic Increase**. The limit of insurance for Your Business Personal Property will automatically increase by 25% to provide for seasonal variations. This increase will apply only if the limit of insurance shown for Your Business Personal Property in the declarations is at least 100% of your average monthly values during the lesser of:

**(1)** The 12 months immediately preceding the date the loss or damage occurs; or

**(2)** The period of time you have been in business as of the date the loss or damage occurs.

**j. Fire Extinguisher Recharge**. We will pay for your expense to recharge portable fire extinguishers used to fight a fire at the premises described in the Declarations or at immediately adjacent premises that expose your property to loss. The most we will pay under this provision is $10,000. No deductible applies to this additional coverage.

**k. Inflation Guard**. The Limits of Insurance for Buildings and Your Business Personal Property under the policy to which this endorsement is attached will automatically increase by an annual percentage of 4%, The amount of increase will be:

**(1)** The Limit of insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

**(2)** 4%, times

**(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance divided by 365.

**l. Tenant Lease Obligation - Damage to Leased Real Property.** If you are a tenant, we will pay up to $15,000 for each location in any one occurrence of covered physical loss or damage to those particular parts of real property leased to you, other than exterior building glass, which you are obligated to insure under a written lease agreement. This is an additional amount of insurance subject to the applicable deductible. For the purposes of this Additional Coverage, the Additional Condition - Coinsurance does not apply.

**5. The following changes are made or coverages are added to the Coverage Extensions under Section A.5.**

**e. Outdoor Property**. You may extend the insurance provided by this Coverage form to apply to damage to your outdoor fences, radio and television antennas, satellite dishes, trees, shrubs and plants, including debris removal expense, resulting from any of the "specified causes of loss" as defined in the Causes of Loss - Special Form. The most we will pay for loss or damage under this Additional Coverage is $50,000, but not more than $2,500 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence. This extension does not apply to trees, shrubs or plants which are "stock" or are part of a vegetated roof.

**h. Accounts Receivable**. You may extend the insurance that applies to Your Business Personal Property to apply to accounts receivable. We will pay:

**(1)** All amounts due you from your customers that you are unable to collect;

**(2)** Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**(3)** Collection expenses in excess of your normal collection expenses that are made necessary by loss or damage; and

**(4)** Other reasonable expenses that you incur to reestablish the records of your accounts receivable that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable. This insurance applies to accounts receivable while:

  **(a)** On premises scheduled in the Declarations of this policy;

  **(b)** While being conveyed outside the premises; or

  **(c)** While temporarily at other premises.

We will not pay for loss or damage caused by or resulting from electrical or magnetic injury, disturbance or erasure of electronic recordings that is caused by or results from:

**(1)** Programming errors or faulty machine instructions; or

**(2)** Faulty installation or maintenance of data processing equipment or component parts,

But we will pay for direct loss or damage caused by lightning.

The most we will pay under this Extension is $250,000 at each described premises.

**i.  Back Up of Sewers or Drains**.

  **(1)  Direct damage**,

  You may extend the insurance that applies to property covered by the BUILDING AND PERSONAL PROPERTY COVERAGE FORM to apply to loss or damage to your property caused by water that:

  **(a)** Backs up through sewers or drains; or

  **(b)** Enters into and overflows from within a:

  **(i)**  Sump pump;

  **(ii)**  sump pump well; or

  Other type system designed to remove subsurface water from the foundation area.

  **(2)  Indirect damage**,

  In addition, we will pay the actual Loss of Business Income or Extra Expense you sustain due to the necessary suspension of your "operations" caused by or resulting from water that backs up through sewers or drains, or water that enters into and overflows from within a:

  **(a)** Sump pump;

  **(b)** Sump pump well; or

  Other type system designed to remove subsurface water from the foundation area.

  Coverage for Loss of Business Income and Extra Expense begins at the time of direct loss or damage caused by or resulting from back up of sewers or drains covered under this endorsement. We will only pay for Loss of Business Income that occurs within 14 calendar days after the date of such direct loss or damage. For the purposes of this coverage extension, the definition of Loss of Business Income and Extra Expense shall be the same as that included in item j. below.

The most we will pay for such loss or damage in any one occurrence at all locations shown in the Declarations is $500,000. The deductible for this coverage extension is $5,000 or the All Perils Deductible applicable to Building coverage shown on the Declarations, whichever is greater. This deductible does not apply to Loss of Business Income and Extra Expense.

**j.  Business Income and Extra Expense**. We will pay for the actual loss of Business Income, including "rental value" you sustain and Extra Expense you incur due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at the premises described in the Declarations. The loss or damage must be caused by or result from a Covered cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of the site at which the described premises are located. If you occupy only part of the site at which the described premises are located, your premises means:

  **(i)**  The portion of the building which you rent, lease or occupy; and

  **(ii)**  Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

**(1)** The most we will pay for loss or damage under this Extension in one occurrence is $250,000.

**(2)** Business Income means the:

  **(a)** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

  **(b)** Continuing normal operating expenses incurred, including payroll.

  For manufacturing risks, Net Income includes the net sales value of production.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

STATE AUTO
Insurance Companies

**(3)** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(a)** Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location;

**(b)** Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have payable under this coverage.

**(4)** "Operations" means:

**(a)** Your business activities occurring at the described premises; and

**(b)** The tenantability of the described premises.

**(5)** "Rental value" means Business Income that consists of:

**(a)** Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

**(b)** Continuing normal operating expenses incurred in connection with that premises, including:

**(i)** Payroll; and

**(ii)** The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

**(6)** "Period of restoration" means the period of time that:

**(a)** Begins immediately after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

**(b)** Ends on the earlier of:

**(i)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(ii)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

**(i)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(ii)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

The expiration date of this policy will not cut short the "period of restoration."

**(7)** "Suspension" means:

**(a)** The slowdown or cessation of your business activities; or

**(b)** That a part of all of the described premises is rendered non-tenantable.

**k.** **Business Income from Dependent Properties**. We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to "dependent property" at premises not described in the Declarations caused by or resulting from a Covered Cause of Loss. However, coverage under this extension does not apply when the only loss to "dependent property" is loss or damage to electronic data, including destruction or corruption of electronic data. If the "dependent property" sustains loss or damage to electronic data and other property, coverage under this extension will not continue once the other property is repaired, rebuilt, or replaced. The term electronic data has the meaning set forth in the Coverage Form to which this endorsement applies.

The following Definitions also apply to this Coverage Extension:

**(1)** "Dependent property" means property owned or operated by others whom you depend on to:

**(a)** Deliver materials or services to you or to others for your account. But any property which delivers any of the following services is not a "dependent property" with respect to such services:

**(i)** Water supply services;

**(ii)** Power supply services; or

**(iii)** Communication supply services, including services relating to internet access or access to any electronic network.

**(b)** Accept your products or services

**(c)** Manufacture products for delivery to your customers under contract of sale; or

**(d)** Attract customers to your business.

**SP1007 (10/16) Page 5 of 12**

*//*SP1007-201610

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**(2)** "Period of Restoration", with respect to "dependent property", means the period of time that:

- **(a)** Begins immediately after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the premises of the "dependent property"; and
- **(b)** Ends on the date when the property at the premises of the "dependent property" should be repaired, rebuilt or replaced with reasonable speed and similar quality.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

- **(a)** Regulates the construction, use or repair, or requires the tearing down of any property; or
- **(b)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration of this policy will not cut short the "period of restoration".

We will reduce the amount of your Business Income from Dependent Properties loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:

- **(a)** Source of materials; or
- **(b)** Outlet for your products.

The most we will pay for loss or damage under this Extension is $250,000.

**l. Claim Data Expense**. You may extend the insurance provided by the BUILDING AND PERSONAL PROPERTY COVERAGE FORM to apply to the expense you incur in preparing claim data when we require it. This includes the cost of taking inventories, making appraisals and preparing other documentation to show the extent of the loss.

The most we will pay for preparation of claim data under this Extension is $10,000. We will not pay for any expenses billed by and payable to insurance adjusters or attorneys or any costs as provided in the Loss Condition Appraisal.

**m. Consequential Damage**. You may extend the insurance that applies to Your Business Personal Property to apply to the consequential loss of your undamaged product part or parts. Consequential damage means a part or parts of your product are physically lost or damaged by a covered cause of loss causing the part or parts that are undamaged to be unmarketable as a complete product. The most we will pay for loss or damage under this Extension is $50,000 in any one occurrence.

**n. Credit Card Slips**. You may extend the insurance that applies to Your Business Personal Property to apply to amounts you are unable to collect due to loss of or damage to credit card slips while located at the described premises as a result of a Covered Cause of Loss.

It is your responsibility to establish the amount of the loss under this Extension. If that is not possible, the amount of loss will be determined as follows:

- **(1)** If you have been in business for more than twelve months at the location of the loss, one-thirtieth (1/30) of the average monthly amount of credit card slips will be considered as the average daily credit card slips for that location. The twelve months immediately preceding the discovery of the loss will be used to determine the average monthly amount.
- **(2)** If you have been in business for less than twelve months at the location of the loss, the average daily credit card slips shall be one-thirtieth (1/30) of the average monthly amount of credit card slips for the number of months you have been in business at that location.
- **(3)** The average daily credit card slips will be multiplied by the number of days for which slips are lost to determine the amount of the loss, subject to the maximum limit indicated below.

The most we will pay as a result of loss or damage to credit card slips under this Extension is $10,000.

No deductible applies to this Extension.

**o. Difference In Value - Leased Equipment**. You may extend the insurance that applies to Your Business Personal Property to cover the difference between the amount due under a lease agreement on covered personal property on the described premises and the replacement cost or actual cash value of that leased personal property.

The most we will pay under this Extension is the greater of the:

- **(1)** Amount due under the terms of the lease to which your business personal property is subject, but not to include:
  - **(a)** Overdue lease payments;
  - **(b)** Financial penalties imposed under the lease due to excessive use or abnormal wear and tear; or
  - **(c)** Security deposits not refunded by the lessor; or
- **(2)** Replacement cost if that is shown in the declarations as applying to Your Business Personal Property; or

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

Issue Date  02/28/2019        01:23:06 PM

0016800    Printed:
03/01/19    01:38:23

(3) Actual cash value if that is shown in the declarations as applying to Your Business Personal Property.

p. **Employee Theft**. You may extend the insurance that applies to Your Business Personal Property to apply to loss of and or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(1) We will not pay for loss as specified below:

(a) Item B.2.h., Exclusions, in the CAUSES OF LOSS - SPECIAL FORM, is replaced by the following: Loss resulting from "theft" or any other dishonest act committed by:

(i) You; or

(ii) Any of your partners or members;

whether acting alone or in collusion with other persons.

(b) Loss caused by any "employee" of yours, or predecessor in interest of yours, for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation; or

(c) Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon

(i) An inventory computation; or

(ii) A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

(d) Loss resulting directly or indirectly from trading, whether in your name or in a genuine or fictitious account.

(e) Loss resulting from fraudulent or dishonest signing, issuing, canceling or failing to cancel, a warehouse receipt or any papers connected with it.

(f) Loss that is an indirect result of any act or "occurrence" covered by this insurance.

(g) Expenses related to any legal action.

(h) Loss caused by any "employee" immediately upon discovery by:

(i) You; or

(ii) Any of your partners, members, managers, officers, directors or trustees not in collusion with the "employee";

of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you.

(2) "Employee"

(a) Means any natural person:

(i) While in your service or for 30 days after termination of service;

(ii) Who you compensate directly by salary, wages or commissions; and

(iii) Who you have the right to direct and control while performing services for you;

(b) Any natural person who is furnished temporarily to you:

(i) To substitute for a permanent "employee" as defined in (a) above, who is on leave; or

(ii) To meet seasonal or short-term work load conditions;

While that person is subject to your direction and control and performing services for you, excluding, however, any such person while having care and custody of property outside the premises;

(c) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as define in Paragraph (b) above;

(d) Any natural person who is a former "employee", director, partner, member, manager, representative or trustee retained as a consultant while performing services for you; or

(e) Any natural person who is a guest student or intern pursing studies or duties, excluding, however, any such person while having care and custody of property outside the premises.

(f) "Employee" does not mean:

(i) Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

(ii) Any manager, director or trustee except while performing acts coming within the scope of the usual duties of an "employee."

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

Case 3:21-cv-02174-HBK PC    Document 343-25    Filed 03/03/22    Page 183 of 538

**STATE AUTO**
Insurance Companies

    **(3)** "Money" means:
        **(a)** Currency, coins and bank notes in current use and having a face value; and
        **(b)** Travelers checks, register checks and money orders held for sale to the public.
    **(4)** "Other property" means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property excluded under this insurance.
    **(5)** "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:
        **(a)** Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and
        **(b)** Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;
        but does not include "money".
    **(6)** "Theft" means the unlawful taking of "money", "securities", or "other property" to the deprivation of the insured.
    The most we will pay for loss or damage under this Extension is $25,000 in any one occurrence. The deductible for this Extension will be $1,000.
    "Occurrence" means all loss caused by, or involving, one or more "employees," whether the result of a single act or a series of acts.

**q.  Fine arts.** You may extend coverage that applies to Your Business Personal Property to cover loss or damage to paintings, etchings, pictures, tapestries, art glass windows and other bona fide works of art or rarity, having historical values or artistic merit. This Extension is subject to the following:
    **(1)** Loss or damage must be caused by a Covered Cause of Loss;
    **(2)** The most we will pay for loss or damage under this Extension is $50,000 at each described premises;
    **(3)** Item 2.b. in Section C., Limitations, in the CAUSES OF LOSS - SPECIAL FORM, pertaining to breakage, does not apply to this coverage; and
    **(4)** The following is added as item f. to paragraph 7, Valuation, of Section E. Loss Conditions, in the BUILDING AND PERSONAL PROPERTY COVERAGE FORM: Fine Arts at market value at the time of loss or damage.

**r.  Forgery or Alteration.** You may extend the insurance that applies to Your Business Personal Property to loss resulting directly from "forgery" or alteration of, any checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are
    **(1)** Made or drawn by or drawn upon you; or
    **(2)** Made or drawn by one acting as your agent;
    Or that are purported to have been so made or drawn.
    If you are sued for refusing to pay any instrument covered in the paragraph above, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense.
    "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.
    "Money" means:
        **(a)** Currency, coins and bank notes in current use and having a face value; and
        **(b)** Travelers checks, register checks and money orders held for sale to the public.
    The most we will pay for any loss, including legal expenses, under this Additional Coverage is $10,000.

**s.  Lock Replacement.** You may extend the insurance that applies to Covered Property to pay for expenses incurred to replace door locks or tumblers of your described premises due to theft of your door keys. Item 1.e. in Section C., Limitations, in the CAUSES OF LOSS - SPECIAL FORM, shall not apply to this coverage. The most we will pay under this Extension is $10,000 in any one occurrence. A $100 deductible applies to this Extension.

**t.  Money and Securities.** You may extend the insurance that applies to Your Business Personal Property to apply to loss of "money", "securities", stamps or lottery tickets held for sale, and "other property". The most we will pay for loss resulting directly from "theft", disappearance or destruction under this Extension is:
    **(1)** $25,000 per occurrence for money, securities, stamps and lottery tickets held for sale while located at the described premises; or
    **(2)** $25,000 per occurrence for money, securities, stamps and lottery tickets held for sale, and "other property" while being conveyed outside the described premises by you, your officers, your partners or your employees. However, coverage for "other property" is limited to loss or damage resulting from an actual or attempted "robbery".

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

0016802    Printed:
03/01/19   01:38:23

**(3)** "Money" means:

    **(a)** Currency, coins and bank notes in current use and having a face value; and

    **(b)** Travelers checks, register checks and money orders held for sale to the public.

"Other property" means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property excluded under this insurance.

"Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

    **(a)** Caused or threatened to cause that person bodily harm; or

    **(b)** Committed an obviously unlawful act witnessed by that person.

"Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

    **(a)** Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

    **(b)** Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

    but does not include "money".

"Theft" means the unlawful taking of "money", "securities", or "other property" to the deprivation of the insured.

**u.** **Money Orders and Counterfeit Money**. You may extend the insurance that applies to Your Business Personal Property to loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

**(1)** Money orders issued by any post office, express company or bank that are not paid upon presentation; or

**(2)** "Counterfeit" money that is acquired during the regular course of business.

"Money" means:

    **(a)** Currency, coins and bank notes in current use and having a face value; and

    **(b)** Travelers checks, register checks and money orders held for sale to the public.

"Counterfeit" means an imitation of an actual valid original which is intended to deceive and to be taken as the original.

The most we will pay for any loss under this Extension is $10,000.

**v.** **Ordinance or Law**. You may extend the insurance that applies to Your Building only if both (1) and (2) below are satisfied and are then subject to the qualifications set forth in (3) as follows:

**(1)** The ordinance or law:

    **(a)** Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

    **(b)** Is in force at the time of loss.

But this coverage extension applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this coverage extension.

**(2) (a)** The building sustains direct physical damage that is covered under this policy and such damage results in enforcement of the ordinance or law; or

    **(b)** The building sustains both direct physical damage that is covered under this policy and direct physical damage that is not covered under this policy, and the building damage in its entirety results in enforcement of the ordinance or law.

    **(c)** But if the building sustains direct physical damage that is not covered under this policy, and such damage is the subject of the ordinance or law, then there is no coverage under this endorsement even if the building has also sustained covered direct physical damage.

**(3)** In the situation described in (2)(b) above, we will not pay the full amount of loss otherwise payable under the terms of this coverage extension. Instead, we will pay a proportion of such loss; meaning the proportion that the covered direct physical damage bears to the total direct physical damage.

However, if the covered direct physical damage, alone, would have resulted in enforcement of the ordinance or law, then we will pay the full amount of loss otherwise payable under the terms of this coverage extension.

**(4)** We will not pay under this coverage extension for:

    **(a)** The costs associated with enforcement of any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

    **(b)** The costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(5)** With respect to the building that has sustained covered direct physical damage, we will pay for:

    **(a)** The loss in value of the undamaged portion of the building as a consequence of enforcement of an ordinance or law that requires demolition of undamaged parts of the same building.

    **(b)** The cost to demolish and clear the site of undamaged parts of the same building, as a consequence of enforcement of an ordinance or law that requires demolition of such undamaged property;

    **(c)** The increased cost to:

        **(i)** Repair or reconstruct damaged portions of that building; and/or

        **(ii)** Reconstruct or remodel undamaged portions of that building, whether or not demolition is required;

        when the increased cost is a consequence of enforcement of the minimum requirements of the ordinance or law.

        However:

        **(i)** This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

        **(ii)** We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

        When a building is damaged or destroyed and this additional coverage applies to that building in accordance with (c) above, coverage for the increased cost of construction also applies to repair or reconstruction of the following, subject to the same conditions stated in (c) above:

        **a.** The cost of excavations, grading, backfilling and filling;

        **b.** Foundation of the building;

        **c.** Pilings; and

        **d.** Underground pipes, flues and drains.

        These four items are deleted from Property Not Covered, but only with respect to the coverage described in this provision.

The most we will pay in any one occurrence for loss described in paragraph (5)(a) above is the Limit of Insurance shown in this policy's Declarations applicable to the building sustaining the loss. The coverage in paragraph (5)(a) above does not increase the Limit of Insurance.

The most we will pay in any one occurrence for loss described in paragraph (5)(b) is $500,000.

The most we will pay in any one occurrence for loss described in paragraph (5)(c) above is $500,000.

The Coinsurance Additional Condition does not apply to (5)(b) or (5)(c) above.

The terms of this Extension shall apply separately to each building to which the Extension applies.

This Extension is subject to the deductible in the Commercial Property Coverage Declarations.

**w. Tenant Glass.** You may extend the insurance that applies to Your Business Personal Property to apply to building glass, including lettering and ornamentation, which you are obligated to insurer under a written lease agreement. The most we will pay under this Extension in any one occurrence is $15,000. This Extension is subject to these provisions:

**(1)** Your responsibility for damage to building glass must be contained in a written lease for premises rented to you at a location shown in the Declarations

**(2)** The loss or damage must be caused by or result from direct physical loss unless the loss is;

    **(a)** Excluded in Section B. Exclusions of the CAUSE OF LOSS - SPECIAL FORM

    **(b)** Limited in Section C. Limitations of the CAUSE OF LOSS - SPECIAL FORM

Building glass losses under this Extension are subject to a $500 deductible, regardless of the property deductible shown in the Declarations of this policy.

**x. Computer Coverage.** You may extend the insurance that applies to Your Business Personal Property to apply to computer hardware and computer software. For the purposes of this Coverage Extension, exclusions 2.a. and 2.d.(6) of the CAUSES OF LOSS - SPECIAL FORM CP 10 30 do not apply and the following definitions are added:

**(1)** Computer hardware means an assemblage of electronic machine components capable of accepting instructions and information, processing the information according to instructions, and producing desired results.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**(2)** Computer software means:

    **(a)** processing, recording or storage media used for electronic data processing operations. This includes films, tapes, cards, discs, drums, cartridges, or cells; and

    **(b)** data, information, and instructions stored on processing, recording, or storage media used for electronic data processing operations.

The most we will pay under this extension for any one occurrence is $50,000.

**y. Additional Covered Property.** The following is withdrawn from Property Not Covered and added to Covered Property.

    **(1)** Bridges, roadways, walks, patios or other paved surfaces;

    **(2)** The cost of excavations, grading, backfilling or filling;

    **(3)** Foundations of buildings, structures, machinery or boilers if their foundations are below:

        **(a)** The lowest basement floor; or

        **(b)** The surface of the ground, if there is no basement;

    **(4)** Bulkheads, pilings, piers, wharves or docks;

    **(5)** Underground pipes, flues or drains.

**z. Utility Services - Direct Damage**. We will pay for loss or damage to Covered Property caused by an interruption in utility service to the premises described in the Declarations. The interruption in utility service must result from direct physical loss or damage by a Covered Cause of Loss to utility property described below that is located off the premises described in the Declarations:

    **(1)** Water Supply Services, meaning the following types of property supplying water to the premises described in the Declarations:

        **(a)** Pumping stations; and

        **(b)** Water mains.

    **(2)** Communications Supply Services, meaning property supplying communication services, including telephone, radio microwave or television services to the premises described in the Declarations, such as:

        **(a)** communication transmission lines, including optic fiber transmission lines, but not including overhead transmission lines;

        **(b)** Coaxial cables; and

        **(c)** Microwave radio relays except satellites.

    **(3)** Power Supply Services, meaning the following types of property supplying electricity, steam, or gas to the premises described in the Declarations:

        **(a)** Utility generating plants;

        **(b)** Switching stations;

        **(c)** Substations;

        **(d)** Transformers: and

        **(e)** Transmission lines, but not including overhead transmission lines.

The most we will pay for loss or damage under this Extension is $100,000. This Extension does not increase the applicable limit of insurance.

**6.** The following is added to Section D. Deductible:

The deductible shown in the Declarations is amended to read $500 when an occurrence involves covered loss or damage only to exterior building glass. In the event other building property is also damaged in the same occurrence, the deductible shown in the Declarations will be the only deductible applied to all covered loss within that occurrence.

**B.** CAUSES OF LOSS - SPECIAL FORM is amended as shown:

The following Additional Coverage, Coverage Extensions, Limits of Insurance, Loss Conditions and Optional Coverages in the CAUSES OF LOSS - SPECIAL FORM are amended as shown;

| Section | Coverage Description | The most we will pay provision is increased to |
|---|---|---|
| E.3. | Additional Coverage - Limited Coverage, "Fungus", Wet Rot, Dry Rot, And Bacteria | $25,000 |

**F.** Additional Coverage Extensions, items 1.a. and 1.c. of **Property In Transit**, are replaced by the following:

    **a.** You may extend the insurance provided by this Coverage Part to apply to Your Business Personal Property while in the care, custody or control of your salespersons or in transit more than 1,000 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**STATE AUTO**
Insurance Companies

**PBP 2855775 00**

   **b.** Loss or damage must be caused by or result from direct physical loss unless the loss is:

     **(1)** Excluded in Section B., Exclusions of the CAUSE OF LOSS - SPECIAL FORM

     **(2)** Limited in Section C. Limitations of the CAUSE OF LOSS - SPECIAL FORM

   **c.** The most we will pay for loss or damage under this Extension is $100,000.

**C.** If the BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM or the BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM is attached to this policy, the following provisions apply:

   **1.** The provision related to "within 100 feet of the site at which the described premises are located" in Sections A.1. and A.5.b.(3) are revised to read "within 1,000 feet" of the site at which the described premises are located:

   **2.** The provision related to "60 consecutive days" in section A.5.c.(1)(b)(ii) is revised to read "90 consecutive days".

   **3.** The following coverage is added to Additional Coverages under Section A.5.:

   **e.** Utility Services - Time Element. Your coverage for Business Income and/or Extra Expense, as provided and limited in the BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM or the BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM is extended to apply to a "suspension" of "operations" at the described premises caused by an interruption in utility service to that premises. The interruption in utility service must result from direct physical loss or damage by a Covered Cause of Loss as defined by the CAUSE OF LOSS - SPECIAL FORM to the following types of property that is located outside of a covered building described in the Declarations:

   **(1)** Water Supply Services, meaning the following types of property supplying water to the described premises:

     **(a)** Pumping stations; and

     **(b)** Water Mains.

   **(2)** Communication Supply Services, meaning property supplying communication services, including telephone, radio, microwave or television services, to the described premises, such as:

     **(a)** Communication transmission lines, including optic fiber transmission lines, but not including overhead transmission lines;

     **(b)** Coaxial cables; and

     **(c)** Microwave radio relays, except satellites.

   **(3)** Power Supply Services, meaning the following types of property supplying electricity, steam or gas to the described premises:

     **(a)** Utility generating plants;

     **(b)** Switching stations;

     **(c)** Substations;

     **(d)** Transformers; and

     **(e)** Transmission lines, but not including overhead transmission lines.

The coinsurance Additional Condition does not apply to the Additional Coverage. The most we will pay for loss or damage under this Additional Coverage in any one occurrence is $250,000. This limit is part of, and not in addition to, the Limit of Insurance for Business Income (With Extra Expense) or the Business Income (Without Extra Expense) stated in the Declarations as applicable to the described premises.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

Issue Date 02/28/2019    01:23:06 PM

0016806 Printed:
03/01/19 01:38:23

STATE AUTO
Insurance Companies

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Coverage

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit Of Insurance is shown in the Declarations:

**(1)** Business Income Including "Rental Value".

**(2)** Business Income Other Than "Rental Value".

**(3)** "Rental Value".

If option **(1)** above is selected, the term Business Income will include "Rental Value". If option **(3)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises means:

**(a)** The portion of the building which you rent, lease or occupy;

**(b)** The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

**(c)** Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

### 2. Extra Expense

**a.** Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

**(2)** Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

### 3. Covered Causes Of Loss, Exclusions And Limitations

See applicable Causes Of Loss form as shown in the Declarations.

*d* Insurance Services Office, Inc., 2011

**4. Additional Limitation - Interruption Of Computer Operations**

**a.** Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**b.** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**c.** Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**d.** This Additional Limitation does not apply when loss or damage to electronic data involves only electronic data which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**5. Additional Coverages**

**a. Civil Authority**

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority Coverage for Business Income ends;

whichever is later.

**b. Alterations And New Buildings**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

**(a)** Used in the construction, alterations or additions; or

**(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**c. Extended Business Income**

**(1) Business Income Other Than "Rental Value"**

If the necessary "suspension" of

**CP0030 (10/12) Page 2 of 8**
*//*CP0030-201210

*d* Insurance Services Office, Inc., 2011

0016808    Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

**PBP 2855775  00**

your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 60 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located. Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(2) "Rental Value"**

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

**(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 60 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions

caused by the impact of the Covered Cause of Loss in the area where the described premises are located. Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**d. Interruption Of Computer Operations**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Additional Limitation - Interruption Of Computer Operations.

**(2)** Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss. However, we will not provide coverage under this Additional Coverage when the Additional Limitation - Interruption Of Computer Operations does not apply based on Paragraph **A.4.d.** therein.

**(3)** With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

**(a)** If the Causes Of Loss - Special Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(b)** If the Causes Of Loss - Broad Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Interruption Of Computer Operations.

**(d)** The Covered Causes of Loss include a virus, harmful code or

**CP0030 (10/12) Page 3 of 8**
*//*CP0030-201210

*d*  Insurance Services Office, Inc., 2011

similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Interruption Of Computer Operations, is $2,500 (unless a higher limit is shown in the Declarations) for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

**(5)** This Additional Coverage, Interruption Of Computer Operations, does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in **(4)** above has not been exhausted.

**6. Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

**a.** You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

**b.** The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location, unless a higher limit is shown in the Declarations.

**c.** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

**(1)** This policy expires;

**(2)** 30 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

**B. Limits Of Insurance**

The most we will pay for loss in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

**1.** Alterations And New Buildings;

**2.** Civil Authority;

**3.** Extra Expense; or

**4.** Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage.

**C. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**d** Insurance Services Office, Inc., 2011

Case 3:21-cv-02174-BJD-PDB    Document 34-25    Filed 03/01/22    Page 192 of 538

**STATE AUTO**
Insurance Companies

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Loss**

**a.** You must see that the following are done in the event of loss:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the direct physical loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(7)** Cooperate with us in the investigation or settlement of the claim.

**(8)** If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Loss Determination**

**a.** The amount of Business Income loss will be determined based on:

**(1)** The Net Income of the business before the direct physical loss or damage occurred;

**(2)** The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

**(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

**(4)** Other relevant sources of information, including:

**(a)** Your financial records and accounting procedures;

**(b)** Bills, invoices and other vouchers; and

**(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

**(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

**(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

**(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(2)** Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**c. Resumption Of Operations**

We will reduce the amount of your:

**(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

**CP0030 (10/12) Page 5 of 8**

*//*CP0030-201210

***d*** Insurance Services Office, Inc., 2011

0016811    Printed:
03/01/19   01:38:23

**(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**4. Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**a.** We have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

**D. Additional Condition**

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

**1.** The Coinsurance percentage shown for Business Income in the Declarations; times

**2.** The sum of:

**a.** The Net Income (Net Profit or Loss before income taxes), and

**b.** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

Step **(1)**: Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

Step **(2)**: Divide the Limit of Insurance for the described premises by the figure determined in Step (1); and

Step **(3)**: Multiply the total amount of loss by the figure determined in Step (2).

We will pay the amount determined in Step (3) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

**(1)** Prepaid freight -   outgoing;

**(2)** Returns and allowances;

**(3)** Discounts;

**(4)** Bad debts;

**(5)** Collection expenses;

**(6)** Cost of raw stock and factory supplies consumed (including transportation charges);

**(7)** Cost of merchandise sold (including transportation charges);

**(8)** Cost of other supplies consumed (including transportation charges);

**(9)** Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

**(10)** Power, heat and refrigeration expenses that do not continue under contract (if Form **CP 15 11** is attached);

**(11)** All payroll expenses or the amount of payroll expense excluded (if Form **CP 15 10** is attached); and

**(12)** Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion - not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example 1 (Underinsurance)**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $  400,000

The Coinsurance percentage is: 50%

The Limit of Insurance is: $  150,000

The amount of loss is: $  80,000

Step **(1)**: $400,000 x 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2)**: $150,000 $200,000 = .75

Step **(3)**: $80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example 2 (Adequate Insurance)**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $  400,000

The Coinsurance percentage is: 50%

The Limit of Insurance is: $  200,000

The amount of loss is: $  80,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this

*d* Insurance Services Office, Inc., 2011

STATE AUTO
Insurance Companies

example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to Extra Expense Coverage.

**E. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

1. **Maximum Period Of Indemnity**
   a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.
   b. The most we will pay for the total of Business Income loss and Extra Expense is the lesser of:
      (1) The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the "period of restoration"; or
      (2) The Limit Of Insurance shown in the Declarations.

2. **Monthly Limit Of Indemnity**
   a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.
   b. The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:
      (1) The Limit of Insurance, multiplied by
      (2) The fraction shown in the Declarations for this Optional Coverage.

**Example**

When:  The Limit of Insurance is: $ 120,000
The fraction shown in the Declarations for this Optional Coverage is: 1/4
The most we will pay for loss in each period of 30 consecutive days is: $ 30,000
($120,000 x 1/4 = $30,000)
If, in this example, the actual amount of loss is:
Days 1-30: $ 40,000
Days 31-60: $ 20,000
Days 61-90: $ 30,000
$ 90,000

We will pay:
Days 1-30: $ 30,000
Days 31-60: $ 20,000
Days 61-90: $ 30,000
$ 80,000

The remaining $10,000 is not covered.

3. **Business Income Agreed Value**
   a. To activate this Optional Coverage:
      (1) A Business Income Report/Work Sheet must be submitted to us and

must show financial data for your "operations":
      (a) During the 12 months prior to the date of the Work Sheet; and
      (b) Estimated for the 12 months immediately following the inception of this Optional Coverage.
      (2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:
      (a) The Coinsurance percentage shown in the Declarations; multiplied by
      (b) The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.
   b. The Additional Condition, Coinsurance, is suspended until:
      (1) 12 months after the effective date of this Optional Coverage; or
      (2) The expiration date of this policy; whichever occurs first.
   c. We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:
      (1) Within 12 months of the effective date of this Optional Coverage; or
      (2) When you request a change in your Business Income Limit of Insurance.
   d. If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:
      (1) The Business Income Limit of Insurance; divided by
      (2) The Agreed Value.

**Example**

When:  The Limit of Insurance is: $ 100,000
The Agreed Value is: $ 200,000
The amount of loss is: $ 80,000
Step (1): $100,000 . $200,000 = .50
Step (2): .50 x $80,000 = $40,000
We will pay $40,000. The remaining $40,000 is not covered.

4. **Extended Period Of Indemnity**
   Under Paragraph **A.5.c., Extended Business Income**, the number 60 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

**F. Definitions**

1. "Finished stock" means stock you have manufactured.
   "Finished stock" also includes whiskey and alcoholic products being aged, unless there

*d* Insurance Services Office, Inc., 2011

is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

**2.** "Operations" means:

    **a.** Your business activities occurring at the described premises; and

    **b.** The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

**3.** "Period of restoration" means the period of time that:

    **a.** Begins:

        **(1)** 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

        **(2)** Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

        caused by or resulting from any Covered Cause of Loss at the described premises; and

    **b.** Ends on the earlier of:

        **(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

        **(2)** The date when business is resumed at a new permanent location.

    "Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

        **(1)** Regulates the construction, use or repair, or requires the tearing down, of any property; or

        **(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

    The expiration date of this policy will not cut short the "period of restoration".

**4.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**5.** "Rental Value" means Business Income that consists of:

    **a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

    **b.** Continuing normal operating expenses incurred in connection with that premises, including:

        **(1)** Payroll; and

        **(2)** The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

**6.** "Suspension" means:

    **a.** The slowdown or cessation of your business activities; or

    **b.** That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

*d* Insurance Services Office, Inc., 2011

STATE AUTO
Insurance Companies

**PBP 2855775    00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUSINESS INCOME CHANGES
# ACTUAL LOSS SUSTAINED ENDORSEMENT -
# 12 MONTH LIMITATION

This endorsement modifies insurance provided under the following:

BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

For the purpose of this endorsement and for the insured location(s) so designated in the Declarations where this endorsement is applicable:

I.    Paragraph **B.,** Limits of Insurance, in the Business Income form attached to this policy is deleted and replaced by the following:

**C.**   LIMITS OF INSURANCE

We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage.

II.   Paragraph **D**., Additional Condition - Coinsurance, in the Business Income form attached to this policy is deleted.

III.  Under Paragraph **E.,** Optional Coverages, options **1., 2**. and 3. are deleted.

**SP 00 15 01 05 Page 1 of 1**
*//*SP 00 15 01 05

Includes copyrighted material of Insurance Services Office, Inc. or
ISO Commercial Risk Services, Inc. with its permission

Case 2:21-cv-02174-JPM-tmp   Document 34-25   Filed 03/03/22   Page 197 of 538

![State Auto Insurance Companies logo] **STATE AUTO**
Insurance Companies

**PBP 2855775   00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**
"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**
The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

**IL 09 52 01 08   Page 1 of 1**
*//*IL 09 52 01 08

ISO Properties, Inc., 2007

0016816  Printed:
03/01/19  01:38:23

**PBP 2855775   00**

**STATE AUTO**
Insurance Companies

THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN
RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK
INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR
CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

Terrorism Premium (Certified Acts) $

This premium is the total Certified Acts premium attributable to the following Coverage
Part(s), Coverage Form(s) and/or Policy(s):

Additional information, if any, concerning the terrorism premium:

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**IL 09 85 01 08   Page 1 of 1**
*//*IL 09 85 01 08

ISO Properties, Inc., 2007

0016817    Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - LEAD LIABILITY

The following exclusions are added to all coverages contained within.

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
BUSINESSOWNERS LIABILITY COVERAGE FORM

This insurance does not apply to:

1. Actual or alleged "bodily injury," arising out of the ingestion, inhalation or absorption of lead or lead compounds in any form.

2. Actual or alleged "property damage" or "personal and advertising injury" arising out of any form of lead or lead compounds.

3. Any loss, cost or expense arising out of any:

   a. Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead or lead compounds;

   b. Claim or "suit" by or on behalf of any governmental authority for damages resulting from testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of lead or lead compounds in any form;

   c. Any actual or alleged negligence in hiring, training, supervision, instructions, recommendations, warnings or advice given or which should have been given to employees, consumers, or others in connection with lead or lead compounds; or

   d. Any obligation to share damages with or repay someone else who must pay damages in connection with lead or lead compounds.

**SL2004 (01/06)  Page 1 of 1**
*//*SL2004-200601

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

**STATE AUTO**
Insurance Companies

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
BUSINESSOWNERS LIABILITY COVERAGE FORM

This insurance does not apply to:
**A.** "Bodily injury," "property damage" or "personal and advertising injury" as defined in the policy arising out of:
   **1.** Inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos;
   **2.** The use of asbestos in constructing or manufacturing any goods, product, or structure;
   **3.** The removal of asbestos from any goods, product or structure;
   **4.** The manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos;
**B.** Any damages or any loss, cost or expense arising out of any claim or suit by or on behalf of any governmental authority requirement that any insured or any other person or entity should be, or should be responsible for:
   **1.** Assessing the presence, absence or amount or effects of asbestos;
   **2.** Identifying, sampling or testing for, detecting, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, abating, disposing of or mitigating asbestos; or
**C.** Responding to asbestos in any way other than as described in subparagraphs **A.** and **B.** above.
**D.** Any actual or alleged negligence in hiring, training, supervision, instructions, recommendations, warnings or advice given or which should have been given to employees, consumers, or others in connection with **A.** and **B.** above; or
**E.** Any obligation to share damages with or repay someone else who must pay damages in connection with any of the subsections above.

**SL2002 (01/06)   Page 1 of 1**
*//*SL2002-200601

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

STATE AUTO
Insurance Companies

**PBP 2855775   00**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE OF PREMIUM AND ESTIMATED PREMIUM FOR CERTIFIED ACTS OF TERRORISM COVERAGE
## (PURSUANT TO TERRORISM RISK INSURANCE ACT)

### SCHEDULE

**SCHEDULE - PART I**
Terrorism Premium (Certified Acts)
(A) Premium through end of year (12/31/     ) $
(B) Estimated Premium beyond the date specified above  $
(Refer to Paragraph **C.** in this endorsement.)
This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):

Additional information, if any, concerning the terrorism premium:

**SCHEDULE - PART II**
Federal share of terrorism losses            % Year: 20 _____
(Refer to Paragraph **B.** in this endorsement.)

Federal share of terrorism losses            % Year: 20 _____
(Refer to Paragraph **B.** in this endorsement.)
Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.  Disclosure Of Premium**
In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B.  Disclosure Of Federal Participation In Payment Of Terrorism Losses**
The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. For losses occurring in 2006, the federal share equals 90%

of that portion of the amount of such insured losses that exceeds the applicable insurer retention. For losses occurring in 2007, the federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. If the federal program is extended beyond 2007, the applicable percentage is shown in Part **II** of the Schedule of this endorsement or in the policy Declarations.

**C.  Possibility Of Additional Or Return Premium**
The premium for certified acts of terrorism coverage is calculated based in part on the federal participation in payment of terrorism losses as set forth in the Terrorism Risk

**IL 09 99 01 07 Page 1 of 2**
*//*IL 09 99 01 07

ISO Properties, Inc. 2005

Case 3:21-cv-02741-RFC Document 343-25 Filed 03/01/22 Page 202 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

Insurance Act. The federal program established by the Act is scheduled to terminate at the end of the year specified in Part **I** of the Schedule of this endorsement, unless extended by the federal government. If the federal program terminates or if the level or terms of federal participation change, the estimated premium shown in **(B)** in Part **I** of the Schedule may not be appropriate.

If this policy contains a Conditional Exclusion, continuation of coverage for certified acts of terrorism, or termination of such coverage, will be determined upon disposition of the federal program, subject to the terms and conditions of the Conditional Exclusion. If this policy does not contain a Conditional Exclusion, coverage for certified acts of terrorism will continue. In either case, when disposition of the federal program is determined, we will recalculate the premium shown in **(B)** in Part **I** of the Schedule and will charge additional premium or refund excess premium, if indicated.

If we notify you of an additional premium charge, the additional premium will be due as specified in such notice.

**IL 09 99 01 07 Page 2 of 2**
*//*IL 09 99 01 07

ISO Properties, Inc. 2005

Case 3:21-cv-00174-HTW-LGI   Document 34-2   Filed 08/03/23   Page 200 of 208

# STATE AUTO
Insurance Companies

**PBP 2855775   00**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MISSISSIPPI CHANGES

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** The **Legal Action Against Us** Condition, in the Commercial Property Conditions, the Standard Property Policy and the Capital Assets Program Coverage Form (Output Policy) is replaced by the following:

**LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 3 years after the date on which the direct physical loss or damage occurred.

**C.** Under the Commercial Property Coverage Part, Paragraph **(1)** of the **Legal Action Against Us** Condition in the Mortgageholders Errors And Omissions Coverage Form is replaced by the following:

**(1)** No one may bring a legal action against us under Coverages **A** and **B** unless:

**(a)** There has been full compliance with all of the terms of Coverages **A** and **B**; and

**(b)** The action is brought within 3 years after you discover the error or accidental omission.

**D.** The **Legal Action Against Us** Condition in the Commercial Inland Marine Conditions is replaced by the following:

**LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all the terms of this Coverage Part; and

**2.** The action is brought within 3 years after you first have knowledge of the direct loss or damage.

*//*IL0119-201210

*d* Insurance Services Office, Inc.,2013

0016822    Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DATA COMPROMISE PLUS

**RESPONSE EXPENSES**
**DEFENSE AND LIABILITY**
**IDENTITY RECOVERY**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Coverage under this endorsement is subject to the following:

## SCHEDULE

**SECTION 1 - RESPONSE EXPENSES**

| | |
|---|---|
| Data Compromise Response Expenses Limit: | $50,000    Annual Aggregate |
| Sublimits: | |
| Named Malware (Sec. 1) | $50,000 Any one "Personal Data Compromise" |
| Forensic IT Review: | $ 5,000 Any one "Personal Data Compromise" |
| Legal Review: | $ 5,000 Any one "Personal Data Compromise" |
| PR Services: | $ 5,000 Any one "Personal Data Compromise" |
| Regulatory Fines And Penalties | $10,000 Any one "Personal Data Compromise" |
| PCI Fines And Penalties | $10,000 Any one "Personal Data Compromise" |
| Response Expenses Deductible: | $2,500 Any one "Personal Data Compromise" |

**SECTION 2 - DEFENSE AND LIABILITY**

| | |
|---|---|
| Data Compromise Defense and Liability Limit: | $50,000    Annual Aggregate |
| Sublimit: | |
| Named Malware (Sec. 2) | $50,000 Any one "Personal Data Compromise" |
| Defense and Liability Deductible: | $2,500    Each "Data Compromise Suit" |

**SECTION 3 - IDENTITY RECOVERY**

| | |
|---|---|
| Case Management Service: | Service for any one "identity theft" for up to 12 months |
| Expense Reimbursement Limit: | $15,000 Annual Aggregate |
| Expense Reimbursement Deductible: | $250 Any one "identity recovery insured" |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** The following is added to **SECTION I - COVERAGES** as an Additional Coverage.
   **SECTION 1 - RESPONSE EXPENSES**
   **DATA COMPROMISE COVERED CAUSE OF LOSS**
   Coverage under this Data Compromise Plus Coverage endorsement applies only if all of the following conditions are met:
   **1.** There has been a "personal data compromise"; and
   **2.** Such "personal data compromise" is first discovered by you during the policy period for which this Data Compromise Plus Coverage endorsement is applicable; and
   **3.** Such "personal data compromise" is reported to us within 60 days after the date it is first discovered by you.

   **COVERAGE - SECTION 1**
   If the three conditions listed above in DATA COMPROMISE - COVERED CAUSE OF LOSS have been met, then we will provide coverage for the following expenses when they arise directly from the covered cause of loss and are necessary and reasonable. Coverages **4** and **5** apply only if there has been a notification of the "personal data compromise" to "affected individuals" as covered under coverage **3.**
   Please note that service providers must be approved by us as described in Additional Condition **6. - Service Providers.**

**SL3100 (05/16) Page** 1 **of** 11
*//*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**STATE AUTO**
Insurance Companies

1. **Forensic Information Technology Review**
   Professional information technologies review if needed to determine, within the constraints of what is possible and reasonable, the nature and extent of the "personal data compromise" and the number and identities of the "affected individuals".

   This does not include costs to analyze, research or determine any of the following:
   **a.** Vulnerabilities in systems, procedures or physical security;
   **b.** Compliance with PCI or other industry security standards; or
   **c.** The nature or extent of loss or damage to data that is not "personally identifying information" or "personally sensitive information".
   If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for costs covered under Forensic Information Technology Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs.

2. **Legal Review**
   Professional legal counsel review of the "personal data compromise" and how you should best respond to it.
   If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for costs covered under Legal Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs.

3. **Notification to "Affected Individuals"**
   We will pay your necessary and reasonable costs to provide notification of the "personal data compromise" to "affected individuals".

4. **Services to "Affected Individuals"**
   We will pay your necessary and reasonable costs to provide the following services to "affected individuals".
   **a.** The following services apply to any "personal data compromise".
     **1)** Informational Materials
       A packet of loss prevention and customer support information.
     **2)** Help Line
       A toll-free telephone line for "affected individuals" with questions about the "personal data compromise". Where applicable, the line can also be used to request additional services as listed in **b.1)** and **2)**
   **b.** The following additional services apply to "personal data compromise" events involving "personally identifying information".
     **1)** Credit Report and Monitoring
       A credit report and an electronic service automatically monitoring for activities affecting an individual's credit records. This service is subject to the "affected individual" enrolling for this service with the designated service provider.
     **2)** Identity Restoration Case Management
       As respects any "affected individual" who is or appears to be a victim of an "identity theft" that may reasonably have arisen from the "personal data compromise", the services of an identity restoration professional who will assist that "affected individual" through the process of correcting credit and other records and, within the constraints of what is possible and reasonable, restoring control over his or her personal identity.

5. **PR Services**
   Professional public relations firm review of and response to the potential impact of the "personal data compromise" on your business relationships.
   This includes costs to implement public relations recommendations of such firm. This may include advertising and special promotions designed to retain your relationship with "affected individuals". However, we will not pay for promotions:
   **a.** Provided to any of your directors or employees; or
   **b.** Costing more than $25 per "affected individual".

6. **Regulatory Fines and Penalties**
   Any fine or penalty imposed under state law, to the extent such fine or penalty is legally insurable.

**SL3100 (05/16) Page 2 of** 11
*//*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

0016824    Printed:
03/01/19   01:38:23

Case 3:21-cv-02154-L-RBC   Document 38-2   Filed 08/03/23   Page 206 of 538

**STATE AUTO**
Insurance Companies

**7. PCI Fines and Penalties**

Any Payment Card Industry (PCI) fine or penalty imposed under a contract to which you are a party. PCI Fines and Penalties do not include any increased transaction costs.

For the purpose of the **Section 1** coverage under this endorsement only, the following replaces **SECTION III - LIMITS OF INSURANCE**

**LIMITS - SECTION 1**

1. The most we will pay under Response Expenses coverage is the Data Compromise Response Expenses Limit indicated for this endorsement.

2. The Data Compromise Response Expenses Limit is an annual aggregate limit. This amount is the most we will pay for the total of all loss covered under **Section 1** arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events discovered by you during that period.

3. A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" will be subject to the Data Compromise Response Expenses Limit applicable to the policy period when the "personal data compromise" was first discovered by you.

4. The most we will pay under Response Expenses coverage for loss arising from any "malware-related compromise" is the Named Malware (Sec. 1) sublimit indicated for this endorsement. For the purpose of the Named Malware (Sec. 1) sublimit, all "malware-related compromises" that are caused, enabled or abetted by the same virus or other malicious code are considered to be a single "personal data compromise".

5. The most we will pay under Forensic IT Review, Legal Review, PR Services, Regulatory Fines and Penalties, PCI Fines and Penalties coverages for loss arising from any one "personal data compromise" is the applicable sublimit for each of those coverages indicated for this endorsement. These sublimits are part of, and not in addition to, the Data Compromise Response Expenses Limit. PR Services coverage is also subject to a limit per "affected individual" as described in **5. PR Services.**

6. Coverage for Services to "affected individuals" is limited to costs to provide such services for a period of up to one year from the date of the notification to the "affected individuals".  Notwithstanding, coverage for Identity Restoration Case Management services initiated within such one year period may continue for a period of up to one year from the date such Identity Restoration Case Management services are initiated.

**DEDUCTIBLE - SECTION 1**

Response Expenses coverage is subject to the Response Expenses Deductible indicated for this endorsement. You will be responsible for such deductible amount as respects each "personal data compromise" covered under this endorsement.

**B.** The following is added to **SECTION I - COVERAGES** as an Additional Coverage.

**SECTION 2 - DEFENSE AND LIABILITY**

**DEFENSE AND LIABILITY COVERED CAUSE OF LOSS**

Coverage under **Section 1** and **Section 2** of this Data Compromise Plus Coverage endorsement applies only if all three of the conditions in DATA COMPROMISE - COVERED CAUSE OF LOSS are met.

Only with regard to **Section 2 - Defense and Liability** coverage, the following conditions must also be met:

1. You have provided notifications and services to "affected individuals" in consultation with us pursuant to Response Expenses coverage; and

2. You receive notice of a "data compromise suit" brought by one or more "affected individuals" or by a governmental entity on behalf of one or more "affected individuals"; and

3. Notice of such "data compromise suit" is received by you within two years of the date that the "affected individuals" are notified of the "personal data compromise"; and

4. Such "data compromise suit" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first received by you.

**COVERAGE - SECTION 2**

If all four of the conditions listed above in DEFENSE AND LIABILITY - COVERED CAUSE OF LOSS have been met, then we will provide coverage for "data compromise defense" and "data compromise liability" directly arising from the covered cause of loss.

For the purpose of the **Section 2** coverage under this endorsement only, the following replaces **SECTION III - LIMITS OF INSURANCE**

**SL3100 (05/16) Page 3 of 11**

*//*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

## LIMITS - SECTION 2

1.  The most we will pay under **Section 2** - Defense and Liability coverage (other than post-judgment interest) is the Data Compromise Defense and Liability Limit indicated for this endorsement.
2.  The Data Compromise Defense and Liability Limit is an annual aggregate limit. This amount is the most we will pay for all loss covered under **Section 2** (other than post-judgment interest) arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events discovered by you during that period.
3.  A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" (other than post-judgment interest) will be subject to the Data Compromise Defense and Liability Limit applicable to the policy period when the "personal data compromise" was first discovered by you.
4.  The most we will pay under Defense and Liability coverage for loss arising from any "malware-related compromise" is the Named Malware (Sec. 2) sublimit indicated for this endorsement. For the purpose of the Named Malware (Sec. 2) sublimit, all "malware-related compromises" that are caused, enabled or abetted by the same virus or other malicious code are considered to be a single "personal data compromise". This sublimit is part of, and not in addition to, the Defense and Liability Limit.

## DEDUCTIBLE - SECTION 2

Defense and Liability coverage is subject to the Defense and Liability Deductible indicated for this endorsement. You will be responsible for such deductible amount as respects each "data compromise suit" covered under this endorsement.

For the purpose of the **Section 1** and **Section 2** coverage under this endorsement only, the following additional exclusions apply to Paragraph **2. Exclusions** under **SECTION I - COVERAGES:**

## EXCLUSIONS - SECTION 1 AND SECTION 2

We will not pay for cost arising from the following:

1.  Your intentional or willful complicity in a "personal data compromise";
2.  Any criminal, fraudulent or dishonest act, error or omission, or any intentional or knowing violation of the law by you;
3.  Any "personal data compromise" occurring prior to the first inception of this Data Compromise Plus Coverage endorsement or any substantially similar to that described in this endorsement;
4.  Cost to research or correct any deficiency. This includes, but is not limited to, any deficiency in your systems, procedure or physical security that may have contributed to a "personal data compromise";
5.  Any fines or penalties imposed under federal law including, but not limited to, HIPAA fines and penalties;
6.  Any criminal investigations or proceedings;
7.  Any extortion or blackmail. This includes, but is not limited to, ransom payments and private security assistance;
8.  Any "personal data compromise" involving data that is being transmitted electronically, unless such data is encrypted to protect the security of the transmission;
9.  Your reckless disregard for the security of "personally identifying information" or "personally sensitive information" in your care, custody, or control;
10. That part of any "data compromise suit" seeking any non-monetary relief; or
11. "Bodily injury", "property damage" or "personal and advertising injury".
12. Any amount not insurable under applicable law.

For the purpose of the **Section 1** and **Section 2** coverage under this endorsement only, **SUPPLEMENTARY PAYMENTS** under **SECTION I - COVERAGES** do not apply.

For the purpose of the **Section 1** and **Section 2** coverage under this endorsement only, subparagraphs **2.b.** and **3.** of **SECTION II - WHO IS AN INSURED** do not apply.

For the purpose of the **Section 1** and **Section 2** coverage under this endorsement only, the following is added to **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:**

## ADDITIONAL CONDITIONS - SECTION 1 AND SECTION 2

1.  **"Data Compromise Liability" Defense**
    a.  We will have the right, and the duty to assume the defense of any applicable "data compromise suit" against you. You will give us such information and cooperation as we may reasonably require.
    b.  You will not admit liability for or settle any "data compromise suit" or incur any defense costs without our prior written consent.

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**STATE AUTO**
Insurance Companies                                    **PBP 2855775    00**

**c.** If you refuse to consent to any settlement recommended by us and acceptable to the claimant, we may then withdraw from your defense by tendering control of the defense to you. From that point forward, you will, at your own expense, negotiate or defend such "data compromise suit" independently of us. Our liability will not exceed the amount for which the claim or suit could have been settled if such recommendation was consented to, plus defense costs incurred by us, and defense costs incurred by you with our written consent, prior to the date of such refusal.

**d.** We will not be obligated to pay any damages or defense costs, or to defend or continue to defend any "data compromise suit" after the Data Compromise Defense and Liability Limit has been exhausted.

**e.** We shall pay all interest on that amount of any judgment within the Data Compromise Defense and Liability Limit which accrues:

   **1)** after entry of judgment; and

   **2)** before we pay, offer to pay or deposit in court that part of the judgment within the Data Compromise Defense and Liability Limit or, in any case, before we pay or offer to pay the entire Data Compromise Defense and Liability Limit.

   These interest payments shall be in addition to and not part of the Data Compromise Defense and Liability Limit.

**2. Duties in the Event of a "Data Compromise Suit"**

**a.** If a "data compromise suit" is brought against you, you must:

   **(1)** Immediately record the specifics of the "data compromise suit" and the date received;

   **(2)** Provide us with written notice, as soon as practicable, but in no event more than 60 days after the date the "data compromise suit" is first received by you;

   **(3)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "data compromise suit";

   **(4)** Authorize us to obtain records and other information;

   **(5)** Cooperate with us in the investigation, settlement or defense of the "data compromise suit";

   **(6)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of loss to which this insurance may also apply; and

   **(7)** Take no action, or fail to take any required action, that prejudices your rights or our rights with respect to such "data compromise suit".

**b.** You may not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our prior written consent.

**c.** If you become aware of a claim or complaint that may become a "data compromise suit", you will promptly inform us of such claim or complaint.

**3. Due Diligence**

You agree to use due diligence to prevent and mitigate costs covered under this endorsement. This includes, but is not limited to, complying with, and requiring your vendors to comply with, reasonable and industry-accepted protocols for:

**a.** Providing and maintaining appropriate physical security for your premises, computer systems and hard copy files;

**b.** Providing and maintaining appropriate computer and Internet security;

**c.** Maintaining and updating at appropriate intervals backups of computer data;

**d.** Protecting transactions, such as processing credit card, debit card and check payments; and

**e.** Appropriate disposal of files containing "personally identifying information" or "personally sensitive information" including shredding hard copy files and destroying physical media used to store electronic data.

**4. Legal Advice**

We are not your legal advisor. Our determination of what is or is not covered under this Data Compromise Plus Coverage endorsement does not represent advice or counsel from us about what you should or should not do.

**5. Pre-Notification Consultation**

You agree to consult with us prior to the issuance of notification to "affected individuals". We assume no responsibility under this Data Compromise Plus Coverage for any services promised to "affected individuals" without our prior agreement. If possible, this pre-notification consultation will also include the designated service provider(s) as agreed to under Additional Condition **6. Service Providers**. You must provide the following at our pre-notification consultation with you:

**a.** The exact list of "affected individuals" to be notified, including contact information;

**b.** Information about the "personal data compromise" that may appropriately be communicated with "affected individuals"; and

**SL3100 (05/16) Page 5 of 11**
*/ /*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**c.** The scope of services that you desire for the "affected individuals". For example, coverage may be structured to provide fewer services in order to make those services available to more "affected individuals" without exceeding the available Response Expenses Limit.

**6. Service Providers**

**a.** We will only pay under this Data Compromise Plus Coverage for services that are provided by service providers approved by us. You must obtain our prior approval for any service provider whose expenses you want covered under this Data Compromise Plus Coverage. We will not unreasonably withhold such approval.

**b.** Prior to the Pre-Notification Consultation described in Additional Condition **5.** above, you must come to agreement with us regarding the service provider(s) to be used for the notification to **"Affected Individuals"** and services to **"Affected Individuals"**. We will suggest a service provider; however, if you prefer to use an alternate service provider, our coverage is subject to the following limitations:

**(1)** Such alternate service provider must be approved by us;

**(2)** Such alternate service provider must provide services that are reasonably equivalent or superior in both kind and quality to the services that would have been provided by the service provider we had suggested; and

**(3)** Our payment for services provided by any alternate service provider will not exceed the amount that we would have paid using the service provider we had suggested.

**7. Services**

The following conditions apply as respects any services provided to you or any "affected individual" by us, our designees or any service firm paid for in whole or in part under this Data Compromise Plus coverage:

**a.** The effectiveness of such services depends on your cooperation and assistance;

**b.** All services may not be available or applicable to all individuals. For example, "affected individuals" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions;

**c.** We do not warrant or guarantee that the services will end or eliminate all problems associated with the covered events; and

**d.** You will have a direct relationship with the professional service firms paid for in whole or in part under this coverage. Those firms work for you.

For the purpose of the **Section 1** and **Section 2** coverage under this endorsement only, the following is added to **SECTION V - DEFINITIONS:**

**DEFINITIONS - SECTION 1 AND SECTION 2**

**1.** "Affected individual" means any person who is your current, former or prospective customer, client, member, owner, director or employee and whose "personally identifying information" or "personally sensitive information" is lost, stolen, accidentally released or accidentally published by a "personal data compromise" covered under this endorsement. This definition is subject to the following provisions:

**a.** "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual";

**b.** An "affected individual" must have a direct relationship with your interests as insured under this policy. The following are examples of individuals who would not meet this requirement:

**1)** If you aggregate or sell information about individuals as part of your business, the individuals about whom you keep such information do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours;

**2)** If you store, process, transmit or transport records, the individuals whose "personally identifying information" or "personally sensitive information" you are storing, processing, transmitting or transporting for another entity do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours; or

**3)** You may have operations, interests or properties that are not insured under this policy. Individuals who have a relationship with you through such other operations, interests or properties do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of the operation insured under this policy; and

**c.** An "affected individual" may reside anywhere in the world.

**SL3100 (05/16) Page 6 of 11**
*//*SL3100-201605

**d** 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**STATE AUTO**
Insurance Companies

2. "Data Compromise Defense Costs" means expenses resulting solely from the investigation, defense and appeal of any "data compromise suit" against you. Such expenses must be reasonable and necessary. They will be incurred by us. They do not include your salaries or your loss of earnings. They do include premiums for any appeal bond, attachment bond or similar bond, but we have no obligation to apply for or furnish any such bond.

3. "Data Compromise Liability"
   a. "Data compromise liability" means the following, when they arise from a "data compromise suit":
      1) Damages, judgments or settlements to "affected individuals";
      2) Defense costs added to that part of any judgment paid by us, when such defense costs are awarded by law or by court order; and
      3) Pre-judgment interest on that part of any judgment paid by us.
   b. "Data compromise liability" does not mean:
      1) Damages, judgments or settlements to anyone who is not an "affected individual";
      2) Civil or criminal fines or penalties imposed by law;
      3) Punitive or exemplary damages;
      4) The multiplied portion of multiplied damages;
      5) Taxes; or
      6) Matters which may be deemed uninsurable under the applicable law.

4. "Data Compromise Suit"
   a. "Data Compromise Suit" means a civil proceeding in which damages to one or more "affected individuals" arising from a "personal data compromise" or the violation of a governmental statute or regulation are alleged. Such proceeding must be brought in the United States of America, Puerto Rico or Canada. "Data compromise suit" includes:
      1) An arbitration proceeding in which such damages are claimed, and to which you must submit or do submit with our consent;
      2) Any other alternative dispute resolution proceeding in which such damages are claimed, and to which you submit with our consent; or
      3) A written demand for money, when such demand could reasonably result in a civil proceeding as described in this definition.
   b. "Data compromise suit" does not mean any demand or action brought by or on behalf of someone who is:
      1) Your director or officer;
      2) Your owner or part-owner; or
      3) A holder of your securities;
      in their capacity as such, whether directly, derivatively, or by class action. "Data compromise suit" will include proceedings brought by such individuals in their capacity as "affected individuals", but only to the extent that the damages claimed are the same as would apply to any other "affected individual".
   c. "Data compromise suit" does not mean any demand or action brought by an organization, business, institution, or any other party that is not an "affected individual" or governmental entity. "Data compromise suit" does not mean any demand or action brought on behalf of an organization, business, institution, governmental entity or any other party that is not an "affected individual".

5. "Identity Theft" means the fraudulent use of "personally identifying information". This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts or commit crimes. "Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

6. "Malware-Related Compromise" means a "personal data compromise" that is caused, enabled or abetted by a virus or other malicious code that, at the time of the "personal data compromise", is named and recognized by the CERT*E* Coordination Center, McAfee*E*, Secunia, Symantec or other comparable third party monitors of malicious code activity.

7. "Personal Data Compromise" means the loss, theft, accidental release or accidental publication of "personally identifying information" or "personally sensitive information" as respects one or more "affected individuals". If the loss, theft, accidental release or accidental publication involves "personally identifying information", such loss theft, accidental release or accidental publication must result in, or have the reasonable possibility of resulting in, the fraudulent use of such information. This definition is subject to the following provisions:

**SL3100 (05/16) Page 7 of 11**

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**a.** At the time of the loss, theft, accidental release or accidental publication, the "personally identifying information" or "personally sensitive information" need not be at the insured premises but must be in your direct care, custody or control of:

1) You; or
2) A professional entity with which you have a direct relationship and to which you (or an "affected individual" at your direction) have turned over (directly or via a professional transmission or transportation provider) such information for storage, processing, transmission or transportation of such information.

**b.** "Personal data compromise" includes disposal or abandonment of "personally identifying information" or "personally sensitive information" without appropriate safeguards such as shredding or destruction, subject to the following provisions:

1) The failure to use appropriate safeguards must be accidental and not reckless or deliberate; and
2) Such disposal or abandonment must take place during the time period for which this Data Compromise Plus Coverage endorsement is effective;

**c.** "Personal data compromise" includes situations where there is a reasonable cause to suspect that such "personally identifying information" or "personally sensitive information" has been lost, stolen, accidentally released or accidentally published, even if there is no firm proof; and

**d.** All incidents of "personal data compromise" that are discovered at the same time or arise from the same cause will be considered one "personal data compromise".

**8.** "Personally identifying information" means information, including health information, which could be used to commit fraud or other illegal activity involving the credit, access to health care, or identity of an "affected individual". This includes but is not limited to Social Security numbers or account numbers. "Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses.

**9.** "Personally Sensitive Information" means private information specific to an individual the release of which requires notification of "affected individuals" under any applicable law.
"Personally sensitive information" does not mean or include "personally identifying information".

**C.** The following is added to **SECTION I - COVERAGES** as an Additional Coverage.

**SECTION 3 - IDENTITY RECOVERY COVERAGE**

**COVERAGE - SECTION 3**

We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met:

**1.** There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this policy; and

**2.** Such "identity theft" is first discovered by the "identity recovery insured" during the policy period for which this Identity Recovery Coverage is applicable; and

**3.** Such "identity theft" is reported to us within 60 days after the date it is first discovered by the "identity recovery insured".

If all three of the requirements listed above have been met, then we will provide the following to the "identity recovery insured":

**1. Case Management Service**

Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

**2. Expense Reimbursement**

Reimbursement of necessary and reasonable "identity recovery expenses" incurred as a direct result of the "identity theft".

For the purpose of the **Section 3** coverage under this endorsement only, the following is added to Paragraph **2. Exclusions** under **SECTION I - COVERAGES:**

**EXCLUSIONS - SECTION 3**

We do not cover loss or expense arising from any of the following:

**1.** The theft of a professional or business identity;

**2.** Any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured", whether acting alone or in collusion with others. However, this exclusion will not apply to the interests of an "identity recovery insured" who has no knowledge of or involvement in such fraud, dishonesty or criminal act; or

**3.** An "identity theft" that is not reported in writing to the police.

For the purpose of the **Section 3** coverage under this endorsement only, **SUPPLEMENTARY PAYMENTS** under **SECTION I - COVERAGES** do not apply:

For the purpose of the **Section 3** coverage under this endorsement only, the following replaces **SECTION III - LIMITS OF INSURANCE**

**SL3100 (05/16) Page 8 of 11**

*/ /*SL3100-201605

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

## LIMITS - SECTION 3

1. Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement Coverage.
2. Expense Reimbursement Coverage is subject to the Expense Reimbursement Limit indicated for this endorsement. The Expense Reimbursement Limit is an annual aggregate limit per "identity recovery insured". Regardless of the number of claims, this limit is the most we will pay for the total of all loss or expense arising out of all "identity thefts" to any one "identity recovery insured" which are first discovered by the "identity recovery insured" during a 12 month period starting with the beginning of the present annual policy
period. If an "identity theft" is first discovered in one policy period and continues into other policy periods, all loss and expense arising from such "identity theft" will be subject to the aggregate limit applicable to the policy period when the "identity theft" was first discovered.
3. Legal costs as provided under item **d.** of the definition of "identity recovery expenses" are part of, and not in addition to, the Expense Reimbursement Coverage limit.
4. Item **e.** (Lost Wages) and item **f.** (Child Elder Care Expenses) of the definition of "identity recovery expenses" are jointly subject to a sublimit of $5,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".
5. Item **g.** (Mental Health Counseling) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to counseling that takes place within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".
6. Item **h.** (Miscellaneous Unnamed Costs) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to costs incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".

## DEDUCTIBLE - SECTION 3

1. Case Management Service is not subject to a deductible.
2. Expense Reimbursement Coverage is subject to the Expense Reimbursement Deductible indicated for this endorsement. Any one "identity recovery insured" will be responsible for only one deductible under this Identity Recovery Coverage during any one policy period.

For the purpose of the coverage under **Section 3** under this endorsement only, **SECTION II - WHO IS AN INSURED** does not apply.

For the purpose of the **Section 3** coverage under this endorsement only, the following is added to **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

## ADDITIONAL CONDITIONS - SECTION 3

1. **Help Line**
   a. For assistance, the "identity recovery insured' should call the **Identity Recovery Help Line** at **1-800-414-9783.**
   b. The **Identity Recovery Help Line** can provide the "identity recovery insured" with:
      1) Information and advice for how to respond to a possible "identity theft; and
      2) Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.
      In some cases, we may provide Case Management Services at our expense to an "identity recovery insured" prior to a determination that a covered "identity theft" has occurred. Our provision of such services is not an admission of liability under this policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered "identity theft" has not occurred.
   c. As respects Expense Reimbursement Coverage the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records that support his or her claims for "identity recovery expenses".
2. **Services**
   The following conditions apply as respects any services provided by us or our designee to any "identity recovery insured" under this endorsement:
   a. Our ability to provide helpful services in the event of an "identity theft" depends on the cooperation, permission and assistance of the "identity recovery insured";

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**STATE AUTO**
Insurance Companies

b. All services may not be available or applicable to all individuals. For example, "identity recovery insureds" who are minors of foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions; and

c. We do not warrant or guarantee that our services will end or eliminate all problems associated with an "identity theft" or prevent future "identity thefts".

For the purpose of the **Section 3** coverage under this endorsement only, the following is added to **SECTION V - DEFINITIONS:**

## DEFINITIONS - SECTION 3

1. "Identity Recovery Case Manager" means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured". This includes, with the permission and cooperation of the "identity recovery insured", written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.

2. "Identity Recovery Expenses" means the following when they are reasonable and necessary expenses that are incurred as a direct result of an "identity theft":

    a. Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft";

    b. Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft";

    c. Costs for credit reports from established credit bureaus;

    d. Fees and expenses for an attorney approved by us for the following:

        1) The defense of any civil suit brought against an "identity recovery insured";

        2) The removal of any civil judgment wrongfully entered against an "identity recovery insured";

        3) Legal assistance for an "identity recovery insured" at an audit or hearing by a governmental agency;

        4) Legal assistance in challenging the accuracy of the "identity recovery insured's" consumer credit report; and

        5) The defense of any criminal charges brought against an "identity recovery insured" arising from the actions of a third party using the personal identity of the "identity recovery insured";

    e. Actual lost wages of the "identity recovery insured" for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self-employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours;

    f. Actual costs for supervision of children or elderly or infirm relatives or dependents of the "identity recovery insured" during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured";

    g. Actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured"; and

    h. Any other reasonable costs necessarily incurred by an "identity recovery insured" as a direct result of the "identity theft".

        1) Such costs include:

        (a) Costs by the "identity recovery insured" to recover control over his or her personal identity; and

        (b) Deductibles or service fees from financial institutions.

        2) Such costs do not include:

        (a) Costs to avoid, prevent or detect "identity theft" or other loss;

        (b) Money lost or stolen; and

        (c) Costs that are restricted or excluded elsewhere in this endorsement or policy.

3. "Identity Recovery Insured" means the following:

    a. When the entity insured under this policy is a sole proprietorship, the "identity recovery insured" is the individual person who is the sole proprietor of the insured entity;

    b. When the entity insured under this policy is a partnership, the "identity recovery insureds" are the current partners; or

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

   c.  When the entity insured under this policy is a corporation or other organization, the "identity recovery insureds" are all the individuals having ownership position of 20% or more of the insured entity. However, if and only if there is no one who has such an ownership position, then the "identity recovery insured" will be:

      **1)**  The chief executive of the insured entity; or

      **2)**  As respects a religious institution, the senior ministerial employee.

An "identity recovery insured" must always be an individual person. The entity insured under this policy is not an "identity recovery insured".

**4.**  "Identity Theft" means the fraudulent use of the social security number or other method of identifying an "identity recovery insured". This includes fraudulently using the personal identity of an "identity recovery insured" to establish credit accounts, secure loans, enter into contracts, or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

*d* 2006, 2009, 2016
Includes copyrighted material of
Insurance Services Office, Inc., with its permission.

**STATE AUTO**
Insurance Companies

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location(s) Of Covered Operations |
|---|---|
|  |  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:
**1.** Your acts or omissions; or
**2.** The acts or omissions of those acting on your behalf;
in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.
However:
**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and
**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.
**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:
This insurance does not apply to "bodily injury" or "property damage" occurring after:

**1.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
**2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.
**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance**:
If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:
**1.** Required by the contract or agreement; or
**2.** Available under the applicable Limits of Insurance shown in the Declarations;
whichever is less.
This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**CG2010 (04/13) Page 1 of 1**
*//*CG2010-201304

*d* Insurance Services Office, Inc., 2012

001683d   Printed:
03/01/19   01:38:23



**STATE AUTO**
Insurance Companies

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:
   A. Under any Liability Coverage, to "bodily injury" or "property damage":
      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or
      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.
   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.
   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:
      (1) The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or
      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:
   "Hazardous properties" includes radioactive, toxic or explosive properties.
   "Nuclear material" means "source material", "special nuclear material" or "by-product material".
   "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.
   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".
   "Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".
   "Nuclear facility" means:
      **(a)** Any "nuclear reactor";

*//*IL0021-200809

ISO Properties, Inc., 2007

001635     Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

**PBP  2855775    00**

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

**IL 00 21 09 08   Page 2 of 2**
*//*IL0021-200809

ISO Properties, Inc., 2007

**STATE AUTO**
Insurance Companies

PBP 2855775    00

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**
  **2. Exclusions**
    This insurance does not apply to:
    **Fungi Or Bacteria**
    **a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.
    **b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.
    This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**
  **2. Exclusions**
    This insurance does not apply to:
    **Fungi Or Bacteria**
    **a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.
    **b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:
    "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

**CG 21 67 12 04  Page 1 of 1**
*//*CG 21 67 12 04

ISO Properties, Inc., 2003

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I - COVERAGES

## COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of

the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a

contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the

intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or

*d* Insurance Services Office, Inc., 2012

regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** - Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

*d* Insurance Services Office, Inc., 2012

Case 3:21-cv-00514-JR  Document 34-2  Filed 08/03/23  Page 220 of 308

**STATE AUTO**
Insurance Companies

**PBP 2855775  00**

**k.  Damage To Your Product**
"Property damage" to "your product" arising out of it or any part of it.

**l.  Damage To Your Work**
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.  Damage To Impaired Property Or Property Not Physically Injured**
"Property damage" to "impaired property" or property that has not been physically injured, arising out of:
**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.  Recall Of Products, Work Or Impaired Property**
Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
**(1)** "Your product";
**(2)** "Your work"; or
**(3)** "Impaired property";
if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.  Personal And Advertising Injury**
"Bodily injury" arising out of "personal and advertising injury".

**p.  Electronic Data**
Damages arising out of the loss of, loss of use, damage to, corruption of, inability to access, or inability to manipulate electronic data.
However, this exclusion does not apply to liability for damages because of "bodily injury".
As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q.  Recording And Distribution Of Material Or Information In Violation Of Law**
"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:
**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;
**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;
**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or
**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** - Limits Of Insurance.

**COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.  Insuring Agreement**
**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:
**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**CG0001 (04/13) Page 5 of 15**
*/*CG0001-201304

*d* Insurance Services Office, Inc., 2012

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

## 2. Exclusions

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods - Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

*d* Insurance Services Office, Inc., 2012

MOBDEC    PBP 2855775  00 02/28/2019 F6H TAYL CPP* N    41ELIT0005590 070006
Case 3:21-cv-00154-HRH Document 34-2 Filed 08/03/23 Page 225 of 538

**PBP 2855775 00**

**STATE AUTO**
Insurance Companies

**n. Pollution-related**
Any loss, cost or expense arising out of any:
**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or
**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**
"Personal and advertising injury", however caused, arising, directly or indirectly, out of:
**(1)** War, including undeclared or civil war;
**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**
"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:
**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;
**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;
**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or
**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**COVERAGE C - MEDICAL PAYMENTS**
**1. Insuring Agreement**
**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:
**(1)** On premises you own or rent;
**(2)** On ways next to premises you own or rent; or
**(3)** Because of your operations;
provided that:
**(a)** The accident takes place in the "coverage territory" and during the policy period;
**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and
**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.
**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:
**(1)** First aid administered at the time of an accident;
**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and
**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**
We will not pay expenses for "bodily injury":
**a. Any Insured**
To any insured, except "volunteer workers".
**b. Hired Person**
To a person hired to do work for or on behalf of any insured or a tenant of any insured.
**c. Injury On Normally Occupied Premises**
To a person injured on that part of premises you own or rent that the person normally occupies.
**d. Workers' Compensation And Similar Laws**
To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.
**e. Athletics Activities**
To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**CG0001 (04/13) Page 7 of 15**
*/*CG0001-201304

*d* Insurance Services Office, Inc., 2012

**f. Products-Completed Operations Hazard**
Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**
Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II - WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only

*d* Insurance Services Office, Inc., 2012

with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

***d*** Insurance Services Office, Inc., 2012

001846  Printed:
03/01/19   01:38:23

Case 3:21-cv-03514-TLB Document 34-2  Filed 08/03/23  Page 228 of 538

**STATE AUTO**
Insurance Companies

**2.** The General Aggregate Limit is the most we will pay for the sum of:
   **a.** Medical expenses under Coverage **C**;
   **b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and
   **c.** Damages under Coverage **B**.
**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".
**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.
**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:
   **a.** Damages under Coverage **A**; and
   **b.** Medical expenses under Coverage **C**
   because of all "bodily injury" and "property damage" arising out of any one "occurrence".
**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.
**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.
The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**
Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.
**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**
   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   **(1)** How, when and where the "occurrence" or offense took place;
   **(2)** The names and addresses of any injured persons and witnesses; and
   **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.
   **b.** If a claim is made or "suit" is brought against any insured, you must:
   **(1)** Immediately record the specifics of the claim or "suit" and the date received; and
   **(2)** Notify us as soon as practicable.
   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.
   **c.** You and any other involved insured must:
   **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";
   **(2)** Authorize us to obtain records and other information;
   **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and
   **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.
   **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.
**3. Legal Action Against Us**
No person or organization has a right under this Coverage Part:
   **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or
   **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.
A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.
**4. Other Insurance**
If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**CG0001 (04/13) Page 10 of 15**
*/¹*CG0001-201304

001684T   Printed:
03/01/19   01:38:23

**a. Primary Insurance**
This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**
**(1)** This insurance is excess over:
  **(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:
   **(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";
   **(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;
   **(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or
   **(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability.
  **(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:
  **(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and
  **(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**
If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**
**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.
**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.
**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**
By accepting this policy, you agree:
**a.** The statements in the Declarations are accurate and complete;
**b.** Those statements are based upon representations you made to us; and
**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**
Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:
**a.** As if each Named Insured were the only Named Insured; and
**b.** Separately to each insured against whom claim is made or "suit" is brought.

*d* Insurance Services Office, Inc., 2012

### 8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

### 9. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in Paragraph a. above;

      (2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

**CG0001 (04/13) Page 12 of 15**

*//°CG0001-201304*

**d** Insurance Services Office, Inc., 2012

**STATE AUTO**
Insurance Companies

**PBP 2855775    00**

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises

***d*** Insurance Services Office, Inc., 2012

that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have

**CG0001 (04/13) Page 14 of 15**
*//*CG0001-201304

*d* Insurance Services Office, Inc., 2012

Issue Date 02/28/2019      01:23:06 PM

0016851   Printed:
03/01/19  01:38:23

Case 3:21-cv-02154-L-BLM   Document 34-2   Filed 08/03/23   Page 233 of 538

acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

*d* Insurance Services Office, Inc., 2012



**PBP 2855775   00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the **Definitions** section is replaced by the following:
"Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**CG2426 (04/13) Page 1 of 1**
*/*CG2426-201304

*d* Insurance Services Office, Inc., 2012

0016853     Printed:
03/01/19  01:38:23

STATE AUTO
Insurance Companies

**PBP 2855775    00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT - RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I - Coverage A - Bodily Injury And Property Damage Liability**:

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I - Coverage B - Personal And Advertising Injury Liability**:

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**CG2147 (12/07) Page** 1 **of** 1

*//*CG2147-200712

*d* ISO Properties, Inc., 2006

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

**Damages arising out of:**

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability**:

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

**CG2106 (05/14) Page 1 of 1**
*/*CG2106-201405

*d* Insurance Services Office, Inc., 2013

001685S   Printed:
03/01/19   01:38:23

STATE AUTO
Insurance Companies

**PBP 2855775 00**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# AMENDMENT OF CONTRACTUAL LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.** The following replaces Paragraph **(2)** of Exclusion **b.**, Contractual Liability, in Paragraph **2.** of SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:
 **(1)** That you would have in the absence of the contract or agreement; or
 **(2)** Assumed by you in a contract or agreement that is an "insured contract", provided that the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed by you in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than you will be deemed to be damages because of "bodily injury" or "property damage", provided that:
  **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed by you in the same "insured contract"; and
  **(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**B.** The following replaces the beginning of Paragraph **2.**, and Paragraphs **2.a.**, **b.**, **c.**, **d.** and **e.**, of SUPPLEMENTARY PAYMENTS - COVERAGES A AND B of SECTION I - COVERAGES:
 **2.** If we defend you against a "suit" and your indemnitee is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:
  **a.** The "suit" against the indemnitee seeks damages for which you have assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";
  **b.** This insurance applies to such liability assumed by you;
  **c.** The obligation to defend, or the cost of the defense of, that indemnitee has also been assumed by you in the same "insured contract";
  **d.** The allegations in the "suit" and the information we know about the "occurrence" are such that we determine that no conflict exists between your interests and the interests of the indemnitee;
  **e.** You and the indemnitee ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend you and the indemnitee; and

**C.** The following replaces the last sentence of Paragraph **2.** of SUPPLEMENTARY PAYMENTS - COVERAGES A AND B of SECTION I - COVERAGES:
 Our obligation to defend your indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:
 **a.** We have used up the applicable limit of insurance in the payment of judgments, settlements, medical expenses; or
 **b.** The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SL 20 51 12 11 Page 1 of 1**
*//*SL2051-201112

Includes copyrighted material of
Insurance Services Office, Inc., with it permission

**STATE AUTO**
Insurance Companies

**PBP 2855775 00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIABILITY PLUS ENDORSEMENT

Unless otherwise amended by separate endorsement this endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

CONTENTS

1. EXPECTED OR INTENDED PROPERTY DAMAGE
2. BROADENED NON-OWNED WATERCRAFT
3. AMENDED SUPPLEMENTARY PAYMENTS
4. .BROADENED DAMAGE TO PREMISES RENTED OR OCCUPIED BY YOU
5. ADDITIONAL INSURED - BROAD FORM VENDORS
6. ADDITIONAL INSURED - MANAGER OR LESSORS OF PREMISES
7. ADDITIONAL INSURED - LESSORS OF EQUIPMENT
8. EXTENDED NEWLY ACQUIRED OR FORMED ORGANIZATIONS AS INSUREDS
9. IMPROVED DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT CONDITION
10. WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS
11. PRIMARY AND NONCONTRIBUTORY - OTHER INSURANCE
12. ELECTRONIC DATA LIABILITY
13. "MOBILE EQUIPMENT" REDEFINED
14. COORDINATING COVERAGE

1. **EXPECTED OR INTENDED PROPERTY DAMAGE**
   **Exclusion 2.a. in SECTION I - COVERAGE A** is replaced by the following:
   **a.** "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.
2. **BROADENED NON-OWNED WATERCRAFT**
   **A.** If Endorsement **CG 21 09, CG 21 10, CG 24 50** or **CG 24 51** is attached to the Policy, the following is added to Paragraph **2.g.(2)(b) - Exclusions** under **Section I - Coverage A - Bodily Injury And Property Damage Liability:**
   Paragraph **2.g.(2)(b)** of **Section I - Coverages** is replaced by the following:
   **(b)** A watercraft you do not own that is:
   **(i)** Less than 51 feet long; and
   **(ii)** Not being used to carry persons or property for a charge;
   **B.** If Paragraph 2.A. does not apply, the following is added to Paragraph **2.g.(2) - Exclusions** under **SECTION I - COVERAGE** pertaining to non-owned watercraft, is changed to the following:
   This exclusion does not apply to:
   **(2)** A watercraft you do not own that is:
   **(a)** Less than 51 feet long; and
   **(b)** Not being used to carry persons or property for a charge.
3. **AMENDED SUPPLEMENTARY PAYMENTS**
   Paragraphs **b.** and **d.** of the **Supplementary Payments - Coverages A and B** section are changed as shown:
   **b.** Up to $2,500 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.
   **d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $500 a day because of time off from work.

**SL1202 (12/15) Page 1 of 6**

*/ /*SL1202-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**STATE AUTO**
Insurance Companies

4. **BROADENED DAMAGE TO PREMISES RENTED TO YOU**
   A. The paragraph immediately following **Exclusion 2.j.(6)** in **SECTION I - COVERAGE A**, is amended as follows:
   Paragraph (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire, smoke, lightning, explosion, water damage or sprinkler leakage) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III - Limits Of Insurance.
   B. The last paragraph under **Exclusion 2.** in **SECTION I - COVERAGE A**, is amended as follows:
   Exclusions c. through n. do not apply to damage by fire, smoke, lightning, explosion, water damage or sprinkler leakage to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III - Limits Of Insurance.
   C. **SECTION III - LIMITS OF INSURANCE** is amended as follows:
   Paragraph 6. is deleted and replaced with the following:
   **6.** Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, smoke, lightning, explosion, water damage or sprinkler leakage, while rented to you or temporarily occupied by you, with permission of the owner.
   Subject to all the terms of SECTION III - LIMITS OF INSURANCE, the Damage to Premises Rented To You Limit is the greater of:
   **a.** $500,000; or
   **b.** The amount shown in the Declarations for Damage to Premises Rented To You Limit.
   D. Paragraph **4.b.(1)(a)(ii)** in **Section IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** is replaced with the following:
   **(ii)** That is Fire, Smoke, Lightning, Explosion, Water Damage, or Sprinkler Leakage Insurance for premises while rented to you or temporarily occupied by you with the permission of the owner.
   E. Paragraph **9.a.** in **Section V - DEFINITIONS** is amended to read:
   **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire, smoke, lightning, explosion, or water damage or sprinkler leakage to premises, while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract".
5. **ADDITIONAL INSURED - BROAD FORM VENDORS**
   A. **SECTION II - WHO IS AN INSURED** is amended to include as an additional insured any person(s) or organization(s) (referred to throughout this section as vendor) with whom you agreed, because of a written contract or agreement to provide insurance, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business.
   However:
   **1.** The insurance afforded to such vendor only applies to the extent permitted by law; and
   **2.** If coverage provided to the vendor is required by contract or agreement, the insurance afforded to such vendor will not be broader than that which you are required by the contract or agreement to provide for such vendor.
   B. With respect to the insurance afforded to these vendors, the following additional exclusions apply:
   **1.** The insurance afforded the vendor does not apply to:
   **a.** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;
   **b.** Any express warranty unauthorized by you;
   **c.** Any physical or chemical change in the product made intentionally by the vendor;
   **d.** Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;
   **e.** Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;
   **f.** Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

0016858    Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

---

**g.** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

**h.** "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

**(1)** The exceptions contained in Sub-paragraphs **d.** or **f.**; or

**(2)** Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

**2.** This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

**3.** Provision **B.2.** does not apply to any vendor included as an insured by an endorsement issued by us and made a part of this Coverage Part.

**4.** This insurance does not apply if "'bodily injury'" or "property damage" included within the "products completed operations hazard" is excluded either by the provisions of the Coverage Part or by endorsement.

**C.** With respect to the insurance afforded to these vendors, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the vendor is required by a contract or agreement, the most we will pay on behalf of the vendor is:

**1.** The minimum amount of insurance required by the contract or agreement; or

**2.** The amount of insurance available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This provision shall not increase the applicable Limits of Insurance shown in the Declarations.

**6. ADDITIONAL INSURED - MANAGER OR LESSORS OF PREMISES**

**A. SECTION II - WHO IS AN INSURED** is amended to include as an additional insured any person(s) or organization(s) from whom you lease a building or premises when you and such person(s) or organization(s) have agreed in writing in a contract or agreement that such person(s) or organization(s) be added as an additional insured on your policy. Such person(s) or organization(s) is an insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused in whole or in part by some negligent act or omissions by you, your employees, your agents, or your subcontractors as a result of your occupancy, maintenance or use of that part of the premises leased to you, provided that:

**1.** The "bodily injury", "property damage" or "personal and advertising injury" giving rise to liability occurs subsequent to the execution of the agreement; and

**2.** The written agreement is in effect at the time of the "bodily injury", "property damage", "personal and advertising injury" for which coverage was sought.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** Exclusions

This insurance does not apply to:

**1.** Any "occurrence" which takes place after you cease to be a tenant in that premises.

**2.** Any structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) from which you lease a building or premises.

**3.** Any premise for which coverage is excluded by endorsement.

**4.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the sole negligence of the additional insured or by those acting on behalf of the additional insured.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is:

**1.** The minimum amount of insurance required by the contract or agreement; or

**2.** The amount of insurance available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This provision shall not increase the applicable Limits of Insurance shown in the Declarations.

**SL1202 (12/15) Page 3 of 6**

*/|*SL1202-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

0016859    Printed:
03/01/19    01:38:23

**STATE AUTO**
Insurance Companies

**PBP 2855775    00**

---

**7.  ADDITIONAL INSURED - LESSORS OF EQUIPMENT**
   **A.  SECTION II - WHO IS AN INSURED** is amended to include as an additional insured any person(s) or organization(s) from whom you lease equipment when you and such person(s) or organization(s) have agreed in writing in a contract or agreement that such person(s) or organization(s) be added as an additional insured on your policy. Such person(s) or organization(s) is an insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).
   However, the insurance afforded to such additional insured:
   **1.**  Only applies to the extent permitted by law; and
   **2.**  Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.
   A person's or organization's status as an additional insured under this endorsement ends when their contract or agreement with you for such leased equipment ends.
   **B.**  With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.
   **C.**  With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**
   The most we will pay on behalf of the additional insured is:
   **1.**  The minimum amount of insurance required by the contract or agreement; or
   **2.**  The amount of insurance available under the applicable Limits of Insurance shown in the Declarations;
   whichever is less.
   This provision shall not increase the applicable Limits of Insurance shown in the Declarations.
**8.  EXTENDED NEWLY FORMED OR ACQUIRED ORGANIZATIONS AS INSUREDS**
   Paragraph **3.** in **SECTION II - WHO IS AN INSURED** is deleted and replaced with the following:
   **3.**  Any organization you newly acquire or form, other than a partnership, or joint venture, and over which you maintain ownership or majority interest, will qualify as an insured if there is no other similar insurance available to that organization. However:
   **a.**  Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier;
   **b.**  Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and
   **c.**  Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization. No person or organization is an insured with respect to the conduct of any current or past partnership, or joint venture that is not shown as an insured in the Declarations.
**8.  IMPROVED DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT CONDITION**
   **Section IV - COMMERCIAL GENERAL LIABILITY CONDITIO**NS is amended as follows:
   Paragraphs **e.** and **f.** are added to **2. Duties In the Event of Occurrence, Offense, Claim Or Suit,** as shown:
   **e.**  The requirement in Condition **2.a.** applies only when the "occurrence" or offense is known to:
   **(1)**  You, if you are an individual;
   **(2)**  A partner, if you are a partnership; or
   **(3)**  An "executive officer" or insurance manager, if you are a corporation.
   **(4)**  A member or manager if the named insured is a limited liability company.
   **f.**  The requirement in Condition **2.b.** will not be breached unless the breach occurs after such claim or "suit" is known to:
   **(1)**  You, if you are an individual;
   **(2)**  A partner, if you are a partnership; or
   **(3)**  An "executive officer" or insurance manager, if you are a corporation.
   **(4)**  A member or manager if the named insured is a limited liability company.
**10.  WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS**
   Condition **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** is amended by the addition of the following:
   We waive any right of recovery we may have against any person or organization because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization which, before the loss, you have agreed in writing to waive your right of recovery.

**SL1202 (12/15) Page 4 of 6**
*//*SL1202-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

This provision does not apply to any written contract formed or executed after performance has begun.

11. **PRIMARY AND NONCONTRIBUTORY**
Subparagraph **a. Primary Insurance** of Paragraph 4. Other Insurance of **Section IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** is amended by the following additional paragraph:
However, this insurance is primary to and will not seek contribution from any other insurance available to a person or organization added as an additional insured under the terms of this Coverage Form or amendatory endorsement provided that:
**a.** The person or organization is a Named Insured under such other insurance; and
**b.** You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

12. **ELECTRONIC DATA LIABILITY**
A. Exclusion **2.p.** of **Coverage A - Bodily Injury And Property Damage Liability** in **Section I - Coverages** is replaced by the following:
   **2. Exclusions**
   This insurance does not apply to:
   **p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**
   Damages arising out of:
   **(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or
   **(2)** The loss of , loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data" that does not result from physical injury to tangible property.
   However, this exclusion does not apply to liability for damage because of "bodily injury".

B. The following is added to Paragraph **2. Exclusions** of **Coverage B - Personal And Advertising Injury Liability** in **Section I - Coverages**:
   **2. Exclusions**
   This insurance does not apply to:
   **Access Or Disclosure Of Confidential Or Personal Information**
   Damages arising out of:
   "Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.
   This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

B. The following paragraph is added to **SECTION III - LIMITS OF INSURANCE**
Subject to **5.** above, we will pay up to $50,000 for the loss of "electronic data" under Coverage **A** for "property damage" because of all loss of "electronic data" arising out of any one "occurrence". The limit does not increase the "occurrence" limit stated in the Declarations.

C. The following definition is added to the **Definitions** section:
"Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

D. For the purposes of the coverage provided by this endorsement, the definition "property damage" in the **Definitions** section is replaced by the following:
   **17.** "Property damage" means:
   **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it.
   **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it; or
   **c.** Loss of, loss of use of, damage to, corruption of, inability to access, or inability to properly manipulate "electronic data" resulting from physical injury to tangible property. All such loss of "electronic data" shall be deemed to occur at the time of the "occurrence" that caused it.
   For the purposes of this insurance, "electronic data" is not tangible property.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

Issue Date  02/28/2019          01:23:06 PM

0016861    Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

PBP 2855775  00

---

13. **"MOBILE EQUIPMENT" REDEFINED**
   **Section V - DEFINITIONS** is amended as follows:
   **a.** Paragraph **12.f.(1)(a), (b)**, and **(c)** of the "mobile equipment" definition does not apply to self-propelled vehicles of less than 1,000 pounds gross vehicle weight.
14. **COORDINATING COVERAGE**
   If the coverage provided by any provision within this endorsement, any other endorsement, form, or policy issued to you by us or any company affiliated with us apply to the same "occurrence", the maximum applicable per occurrence and aggregate limits of insurance available under all the endorsements, forms or policies shall not exceed the highest applicable per occurrence and aggregate limits of insurance under any one endorsement, form, or policy.
   This condition does not apply to any coverage or policy issued by us or an affiliated company to apply specifically as excess insurance over the applicable coverage.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**STATE AUTO**
Insurance Companies

**PBP 2855775 00**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PREMIER LIABILITY PLUS ENDORSEMENT

### SOME PROVISIONS WITHIN THIS ENDORSEMENT PROVIDE CLAIMS-MADE COVERAGE. PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**CONTENTS**
**A.** EXPECTED OR INTENDED PROPERTY DAMAGE
**B.** FELLOW EMPLOYEE COVERAGE
**C.** EXTENDED NON-OWNED AIRCRAFT AND WATERCRAFT
**D.** EXPANDED DAMAGE TO PREMISES RENTED OR OCCUPIED BY YOU
**E.** INCREASED SUPPLEMENTARY PAYMENTS
**F.** BROADENED NAMED INSURED
**G.** ENHANCED DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT CONDITION
**H.** UNINTENTIONAL FAILURE TO DISCLOSE ALL HAZARDS
**I.** LIBERALIZATION CONDITION
**J.** BROADENED BODILY INJURY DEFINITION
**K.** COVERAGE TERRITORY BROADENED
**L.** LIMITED PRODUCT WITHDRAWAL EXPENSE
**M.** EMPLOYEE BENEFITS LIABILITY COVERAGE **(CLAIMS-MADE COVERAGE)**
**N.** COORDINATING COVERAGE

**A. EXPECTED OR INTENDED PROPERTY DAMAGE**
Unless otherwise amended by separate endorsement to this Coverage Form, **Exclusion 2.a.** in **SECTION I - COVERAGE A** is deleted and replaced by the following:
    **a.** "Bodily Injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.
**B. FELLOW EMPLOYEE COVERAGE**
Unless otherwise amended by separate endorsement to this Coverage Form, paragraph 2.**a.(1)**, in **Section II - Who is an Insured,** is replaced by the following:
**(1)** "Bodily injury" or "personal and advertising injury":
    **(a)** To you, to your partners or member (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co "employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business.
    **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;
    **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or
    **(d)** Arising out of his or her providing or failing to provide professional health care services.
However, this does not apply to "bodily injury" to a co -"employee" when caused by your "employee", except with respect to claims for "bodily injury" to:
**(a)** A person arising out of any:
    **(i)** Refusal to employ that person;
    **(ii)** Termination of that person's employment; or
    **(iii)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person;
**(b)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a) (i), (ii),** or **(iii)** above is directed; or
**(c)** Any person due to alleged negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others.

**SL4000 (12/15) Page 1 of 12**
*//*SL4000-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

0016863 Printed:
03/01/19 01:38:23

**STATE AUTO**
Insurance Companies

**PBP 2855775  00**

**C. EXTENDED NON-OWNED AIRCRAFT AND WATERCRAFT**
Unless otherwise amended by separate endorsement to this Coverage Form, the following changes apply:

1. If Endorsement **CG 21 09, CG 21 10, CG 24 50 or CG 24 51** is attached to the Policy, Paragraph **2.g. - Exclusions** under **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

   2. Exclusions

      This insurance does not apply to:

      **g. Aircraft, Auto Or Watercraft**

      **(1) Unmanned Aircraft**

      "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and "loading or unloading".

      This Paragraph **g.(1)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

      **(2) Aircraft (Other Than Unmanned Aircraft)**

      "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft"), "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

      This Paragraph **g.(2)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

      This Paragraph **g.(2)** does not apply to:

      **(a)** A watercraft while ashore on premises you own or rent;

      **(b)** A watercraft you do not own that is:

         **(i)** Less than 76 feet long; and

         **(ii)** Not being used to carry persons or property for a charge;

      **(e)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

      **(f)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

      **(g)** "Bodily injury" or "property damage" arising out of:

         **(i)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

         **(ii)** The operation of any of the machinery or equipment listed in Paragraph **f.(2) or f.(3)** of the definition of "mobile equipment".

      **(h)** An aircraft (other than unmanned aircraft) that is hired, chartered or loaned with a paid and licensed crew and is not owned in whole or in part by any insured

2. **If Paragraph C.1. does not apply, Exclusion 2. g.** in **SECTION I - COVERAGE A** is replaced by the following:

   **g.** "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

   This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

   This exclusion does not apply to:

   **(1)** A watercraft while ashore on premises you own or rent;

   **(2)** A watercraft you do not own that is:

      **(a)** Less than 76 feet long; and

**SL4000 (12/15) Page 2 of 12**
*/"*SL4000-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

MOBDEC    PBP 2855775  00 02/28/2019 F6H TAYL CPP * N    41ELIT0005590 070006
Case 3:21-cv-02154-N
Document 33-2    Filed 08/03/23    Page 246 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775    00**

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**(6)** An aircraft that is hired, chartered or loaned with a paid and licensed crew and is not owned in whole or in part by any insured

**3.** The following paragraph is added to **SECTION II - WHO IS AN INSURED**:

With respect to watercraft that you do not own that is less than 76 feet long and is not being used to carry persons for a charge, any person is an insured while operating such watercraft with your permission.

**D. EXPANDED DAMAGE TO PREMISES RENTED OR OCCUPIED BY YOU**

Unless coverage for Damage To Premises Rented To You under Coverage A is amended or excluded from the Coverage Form by separate endorsement, the following changes apply:

**1.** The paragraph immediately following **Exclusion 2.j. (6)** in **SECTION I - COVERAGE A**, is replaced by the following:

Paragraph (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire, lightning, explosion, windstorm or hail, smoke, aircraft or vehicles, vandalism, weight of snow, ice or sleet, sprinkler leakage, or accidental discharge or leakage of water or steam) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III - Limits Of Insurance.

**2.** The last paragraph under **Exclusion 2**. in **SECTION I - COVERAGE A**, is replaced by the following:

Exclusions **c.** through **n.** do not apply to damage by fire, lightning, explosion, windstorm or hail, smoke, aircraft or vehicles, vandalism, weight of snow, ice or sleet, sprinkler leakage, or accidental discharge or leakage of water or steam to premises while rented to you or temporarily occupied by you with permission of the owner. A separate Damage To Premises Rented To You Limit of Insurance applies to this coverage as described in **Section III - LIMITS OF INSURANCE**.

**3.** Paragraph **6.** in **SECTION III - LIMITS OF INSURANCE** is deleted and replaced by the following:

**6.** Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage", while rented to you, or in the case of damage by fire, lightning, explosion, windstorm or hail, smoke, aircraft or vehicles, vandalism, weight of snow, ice or sleet, sprinkler leakage, or accidental discharge or leakage of water or steam, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one "occurrence".

Subject to all the terms of **SECTION III - LIMITS OF INSURANCE**, the Damage to Premises Rented To You Limit is the greater of:

**a.** $750,000; or

**b.** The amount shown in the Declarations for Damage to Premises Rented To You Limit.

**4.** Paragraph **4.b.(1)(a)(ii)** in **Section IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** is replaced with the following:

**(ii)** That is fire, lightning, explosion, windstorm or hail, smoke, aircraft or vehicles, vandalism, weight of snow, ice or sleet, sprinkler leakage, or accidental discharge or leakage of water or steam Insurance for premises while rented to you or temporarily occupied by you with the permission of the owner.

**5.** Paragraph **9.a.** in **Section V - DEFINITIONS** is amended to read:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire, lightning, explosion, windstorm or hail, smoke, aircraft or vehicles, vandalism, weight of snow, ice or sleet, sprinkler leakage, or accidental discharge or leakage of water or steam to premises, while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract".

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**STATE AUTO**
Insurance Companies

**E. INCREASED SUPPLEMENTARY PAYMENTS**

Unless otherwise amended by separate endorsement to this Coverage Form, the following changes apply: Paragraph **1.b.** and **1.d.** of **SECTION I - SUPPLEMENTARY PAYMENTS - COVERAGES A AND B** are amended as follows:

**b.** Up to $3,000 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $750 a day because of time off from work.

**F. BROADENED NAMED INSURED**

1. Paragraph **3.** of **SECTION II - WHO IS AN INSURED** is deleted and replaced by the following:

   **3.** Any organization of yours, other than a partnership or joint venture, which is not shown in the Declarations, and of which you own a financial interest of more than 50% as of the effective date of this Coverage Form, will qualify as an insured subject to the following:

   **a.** Newly acquired or formed organizations:

   **(3)** Coverage A does not apply to "bodily injury" or "property damage" that occurred, and

   **(4)** Coverage B does not apply to "personal and advertising injury" arising out of an offense, before you acquired or formed the new organization.

   **b.** Existing and newly acquired or formed organizations will not qualify as an insured if it:

   **(1)** Is also an insured under another policy, other than a policy written to apply specifically in excess of this policy; or

   **(2)** Would be an insured under such policy but for its termination or exhaustion of its limits of insurance.

   Each such organization remains qualified as an insured only while you own a financial interest of more than 50% in the organization during the policy period.

   An additional premium will apply in accordance with our rules and rates in effect at the beginning of the policy period or on the date you acquired or formed the organization if subsequent to the inception date of the policy.

   This provision does not apply if coverage for newly formed or acquired organizations is excluded either by the provisions of the Commercial General Liability Coverage Form or by any applicable endorsement.

2. Under Section IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, the following is added to Condition **4.** Other Insurance, paragraph **b.** Excess Insurance.

   This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis, that is available to an insured when this insurance is available solely by reason of your direct or indirect control of more than fifty (50) percent of the interests entitled to vote generally in the election of the governing body of such organization.

**G. ENHANCED DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT CONDITION**

Unless otherwise amended by separate endorsement to this Coverage Form, the following paragraph is added to the end of Paragraph **2. Section IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:**

Your obligation to notify us as soon as practicable of an "occurrence", offense, claim or "suit" is satisfied if you send us written notice as soon as practicable after any of your "executive officers", directors, partners, insurance managers, legal representatives, "employees" or "volunteer workers" authorized by you to give or receive notices becomes aware of or should have become aware of such "occurrence", offense, claims or "suit".

If you report an "occurrence" or offense to your Workers Compensation insurer which later becomes a claim under this coverage form, failure to report such "occurrence" or offense to us at the time of the "occurrence" or offense will not be considered a violation of this Condition, if you notify us as soon as practicable when you become aware that the "occurrence" or offense has become a liability claim.

**H. UNINTENTIONAL FAILURE TO DISCLOSE ALL HAZARDS**

Unless otherwise amended by separate endorsement to this Coverage Form, the following paragraph is added to Paragraph **6.** of **SECTION IV - CONDITIONS:**

Based on our reliance on your representations as to existing hazards, if you unintentionally fail to disclose all such hazards prior to the beginning of the policy period of this Coverage Form, we shall not deny coverage under this Coverage Form because of such failure.

*//*SL4000-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

Issue Date  02/28/2019        01:23:06 PM

MODBEC    PBP 2855775 00 02/28/2019 F6H TAYL CPP* N    41ELIT0005590 070006
Case 3:21-cv-02154-HES-PDB    Document 38-2    Filed 08/03/23    Page 248 of 538

PBP 2855775    00

**STATE AUTO**
Insurance Companies

## I. LIBERALIZATION CONDITION

Unless otherwise amended by separate endorsement to this Coverage Form, the following paragraph is added to **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

If we revise this Coverage Form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

## J. BROADENED BODILY INJURY DEFINITION

Unless otherwise amended by separate endorsement to this Coverage Form, the following replaces paragraph 3. in **SECTION V - DEFINITIONS**

**3.** "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death, shock, mental anguish or mental injury sustained by that person at any time resulting from the bodily injury, sickness or disease.

## K. BROADENED COVERAGE TERRITORY

Unless otherwise amended by separate endorsement to this Coverage Form, paragraph **4.a.** of "Coverage Territory" in **SECTION V - DEFINITIONS** is replaced with the following:

**a.** The United States of America (including its territories and possessions), Canada, Bermuda, the Bahamas, the Cayman Islands, British Virgin Islands and Puerto Rico.

## L. LIMITED PRODUCT WITHDRAWAL EXPENSE

**THIS PROVISION ONLY PROVIDES REIMBURSEMENT TO YOU FOR EXPENSES INCURRED BECAUSE OF A COVERED "PRODUCT WITHDRAWAL". THIS ENDORSEMENT DOES NOT PROVIDE ANY LIABILITY COVERAGE OR COVERAGE FOR THE COST OR EXPENSE OF DEFENDING ANY CLAIM OR SUIT.**

For the purpose of this coverage, the following is added to **Section I - Coverages:**

**SECTION I - LIMITED PRODUCT WITHDRAWAL EXPENSE COVERAGE**

**1. Insuring Agreement**

**a.** We will reimburse you for "product withdrawal expenses" incurred by you because of a "product withdrawal" to which this insurance applies.

The amount of such reimbursement is limited as described in Section **III** - Limits Of Insurance. No other obligation or liability to pay sums or perform acts or services is covered.

**b.** This insurance applies to a "product withdrawal" only if the "product withdrawal" is initiated in the "coverage territory" during the policy period because:

**(1)** You determine that the "product withdrawal" is necessary; or

**(2)** An authorized government entity has ordered you to conduct a "product withdrawal".

**c.** We will reimburse "product withdrawal expenses" only if:

**(1)** The expenses are incurred within one year of the date the "product withdrawal" was initiated; and

**(2)** The expenses are reported to us within one year of the date the expenses were incurred.

**d.** The initiation of a "product withdrawal" will be deemed to have been made only at the earliest of the following times:

**(1)** When you first announced, in any manner, to the general public, your vendors or to your employees (other than those employees directly involved in making the determination) your decision to conduct or participate in a "product withdrawal". This applies regardless of whether the determination to conduct a "product withdrawal" is made by you or is requested by a third party; or

**(2)** When you first received, either orally or in writing, notification of an order from an authorized government entity to conduct a "product withdrawal.

**e.** "Product withdrawal expenses" incurred to withdraw "your products" which contain the same or substantially similar "defects" will be deemed to have arisen out of the same "product withdrawal".

**2. Exclusions**

This insurance does not apply to "product withdrawal expenses" arising out of:

**a. Breach Of Warranty And Failure To Conform To Intended Purpose**

Any "product withdrawal" initiated due to the failure of "your product" to accomplish its intended purpose, including any breach of warranty of fitness, whether written or implied. This exclusion does not apply if such failure has caused or is reasonably expected to cause "bodily injury" or physical damage to tangible property other than "your product".

**b. Infringement Of Copyright, Patent, Trade Secret, Trade Dress Or Trademark**

Any "product withdrawal" initiated due to copyright, patent, trade secret, trade dress or trademark infringements.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**STATE AUTO**
Insurance Companies

  c. **Deterioration, Decomposition Or Chemical Transformation**
Any "product withdrawal" initiated due to transformation of a chemical nature, deterioration or decomposition of "your product". This exclusion does not apply if it is caused by:
    **(1)** An error in manufacturing, design, or processing;
    **(2)** Transportation of "your product"; or
    **(3)** "Product tampering".
  d. **Goodwill, Market Share, Revenue, Profit Or Redesign**
The costs of regaining goodwill, market share, revenue or "profit" or the costs of redesigning "your product".
  e. **Expiration Of Shelf Life**
Any "product withdrawal" initiated due to expiration of the designated shelf life of "your product".
  f. **Known Defect**
A "product withdrawal", initiated because of a "defect" in "your product" known to exist by the Named Insured or the Named Insured's "executive officers", prior to the date when this Coverage Part was first issued to you or prior to the time "your product" leaves your control or possession.
  g. **Otherwise Excluded Products**
A recall of any specific products for which "bodily injury" or "property damage" is excluded under Coverage **A** - Bodily Injury And Property Damage Liability by endorsement.
  h. **Governmental Ban**
A recall when "your product" or a component contained within "your product" has been:
    **(1)** Banned from the market by an authorized government entity prior to the policy period; or
    **(2)** Distributed or sold by you subsequent to any governmental ban.
  i. **Defense Of Claim**
The defense of a claim or "suit" against you for liability arising out of a "product withdrawal".
  j. **Third Party Damages, Fines And Penalties**
Any compensatory damages, fines, penalties, "punitive damages", exemplary or other non-compensatory damages imposed upon the insured.
  k. **Pollution-Related Expenses**
Any loss, cost or expense due to any:
    **(1)** Request, demand, order, statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or
    **(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

For the purposes of this coverage, **Section III - Limits Of Insurance** is replaced by the following:
**SECTION III - LIMITS OF INSURANCE**
**1.** The Limits of Insurance shown in the rules below fix the most we will pay regardless of the number of:
  **a.** Insureds;
  **b.** "Product withdrawals" initiated; or
  **c.** Number of "your products" withdrawn.
**2.** The most we will reimburse you for "product withdrawal expenses" is $100,000 aggregate limit for the sum of all "product withdrawal expenses" incurred for all "product withdrawals" initiated during the policy period, unless higher limits of insurance are purchased and specified elsewhere in the policy Declarations or by endorsement.
**3.** **Deductible**
We will only pay for the amount of "product withdrawal expenses" which are in excess of a $1,000 deductible amount unless a higher deductible amount is specified elsewhere in the policy Declarations or by endorsement. The deductible applies separately to each "product withdrawal". The limits of insurance will not be reduced by the amount of this deductible.
We may, or will if required by law, pay all or any part of any deductible amount, if applicable. Upon notice of our payment of a deductible amount, you shall promptly reimburse us for the part of the deductible amount we paid.

For the purposes of this coverage, the **Duties In The Event Of Occurrence, Claim Or Suit Condition** under **Section IV - Conditions** is replaced by the following:
  **2. Duties In The Event Of A "Defect" Or A "Product Withdrawal"**
    **a.** You must see to it that we are notified as soon as practicable of any actual, suspected or threatened "defect" in "your product", or any governmental investigation, that may result in a "product withdrawal". To the extent possible, notice should include:

**SL4000 (12/15) Page 6 of 12**
*//*SL4000-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

(1) How, when and where the "defect" was discovered;
(2) The names and addresses of any injured persons and witnesses; and
(3) The nature, location and circumstances of any injury or damage arising out of use or consumption of "your product".

**b.** If a "product withdrawal" is initiated, you must:
(1) Immediately record the specifics of the "product withdrawal" and the date it was initiated; and
(2) Notify us as soon as practicable.
You must see to it that we receive written notice of the "product withdrawal" as soon as practicable.

**c.** You must promptly take all reasonable steps to mitigate the expenses associated with a "product withdrawal". Any "profit" that you receive from mitigating the expenses will be deducted from the amount of reimbursement that you will receive for "product withdrawal expenses".

**d.** You and any other involved insured must:
(1) Immediately send us copies of pertinent correspondence received in connection with the "product withdrawal";
(2) Authorize us to obtain records and other information; and
(3) Cooperate with us in our investigation of the "product withdrawal".

For the purposes of this coverage the following condition is added to **Section IV - Section IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:**

**"Product Withdrawal" Concealment Or Fraud**

We will not provide coverage under Section I of this endorsement to you, or any other insured, who at any time:

**1.** Engaged in fraudulent conduct; or
**2.** Intentionally concealed or misrepresented a material fact concerning a "product withdrawal" or "product withdrawal expenses" incurred by you under Section **I** of this endorsement.

The following definitions are added to the **Definitions** Section:

**1.** "Defect" means a defect, deficiency or inadequacy that creates a dangerous condition.
**2.** "Product tampering" is an act of intentional alteration of "your product" which has caused or is reasonably expected to cause "bodily injury" or physical injury to tangible property other than "your product".
When "product tampering" is known, suspected or threatened, a "product withdrawal" will be limited to those batches of "your product" which are known or suspected to have been tampered with.
For the purposes of this insurance, electronic data is not tangible property.
As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**3.** "Product withdrawal" means the recall or withdrawal:
**a.** From the market; or
**b.** From use by any other person or organization;
of "your products", or products which contain "your products", because of known or suspected "defects" in "your product", or known or suspected "product tampering", which has caused or is reasonably expected to cause "bodily injury" or physical injury to tangible property other than "your product".
For the purposes of this insurance, electronic data is not tangible property.
As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**4.** "Product withdrawal expenses" means those reasonable and necessary extra expenses, listed below, paid and directly related to a "product withdrawal":
**a.** Costs of notification;
**b.** Costs of stationery, envelopes, production of announcements and postage or facsimiles;
**c.** Costs of overtime paid to your regular non-salaried employees and costs incurred by your employees, including costs of transportation and accommodations;
**d.** Costs of computer time;
**e.** Costs of hiring independent contractors and other temporary employees;
**f.** Costs of transportation, shipping or packaging;

**SL4000 (12/15) Page 7 of 12**
*/'*SL4000-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

g. Costs of warehouse or storage space; or

h. Costs of proper disposal of "your products", or products that contain "your products", that cannot be reused, not exceeding your purchase price or your cost to produce the products.

5. "Profit" means the positive gain from business operation after subtracting for all expenses.

6. "Punitive damages" means damages that may be imposed to punish a wrongdoer and to deter others from similar conduct.

## M. EMPLOYEE BENEFITS LIABILITY COVERAGE

1. For the purpose of this coverage the following is added to **Section I - Coverages:**
   **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Paragraph **4.** of this coverage and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

   b. This insurance applies to damages only if:

      (1) The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

      (2) The act, error or omission, takes place before the end of the policy period; and

      (3) A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or an Extended Reporting Period we provide under Paragraph **6.** of this endorsement.

   c. A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

      (1) When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

      (2) When we make settlement in accordance with Paragraph **1.a.** above.

      A "claim" received and recorded by the insured within 60 days after the end of the policy period will be considered to have been received within the policy period, if no subsequent policy is available to cover the claim.

   d. All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

   **Exclusions**
   This insurance does not apply to:

   a. **Dishonest, Fraudulent, Criminal Or Malicious Act**
      Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

   b. **Bodily Injury, Property Damage, Or Personal And Advertising Injury**
      "Bodily injury", "property damage" or "personal and advertising injury".

   c. **Failure To Perform A Contract**
      Damages arising out of failure of performance of contract by any insurer.

   d. **Insufficiency Of Funds**
      Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

   e. **Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation**
      Any "claim" based upon:

      (1) Failure of any investment to perform;

      (2) Errors in providing information on past performance of investment vehicles; or

      (3) Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

001687O  Printed:
03/01/19  01:38:23

**f. Workers' Compensation And Similar Laws**
Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**g. ERISA**
Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**h. Available Benefits**
Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**i. Taxes, Fines Or Penalties**
Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**j. Employment-Related Practices**
Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

**2.** For the purposes of this coverage:
**a.** All references to Supplementary Payments - Coverages **A** and **B** are replaced by Supplementary Payments - Coverages **A**, **B** and **Employee Benefits Liability**.
**b.** Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

**3.** For the purposes of the coverage provided by this endorsement, Paragraph **2.** of **Section II - Who Is An Insured** is replaced by the following:
**2.** Each of the following is also an insured:
**a.** Each of your "employees" who is or was authorized to administer your "employee benefit program".
**b.** Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.
**c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

**4.** For the purposes of this coverage, **Section III - Limits Of Insurance** is replaced by the following:

**Limits Of Insurance**
**a.** The Limits of Insurance shown in paragraph **d.** below and the rules below fix the most we will pay regardless of the number of:
**(1)** Insureds;
**(2)** "Claims" made or "suits" brought;
**(3)** Persons or organizations making "claims" or bringing "suits";
**(4)** Acts, errors or omissions; or
**(5)** Benefits included in your "employee benefit program".
**b.** The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".
**c.** Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:
**(1)** An act, error or omission; or
**(2)** A series of related acts, errors or omissions
negligently committed in the "administration" of your "employee benefit program".
However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".
**d.** Employee Benefits Liability Limits of Insurance
Each Employee Limit: $1,000,000
Aggregate Limit: $2,000,000
The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits Of Insurance.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

MOBDEC   PBP 2855775 00 02/28/2019 F6H TAYL CPP* N   41ELIT0005590 070006
Case 2:21-cv-02154-JPB-DPC   Document 38-2   Filed 08/03/23   Page 250 of 308

PBP 2855775 00

**Deductible**

**a.** Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in paragraph **e.** below as applicable to Each Employee. The limits of insurance shall not be reduced by the amount of this deductible.

**b.** The deductible amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

**c.** The terms of this insurance, including those with respect to:

**(1)** Our right and duty to defend any "suits" seeking those damages; and

**(2)** Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim"

apply irrespective of the application of the deductible amount.

**d.** We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

**e.** Employee Benefits Liability Deductible

Each Employee Deductible: $1,000

**5.** For the purposes of this coverage, Conditions **2.** and **4.** of **Section IV - Commercial General Liability Conditions** are replaced by the following:

**2. Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

**a.** You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim". To the extent possible, notice should include:

**(1)** What the act, error or omission was and when it occurred; and

**(2)** The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

**b.** If a "claim" is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the "claim" or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an act, error or omission on other than a claims-made basis, if:

**(a)** No Retroactive Date is shown in the Schedule of this insurance; or

**(b)** The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

**(2)** When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**SL4000 (12/15) Page 10 of 12**

*//*SL4000-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

    (3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

    (4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

  **c. Method Of Sharing**

    If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

    If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

**6.** For the purposes of this coverage, the following Extended Reporting Period provisions are added, **EXTENDED REPORTING PERIOD**

  **a.** You will have the right to purchase an Extended Reporting Period, as described below, if:

    (1) This endorsement is canceled or not renewed; or

    (2) We renew or replace this endorsement with insurance that:

      (a) Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

      (b) Does not apply to an act, error or omission on a claims-made basis.

  **b.** The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to "claims" for acts, errors or omissions that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be canceled.

  **c.** An Extended Reporting Period of five years is available, but only by an endorsement and for an extra charge.

    You must give us a written request for the endorsement within 60 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

    We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

    (1) The "employee benefit programs" insured;

    (2) Previous types and amounts of insurance;

    (3) Limits of insurance available under this coverage for future payment of damages; and

    (4) Other related factors.

    The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

  **d.** If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for claims first received and recorded during the Extended Reporting Period.

    The extended reporting period aggregate limit of insurance will be equal to the dollar amount shown in the Schedule of this endorsement under Limits of Insurance.

    Paragraph **4.b.** of this provision will be amended accordingly. The Each Employee Limit shown in the Schedule will then continue to apply as set forth in Paragraph **4.c.**

**7.** For the purposes of this coverage, the following definitions are added to the **Definitions** Section:

  **a.** "Administration" means:

    (1) Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    (2) Handling records in connection with the "employee benefit program"; or

    (3) Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

    However, "administration" does not include handling payroll deductions.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

Case 2:21-cv-02154-JPC   Document 18-2   Filed 08/03/23   Page 255 of 538

**STATE AUTO**
Insurance Companies

   **b.** "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

   **c.** "Claim" means any demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

   **d.** "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

     **(1)** Group life insurance; group accident or health insurance; dental, vision and hearing plans; and flexible spending accounts; provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

     **(2).** Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

     **(3)** Unemployment insurance, social security benefits, workers' compensation and disability benefits;

     **(4)** Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

     **(5)** Any other similar benefits designated in the Schedule or added thereto by endorsement.

 **8.** For the purposes of this coverage, Definitions **5.** and **18.** in the **Definitions** Section are replaced by the following:

   **5.** "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

   **18.** "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

     **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

     **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**N. COORDINATING COVERAGE**

If the coverage provided by any provision within this endorsement, any other endorsement, form, or policy issued to you by us or any company affiliated with us apply to the same "occurrence", the maximum applicable per occurrence and aggregate limits of insurance available under all the endorsements, forms or policies shall not exceed the highest applicable per occurrence and aggregate limits of insurance under any one endorsement, form, or policy.

This condition does not apply to any coverage or policy issued by us or an affiliated company to apply specifically as excess insurance over the applicable coverage.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

0016874   Printed:
03/01/19  01:38:23

**STATE AUTO**
Insurance Companies

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTRACTORS PLUS ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

CONTENTS:
- **A.** PROPERTY OF OTHERS IN THE CARE, CUSTODY OR CONTROL OF THE INSURED
- **B.** CONSTRUCTION PROJECT/"LOCATION" GENERAL AGGREGATE
- **C.** LIMITED COVERAGE - DAMAGE TO WORK PERFORMED BY SUBCONTRACTORS
- **D.** ADDITIONAL INSURED - AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENTS
- **E.** ADDITIONAL INSURED - AUTOMATIC STATUS WHEN REQUIRED FOR PERMITS
- **F.** ADDITIONAL INSURED - AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENTS
- **G.** "MOBILE EQUIPMENT" REDEFINED
- **H.** ALIENATED PREMISES AMENDMENT
- **I.** CONTRACT PENALTY REIMBURSEMENT
- **J.** COORDINATING COVERAGE

**A. PROPERTY OF OTHERS IN THE CARE, CUSTODY OR CONTROL OF THE INSURED**

**1.** Subject to the provisions of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, we will pay for "loss" to property belonging to others, including all resulting loss of use of the property, while that property is in the, care, custody or control of, or over which physical control is being exercised for any purpose by, the insured and such "loss" arises out of your business operations to which this policy applies.

**2.** Additional Exclusions
The following is added to paragraph **2.** Exclusions, of Section **I** - Coverage **A**. Bodily Injury and Property Damage Liability:
This insurance does not apply to "loss" to property:
   **(1)** held by the insured for sale or entrusted to the insured for storage or safekeeping;
   **(2)** owned or occupied by, rented or leased to, or loaned to any insured;
   **(3)** included in the "products - completed operations hazard"; or
   **(4)** arising from errors or mistakes in design plans or specifications committed by or on behalf of the insured.

**3.** Limits of Insurance
   **a.** The most we will pay for "loss", including all resulting loss of use of that property is:
      **(1)** $2,500 as a result of any one "occurrence" and the most we will pay for the sum of all occurrences during the policy period is the aggregate limit of $10,000; or
      **(2)** The amount shown in the Declarations, if greater than **(1)** above, for Voluntary Property Damage And/Or Property Of Others In The Care, Custody, And Control Of The Insured.
   **b.** The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**4.** Deductible
   **a.** We are not obligated to pay any "loss" until such "loss" exceeds a $250 deductible. We will then pay the amount of "loss" in excess of the deductible up to the applicable Limit of Insurance. This deductible amount applies to all "loss" to property belonging to others as the result of any one "occurrence".
   **b.** We may pay any part or the entire deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken; you shall promptly reimburse us for such part of the deductible amount as has been paid by us.
   **c.** The terms of this insurance, including those with respect to:
      **(1)** our right and duty to defend any "suits" seeking those damages; and
      **(2)** your duties in the event of an "occurrence", claim or suit:
      apply irrespective of the application of the deductible amounts.

**5.** Excess Insurance
This insurance is excess over any other collectible insurance available to the insured.

*//*SL1011-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

Issue Date  02/28/2019          01:23:06 PM

001675  Printed:
03/01/19  01:38:23

MOBDEC    PBP 2855775  00 02/28/2019  F6H TAYL CPP* N    41ELIT0005590 070006
Case 3:21-cv-02154-HES-PDB   Document 18-2   Filed 08/03/23   Page 257 of 538

**STATE AUTO**
Insurance Companies                                    **PBP 2855775   00**

**6.** Additional Definition
The following is added to Section **V** - Definitions:
**a.** "Loss" means unintentional damage or destruction, but does not include disappearance or abstraction.

## B. CONSTRUCTION PROJECT/"LOCATION" GENERAL AGGREGATE

**1.** For all sums which the insured becomes legally obligated to pay as damages caused by an "occurrence" under **Section I - Coverage A**, and for all medical expenses caused by accidents under **Section I - Coverage C**, which can be attributed:

**(i)** only to ongoing operations at a single construction project away from premises owned or rented to you or;

**(ii)** to a single "location" owned or rented to you:

**a.** A separate Construction Project/"Location" General Aggregate Limit applies to each construction project or covered location, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

**b.** The Construction Project/"Location" General Aggregate Limit is the most we will pay for the sum of all damages under **Coverage A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under **Coverage C** regardless of the number of:

**(1)** Insureds;

**(2)** Claims made or "suits" brought; or

**(3)** Persons or organizations making claims or bringing "suits".

**c.** Any payments made under **Section I - Coverage A** for damages or under **Coverage C** for medical expenses shall reduce the Construction Project/"Location" General Aggregate Limit for that construction project or covered location. Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Construction Project/"Location" General Aggregate Limit for any other construction project or covered location.

**d.** The limits shown in the Declarations for Each Occurrence, Damage To Premises Rented To You and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Construction Project/"Location" General Aggregate Limit.

**2.** For all sums which the insured becomes legally obligated to pay as damages caused by an "occurrence" under **Section I - Coverage A** , and for all medical expenses caused by accidents under **Section I - Coverage C**, which cannot be attributed only to ongoing operations at a single construction project or only to operations at a single "location":

**a.** Any payments made under **Coverage A** for damages or under **Coverage C** for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

**b.** Such payments shall not reduce any Construction Project/"Location" General Aggregate Limit.

**3.** When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Construction Project/"Location" General Aggregate Limit.

**4.** If the applicable construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

**5.** For the purposes of this endorsement, the Definitions Section is amended by the addition of the following definition:
"Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

**6.** The provisions of **Section III - Limits Of Insurance** not otherwise modified by this endorsement shall continue to apply as stipulated.

## C. LIMITED COVERAGE - DAMAGE TO WORK PERFORMED BY SUBCONTRACTORS

If endorsement **CG 22 94 Exclusion - Damage To Work Performed By Subcontractors On Your Behalf** amends this policy, the following applies:

**1.** Paragraph **1.a.** Insuring Agreement of Section I - Coverage **A** - Bodily Injury And Property Damage Liability is amended to include the following:

**a.** We will pay for "property damage" to "your work" which you become legally obligated to pay, but only if:

**(1)** The damaged work or the work out of which the damage arises was performed on your behalf by your subcontractor(s) that is not a named insured;

**(2)** Such "property damage" is included within the "products-completed operations hazard";

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

Case 3:21-cv-02154-B-BT-PBC   Document 14-2   Filed 08/03/23   Page 258 of 538

**STATE AUTO**
Insurance Companies

(3) Such "property damage" consists of physical injury to tangible property; and,

(4) Such "property damage" was not a result of wanton, willful or intentional misconduct.

2. **Additional Exclusions**

   a. The following is added to paragraph 2. **Exclusions**, subparagraph **I. Damage To Your Work** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability as amended by endorsement **CG 22 94** - Exclusion - Damage To Work Performed By Contractors On Your Behalf when attached to this policy.

   This exclusion does not apply in "property damage" to which paragraph **C. 1.** of this endorsement applies.

   b. The following is added to paragraph 2., **Exclusions**, of **Section I - Coverage A. - Bodily Injury and Property Damage Liability**:

   This insurance does not apply to "loss" to property:

   (1) held by the insured for sale or entrusted to the insured for safekeeping;

   (2) owned or occupied by, rented or leased to, or loaned to any insured; or

   (3) arising from errors or mistakes in design plans or specifications committed by or on behalf of the insured.

3. **Limits of Insurance**

   a. The following is added to **Section III - Limits of Insurance**

   (1) Subject to paragraph 3. of this section for all payments under the "products-completed operations hazard" for this policy, the most we will pay for "property damage" to "your work", including all resulting loss of use of that property is as follows, unless higher limits of insurance are specified in the Declarations:

   (a) $2,500 for each subcontractor that performed the work out of which the damage arose, subject to

   (b) $10,000 as a result of any one "occurrence", and

   (c) $25,000 aggregate limit for the sum of all occurrences during the policy period.

   (2) The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

   (3) Subject to the limitations for payment of this coverage under paragraph **3.a.(1)** above, all payments for this coverage combined with all other claims and payments under the "products-completed operations hazard" will be limited to the Products-Completed Operations Aggregate specified in the Declarations.

4. **Deductible**

   a. We will not be obligated to pay any "loss" until such "loss" exceeds a $250 deductible, or higher deductible amount specified in the Declarations. We will then pay the amount of "loss" in excess of the deductible up to the applicable Limit of Insurance. This deductible amount applies to all "property damage" to "your work", as the result of any one "occurrence", if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

   b. We may pay any part or the entire deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken; you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

   c. The terms of this insurance, including those with respect to:

   (1) our right and duty to defend any "suits" seeking those damages; and

   (2) your duties in the event of an "occurrence", claim or suit:

   apply irrespective of the application of the deductible amounts.

5. **Excess Insurance**

   a. For the purpose of the coverage under paragraph **C.** of this endorsement, paragraph **5. Other Insurance, b. Excess Insurance** of **Section IV - Commercial General Liability Conditions** is amended to include the following:

   (this insurance is excess over:)

   (1) Any other insurance:

   (a) Whether primary, excess, contingent or on any other basis, except when such insurance is written specifically to be excess over this insurance; and

   (b) Provided the insured is covered by such other insurance for "property damage" to which this endorsement applies.

This coverage does not apply if this policy is not amended by **CG 22 94 Exclusion - Damage To Work Performed By Subcontractors On Your Behalf**

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

0016877   Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

## D. ADDITIONAL INSURED - AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENTS

1. The words "you" and "your" as used in this provision refer to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under the policy to which this endorsement is attached. "You" and "your" do not refer to an additional insured.

2. **Section II - Who Is An Insured** is amended to include any person or organization for whom you are performing operations when you and such person or organization have agreed in a written contract or written agreement, that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to:

   **a.** Liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

      **(1)** Your acts or omissions; or

      **(2)** The acts or omissions of those acting on your behalf,

      in the performance of your ongoing operations for the additional insured.

      A person or organization's status as an additional insured for ongoing operations ends when your operations for that additional insured are completed.

   **b.** Liability for "bodily injury" or "property damage" caused in whole or in part, by "your work" at the location designated and described in the written contract or written agreement with that additional insured and included within the "products-completed operations hazard".

3. With respect to the insurance afforded to the additional insured described above, the following additional exclusions or limitations apply:

   **a.** The insurance applies only to the extent permitted by law;

   **b.** This insurance does not apply to "bodily injury" or "property damage" caused by your ongoing operations, or "your work" included in the "products-completed operations hazard", unless you are required to provide such coverage for the additional insured by a written contract or written agreement. The contract or agreement must be in effect during this policy period and signed and executed by you prior to the loss for which coverage is sought. Coverage for the additional insured is provided only for the lesser of: **(i)** the period of time required by such contract or agreement; or **(ii)** the end of the policy period.

   **c.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render any professional engineering, architectural or surveying services by you or others on your behalf, including:

      **(1)** The preparing, approving, failing to prepare approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; or

      **(2)** Supervisor or inspection activities performed as part of any related architectural or engineering activities.

      However, professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

   This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or the failure to render any professional architectural, engineering or surveying services.

   **d.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the sole negligence or willful misconduct of, or defects in design furnished by, the additional insured or its "employees".

   **e.** This insurance does not apply to "bodily injury" or "property damage":

      **(1)** Occurring after all work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance, or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

      **(2)** Once the location designated and described in the written contract or written agreement has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project,

      except to the extent a written contract or written agreement requires coverage to be provided for "bodily injury" or "property damage" included within the "products-completed operations hazard".

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**STATE AUTO**
Insurance Companies

**f.** With respect to any person or organization added as an additional insured by this endorsement, the definition of "insured contract" under **Section V - Definitions** is amended as follows:

  **(1)** Paragraph **9.f.** does not apply to "bodily injury" or "property damage" included within the "products-completed operations hazard" unless such contractual assumption of liability is specifically required by a written contract or written agreement.

  **(2)** Under paragraph **9.f.** any such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law.

**g.** The insurance as provided in this endorsement does not apply to "bodily injury", "property damage" or "personal and advertising injury" caused by "your work" for which a consolidated (wrap-up) insurance program has been provided by the prime contractor, project manager or owner of a construction project in which you are involved.

**h.** This insurance will not be broader than that which you are required by a contract or agreement to provide for such additional insured.

**4.** With respect to the insurance afforded to the additional insured the following is added to **Section III - Limits of Insurance**:

The most we will pay on behalf of the additional insured is the amount of insurance:

**a.** Required by the contract or agreement you have entered into with the additional insured; or

**b.** Available under the applicable Limit of Insurance shown in the Declarations,

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**5.** With respect to the coverage provided under this endorsement to an additional insured, the following is added to paragraph **4.a., Other Insurance**, of **Section IV - Commercial General Liability Conditions**:

However, this insurance is primary to and will not seek contribution from any other insurance available to a person or organization added as an additional insured under the terms of the endorsement provided that

**(1)** The person or organization is a Named Insured under such other insurance; and

**(2)** You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

**6.** As a condition of coverage, each additional insured must:

**a.** Give us prompt written notice of any "occurrence" or offense which may result in a claim and prompt written notice of "suit".

**b.** Immediately forward all legal papers to us, cooperate in the investigation or settlement of the claim or defense against the "suit," and otherwise comply with policy conditions.

**c.** Tender the defense and indemnity of any claim or "suit" to any other insurer which also insures against a loss we cover under this endorsement. This includes, but is not limited to, any insurer which has issued a policy of insurance in which the additional insured qualifies as an insured under any applicable policy definition. For purposes of this requirement, the term "insures against" refers to any self-insurance and to any insurer which issued a policy of insurance that may provide coverage for the loss, regardless of whether the additional insured has actually requested, demanded, or targeted tender that the insurer provide the additional insured with a defense and/or indemnity under that policy of insurance.

**d.** Agree to make available any other insurance that the additional insured has for a loss we cover under this endorsement.

**E. ADDITIONAL INSURED - AUTOMATIC STATUS WHEN REQUIRED FOR PERMITS**

**1.** The words "you" and "your" as used in this provision refer to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under the policy to which this endorsement is attached. "You" and "your" do not refer to an additional insured.

**2. Section II - Who Is An Insured** is amended to include any state, governmental agency, subdivision or political subdivision for which you are required to add as an additional insured because of the issuance or existence of a permit, but only with respect to:

**a.** Liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

  **(1)** Your acts or omissions; or

  **(2)** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for which the permit was issued; and

**b.** Permits:

  **(1)** Currently in effect or becoming effective during the term of this policy; and

  **(2)** Executed prior to the "bodily injury", "property damage," or "personal and advertising injury".

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

001SB79   Printed:
03/01/19   01:38:23

However:

    **a.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

    **b.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

A person's or organization's status as an additional insured for ongoing operations ends when your operations for which the permit was issued are completed.

**3.** With respect to the insurance afforded to the additional insured described in **E. 2**. above, this insurance does not apply to:

    **a.** Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the federal government, state or municipality; or

    **b.** "Bodily injury" or "property damage" included within the "products-completed operations hazard".

**4.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance**:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

    **a.** Required by the contract or agreement; or

    **b.** Available under the applicable Limits of Insurance shown in the Declarations,

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

## F. ADDITIONAL INSURED - AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENTS

**1.** The words "you" and "your" as used in this provision refer to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under the policy to which this endorsement is attached. "You" and "your" do not refer to an additional insured.

**2.** **Section II - Who Is An Insured** is amended to include as an additional insured any person or organization from whom you lease equipment when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person or organization.

However, the insurance afforded to such additional insured:

    **a.** Only applies to the extent permitted by law; and

    **b.** Will not be broader than that which you are required by the contract or agreement to provided for such additional insured.

A person's or organization's status as an additional insured under this endorsement ends when their contract or agreement with you for such leased equipment ends.

**3.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**4.** With respect to the insured afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance**:

The most we will pay on behalf of the additional insured is the amount of insurance:

    **a.** Required by the contract or agreement you have entered into with the additional insured; or

    **b.** Available under the applicable Limits of Insurance shown in the Declaration,

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

## G. "MOBILE EQUIPMENT" REDEFINED

**1.** Section **V - DEFINITIONS** is amended as follows:

    **a.** Paragraph **12.f.(1)(a), (b)**, and **(c)** of the "mobile equipment" definition does not apply to self-propelled vehicles of less than 1,000 pounds gross vehicle weight.

## H. ALIENATED PREMISES AMENDMENT

**1.** Paragraph **2.J.(2)**, Exclusions, of Section **I - Coverage A**. Bodily Injury and Property Damage Liability is replaced as follows:

    **(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.;

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

0016880   Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

**I.  CONTRACT PENALTY REIMBURSEMENT**

**1.** Subject to the provisions of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, we will pay up to 50% of the contractual penalties you are required to pay to your customers as a result of a written contract or agreement for failure to timely deliver your product according to the contract terms due to "bodily injury" or "property damage" which arises out of your business operations to which this policy applies.

**2.** The most we will pay under the coverage is $10,000 in any one policy year.

**J.  COORDINATING COVERAGE**

If the coverage provided by any provision within this endorsement, any other endorsement, form, or policy issued to you by us or any company affiliated with us apply to the same "occurrence", the maximum applicable per occurrence and aggregate limits of insurance available under all the endorsements, forms or policies shall not exceed the highest applicable per occurrence and aggregate limits of insurance under any one endorsement, form, or policy.

This condition does not apply to any coverage or policy issued by us or an affiliated company to apply specifically as excess insurance over the applicable coverage.

**SL1011 (12/15) Page 7 of 7**
*//*SL1011-201512

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

Issue Date  02/28/2019          01:23:06 PM

0016881      Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT PRACTICES RISK MANAGEMENT INFORMATION

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE COVERAGE PART**

The following is added to **SECTION V - CONDITIONS**

**P. Employment Practices Legal Advice Line**

    **a.** Include with this Coverage is access to certain sources of "employment practices" risk management information. This information is available to you through various means, including, but not limited to, telephonic, electronic, and print media. The specific information sources and media will be determined solely by us.

    **b.** Instructions for accessing "employment practices" risk management information are included with documents attached to this policy.

    **c.** The "employment practices" risk management information provided through sources we make available to you is for your informational purposes only. We do not warrant that such "employment practices" risk management information is applicable to, or suitable for, your business, nor do we represent that such "employment practices" risk management information constitutes professional advice. The sources of the "employment practices" risk management information are third-party vendors, and, as such, are contractors independent of us. We do not assume any liability for any error or omission on the part of the vendors, and liability is expressly denied.

    **d.** Giving information to an "employment practices" risk management information source provided by us concerning any specific "employment practices" which you believe may result in an actual "claim" does not constitute legal notice of that "claim" to us as set forth in **SECTION VI - CONDITIONS** provision **D. Duties in the Event of an Incident, "Claim" or "Suit"** of the policy to which this endorsement is attached.

    **e.** We reserve the right to discontinue this "employment practices" risk management information service at our sole discretion without further notice to you.

**EP 24 12 01 14 Page 1 of 1**
*//*EP2412-201401

Case 3:21-cv-02154-JPC    Document 38-2    Filed 08/03/23    Page 264 of 308

| THIS IS A CLAIMS-MADE AND REPORTED COVERAGE PART. |
| --- |

# EMPLOYMENT PRACTICES LIABILITY INSURANCE COVERAGE PART

Throughout this Coverage Part (hereinafter referred to as "EPL Coverage"), the words "you" and "your" refer to the "named insured(s)" shown in the Supplemental Declarations of this EPL Coverage and any other person(s) or organization(s) qualifying as a "named insured" under this EPL Coverage. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under SECTION III. WHO IS AN INSURED.

Other words and phrases that appear in "quotations" have special meaning. Refer to SECTION VII. DEFINITIONS.

The terms and conditions of the Cancellation Clause of the Common Policy Conditions and any amendment to such terms incorporated by endorsement are hereby incorporated herein and shall apply to coverage as is afforded by this EPL Coverage, unless specifically stated otherwise in an endorsement(s) attached hereto.

## SECTION I. WHAT IS COVERED
### A. Insuring Agreement
1. "We" shall pay those "losses" arising out of an "insured's" "wrongful employment act" (other than a "third party violation") against "your" "employees", "recognized volunteers" and applicants for employment to which this insurance applies.
2. If coverage for "third party violations" is shown on the Supplemental Declarations, then "we" shall pay those "losses" arising out of an "insured's" "third party violation".
3. For coverage to apply under this EPL Coverage, the "wrongful employment act" must commence or take place after the Retroactive Date, but before the end of the "EPL coverage period". If no Retroactive Date appears on the Supplemental Declarations then the Retroactive Date shall be the date of organization of the "named insured." A "claim" or "suit" for a "wrongful employment act" must be first made against "you" during the "EPL coverage period" or Extended Reporting Periods (if applicable) and reported to "us" pursuant to the terms of this EPL Coverage.
4. A "claim" or "suit" by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:
   a. When written notice of such "claim" or "suit" is received and recorded by any "insured" or by "us", whichever comes first; or
   b. When "we" make any settlement in accordance with the terms of this EPL Coverage.

### B. Defense
1. "We" have the right and duty to defend and appoint an attorney to defend any "claim" or "suit" brought against any "insured" for a "wrongful employment act" to which this insurance applies, even if the "claim" or "suit" is groundless or fraudulent.
   At the time a "claim" or "suit" is first reported to "us", "you" may request that "we" appoint a defense attorney of "your" choice. "We" will give full consideration to any such request.
2. "We" have the right to investigate and settle any "claim" or "suit" that "we" believe is proper. "You" shall be entitled to consent to such settlement, provided "your" consent is not unreasonably withheld and is provided as soon as practicable.
   If "you" refuse to consent to any settlement that "we" recommend and that is acceptable to the claimant, then "our" liability under this EPL Coverage for such "claim" or "suit" shall not exceed the amount for which we could have settled had "your" consent not been withheld at the time of "our" recommendation. "You" shall thereafter negotiate and defend that "claim" or "suit" at "your" own cost and without "our" involvement.
3. "We" shall pay all reasonable costs "we" ask the "insured" to incur while helping "us" investigate or defend a "claim" or "suit". "We", however, will not pay more than $250 per day for earnings lost by the "insured" because of time taken off from work.
4. "We" shall pay premiums for appeal bonds, or bonds to release property being used to secure a legal obligation, for a covered "suit". "We" shall only pay, however, for bonds valued up to "our" EPL Aggregate Limit of Liability. "We" shall have no obligation to appeal or to obtain these bonds.

**STATE AUTO**
Insurance Companies

**PBP 2855775  00**

5. Payments for "defense costs" are included within the EPL Aggregate Limit of Liability. They are not in addition to the EPL Aggregate Limit of Liability. "Our" duty to defend or to make payment of any "claim" or "suit" pursuant to Paragraphs 1. through 4. of this Clause B., ends after the EPL Aggregate Limit of Liability has been exhausted by payment of "loss", including "defense costs".

6. "We" shall pay all interest on that amount of any judgment within the EPL Aggregate Limit of Liability:
   a. Which accrues after entry of judgment; and
   b. Before "we" pay, offer to pay, or deposit in court that part of the judgment within the EPL Aggregate Limit of Liability.
   These interest payments shall be in addition to and not part of the EPL Aggregate Limit of Liability.

**C. Transfer of Control**
1. "You" may take over control of any outstanding "claim" or "suit" previously reported to "us", but only if "we", in "our" sole discretion, decide that you should, or if a court orders "you" to do so.

2. Notwithstanding Paragraph 1. of this Clause C., in all events, if the EPL Aggregate Limit of Liability is exhausted, "we" will notify "you" of all outstanding "claims" or "suits" and "you" will take over control of the defense. "We" will help transfer control of the "claims" and "suits" to "you".

3. "We" shall take whatever steps are necessary to continue the defense of any outstanding "claim" or "suit" and avoid a default judgment during the transfer of control to "you". If "we" do so, "we" shall not waive or give up any of "our" rights. "You" shall pay all reasonable expenses "we" incur for taking such steps after the EPL Aggregate Limit of Liability is exhausted.

**SECTION II. EXCLUSIONS -  WHAT IS NOT COVERED**
This insurance does not apply to:
**A. Criminal Acts**
   Any liability arising out of any dishonest, fraudulent, criminal, or malicious act by or at the direction of any "insured". However, to the extent that a "claim" or "suit" is otherwise covered under this EPL Coverage "we" will defend a "claim" or "suit" asserting a dishonest, fraudulent, criminal or malicious act until such time as the "insured" is determined to have committed such dishonest, fraudulent, criminal or malicious act;

The "wrongful employment act(s)" of an "insured" shall not be imputed to any other "insured" for the purpose of determining the applicability of this Exclusion A.;

**B. "Property Damage"**
   Any liability arising out of "property damage";

**C. "Bodily Injury"**
   Any liability arising out of "bodily injury";

**D. Worker's Compensation, Social Security and Unemployment, Disability and Retirement Benefits**
   Any liability arising out of any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law. This exclusion, however, shall not apply to "loss" arising from a "claim" or "suit" for "retaliation";

**E. Contractual Liability**
   Any liability arising out of any actual or alleged contractual liability of any "insured" under any express contract or agreement. This exclusion, however, shall not apply to any liability the "insured" would have in the absence of such express contract or agreement;

**F. ERISA, FLSA, NLRA, WARN, COBRA, and OSHA**
   Any liability for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law.
   It is acknowledged that "claims" and "suits" for violation(s) of any of the responsibilities, obligations or duties imposed by "similar federal, state, local or foreign statutory law or common law," as such quoted language is used in the immediately-preceding paragraph, include, without limitation, any and all "claims" and "suits" which in whole or in part allege, arise out of, are based upon, are attributable to, or are in any way related to any of the circumstances described in any of the following:
1. The refusal, failure or inability of any "insured(s)" to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered or time spent in connection with work related activities (as opposed to tort-based back pay or front pay damages for torts other than conversion);
2. Improper deductions from pay taken by any "insured(s)" from any "employee(s)" or purported employee(s); or

001884   Printed:
03/01/19   01:38:23

**PBP 2855775 00**

3. Failure to provide or enforce legally required meal or rest break periods;

Notwithstanding the foregoing, this Exclusion F. shall not apply to the extent that a "claim" or "suit" is for "retaliation";

**G. Prior Knowledge**

Any liability arising out of incidents, circumstances or "wrongful employment acts", which an "insured"

1. Had knowledge of; or
2. Could have reasonably foreseen might result in a "claim" or "suit"

and which were known to the "insured" prior to the effective date of this EPL Coverage or the first EPL Coverage issued by "us" of which this EPL Coverage is an uninterrupted renewal;

**H. Prior Notice**

Any liability arising out of the facts alleged, or to the same or "related wrongful employment acts" alleged or contained in any "claim" or "suit" which has been reported, or in any circumstances of which notice has been given, under any policy of which this EPL Coverage is a renewal or replacement or which it may succeed in time;

**I. Prior Litigation**

Any liability arising out of any prior

1. Litigation; or
2. Administrative or regulatory proceeding or investigation

of which an "insured" had notice, or alleging the same or "related wrongful employment acts" alleged or contained in such pending or prior litigation or administrative or regulatory proceeding or investigation which the "insured" had knowledge of prior to the effective date of this EPL Coverage or the first EPL Coverage issued by "us" of which this EPL Coverage is an uninterrupted renewal.

**SECTION III. WHO IS AN INSURED**

**A. Individual**

If "you" are shown in the Supplemental Declarations of this EPL Coverage as an individual, "you" and "your" spouse or "Domestic Partner" are "insureds", only for the conduct of a business of which "you" are the sole owner.

**B. Corporation**

If "you" are shown in the Supplemental Declarations of this EPL Coverage as a corporation or organization other than a partnership, joint venture, or limited liability company, "you" and "your" "subsidiaries" are "insureds".

**C. Partnership or Joint Venture**

If "you" are shown in the Supplemental Declarations of this EPL Coverage as a partnership or joint venture, "you" are an "insured". "Your" members, partners or co-venturers and their spouses or "Domestic Partners" are also "insureds", but only for the conduct of "your" business.

**D. Limited Liability Company**

If "you" are shown in the Supplemental Declarations of this EPL Coverage as a limited liability company, "you" are an "insured." "Your" members are also "insureds", but only with respect to the conduct of "your" business. "Your" managers are "insureds", but only with respect to their duties as "your" managers.

**E. Trusts**

If "you" are shown in the Supplemental Declarations of this EPL Coverage as a trust, "you" are an "insured". "Your" trustees are also "insureds", but only with respect to their duties as trustees.

**F. "Employees"**

"Your" "employees", executive officers and directors are "insureds", only for the conduct of "your" business within the scope of their employment or their duties as executive officers or directors.

**G. Extensions**

1. Subject otherwise to the terms hereof, this EPL Coverage shall cover "loss" arising from any "claims" or "suits" made against the estates, heirs, or legal representative of deceased individual "insureds", and the legal representatives of individual "insureds", in the event of incompetency, who were individual "insureds" at the time the "wrongful employment acts", upon which such "claims" or "suits" are based, were committed.

2. Subject otherwise to the terms hereof, this EPL Coverage shall cover "loss" arising from all "claims" and "suits" made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) or "Domestic Partner" of an individual "insured", including a "claim" or "suit" that seeks damages recoverable from marital community property, property jointly held by the individual "insured" and the spouse or "Domestic Partner", or property transferred from the individual "insured" to the spouse or "Domestic Partner"; provided, however, that this extension shall not afford coverage for a "claim" or "suit" arising out of any "wrongful employment act" of the spouse or "Domestic Partner", but shall apply only to "claims" or "suits" arising out of any "wrongful employment acts" of an individual "insured", subject to this EPL Coverage's terms, conditions and exclusions.

**SECTION IV. LIMIT OF LIABILITY (including "defense costs")**

**A.** The EPL Aggregate Limit of Liability shown in the Supplemental Declarations of this EPL Coverage and the information contained in this section limits the most "we" shall pay for all

Case 3:21-cv-02154-JR    Document 34-2    Filed 08/03/23    Page 267 of 538

# STATE AUTO
Insurance Companies

**PBP 2855775  00**

"loss" (other than post-judgment interest described in Section I., Clause B., Paragraph 6.) arising out of "claims" and "suits" first made against "insureds" during the "EPL coverage period" or Extended Reporting Periods (if applicable), regardless of:

1. The number of persons or organizations covered by this EPL Coverage; or
2. The number of "claims" made or "suits" brought; or
3. The length of the "EPL coverage period".

**B.** The EPL Aggregate Limit of Liability is the most "we" shall pay for all "losses" (other than post-judgment interest described in Section I., Clause B., Paragraph 6.), including amounts incurred for "defense costs".

**C.** The EPL Aggregate Limit of Liability for the Extended Reporting Periods (if applicable) shall be part of, and not in addition to the EPL Aggregate Limit of Liability for the "EPL coverage period".

**D.** All "claims" and "suits" arising from the same or "related wrongful employment acts" shall be treated as arising out of a single "wrongful employment act".

**E.** All "claims" or "suits" arising out of one "wrongful employment act" shall be deemed to be made on the date that the first such "claim" is made or "suit" is brought. All "claims" asserted in a "class action suit" will be treated as arising out of a single "wrongful employment act".

**F.** Any "claim" or "suit" which is made subsequent to the "EPL coverage period" or Extended Reporting Periods (if applicable) which, pursuant to Section VI., Clause D., Paragraphs 3. and 4. is considered made during the "EPL coverage period" or Extended Reporting Periods (if applicable) shall also be subject to the one EPL Aggregate Limit of Liability stated in the Supplemental Declarations of this EPL Coverage.

## SECTION V. DEDUCTIBLE

"You" shall be responsible for the deductible amount shown in the Supplemental Declarations of this EPL Coverage with respect to each "claim" and "suit" and "you" may not insure against it. A single deductible amount shall apply to "loss" arising from all "claims" and "suits" alleging the same "wrongful employment act" or "related wrongful employment acts". Expenses "we" incur in investigating, defending and settling "claims" and "suits" are included in the deductible. The deductible is not included within the EPL Aggregate Limit of Liability. At our option, "we" may pay any part or all of the EPL Deductible Amount to effect settlement of any "claim" or "suit" and upon notification of the action taken, "you" shall promptly reimburse "us" for such part of the deductible that has been paid by "us".

## SECTION VI. CONDITIONS

"We" have no duty to provide coverage under this EPL Coverage, unless there has been full compliance with all the Conditions contained in this EPL Coverage.

**A. Assignment**
The interest of any "insured" is not assignable. "You" cannot assign or transfer "your" interest in this EPL Coverage without "our" written consent attached to the EPL Coverage.

**B. Bankruptcy or Insolvency**
"Your" bankruptcy, insolvency or inability to pay, will not relieve "us" from the payment of any "claim" or "suit" covered by this EPL Coverage. Under no circumstances will "your" bankruptcy, insolvency, or inability to pay require "us" to drop down, in any way replace, or assume any of "your" obligations with respect to the Deductible provisions of this EPL Coverage.

**C. Coverage Territory**
"We" cover "wrongful employment acts" anywhere in the world, but only if the "claim" is made and the "suit" is brought for such "wrongful employment act" in the United States of America, its territories and possessions, Puerto Rico, or Canada.

**D. Duties in the Event of an Incident, "Claim" or "Suit"**

1. If, during the "EPL coverage period", incidents or events occur which "you" reasonably believe may give rise to a "claim" or "suit" for which coverage may be provided hereunder, such belief being based upon either written notice from the potential claimant or the potential claimant's representative; or notice of a complaint filed with EEOC, DOL or OFCCP (or similar federal, state or local agency); or upon an oral "claim", allegation or threat, "you" shall give written notice to "us" as soon as practicable and either:
   a. Anytime during the "EPL coverage period"; or
   b. Anytime during the Extended Reporting Periods (if applicable).
2. If a "claim" is made or a "suit" is brought against any "insured", "you" must:
   a. Immediately record the specifics of the "claim" or "suit" and the date received; and
   b. Provide "us" with written notice, as described in Paragraph 3. of this Clause D., as soon as practicable.
3. Such written notice of "claim" or "suit" shall contain:
   a. The identity of the person(s) alleging a "wrongful employment act";
   b. The identity of the "insured(s)" who allegedly were involved in the incidents or events;

STATE AUTO
Insurance Companies

c. The date the alleged incidents or events took place; and

d. The written notice or a memorandum of the oral "claim", allegation or threat referred to above.

If written notice is given to "us" during the "EPL coverage period" or Extended Reporting Periods (if applicable), pursuant to the above requirements, then any "claim" or "suit" which is subsequently made against any "insureds" and reported to "us" alleging, arising out of, based upon or attributable to such circumstances or alleging any "related wrongful employment act" to such circumstances, shall be considered made at the time such notice of such circumstances was first given.

4. If "you" submit written notice of a "claim" or "suit", pursuant to this Clause D., then any "claim" or "suit" that may subsequently be made against an "insured" and reported to "us" alleging the same or a "related wrongful employment act" to the "claim" or "suit" for which such notice has been given shall be deemed, for the purpose of this insurance, to have been first made during the "EPL coverage period" or Extended Reporting Period (if applicable) in effect at the time such written notice was first submitted to "us".

5. "You" and any other "insured" must:

a. Immediately send "us" copies of any demands, notices, summonses or legal papers received in connection with any "claim" or "suit";

b. Authorize "us" to obtain records and other information;

c. Cooperate with "us" in the investigation, settlement or defense of the "claim" or "suit";

d. Assist "us", upon "our" request, in the enforcement of any right against any person or organization which may be liable to the "insured" because of injury or damage to which this insurance may also apply;

e. Not take any action, nor fail to take any required action, that prejudices the rights of the "insureds" or "us" with respect to such "claim" or "suit".

6. No "insureds" will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without "our" prior written consent.

E. **Transfer of Rights of Recovery Against Others to "Us"**

"You" may be able to recover all or part of a "loss" from someone other than "us". "You", therefore, shall do all that is possible after a "loss" to preserve any such right of recovery. If "we" make a payment under this EPL Coverage,

that right of recovery shall belong to "us". "You" shall do whatever is necessary, including signing documents, to help "us" obtain that recovery.

F. **Extended Reporting Periods**

1. You shall have the right to the Extended Reporting Periods described in Paragraph 2. of this Clause F., in the event that:

a. "You" or "we" shall cancel this EPL Coverage;

b. "You" or "we" shall refuse to renew this EPL Coverage; or

c. "We" renew this EPL Coverage on an other than a claims-made basis or with a Retroactive Date later than the Retroactive Date shown on the Supplemental Declarations of this EPL Coverage;

2. If an event as specified in Paragraph 1. of this Clause F. has occurred, "you" shall have the right to the following:

a. An Automatic Extended Reporting Period of thirty (30) days after the effective date of cancellation or nonrenewal at no additional premium in which to give to "us" written notice of "claims" first made or "suits" first brought against the "insureds" during said Automatic Extended Reporting Period for any "wrongful employment acts" occurring before the end of the "EPL coverage period" and are otherwise covered by this EPL Coverage; and

b. Upon payment of an additional premium of 100% of the full annual premium applicable to this EPL Coverage, a Supplemental Extended Reporting Period of one (1) year immediately following the effective date of cancellation or nonrenewal in which to give to "us" written notice of "claims" first made or "suits" first brought against the "insureds" during said Supplemental Extended Reporting Period for any "wrongful employment acts" occurring before the end of the "EPL coverage period" and are otherwise covered by this EPL Coverage.

To obtain the Supplemental Extended Reporting Period, "you" must request it in writing and pay the additional premium due, within thirty (30) days of the effective date of cancellation or nonrenewal. The additional premium for the Supplemental Extended Reporting Period shall be fully earned at the inception of the Supplemental Extended Reporting Period. If "we" do not receive the written request as required, "you" may not exercise this right at a later date.

**EP 00 01 01 14 Page 5 of 8**
*//*EP0001-201401*

0016887    Printed:
03/01/19   01:38:23

MOBDEC   PBP 2855775  00 02/28/2019 F6H TAYL CPP * N   41ELIT0005590 070006
Case 3:21-cv-02154-L-BGS   Document 14-2   Filed 08/03/23   PageID.268 of 208

**PBP 2855775  00**

STATE AUTO
Insurance Companies

This insurance, provided during the Supplemental Extended Reporting Period, is excess over any other valid and collectible insurance that begins or continues in effect after the Supplemental Extended Reporting Period becomes effective, whether the other insurance applies on a primary, excess, contingent, or any other basis.

**G. Change in Control of "Named Insured"**
In the event of a "Transaction" then this EPL Coverage shall continue in full force and effect as to "wrongful employment acts" occurring prior to the effective time of the "Transaction", but there shall be no coverage afforded by any provision of this EPL Coverage for any actual or alleged "wrongful employment acts" occurring after the effective time of the "Transaction". This EPL Coverage may not be cancelled after the effective time of the "Transaction" and the entire premium for this EPL Coverage shall be deemed earned as of such time. "You" shall also have the right to the Extended Reporting Periods described in Clause F. of this Section VI. "You" shall give "us" written notice of the "Transaction" as soon as practicable, but not later than thirty (30) days after the effective date of the "Transaction".

**H. Legal Action Against "Us"**
No person or organization has the right to join "us" as a party or otherwise bring "us" into a "suit" asking for damages from an "insured".

**I. Other Insurance**
Unless expressly written to be excess over other applicable insurance, it is intended that the insurance provided by this EPL Coverage shall be primary.

**J. EPL Coverage Changes**
This EPL Coverage contains all the agreements between "you" and "us" concerning this insurance. The first "named insured" in the Supplemental Declarations of this EPL Coverage is authorized to request changes in this EPL Coverage. This EPL Coverage can only be changed by a written endorsement "we" issue and make part of this EPL Coverage.

**K. Representations**
Any and all relevant provisions of this EPL Coverage may be voidable by "us" in any case of fraud, intentional concealment, or misrepresentation of material fact by any "insured".

**L. Special Rights and Duties of the First "Named Insured"**
"You" agree that when there is more than one person and/or entity covered under this EPL Coverage, the first "named insured" in the Supplemental Declarations of this EPL Coverage shall act on behalf of all "insureds" as to:
1. Giving of notice of a "claim" or "suit";
2. Giving and receiving notice of cancellation or nonrenewal;

3. Payment of premiums and receipt of return premiums;
4. Acceptance of any endorsements issued to form a part of this EPL Coverage; or
5. Purchasing or deciding not to purchase the Supplemental Extended Reporting Period.

**M. Separation of Insureds**
Except with respect to the EPL Aggregate Limit of Liability and any rights or duties specifically assigned to the first "named insured" in Clause L. of this Section VI, this insurance applies:
1. As if each "named insured" were the only "named insured"; and
2. Separately to each insured against whom a "claim" or "suit" is made.

**N. Tie-In of Limits**
As respects any "claim" or "suit" in which at least one person/entity claimed against is an "insured" under this EPL Coverage and at least one person/entity claimed against is an insured under any other EPL Coverage issued to "you" by "us" (the "Other Policy"), the combined EPL Aggregate Limit of Liability under both this EPL Coverage and the Other Policy for all "losses" arising from such "claims" or "suits" combined shall not exceed the highest applicable limit of insurance under either this EPL Coverage or the Other Policy. This limitation shall apply even if both this EPL Coverage and the Other Policy have been triggered due to a "claim" or "suit" made against the same person/entity but alleging "wrongful employment acts" both in his, her or its capacity as an insured under the "Other policy" and as an "insured" under this EPL Coverage.

**O. Headings**
The descriptions in the headings of this EPL Coverage are solely for convenience, and form no part of the terms and conditions of coverage.

**SECTION VII. DEFINITIONS**
**A.** "Bodily injury" means physical injury, sickness, or disease, including death resulting therefrom.
**B.** "Claim" means a written demand for monetary and non-monetary relief (including any request to toll or waive any statute of limitations). The term "claim" shall also mean an Equal Employment Opportunity Commission (EEOC), Department of Labor (DOL) or Office of Federal Contract Compliance Program (OFCCP) (or similar federal, state or local agency) proceeding or investigation commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to "you". However, in no event, shall the term "claim" include any labor or grievance proceeding, which is subject to a collective bargaining agreement.
**C.** "Class action suit" means any suit seeking certification or certified as a class action by a federal or state court.
**D.** "Defense costs" means reasonable and necessary fees, costs and expenses consented to by "us"

001688    Printed:
03/01/19    01:38:23

Case 3:21-cv-02154-U-BK-BPC    Document 13-2    Filed 08/03/23    Page 270 of 538

resulting solely from the investigation, adjustment, defense and appeal of a "claim" or "suit" against "you". In no event shall "Defense Costs" include "your" or "our" routine on-going expenses, including, without limitation, the salaries of "your" or "our" "employees", officers or staff attorneys.

**E.** "Domestic partner" means any natural person legally recognized as a domestic or civil union partner under:
1. The provisions of any applicable federal, state or local law; or
2. The provisions of any formal program established by "you".

**F.** "Employee" means an individual whose labor or service is engaged by and directed by "you" for remuneration, whether such individual is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal, and temporary "employees".
An individual who is an independent contractor or leased to "you" shall also be an "employee". Independent contractors who do not provide ongoing and routine services solely for "you" shall not be considered "employees", including but not limited to independent trade contractors (e.g. plumber, electrician).

**G.** "EPL coverage period" means the period commencing on the effective date shown in the Supplemental Declarations of this EPL Coverage. This period ends on the earlier of the expiration date or the effective date of cancellation of this EPL Coverage. If "you" became an "insured" under this EPL Coverage after the effective date, the "EPL coverage period" begins on the date "you" became an "insured".

**H.** "Loss(es)" means monetary amounts to which this insurance applies and which "you" are legally obligated to pay (including front pay and back pay), judgments, settlements, pre- and post-judgment interest on that part of any judgment paid by "us", statutory attorney fees, and "defense costs"; however, "loss" shall not include:
1. Civil or criminal fines or penalties imposed by law;
2. Taxes;
3. Employment related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation;
4. Any liability or costs incurred by any "insured" to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar; or
5. Matters which may be deemed uninsurable under the law pursuant to which this EPL Coverage shall be construed.

Where permitted by law, "loss" shall include punitive or exemplary damages imposed upon any "insured" (subject to the policy's other terms, conditions and exclusions).

**I.** "Named insured" means the person or organization designated in the Supplemental Declarations page of this EPL Coverage.

**J.** "Property damage" means physical injury to, or destruction of, tangible property including the loss of use thereof, or loss of use of tangible property, which has not been physically injured or destroyed.

**K.** "Recognized volunteer" means an uncompensated individual who volunteers labor or services to "you", but only when performing such labor or services at the request of and under the direction of "you".

**L.** "Related wrongful employment act(s)" means "wrongful employment acts" which are the same, related or continuous, or "wrongful employment acts" which arise from a common nucleus of facts. "Claims" or "suits" can allege "related wrongful employment acts", regardless of whether such "claims" or "suits" involve the same or different claimants, "insureds" or legal causes of actions.

**M.** "Retaliation" means a "wrongful employment act" of an "insured" alleged to be in response to, the actual or attempted exercise by an "employee" of any right that such "employee" has under the law. Provided, however, "retaliation" shall not include the "wrongful employment act" of an "insured" alleged to be in response to the threat of or the actual filing of any claim or suit under the Federal False Claims Act or any other federal, state, local or foreign "whistleblower law".

**N.** "Subsidiary" means:
1. Any for-profit organization which, on or before the inception of the "EPL coverage period", is more than fifty (50%) percent owned by the "named insured", either directly or indirectly through one or more of its "subsidiaries"; or
2. A for-profit organization which becomes a "subsidiary" during the "EPL coverage period", but only upon the condition that within ninety (90) days of its becoming a "subsidiary", the "named insured" shall have provided "us" with full particulars of the new "subsidiary" and agreed to any additional premium or amendment of the provisions of this EPL Coverage required by "us" relating to such new "subsidiary". Further, coverage as shall be afforded to the new "subsidiary" is conditioned upon the "named insured" paying when due any additional premium required by "us" relating to such new "subsidiary".

An organization becomes a "subsidiary" when the "named insured" owns more than fifty (50%) percent ownership interest in such "subsidiary",

STATE AUTO
Insurance Companies

either directly, or indirectly through one or more of its "subsidiaries". An organization ceases to be a "subsidiary" when the "named insured" ceases to own more than a fifty (50%) percent ownership in such "subsidiary", either directly, or indirectly through one or more of its "subsidiaries".

In all events, coverage as is afforded under this EPL Coverage with respect to a "claim" made or "suit" brought against any "subsidiary" or an "insured" of any "subsidiary", shall only apply to "wrongful employment act(s)" commenced or allegedly commenced after the effective time that such "subsidiary" became a "subsidiary", and prior to the time that such "subsidiary" ceased to be a "subsidiary".

**O.** "Suit" means a civil proceeding or an administrative proceeding seeking money damages, and includes an arbitration, mediation or any other alternative dispute resolution procedure seeking such damages, to which the "insured" must submit or may submit with "our" consent. "Suit" shall not include any civil proceeding or administrative proceeding arising from any labor or grievance dispute which is subject to a collective bargaining agreement.

**P.** "Third party violation" means any actual or alleged discrimination or sexual harassment against "your" customers, vendors or clients. "Third party violation" shall also include any of the following as it relates to such discrimination or sexual harassment:
1. Violation of an individual's civil rights;
2. Libel;
3. Slander;
4. Humiliation;
5. Mental anguish;
6. Infliction of emotional distress;
7. Defamation; or
8. Invasion of privacy;

**Q.** "Transaction" means any of the following that occur during the "EPL coverage period":
1. The "named insured" shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or
2. Any person or entity or group of persons or entities acting in concert shall acquire an amount of the outstanding securities representing more than fifty (50%) percent of the voting power for the election of directors or General Partners of the "named insured" (in the event the "named insured" is a Partnership), or acquires the voting rights of such an amount of such securities; or

3. A General Partner of the "named insured" (in the event the "named insured" is a partnership) withdraws, resigns or is terminated;

**R.** "Whistleblower law" means a statute, rule or regulation, which protects an employee against discrimination from his or her employer, if the employee discloses or threatens to disclose to a superior or any governmental agency; or who gives testimony relating to, any action with respect to the employer's operations, which may be a violation of public policy as reflected in legislation, administrative rules, regulations or decisions, judicial decisions, and professional codes of ethics.

**S.** "Wrongful employment act(s)" means any actual or alleged:
1. Wrongful dismissal, discharge or termination (either actual or constructive), including breach of an implied contract;
2. Harassment or coercion (including sexual harassment, whether quid pro quo, hostile work environment or otherwise);
3. Discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);
4. "Retaliation" (including lockouts);
5. Employment-related misrepresentation(s) to "your" "employee" or applicant for employment with "you";
6. Employment-related libel, slander, humiliation, mental anguish, infliction of emotional distress, defamation, or invasion of privacy;
7. Wrongful failure to employ or promote;
8. Wrongful deprivation of career opportunity, wrongful demotion or negligent "employee" evaluation, including the giving of negative or defamatory statements in connection with an "employee" reference;
9. Wrongful discipline;
10. Failure to provide or enforce adequate or consistent corporate policies and procedures relating to any "wrongful employment act";
11. Negligent supervision or hiring by an "insured", relating to any of the above;
12. Violation of an individual's civil rights relating to any of the above; or
13. "Third party violations", but only if coverage for "third party violations" is shown on the Supplemental Declarations.

**STATE AUTO**
Insurance Companies

PBP 2855775  00

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY AND WAR EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

1. The insurance does not apply:
   **A.** Under any Liability Coverage, to "bodily injury" or "property damage":
   **(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or
   **(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.
   **B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.
   **C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:
   **(1)** The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of an "insured" or (b) has been discharged or dispersed therefrom;
   **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or
   **(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

   As used in this endorsement:
   "Hazardous properties" includes radioactive, toxic or explosive properties. "Nuclear material" means "source material", "special nuclear material" or "by-product material". "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor". "Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

   "Nuclear facility" means:
   **(a)** Any "nuclear reactor";
   **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";
   **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**EP 40 04 03 14 Page 1 of 2**
*//*EP4004-201403

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste"; and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. "Property damage" includes all forms of radioactive contamination of property.

**2.** The insurance does not apply:
 **A.** Any liability arising from any consequence, whether direct or indirect, out of:
  **1.** War, including undeclared or civil war, or
  **2.** Warlike action by a military force, including action in hindering or defending against an actual or expected attach, by any government, sovereign or other authority using military personnel or other agents, or
  **3.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**EP 40 04 03 14 Page 2 of 2**
*//*EP4004-201403

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

**IL 00 03 09 08   Page 1 of 1**
*//*IL0003-200809

ISO Properties, Inc., 2007

Issue Date  02/28/2019          01:23:06 PM

0016893      Printed:
03/01/19    01:38:23

**STATE AUTO**
Insurance Companies

PBP 2855775  00

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF PUNITIVE DAMAGES
# RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:
This insurance does not apply to:
**TERRORISM PUNITIVE DAMAGES**
Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:
"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

**CG2176 (01/15) Page 1 of 1**
*//*CG2176-201501

*d* Insurance Services Office, Inc., 2015

0016894    Printed:
03/01/19   01:38:23

STATE AUTO
Insurance Companies

**PBP 2855775   00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TENNESSEE CHANGES - CANCELLATION
# AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:
   **5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. The refund will be pro rata if:
   **a.** We cancel; or
   **b.** The policy is cancelled at the request of a premium finance company that has financed this policy under a premium finance agreement.
   The refund may be less than pro rata if the first Named Insured cancels the policy.
   The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to the **Cancellation** Common Policy Condition:
   **CANCELLATION OF POLICIES IN EFFECT FOR 60 DAYS OR MORE**
   If this policy has been in effect for 60 days or more, or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:
   **1.** Nonpayment of premium, including any additional premium, calculated in accordance with our current rating manual, justified by a physical change in the insured property or a change in its occupancy or use;
   **2.** Your conviction of a crime increasing any hazard insured against;
   **3.** Discovery of fraud or material misrepresentation on the part of either of the following:
      **a.** You or your representative in obtaining this insurance; or
      **b.** You in pursuing a claim under this policy;
   **4.** Failure to comply with written loss control recommendations;
   **5.** Material change in the risk which increases the risk of loss after we issued or renewed insurance coverage;

**6.** Determination by the insurance commissioner that the continuation of the policy would jeopardize our solvency or would place us in violation of the insurance laws of Tennessee or any other state;
**7.** Your violation or breach of any policy terms or conditions; or
**8.** Other reasons that are approved by the insurance commissioner.
Notice of cancellation will state the reason for cancellation.

**C.** The following is added and supersedes any provisions to the contrary:
   **NONRENEWAL**
   **1.** If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured and agent, at least 60 days before the expiration date unless:
      **a.** We have offered to issue a renewal policy; or
      **b.** You have obtained replacement coverage or have agreed in writing to obtain replacement coverage.
   **2.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured's and agent's addresses shown in the policy. If notice is mailed, proof of mailing will be sufficient proof of notice.

**D.** The following is added to the **Premiums** Common Policy Condition:
   Whenever an insurance policy which is financed with a premium finance company is cancelled, the insurer shall return, within 30 days after the effective date of the cancellation, whatever gross unearned premiums are due under the insurance policy directly to the premium finance company for the account of the first Named Insured.

**IL0250 (09/08) Page 1 of 1**
*//*IL0250-200809

ISO Properties, Inc., 2007

0016895    Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MISSISSIPPI CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **7.** is added to the **Cancellation** Common Policy Conditions:

**7.** If:

**a.** The first Named Insured cancels this policy, we will notify any named creditor loss payee.

**b.** We cancel this policy, we will mail or deliver our written notice of cancellation to any named creditor loss payee in the same manner and at the same time as notification is given to the first Named Insured, as stated in this Condition.

The provisions of Paragraphs **a.** and **b.** above do not apply to any mortgageholder.

**B.** Paragraphs **f.** and **g.** of the **Mortgageholders** Condition, if any, are replaced by the following:

**f.** If:

**(1)** The first Named Insured cancels this policy, we will notify the mortgageholder.

**(2)** We cancel this policy, we will give written notice to the mortgageholder at least 30 days before the effective date of cancellation.

We will notify the mortgageholder by mailing or delivering the cancellation notice to the last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**g.** If:

**(1)** The first Named Insured does not renew this policy, we will notify the mortgageholder.

**(2)** We decide not to renew this policy, we will give written notice to the mortgageholder at least:

**(a)** 10 days before an anniversary date or the expiration date of the policy, if the nonrenewal is due to nonpayment of premium; or

**(b)** 30 days before an anniversary date or the expiration date of the

policy, if the nonrenewal is for any other reason.

We will notify the mortgageholder by mailing or delivering the notice of nonrenewal to the last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**C.** The following Condition is added and supersedes any provision to the contrary:

**NONRENEWAL**

**1.** If the first Named Insured does not renew this policy, we will notify any named creditor loss payee.

**2.** If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured and any named creditor loss payee, at least:

**a.** 10 days before the effective date of nonrenewal, if the nonrenewal is due to nonpayment of premium; or

**b.** 30 days before an anniversary date or the expiration date of the policy, if the nonrenewal is for any other reason.

We will notify the first Named Insured and any named creditor loss payee by mailing or delivering the notice of nonrenewal to the last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

The provisions of Paragraphs **1.** and **2.** above do not apply to any mortgageholder.

**D.** The requirements for notification of cancellation or nonrenewal of this policy, as stated in Paragraphs **A.**, **B.** and **C.** above, supersede any other notification requirements to any named creditor loss payee and any mortgageholder, stated in this policy, including any endorsement attached to the policy.

**E.** Any named creditor loss payee and any mortgageholder may elect not to receive notification of cancellation or nonrenewal by providing us with a written release.

**IL0282 (09/08) Page 1 of 1**
*//*IL0282-200809

*d* ISO Properties, Inc., 2007

**STATE AUTO**
Insurance Companies

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

**CG2170 (01/15) Page** 1 **of** 1
*//*CG2170-201501

*d* Insurance Services Office, Inc., 2015

MOBDEC    PBP 2855775  00 02/28/2019 F6H TAYL CPP * N    41ELIT0005590  070006

![STATE AUTO Insurance Companies logo]

**PBP 2855775    00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONDITIONAL EXCLUSION OF TERRORISM
## (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> EQUIPMENT BREAKDOWN PROTECTION COVERAGE FORM
> FARM COVERAGE PART
> STANDARD PROPERTY POLICY

## SCHEDULE

The **Exception Covering Certain Fire Losses** (Paragraph **D**) applies to property located in the following state(s), if covered under the indicated Coverage Form, Coverage Part or Policy:

| State(s) | Coverage Form, Coverage Part or Policy |
|---|---|
| Illinois<br>Iowa<br>Missouri<br>North Carolina<br>North Dakota<br>Pennsylvania<br>Virginia<br>West Virginia<br>Wisconsin | Commercial Property Coverage Part |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** Applicability Of The Provisions Of This Endorsement

  **1.** The provisions of this endorsement become applicable commencing on the date when any one or more of the following first occurs. But if your policy (meaning the policy period in which this endorsement applies) begins after such date, then the provisions of this endorsement become applicable on the date your policy begins.

    **a.** The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Form, Coverage Part or Policy; or

    **b.** A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:

  **(1)** Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or

  **(2)** Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or

  **(3)** Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

**IL 09 95 01 07 Page 1 of 3**

*//*IL 09 95 01 07

ISO Properties, Inc. 2005

0016898    Printed:
03/01/19    01:38:23

**2.** If the provisions of this endorsement become applicable, such provisions:

**a.** Supersede any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to loss or damage from an incident(s) of terrorism (however defined) that occurs on or after the date when the provisions of this endorsement become applicable; and

**b.** Remain applicable unless we notify you of changes in these provisions, in response to federal law.

**3.** If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism" and/or "other acts of terrorism", will continue in effect unless we notify you of changes to that endorsement in response to federal law.

**B.** The following definition is added and applies under this endorsement wherever the term terrorism is enclosed in quotation marks.

"Terrorism" means activities against persons, organizations or property of any nature:

**1.** That involve the following or preparation for the following:

**a.** Use or threat of force or violence; or

**b.** Commission or threat of a dangerous act; or

**c.** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

**2.** When one or both of the following applies:

**a.** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

**b.** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

**C.** The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for loss or damage caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

**1.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**3.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

**5.** The total of insured damage to all types of property in the United States, its territories and possessions, Puerto Rico and Canada exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions. Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the threshold is exceeded.

With respect to this Item **C.5.**, the immediately preceding paragraph describes the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Form, Coverage Part or Policy.

**D. Exception Covering Certain Fire Losses**

The following exception to the Exclusion Of Terrorism applies only if indicated and as indicated in the Schedule of this endorsement.

If "terrorism" results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements

**IL 09 95 01 07 Page 2 of 3**
*//*IL 09 95 01 07

ISO Properties, Inc. 2005

MOBDEC   PBP 2855775 00 02/28/2019 F6H TAYL CPP * N   41 ELIT0005590 070006

that apply to those coverage forms, or to the Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

**E.   Application Of Other Exclusions**

1. When the Exclusion Of Terrorism applies in accordance with the terms of **C.1.** or **C.2.**, such exclusion applies without regard to the Nuclear Hazard Exclusion in this Coverage Form, Coverage Part or Policy.

2. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss or damage which would otherwise be excluded under this Coverage Form, Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

**IL 09 95 01 07 Page 3 of 3**
*//*IL 09 95 01 07

ISO Properties, Inc. 2005

**STATE AUTO**
Insurance Companies                                               **PBP 2855775   00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

    BOILER AND MACHINERY COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART
    EQUIPMENT BREAKDOWN COVERAGE PART
    FARM COVERAGE PART
    STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

**IL0952 (01/15) Page 1 of 1**
*//*IL0952-201501

*d* Insurance Services Office, Inc., 2015

0016901   Printed:
03/01/19   01:38:23

# COMMERCIAL UMBRELLA COVERAGE FORM

PLEASE READ THIS POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES, COVERAGE AND COVERAGE RESTRICTIONS. WE HAVE NO DUTY TO PROVIDE COVERAGE UNLESS THERE HAS BEEN FULL COMPLIANCE WITH ALL THE CONDITIONS - SECTION **V** - OF THIS POLICY.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us", and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **III** - Who Is An Insured. Other words and phrases that appear in quotation marks have special meaning. Refer to Section **VI** - Definitions.

## Section I Insuring Agreements

In consideration of the payment of premium and in reliance upon representations you made to us during the process of obtaining this insurance and subject to the Limit of Insurance shown in the Declarations, and all the exclusions, terms and conditions of this policy, we agree with you as follows:

### Coverage A   Bodily Injury And Property Damage Liability

**1. Insuring Agreement**

  **a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right to associate with the "underlying insurer" and the insured to defend against any "suit" seeking those damages. But:

    **(1)** The amount we will pay for "ultimate net loss" is limited as described in Section **IV** - Limit Of Insurance;

    **(2)** At our discretion, we may investigate any "occurrence" and settle any resulting "claim" or "suit";

    **(3)** We have a right and duty to defend the insured against any "suits" to which this insurance applies:

      **(a)** But which are not covered by any "underlying insurance" shown in the Declarations or by any other primary policies that may apply; or

      **(b)** If the applicable limit of "underlying insurance" is exhausted.

    However, we will have no duty to defend the insured against any "suits" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply; and

    **(4)** Both our right and duty to defend any existing or future "suits" end when we have exhausted the applicable Limit of Insurance in payment of judgments or settlements under Coverages **A** and **B.**

  No other obligation or liability to pay or perform acts or services is covered unless explicitly provided for under Section **II** - Defense.

  **b.** This insurance applies to "bodily injury" or "property damage" which may be subject to an applicable "retained limit" when shown in the Declarations. If any other limit, such as a sublimit, is specified in the "underlying insurance", this insurance does not apply to "bodily injury" or "property damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of Underlying Insurance.

  **c.** It is agreed that this insurance only applies if:

    **(1)** The "bodily injury" or "property damage" occurs during the policy period of this policy;

    **(2)** With respect to your liability (other than under a contract) for "bodily injury" to your "employees" arising out of and in the course of their employment by you:

      **(a)** Any "bodily injury" by disease is caused or aggravated by the conditions of that employment; and

      **(b)** An "employee's" last day of last exposure to conditions causing or aggravating such disease occurs during the policy period of this policy; and

    **(3)** The "bodily injury" or "property damage" is caused by an "occurrence", and such "occurrence" takes place in the "coverage territory".

    **(4)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **III** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

  **d.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **III** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**CXS0001 (12/15) Page 1 of 23**
*//*CXS0001-201512

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

**STATE AUTO**
Insurance Companies

e. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **III -** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

f. "Ultimate net loss" because of "bodily injury" includes damages sought by any person or organization for care or loss of services resulting at any time from the "bodily injury".

2. **Exclusions**

This insurance does not apply to:

a. **Expected Or Intended Injury**

"Bodily injury" or "property damage" either expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property;

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That you would have in the absence of the contract or agreement; or

(2) Assumed by you in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed by you in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than you will be deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed by you in the same "insured contract";

(b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged; and

(c) The indemnitor insured's "underlying insurance" also deems these expenses to be damages;

c. Any obligation of the insured under:

(1) **Workers' Compensation And Similar Laws**

Any workers' compensation, unemployment compensation or disability benefits law or any similar law.

(2) **E.R.I.S.A.**

The Employee's Retirement Income Security Act of 1974 (E.R.I.S.A.), and amendments thereto or any similar federal, state, or local statute.

d. **Employers Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister, or other dependents of that "employee" as a consequence of **d.(1)** above.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

However, this exclusion **d.(1)** and **d.(2)** applies only with respect to:

(1) "Bodily injury" to any person in work subject to the Longshore and Harbor Workers Compensation Act (33 USC Sections 901-950), the Non-appropriated Fund Instrumentalities Act (5 USC Sections 8171-8173), the Outer Continental Shelf Lands Act (43 USC Sections 1331-1356), the Defense Base Act (42 USC Sections 1651-1654), the Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901-942), and any other federal workers or workmen's compensation law or other federal occupational disease law, or any amendments to these laws;

(2) "Bodily injury" to any person in work subject to the Federal Employers' Liability Act (45 USC Sections 51-60), any other federal laws obligating an employer to pay damages to an "employee" due to "bodily injury" arising out of or in the course of employment, or any amendments to those laws;

(3) "Bodily injury" to a master or member of the crew of any vessel;

(4) Fines or penalties imposed for violation of federal or state law;

**CXS0001 (12/15) Page 2 of 23**

*/*CXS0001-201512

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

(5) Damages payable under the Migrant and Seasonal Agricultural Worker Protection Act (29 USC Sections 1801-1872) and under any other federal law awarding damages for violation of those laws or regulations issued there under, and any amendments to those laws;

(6) Punitive or exemplary damages because of "bodily injury" to any "employee" employed in violation of law;

(7) "Bodily injury" to an "employee" while employed in violation of law with the insured's actual knowledge or the actual knowledge of any of your "executive officers"; and

(8) "Bodily injury" to an "employee" if such employment is subject to the workers compensation laws of the states of Massachusetts, Missouri, New Jersey, New York or any other state which requires unlimited Employers Liability coverage in conjunction with primary Workers Compensation policies.

(9) "Defense expense" for allegations of an employer's intentional injury to employees that results in "bodily injury" whether or not the Ohio Employers Intentional Injury Defense Expense is written as "underlying insurance".

This exclusion **d.** applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of such injury.

With respect to your liability (other than under a contract or agreement) for "bodily injury" to your "employees" arising out of and in the course of their employment by you, exclusions **f., g.,** and **h.** do not apply.

**e. Employment-related Practices**
"Bodily injury" to:

(1) A person arising out of any:
   (a) Refusal to employ that person;
   (b) Failure to promote an employee;
   (c) Discipline, demotion, negligent evaluation or negligent reassignment;
   (d) Termination of that person's employment;
   (e) Employment-related practices, policies, acts or omissions, including, without limitation, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or
   (f) Oral or written publication of materials that slanders, defames, or libels an "employee" or violates or invades an "employee's" right of privacy.

(2) The spouse, child, parent, brother or sister, or any other dependents of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraph **e.(1)** above is directed.

This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of such "bodily injury".

**f. Pollution:**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, seepage, migration, dispersal, release or escape of "pollutants":

   (a) That are, or ever were, contained in any property that is, or ever was:
      (i) Being transported or towed by, handled, or handled for movement into, onto or from any "auto";
      (ii) Otherwise in the course of transit by or on behalf of the insured; or
      (iii) Being stored, disposed of, treated or processed in or upon any "auto";

   (b) At or from any premises, site or location which is or was at any time, owned or occupied by, or rented or loaned to, any insured. However, this subparagraph **f.1.(b)** does not apply to:
      (i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests.
      (ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your applicable "underlying insurance" as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than the additional insured; or
      (iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**CXS0001 (12/15) Page 3 of 23**
*/*CXS0001-201512

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

(c) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(d) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph **f.(1)(e)** does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment", any "auto" covered by applicable "underlying insurance" or the parts of either, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire."

(f) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to, or assess the effects of, "pollutants"; or

(b) "Claim" or "suit" by or on behalf of any governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph **(2)** does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

Subparagraph **(a)** of part **(1)** of this exclusion **f.** does not apply if any applicable "underlying insurance" shown in the Schedule of Underlying Insurance provides coverage at the full limits of liability shown therein for such losses as are described in subparagraph **(a)** of part **(1)** for any "autos" involved in such operations.

(3) Exceptions:

(a) Paragraphs **f.(1)(c)** through **f.(1)(f)** of this exclusion do not apply to pollutants that are not in or upon a "covered auto" if:

(i) The pollutants or any property in which the pollutants are contained are upset, overturned or damaged as a result of the maintenance or use of a "covered auto"; and

(ii) The discharge, dispersal, release or escape of the pollutants is caused directly by such upset, overturn or damage.

**g. Aircraft Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft or watercraft owned or operated by or chartered, rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrong doing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of aircraft, or watercraft that is owned or operated by or rented or loaned to any insured.

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

This exclusion does not apply to:

**(1)** Watercraft while ashore on premises you own or rent;

**(2)** Watercraft you do not own that is:

    **(a)** Less than 51 feet long or the extent such coverage is provided by the "underlying insurance" listed in the Schedule of Underlying Insurance if greater; and

    **(b)** Not being used to carry persons or property for a charge; or

**(3)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft;

**(4)** Aircraft (other than "unmanned aircraft") that is:

    **(a)** Chartered by, loaned to, or hired by you with a paid crew; and

    **(b)** Not owned by any insured; or

**(5)** With the exception of Paragraph **g.(4)** above, the extent that valid "underlying insurance" for aircraft (other than "unmanned aircraft", "unmanned aircraft" or watercraft liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" or "property damage". Coverage provided will follow the provisions, exclusions and limitations of the "underlying insurance" unless otherwise directed by this insurance.

**h.  Racing Activities**

"Bodily injury" or "property damage" arising out of the use of any "mobile equipment" or "auto" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity.

**i.  War**

"Bodily injury" or "property damage" however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j.  Damage To Property**

"Property damage" to:

**(1)** Property:

    **(a)** You own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration, or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property; or

    **(b)** Owned or transported by the insured and arising out of the ownership, maintenance or use of a "covered auto".

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of any insured;

**(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired, or replaced because "your work" was incorrectly performed on it.

Paragraph **j.(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **j.(3)**, **j.(4)**, **j.(5)** and **j.(6)** of this exclusion do not apply to liability assumed under a railroad sidetrack agreement.

Paragraphs **j.(3)**, and **j.(4)** of this exclusion do not apply to liability assumed under a written Trailer Interchange agreement.

Paragraph **j.(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k.  Damage To your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.  Damage To your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

**STATE AUTO**
Insurance Companies

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

If such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury."

**p. Asbestos**

**(1)** "Bodily injury" or "property damage" arising out of, resulting from, caused by, or contributed to:

    **(a)** Inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos;

    **(b)** The use of asbestos in constructing or manufacturing any goods, product or structure;

    **(c)** The removal of asbestos from any goods, product or structure;

    **(d)** The manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos;

**(2)** Any damages or any loss, cost or expense arising out of any claim or suit by or on behalf of any governmental authority requirement that any insured or any other person or entity should be, or should be responsible for:

    **(a)** Assessing the presence, absence or amount or effects of asbestos;

    **(b)** Identifying, sampling or testing for, detecting, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, abating, disposing of or mitigating asbestos; or

    **(c)** Responding to asbestos in any way other than as described in subparagraphs **(1)** and **(2)** above.

**(3)** Any actual or alleged negligence in hiring, training, supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with actions described in subparagraphs **(1)** and **(2)** of this exclusion; or

**(4)** Any obligation to share damages with or repay someone else who must pay damages in connection with any of the subsections above.

**q. Lead**

"Bodily injury" or "property damage" arising out of any form of lead or lead compounds. In addition, this insurance does not apply to any loss, cost or expense arising out of:

**(1)** Any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of lead or lead compounds;

**(2)** Any "claim" or "suit" by or on behalf of any governmental authority for damages resulting from testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of lead or lead compounds in any form;

**(3)** Any actual or alleged negligence in hiring, training, supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with lead or lead compounds; or

**(4)** Any obligation to share damages with or repay someone else who must pay damages in connection with lead or lead compounds.

**r. Professional Services**

"Bodily injury", "property damage", acts, errors or omissions, or "wrongful acts" arising out of the rendering of or failure to render any professional service. With exception of Pre-funded Funeral Services addressed under exclusion **2.z.** below, this includes but is not limited to:

**(1)** Legal, accounting or advertising services;

**(2)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings or specifications;

**(3)** Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;

**CXS0001 (12/15) Page 6 of 23**
*/\*CXS0001-201512

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

**(4)** Engineering services, including related supervisory or inspection services;
**(5)** Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;
**(6)** Any health or therapeutic service treatment, advice or instruction;
**(7)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement, or personal grooming or therapy;
**(8)** Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardiovascular fitness, bodybuilding or physical training programs;
**(9)** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;
**(10)** Body piercing services;
**(11)** Services in the practice of pharmacy; but this exclusion does not apply if you are a retail druggist or your operations are those of a retail drugstore;
**(12)** Law enforcement or firefighting services; and
**(13)** Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.
**(14)** Printing or publishing services;
**(15)** Insurance and insurance related services, including placement and sales of insurance products, insurance consulting, premium financing, notarizing, claim adjusting and claims administration, loss control services, appraising real or personal property, sale of mutual funds or variable annuities, real estate services including the ownership, use or transfer of real property.
This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", involved the rendering of or failure to render any professional service.
This exclusion does not apply to the extent that valid "underlying insurance" for the professional services described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" or "property damage". Coverage provided will follow the provisions, exclusions and limitations of the "underlying insurance" unless otherwise directed by this insurance.
**s.   Employee Benefits Liability**
Any obligation arising out of the administration of any employee benefit plan.
**t.   Directors, Officers, and Trustees Liability**
Any "wrongful act" of any director, "executive officer", or trustee of any insured in the discharge or performance of their duties as such.
**u.   Liquor Liability**
"Bodily injury" or "property damage" for which any insured may be held liable by reason of:
**(1)** Causing or contributing to the intoxication of any person;
**(2)** The furnishing of alcoholic beverages to a person under legal drinking age or under the influence of alcohol; or
**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.
This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:
   **(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or
   **(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol.
If the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.
However, this exclusion **u.** applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.
**v.   Nuclear Energy**
"Bodily injury" or "property damage":
**(1)** With respect to which an insured under this policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability;

**CXS0001 (12/15) Page 7 of 23**
*/ /*CXS0001-201512

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

    **(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which:
        **(a)** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or
        **(b)** The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; or
    **(3)** Resulting from the "hazardous properties" of "nuclear material", if:
        **(a)** The "nuclear material":
            **(i)** Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or
            **(ii)** Has been discharged or dispersed therefrom;
        **(b)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or
        **(c)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this subparagraph **(c)** applies only to "property damage" to such "nuclear facility" and any property thereat.
As used in this exclusion:
**(1)** "Hazardous properties" include radioactive, toxic or explosive properties;
**(2)** "Nuclear material" means "source material", "special nuclear material" or "by-product material";
**(3)** "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;
**(4)** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";
**(5)** "Waste" means any waste material:
        **(a)** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and
        **(b)** Resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility";
**(6)** "Nuclear facility" means:
        **(a)** Any "nuclear reactor";
        **(b)** Any equipment or device designed or used for:
            **(i)** Separating the isotopes of uranium or plutonium;
            **(ii)** Processing or utilizing "spent fuel"; or
            **(iii)** Handling, processing or packaging "waste";
        **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or
        **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";
        and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;
**(7)** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;
**(8)** "Property damage" includes all forms of radioactive contamination of property.
**w. Electronic Data**
Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.
However, this exclusion does not apply to liability for damages because of "bodily injury".
As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.
**x. Recording And Distribution Of Material Or Information in Violation Of Law**
"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:
    **(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003, or FCRA and their amendments and additions, that addresses, prohibits or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**y.  Auto Coverages**

**(1)** "Bodily injury" or "property damage" arising out of the ownership, maintenance, use "loading or unloading", or entrustment to others of any "auto" which is not a "covered auto"; or

**(2)** Any loss, cost or expense payable under or resulting from any first-party physical damage coverage; no-fault law; personal injury protection or auto medical payments coverage; or uninsured or underinsured motorist law.

**z.  Pre-Funded Funeral Services**

"Bodily injury", "property damage", acts, errors, or omissions, or "wrongful acts" arising out of consultation for, marketing or selling of insurance or non-insurance products for pre-funded funeral services.

**aa. Data Breach or Compromise**

**(1)** "Bodily injury" or "property damage" arising out of the loss, theft, release, accidental release, publication, accidental publication, disposal, or abandonment of "personally identifying information":

**(a)** Of a current, former or prospective customer, client, member, owner, partner, director, stockholder, employee or any other person;

**(b)** That is in the care, custody or control of a third party to which you have directly or indirectly turned over such information for any reason.

**(2)** The exclusion described in **aa.(1)** above also applies:

**(a)** To any demand, action, imposed cost or expense brought by or on behalf of an organization, business, institution, governmental entity or any other party.

**(b)** If you aggregate or sell "personally identifying information" about individuals as part of your business; and

**(c)** If you store, process, transmit or transport records that include "personally identifying information" of individuals for another entity;

**(3)** "Personally identifying information" means information that could be used to commit fraud or other illegal activity involving the credit or identity of an individual. This includes but is not limited to Social Security numbers or account numbers correlated with names and addresses.

## Coverage B   Personal And Advertising Injury Liability

**1.  Insuring Agreement**

**a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "personal and advertising injury" to which this insurance applies. We will have the right to associate with the "underlying insurer" and the insured to defend against any "suit" seeking damages. But:

**(1)** The amount we will pay for the "ultimate net loss" is limited as described in Section **IV** - Limit Of Insurance;

**(2)** At our discretion, we may investigate any offense and settle any resulting "claim" or "suit";

**(3)** We have a right and duty to defend the insured against any "suits" to which this insurance applies:

**(a)** But which are not covered by any "underlying insurance" shown in the Declarations or by any other primary policies that may apply; or

**(b)** If the applicable limit of "underlying insurance" is exhausted.

However, we will have no duty to defend the insured against any "suits" seeking damages for "personal and advertising injury" to which this insurance does not apply; and

**(4)** Both our right and duty to defend any existing or future "suits" end when we have exhausted the applicable Limit of Insurance in payment of judgments or settlements under Coverages **A** and **B.**

No other obligation or liability to pay or perform acts or services is covered unless explicitly provided for under Section **II** - Defense.

**b.** This insurance applies to "bodily injury" or "property damage" which may be subject to an applicable "retained limit" when shown in the Declarations. If any other limit, such as a sublimit, is specified in the "underlying insurance", this insurance does not apply to "bodily injury" or "property damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of Underlying Insurance.

**c.** This insurance applies only to "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

**2. Exclusions**

This insurance does not apply to:

**a.** "Personal and advertising injury"

(1) **Knowing Violation Of Rights Of Another**
Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

**(2) Material Published With Knowledge Of Falsity**
Arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity;

**(3) Material Published Prior To Policy Period**
Arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period;

**(4) Criminal Acts**
Arising out of a criminal act committed by or at the direction of the insured;

**(5) Contractual Liability**
For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to:

**(a)** Liability for damages that you would have in the absence of the contract or agreement.

**(b)** Liability for false arrest, detention, or imprisonment assumed by you in a contract or agreement.

**(6) Breach Of Contract**
Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

**(7) Quality Or Performance Of Goods - Failure To Conform To Statements**
Arising out of the failure of goods, products or services to conform to any statement of quality or performance made in your "advertisement";

**(8) Wrong Description Of Prices**
Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

**(9) Infringement Of Copyright, Patent, Trademark Or Trade Secret**
Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.
However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**(10) Insureds In Media And Internet Type Businesses**
Committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of web-sites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **17.a. b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

(11) **Electronic Chatrooms Or Bulletin Boards**
Arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**(12) Unauthorized Use Of Another's Name Or Product**
Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**(13) Pollution**

**(a)** Arising out of the actual, alleged or threatened discharge, seepage, migration, dispersal, release or escape of "pollutants" at any time; or

**(b)** Any loss, cost or expense arising out of any:

**(i)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to, or assess the effects of, "pollutants"; or

**(ii)** "Claim" or "suit" by or on behalf of any governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

**(14) Asbestos**

Arising out of:

**(a)** Inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos;

**(b)** The use of asbestos in constructing or manufacturing any good, product or structure;

**(c)** The removal of asbestos from any good, product or structure;

**(d)** The manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos;

**(e)** Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with parts **(14) (a)** through **(14) (d)** of this exclusion; or

**(f)** Any obligation to share damages with or repay someone else who must pay damages in connection with parts **(14) (a)** through **(14) (e)** of this exclusion.

**(15) Lead**

Arising out of any form of lead or lead compounds. In addition, any loss, cost or expense arising out of:

**(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of lead or lead compounds;

**(b)** "Claim" or "suit" by or on behalf of any governmental authority for damages resulting from testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of lead or lead compounds in any form;

**(c)** Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with lead or lead compounds; or

**(d)** Any obligation to share damages with or repay someone else who must pay damages in connection with lead or lead compounds.

**(16) Professional Services**

Arising from acts, errors, or omissions or "wrongful acts" in resulting from the rendering of or failure to render any professional service. With exception of Pre-funded Funeral Services addressed under exclusion **2.a.(21)** below, this includes but is not limited to:

**(a)** Legal, accounting or advertising services;

**(b)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings or specifications;

**(c)** Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;

**(d)** Engineering services, including related supervisory or inspection services;

**(e)** Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

**(f)** Any health or therapeutic service treatment, advice or instruction;

**(g)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement, or personal grooming or therapy;

**(h)** Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardiovascular fitness, bodybuilding or physical training programs;

**(i)** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(j)** Body piercing services;

**(k)** Services in the practice of pharmacy; but this exclusion does not apply if you are a retail druggist or your operations are those of a retail drugstore;

**(l)** Law enforcement or firefighting services; and

**(m)** Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

**(n)** Printing or publishing services;

**(o)** Insurance and insurance related services, including placement and sales of insurance products, insurance consulting, premium financing, notarizing, claim adjusting and claims administration, loss control services, appraising real or personal property, sale of mutual funds or variable annuities, real estate services including the ownership, use or transfer of real property.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", involved the rendering of or failure to render any professional service.

**CXS0001 (12/15) Page 11 of 23**

*/*CXS0001-201512

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

001691 2   Printed:
03/01/19   01:38:23

**STATE AUTO**
Insurance Companies

This exclusion does not apply to the extent that valid "underlying insurance" for the professional services described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" or "property damage". Coverage provided will follow the provisions, exclusions and limitations of the "underlying insurance" unless otherwise directed by this insurance.

**(17) Directors, Officers, and Trustees**

Arising out of any "wrongful act" of any director, "executive officer", or trustee of any insured in the discharge or performance of their duties as such.

**(18) Employment-Related Practices**

To:

**(a)** A person arising out of any:

  **(i)** Refusal to employ that person;

  **(ii)** Failure to promote an employee;

  **(iii)** Discipline, demotion, negligent evaluation or negligent reassignment;

  **(iv)** Termination of that person's employment;

  **(v)** Employment-related practices, policies, acts or omissions such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  **(vi)** Oral or written publication of materials that slanders, defames, or libels an "employee" or violates or invades an "employee's" right of privacy.

**(b)** The spouse, child, parent, brother or sister, or any other dependents of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in paragraph **(18)(a)** of this exclusion were directed.

**(c)** This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of such "personal and advertising injury".

**(19) War**

However caused, arising, directly or indirectly, out of:

**(a)** War, including undeclared or civil war;

**(b)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(c)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**(20)    Distribution Of Material In Violation Of Statutes Recording and Distribution Of Material Or Information In Violation Of Law**

Arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(a)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law, or

**(b)** The CAN SPAM Act of 2003, including any amendment of or addition to such law, or

**(c)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(d)** Any federal, state or local statute, ordinance, or regulation, other than the TCPA, CAN SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating, or distribution of material or information.

**(21) Pre-Funded Funeral Services**

Caused by acts, errors, or omissions, or "wrongful acts" arising out of the consultation for, marketing, or selling of insurance products for pre-funded funeral services.

**(22)    Data Breach or Compromise**

**(a)** Arising out of the loss, theft, release, accidental release, publication, accidental publication, disposal, or abandonment of "personally identifying information":

  **(i)** Of a current, former or prospective customer, client, member, owner, partner, director, stockholder, employee or any other person.

  **(ii)** That is in the care, custody or control of a third party to which you have directly or indirectly turned over such information for any reason.

**(b)** The exclusion described in **(a)** also applies:

  **(i)** To any demand, action, imposed cost or expense brought by or on behalf of an organization, business, institution, governmental entity or any other party;

  **(ii)** If you aggregate or sell "personally identifying information" about individuals as part of your business; and

**CXS0001 (12/15) Page 12 of 23**

*//*CXS0001-201512*

Issue Date  02/28/2019        01:23:06 PM

0016913  Printed:
03/01/19   01:38:23

**(iii)** If you store, process, transmit or transport records that include "personally identifying information" of individuals for another entity;

**(c)** "Personally identifying information" means information that could be used to commit fraud or other illegal activity involving the credit or identity of an individual. This includes but is not limited to Social Security numbers or account numbers correlated with names and addresses.

## Section II Defense

1. When we have the duty to defend, or we investigate or settle any offense, "occurrence", "claim" or "suit", and then only to the extent that "underlying insurance" is not responsible for the costs shown below in items **a.** through **f.**, we will pay on behalf of the insured:

   **a.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations related to an accident arising out of the use of any vehicle to which this policy applies. We do not have to furnish these bonds.

   **b.** The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.

   **c.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of any "claim" or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   **d.** All costs taxed against the insured in any "suit" we defend.

   **e.** "Pre-judgment interest" awarded against the insured on that part of any judgment covered under this policy. If we offer the applicable Limit of Insurance in settlement of a "claim" or "suit", we will not pay for any "pre-judgment interest" imposed or earned after the date of such offer.

   **f.** All interest earned on that part of any judgment within the Limit of Insurance after entry of the judgment and before we have paid, offered to pay, or deposited in court that part of any judgment that is within the applicable Limit of Insurance.

2. Payments under this section of the policy, as well as payments for all expenses we incur, will not reduce the Limit of Insurance.

3. When we have the right but not the duty to defend the insured and elect to participate in the defense, we will pay our own expenses but will not contribute to the expenses of the insured or the "underlying insurer".

4. If we defend you against a "suit" and your indemnitee is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   **a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   **b.** This insurance applies to such liability assumed by you;

   **c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by you in the same "insured contract";

   **d.** The allegations in the "suit" and the information we know about the offense or "occurrence" are such that no conflict appears to exist between the your interests and the interests of the indemnitee;

   **e.** You and the indemnitee ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend you and the indemnitee; and

   **f.** The indemnitee:

      **(1)** Agrees in writing to:

         **(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

         **(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

         **(c)** Notify any other insurer whose coverage is available to the indemnitee; and

         **(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      **(2)** Provides us with written authorization to:

         **(a)** Obtain records and other information related to the "suit"; and

         **(b)** Conduct and control the defense of the indemnitee in such "suit".

   So long as the conditions in this subparagraph **f.** are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid under Section **II -** Defense. Notwithstanding the provisions of paragraph **2.b.(2)** of Coverage **A. -** Bodily Injury And Property Damage Liability (Section **I**), such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

5. Our obligation to defend your indemnitee and to pay for attorneys' fees and necessary litigation expenses under Section **II -** Defense ends when:

   **a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

   **b.** The conditions set forth above, or the terms of the agreement described in paragraph **3.f.** above, are no longer met by the indemnitee.

**CXS0001 (12/15) Page 13 of 23**

*/*CXS0001-201512

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

## Section III Who Is An Insured

1. Except for liability arising out of the ownership, maintenance or use of "covered autos":
   **a.** If you are designated in the Declarations as:
   **(1)** An individual, you, as a natural person, and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.
   **(2)** A partnership or joint venture, you are an insured. Except with respect to any "auto", your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.
   **(3)** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.
   **(4)** An organization other than a partnership, or joint venture, or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.
   **(5)** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.
   **b.** Each of the following is also an insured:
   **(1)** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for :
   **(a)** "Bodily injury" or "personal and advertising injury":
   **(i)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or while performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;
   **(ii)** To the spouse, child, parent, brother or sister, or other dependent of that co-"employee" as a consequence of paragraph **(a)(i)** above;
   **(iii)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraph **(a)(i)** or **(ii)** above; or
   **(iv)** Arising out of his or her providing or failing to provide professional health care services.
   **(b)** "Property damage" to property:
   **(ii)** Owned, occupied or used by; or
   **(iii)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;
   you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).
   **(2)** Any person (other than your "employee" or "volunteer worker") or any organization while acting as your real estate manager
   **(3)** Any person or organization having proper temporary custody of your property if you die, but only:
   **(a)** With respect to liability arising out of the maintenance or use of that property; and
   **(b)** Until your legal representative has been appointed.
   **(4)** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.
   **c.** Any organization you newly acquire or form, other than a partnership, or joint venture, and over which you maintain ownership or majority interest, will qualify as a named insured if there is no other similar insurance available to that organization. However:
   **(1)** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period set forth in the Declarations, whichever is earlier;
   **(2)** Coverage is applicable only in excess of the Limits of "underlying insurance" as shown in the Declarations, and you must add such organization to your "underlying insurance" as soon as practicable, advising us of such additions. We may then make adjustment of premium charges as called for in Condition **9** - Maintenance of Underlying Insurance;
   **(3)** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

Case 3:21-cv-00154-JPB-RWT Document 34-2 Filed 08/03/23 Page 297 of 538

    **(4)** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, or joint venture that is not shown as a named insured in the Declarations.

**2.** Only with respect to liability arising out of the ownership, maintenance or use of "covered autos":

  **a.** You are an insured.

  **b.** Anyone else while using a "covered auto" you own, hire or borrow with your permission is also an insured except:

    **(1)** The owner or anyone else from whom you hire or borrow a "covered auto". This exception does not apply if the "covered auto" is a trailer or semitrailer connected to a "covered auto" you own.

    **(2)** Your "employee" if the "covered auto" is owned by that "employee" or a member of his or her household.

    **(3)** A partner (if you are a partnership), or a member (if you are a limited liability company) for a "covered auto" owned by him or her or a member of his or her household.

    **(4)** Someone using a "covered auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

    **(5)** Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from a "covered auto".

    **(6)** "Employees" with respect to "bodily injury" to:

      **(a)** Any fellow "employee" of the insured arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

      **(b)** The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph **(a)** above.

    **(7)** "Property damage" to property owned by the employer of any person who is an insured under this provision.

  However, paragraphs **b. (2)** and **b. (3)** do not apply if:

    **(1)** Insurance is afforded to the owner for such "covered auto" by "underlying insurance", or would be afforded under such "underlying insurance" but for exhaustion of such policy's limits of insurance; or

    **(2)** Such "covered auto" is a trailer connected to a "covered auto" you own.

  **c.** Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the "covered auto".

**3.** Any additional insured under any policy of "underlying insurance" will automatically be an insured under this insurance.

Subject to Section IV - Limits Of Insurance, if coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured will not exceed either the:

  **a.** Minimum limit of insurance you agreed to provide, less any amounts payable by any "underlying insurance"; or

  **b.** Available under the applicable Limits of Insurance available under this policy;

whichever is less,

Additional insured coverage provided by this insurance will not be broader than coverage provided by the "underlying insurance".

## Section IV Limits Of Insurance

**1.** The Policy Aggregate Limit shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

  **a.** Insureds;

  **b.** "Claims" made or "suits" brought, or number of vehicles involved; or

  **c.** Persons or organizations making "claims" or bringing "suits".

**2.** The Policy Aggregate Limit is the most we will pay for:

  **a.** The sum of all "ultimate net loss" under Coverage **A** and Coverage **B** combined, except "ultimate net loss" because of "bodily injury" and "property damage" arising from the "automobile hazard"; and

  **b.** Each "occurrence" with regard to "ultimate net loss" because of injury and damage arising from the "automobile hazard".

**3.** If the Policy Aggregate Limit is paid prior to this policy's termination date for losses other than losses arising from the "automobile hazard", this policy's premium is fully earned.

**4.** If there is "underlying insurance" with a policy period that is non-concurrent with the policy period of this Commercial Umbrella Coverage Form, the "retained limit(s)" will only be reduced or exhausted by payments for:

  **a. "Bodily injury" or "property damage" which occurs during the policy period of this Coverage Form; or**

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

b. **"Personal and advertising injury" for offenses that are committed during the policy period of this Coverage Form.**

However, if any "underlying insurance" is written on a claims-made basis, the "retained limit(s)" will only be reduced or exhausted by claims for that insurance that are made during the policy period, or any Extended Reporting Period, of this Coverage Form.

5. The Policy Aggregate Limit applies separately to each consecutive annual period, and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limit of Insurance.

## Section V Conditions

1. **Appeals.** In the event the insured or any "underlying insurer" elects not to appeal a judgment for damages covered by this policy and which exceeds the "retained limit", we may elect, but have no duty, to do so. We shall be liable, in addition to the Limit of Insurance, for all costs and expenses incurred and interest on judgments incidental to such an appeal and for all such costs, expenses and interest on appeals in connection with our right and duty to defend the insured under this policy.

2. **Bankruptcy.** Bankruptcy, insolvency, or receivership of the insured, the insured's estate or of any "underlying insurer" will not relieve us of our obligations under this policy. With regard to bankruptcy, insolvency, or receivership of any "underlying insurer", this policy shall not apply as a replacement of such bankrupt or insolvent insurer and our Limits of Insurance will apply only in excess of the required Limit(s) of Insurance stated in the Declarations of this policy.

3. **Cancellation.**
   a. The first named insured shown in the Declarations may cancel this policy by delivering it to us or any of our authorized agents or by sending us written notice stating when the future cancellation will take effect. Cancellation will become effective the date of delivery of the policy to us or upon such future date requested by the first named insured.
   b. We may cancel this policy by mailing or delivering to the first named insured written notice of cancellation at least:
      (1) Ten (10) days before the effective date of cancellation if we cancel because of nonpayment of premium whether payable directly to us or payable to our agents or others under any installment payment plan, premium finance plan, extension of credit or other payment plan; or
      (2) Thirty (30) days before the effective date of cancellation if we cancel for any other reason.
   c. We will mail or deliver our notice to the first named insured's last mailing address known to us.
   d. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.
   e. If this policy is canceled, we will send the first named insured any premium refund due. If we or the first named insured cancel, the refund will be pro rata. The cancellation will be effective even if we have not made or offered any refund of unearned premium.
   f. If notice is mailed, proof of mailing will be sufficient proof of notice.

4. **Changes.** This policy contains all the agreements between you and us concerning the insurance afforded. The first named insured shown in the Declarations is authorized to make changes in the terms of this policy upon our giving written consent. This policy's terms can be amended or waived only by endorsement to this policy issued by us and made a part of this policy.

5. **Duties In The Event Of Occurrence, Offense, Claim Or Suit.**
   a. You must see to it that we or our authorized representative are notified as soon as practicable of an "occurrence" or an offense which may result in a "claim". To the extent possible, notice should include:
      (1) How, when, and where the "occurrence" or alleged offense took place;
      (2) The insured's name and address;
      (3) The names and addresses of any injured persons or witnesses; and
      (4) The nature and location of any injury or damage arising out of the "occurrence" or offense.
      Notice of an "occurrence" or an offense is not notice of a "claim".
   b. If a "claim" is made or "suit" is brought against any insured, you must:
      (1) Immediately record the specifics of the "claim" or "suit" and the date received; and
      (2) Notify us as soon as practicable.
      You must see to it that we also receive written notice of the "claim" or "suit" as soon as practicable.
   c. You and any other insured involved in such "claim" or "suit" must:
      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";
      (2) Authorize us to obtain records and other information;
      (3) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

Issue Date  02/28/2019        01:23:06 PM

001697  Printed:
03/01/19   01:38:23

STATE AUTO
Insurance Companies

    **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

  **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

  **e.** No insureds shall in any way jeopardize our rights after an "occurrence" or offense.

**6. Examination of Your Books and Records**. We may examine and audit your books and records as they relate to this policy at any time during the policy period set forth in the Declarations and up to three years afterward.

**7. Inspection and Surveys.**

  **a.** We have the right but are not obligated to:

    **(1)** Make inspections and surveys at any time;

    **(2)** Give you reports on the conditions we find; and

    **(3)** Recommend changes to such conditions.

  **b.** Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. We also do not warrant that conditions:

    **(1)** Are safe or healthful; or

    **(2)** Comply with laws, regulations, codes or standards.

  **c.** This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations on our behalf.

**8. Legal Action Against Us.**

  **a.** No person or organization has a right under this policy:

    **(1)** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

    **(2)** To sue us under this policy unless all of its terms have been fully complied with.

  **b.** A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**9. Maintenance of Underlying Insurance.**

  **a.** You must keep the "underlying insurance" listed in the Schedule of "underlying insurance" in the Declarations, or renewal or replacement policies not more restrictive in their terms and conditions, in full force and effect throughout the policy period of this insurance. The Limits of Insurance must be maintained in full effect without reduction of limits except for reduction of the aggregate limit due to payment of claims, settlement or judgments to which this insurance applies. You must also notify us in writing, within 30 days of any termination of any policy of "underlying insurance", or replacement of any policy of "underlying insurance".

  **b.** You must notify us in writing, within 30 days of any changes to the terms or limits of any "underlying insurance" policies. We may adjust premium charges under this policy from the effective date of such changes to the terms of any "underlying insurance."

  **c.** Your failure to comply with the foregoing paragraphs **9.a.** and **9.b.** will not invalidate this policy, but in the event of such failure, we shall be liable under this policy only to the extent that we would have been liable had you complied with these obligations.

**10. Other Insurance.** If other valid and collectible insurance is available to the insured for "ultimate net loss" we cover under this policy, our obligations under this policy are limited as follows:

  **a.** This insurance is excess over:

    **(1)** Any other insurance, whether primary, excess, contingent or on any other basis, except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance; and

    **(2)** Any other insurance available to the insured, whether primary or excess, covering liability for damages arising out of premises or operations for which you have been added as an additional insured.

  **b.** We will indemnify only our share of the amount of "ultimate net loss", if any, that exceeds the sum of:

    **(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

    **(2)** The total of all deductible and self-insured amounts under this or any other insurance.

  **c.** We will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we may undertake to do so, but we will be entitled to the insured's rights against all other insurers in accordance with provisions of Condition **16** below.

**CXS0001 (12/15) Page 17 of 23**

*//*CXS0001-201512

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

## STATE AUTO
### Insurance Companies

**11. Premium Audit.**
   **a.** We will compute all premiums for this policy in accordance with our rules and rates.
   **b.** Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period, we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first named insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first named insured, but not if such audit premium is less than the Minimum Premium shown in the Declarations.
   **c.** The first named insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**12. Premiums.** The first named insured shown in the Declarations:
   **a.** Is responsible for the payment of all premiums; and
   **b.** Will be the payee for any return premiums we pay.

**13. Representations.** By accepting this policy, you agree that:
   **a.** The information shown on the Declarations is accurate and complete;
   **b.** The information is based upon representations you made to us in your application(s) for this policy;
   **c.** We have issued this policy in reliance upon your representations; and
   **d.** Except as otherwise provided in this policy or by law, this policy is void if you conceal or misrepresent any material facts concerning this policy, in your application for this policy or otherwise.

**14. Separation of Insureds.** Except with respect to the Limit of Insurance, and any rights or duties specifically assigned to the first named insured, this insurance applies:
   **a.** As if each named insured were the only named insured; and
   **b.** Separately to each insured against whom "claim" is made or "suit" is brought.

**15. Sole Agent.** The named insured first shown in the Declarations is authorized to act on behalf of all insureds with respect to giving or receiving notice of cancellation or nonrenewal, receiving refunds, and agreeing to any changes in this policy.

**16. Transfer Of Rights Of Recovery Against Others To Us.**
   **a.** If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring suit or transfer those rights to us and
   **b.** Any recoveries shall be applied first to reimburse any interests (including the insured) that may have paid any amounts in excess of our liability under this policy; then to reimburse us for any payment hereunder; and lastly to reimburse such interests (including the insured) as to which this policy is excess, as are entitled to the residue, if any.
   **c.** When we assist in pursuit of the insured's rights of recovery, reasonable expenses resulting therefrom shall be apportioned among all interests in the ratio of their respective recoveries.
   **d.** If there should be no recovery as a result of proceedings instituted solely at our request, we shall bear all expenses of such proceedings.

**17. Transfer of Your Rights and Duties Under This Policy.**
   **a.** Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.
   **b.** If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**18. When Loss Payable.** Our liability for any portion of "ultimate net loss" shall not apply until the insured or any "underlying insurer" shall be obligated to actually pay the full and complete amount of the "retained limit". When "ultimate net loss" has been finally determined, the insured may make "claim" for payment under this policy as soon as practicable thereafter. Such insured's obligation to pay any amount of "ultimate net loss" must have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant or the claimant's legal representative and us.

**19. When We Do Not Renew.**
   **a.** If we decide not to renew this policy, we will mail or deliver to the first named insured shown in the Declarations written notice of the non-renewal not less than 30 days before the expiration date or such other period as may be required by law.
   **b.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**20. Expanded Coverage Territory**
   **a.** If a "suit" is brought in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from defending the insured, the insured will initiate a defense of the "suit". We will reimburse the insured, under Supplementary Payments, for any reasonable and necessary expenses incurred

**CXS0001 (12/15) Page 18 of 23**
*/ˆCXS0001-201512

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

001691/9   Printed:
03/01/19  01:38:23

for the defense of a "suit" seeking damages to which this insurance applies, that we would have paid had we been able to exercise our right and duty to defend.

If the insured becomes legally obligated to pay sums because of damages to which this insurance applies in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from paying such sums on the insured's behalf, we will reimburse the insured for such sums.

**b.** All payments or reimbursements we make for damages because of judgments or settlements will be made in U.S. currency at the prevailing exchange rate at the time the insured became legally obligated to pay such sums. All payments or reimbursements we make for expenses under Supplementary Payments will be made in U.S. currency at the prevailing exchange rate at the time the expenses were incurred.

**c.** Any disputes between you and us as to whether there is coverage under this policy must be filed in the courts of the United States of America (including its territories and possessions), Canada or Puerto Rico.

**d.** The insured must fully maintain any coverage required by law, regulation or other governmental authority during the policy period, except for reduction of the aggregate limits due to payments of claims, judgments or settlements.

Failure to maintain such coverage required by law, regulation or other governmental authority will not invalidate this insurance. However, this insurance will apply as if the required coverage by law, regulation or other governmental authority was in full effect.

## Section VI Definitions

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purpose of this definition:
   **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and
   **b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporter is considered an advertisement.

2. "Auto" means:
   **a.** A land motor vehicle, trailer or semi trailer designed for travel on public roads, including any attached machinery or equipment, or
   **b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.
   However, "auto" does not include "mobile equipment".

3. "Automobile hazard" means liability arising out of the ownership, maintenance, use or entrustment of any "covered auto". Use includes operation and "loading or unloading".

4. "Bodily injury" means bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time. "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury".

5. "Claim" means any demand upon the insured for damages or services alleging liability of the insured as the result of an "occurrence" or offense.

6. "Covered auto" means only those "autos" to which "underlying insurance" applies.

7. "Coverage territory" means
   **a.** anywhere in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.
   **b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or
   **c.** All other parts of the world if the injury or damage arises out of:
      **1)** Goods or products made or sold by you in the territory described in **a.** above;
      **2)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or
      **3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication
      provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

8. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

9. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

10. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

11. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
    **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**CXS0001 (12/15) Page 19 of 23**
*/*CXS0001-201512

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

**STATE AUTO**
Insurance Companies

**b.** You have failed to fulfill the terms of a contract or agreement;

If such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work", or by your fulfilling the terms of the contract or agreement.

**12.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of a contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement; or

**f.** That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

**g.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law for injury to persons or property in the absence of any contract or agreement.

Paragraphs **f.** and **g.** does not include that part of any contract or agreement:

**(1)** That indemnifies any person or organization for "bodily injury" or "property damage" arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities ;

**(4)** That pertains to the loan, lease or rental of an "auto" to you or any of your "employees," if the "auto" is loaned, leased or rented with a driver; or

**(5)** That holds a person or organization engaged in the business of transporting property by "auto" for hire, harmless for your use of a "covered auto" over a route or territory that person or organization is authorized to serve by public authority.

**13.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**14.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered; but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**15.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, on which are permanently mounted:

    **(1)** Power cranes, shovels, loaders, diggers or drills; or

    **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**CXS0001 (12/15) Page 20 of 23**

*//*CXS0001-201512*

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

e.  Vehicles not described in **a.**, **b.**, **c.**, or **d.** immediately preceding that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:
  **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or
  **(2)** Cherry pickers and similar devices used to raise or lower workers;

f.  Vehicles not described in **a.**, **b.**, **c.**, or **d.** of this section maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":
  **(1)** Equipment designed primarily for:
    **(a)** Snow removal;
    **(b)** Road maintenance, but not construction or resurfacing; or
    **(c)** Street cleaning;
  **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and
  **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

  However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

16. "Occurrence" means:
  a.  With respect to "bodily injury" or "property damage", an accident, including continuous or repeated exposure to substantially the same general harmful conditions. This does not apply to your liability (other than under a contract or agreement) for "bodily injury" to your "employees" arising out of and in the course of employment by you; or
  b.  With respect to your liability (other than under a contract or agreement) for "bodily injury" to your "employees" arising out of and in the course of employment by you, "bodily injury" caused by accident or disease.

17. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
  a.  False arrest, detention or imprisonment;
  b.  Malicious prosecution;
  c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
  d.  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
  e.  Oral or written publication, in any manner, of material that violates a person's right of privacy;
  f.  The use of another's advertising idea in your "advertisement"; or
  g.  Infringing upon another's copyright, trade dress or slogan in your "advertisement."

18. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes, without limitation, materials to be recycled, reconditioned or reclaimed.

19. "Pre-judgment interest" means interest added to a settlement, verdict, award or judgment based on the amount of time prior to the settlement, verdict, award or judgment whether or not made part of the settlement, verdict, award or judgment.

20. "Products-completed operations hazard":
  a.  Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
    **(1)** Products that are still in your physical possession; or
    **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
      **(a)** When all of the work called for in your contract has been completed;
      **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or
      **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

STATE AUTO
Insurance Companies

**b.** Does not include "bodily injury" or "property damage" arising out of:
   **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;
   **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or
   **(3)** Those products or operations for which the applicable classification, under a policy of "underlying insurance", states that products-completed operations are subject to that policy's General Aggregate Limit.

**21.** "Property damage" means:
   **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
   **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
   For the purposes of this insurance, electronic data is not tangible property.
   As used in this definition, electronic data means information, facts or programs stored as or on created or used on, or transmitted to or from computer software, including systems and application software, hard or floppy disks, CD-ROMs, tapes drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**22.** "Retained limit" means the greater of:
   **a.** The sum of amounts applicable to any "claim" or "suit" from:
      **(1)** The available limits of "underlying insurance"; and
      **(2)** Other collectible primary insurance; or
   **b.** The "self-insured retention".

**23.** "Self-insured retention" means the dollar amount listed in the Declarations that will be paid by the insured before this insurance becomes applicable only with respect to "occurrences" or offenses not covered by the "underlying insurance". The "self-insured retention" does not apply to "occurrences" or offenses which would have been covered by "underlying insurance" but for the exhaustion of applicable limits

**24.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies is alleged. "Suit" includes:
   **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or submits with our consent; or
   **b.** Any other alternative dispute resolution proceeding in which such damages is claimed and to which the insured must submit or submits with our consent.

**25.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**26.** "Ultimate net loss" means the total amount of damages for which the insured is legally liable in payment of "bodily injury", "property damage" or "personal and advertising injury". "Ultimate net loss" must be fully determined as shown in Condition **18 -** When Loss Payable. "Ultimate net loss" shall be reduced by any recoveries or salvages which have been paid or will be collected, but the amount of "ultimate net loss" shall not include any expenses incurred by any insured, by us or by any "underlying insurer".

**27.** "Underlying insurance" means the coverage(s) afforded under insurance policies designated in the Declarations under the Schedule of "underlying insurance" and any renewals or replacements of those policies.

**28.** Underlying insurer" means any company issuing any policy of "underlying insurance".

**29.** "Unmanned aircraft" means an aircraft that is not:
   **1.** Designed;
   **2.** Manufactured; or
   **3.** Modified after manufacture;
   to be controlled directly by a person from within or on the aircraft.

**30.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**31.** "Wrongful act" means any actual or alleged error, misstatement or misleading statement, act, omission or neglect or breach of duty by a director or "executive officer" in discharge of their duties, individually or collectively, or any matter claimed against them solely by reason of their being directors or officers of your business.
   "Wrongful act" does not include "bodily injury", "property damage" or "personal and advertising injury" as defined in this coverage form.

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

Case 3:21-cv-00154 Filed 08/03/23 Page 305 of 538 Document 33-2

**STATE AUTO**
Insurance Companies

**32.** "Your product":
  **a.** Means:
    **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
      **(a)** You;
      **(b)** Others trading under your name; or
      **(c)** A person or organization whose business or assets you have acquired; and
    **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.
  **b.** Includes:
    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and
    **(2)** The providing of or failure to provide warnings or instructions.
  **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**33.** "Your work":
  **a.** Means:
    **(1)** Work or operations performed by you or on your behalf; and
    **(2)** Materials, parts or equipment furnished in connection with such work or operations.
  **b.** Includes:
    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and
    **(2)** The providing of or failure to provide warnings or instructions.

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

Issue Date  02/28/2019          01:23:06 PM

0016924    Printed:
03/01/19   01:38:23

# STATE AUTO
## Insurance Companies

**PBP 2855775   00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION-ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA COVERAGE FORM

**A.** Exclusion **2.w.** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**w. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

**CXS 23 00 05 14   Page 1 of 1**

*//*CXS2300-201405

Includes copyrighted material of
Insurance Services Office, with its permission

Issue Date  02/28/2019          01:23:06 PM

001692S    Printed:
03/01/19   01:38:23

Case 3:21-cv-00154-JBA  Document 33-2  Filed 08/03/23  Page 307 of 538

**STATE AUTO**
Insurance Companies

**PBP  2855775    00**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CONTRACTORS LIMITATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA COVERAGE FORM

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:
  1. Any project insured under a wrap up, owner controlled insurance plan, or any similar coverage or rating plan.
  2. Any professional services performed by or on behalf of any insured, including the preparation or approval of or failure to approve maps, drawings, plans, opinions, reports, surveys, change orders, designs or specifications, and any supervisory, inspection or engineering services.

**B.** LIMITED COVERAGE - DAMAGE TO WORK PERFORMED BY SUBCONTRACTORS
   If endorsement CG 22 94 Exclusion - Damage To Work Performed By Subcontractors On Your Behalf or SL 11 72 Limited Coverage - Damage To Work Performed by Subcontracted Work Performed By Subcontractors amends any "underlying insurance", the following applies:
  1. Subparagraph **2.l.,** is amended as follows:
     This insurance does not apply to:
     **l.** "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

**C.** Except to the extent coverage is provided in "underlying insurance," and subject to Condition 9 - Maintenance of Underlying Insurance, this insurance does not apply:
  1. To "bodily injury", "property damage" or "personal injury and advertising injury" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.
  2. To "property damage" included within the "explosion hazard", the "collapse hazard", "underground hazard" or the "blasting hazard" as defined in this endorsement.
     This does not apply to:
     **a.** Operations performed for you by others; or
     **b.** "Property damage" included within the "products-completed operations hazard."

**D.** With respects this endorsement, the following additional definitions apply.
  1. "Explosion hazard" includes property damage arising out of blasting or explosion. The explosion hazard does not include property damage arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery, or power transmitting equipment.
  2. "Collapse hazard" includes "structural property damage" and any resulting property damage to any other property at any time.
  3. "Structural property damage" means the collapse of or structural injury to any building or structure due to:
     **a.** Grading of land, excavating, borrowing, filling, back filling, tunneling, pile driving, cofferdam work, or caisson work; or
     **b.** Moving, shoring, underpinning, raising or demolition of any building or structure, or removal of rebuilding of any structural support of that building or structure.
  4. "Underground hazard" includes underground property damage and any resulting property damage to any other property at any time. Underground property damage means property damage to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus used with them beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, paving, excavating, drilling, borrowing, filing, back-filling, or pile driving.
  5. "Blasting" means the intentional detonation of explosive materials, including the transportation, handling and placing of such explosive materials in preparation for intentional detonations.
  6. "Blasting hazard" means "property damage" arising out of any "blasting" performed by an insured.

**CXS 30 12 01 12   Page 1 of 1**
*//*CX3012-201201

Includes copyrighted material of
Insurance Services Office, Inc., with its permission

**STATE AUTO**
Insurance Companies

**PBP 2855775 00**

MOBDEC   PBP 2855775 00 02/28/2019 F6H TAYL CPP*N   41ELIT0005590 070006

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

**CXS2170 (01/15) Page 1 of 1**
*//*CXS2170-201501

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

Issue Date  02/28/2019          01:23:06 PM

001692? Printed:
03/01/19  01:38:23

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:
COMMERCIAL UMBRELLA COVERAGE FORM

**A. The following exclusion is added:**
This insurance does not apply to:
**TERRORISM PUNITIVE DAMAGES**
Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B. The following definition is added:**
"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism":

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

---

**CXS2176 (01/15) Page 1 of 1**
*//*CXS2176-201501*

Includes copyrighted material of
Insurance Services Office, Inc. with its permission

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FOLLOWING FORM - AUTO LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA COVERAGE FORM

The following is added to subparagraph **a.,** of paragraph **1,** Insuring Agreement, of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability:

**(5)** This insurance only applies to the extent coverage is provided in "underlying insurance" for "bodily injury" or "property damage" arising out of the ownership, maintenance, use, "loading or unloading", or entrustment to others of any "auto":

**(a)** While away from premises you own, rent, or occupy; or

**(b)** Owned by or rented or loaned to any insured.

**CXS 30 01 07 98 Page 1 of 1**
*//*CXS 30 01 07 98

0016929    Printed:
03/01/19    01:38:23

Case 3:21-cv-00154 JRG-DPC    Document 11-2    Filed 08/03/23    Page 311 of 538

**STATE AUTO**
Insurance Companies

**PBP 2855775   00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TENNESSEE CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA COVERAGE FORM

**A.** Subparagraph **e.** of paragraph **3.,** Cancellation, of Section **V** - Conditions is replaced by the following:
   **e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. The refund will be pro rata if:
     **(1)** We cancel; or
     **(2)** The policy is cancelled at the request of a premium finance company that has financed this policy under a premium finance agreement.
     The refund may be less than pro rata if the first Named Insured cancels the policy.
     The cancellation will be effective even if we have not made or offered a refund.

**B.** Subparagraph **g.** is added to paragraph **3.,** Cancellation, of Section **V** - Conditions as follows:
   **9.** Cancellation Of Policies In Effect For 60 Days Or More. If this policy has been in effect for 60 days or more, or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:
     **(1)** Nonpayment of premium, including any additional premium, calculated in accordance with our current rating manual, justified by a physical change in the insured property or a change in its occupancy or use;
     **(2)** Your conviction of a crime increasing any hazard insured against;
     **(3)** Discovery of fraud or material misrepresentation on the part of either of the following:
       **(a)** You or your representative in obtaining this insurance; or
       **(b)** You in pursuing a claim under this policy;
     **(4)** Failure to comply with written loss control recommendations;
     **(5)** Material change in the risk which increases the risk of loss after we issued or renewed insurance coverage;
     **(6)** Determination by the insurance commissioner that the continuation of the policy would jeopardize our solvency or would place us in violation of the insurance laws of Tennessee or any other state;
     **(7)** Your violation or breach of any policy terms or conditions; or
     **(8)** Other reasons that are approved by the insurance commissioner.
     Notice of cancellation will state the reason for cancellation.

**C.** Paragraph **19.,** When We Do Not Renew, of Section **V** - Conditions is replaced by the following:
   **19.** When We Do Not Renew.
     **a.** If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured and agent, at least 60 days before the expiration date unless:
       **(1)** We have offered to issue a renewal policy; or
       **(2)** You have obtained replacement coverage or have agreed in writing to obtain replacement coverage.
     **b.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured's and agent's addresses shown in the policy. If notice is mailed, proof of mailing will be sufficient proof of notice.

**D.** The following is added to paragraph **12.,** Premiums, of Section **V** - Conditions:
   Whenever an insurance policy which is financed with a premium finance company is cancelled, the insurer shall return, within 30 days after the effective date of the cancellation, whatever gross unearned premiums are due under the insurance policy directly to the premium finance company for the account of the first Named Insured.

**CXS 00 41 07 98   Page 1 of 1**
*//*CXS 00 41 07 98

Copyright, Insurance Services Office, Inc.

001693O   Printed:
03/01/19   01:38:23

# Exhibit C

**First Amended Complaint in *Kytch, Inc. v. Gamble, et al.*, Case No. RG21099155 (Cal. Super. Ct., Alameda Cnty.)**



FILED
Superior Court of California
County of Alameda

04/29/2022

Chad Finke, Executive Officer/Clerk of the Court

By: _____ Deputy
S. Pesko

Electronically Received 04/29/2022 12:48 PM

1

2   Jason Sheasby SBN 205455
    jsheasby@irell.com
3   IRELL & MANELLA
    1800 Avenue of the Stars, Suite 900
4   Los Angeles, California 90067-4267
    Telephone: (310) 277-1010
    Facsimile: (310) 203-7199
5

6   Elizabeth M. Locke, P.C. (pro hac vice)      John C. Kirke SBN 175055
    libby@clarelocke.com                         jkirke@donahue.com
7   Daniel P. Watkins (pro hac vice)             Andrew S. Mackay SBN 197074
    daniel@clarelocke.com                        amackay@donahue.com
8   CLARE LOCKE LLP                              DONAHUE FITZGERALD LLP
    10 Prince Street                             1999 Harrison Street, 26th Floor
9   Alexandria, Virginia 22314                   Oakland, California 94612-3520
    Telephone: (202) 628-7400                    Telephone: (510) 451-3300
10  Facsimile: (202) 478-0475                    Facsimile: (510) 451-1527

11  *Attorneys for Plaintiff Kytch, Inc.*

12          SUPERIOR COURT OF THE STATE OF CALIFORNIA

13              FOR THE COUNTY OF ALAMEDA

14  KYTCH, INC.,                          Case No.  RG21099155

15              Plaintiff,                **FIRST AMENDED COMPLAINT
                                          FOR DAMAGES, INJUNCTIVE**
16      v.                                **RELIEF AND DEMAND FOR JURY
                                          TRIAL**
17  JONATHAN TYLER GAMBLE; TFGROUP
    LLC;  AND TAYLOR COMMERCIAL           **REDACTED**
18  FOODSERVICE, LLC DBA TAYLOR
    COMPANY,

19              Defendants.               1.  Breach of Contract
                                          2.  Tortious Interference of Contract
20                                        3.  Misappropriation of Trade Secrets
                                          4.  False Advertising
21                                        5.  Trade Libel
                                          6.  Intentional Interference with Business
22                                            Expectancy
                                          7.  Negligent Interference with Business
23                                            Expectancy
                                          8.  Computer Data Access and Fraud Act
24                                        9.  Deceptive Trade Practices
                                          10. Breach of Contract
25

26                          **PUBLIC**
            **REDACTS MATERIAL FROM CONDITIONALLY SEALED RECORD**
27

28

## PRELIMINARY STATEMENT[1]

1.     This is a case about corporate espionage and the extreme steps one manufacturer has taken to conceal and protect a multimillion-dollar repair racket.

2.     McDonald's is best known for its world-famous burgers, fries, and broken ice cream machines.



McDonald's[7] ✓ @McDonalds · Aug 11, 2020   ···
we have a joke about our soft serve machine but we're worried it won't work
💬 862     ↻ 4.5K     ♡ 29K     ⬆

3.     Despite McDonald's Corp. poking fun at its problematic machines, this is no laughing matter to the McDonald's franchise operators forced to shoulder the expensive maintenance and repair costs when the machines are out of commission.

4.     Back in 2003, McDonald's gave an effective monopoly to manufacturing giant Taylor Company ("Taylor") to provide soft-serve machines for its approximate 14,000 retail locations in the United States. The problem is Taylor designed its software so that only Taylor-certified technicians can service and repair the machines. Taylor's own documents confirm that in 2017 alone, 6,500 Taylor-certified technicians brought in almost $80 million in revenue for parts and service support.[2]

5.     This may explain why Taylor has failed to identify a global solution to fix the buggy machines. Especially in light of the fact that McDonald's customers across the country have taken to Twitter and other social media platforms to complain about the machines. One customer expressed that he was unwilling to go to McDonald's because, "I can't deal with disappointment of [the] ice cream machine being broken today."[3]

---

[1] Kytch pleads the following recitals with knowledge of its own conduct and on information and belief of the behavior of Defendants.

[2] The Middleby Corporation: Taylor Acquisition Overview, (May 18, 2018), https://middlebycorporation.gcs-web.com/static-files/5bd70207-96b1-48bd-a4a2-70dce00a247a.

[3] Bakari Sellers (@Bakari_Sellers), Twitter (April 16, 2021, 3:39 p.m.) https://twitter.com/Bakari_Sellers/status/1383143104941801474?s=20.



6. For almost two decades, it appeared that Taylor's broken machines would never be fixed. Until a small California tech startup called Kytch, Inc. cracked the code in April 2019. During product testing and development, Kytch used a proprietary combination of hardware, software, and machine learning to demystify the finicky machines.

7. Kytch soon uncovered a repair racket whereby Taylor designed flawed code that *caused the machines to malfunction*. Whether Taylor intentionally designed these flaws or merely did not care enough to ensure bug-free code will become clear during discovery. Either way, Taylor's web of partners profited millions in repair fees for the malfunctions that it manufactured.

8. A number of Taylor's customers at McDonald's have reported that Taylor's technicians made unauthorized changes to software that frequently resulted in expensive—and otherwise unnecessary—repairs. Some franchise operators have reported shelling out thousands of dollars per month in service fees to Taylor through its many franchised distributors (including Defendant TFGroup, LLC ("TFG")).

9. To maintain its lucrative repair and service market, Taylor employs a hidden "Technician's Menu" to conduct even basic maintenance on the machine. Until Kytch entered the marketplace, only Taylor-certified technicians had the tools and know-how to navigate the machines' volatile operations and software.

10. That changed when Kytch launched its flagship device Kytch Solution in spring 2019 as part of a confidential product trial to limited fast-food restaurants. Kytch spent years developing a trade secret man-in-the-middle technology to unlock the cryptic machines ("Kytch Solution

Device" or "KSD").  Kytch also designed an online system ("Kytch Solution Platform" or "KSP") for its customers to manage and monitor their machines.  The Kytch Solution Platform is equipped with a user-friendly interface to finally simplify the difficult Taylor machines that were designed to fail.

11.     Kytch originally agreed to provide its top-secret technologies and user interface to trial participants under strict non-disclosure and non-use agreements (the "Kytch Trial Agreement" and "Terms of Service").  The Kytch Trial was an overnight sensation, and media outlets reported on the innovative technology that promised to reduce the machines' downtime and to consistently deliver more frozen treats to McDonald's customers.

12.     In 2019, Kytch launched a confidential product trial (the "Kytch Trial") after dedicating significant capital to develop the solution.  The product trial allowed Kytch to aggregate and analyze machine hours to create automated adjustment that reduce the machines' downtime. By analyzing this customer data in real-time, Kytch created and fine-tuned a proprietary alert and notification system wildly popular with customers, launching Kytch's rapid market growth and instant success.

13.     By contrast, Taylor has spent twenty years—since 2002—attempting to develop its own IoT solution for its broken machines.  But Taylor's product (unlike Kytch's) will not permit users to fix its broken machines—only to monitor them in a limited fashion.  This arrangement enables Taylor to retain the revenue from its lucrative repair business.  Regardless, Taylor's limited IoT product, called "Open Kitchen," has never launched—because Taylor is not a software company and, until very recently, it lacked the knowhow.

14.     Recognizing these limitations, in April 2019, Taylor's parent company, The Middleby Corporation, purchased a tech company called Powerhouse Dynamics ("PHD") to try to modernize Taylor's machines.  But these efforts to date, have faltered.

15.     By the end of 2019, Taylor stopped "further development on its own IoT platform" after McDonald's tabled Taylor's proposed solution as premature for its restaurants. Taylor and PHD's IoT project remained dormant until a February 2020 *Business Insider* article about Kytch

highlighted many of the problems with Taylor's machines and described Kytch as a viable solution to "correct[] unnecessary malfunctions" that cause downtime.

16.     The article described Kytch's success and explains that McDonald's operators were relying on the Kytch Solution to manage Taylor's finicky machines.  The positive coverage about Kytch angered Taylor and McDonald's.  So the two companies joined forces to drive Kytch out of the marketplace.

17.     Because Kytch Solution reduces the need for Taylor service technicians to repair the machines, Kytch's leadership was not surprised when Taylor attempted to obtain the Kytch Solution.  First, one of Taylor's technology distribution managers tried to purchase a device, but Kytch's security protocol flagged and blocked the purchase.  Then, a lawyer employed by Taylor's outside counsel attempted to purchase the Kytch Solution.  Kytch blocked this second attempt.  After that, two private investigators associated with Taylor used aliases and dummy email addresses to get their hands on the device.  Once again, Kytch canceled the orders.

18.     As Kytch's product trial expanded in 2020, it became the largest independent IoT/connectivity software vendor for the shake machine in the McDonald's system.  By all appearances, the Kytch Solution Device modernized the outdated soft-serve machines that had frustrated customers for years.

19.     Based on this rapid growth, Kytch built a reputation as an emerging leader in the fast-growing IoT industry.  Kytch was barreling towards a $50 million valuation, and the company kicked off a $10 million Series A fundraising round in October of 2020.

20.     Unable to compete fairly with Kytch, McDonald's and Taylor enlisted a group of Kytch Trial participants to develop a competing product that would prevent Kytch from fixing the machines.  McDonald's and Taylor relied on Taylor's franchise distributors—including TFG—to identify and solicit Kytch's customers to obtain Kytch's innovative technology.

21.     Taylor and McDonald's held bi-weekly meetings devoted to copying Kytch's technology from the Kytch Trial participants.  Meeting minutes describe focus group sessions with Kytch customers and confirm that Taylor accessed valuable and nonpublic insights into Kytch's

- 5 -

1  features, user experience, customer preferences, and alert management protocols—"[f]eatures from

2  Kytch" that McDonald's and Taylor admitted "we're lacking."

3      22.    Taylor COO James "Jim" Minard accessed the password-protected portions of

4  Kytch's online interface, the KSP, during a Zoom conference call on June 23, 2020.  He did so by

5  using Tyler Gamble's confidential login credentials, just months after Kytch refused to sell or

6  license its product to Taylor without an NDA.

7      23.    TFG improperly obtained a physical KSD from Tyler Gamble in May 2020, and

8  Gamble provided TFG his login credentials to the KSP the following month.  Using this

9  unauthorized access, TFG sent Taylor screen captures depicting password-protected portions of the

10  KSP.  And McDonald's, Taylor, PHD, and TFG coordinated to add features to Open Kitchen using

11  feedback from Kytch's customers based on their user experience with Kytch.

12      24.    Despite this insider access to Kytch's confidential product trial, Taylor's

13  Open Kitchen could not keep up with Kytch.  In mid-October 2020, after having access to the Kytch

14  Solution for months—Open Kitchen was still "not ready to commercialize."

15      25.    Kytch was the only product on the market that was positioned to fix Taylor's soft-

16  serve machine.  Kytch soon gained market dominance after the largest organization of independent

17  McDonald's operators—the National Owners' Association ("NOA")—endorsed Kytch at its

18  national conference.

19      26.    Taylor and McDonald's took note.  McDonald's Director of Global Equipment,

20  Mike Zagorski, directed that "[t]hings need to go much faster" with Taylor's Open Kitchen

21  development, which was moving at a "turtle[']s pace."  And McDonald's warned Taylor that

22  independent restaurant operators were demanding that McDonald's integrate Kytch into the

23  McDonald's system.  This threatened to undermine Taylor's longstanding service and repair racket

24  that the new Open Kitchen device was being designed to protect.  Taylor and McDonald's needed

25  to buy more time to get Open Kitchen to the market.

26      27.    To that end, Taylor and McDonald's worked together to create a stall tactic.

27  Together they fabricated bogus "safety" claims to mislead Kytch's customers into believing that

28

- 6 -

safety testing determined that the Kytch Solution would cause "serious human injury" to users—
claims that are, and that Taylor and McDonald's both knew at the time to be, demonstrably false.

**Dear Operators,**

We are pleased to share that the McDonald's GSSS-Equipment Team, in partnership with the NSLC Equipment Sub-Team, has been working on a strategic connectivity solution with Taylor for their Shake Sundae solution. This solution will allow operators to receive text updates from their machine when it's down, and provide data on products dispensed, as well as other relevant information, to help restaurants keep the machine running in its optimal condition. This solution is being designed with long term benefits in mind, and would enable future connection with other equipment in the restaurants.

*The Taylor Shake Sundae Connectivity (TSSC) is currently in test with NSLC operators and the current target for release to the US market is by the end of Q1, 2021.*

IMPORTANT NOTE: We have become aware that a few operators may be using an unapproved aftermarket technology, Kytch, on their Shake Sundae machine. As a reminder, any operator that is using this aftermarket "add-on" to any of their machines, will completely void any existing OEM equipment warranty. Additionally, any machine failures that are associated with the installation of Kytch during or after warranty expires, will be the sole responsibility of the operator, not the OEM supplier. The Kytch device allows complete access to all aspects of the equipment's controller and confidential data, including areas where only certified technicians should have access, creating potential equipment reliability issues without the restaurant's knowledge or ability to stop it. Even more concerning, McDonald's has recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury. As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use, and is reminding you that any continued use is not approved and is at your sole risk.

For any immediate questions or concerns, please contact any one of the following individuals below:
- Taylor – Scott Nicholas, scott.nicholas@taylor-company.com
- McDonald's GSSS - Equipment Engineering, Mike Zagorski, mike.zagorski@us.mcd.com
- McDonald's GSSS – Equipment Supply Chain, John Sulit, john.sulit@us.mcd.com

28. Taylor was surprised that McDonald's was so willing to go out of its way to disparage and defame the KSD. But the reason for McDonald's eagerness was clear—the false safety alert was a pretext to "promote the new connectivity platform" that Taylor and McDonald's needed time to develop and market to McDonald's independent owners that were clamoring for an affordable fix to Taylor's soft-serve machines.

**From:** Nicholas, Scott
**Sent:** Tuesday, October 27, 2020 7:18 AM
**To:** Dobrowolski, Jeremy <Jeremy.Dobrowolski@Taylor-Company.com>
**Subject:** Re: US Comm to Operators on Taylor SS Connectivity

I am a bit in shock that they are willing to take such a strong position. Beyond their Kytch statement, I think we want to be promote the new connectivity platform as a PHD concept. If the names Kytch and Taylor are the only names used, I feel there will be unnecessary hard feelings towards us.

29.    The claims in the ad about Kytch are demonstrably false and materially misleading to consumers.  *First,* contrary to their assertions, Taylor has filed sworn declarations that they never tested the Kytch Solution.  Both McDonald's and Taylor tried to obtain the devices through Kytch, but they were unwilling to sign binding NDA/non-compete agreements to do so.  *Second,* Intertek, an industry leader in quality and safety product testing, has certified that Kytch satisfies all electrical safety requirements in accordance with Underwriters Laboratories (UL) and FCC regulations. These are the same standards that apply to *Taylor's* soft-serve machines used in McDonald's locations throughout North America.  *Third,* Kytch was founded for the very purpose of, and has been in fact, *improving* the safety and reliability of the soft-serve machines at McDonald's, and Kytch has never received a single report of injury caused by the Kytch Solution.  *Fourth,* far from being comparatively more dangerous than Taylor's competing device, the Kytch Solution integrates (and is constrained by) the soft-serve machines' safety mechanisms.  For example, when the freezer door is removed exposing interior parts of the machine that might create a safety risk, a magnetic interlock system disables motor function to protect the operator from injury, and Kytch cannot operate the machine remotely.  Thus, while Kytch does have the ability to remotely control the machine, it is limited by Taylor's existing control mechanisms—including this magnetic interlock system—to ensure safety.  *Fifth*, Kytch's interface gives users complete monitoring and control, in real-time, of the Kytch Solution's functions.

30.    Because of these safeguards and certifications, there is compelling direct evidence that conclusively disproves McDonald's claims that the Kytch Solution is unsafe and uncontrollable.

31.    Taylor and McDonald's knew that their claims were false because Tyler Gamble—Taylor and McDonald's primary source for intelligence about Kytch—told them so.  In the days before Taylor and McDonald's false and deceptive ads were published, Gamble sought safety information from Kytch's founder, Jeremy O'Sullivan, and unbeknownst to Kytch, forwarded O'Sullivan's explanation for why any safety concerns were baseless:

"There are a number of layers of protection.  First, the machine should be powered off and unplugged before any work is started.  This is a standard safety for any

- 8 -

equipment.  Second, there is a sensor on the freezer door that when the freezer door is removed prevents the motor from turning on.  Third, we do have a mechanism in place that disables any automation when a user takes control of the front panel by pressing any buttons.  Also the product has been tested and certified for safety to UL standards by Intertek labs."

32.     Taylor and McDonald's received and understood these facts, but intentionally and recklessly disregarded them and falsely accused Kytch of being prone to cause "serious human injury."  Taylor and McDonald's published these false claims to all of Kytch's current customers and many of its potential customers, including to all McDonald's operators in North America (and to Coca-Cola and Burger King).  At the same time, Taylor and McDonald's announced that Taylor would be launching its competing Open Kitchen device in Q1 2021 despite knowing all along they could never meet this deadline.  The purpose: to convince McDonald's restaurant owners to cancel their contracts with Kytch and thwart Kytch's forward momentum in the market giving Taylor and PHD time to develop their competing Open Kitchen system.

33.     Indeed, a full eight months before Taylor's and McDonald's false ads, McDonald's insiders informed Kytch that Taylor and McDonald's would fabricate safety concerns to destroy Kytch's business: "If they don't want [Kytch] in the market, they're going to throw that [safety] stuff at you [to throw you] under the bus.  And keep putting that at you until you go away eventually."

34.     Those words were prescient.

35.     Taylor's advertisements fail to provide substantive details regarding Kytch's supposed operational safety risks or what "potential equipment reliability issues" the KSD causes— because these are complete fabrications.  Rather, *Taylor* has intentionally created "equipment reliability issues" for years, and its service department has charged hundreds of millions of dollars in fees for repairs that Taylor itself caused.

36.     To date, Taylor still has not released Open Kitchen but its Chief Operating Officer has represented to this Court that it is "nearly complete."  As alleged in the original complaint,

- 9 -

Taylor improperly obtained Kytch's confidential and trade secret information to assist in the development of a competing device. This, in combination with the false advertising attacking the safety of the Kytch device allowed Taylor and PHD to gain a head start to launch Open Kitchen using proprietary insights that came from years of Kytch's costly product development.

37. The damage to Kytch was instant and monumental. Customers contacted Kytch in the days following the ads and canceled their subscription because of McDonald's false assertions that Kytch was unsafe and prone to cause serious human injury. Kytch had been barreling towards a $50 million valuation in 2020 as it quickly expanded to fast-food restaurants throughout the country—and its valuation in the following year was expected to be exponentially more.

38. That all changed after the false ads, and Kytch was soon unable to court investors to help fund its exponential growth trajectory. Taylor and its co-Defendants' unlawful conduct had dire financial consequences for Kytch, its founders, investors, and its employees.

39. Nine months earlier, Gamble approached Kytch and explained that he was the head of McDonald's Equipment Team, the committee responsible for recommending new products to McDonald's Corp.

40. At first, Gamble appeared to support Kytch's mission; Gamble even indicated that he would push McDonald's to purchase Kytch Solution Device for all of its U.S. locations.

41. Kytch is informed and believes this was a ruse.

42. In reality, Kytch is informed and believes that Gamble was working hand-in-hand with Kytch's competitor Taylor to steal Kytch's trade secrets. As part of this unlawful scheme, Gamble breached the Kytch Trial Agreement and Terms of Service last summer by soliciting Kytch's most sensitive information, only to share it with Taylor through one of its distributors.

43. Kytch is informed and believes that Taylor's distributor shared Kytch's trade secrets with the manufacturing giant to enable Taylor to monitor Kytch's development. With insider access to Kytch's trade secret information, Taylor could stay one step ahead of Kytch's diagnostic capabilities.

44.     On November 1, 2020, Kytch sent a message to Gamble (and no one else) ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████████████

45.     Kytch is informed and believes that news of Kytch's operating system led to Taylor's decision to launch its own competing device rapidly to preserve its repair racket.

46.     Tyler Gamble knew he was acting improperly.  In February 2021, Tyler Gamble and his father tried to delete the electronic invitations they sent out to unauthorized third parties providing access to the Kytch Solution Platform.

47.     These uses of Kytch's confidential information were unauthorized, they have cost Kytch untold millions of dollars, and they will certainly cause Kytch further damage in the future; Defendants have also been unjustly enriched through violating contractual obligations and by exploiting Kytch's confidential information.

48.     Defendants' conduct has come close to destroying Kytch.

49.     Accordingly, Defendants must make Kytch whole for the damage caused by their unlawful conduct, and the Court should, as required by the Kytch Trial Agreement and the Terms of Service, enjoin them from further using Kytch's confidential information and trade secrets.

**PARTIES**

*Kytch's Background.*

50.     Plaintiff Kytch, Inc. is a Delaware corporation with its principal place of business in Alameda County, California.  Kytch is a subsidiary of Frobot, Inc.  At all times relevant, Kytch operated in Fremont, California, which was the site of its system, intellectual property, and trade secrets.  Kytch considered the Kytch Solution and aspects of the KSP to be confidential trade secrets that it would only disclose under a confidentiality agreement.

51.     Kytch's data-driven product testing ultimately yielded next-generation IoT technology that cemented the company's status as a leader in the industry.

52.     Kytch launched its flagship device, the Kytch Solution, in Spring 2019 as part of a confidential product trial to limited fast-food restaurants (the Kytch Trial).  Kytch spent years developing a trade secret man-in-the-middle technology (known as the KSD), to unlock Taylor's cryptic soft-serve machines.  Kytch also designed an online system, the KSP, for its customers to manage and monitor their machines.  The KSD and the KSP are referred to collectively as the "Kytch Solution." The KSP is equipped with a user-friendly interface to simplify the non-user-friendly Taylor machines.

53.     Kytch uncovered a repair racket whereby Taylor designed flawed code that ***caused the machines to malfunction.***  One of Taylor's service partners described this arrangement as a "money trap," and further explained that Taylor's "service department will reap the benefits of [the] steady stream of repair bills" to keep the machines up-and-running.

54.     Kytch originally agreed to provide its confidential technologies and user interface to trial participants under strict non-disclosure and non-use agreements (the "Kytch Trial Agreement" and "Terms of Service").  The Kytch Trial was an overnight sensation, and media outlets reported on the innovative technology that promised to reduce the machines' downtime and to consistently deliver more frozen treats to McDonald's customers.

55.     As the Kytch Trial expanded in 2020, it became the largest independent IoT/connectivity software vendor for the shake machine in the McDonald's system.  By all appearances, the KSD modernized the outdated soft-serve machines that had frustrated customers for years.

56.     Through years of development, Kytch has built expertise, proprietary insights, diagnostic tools, and notification systems for the growing "smart kitchen" marketplace.

57.     Kytch's founders, Jeremy O'Sullivan and Melissa Nelson have worked with Taylor's executive team for years.  Taylor shipped soft-serve machines to Kytch in California, and Defendants knew that Kytch was operating in California and that it was actively protecting its

proprietary information through non-disclosure agreements and industry-leading security measures described in more detail below.

58.     Defendants' misconduct injured Kytch.  Kytch suffered significant loss of revenues and profits because of Taylor and McDonald's misconduct, which caused, among other things, a decline in Kytch's sales.  Kytch will suffer significant loss of revenues and profits in the future due to Defendants' misconduct, which has caused, among other things, a decline in Kytch's sales compared to prior years and earlier forecasts.  And Kytch lost valuable intellectual property and suffered reputational damage because of Defendants' unlawful acts.

### *Background of Taylor, McDonald's and Their Co-Conspirators.*

59.     Defendant Taylor Commercial Foodservice, LLC DBA Taylor Company is incorporated in Delaware, and it manufacturers soft-serve machines for McDonald's and other commercial kitchens.  Taylor's CEO Jeremy Dobrowolski, its COO James Minard, and its Senior Business Manager for McDonald's Scott Nicholas directed, supervised, oversaw, and participated in the misappropriation of Kytch's trade secrets and the unlawful competition alleged herein.

60.     McDonald's Corporation is a Delaware corporation with its principal place of business in Oak Brook, Illinois.  McDonald's Director of Global Equipment Development, Mike Zagorski, and its Global Director of Strategic Sourcing, John Sulit, directed, supervised, and oversaw the misappropriation of Kytch's trade secrets and the unfair competition campaign alleged herein.

61.     TFGroup LLC ("TFG") is a Louisiana limited liability company that is a franchised distributor for Taylor.  TFG describes itself as utilizing "analytical advances to ensure speed of service, reduction of equipment downtime and labor savings."  TFG, through its principal Blaine Martin, its repair technician Ben Rhodes, and others, misappropriated Kytch's trade secrets and attempted to reverse engineer the KSD.

62. Jonathan "Tyler" Gamble operates ten McDonald's restaurants in Tennessee and Mississippi. Gamble is an independent franchise owner, and at all times relevant he served as the Equipment Team Lead for McDonald's National Supplier Leadership Council.[4]

63. Gamble enrolled in the Kytch Trial after executing the binding Kytch Trial Agreement and after representing that he and his company would not use Kytch's trade secrets to "build or support, and/or assist a third party in building or supporting products or services competitive" to Kytch. (Kytch Terms of Service, § 1(g).)

64. The Kytch Trial Agreement incorporates Kytch's binding Terms of Service, and those provisions, among other things, prohibit Gamble from "providing unauthorized access or exceeding authorized access to [Kytch's] products, services or any account." (Kytch Terms of Service, § "Notice.")[5]

65. Kytch is informed and believes in committing the acts or omissions alleged in this First Amended Complaint, each of these parties conspired with, aided and abetted, or acted in concert with each other. Under principles of *respondeat superior* and similar doctrines, Defendants are liable for the acts and omissions of their employees and agents.

## JURISDICTION & VENUE

66. This Court has already correctly concluded that Defendants Taylor, Gamble, and TFG are properly subject to this Court's jurisdiction. Defendants conduct business in California. Defendants have sufficient minimum contacts with California, and otherwise purposefully avail themselves of the markets in this State through the research and development of products in California, thereby rendering the exercise of jurisdiction by California courts permissible under traditional notions of fair play and substantial justice.

67. The Court has jurisdiction over Defendants because they spent significant time and resources obtaining information about the Kytch Solution from Kytch in California. Taylor worked

---

[4] This complaint refers to the National Supply Leadership Counsel as the "NSLC," and the NSLC's Equipment Team as the "McDonald's Equipment Team."

[5] Copies of the Kytch Trial Agreement and the Terms of Service that bind Gamble, TFG, and the other Kytch Trial participants are attached as **Exhibit 1.**

with McDonald's to direct Gamble, Eric Wilson, and others to secure a KSD and to obtain access to the KSP. Defendants consented to jurisdiction and venue in the court of Alameda County, California as the proper forum to litigate any disputes arising from and relating to the Kytch Trial Agreement and the Terms of Service.

68. Taylor repeatedly contacted Kytch's founders in Fremont, California, as part of its efforts to misappropriate Kytch's trade secrets and to confirm the KSDs were shipped out from Kytch in California. Taylor and TFG were able to access the online Kytch Solution Platform in Fremont, California, using login credentials that they knew were not theirs, and to intercept hard-to-detect errors and problems on Taylor's soft-serve machines.

69. Taylor's years-long efforts to obtain a KSD from Kytch in California are indisputable. Taylor dispatched its Technology Distribution Manager Heather Jordan and others to complete purchase orders for KSDs. Taylor hired outside counsel and utilized private investigators using assumed names to try to circumvent Kytch's security protocol. Taylor and the remaining Defendants have reviewed Kytch's Terms of Service and its website, both of which identify Fremont, California, as Kytch's headquarters and nucleus of operation.

70. Taylor targeted Kytch's California-based customers and its California-based proprietary technology to unlawfully compete with Kytch and to drive the startup out of the "smart kitchen" industry.

71. This Court has jurisdiction over Gamble because this action arises out of his business activities with Kytch in California, including that Gamble has transacted business and has caused injury to Kytch in California. Gamble consented to jurisdiction and venue in the court of Alameda County, California, as the proper forum to litigate any disputes arising from and relating to the Kytch Trial Agreement and the Terms of Service.

72. TFG consented to jurisdiction and venue in California for any disputes or litigation arising from and relating to Kytch's Terms of Service.

73. Each Defendant had actual notice that it was dealing with a California company whose system resides on servers in California, and Kytch considered aspects of the Kytch Platform

- 15 -

to be confidential trade secrets that it would only disclose under a non-disclosure agreement. This Court has personal jurisdiction over Defendants because they committed many of the acts that form the basis of Kytch's claims—including misappropriating Kytch's California-based trade secrets and disseminating false advertisements—in Alameda County, California.

74.    Taylor directed false advertisements and libelous statements to Kytch's customers and potential customers throughout the state of California.

75.    Defendants intentionally committed torts against Kytch in Alameda County, and they intended to harm California, and to damage Kytch in its residence.  Kytch suffered the financial and reputational consequences of Defendants' conduct in Alameda County, in part because the false advertising and misappropriation of trade secrets occurred here.

76.    The acts alleged in this First Amended Complaint occurred and the damages to Kytch were inflicted and occurred in substantial part in California and within Alameda County.

## **BACKGROUND FACTS**

### *To Protect the Company's Trade Secrets and Confidential Information, Kytch's Trial Agreement Contains Non-Disclosure and Non-Use Provisions.*

77.    Kytch's data-driven product testing ultimately yielded next-generation IoT technology that cemented the company's status as a leader in the industry.

78.    Through years of development and $1.3 million of effort, Kytch has built expertise, proprietary insights, diagnostic tools, and notification systems for the growing "smart kitchen" marketplace.

79.    In February 2020, Tyler Gamble first contacted Kytch and asked to enroll in the Kytch Trial.  Because one of Kytch's key strategic advantages lies in its proprietary information, Kytch required Gamble to enter into a non-disclosure agreement to protect Kytch's trade secrets and confidential information.  Gamble executed the Kytch Trial Agreement (the "NDA") on March 19, 2020.[6]

---

[6] The NDA refers to the Kytch Trial Agreement and the Terms of Service incorporated in that document.

This Agreement is effective as of ___03 / 19 / 2020___, 2020 (the "Effective Date"), by and between:

*J Tyler Gamble*

80.     The NDA reflects the fundamental nature of the business relationship Kytch has with its customers.  Kytch is in the midst of developing its solution to the broken machines with the need to collect more data for the Kytch Trial.  Gamble is in charge of identifying new and innovative products for McDonald's, and the ice cream machines in his ten stores were constantly breaking down.

81.     Kytch's customers sought out Kytch's data-driven approach to fixing the machines. Kytch, on the other hand, needed to make sure that one of its chief assets—its innovative hardware and software were protected from competitors.

82.     Kytch would never just give away its trade secrets for free or so that Gamble could use them for his benefit, much less to benefit Kytch's competitors in the rapid-paced IoT industry. The NDA memorializes how the parties came together around these competing interests: Gamble was obligated and agreed to keep confidential the information and devices Kytch provided, and he could use it only in furtherance of the Kytch Trial.

83.     The NDA states that Kytch Trial participants and those who accepted the Terms of Service "may not and may not directly or indirectly cause, permit, or allow others to . . . make [Kytch's] Products or Services, including any Kytch programs or materials to which you are provided access, available ***in any manner to any third party***."  Terms of Service §1(g).

84.     The NDA also prohibits "access[ing] or us[ing] [Kytch's] services in order to build or support, and/or assist a third party in building or supporting, Products or Services competitive to Kytch."  Likewise, Kytch Trial participants and users must not "disclose the results of the performance of [Kytch's] Products and Services without Kytch's prior written consent."  *Id.*

85.     Further, Kytch Trial participants "shall not, and shall not cause or permit others to . . . distribute or republish all or any part of [Kytch's] Products or otherwise access or use the Products

- 17 -

in order to build or support, and/or assist a third party in building or supporting products or services competitive to any Kytch Products." To avoid doubt, the NDA expressly forbids "display[ing] . . . or mak[ing] the Kytch Products available to (or use such Products for the benefit of) any third party." Kytch Trial Agreement § D.

86.   Finally, the NDA limits use of Kytch's products to the Kytch Trial, and Kytch Trial participants and users must not utilize "the Products for any business other than" the Kytch Trial, and they cannot use the Products or disclose any of Kytch's confidential information "for any purpose other than [] evaluat[ing] the [Kytch] Solution" as part of the Kytch Trial. Kytch Trial Agreement § J.

87.   With these contractual protections in place, Kytch gave customers access to a substantial amount of proprietary information and confidential documents. Kytch also sent several Kytch Solution Devices—each protected by the NDA—for Gamble and the other Kytch Trial participants to use at their McDonald's locations for one purpose: to support and further the Kytch Trial.

88.   Kytch shared its confidential and proprietary hardware and software designs with Gamble and the other Kytch Trial Participants. As explained further below, Kytch is informed and believes that Gamble and other Kytch Trial participants, betrayed Kytch, and their contractual obligations, when they used Kytch's own confidential information to compete against the company. This has caused irreparable harm to Kytch.

89.   Kytch required that this information be protected with the NDA because this confidential information is at the heart of Kytch's business model and is what sets it apart from its competitors, specifically Taylor and TFG.

90.   Kytch's proprietary materials offer a roadmap for a strategy that has never before been attempted in the soft-serve machine industry: using man-in-the-middle technology to communicate with the finicky machines and to stabilize volatile software, all while providing real-time notifications to customers. This offering reduced the need for restaurant operators to pay costly repairs fees to Taylor and TFG.

91.     Kytch introduced the industry to the revolutionary notion that these industrial machines should be controlled by the restaurant owners and artificial intelligence, and that by demystifying the complicated machines and reducing the need for costly service technicians, Kytch could save its customers millions of dollars in recaptured revenue and reduced overhead.  Kytch's cohesive strategy promises enormous returns, far in excess of current outputs from Taylor's technology.

92.     Successfully executing this strategy would require a combination of innovative thinking, expertise in the fast-food industry, and sensitivity to customer needs, together with a willingness to invest significant time and resources into creating the analyses and conducting the product testing to turn the strategy into a thriving business.  Since its inception, Kytch has invested time and effort building out, in painstaking detail, the Kytch Solution Device and the Kytch Solution Platform.

### *Taylor's Ice Cream Machines Are Notorious for Always Breaking Down.*

93.     The majority of McDonald's restaurants are equipped with Taylor Model C602 soft-serve machines.

94.     Although Taylor occupies a substantial share of the market, its machines have been described as unreliable and "notorious for constantly breaking down."

95.     The machines' reputation for breaking led *The Wall Street Journal* to explain in a recent story that "[t]he interruption in ice cream, milkshake, and McFlurry service is so widespread that it has spawned an avalanche of social media complaints in the U.S. and abroad—and conspiracy theories."

96.     In response to the criticism, Taylor has tried to deflect responsibility despite widespread complaints across the world.  Taylor's COO James Minard has referred to news coverage about the machine malfunctions as "Fake news," in what appears to be an attempt to discredit *The Wall Street Journal's* headline bearing the question, "Why is the McFlurry Machine Down Again?"



97.     The ridicule McDonald's has received from the media because of the defective ice cream machines is more serious than the whimsical headlines suggest because some of the problems have alarming public health implications.

98.     A recent study conducted by Dateline, for example, assessed the cleanliness of top fast-food chains, including McDonald's.  According to that NBC News report, "[m]ore than 120 people were sickened after eating ice cream at their local McDonald's."[7]

99.     That is not surprising.  Proprietary data Kytch has developed about McDonald's ice cream machines from an analysis of its customer data revealed that many of the Taylor machines, including the C602, have a manual switch allowing users to bypass mandatory pasteurization and brush cleanings.  A significant portion of the machines in the Kytch Trial operated with this bypass, in violation of public health agency and food safety regulations.

_____

[7] Jack Cloherty, *Dirty Dining: The investigation NBC News producer Jack Cloherty shares the story behind Dateline's cleanliness survey of top fast food chains*, NBC News (Mar. 10, 2005), https://www.nbcnews.com/id/wbna7149927.

- 20 -

100.    Indeed, for years, Taylor's service manuals contained step-by-step instructions to bypass the regulations.[8]

101.    Despite these issues, and in complete disregard of state and county inspection reports confirming that Taylor's machines breach safety protocols, Taylor's pattern of denialism continued for years.

102.    Separate from the serious public health concerns created by Taylor's machines, there are also significant anti-competitive concerns raised by Taylor's and McDonald's conduct in requiring Taylor soft-serve machine owners to have their machines serviced and repaired only by Taylor technicians.

103.    Any remaining plausibility to Taylor's denial campaign evaporated after a software engineer launched www.McBroken.com to compile statistics reflecting the number of McDonald's ice cream machines that are out of commission at any moment.

104.    At the time this lawsuit was filed, McBroken.com reports that more than 11% of the soft-serve machines at McDonald's restaurants in the United States are out of service. These machine outages have cost franchise operators millions of dollars in lost revenue.

105.    Consequently, McDonald's franchisees have gone on record to explain that Taylor's "machines are temperamental and expensive to repair." McDonald's franchisees have also reported that some of the software updates installed by Taylor technicians cause even more glitches and expensive outages.

***Kytch's Product Testing Reveals that Defects Were Built-in to Taylor's Machines.***

106.    Kytch's approach to fixing the problematic Taylor machines has always been a data-driven, iterative process that relies on the collection and analysis of large amounts of data.

---

[8] Many Taylor machines have a jumper placed on the W2 pins on the rear of the machine that disables necessary safety mechanisms. Taylor has been aware of this hazard for years but has taken no action to correct this defect. This violates NSF International's food safety requirements and may endanger consumers.

- 21 -

107.    Before launching Kytch, founders Jeremy O'Sullivan and Melissa Nelson started Frobot, Inc. back in 2011.  Frobot is a fully robotic frozen yogurt dispenser that produces made-to-order frozen confections.  Frobot is designed to interact with soft-serve machines made by Taylor.

108.    Through that venture, Frobot informed Taylor's leadership about its device that promised to augment the capabilities of Taylor's machines, including automation and increasing safety offerings.

109.    This innovation required years of product development and additional safety testing given that the process involves serving dairy products to the general public.  Taylor's response to Frobot's prototype was positive, and years—and hundreds of thousands of dollars—of product development followed.

110.    Frobot had a small fleet of Taylor machines, and Nelson and O'Sullivan soon learned that the only way to keep the machines up and running is through frequent and expensive service visits.

111.    After only a few months of gathering data, it became clear to Kytch that Taylor's machines were not very robust, and the finicky software was constantly causing outages.

112.    Kytch was founded in 2018 as a subsidiary of Frobot, and its original purpose was a safety add-on to the automated soft-serve machines.  In contrast to Frobot's focus on automation capabilities, Kytch focused on data and software to optimize the soft-serve machines and reduce outages.

113.    The Kytch Solution officially launched in July 2019 at Tesla's factory in Lathrop, California, before expanding to fast-food restaurants in the broader San Francisco area a short time later.

114.    Kytch learned that Taylor machines are designed to prohibit users from accessing the fulsome "Technician's Menu" that operates the machines.  Taylor's menu contains confusing messages that leave McDonald's franchisees frustrated and unable to operate the machine, causing them to "call the technician" for even minor problems with their Taylor machines.  One example of Taylor's cryptic error messages is below.



*Kytch's Innovative Technology, Trade Secrets, and Confidential Information*

115.     Kytch's flagship invention is known as the Kytch Solution Device: powered by a tiny Raspberry Pi computer with software to understand the communication between the machine's logic board and interface system.

116.     There is nothing like the Kytch Solution Device on the market, and the ability of a competitor to access and test the device would allow the competitor to obtain an extraordinary head start in the creation of a competitive device.

117.     The Kytch Solution Device is an easy-to-install device that can be bolted on the soft-serve machines.  When mounted on the machine and connected to Kytch's software and online platform, Kytch's IoT technology and data retrieval processes enable restaurant operators to see exactly what is going on with their machines.  Kytch's intensive data-analytics and automated processes work in tandem to optimize machine performance, and Kytch can actually detect errors in the machines and notify users in real-time before the machines malfunction.

118.     When the Kytch Solution is connected to the internet, the software sends messages to www.Kytch.com.

119.     Working in tandem with Kytch's data retrieval and data analytics systems, Kytch's proprietary and confidential online platform at www.Kytch.com ("Kytch Solution Platform") provides customers with more ways to understand and interact with the soft-serve machines.

120.     There is nothing like the Kytch Solution Platform on the market, and the ability of a competitor to access and observe in how the Kytch Solution Platform operates in real time would allow a competitor to obtain an extraordinary head start in the creation of a competitive device.

***The Kytch Solution Is Safe and Certified by Intertek to Comply***

***with FCC Regulations and UL Standards.***

121.    Kytch's central mission is to improve the safety and reliability of soft-serve machines.  Kytch spent years and many hundreds of hours monitoring the soft-serve machines and creating a solution that incorporates Taylor's existing safeguards.

122.    The Taylor machine's marketing materials say that Taylor has "gone to extreme efforts to design" mechanisms to keep users safe.   The Kytch Solution complements and incorporates these safety efforts.

123.    One example is the magnetic lock system.  When the freezer door is removed, users can be exposed to moving parts of the soft-serve machine, such as the beater depicted below.



(Taylor Model C602 Beater)

124.    Rotating blades attached to the beaters scrape soft serve mix from the walls of the machine's cylinder as it freezes.  Taylor's magnetic interlock system is triggered whenever the freezer door has been opened or removed (and the beater is exposed).  This system disables the motor and prevents users from inadvertently engaging the beater or other moving parts within the machine while the door is open.  Removing the freezer door also automatically disables the buttons on the control panel to ensure that the motor is not turned on.

125.    Kytch operates within these critical safety functions, and Kytch cannot and does not override the magnetic interlock system or the disabled control panel.  Kytch also disables its

automation features when users are cleaning the interior of the machine and when anyone presses the physical buttons on the control panel.

126.   On top of these safety features, the Kytch Solution Device ("KSD") cannot operate when machines are unplugged or turned off.  Taylor's operations manuals state that technicians must turn off and unplug the soft-serve machines before completing any maintenance or service repairs.[9] These safety steps are standard in the industry.

127.   Far from endangering customers, Kytch made the C602 machines *safer* by allowing users to monitor their machines and by flagging when employees miss cleaning or heating cycles required by food safety regulations.  For example, Kytch discovered that many of the C602 machines have a jumper installed on the W2 pins on the rear of the machine.  This jumper disables necessary safety mechanisms related to mandatory pasteurization and heating cycles.  Taylor has been aware of this hazard for years, but it has taken no action to correct this defect.  This violates NSF International's food safety requirements and may endanger consumers.

128.   Kytch instructs customers how to avoid this dangerous condition.

129.   The data Kytch gathered demonstrates that the KSD actually *improves* the C602 and other Taylor machines by *increasing* uptime and preventing common errors before they occur.

130.   In addition to Kytch's in-house safety testing, Intertek—an independent lab designed to test and certify products to North American safety standards—has certified that Kytch's products comply with the same safety standards as Taylor's products.

131.   Manufacturers like Kytch that sell radio transmitters in the United States must have their products tested by FCC accredited labs and certified by the FCC for electromagnetic compatibility ("EMC") compliance.  Radio devices like the KSD are subject to a series of FCC regulations, commonly referred to as "Part 15."  47 C.F.R. Part 15.  To obtain certification for such devices, a company must submit a representative sample device to an independent testing facility

---

[9] The manual states: "The main power supplies to the machine must be disconnected prior to performing any repairs."

that determines, among other things, whether the power output levels for the devices comply with FCC Part 15 regulations.

132.    That is precisely what Kytch did.  In June 2019, Kytch contracted with Intertek to subject the KSD to rigorous safety testing at Intertek's laboratory.  Intertek completed those tests and confirmed that the KSD complied with FCC regulations and that it did not present a safety hazard for end-users.

133.    Intertek issued a report explaining its findings.  "Based on the results of our investigation we have concluded the [KSD] complies with the requirements of [FCC Part 15 Subpart B and Industry Canada ICES-003 Issues 6]."  Intertek also confirmed that the KSD satisfies radiated emissions standards and that it "met the radiated disturbance" and "conducted disturbance" FCC requirements.[10]

134.    This EMC compliance testing was not the only safety testing Intertek completed.  The KSD was also certified through Intertek's Extract-Transform-Load ("ETL") testing.  ETL testing ensures that data is accurately loaded from the machines and transmitted to the Kytch device.  ETL testing also verifies the data at various middle stages of the communications process between source and destination.

135.    Intertek completed additional testing including input tests, marking tests, temperature tests, and tests to classify electrical energy sources.  Kytch passed these tests with flying colors.  After this independent testing, Intertek concluded that the KSD "has been evaluated and found to comply with the applicable requirements" and standards developed by UL.  (UL is a corporation that promulgates and certifies compliance with safety standards for thousands of consumer and other products.)

136.    Through this testing, Intertek confirmed:

---

[10] Radiated emissions are unintentional energy that escape the equipment in the form of electric, magnetic, or electromagnetic fields.  Conducted emissions are unintentional energy carried out of the equipment on the equipment's power cables or attached signal cables.

- The KSD "***does not pose a risk of shock hazard***" because its power source is "not accessible to an end user."

- "All uninsulated live parts in primary circuitry are [] housed within a[n] enclosure" and are "not accessible to end users."

- "All ferrous metal parts are protected against corrosion."

137.   These are just a few examples of Intertek's findings confirming that the KSD is safe. Indeed, Intertek would not have certified the KSD if it determined that it presented a serious risk of human injury as McDonald's and Taylor later claimed.  Each KSD is marked with Intertek's certification explaining that it conforms with UL standards.

138.   Kytch displays this certification label prominently to notify users that it has passed rigorous—and time consuming—safety testing.  Thus, McDonald's had actual knowledge that Kytch had passed safety tests.  Kytch has always prioritized product safety: not a single customer has ever reported an injury using the KSD or the Kytch Solution Platform ("KSP").

***Taylor Tries to Intercept the Kytch Solution to Access Kytch's Trade Secrets.***

139.   Kytch launched the Kytch Solution Device in April 2019.  Taylor started making efforts to obtain the device almost immediately.

140.   During routine monitoring of its website (www.kytch.com) in April 2019, Kytch discovered that Taylor representatives were trawling Kytch's home page, including its Terms of Service.  This and other communications notified Taylor that Kytch's operations—including its proprietary information, and computers—were based in Fremont, California.

141.   After scraping information from Kytch's website, Taylor attempted to purchase a KSD.  On April 23, 2019, Taylor VP of Quality and Customer Service Dan Domberg instructed Taylor Service Technology Manager Heather Jordan to order a KSD through www.kytch.com. Kytch flagged, and then canceled, Ms. Jordan's order after matching her shipping address to Taylor's headquarters.

142.    When Taylor learned Kytch blocked its order, Taylor's VP of Quality and Customer Service told Heather Jordan that Taylor "should've ordered [the Kytch Solution] in stealth mode," adding a smiley face emoji for emphasis.



143.    This marked the beginning of Taylor's attempts to secure a KSD.  A short time later Taylor COO James Minard admitted that Kytch's technology was more advanced than Taylor's and PHD's.  In a May 16, 2019 email, Minard directed Taylor's Controls Manager Joseph Beard to buy a Kytch Solution device because it "[s]eems we might be missing something in our approach to our connected equipment."  Taylor's CEO Jeremy Dobrowolski is copied on the message.

144.    Taylor followed through on Minard's instruction, this time opting to proceed against Kytch using "stealth mode."  Taylor ordered KSDs through its outside counsel at Brinks Gilson to try to circumvent Kytch's security protocols. But Kytch identified the prospective buyer as Taylor's legal counsel and blocked the order.

145.    Taylor doubled down on its efforts and its counsel hired at least two private investigators using assumed names to try to avoid raising suspicion.  Just like the previous orders, Kytch's security precautions flagged and thwarted these attempts from Taylor to obtain KSDs.

Taylor's mission to covertly retrieve Kytch Solutions—and the attention Kytch received from Taylor's c-suite—is further evidence that Kytch's technology has substantial economic value.

146.    In May 2019 Taylor's CEO Jeremy Dobrowolski wrote in an email that Taylor was "continu[ing] to pursue the acquisition of one of [Kytch's] devises [*sic*]."  At the same time, Taylor and PHD were trying, albeit unsuccessfully, to invent a competing solution for McDonald's.

147.    Unable to compete with Kytch, Taylor changed tack in June 2019 and directed its outside counsel to send Kytch a cease-and-desist-letter.

148.    After spending the previous six months trying to secretly obtain a KSD, Minard emailed and called Kytch in October 2019 to discuss a potential licensing arrangement.  Minard told Kytch that Taylor was interested in purchasing rights to some of Kytch's technology.

149.    These discussions ended, however, after Kytch informed Taylor that it would not share any proprietary information about the KSD or KSP unless, and until, Taylor signed an NDA.

150.    According to Minard, by the end of 2019—*less than four months after Middleby acquired PHD*—"Taylor decided to stop further development on its own IoT platform" because Taylor lacked the "resources and expertise" necessary to "devote to the development of IoT technology."

151.    Kytch's security precautions flagged and thwarted these initial attempts from Taylor and its confederates to obtain the Kytch Solution.  But these efforts to obtain Kytch's intellectual property provide further evidence that Kytch's innovative product has substantial economic value.

### *The Kytch Trial Expands to McDonald's in Fall 2019 as McDonald's Rejects Taylor and PHD's Open Kitchen.*

152.    While Taylor was trying to secure a KSD, demand for Kytch continued to grow throughout the spring and summer of 2019 as more restaurant operators adopted the KSD and KSP. The earliest participants in the Kytch Trial were based in California.  But by fall, Kytch spread to McDonald's restaurants across the United States.

153.    Just as Kytch was gaining momentum with independent McDonald's operators, Taylor and PHD's Open Kitchen efforts were failing.  McDonald's rejected Open Kitchen as

premature to place into the McDonald's system, and Taylor and PHD were forced to sideline their IoT efforts.

154. Kytch customers were overjoyed to see their volatile Taylor machines modernized. Customer goodwill grew as Kytch reduced the cost of ownership by minimizing Taylor repair costs. Franchise operators reported increased revenue from their frozen offerings, and Kytch continued to spread like wildfire.

155. As explained above, the iterative nature of Kytch's innovations made the Kytch Solution smarter as it gathered more data about Taylor's machines. This means that with more runtime, the Kytch Solution becomes *more* efficient at reducing downtime and associated service costs.

156. Kytch spread to McDonald's in the fall of 2019. In October of that year, Kytch was featured at the National Owners Association conference in Dallas, Texas, and it showcased the Kytch Solution in front of the largest association of independent U.S. McDonald's franchise operators.

157. These independent franchisees control and operate several trade organizations, including the NSLC. The NSLC collaborates with McDonald's supply chain leadership and its "Equipment Team"—led by Tyler Gamble—provides valuable insight to McDonald's concerning product innovations to integrate into McDonald's system.

158. One of the key focus areas for the Equipment Team is to identify solutions for McDonald's soft-serve machine problem through the "McFlurry Task Force," also known as the "Shake Machine Reliability Project."

159. Taylor and McDonald's leveraged the NSLC and the Equipment Team to access Kytch's Confidential Information and trade secrets. Specifically, Taylor coordinated with NSLC Equipment Team Lead Defendant Tyler Gamble, NSLC Chair and Vice Chair Jon Kelley and Eric Wilson, NSLC Competitive Advantage Team Lead Larry Miller, and Logistics Team Lead Laura Bucar.

***February 2020: After Reading News Reports of Kytch's Success,***

***Defendants Infiltrate Kytch's Product Trial to Misappropriate Kytch's Trade Secrets.***

160.    By 2020, McDonald's franchise operators enrolled in the Kytch Trial to test the Kytch Solution at restaurants in Arkansas, California, Connecticut, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Washington, and Wisconsin.

161.    As a result of this massive expansion, Kytch is informed and believes that it became the largest independent IOT/connectivity software vendor for the shake machine in the McDonald's system.  By all appearances, the Kytch Solution was a viable remedy to many of the problems that had troubled Taylor soft-serve machines and frustrated customers for years.

162.    In February 2020, news outlets reported on Kytch's success.



**LICK OF TIME** McDonald's ice cream machines may never break down on you again – thanks to new machine

Feb 12 2020, 19:42 ET | Updated: Feb 12 2020, 23:07 ET

New device may prevent McDonald's ice cream machines from breaking

By **WWAY News** · February 12, 2020 11:28 AM

McDonald's and Burger King franchisees are raving about a new device that can update their notoriously broken soft-serve machines

Shoshy Ciment  Feb 11, 2020, 10:21 AM

A New Device Promises to Keep McFlurry Machines Up and Running

Already popping up in some restaurants, Kytch is hoping to end the scourge of broken down McDonald's soft-serve machines.

By Mike Pomranz  Updated February 13, 2020

163.    A February 11, 2020 *Business Insider* article discussing Kytch's innovative product was an inflection point.  The article—titled "McDonald's and Burger King franchisees are raving

REDACTED VERSION - FIRST AMENDED COMPLAINT

about a new device that can update their notoriously broken soft-serve machines"—highlights many of the problems at McDonald's. It also describes Kytch as a viable solution to this problem because the new technology "corrects unnecessary malfunctions" that cause downtime.

164. On February 12, 2020, McDonald's mentioned Kytch in its "Daily Briefing." The Daily Briefing describes some of the news coverage and explains that McDonald's competitors—specifically Burger King, Tim Horton's and Popeyes—are "'doubling down' on [their] modernization strategy."

165. Customers contacted McDonald's and Defendants that same day asking how to sign up for Kytch. This created a problem for Taylor and McDonald's because Kytch was highlighting the problem with the broken soft-serve machines, and Taylor and PHD lacked the technology to compete with their own IoT solution.

166. Taylor and PHD exchanged emails describing their plan to take Kytch's Confidential Information and trade secrets. One such email says that Taylor and PHD were trying to develop a "Kytch Replacement" and the central question for their competing product was: "How does it compare with Kitch's [*sic*] solution?"

167. On February 12, 2020, Taylor's CEO, Jeremy Dobrowolski, and its COO, James Minard, scheduled a one-hour teleconference for the following day to discuss "Kytch, and Options for Data Collection for McDonald's Equipment." Senior leadership from McDonald's and Middleby were invited to the call, along with two independent McDonald's franchise operators, Defendant Gamble (McDonald's Equipment Team Lead) and Eric Wilson (who previously served the same position).

168. By this point, Taylor had been trying to circumvent Kytch's security protocols to obtain KSDs for ten months.

169. Because Taylor was unable to obtain the Kytch Solution through its employees, its lawyers, or its private investigators, Kytch is informed and believes that Taylor worked with McDonald's franchisees, including Tyler Gamble, to infiltrate the Kytch Trial.

170. Taylor and McDonald's scheduled the February 13, 2020 call to direct McDonald's operators—including Gamble—to infiltrate the Kytch Trial and to obtain Kytch's proprietary insights and confidential information.

171. Gamble and others would then share these insights and trade secrets with McDonald's, Taylor, and PHD so they could copy Kytch's technology.

172. Before the meeting, Taylor sent a memo to McDonald's, Gamble, and Wilson providing "a summary of the Kytch device."

173. The presentation contains pictures of KSDs from a South Carolina McDonald's franchise operator. Taylor admits in the document that it "***attempted to obtain a Kytch device through multiple channels and has been unsuccessful in doing so,***" and explained that Taylor was "***continuing their efforts to obtain a unit from Kytch.***"

174. A short time later, Kytch CEO Jeremy O'Sullivan had a conversation with Gamble and Eric Wilson, NSLC's Vice Chair and prior McDonald's Equipment Team Lead.

175. During this conversation, Gamble said he was familiar with Kytch's ability to navigate, search and fine-tune the inner workings of Taylor's machines. Gamble, along with NSLC Chair and Vice Chair Jon Kelley and Eric Wilson participated in the Kytch Trial a short time later.

176. Tyler Gamble was eager to obtain the Kytch Solution. Gamble also offered to serve as the liaison between Kytch and the fast-food giant, promising to solidify Kytch's relationship with McDonald's.


**Tyler Gamble**
NSLC Equipment Team Lead


**Eric Wilson**
NSLC Vice Chair


**Jon Kelley**
NSLC Chair

177. Unbeknownst to Kytch, after Tyler Gamble contacted Kytch, but before he signed the Kytch Trial Agreement, Taylor COO James Minard asked McDonald's leadership to "[p]lease

- 33 -

let me know when you and your team have secured access to a Kytch unit and I will have my team available for a complete review."

178.    On March 12, 2020—approximately one month after he first emailed Kytch—Gamble called Kytch's founder Jeremy O'Sullivan.  During the call, Gamble said that he would leverage his position with McDonald's Equipment Team to encourage McDonald's to adopt Kytch's technology.  He also said Taylor and McDonald's were offended that Kytch did not approach them directly, and that Taylor intended to manufacture safety concerns to make Kytch "go away" and leave the marketplace.

179.    At the same time, Taylor and PHD continued to struggle to develop their competing product.  Taylor tasked its "Technology Manager" Heather Jordan to develop the user interface for "Open Kitchen."

180.    On March 13, 2020, Jordan complained that PHD lacked the capacity to compete with Kytch.  Taylor was trying to develop Open Kitchen, but PHD was unable to pull data from Taylor's soft-serve machines.  Thus, PHD could not identify when machines experienced errors, when buttons were pressed, or when functions were engaged to display on a user-friendly interface:

> "I think we need to have a heart-to-heart conversation with [PHD].  I'm concerned they don't have the resources to support us.  I sent them U[ser] I[nterface] feedback a week ago and have not been able to confirm when the changes will be made.  I know they're probably in the same situation we are, but we need to understand their capacities before we can make a decision to move forward with them."

### *Gamble Breaches His Contractual Obligations To Kytch.*

181.    On March 19, 2020, Kytch and Gamble entered a valid and binding contract whereby, in exchange for Gamble's covenants of nondisclosure and secrecy, Kytch agreed to provide its trade secrets and Confidential Information—including Kytch Solution and Kytch Solution Platform—to Gamble to use for the sole purpose of furthering the Kytch Trial.

182.    When he signed the Kytch Trial Agreement, Gamble agreed that he would not—nor permit others to—"access or use the Solution in order to build or support, and/or assist a third party

- 34 -

in building or supporting, products or services competitive to any Kytch Solution." (Kytch Trial Agreement § N.)

183. Despite these covenants, Gamble enrolled in the Kytch Trial to misappropriate Kytch's trade secrets to benefit Taylor and McDonald's. Gamble shared Kytch's trade secrets and Confidential Information with TFG and Taylor. Specifically, Gamble provided a KSD to TFG, and he even gave TFG his login credentials after sending screenshots of the KSP and forwarding notifications from Kytch.

184. On May 19, 2020, Gamble text messaged TFG principal Blaine Martin and TFG technician Ben Rhodes (1) copies of notifications he received from the KSP and (2) a screenshot of the password protected portion of the KSP. Gamble's text messages show that Gamble repeatedly forwarded KSP notifications or screenshots to Martin, Rhodes, and other unauthorized third parties.

185. TFG principal Blaine Martin and TFG employee Ben Rhodes unlawfully accessed the Kytch Solution Platform after trafficking Tyler Gamble's passwords despite reading and accepting the Kytch Terms of Service.

186. On June 3, 2020, Blaine Martin asked Tyler Gamble if TFG could "access" the KSP "to see the data it provides."

**RE: Kytch Health Alert: Stonebrook 1**

Blaine Martin <bmartin@tfgroupllc.com>
Thu 6/4/2020 12:55 PM
To: Gamble Tyler (US Partners) <tyler.gamble@partners.mcd.com>
Would it be possible for us to have access to the system to see the data it provides

Thanks,
Blaine Martin
TFG Companies
Louisiana – Mississippi – Tennessee – Arkansas
504-415-2795
bmartin@tfgroupllc.com

187. Gamble agreed. Text messages with Gamble and TFG demonstrate that Rhodes "logged in" to the KSP "with Blaine [Martin]'s credentials." In another text exchange with Rhodes, Gamble admits that he gave TFG principal Blaine Martin "a login to the [K]ytch device." (This

"login" references the KSP.)  Later that day Taylor started receiving notifications that the KSP sent to Gamble's account.

188.    A short time after Gamble provided a KSD to TFG, Gamble invited someone named "Matt," using the telephone number for Blaine Martin to access the KSP.  Martin used the registered name "Matt" as an alias to try to hide the fact that he was accessing the KSP without permission.

189.    This account, tied to TFG, obtained access to Kytch's Confidential Information and trade secrets through the KSD and KSP.  This includes access to all historic notifications, the remote control—and ultimately Kytch Rewind—using Gamble's account.  The confidential customer data from the KSP, which Gamble allowed the TFG to access, and the information represented by these data is attached as **Exhibit 3**.  For Gamble or Taylor to obtain these data would have taken years, millions of dollars, and a vast trial program.

190.    Kytch has forensically confirmed that the fake account associated with the TFG was used to access the Kytch Solution Platform on multiple occasions.  (Nelson Decl. (May 6, 2021) ¶ 128.)

191.    There is also other significant forensic evidence that TFG accessed Kytch's confidential technology. The KSD Gamble provided to TFG was disconnected from the internet beginning in June of 2020 until February 2021.  However, its SD card was 90% full when it was finally re-connected to the internet.  The device log indicates that someone at TFG had been accessing the KSD, and that the device was powered on and used for weeks after going offline.

192.    ***Two days*** after Gamble gave TFG access to the KSP, TFG sent a screenshot of the password-protected portions of the KSP to Taylor's Technology Manager Heather Jordan.  Martin wrote: "[t]his is a picture of the Kytch screen.  Wasn't sure if anyone ever shared what it looked like with you."

193.    Heather Jordan led the development of Open Kitchen, specifically the user interface experience.

***Throughout 2020, Gamble Continues to Share Kytch's Trade Secrets***

***with Taylor and McDonald's.***

194.     Gamble continued to leak Kytch's trade secrets to Taylor, TFG and McDonald's in Summer 2020.  Taylor, McDonald's, and PHD pressured Gamble and other Kytch Trial participants to violate their binding NDAs by sharing Kytch's proprietary insights and helping them develop Open Kitchen.

195.     Gamble has admitted that Scott Nicholas, Taylor's Business Manager for McDonald's, "was asking franchisees" enrolled in the Kytch Trial "about the relative advantages" between Kytch's product and Open Kitchen.

196.     Likewise, Gamble has admitted that he was talking with "McDonald's engineers" about the confidential Kytch Trial throughout 2020.

197.     TFGroup LLC is a franchised servicer and distributor for Taylor and its machines. On its LinkedIn page, TFG describes itself as "[a] leader in the foodservice equipment segment, TFGroup utilizes analytical advances to ensure speed of service, reduction of equipment downtime and labor savings."[11]

198.     Kytch's investigation determined that on May 27, 2020, Tyler Gamble's Kytch Solution identified as "Brownsville" went offline.  The device remained offline for eight months, and when Kytch questioned Gamble about its downtime, he claimed that the Taylor machine had an issue with one of its compressors.

199.     One week after Gamble's Brownsville Kytch Solution Device went offline, Kytch issued a real-time alert from Gamble's Kytch Solution identified as Stonebrook 1.  The alert stated "L PRODUCT TOO VISC" was occurring frequently.

200.     Kytch ████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[11] "TFGROUP EXPANDING TAYLOR BRAND INTO ARKANSAS AND N. LOUISIANA MARKETS," LinkedIn, April 16, 2021, https://www.linkedin.com/posts/tfgcompanies_tfgroup-expanding-taylor-brand-into-arkansas-activity-6788613873491603456-1Zam.

1       █████████████████████████████████████       Kytch also provided

2  specific tips on how to correct the problem.

3       201.    Tyler Gamble shared the message with TFG, and Taylor subsequently adjusted its

4  programming to account for the error.

5       202.    When Gamble's Brownsville device was connected to the internet again in February

6  2021, its SD card was 90% full.  The device log indicates that someone had been accessing the

7  Kytch Solution Device, and that the Device was powered on and used for weeks after going offline.

8  However, according to the device log, the Kytch cables were disconnected periodically so the device

9  could not retrieve information or connect to the internet.  The uninterrupted reverse engineering of

10 the Kytch Solution Device evidenced by this behavior would provide Taylor and TFG with a

11 dramatic head start in designing a competing device.  There is nothing like the Kytch Solution in

12 the marketplace.  Kytch restricts who has access to its devices because the ability to reverse engineer

13 the device exposes Kytch's trade secrets.

14      203.    In April 2021, a spokesperson from Middleby Corporation—Taylor's parent

15 company—confirmed that a "Tennessee distributor reported to Taylor that its servicer removed a

16 Kytch device" from one of Kytch's trial participant's stores.

17      204.    Upon information and belief, this "Tennessee distributor" is TFGroup LLC, and the

18 trial participant is Tyler Gamble.

19      205.    Kytch has forensically confirmed that the fake account associated with TFG was used

20 to access the Kytch Solution Platform on multiple occasions and the unauthorized access from

21 TFG's account continued through January 17, 2021.

22      206.    Kytch's  investigation  also  determined  that  Gamble  unlawfully  invited

23 Mike Zagorski to access Kytch's trade secrets and Confidential Information.

24      207.    The invitation was sent from Gamble's account and it says "Kytch invite for

25 Gamble."

26

27

28

- 38 -
REDACTED VERSION - FIRST AMENDED COMPLAINT



208.    Mike Zagorski is the Director of Global Equipment Development at McDonald's Corp. and Kytch did not authorize Gamble to invite Zagorski to access Kytch's interface.  Kytch's investigation has not uncovered evidence that Mr. Zagorski accepted the invitation.

209.    On January 29, 2021, right around the time they were contacted about another Business Insider article covering Kytch, Tyler Gamble and his father Jeff Gamble both logged in to the Kytch Platform and deleted the users (including Blaine Martin and william_p@eplus.net) that they had invited to access Kytch's trade secret information.

210.    Despite registering his Kytch devices for use in Tennessee and Mississippi, Kytch's forensic records confirm that the Kytch Solutions Gamble ordered have been accessed—likely by Taylor and TFG—in Little Rock, Arkansas; Ponchatoula, Louisiana; and New Orleans, Louisiana.

211.    By using the Kytch Solution at these unauthorized locations, Gamble breached the Kytch Trial Agreement.

212.    While contractually partnering with Kytch, Gamble was, in fact, stealing Kytch's Confidential Information and trade secrets in the marketplace and passing them to Taylor and TFG.

213. In June 2020, Tyler Gamble sent text messages to McDonald's Director of Global Equipment Development Mike Zagorski about the Kytch Solution device. Zagorski followed-up with Gamble via email, and asked Gamble to meet with Taylor's leadership—including Taylor's CEO and COO—to "catch up [] and understand what [he's] learned, like[s], dislike[s], etc. so far about [his] experience" with Kytch.



213. (continued)

From: Zagorski Mike <Mike.Zagorski@us.mcd.com>
Sent: Thursday, June 18, 2020 12:54 PM
To: Zagorski Mike (US Partners); Dobrowolski, Jeremy; Minard, Jim; Nicholas, Scott
Subject: Kytch/Shake Machine Connectivity
When: Tuesday, June 23, 2020 10:00 AM-10:30 AM (UTC-06:00) Central Time (US & Canada).
Where: WebEx

Tyler –

I had a call with the Taylor team this morning about multiple topics, and mentioned your text about the Kytch device. We'd love to take a few minutes to catch up with you and understand what you've learned, like, dislike, etc. so far about your experience.

Let me know if this time doesn't work for anyone and we can reschedule. Thanks!

214. The following people were invited to join Tyler Gamble on that June 23, 2020 call: Jeremy Dobrowolski (Taylor's CEO), James Minard (Taylor's COO), Scott Nicholas (Taylor's Senior Business Manager for McDonald's), Mike Zagorski (McDonald's Director of Global Equipment Development), and John Sulit (McDonald's Director of Global Strategic Sourcing).

215. Gamble disclosed Kytch's Confidential Information and trade secrets during the call, and he described "the overall satisfaction of the Kytch device as it compares to Taylor['s] competing device." Gamble also shared his reaction and thoughts concerning Kytch's technology, proprietary information, and customer experience. Taylor COO James Minard has admitted that Gamble "showed the Kytch platform" via screenshare so that Taylor and McDonald's representatives could access the password-protected portions of the KSP.

216. Minard captured images of Gamble's screenshare reflecting password-protected portions of the KSP. Minard screenshotted the portion of the KSP that controls one of the KSDs that Gamble was assigned as a Kytch Trial participant.

217. Another one of Minard's screen captures shows the portion of the KSP where Kytch customers input a code to access their KSD and remotely control their Taylor soft-serve machines.

- 40 -

218. A third screenshot Minard captured shows notifications of the KSP displays including the machine's fault and lockout and heat cycle histories.

219. Minard's screenshots also show that Gamble shared screens of Taylor's more limited online interface to compare it with the KSP.

220. McDonald's Director of Global Sourcing thanked Gamble in an email for providing confidential, trade secret information about Kytch: ***In regards, to Kytch, we appreciate that you've been keeping us informed of your findings on this aftermarket technology that you had installed in your Taylor Shake Sundae machine.***

221. Taylor and PHD tried to ramp up product development after receiving feedback from Gamble. But instead of coming up with their own innovations, Taylor's COO James Minard emailed Taylor engineer Joseph Beard to ask him, "So how can we do the same thing Kytch is doing as far as sending commands from a remote interface[?]"

**From:** Minard, Jim
**Sent:** Wednesday, July 8, 2020 2:23 PM
**To:** Beard, Joseph
**Subject:** Remote Access
**Attachments:** Kytch Review Conference Call 6-23-2020.docx

So how can we do the same thing Kytch is doing as far as sending commands from a remote interface. Please see my report.....


Sincerely,



**James J. Minard |Chief Operations Officer**
**Taylor Company**

222. In another email, dated July 15, 2020, Minard says to "[t]ake today's design" of the Open Kitchen "[a]nd make it more 'user friendly' (Kytch Screenshot below)."

- 41 -
REDACTED VERSION - FIRST AMENDED COMPLAINT



***The Largest Group of Independent McDonald's Franchise Operators***

***Endorses Kytch in October 2020.***

223.    Despite these sustained efforts to misappropriate Kytch's trade secrets, Kytch continued to grow throughout 2020.  Kytch customers gave positive reviews, praising Kytch for reducing unnecessary service fees and for finally bringing clarity to Taylor's finicky machines.  Its customer retention rate exceeded 90%.

224.    Restaurant operators' interest in Kytch spread like wildfire, and by October 2020, hundreds of McDonald's restaurants across the country relied on Kytch to keep their soft-serve machines up and running.  Kytch—through the Kytch Trial—demonstrated that its technology was outpacing its peers in the competitive smart kitchen industry.

225.    On October 7, 2020, the National Owners' Association endorsed Kytch at its annual conference.

226.    The NOA endorsement brought more unwanted attention to Taylor's soft-serve machines.  *Business Insider* published a story the next week explaining that because of Kytch,

- 42 -

"McDonald's franchisees are taking matters into their own hands to fix the chain's notoriously broken soft-serve machines."[12]

227.    The article also reported that McDonald's "soft-serve dilemma is not something that can be ignored any longer" because "a software company called Kytch has put out a device that corrects for machine error and helps machine users understand the details of the machine's behavior."

228.    McDonald's acknowledged that it could not compete with Kytch because development of Open Kitchen had stalled.  Taylor and McDonald's had "been hung up with Technology team since June to work on [their] platform," and McDonald's leadership complained about the lack of progress, explaining "[t]hings need to go much faster."

229.    Less than a week after the *Business Insider* article was published, a software engineer launched McBroken.com, a website that compiles statistics reflecting the number of Taylor soft-serve machines that are out of commission at any one moment.



_____

[12] Shoshy Ciment, "McDonald's franchisees are taking matters into their own hands to fix the chain's notoriously broken soft-serve machines," Business Insider (Oct. 16, 2020), https://www.businessinsider.com/mcdonalds-franchisees-will-tackle-soft-serve-machine-problems-alone-2020-10.

- 43 -

230. Public backlash against McDonald's was swift.



***Taylor and McDonald's Launch a False Advertising Campaign to***

***Unlawfully Compete Against Kytch.***

231. Shortly after the NOA conference, Kytch quickly gained market share as it spread to hundreds of McDonald's locations throughout the country. This sent Taylor, McDonald's, and PHD into crisis: Open Kitchen was nowhere near ready to launch but Taylor and McDonald's were desperate to drive Kytch from the marketplace.

232. They knew they had to create a stall tactic to interrupt Kytch's rapid growth and customer acquisition trajectories.

233. On October 16, 2020, Gerard Giustino–Chief Customer Officer at Middleby–sent an email to Jeremy Dobrowolski (CEO at Taylor), James Minard (COO at Taylor), and Scott Nicholas (Taylor's Senior Business Manager for McDonald's) acknowledging that the Kytch Solution works: "Many operators who are testing the solution feel that the Kytch solution actually eases operations and helps to reduce complexities of the machine."

234. The email continues, "Mike [Zagorski] (McDonald's Director of Global Equipment Development) mentioned that without an alternate option [] to consider" McDonald's would be forced to go with Kytch. Mike Zagorski explained, "If we don't have a solution to offer, we have no options."

- 44 -

REDACTED VERSION - FIRST AMENDED COMPLAINT

235.    Three days after this email, Gamble text messaged Jeremy O'Sullivan and asked him if there was "a way to ensure that no one using the Kytch device remotely accesses the machine while a technician may be working on it?  This is a big concern with MHQ for safety reasons."

236.    As a preliminary matter, Taylor and McDonald's did not have "a big concern . . . for safety reasons."  Indeed, Gamble, himself, had warned Kytch six months earlier that McDonald's would fabricate safety concerns to disparage the Kytch Solution and disrupt Kytch's business.

237.    Nonetheless, O'Sullivan responded and explained why the concern because of "safety reasons" was baseless:

> "There are a number of layers of protection.  First, the machine should be powered off and unplugged before any work is started.  This is a standard safety for any equipment.  Second, there is a sensor on the freezer door that when the freezer door is removed prevents the motor from turning on.  Third, we do have a mechanism in place that disables any automation when a user takes control of the front panel by pressing any buttons.  Also the product has been tested and certified for safety to UL standards by Intertek labs."

238.    Jeremy O'Sullivan explained these facts to McDonald's Equipment Team Leader Tyler Gamble less than two weeks before Taylor's false advertisement.  This, alone, should have resolved any safety concerns about Kytch somehow causing serious human injury.

239.    But Taylor intentionally disregarded these facts to pursue its preconceived narrative disparaging Kytch's products.

240.    Indeed, Taylor and McDonald's already knew that Intertek—the same organization that tests Taylor's products—had certified the Kytch Solution; Intertek's seal of approval is displayed prominently on the KSDs.

241.    Several independent McDonald's restaurant operators contacted Gamble and Taylor to try to sign up for the Kytch Trial, and they expected McDonald's to approve the Kytch Solution and incorporate it into the McDonald's system.

242.    But Gamble explained that Kytch "will likely never be approved" because of "[b]ad blood between [Kytch] and Taylor."  Gamble acknowledged that Kytch had the superior product but he told operators to be patient because he was "getting very close to a version of the same type technology by powerhouse dynamics, a division of Middleby.  Taylor's parent company."

243.    Gamble sent text messages to several other franchise operators warning them that McDonald's was about to issue an advertisement attacking Kytch.  In response, an operator named Danielle Marasco said that she thought Kytch was an effective product.  Gamble agreed and said that Taylor and McDonald's "are *supposedly* concerned with the safety issue of being able to remotely control the machine."

244.    Marasco replied with the true motivations for the disinformation campaign against Kytch: ***"They are upset they didn't invent it and they can't profit off it."***

245.    A few days later, Taylor and McDonald's made good on their promise to drive Kytch from the marketplace by fabricating safety concerns about the KSD.  On November 2, 2020, Taylor and McDonald's launched their false and deceptive disinformation campaign against Kytch.  Instead of promoting Open Kitchen through traditional advertising channels, Taylor issued a so-called "IMPORTANT NOTE" to publish false and disparaging statements of fact about the quality and nature of Kytch's product and services.

246.    On November 2, 2020, Taylor directed and published the following false and defamatory statements about Kytch. [13]

> We are pleased to share that the McDonald's GSSS-Equipment Team, in partnership with the NSLC Equipment Sub-Team, has been working on a strategic connectivity solution with Taylor for their Shake Sundae machine. This solution will allow operators to receive text updates from their machine when it's down, and provide data on products dispensed, as well as other relevant information, to help restaurants keep the machine running in its optimal condition. This solution is being designed with long term benefits in mind, and would enable future connection with other equipment in the restaurants.

---

[13]  Taylor contributed to McDonald's advertisements by knowingly inducing and causing the false advertisements to be published, and Taylor materially participated in McDonald's false advertising.  Likewise, McDonald's contributed to Taylor's advertisements by knowingly inducing and causing the false advertisements to be published, and McDonald's materially participated in Taylor's false advertising.

- 46 -

*The Taylor Shake Sundae Connectivity (TSSC) is currently in test [sic] with NSLC operators and the current target for release in the US market is by the end of Q1, 2021.*

**IMPORTANT NOTE:** We have become aware that a few operators may be using an unapproved aftermarket technology, Kytch, on their Shake Sundae machine. As a reminder, any operator that is using this aftermarket "add-on" to any of their machines, will completely void any existing OEM equipment warranty. Additionally, any machine failures that are associated with the installation of Kytch during or after warranty expires, will be the sole responsibility of the operator, not the OEM supplier. The Kytch device allows complete access to all aspects of the equipment's controller and confidential data, including areas where only certified technicians should have access, creating potential equipment reliability issues without the restaurant's knowledge or ability to stop it. Even more concerning, McDonald's has recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury. As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use, and is reminding you that any continued use is not approved and is at your sole risk.

247.   On November 2, 2020, Taylor's directed and published the following false and defamatory statements:

Taylor Shake Sundae Connectivity & Kytch Technology Update

McDonald's US Equipment Team, in partnership with NSLC, has been developing a strategic connectivity solution with Taylor for their Shake Sundae machine. The solution will allow operators to receive text updates when their machine is down, view number of products dispensed, and get other information to keep the. Machine running on optimal condition. *The Taylor Shake Sundae Connectivity (TSSC) is currently in test with NSLC operators and the current target for release to the. US market is by the end of Q1, 2021.*

*IMPORTANT SAFETY NOTE:* We have become aware that a few operators may be using an unapproved after-market technology, Kytch, on their Shake Sundae machine. This action will completely void any existing OEM equipment warranty. More importantly, McDonald's and Taylor have recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine due to its remote operation capability. *As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use. Any continued use is not approved and is at your sole risk.*

248.   Taylor and McDonald's advertisements contain false claims about the Kytch Solution and Taylor's own products and services, including: (1) "the Kytch device creates a potential

very serious safety risk for the crew or technician attempting to clean or repair the machine due to its remote operation capability"; (2) "the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury"; (3) the Kytch Solution is either not secure or is defectively designed such that its remote operation capabilities pose a safety risk; (4) the KSD presents an increased safety risk to Taylor machines vis-à-vis Taylor machines without the KSD; (5) Taylor and McDonald's "recently determined" that the KSD poses a safety risk, even though no determination was made because Taylor and McDonald's deny ever having access to KSD, and their internal records show no evidence of safety risks; (6) the Kytch Solution "creat[es] potential equipment reliability issues without the restaurant's knowledge or ability to stop it"; (7) the hidden and uncontrollable "potential equipment reliability issues" Kytch creates are materially different or more problematic than those caused by Taylor's machines generally, or from repairs performed by a Taylor-certified technician; (8) Taylor was ready for commercialization and planned to release the "Taylor Shake Sundae Connectivity" project (Open Kitchen) by Q1 2021; and (9) Taylor's competing device had similar functionality to the Kytch Solution without presenting the supposed safety or reliability risks. These statements are either expressly contradicted or unsupported by Taylor's internal records.

249. Taylor and McDonald's published multiple versions of this advertisement during the first week of November. One version makes the additional false claim that "the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury."

250. Taylor and McDonald's sent these false advertisements to all McDonald's restaurant operators and Taylor's distributor network. This constituted the majority of Kytch's then-customers, and it was a large portion of Kytch's potential customer pool associated with McDonald's. The false advertisements and defamatory messages destroyed Kytch's goodwill with these third parties.

251.     Taylor and McDonald's also sent these and similar messages to RBI Brands and Coca-Cola in 2020 to further disparage and defame the Kytch Solution.

252.     Taylor and McDonald's knew that their accusations were baseless and that they would mislead consumers.  But Taylor issued the false advertisements as part of a stall tactic to buy more time to develop the Open Kitchen concept.

253.     The advertisements about Kytch are literally false and misleading in multiple respects.  *First*, Taylor and McDonald's misled consumers into believing that they tested the KSD and factually "determined" that Kytch operates in an unsafe and dangerous manner.  This is false.  Taylor has claimed in this litigation that it did not test the KSD; Taylor COO James Minard stated that neither he nor "[any]one else at Taylor, has obtained or possessed a Kytch device, nor had access to Kytch's software platform."  McDonald's has also denied obtaining the KSD for testing.

254.     *Second*, the advertisements are literally false because they state that the KSD is unsuitable or unsafe for use in kitchens, even though Intertek—one of the leading independent testing laboratories in the world—confirmed and certified that Kytch's products are safe for consumers and that they comply with both FCC requirements and safety standards promulgated by UL.

255.     *Third,* far from being a safety hazard or creating "reliability issues," the KSD improves the effectiveness of Taylor's machines.  And, as explained above, Kytch's safety record is unblemished; the company has never received a single report of injury caused by the KSD.

256.     *Fourth*, the KSD was designed to incorporate the safeguards Taylor designed in its machines.  This includes the magnetic interlock system and other safety features that prevent users from inadvertently engaging the machine's motor during cleaning and repair.

257.     *Fifth,* there is no basis for Taylor and McDonald's assertion that Kytch functions "without the restaurant's knowledge or ability to stop it."  As Taylor knows from accessing the KSP, Kytch's interface gives users complete monitoring *and control* of the KSD's functions.  This monitoring is not available on Taylor's machines.

- 49 -

258. Taylor intentionally disregarded these facts to convince customers to "remove the Kytch device from any machines and discontinue all use" of Kytch's products.

259. The context and framing of Taylor's advertising further show that Taylor intended to make—and did make—false statements of facts about Kytch.

260. Taylor purposefully used the words **"IMPORTANT NOTE"** in bold, capital letters to describe the "serious safety risk" and "serious human injury" to create the overall impression in the mind of reasonable consumers and readers alike that Taylor and McDonald's "determined"— through product safety testing or through other scientific findings—that the KSD posed a substantial hazard to health and safety.

261. Taylor intentionally communicated to consumers that the KSD was technically unreliable, unsuitable to use in commercial kitchens, and dangerous to human health and safety.

262. Taylor and McDonald's false statements about Kytch had their intended effect.

263. Shortly after receiving the false advertisement, Kytch's customers started canceling their subscriptions and cutting ties with Kytch. Several Kytch subscribers said they believed McDonald's false and deceptive claim that the Kytch Solution "poses a safety risk" and is known to cause human injury. They also stated that they had no choice but to wait until Spring 2021 to purchase Taylor's competing device.

264. Taylor and McDonald's false advertisements created these consumer reactions and permanently damaged Kytch's ability to compete in the marketplace.

***After Urging Consumers to Boycott Kytch, Taylor Directed Gamble and Others to Continue to Use the KSD to Help Taylor Incorporate Kytch's Technology into Open Kitchen.***

265. Taylor's and McDonald's advertisements describe Kytch as a dangerous, unreliable product. Privately, however, Taylor and McDonald's relied on Kytch's active users to gain access to Kytch's proprietary insights.

266. Taylor and McDonald's enlisted several Kytch customers to test Open Kitchen beginning in November 2020. Taylor had promised to commercialize its Open Kitchen concept by Q1 2021, but Taylor and PHD never intended to meet this deadline.

267.    Rather, Taylor intentionally misrepresented Open Kitchen's release date to mislead consumers into believing that a solution to Taylor's broken machines was imminent.  By telling prospective purchasers that the Open Kitchen would be available soon, Taylor persuaded consumers to stop using—and to refrain from buying—Kytch's device.

268.    Desperate to appear that they would launch Open Kitchen during Q1 2021, Taylor, McDonald's and PHD targeted Kytch users—including Gamble, Eric Wilson, and David Balducci—to attend bi-weekly focus groups to jumpstart the development of Open Kitchen. Meeting minutes from the focus groups confirm that McDonald's and Taylor solicited "feedback from operator[s] using Kytch" to identify "[f]eatures from Kytch that [Open Kitchen] lack[ed]."

269.    Taylor, McDonald's and PHD continued to direct restaurant operators to use the Kytch Solution for at least three months after the November 2020 false advertisements.  Taylor and McDonald's received feedback from Kytch's customers explaining that the Kytch Solution was safe, reliable, and that it would not cause "serious human injury."

270.    The documents further demonstrate that Taylor and PHD copied Kytch's design, user interface, features, and customer preferences.  If Taylor actually believed that Kytch was unreliable and unsafe, it would not have systematically copied Kytch's technology and product offerings.

***Defendants Misappropriate Kytch's Trade Secrets.***

271.    After Taylor's distributor TFGroup LLC gained access to Kytch's trade secrets and Confidential Information, Kytch is informed and believes that Taylor benefitted from the misappropriation of trade secrets because TFG shared the information with Taylor.  Taylor and TFG knew that the information was subject to secrecy agreements and, Kytch is informed and believes, Taylor and TFG induced Tyler Gamble to breach his secrecy obligations to gain access to Kytch's confidential information and trade secrets.

272.    Once its distributor had obtained the Kytch Solution Device, Taylor targeted Kytch's customers—who Taylor knew to be bound by NDAs—and induced them to enroll in Taylor's product trial.  Specifically, according to Taylor's own statements, the McDonald's Equipment Team was developing Taylor's competing product.  Three of Kytch's customers have served on the

Equipment Team: David Balducci, Eric Wilson, and Tyler Gamble.  Additionally, Jon Kelley—another Kytch customer who oversees the equipment team—is also testing Taylor's competing product.

273.    Separately, Kytch's investigation revealed more suspicious activities from trial participants connected to McDonald's NSLC.  Sellia Group executed the Kytch Trial Agreement on August 17, 2020, and it operates 18 locations in Massachusetts and Rhode Island, not far from the headquarters of Powerhouse Dynamics.

274.    David Balducci works through the Sellia Group, and they are members of McDonald's Equipment Team.

275.    On March 20, 2021, Sellia Group's Kytch account was accessed from the Chicago, Illinois, and the Bronx, New York, using a VPN, before logging in from Milford, Massachusetts, the area where the account was registered.

276.    On November 1, 2020, Kytch sent the following message to Gamble.

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

277.    Kytch would later learn that TFG had access to Tyler Gamble's account and, thus, this message.  Taylor knew that Kytch's operating system "KytchOS" presented an existential threat to Taylor's service and repair scheme.

278.    TFG is a distributor for Taylor, but Taylor maintains control over software development and updates related to the machines.  Kytch is informed and believes that TFG was, at all times, working in concert with Taylor to misappropriate Kytch's trade secrets.

279.    Potential investors and customers alike have pointed to Taylor's conduct as a primary basis for why they will not invest in Kytch.  Kytch's communications with at least one investor—Benhamou Global Ventures—stalled after news of Taylor's misconduct became public.

280.    And one of Kytch's most trusted advisors—Narbeh Derhacobian—was forced to pull back conversations with other investors based on the uncertainty flowing from Defendants' misappropriation of trade secrets.

### *Taylor's Competing Product Is Markedly Similar to the Kytch Solution.*

281.    Although initial reports indicated that Taylor would be releasing its Taylor Shake Sundae Connectivity ("TSSC") in Q1 of 2021, the device has not yet been released.

282.    The TSSC product is being rolled out through a Taylor-affiliate entity called Powerhouse Dynamics and its "Open Kitchen" concept.

283.    In January of 2021, Powerhouse Dynamics released images of the new device, and its offerings and trade dress is similar to the machine depicted in a Kytch user-video that was released years earlier.

284.    Specifically, of the hundreds of device functions within the respective products, the three functions Powerhouse Dynamics decided to animate in its marketing materials are identical to the functions depicted in Kytch's rendering.





- 53 -

285. Additionally, although the competing device from PHD has not yet been released, information about the product that is available demonstrates that all of the features in the PHD device are already within Kytch's product offerings.



286. PHD's product offers servings reports which resemble Kytch's method for programmatically opening the menu to retrieve the data at a specified time each day, saving the data, and displaying the data on a website or email notification.

287. Beyond the similarities in the names of the two products, PHD's Kytch replacement device resembles the Kytch Solution's Rewind feature; PHD offers a visual representation of the machine's time on various modes.

288. PHD also offers real time alerts via text message on soft and hard locks presented on the front panel of the machine. Kytch's innovations involve reading messages on the screen and sending real-time alerts regarding those messages.

289. In its current form, the Taylor machine is incapable of connecting to the internet. Therefore, Powerhouse is likely adding a computing module (raspberry pi or the like) that has wifi capabilities. Just like the Kytch Solution.

290. Powerhouse Dynamics's version of Kytch references all Kytch's landmark features, its design, and several components that were subject to binding non-disclosure agreements and that were not publicly available.

291. The fact that Powerhouse Dynamics graphics highlight the display of the hopper temperatures provides further evidence of overlap from Kytch's earlier offering. Displaying hopper temperatures is ***not*** permissible in the default setting of the Taylor machines. Indeed, the display of hopper temperatures deviates from Taylor service manuals. Kytch's innovation was delivering its

- 54 -

users information related to hopper temperatures, and this fact was only shared as Confidential Information to trial participants.

292.    Finally, Powerhouse Dynamics's website indicates that the competing device is being tried out with McDonald's franchise operator and Equipment Team co-lead Louis Buono, Jr.

***Taylor, McDonald's and Middleby Have Repeatedly Misled Consumers with Empty Promises About the "Imminent Release" of Workable IoT Solutions.***

293.    In addition to misrepresenting the quality and nature of the Kytch Solution, Taylor and McDonald's assured consumers that they would launch Open Kitchen during Q1 2021.  But Open Kitchen is still not on the market as of the time of this filing.

294.    Text messages from Gamble demonstrate that in January 2021—two months after the Open Kitchen announcement—Taylor knew it would be unable to meet the advertised release date. Instead of the Q1 2021 deadline, Gamble hedged and assured restaurant operators that Open Kitchen "***should be*** made available by summer 2021."

295.    This is not the first time that Taylor, McDonald's, and Middleby have lied about their ability to fix Taylor's soft-serve machines.  Taylor and McDonald's contend that a fix is right around the corner whenever media outlets report on their broken machines.  But year after year, those fixes never materialize, and Taylor continues to reap the benefits of its repair racket.

296.    For example, *Business Insider* published a story in March 2017 about the broken soft-serve machines.  A spokesperson for the company said that McDonald's was "finally replacing its ice cream machines, after years of complaints from customers."[14]  Four years later, McDonald's has not replaced its machines and the machines are still broken.

297.    Taylor marketed "an addition to" its supposed IoT platform, Taylor ATLAS (the precursor to Open Kitchen), throughout 2018.  Taylor promised that this new product would "provide[] customers the ability to monitor data and initiate service to avoid downtime with Taylor equipment."  But Taylor ATLAS had only rudimentary data acquisition and analysis capabilities

---

[14] Kate Taylor, *McDonald's is making a big change after years of complaints from customers*, Business Insider, (Mar. 3, 2017), ://www.businessinsider.com/mcdonalds-is-getting-new-ice-cream-machines-2017-3.

and, unlike the Kytch Solution, did not allow users to fix malfunctioning soft-serve machines ***or to monitor the soft-serve machines in real-time***.



298.    Taylor never released this product.

299.    As Taylor touted the ATLAS platform in Spring 2019, Middleby started advertising another IoT solution called Middleby Connect.  Middleby's marketing materials describe Middleby Connect as an "IoT-based equipment management system for the food service and baking industries" that provides "one point of access to all [] equipment across Middleby brands [and] orders."  Middleby Connect also promised to "save [customers] money on many aspects of operation" such as "updating programs and software."

300.    Middleby Connect supposedly "g[i]ve[s] [users] a quick and easy overview of all [their] equipment and can notify [them] before operational problems arise . . . [and allows] technician[s] . . . to see the service status of [] equipment and which components need replacement soon," facilitating "preventative maintenance, and more efficient service calls."



301.    These claims are false.  If Middleby Connect had the connective diagnostic and over-the-air update capabilities Middleby claimed, Taylor could have competed with the Kytch Solution—and it would not have developed Open Kitchen in the first place.

302.    Much like Taylor ATLAS, Middleby appears to have abandoned its Middleby Connect technology, and the Middleby Connect website (www.MiddlebyConnect.com) was deactivated around the time Kytch filed this lawsuit.

303.    In April 2019, Middleby acquired PHD, and later that year began marketing PHD's SiteSage technology as a "[c]onnected [k]itchen" "IoT [s]olution" for addressing, among other things, "equipment performance."

304.     SiteSage, like Taylor ATLAS, is a low-tech platform incapable of performing many of the complex diagnostic functions carried out by the Kytch Solution, and without the man-in-the-middle technology that allows users of the Kytch Solution to remotely interact with, and repair, Taylor soft-serve machines.

305.     SiteSage failed to provide a solution and it never launched as advertised.

***Taylor Published the False Advertisements with Reckless Disregard for the Truth.***

306.     Before publishing its false advertisements, Taylor knew—but intentionally misrepresented, disregarded, and concealed—facts that disproved its false preconceived narrative that Kytch is unsafe or unreliable.  The facts include:

- The KSD successfully completed Intertek's rigorous, independent laboratory testing and satisfied applicable safety standards promulgated by the UL and the FCC.  These are the same standards that govern Taylor machines.

- Intertek's seal of approval is featured prominently on the KSDs that Taylor accessed and viewed beginning in February 2020.

- The KSD integrates and is constrained by Taylor's existing safety mechanisms. For example, the KSD utilizes Taylor's magnetic interlock system to disable the machines' control panel.  This immobilizes motor function to protect operators or technicians from being injured.

307.     Tyler Gamble provided this information to Taylor in October 2020.  Taylor also knew the following facts before publishing the false statements about Kytch:

- Kytch improves the reliability of Taylor's machines, as evidenced by numerous news reports reviewed by Taylor's CEO and COO, customer feedback Taylor received describing the increased uptime and improved functioning made possible via the KSD, and because Kytch's customers reported fewer machine outages and their service requests decreased.

- 58 -

- Despite its representations to the contrary, Taylor never actually "determined" that Kytch was unsafe or unreliable. It fabricated those concerns to drive Kytch out of the marketplace as a stall tactic to buy more time to develop Open Kitchen.

- Taylor knows the "reliability issues" are caused by its own machines. For decades Taylor and McDonald's have admitted that the machines are notorious for breaking down.

308. Taylor manufactured the safety concerns as part of its preconceived narrative to destroy Kytch's business. Taylor created this narrative in February of 2020 a short time after *Business Insider* reported on Kytch's early successes. Kytch was Taylor's only competition in the marketplace, and Taylor knew that restaurant operators would adopt Kytch's innovative technology to reduce overhead and increase revenue by improving ice cream sales. In February 2020, Taylor's leadership explained to McDonald's franchise operators Gamble and Wilson that it would deploy the false safety claims about the KSD when Kytch gained traction in the market.

309. Taylor also intentionally avoided obvious sources of information that contradicted its statements. For example, Taylor did not contact Intertek or the FCC to raise these safety concerns. Taylor has also never communicated with Kytch founders Jeremy O'Sullivan or Melissa Nelson to discuss Kytch's safety even though they have a longstanding working relationship dating back to 2014 when Nelson and O'Sullivan first started developing products to improve the safety of Taylor's machines.

310. Taylor's accusations are also inherently improbable. The largest organization of independent McDonald's franchise operators in the world endorsed Kytch as an effective and reliable solution to fix Taylor's soft-serve machines. Taylor knew that many of these franchise operators were directly involved in McDonald's product development efforts, and that they had spent thousands of hours using and observing the KSD. The National Owners Association would not have endorsed Kytch's product if Taylor's explosive safety claims were true.

311. Indeed, the October 2020 endorsement from the National Owners Association triggered Taylor's false advertisements against Kytch. As demand for Kytch grew, McDonald's

- 59 -

informed Taylor that its independent owners were pressuring corporate leadership to adopt Kytch into the McDonald's system to alleviate the exorbitant repair fees they were being forced to pay Taylor.

312.    Taylor's solution was not ready for market so Taylor needed a stall tactic to buy more time to develop Open Kitchen.  So it manufactured the false ads attacking Kytch's safety record and reliability.  It also falsely claimed that Open Kitchen would be released in Q1 of 2021 despite knowing that it needed more than a year to develop its technology.

313.    Taylor also had a strong financial motive to misrepresent the facts about Kytch's products.  Taylor's business model relies on a massive web of distribution partners who repair, maintain, and service Taylor's soft-serve machines.  Kytch threatened this lucrative arrangement when it entered the marketplace because Kytch gave customers the ability to control their machines without needing to hire a Taylor-certified technician.

314.    Separate and apart from these pre-publication indicators of its actual malice, Taylor's conduct **after** publication provides even more evidence of its actual malice and disregard for the truth.  Despite instructing users to "discontinue use" of Kytch's products based on the false safety claims, from November 2020 through January 2021, Taylor directed a subset of customers to continue to use KSDs so that Taylor could incorporate Kytch's innovations into Open Kitchen.

### *Taylor Doubled Down on Its False Claims*
### *Even After Kytch Provided Formal Written Notice of the Facts.*

315.    Kytch tried to mitigate the harm caused by Taylor and McDonald's false advertisements by demanding a full retraction on December 7, 2020.  The letter provided "written notice of the falsity of Taylor's claims about Kytch" and explained why Taylor's claims are false and defamatory:

> There is absolutely zero support, whatsoever, for Taylor's claim that Kytch "creates a potential very serious safety risk" or its accusation that Kytch "can cause serious human injury."  Tellingly, Taylor has failed to even attempt to corroborate its prevarications about Kytch's safety record.  In fact, Kytch underwent extensive product testing and certification at Intertek during product development to ensure that it satisfies all Underwriters Laboratories (UL) electrical safety requirements. Kytch conforms to UL

STD 62368-1 and has successfully completed EMC testing consistent with the requirements of 47CFR Subpart B§§ 15.101 -15.123. There have not been any reported "human injur[ies]" of any kind that were caused by Kytch's devices. To be clear, Kytch does not permanently alter the machine, and it certainly does not disable or otherwise negate any of the machine's factory-installed safety mechanisms. The opposite is true: Kytch warns the user when a particular component of the machine may fail and it monitors how often and effectively each machine is cleaned, thus optimizing operating conditions.

Moreover, Kytch was designed to complement the existing safety tools, including but not limited to quality control of the ice cream's temperatures. The "IMPORTANT NOTICE" fails to provide substantive details regarding what supposedly makes Kytch unsafe to operate. It does, however, claim that Kytch is "creating potential equipment reliability issues without the restaurant's knowledge or ability to stop it." This is a complete fabrication. Rather, Taylor has intentionally created "equipment reliability issues" for years, and its service department has charged hundreds of millions of dollars in fees for repairs that Taylor itself caused. Taylor's claim that Kytch's remote-control capabilities present a safety hazard is also manifestly false. Kytch's functionality only permits users to control a machine in the same way that the machine is operated without Kytch. For example, just like a human operator, Kytch can only utilize the same functions that are available to workers using a Taylor machine without Kytch. In other words, Kytch is restricted by all of the same safety mechanisms that constrain human operators.

316. A copy of the December 7, 2020 letter is attached as **Exhibit 4.**

317. Taylor disregarded Kytch's retraction demand and failed to respond to the merits of Kytch's letter. To date, Taylor has refused to retract its false and damaging accusations against Kytch.

### *Despite Threatening Legal Claims Against Kytch in June 2019 and December 2020, Taylor Systematically Destroyed Documents Until June of 2021.*

318. Kytch's retraction demand notified Taylor that litigation regarding these issues was imminent. The letter also included detailed document preservation language, set forth below:

[U]ntil all issues regarding Taylor's unlawful conduct are fully resolved, we require that you *preserve and retain all documents, data, and electronically stored information relating in any way to Frobot, Kytch, their products, or your attempts to damage Kytch's business reputation and professional standing. These items should be preserved regardless of the medium, format, or device on which they are stored or hosted, and regardless of whether they appear in documents, drafts, notes, emails,*

*text messages, voicemail messages, social media posts, or in any other form. Failure to adhere to this request could subject you to significant penalties, including claims and sanctions for spoliation. Please let us know if this request is in any way unclear.*

319. Despite this clear directive, Taylor failed to take any precautions to instruct employees—including key witnesses in this case—to preserve documents until after this case was filed.

    319.1 According to a sworn declaration Taylor's executive Scott Nicholas systematically deleted "work text messages" about Kytch as recently as June 2, 2021—one month *after* Kytch filed this case and *six months* after Kytch's document preservation notice.

    319.2 Nicholas text messaged Gamble and others "about the relative advantages" of the KSD and KSP compared to Open Kitchen. But Taylor deleted these and other text messages of Nicholas discussing the facts at the heart of this litigation.

    319.3 Taylor communicated with counsel about potential claims against Kytch in February 2020—further showing that Taylor anticipated litigation while it systematically deleted documents that are relevant to this litigation.

320. Taylor anticipated litigation with Kytch as early as June of 2019 when it sent Kytch a cease-and-desist letter based on Kytch referencing Taylor in marketing materials. But Taylor deleted Heather Jordan's entire email account in August 2020, and there is no backup.

321. Jordan was central to Taylor's attempts to misappropriate Kytch's technology. She was Taylor's "Distributor Technology Manager" responsible for "manag[ing] development and support of technology solutions." Documents show that Minard tasked Jordan with attempting to secretly obtain a KSD, TFG sent Jordan screenshots of the KSP, and Jordan (together with Nicholas) worked with Gamble to compare Open Kitchen to Kytch's products.

322. Taylor has also admitted that it deleted Heather Jordan's *entire* email account in August 2020—and there is no backup. Jordan was a key player in Taylor's efforts to obtain Kytch's

KSD (and access to its KSP) and steal Kytch's technology.  In 2019, Taylor COO Minard tasked Jordan with attempting to secretly obtain a KSD.  Jordan (together with Nicholas) communicated with TFG and Gamble to compare Kytch's products to the competing device Taylor was developing.

323.    For example, in March 2020, TFG principal Blaine Martin emailed Jordan to urge Taylor to add ████████████████████████████ to Open Kitchen.  TFG informed Jordan that this alert was "the entire reason" an operator "purchased the Kytch system." Jordan relayed the message to PHD, and she later explained that she was **working to "collect feedback" from Tyler Gamble "to make decisions on our IoT solution going forward."**

324.    This is clear evidence that the Jordan email account contains highly relevant information evidencing the misappropriation. But Taylor failed to produce **any** communications between Jordan and Gamble even though the two worked closely to misappropriate Kytch's trade secrets.  That is likely because Taylor deleted Jordan's emails demonstrating Taylor's tortious actions.

325.    The graphic below depicts the timeline of Taylor's document preservation obligations from June 11, 2019 (when Taylor first sent a cease-and-desist letter to Kytch) to June 2, 2021 (when Taylor finally stopped deleting communications about Kytch that go to the heart of this case).



***Defendant's Tortious and Unlawful Conduct Destroyed Kytch's Business.***

326.    Defendants' tortious conduct grievously injured Kytch—a fast-growing company with devoted customers—at a critical time in its development, destroying the business.

327.    Kytch's enterprise value is a fraction of what it was before Taylor's disparaging ads. Kytch's reputation has become tainted by Taylor's false claims that the KSD is unsafe, known to cause human injury, and unreliable.

328.    Taylor's statements have undermined trust and consumer confidence in Kytch and in the security and reliability of its hardware and software solutions.

329.    The statements go directly to the heart of Kytch's trade. Kytch spent years in product development to create a safe solution to modernize Taylor's soft-serve machines.

330.    Taylor is primarily engaged in the business of selling goods and services, its false advertisements consist of misrepresentations of fact about Taylor's and Kytch's products, and the intended audience of Taylor's statements was actual and potential buyers or people likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer.

331.    Kytch entered the market in late 2019 and roughly doubled its customer base each quarter over its first year of operation. As of October 2020, Kytch had 425 subscribers and a 93% customer retention rate. Due to the significant value the Kytch Solution offered to franchise owners, the company was able to successfully raise prices three times in its first year of operation—from a $0 activation fee and $10 per month, to a $250 activation fee and $29 per month, to a $250 activation fee and $39 per month. Kytch further anticipated raising prices one more time to charge $49 per month.

332.    Beyond the activation fee and subscription fee revenues it was already collecting from its customer base, in October 2020 Kytch had four additional products in development. ***First***, Kytch was testing a remote diagnosis service, offering basic service and advice via telephone and online chat. ***Second***, Kytch's planned e-commerce business would sell replacement parts for Taylor machines and connect them with qualified repair technicians outside the Taylor network. ***Third***, Kytch planned to launch an "API and Data" business, which would monetize the treasure trove of

data Kytch was gathering by observing the Taylor machines. This product relied upon the growth of the Kytch Solution to gather data. **Fourth**, Kytch planned its own operating system, which would be licensed to commercial grade appliance manufacturers like Taylor.

333. Kytch was also in serious talks with prominent Silicon Valley Venture Capital firms to raise a $10 million Series A, on a $50 million dollar valuation.

334. Defendants' conduct radically changed the business landscape for Kytch—its good will among restaurant franchise owners has been destroyed, its business has dried up, and Kytch's innovative solutions are now in Taylor's hands.

335. Beginning in November 2020, Kytch lost nearly all its existing customers, cratering to just 83 renewing devices in 2021. Despite its prior growth, Kytch has attracted essentially no new customers.

336. Kytch's plans to develop new product lines were crushed when the Defendants decimated Kytch's client base—the product lines are no longer a viable model without subscribers.

337. Kytch has lost millions in profits to date and will lose many millions in profit in the years to come. Kytch's valuation has plummeted to as low as $3 million.

338. By contrast, Taylor has continued to rake in $75 million in annual revenue from its repair racket at McDonald's and other restaurants.

<div align="center">

**FIRST CAUSE OF ACTION[15]**

**Breach of Written Contract (Gamble)**

</div>

339. Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

340. The Kytch Trial Agreement was a valid and existing contract at all times during and after Gamble's involvement with Kytch and imposed binding contractual obligations on Gamble at all relevant times and as a condition of Gamble's participation in the Trial.

341. The Kytch Trial Agreement also contains the following confidentiality undertaking: "You agree, both during the term of this Agreement and for a period of five years after termination

---

[15] The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these claims all readings that might otherwise be construed to be outside of their scope.

<div align="center">

- 65 -

REDACTED VERSION - FIRST AMENDED COMPLAINT

</div>

of this Agreement, to hold Kytch's Confidential Information in strict confidence using no less than a reasonable degree of care, not to disclose Kytch Confidential Information to any third party (other than your users) and not to use Kytch Confidential Information for any purpose other than your evaluation of the Solution as part of the Trial."

342. The Agreement defines "Confidential Information" as "aspects of [Kytch's] Products and information relating to its features, specifications, functionality and performance." Gamble breached this clause by: (a) participating in the development of the competing Taylor device known as TSSC/Open Kitchen; (b) assisting in the disassembly, reverse engineering, and distribution of at least the Brownsville Kytch Solution Device; (c) granting Taylor, TFG, and McDonald's access to the Kytch Solution Platform.

343. The Kytch Trial Agreements further prohibits Gamble from taking any of the following actions:

- "remove or modify any Solution markings or any notice of Kytch's or its licensors' proprietary rights;

- modify, make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute or republish all or any part of the Solution, or otherwise access or use the Solution in order to build or support, and/or assist a third party in building or supporting, products or services competitive to any Kytch Solution;

- disclose results of any benchmark tests or performance tests of the Kytch Solution without Kytch's prior written consent;

- perform or disclose any of the following security testing of the Solution (or associated systems, services or infrastructure): network discovery, port and service identification, vulnerability scanning, password cracking, remote access testing, or penetration testing; and

- license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit timesharing or service bureau use, or otherwise commercially exploit or make

- 66 -

the Kytch Solution available to (or use such Solution for the benefit of) any third party."

344. Gamble breached this clause by: (a) participating in the development of the competing Taylor device known as TSSC/Open Kitchen; (b) assisting in the disassembly, reverse engineering and distribution of at least the Brownsville Kytch Solution Device; and (c) granting TFG and McDonald's access to the Kytch Solution Platform.

345. Gamble improperly took and continues to retain Kytch "Proprietary Information" to develop products and to otherwise compete against Kytch.

346. Gamble and his company improperly took and continue to retain Kytch's Confidential Information for the additional purpose of enriching themselves in breach of the Kytch Trial Agreement.

347. Kytch is entitled to recover from Gamble the damages he caused by breaching the Kytch Trial Agreement and the Terms of Service.

348. The amount of such damages cannot be determined at this time but will be proven at trial. Kytch is further entitled to recover from Gamble the gains, profits, and advantages that Gamble obtained as a result of these breaches. Kytch is currently unable to ascertain the full extent of these gains, profits, and advantages but will prove the value thereof at trial.

349. Kytch is informed and believes that Gamble is continuing to breach the Kytch Trial Agreement.

350. By reason of the ongoing breaches, Kytch has and will suffer great and irreparable harm and damage, which harm and damage will be difficult to ascertain, and Kytch will be without an adequate remedy at law.

351. Gamble acknowledged in the Terms of Service contract that: "Kytch may seek injunctive or other equitable relief to protect its confidential information and intellectual property rights or to prevent loss of data or damage to its servers in any court of competent jurisdiction and You agree that Kytch may do so without the need to post bond or other surety."

352.     Kytch's ability to provide comprehensive explanations of the machines' errors is made possible through years of product testing and through hundreds of machines connected to Kytch's platform.  The data yield from these interactions provides Kytch a competitive advantage because Kytch was testing and evaluating Taylor's machines to a greater extent than Taylor, even before the trials expanded to McDonald's locations.

353.     Kytch has flagged defects and bugs with Taylor's software, including the daylight savings bug that causes heat cycle failure, a software version that makes the barrels too cold and causes interruptions of functionality, and the tendency of the machines' heat cycle target temperatures to change on a nightly basis.

354.     Maintaining this information as confidential is essential to Kytch's ability to compete in the market of IoT technology.  These fields are characterized by rapid technological advances and intense competition.  If a competitor were to obtain details about Kytch's technology or related commercial information, that competitor could significantly harm Kytch by using Kytch's own technology, know-how, and other details about these products to compete directly with Kytch without having to spend the capital or time that Kytch invested in developing such technologies.

355.     If Kytch's competitors continue to obtain access to Kytch's Confidential Information, those competitors will benefit significantly from the knowledge gained through that access by directing their product development and marketing efforts to frustrate Kytch's plans.  This strategic advantage to Kytch's competitors could, in turn, severely harm Kytch.

356.     Kytch's research and development is conducted under rigorous conditions to maintain the secrecy of those activities and the products themselves.  Kytch carefully controls all information relating to these projects.  The Kytch development teams expend substantial time and energy to ensure that the process remains secret.  Further, Kytch has spent multiple years working on secret products and methods that have never been discussed publicly.

357.     The information and physical devices misappropriated by Defendants are comprised of confidential information about Kytch technology, its online interface and security processes, and confidential Kytch documentation.  All of this material comprises Kytch trade secrets.  In violation

of Kytch's rights, the Defendants misappropriated Kytch's confidential information in the improper and unlawful manner as alleged herein.

358. Defendants' misappropriation of Kytch's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendants have attempted and continue to attempt to conceal their misappropriation.

359. As the direct and proximate result of Defendants' conduct, Kytch has suffered and, unless Defendants' conduct is stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.

360. Because Kytch's remedy at law is inadequate, Kytch seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Kytch's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## SECOND CAUSE OF ACTION

### Tortious Interference of Contract (All Defendants)

361. Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

362. Kytch entered into NDAs with the Kytch Trial participants including but not limited to: Tyler Gamble; Eric Wilson; David Balducci; Kevin Moore; Jon Kelley; and others.

363. The NDA is incorporated into the Kytch Trial Agreement through the Terms of Service and constitutes a valid and enforceable contract pursuant to which Kytch provided Kytch Trial participants and Authorized Users access to the Kytch Solution in exchange for covenants of confidentiality, non-disclosure, and agreements for the sole purpose of furthering the Kytch Trial.

364. The NDA expressly prohibits Kytch customers and Authorized Users from aiding or assisting any third-party in developing or testing a product or service competitive to Kytch.

365. In exchange for the Kytch Trial participants' covenants of nondisclosure and secrecy, Kytch agreed to provide its trade secrets and Confidential Information—including Kytch Solution and Kytch Solution Platform—for them to use for the sole purpose of furthering the Kytch Trial.

- 69 -

366.    Defendants had knowledge of the Kytch Trial Agreement and intentionally selected Kytch's customers to develop Taylor's competing product in breach of the NDA.

367.    Defendants had knowledge of these contracts—Taylor solicited Kytch customers based on their participation and Tyler Gamble and others publicly discussed their participation in Kytch's product trial, and upon information and belief, discussed the same with Taylor and TFG.

368.    Defendants acted intentionally to interfere with and induce Gamble and the others (including but not limited to those referenced above) to breach the Kytch Trial Agreement by providing it with access to the Kytch Solution Device and Platform.

369.    Taylor and TFG pushed Trial Participants to breach the Kytch Trial Agreement, using their corporate influence over McDonald's franchisees.  Likewise, Gamble used his leadership position on the NSLC to induce other Kytch Trial participants to breach their contracts with Kytch.  This includes Gamble's efforts to develop Taylor and PHD's competing product by using Kytch's customers and the proprietary insights they obtained by virtue of the Kytch Trial.

370.    Defendants' intentional actions caused Kytch considerable damage by disrupting its contractual relationships with Gamble, caused Kytch's performance under the contract to be more expensive and difficult, and resulted in breaches of the Kytch Trial Agreement.

371.    Taylor and TFG's intentional actions caused Kytch substantial damage by disrupting its contractual relationship with Gamble and the Kytch Trial participants identified above, allowing Taylor to launch a competing device and driving investors away from Kytch.

372.    As a direct and proximate result of these actions, Kytch has suffered severe and substantial economic harm.

**THIRD CAUSE OF ACTION**

**Violation of California Uniform Trade Secrets Act (All Defendants)**

373.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

374.    There is nothing like the KSD on the market, and the ability of a competitor to access and test the device would allow the competitor to obtain an extraordinary head start in the creation of a competitive device.

375.    When the Kytch Solution is connected to the internet, the software sends messages to www.Kytch.com.

376.    The Kytch Solution is depicted below in the "Kytch Kit."



377.    The KSD works with custom-made ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████

378.    ████████████████████████████████████████████████████████ ██████████████████████████████

379.    Kytch's technology and wrap-around software and online platform improve the limited and simplistic interfaces of many appliances.  Taylor machines are designed so that only technical experts can navigate their internal workings.  Kytch disrupted this approach by creating user-friendly interfaces that are accessible to people without any technical training.

380.    Generally, Kytch collects three types of proprietary data for the soft-serve machines.

381.    *First*, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

- 71 -

REDACTED VERSION - FIRST AMENDED COMPLAINT

382. The second datatype is related to machine settings, including: ██████

383. Both datatypes reflect unique selections of data for at least two reasons. Taylor makes it extremely difficult, if not impossible, for owners of the device to be able to access this data without the assistance of a trained technician.  Moreover, it was only after extensive analysis of massive amounts of data that Kytch identified the above factors as relevant for making decisions on the machine.

384. The third datatype is production data.  This includes ██████ To capture the necessary data, Kytch employs scripts to programmatically enter the menu without human assistance. This is unique because normally a human operator must press a ***minimum of 12 buttons*** just to open the Manager's Menu.

385. Another innovative component of Kytch's trade secrets is the remote method for interacting with kitchen devices that Kytch pioneered using a universal master operating system to serve as the user interface and communication system with kitchen appliances. This is made possible through a man-in-the-middle cable and software for securely inserting the Kytch Solution for reading and writing data to and from the control panel assembly of the appliance, without exposing users, employees, and technicians to the potential of high voltage shocks or other related hazards.

REDACTED VERSION - FIRST AMENDED COMPLAINT

386.    The man-in-the-middle ("MITM") software code allows Kytch █████████████ ███████████████████████████████████████████████████████████████ ███████████████████    The software then communicates messages from the device to Kytch's cloud system for data analytics and navigation.

387.    Kytch constantly reviews customers' reported errors, and these readings and related notifications Kytch provides concerning the issues are available for customers to review on Kytch's online platform.  By detecting anomalous appliance behavior, Kytch builds preference models and enhances its business analytics to predict the needs of its customers.

388.    Part of Kytch's proprietary technology is discriminating between the substantial amounts of data that it gathers from customers' machine usage.  Kytch sends only select machine metrics, typically based on thresholds that Kytch has set based on the historic performance and error rates of the machines plugged into Kytch's systems. This information includes: ███████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████  warning of potential damage to equipment due to human error; ██████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████  (7) identifying lack of training and improper use of the machines; and (8) advanced troubleshooting based on customer data across the Kytch platform.

389.    If the machine's AUTO function is disabled, ████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████

- 73 -
REDACTED VERSION - FIRST AMENDED COMPLAINT

390. The machines' heat cycle commonly fails, and this is often not addressed by restaurant staff quickly enough. Alternatively, the staff lacks the technical know-how to mitigate this failure. Kytch Assist functions as a human-assisted automation service. Kytch manages heat cycle ████████████████████████████████████████████████████████████████

391. The machines' heat cycle commonly fails ████████████████████████████████

392. Taylor's glycol holding temperature is set at 165 degrees ████████████████

393. Kytch's data has determined ████████████████████████████████████ Kytch informs customers ████████████████████████████████

394. Kytch also sends productivity alerts ████████████████████████████ Kytch sends a message to the user ████

395. Kytch provides real-time alerts on ████████████████████████████████

- 74 -
REDACTED VERSION - FIRST AMENDED COMPLAINT

1    396.    Kytch also provides informative warning alerts in order to prevent damage to the

2    machine ███████████████████████████████████████████████████████████

3    ### *The Kytch Online Platform & Notification System*

4    397.    Working in tandem with Kytch's data retrieval and data analytics systems, the KSP

5    is Kytch's proprietary and confidential online platform at www.Kytch.com that provides customers

6    with more ways to understand and interact with the soft-serve machines.

7    398.    There is nothing like the KSP on the market, and the ability of a competitor to access

8    and observe in real time the operation of the KSP allows a competitor to obtain an extraordinary

9    head start in the creation of a competitive device.

10   399.    Kytch sends its customers daily reports regarding machine usage.  One example is

11   the Servings Summary, which contains the number of shakes and soft-serve products that were

12   produced each day.  This information can only be produced using the proprietary script used to

13   programmatically open the menu employed by the Kytch Solution. ███████████████████

14   ███████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████

18   ██████████████████████████████████

19

20

21

22

23

24

25

26

27

28

- 75 -

REDACTED VERSION - FIRST AMENDED COMPLAINT



400.	Another function available on Kytch.com is "Kytch Rewind."

The visualization is similar to a video rewind function.

401.	The genesis for Kytch Rewind took place during product testing. Kytch needed a way to correlate the data from the machines to identifiable recurring events—either with the machine itself, or through human interactions.

402.	So Kytch

This monitoring enabled Kytch to troubleshoot errors in a data-driven manner.

403.	Specifically, whether a particular outage was caused by human error—such as loading frozen ice cream mix into the machine—or a software bug.

404.	When Kytch realized how useful this tool was, it developed Kytch Rewind to further empower its customers to better understand their machines.

405.	Kytch Rewind allows the user

- 76 -

REDACTED VERSION - FIRST AMENDED COMPLAINT

1 ███████████████████████████████████████████████

2 ███████████████████████

3    406.    ████████████████████████████████████████

4 ███████████████████████████████████████████████

5 ███████████████

6    407.    Reviewing these patterns subsequently allows Kytch to continue to optimize the

7 machines and select the optimal parameters for functioning, and to avoid outages and costly service

8 appointments.  A screenshot of the rewind function is below:



18    408.    In this exemplar, Kytch Rewind shows the user the contents of the machine's menu

19 at 5:59 a.m. ET.  The machine was in "HEAT MODE" while the right hopper had low mix.

20    409.    Another feature of Kytch's notification system is Kytch Assist.  Kytch Assist uses

21 human-assisted experience to make decisions to keep Taylor machines up and running. ████

22 ███████████████████████████████████████████████

23 ███████████████████████████████████████████████

24 ███████████████████████████████████████████████

25

26 _____

27 [16] The JP2 pin of Taylor's C713 machine hides the hopper temperature by default. ████

28 ███████████████████

- 77 -

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3        410.    The interaction of these files and the methodology and processes for keeping the

4 system stable and functional have taken a substantial amount of time and money to develop and

5 perfect.  An example notification from Kytch Assist is depicted below.



**Kytch Assist**                                                                    10:50 AM

Heat cycle failed because the left hopper reached 135.7 degrees instead of the required 151 degrees during the HEAT phase. Kytch restarted the heat cycle to reduce downtime. Potentially caused by overfilling the hopper.

11        411.    This notification describes a common error that frustrates many Kytch clients: the

12 heat cycle fails because the hopper missed the target temperature required by the heating phase by

13 approximately one degree.

14        412.    Based on ████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ██████████████████████████████████ Kytch Assist ████████████████

17 █████  to avert machine outages.  If Kytch takes action on the machine, ████████████████

18 ████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████

22 █████████████████████████████████ The purpose of these notifications is to educate

23 the user about their machine's issues, ████████████████████████████████

24 ███████████████████████████

25        413.    This is important because Kytch's data analysis has confirmed ████████████

26 ████████████████████████████████████████████████████████

27

28

REDACTED VERSION - FIRST AMENDED COMPLAINT

1 ███████████████████████████████ This means less

2 downtime than waiting for an employee to get around to pressing the button during a lunch rush.

3     414.    Additionally, Kytch's data capture exposes when employees misuse the soft-serve

4 machines. For example, ████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████

12     415.    Kytch notifies the user ██████████████████

13 ████████████████████████████████████████████

14 ██████████████████████ Kytch notifies the user ███████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ██████████ Kytch has developed the ability to ███████████

18 ██████████████████████████ Kytch examines ████

19 ████████████████████████████████████████████

20 ████ to warn customers ████████████████████

21 ████████████████████

22     416.    Kytch also notifies users when there is a potential issue with █████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████████

26 ████████████████████████████████████████████

27 ████████████████████████████████████████████

28

- 79 -

REDACTED VERSION - FIRST AMENDED COMPLAINT



417.    Kytch also notifies users when

For example, Kytch notifies the user

The notification also directs the user to use the Kytch.com web application

[REDACTED] Kytch may notify [REDACTED]

[REDACTED]

418.    One of the most important features of Kytch's platform is the Remote Control application and interface.  This permits Kytch's customers to access Taylor's machines and to optimize the functionality of their machines even when they are not on site.

419.    The Remote Control creates a power shift, as one operator or their in-house technician can now access all of their machines from one location.

420.    Kytch's innovative solutions reduce franchisees' need to hire Taylor technicians by providing, for the first time, previously unavailable data and control mechanisms in the palm of each user's hand.

421.    Kytch's Remote Control is designed to capture the front panel of the Taylor machines, and it allows users to quickly understand how to use the equipment.  Kytch also provides [REDACTED] The image below depicts the remote-control feature on Kytch's online platform.



422.    After many hundreds of hours of data analysis on hundreds of machines, Kytch has determined that many of the issues with the machines can be corrected by simply using the controls and menu on the Taylor machine.

423.    For example, thermistor probes measure temperatures within the machine.  Kytch discovered that [REDACTED]

[REDACTED]

424. Kytch also discovered a cryptic message, "E7," that displayed on the "brush clean" counter, because Taylor's software was unable to display a three-digit number. Kytch's software determined that "E7" indicated that 147 machine hours had passed since the freezer door was last removed. However, despite this cryptic message, the machines continued to operate and serve customers. In simple terms, this means that the machines were designed to serve ice cream without complying with the mandatory brush-cleaning schedules required by public health and safety standards. ████████████████████████████████████████████████
████████████████████████████████

425. ██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

426. ██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

427. Customers often praise the proactive flagging of software bugs Kytch provides through Kytch's notification systems and data analytics. Additionally, Kytch tracks all temperatures and alerts across each machine connected to its system. Because of the hundreds of devices on its network, Kytch can analyze the data and flag software errors within Taylor's product.

428. When Kytch uncovers common or disruptive bugs, it notifies its customers about the issues, and it attempts to identify and implement automation features to counteract the errors. Kytch's ultimate goal was to create a stable software version that was direct-to-consumer and included updates to eliminate these bugs.

REDACTED VERSION - FIRST AMENDED COMPLAINT

429.     One such error is █████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

430.     Kytch flags this problem for its customers in advance, providing them with detailed,

user-friendly instructions on how to fix the issue. ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

REDACTED VERSION - FIRST AMENDED COMPLAINT



431.

432.    Kytch's real-time notifications, sent via text and email, include mix alerts, Kytch Health Alerts, alerts for heat cycle failures, downtime, weekly summaries, and issue-spotting alerts. Kytch Health Alerts explain malfunctions and provides tips on how to address each issue.

433.    Kytch also provides explanations for heat cycle failures ████████████
████████████████████████████████████████████████████████████████
██████████████████████ Kytch sends ████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████

434.    One of Kytch's Weekly Summary notifications is depicted below. The weekly summary email tallies ██████████████████████████████████ that appear on the front panel of the machine.

435.    Through the Kytch.com platform, users are able to see ██████████████
██████████████████████████ This information, alone, is incredibly valuable.  And in

the aggregate, it enables Kytch to identify problems and potential issues long before Taylor and its certified technicians.

436.    Importantly, Kytch.com also allows customers to invite team members to manage and navigate the online interface.

437.    The data Kytch has collected has enabled the company to perform market assessments to anticipate shifting demands, to develop pricing strategies, to decide when and where to launch products, and it informs Kytch's investments in product development and new technologies.

438.    Indeed, based on Kytch's robust data retrieval and analytics capabilities, Kytch possessed considerably more data about Taylor's machines, performance histories, and performance optimization than Taylor itself.

439.    Kytch Solution's proprietary design and software, as alleged above, in Kytch's statement of trade secrets,[17] and the Declaration of Melissa Nelson at Exs. 1-2,[18] and at Paragraphs 92, 171, 172, 238, 239, 241, 242, 272, 322, 323, 326, 327, 329, 331, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 344-80, constitute trade secrets under the California Uniform Trade Secrets Act.

440.    Kytch is informed and believes that Gamble provided a Kytch Solution Device and access to the Kytch Solution Platform to Taylor and TFG for at least eight months, during which time Kytch's trade secrets were misappropriated.

441.    Kytch has not disclosed its trade secret information and the information has actual or potential independent economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

442.    Kytch has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue.

---

[17] Kytch has filed and served its statement of trade secrets pursuant to California Code of Civil procedure section 2019.210.

[18] The Declaration of Melissa Nelson is attached as **Exhibit 2** to this proposed First Amended Complaint.

Redacted Version Filed 04/29/2022 -- Page 86 of 224

443. Defendants knew or should have known under the circumstances that the information they misappropriated were confidential trade secret materials.

444. Defendants knew or should have known under the circumstances that the information they misappropriated were trade secret materials.

445. The California Uniform Trade Secrets Act ("CUTSA") prohibits the unfair competition—and associated irreparable harm to business interests—that is caused by product trial participants improperly using or disclosing documents, information, inventions, and business strategies that require substantial investment, innovation, and countless hours to develop.

446. Defendants have misappropriated Kytch Trade Secrets by: (1) viewing Confidential Information and trade secrets on the Kytch Solution Platform during the June 23, 2020 Zoom meeting with Gamble and Taylor; (2) repeatedly interviewing Gamble and other Kytch customers during regularly schedule focus group sessions to obtain proprietary insight into Kytch's confidential activities and findings; and (3) directing Tyler Gamble and other Kytch customers to use Kytch's Confidential Information to help Taylor and PHD develop its competing product.

447. As a direct and proximate result of Defendants' conduct, Kytch is threatened with injury and has been injured in an amount more than the jurisdictional minimum of this Court, and that will be proven at trial.

448. Kytch has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorney's fees, as a result of Defendants' misappropriation. As a further proximate result of the misappropriation and use of Kytch's trade secrets, Defendants were unjustly enriched.

449. Defendants acted willfully, maliciously, and fraudulently. Kytch is therefore entitled to exemplary damages under California Civil Code § 3426.3(c). Defendants' conduct constitutes transgressions of a continuing nature for which Kytch has no adequate remedy at law.

450. Unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use Kytch's trade secret information to enrich themselves and divert business from Kytch. Pursuant to California Civil Code § 3426.2, Kytch is entitled to an injunction against

the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further asks the Court to restrain Defendants from using all trade secret information misappropriated from Kytch and to return all trade secret information to the company.

451.    Pursuant to California Civil Code § 3426.4 and related law, Kytch is entitled to an award of attorneys' fees for Defendants' misappropriation of trade secrets.

452.    As the direct and proximate result of Defendants' conduct, Kytch has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.

453.    Because Kytch's remedy at law is inadequate, Kytch seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.

454.    Kytch's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

455.    Kytch has been damaged by all the foregoing and is entitled to an award of exemplary damages and attorney's fees.

## FOURTH CAUSE OF ACTION

**False Advertising in Violation of Cal. Bus. & Prof. Code § 17500, et seq. (Taylor)**

456.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

457.    Beginning on November 2, 2020, Taylor—working jointly and in concert with McDonald's—arranged for false and deceptive advertising to be distributed via the internet to thousands of McDonald's franchise operators and thousands of Taylor customers, factory-trained technicians, and distributors.  Taylor circulated these false advertisements to thousands of California residents.

458.    Taylor and McDonald's directed these advertisements to consumers.

459.    The advertisements contain false claims about the Kytch Solution and Taylor's own products and services, including:

- 88 -

459.1 "the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine due to its remote operation capability";

459.2 "the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury";

459.3 the Kytch Solution is either not secure or is defectively designed such that its remote operation capabilities pose a safety risk;

459.4 the KSD presents an increased safety risk to Taylor machines vis-à-vis Taylor machines without the KSD;

459.5 Taylor and McDonald's "recently determined" that the KSD poses a safety risk by product safety testing or other scientific analysis;

459.6 the Kytch Solution "creat[es] potential equipment reliability issues without the restaurant's knowledge or ability to stop it";

459.7 the "potential equipment reliability issues" Kytch creates are materially different or more problematic than those resulting from Taylor machines generally, or from repairs performed by a Taylor-certified technician;

459.8 Taylor planned to release Open Kitchen in the US market … by the end of Q1, 2021";

459.9 Taylor was ready for commercialization and had incorporated the necessary technology to release the "Taylor Shake Sundae Connectivity" by Q1, 2021; and

459.10 the Taylor Shake Sundae Connectivity device would offer similar functionality to the Kytch Solution without the supposed safety or reliability risk.

- 89 -

460.    Taylor's claims are false because they conflict with reality in several ways, as set forth above.

461.    Taylor knew or by the exercise of reasonable care should have known that its conduct would cause confusion, mistake, or deception among purchasers, users, and consumers. Taylor's claims had the tendency to deceive a substantial segment of the target audience, Taylor intended that they deceive the target audience, and they did in fact deceive the target audience.

462.    Because Taylor's false claims concerned health, safety, and inherent characteristics of the products at issue, consumers necessarily found them to be material.

463.    Further, the facts show that consumers found Taylor's false claims to be material to their purchasing decisions. Among other things, Kytch's customers started cancelling their subscriptions and returning KSDs immediately following the November 2, 2020 advertisements and Kytch's business collapsed.  Customers also specifically informed Kytch that they credited the representations and found them to be material. For example, on November 6, 2020, one Kytch customer stated that he was cancelling his subscription because of the "determination" that the Kytch Solution "poses a safety risk."  Another customer explained that Taylor was "actually working out a similar-type-deal in-house," and that he, too, was withdrawing from the Kytch Trial based on Taylor's bogus safety concerns.

464.    Taylor is liable for both its own false claims about Kytch and the similar claims McDonald's disseminated to operators because Taylor and McDonald's worked together to develop the false message and each contributed to the dissemination of the communication.

465.    Taylor's false claims eroded Kytch's good will among consumers and caused Kytch's customers and prospective customers to cease doing business with Kytch. Instead, consumers chose Taylor's forthcoming competing product or chose to continue relying on Taylor's costly replacement parts and repair services. This led to the virtual destruction of Kytch's business and provided Taylor with ill-gotten gains.

**FIFTH CAUSE OF ACTION**

**Trade Libel (Taylor)**

466.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

467.    Taylor issued the following false and deceptive statements of fact about the Kytch Solution:

467.1    Beginning shortly before November 2, 2020, Taylor falsely claimed in advertisements to consumers, franchise operators, Kytch's customers and potential customers, and other players in the "smart kitchen" market, in words or substance, that the Kytch Solution is unsafe, that the Kytch Solution is prone to cause serious human injury, and that the Kytch Solution was unfit for use in smart kitchens.  In making these false claims, Taylor acted in concert with its distributors and McDonald's to promote this disinformation about Kytch.

467.2    On November 2, 2020, McDonald's directed and published the following false and defamatory statements:

We are pleased to share that the McDonald's GSSS-Equipment Team, in partnership with the NSLC Equipment Sub-Team, has been working on a strategic connectivity solution with Taylor for their Shake Sundae machine. This solution will allow operators to receive text updates from their machine when it's down, and provide data on products dispensed, as well as other relevant information, to help restaurants keep the machine running in its optimal condition. This solution is being designed with long term benefits in mind, and would enable future connection with other equipment in the restaurants.

***The Taylor Shake Sundae Connectivity (TSSC) is currently in test [sic] with NSLC operators and the current target for release in the US market is by the end of Q1, 2021.***

**IMPORTANT NOTE:** We have become aware that a few operators may be using an unapproved aftermarket technology, Kytch, on their Shake Sundae machine.  As a reminder, any operator that is using this aftermarket "add-on" to any of their machines, will completely void any existing OEM equipment warranty. Additionally, any machine failures that are associated with the installation of Kytch during or after warranty expires, will be sole responsibility of the operator, not the OEM supplier.  The Kytch device allows complete access to all aspects of the equipment's controller and confidential data, including areas where only certified technicians should have

access, creating potential equipment reliability issues without the restaurant's knowledge or ability to stop it. Even more concerning, McDonald's has recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury. As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use, and is reminding you that any continued use is not approved and is at your sole risk.

467.3   On November 2, 2020, Taylor directed and published the following false and

defamatory statements:

Taylor Shake Sundae Connectivity & Kytch Technology Update

McDonald's US Equipment Team, in partnership with NSLC, has been developing a strategic connectivity solution with Taylor for their Shake Sundae machine.  The solution will allow operators to receive text updates when their machine is down, view number of products dispensed, and get other information to keep the. Machine running on optimal condition.  ***The Taylor Shake Sundae Connectivity (TSSC) is currently in test with NSLC operators and the current target for release to the. US market is by the end of Q1, 2021.***

***IMPORTANT SAFETY NOTE:*** We have become aware that a few operators may be using an unapproved after-market technology, Kytch, on their Shake Sundae machine.  This action will completely void any existing OEM equipment warranty.  More importantly, McDonald's and Taylor have recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine due to its remote operation capability.  ***As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use. Any continued use is not approved and is at your sole risk.***

468.    Taylor made similar statements to RBI, Coca-Cola, and Burger King throughout 2020.

469.    Taylor's statements were intended and did falsely convey that the Kytch Solution is a dangerous product that is known to cause serious human injury, and that it damages the machines without the operators' knowledge.

REDACTED VERSION - FIRST AMENDED COMPLAINT

470.    These accusations are reasonably understood to be statements of fact about Kytch and were understood by people who read them to be statements of fact about Kytch.  Kytch has never received a report of "serious human injury" attributed to the Kytch Solution.

471.    Kytch's customers started returning Kytch Solutions immediately.  One franchise operator stated that he could not accept "the liability of using [Kytch's] device" because the device poses a serious safety risk.

472.    On November 6, 2020, one Kytch customer stated that he was cancelling his subscription because McDonald's had made the "determination" that the Kytch Solution "poses a safety risk."  That same day, another customer explained that Taylor was "actually working out a similar-type-deal in-house," and that he, too, was withdrawing from the Kytch Trial based on Taylor's bogus safety concerns. These customers include Lawrence Miller, Brandon Mayers, Rikesh Patel, Michael Keenan, Peter Rotolo, the Tom Locke group, and Rick Darmody.

473.    Taylor's advertisements are literally false because they say that the Kytch Solution is unsuitable or unsafe for use in commercial kitchens.  Kytch is both safe and suitable for use in commercial kitchens; it does not create an incremental risk of injury caused by Taylor's soft-serve machines.  The Kytch Solution has improved the functioning and effectiveness of Taylor's soft-serve machines.  The Kytch Solution incorporates, utilizes, and is constrained by the soft-serve machines' existing safety protocols and mechanisms.  Kytch's users can remotely monitor and control the soft-serve machines.  Kytch disables automation features when any user is cleaning the interior of the machine or pressing buttons on the control panel.  Kytch cannot remotely engage the soft-serve machines' motors when the freezer door is removed.

474.    Kytch has been approved by the FCC and certified by Intertek—a world renown multinational assurance, inspection, product testing and certification company headquartered in London.

475.    Taylor's claim that consumers are unable to view or control the Kytch Solution is also literally false.  Kytch does not create reliability issues without the knowledge or control of the operator.  The Kytch Rewind allows users to view the functionality of the Kytch Solution.  Users

can control their Taylor soft-serve machines remotely, and they can opt-in or opt-out of Kytch's automated features.

476.    These statements are defamatory and libelous as a matter of law.

477.    Taylor's statements were calculated to—and did—provoke outrage and cause the company enormous reputational and financial damage, to Taylor's benefit.

478.    Taylor knew that its statements were false and had actual knowledge that Kytch does not create any incremental risk in Taylor's soft-serve machines.  In February 2020, Taylor met with McDonald's, The Middleby Corporation, Eric Wilson, and Tyler Gamble to discuss infiltrating the Kytch Trial.  The next month, on March 12, 2020, Gamble warned Kytch that McDonald's intended to fabricate safety concerns to drive Kytch out of the marketplace.

479.    When making the statements, Taylor's real motivation was to disrupt Kytch's customer relationships at a crucial time—just after Kytch received the NOA's endorsement and before Taylor had its competing product ready for the market. By branding Kytch's products as unsafe, Taylor bought itself more time to develop its product before Kytch fully penetrated the market.

480.    In October 2020, Taylor received messages that described, in detail, Kytch's safety components and the fact that it incorporates Taylor's existing safety mechanisms.  The messages—and Taylor's independent research—put Taylor on notice that Kytch was certified by Intertek, using the same safety regulations used by Taylor.

481.    Throughout 2020, Taylor received insight from Kytch customers regarding the Kytch Solution and the Kytch Rewind function.  Taylor did not have legitimate concerns about safety—Taylor continued to direct Kytch customers to use the Kytch Solution for months *after* the November 2020 false statements about Kytch.

482.    Taylor's claims are completely uncorroborated, and Taylor intentionally avoided obvious sources of information regarding the Kytch Solution.  Taylor never once contacted Kytch to discuss the manufactured safety issues, and Taylor never tried to corroborate its false accusations because it knew they were baseless.

483.     Kytch sent a retraction demand to Taylor in December 2020.  A copy of that demand letter is attached as **Exhibit 4**.  Kytch informed Taylor that its accusations were demonstrably false and described the myriad reasons that Taylor's defamatory statements were contradicted by the facts.

484.     Taylor refused to retract its statements, and it never provided any justification to support its false claims about the KSD.

485.     The relevant statements are commercial speech, and Taylor had no applicable privilege or legal authorization to make these false and defamatory statements, or if it did, it abused that privilege or authorization.

**SIXTH CAUSE OF ACTION**

**Intentional Interference with Business Expectancy (All Defendants)**

486.     Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

487.     Kytch developed valuable contractual and other business and economic relationships with McDonald's franchise operators. Those franchise operators have engaged in, engage in, are scheduled to engage in, or may engage in business dealings with Kytch, with a probability of future economic benefit.

488.     Defendants know and at all relevant times knew of these contractual and other business and economic relationships between Kytch and the McDonald's franchise operators because, among other things, their own documents show that they were paying close attention to McDonald's operators' adoption of the Kytch Solution and that Taylor and TFG used their network of repair technicians to systematically identify machines to which a KSD was attached.

489.     Defendants acted intentionally to induce Kytch's customers and prospective customers to discontinue their existing and prospective business relationships with Kytch by (a) making the unlawful statements to all Kytch customers and potential customers; (b) threatening to void the warrantees on machines to which a KSD had been attached even though Taylor lacked any legal right to do so and, in fact, never did so; (c) misappropriating Kytch's trade secrets; and (d)

inducing Kytch customers to develop Taylor and PHD's competing product by using Kytch's proprietary insights, described above.

490.    Defendants knew that their conduct was substantially certain to interfere with Kytch's economic interests, namely its ability to retain existing customers and obtain new customers. Defendants acted knowingly and intentionally and with reckless disregard of the foreseeable consequences of its actions.

491.    Defendants' conduct was intended to intimidate and scare Kytch's customers and prospective customers into ceasing to do business with Kytch and/or to instead adopt Taylor's forthcoming competing product or to continue using Taylor's and TFG's costly replacement parts and repair services at an astronomical and unnecessary rate.

492.    Defendants' conduct is and was wrongful—independent of any interference with the business and economic relationships discussed here—because it constitutes product disparagement, false advertising, trade libel, extortion, fraud, and trade secrets misappropriation.

493.    Taylor's wrongful conduct caused certain of Kytch's customers to cease or curtail their relationships with Kytch.  Kytch's contractual and other business and economic relationships with these third parties have been and continue to be disrupted by Taylor' conduct.  As a result of Taylor's conduct, which disrupted Kytch's business relationships, Kytch has suffered injury to its reputation and lost substantial revenue in an amount to be proved at trial.

**SEVENTH CAUSE OF ACTION**

**Negligent Interference with Business Expectancy (All Defendants)**

494.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

495.    Kytch developed valuable contractual and other business and economic relationships with McDonald's franchise operators. Those franchise operators have engaged in, engage in, are scheduled to engage in, or may engage in business dealings with Kytch, with a probability of future economic benefit.

496.    Defendants know and at all relevant times knew of these contractual and other business and economic relationships between Kytch and the McDonald's franchise operators

because, among other things, their own documents show that they were paying close attention to McDonald's operators' adoption of the Kytch Solution and that Taylor and TFG used their network of repair technicians to systematically identify machines to which a KSD was attached.

497. Defendants acted, at minimum, negligently when inducing Kytch's customers and prospective customers to discontinue their existing and prospective business relationships with Kytch by (a) making the unlawful statements to all Kytch customers and potential customers; (b) threatening to void the warrantees on machines to which a KSD had been attached even though Taylor lacked any legal right to do so and, in fact, never did so; (c) misappropriating Kytch's trade secrets; and (d) inducing Kytch customers to develop Taylor and PHD's competing product by using Kytch's proprietary insights, described above.

498. By doing so, Defendants failed to act with due care.

499. Defendants knew or should have known that a failure to act with due care would disrupt Kytch's relationships with its customers, including but not limited to McDonald's franchise operators.

500. Defendants owed Kytch a duty of care since they knew or should have known of Kytch's relationships with its customers, including but not limited to McDonald's franchise operators, and knew or should have known that its failure to act with due care would disrupt that relationship.

501. Defendants' conduct was and was wrongful—independent of any interference with the business and economic relationships discussed here—because it constitutes product disparagement, false advertising, trade libel, extortion, fraud, and trade secrets misappropriation.

502. Kytch's contractual and other business and economic relationships with its customers have and continue to be disrupted by Defendants' conduct.

503. As a result of Defendants' conduct, Kytch has suffered injury to its reputation and lost substantial revenue in an amount to be proved at trial.

- 97 -

**EIGHTH CAUSE OF ACTION**

**Violation of the California Computer Data Access and Fraud Act (All Defendants)**

504.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

505.    In violation of California Penal Code § 502, Defendants knowingly and willfully took multiple specific acts to access the computer networks and data of Kytch without permission. The Defendants' actions include, but are not limited to, the following:

505.1   Knowingly, willfully, and without permission, using Kytch's computer services, in violation of California Penal Code § 502(c)(3).

505.2   Knowingly, willfully, and without permission, accessing Kytch's computers, computer systems, or computer networks, in violation of California Penal Code § 502(c)(7).

505.3   Knowingly, willfully, and without permission, assisting others to provide a means of accessing Kytch's computers, computer systems, or computer networks, in violation of California Penal Code § 502(c)(6).

505.4   Knowingly, willfully, and without permission, accessing Kytch's computers, computer networks, or computer systems to take or copy Kytch's data or supporting documentation, in violation of California Penal Code § 502(c)(2).

505.5   Knowingly, willfully, and without permission, using Kytch's data, computers, computer systems, or computer networks, to wrongfully obtain property and data belonging to Kytch, in violation of California Penal Code § 502(c)(1).

506.    California Penal Code § 502(e) provides a civil cause of action to victims like Kytch who have been harmed by the aforementioned violations.

507.    Pursuant to California Penal Code § 502(e)(1), Kytch is entitled to an award of compensatory damages, injunctive relief, and any other equitable relief deemed appropriate by the Court.

508.    Pursuant to California Penal Code § 502(e)(2), Kytch is entitled to an award of its reasonable attorney's fees incurred in bringing this action.

509.    Because the Defendants acted willfully to violate California Penal Code § 502(c), as described above, and because the Defendants also acted with oppression, fraud, or malice towards Kytch, Kytch is entitled to an additional award of punitive or exemplary damages, pursuant to California Penal Code § 502(e)(4).

**NINTH CAUSE OF ACTION**

**Deceptive Trade Practices - Cal. Bus. & Prof. Code § 17200 (All Defendants)**

510.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

511.    Defendants have engaged in unlawful, unfair, and otherwise prohibited business acts and practices, as outlined above.

512.    Defendants' conduct was knowing, deliberate, willful, and intended to cause confusion, mistake or to deceive, all in blatant disregard of Kytch's rights.

513.    Further, Taylor has engaged in unlawful, unethical, and wrongful conduct by threatening to void the warranties on machines to which a KSD had been attached even though Taylor lacked any legal right to do so and, in fact, never did so.  Taylor's conduct was intended to intimidate and scare Kytch's customers and prospective customers into ceasing to do business with Kytch and to instead adopt Taylor's forthcoming competing product or to continue using Taylor's costly replacement parts and repair services at an astronomical rate.

514.    As a direct and proximate result of Defendants' wrongful conduct, as alleged herein, Kytch has been and will be deprived of substantial sales of its products and good will among McDonald's franchise operators and other customers and sustained hundreds of millions of dollars in loss.

515.    Kytch seeks restitution in this matter, including an order granting Taylor's profits stemming from its illegal activity, Kytch's actual and compensatory damages, and any other restitution award available by law.

**TENTH CAUSE OF ACTION**

**Breach of Contract (TFG)**

516.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

517.    Agents for TFG electronically accessed Kytch's online interface, the KSP, where they agreed to Kytch's Terms of Service (attached as **Exhibit 1**).  This consent formed valid, enforceable contracts between the parties.  Yet, TFG breached those contracts in multiple ways, severely damaging Kytch in the process.

518.    Similarly, Gamble provided TFG his login credentials to the KSP.  Using this unauthorized access, TFG's Blaine Martin and Ben Rhodes accessed the password-protected portions of Kytch's online interface, the KSP.  At all relevant times, Martin and Rhodes were acting on behalf of their employer, TFG.

519.    As a part of the process to access the KSP, agents for both Taylor and TFG were presented with a log-in screen where they chose to "agree to the terms of service" as shown in the image below.



- 100 -

REDACTED VERSION - FIRST AMENDED COMPLAINT

520.     The phrase "terms of service" was underlined and hyperlinked, leading to a publicly available web page maintained by Kytch and setting forth the full text of Kytch's Terms of Service,[19] which is reproduced in **Exhibit 1.**

521.     Before TFG's agents could successfully log into the KSP, they had to check the circle stating that they agreed to Kytch's Terms of Service.  They did so before clicking the "Sign In" button to access the KSP.  Once the agents agreed to the Terms of Service and clicked the "Sign In" button, they received full access to the KSP.

522.     By agreeing to the Terms of Service, TFG agreed to refrain from using Kytch's trade secrets to "build or support, and/or assist a third party in building or supporting products or services competitive" to Kytch.  (Kytch Terms of Service, § 1(g).)

523.     TFG also agreed that they would not "modify, make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute, [or] republish" any part of the KSP.  (Kytch Terms of Service, § 1(g).)

524.     TFG further agreed that it would not "transfer", "distribute", or "disclose" any part of the KSP to "any third party."  (Kytch Terms of Service, § 1(g).)

525.     TFG agreed that it would not "commercially exploit" any part of the KSP.  (Kytch Terms of Service, § 1(g).)

526.     TFG agreed to these and other contractual provisions set forth in the Kytch Terms of Service.  (*See, e.g.*, Kytch Terms of Service, § 3(e).)

527.     TFG breached material provisions of the Kytch Terms of Service, resulting in damage to Kytch.

528.     In addition to other breaches, TFG breached their contractual obligations by (a) participating in the development of the competing device known as Open Kitchen; (b) assisting in the disassembly, reverse engineering and distribution of KSDs; and (c) by giving McDonald's and other third-parties access to the Kytch Solution Platform.

---

[19] *See Kytch, Inc. Terms of Service*, https://kytch.com/tos.

529.     TFG improperly took and continues to retain Kytch "Proprietary Information" to develop products and to otherwise compete against Kytch.

530.     TFG improperly took and continues to retain Kytch's Confidential Information for the additional purpose of enriching itself and the other Defendants in breach of the Kytch Trial Agreement.

531.     Kytch is entitled to recover from TFG the damages caused by its breaches of the Kytch Terms of Service.

532.     TFG agreed that "Kytch may recover damages from [TFG] for . . . utilizing [the KSP] for purposes other than those contemplated by the [Terms of Service]." (Kytch Terms of Service, § 1(o).)

533.     Kytch is informed and believes that TFG is continuing to breach the Kytch Terms of Service.

534.     By reason of the ongoing breaches, Kytch has and will suffer great and irreparable harm and damage, which harm and damage will be difficult to ascertain, and Kytch will be without an adequate remedy at law.

535.     TFG acknowledged in the Terms of Service contract that: "Kytch may seek injunctive or other equitable relief to protect its confidential information and intellectual property rights or to prevent loss of data or damage to its servers in any court of competent jurisdiction and You agree that Kytch may do so without the need to post bond or other surety." (Kytch Terms of Service, § 15(c).)

536.     The amount of such damages cannot be determined at this time but will be proven at trial.  Kytch is further entitled to recover from TFG the gains, profits, and advantages that it obtained as a result of these breaches.  Kytch is currently unable to ascertain the full extent of these gains, profits, and advantages but will prove the value thereof at trial.

537.     Because Kytch's remedy at law is inadequate, Kytch seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Kytch's

REDACTED VERSION - FIRST AMENDED COMPLAINT

business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE,** Kytch respectfully requests the following relief:

538.     That the Court enter judgment in Kytch's favor and against Defendants on all causes of action alleged herein;

539.     That the Court award injunctive relief, including ordering that:

539.1   Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, be preliminarily and permanently restrained and enjoined from misappropriating, disclosing, or using Kytch's Confidential Information and trade secrets;

539.2   Defendants recall and surrender all material and trade secrets wrongfully misappropriated or converted;

539.3   Defendants, their officers, agents, servants and employees, and all people or entities in active concert and participation with them be preliminarily and permanently enjoined from further disseminating the false and deceptive claims described herein in any form or medium;

539.4   Defendants to withdraw and retrieve all offending communications from the marketplace;

539.5   Defendants to disseminate corrective communications to dispel the false and deceptive messages described herein;

539.6   Defendants be enjoined from further accessing Kytch's computer networks and data without permission;

539.7   Defendants be enjoined from using any information already obtained from accessing Kytch's computer networks and data without permission;

539.8   Other appropriate injunctive relief.

REDACTED VERSION - FIRST AMENDED COMPLAINT

540.    That Kytch recover compensatory damages, consequential damages, restitution, and other compensation for the harm sustained by virtue of Defendants' wrongdoing, in an amount to be established at trial;

541.    That Defendants be ordered to account for and pay to Kytch all gains, profits and advantages derived by Defendants from the above-described wrongful acts;

542.    That the Court award punitive damages or other exemplary damages, as permitted by statute and contract, in an amount to be proved at trial;

543.    That Kytch recover any other damages permitted by statute or contract;

544.    That Kytch recover attorneys' fees and the costs of suit herein;

545.    That Kytch recover pre-judgment and post-judgment interest at the maximum legal rate; and

546.    Such other and further relief as the Court may deem to be just and proper.

**DEMAND FOR JURY TRIAL** Kytch hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

1   Dated:      April 29, 2022              IRELL & MANELLA LLP

2

3                                          By:  /s/ Jason Sheasby
                                           Jason Sheasby SBN 205455
4                                          *Attorneys for Plaintiff Kytch, Inc.*

5                                          CLARE LOCKE LLP
                                           Elizabeth M. Locke, P.C. * VA Bar No. 71784
6                                          Daniel P. Watkins, * VA Bar No. 84592
                                           Appearance *Pro Hac Vice*
7                                          *Attorneys for Plaintiff Kytch, Inc.*

8
                                           John C. Kirke SBN 175055
9                                          jkirke@donahue.com
                                           Andrew S. Mackay SBN 197074
10                                         amackay@donahue.com
                                           DONAHUE FITZGERALD LLP
11                                         1999 Harrison Street, 26th Floor
                                           Oakland, California 94612-3520
12                                         Telephone: (510) 451-3300
                                           Facsimile:  (510) 451-1527
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED VERSION - FIRST AMENDED COMPLAINT

# Exhibit 1

Redacted Version Filed 04/29/2022 -- Page 106 of 224

## KYTCH TRIAL AGREEMENT

PLEASE READ ALL OF THE FOLLOWING TERMS OF USE CAREFULLY. THIS IS A LEGAL AGREEMENT ("AGREEMENT") BETWEEN YOU AND KYTCH, INC. STATING THE TERMS AND CONDITIONS THAT GOVERN YOUR USE OF THE KYTCH SOLUTION DURING THE TRIAL. IF YOU ARE ENTERING INTO THIS AGREEMENT ON BEHALF OF A COMPANY OR LEGAL ENTITY, YOU REPRESENT THAT YOU HAVE THE AUTHORITY TO BIND SUCH ENTITY TO THESE TERMS AND CONDITIONS, IN WHICH CASE THE TERMS "YOU" AND "YOUR" SHALL REFER TO SUCH ENTITY. BY SIGNING BELOW OR BY USING THE KYTCH SOLUTION, YOU ARE AGREEING TO ALL OF THE TERMS AND CONDITIONS STATED HEREIN. IF YOU DO NOT AGREE TO THESE TERMS, DO NOT SIGN BELOW AND YOU SHALL NOT HAVE THE RIGHT TO ACCESS OR USE THE KYTCH SOLUTION.

A. Agreement Definitions

"Kytch" refers to Kytch, Inc. "You" and "your" refers to the individual or entity that has ordered the Kytch Trial by having signed below or otherwise having used the Kytch Trial.

The terms "Kytch Trial," or the "Trial," means your use of the Kytch Solution during the Trial Period solely for your internal evaluation and testing and not for commercial or production purposes.

The term "Kytch Solution"  or "Solution" refers to the hardware and software products owned or distributed by Kytch and related cloud services, programs, technology platform and other materials to which Kytch grants you access as part of the Trial, including user guides, and any program updates provided as part of the Solution.

The term "users" means only your employees who have a reasonable need to have access to the Kytch Solution solely for internal evaluation in connection with the Trial.

B. Trial Period

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

This Agreement is effective on the Effective Date (defined below) and will terminate six (6) months from the date Kytch ships you the Solution, unless earlier terminated (the "Trial Period"). Certain Kytch Trials may permit you a one-time option to extend the Trial Period by an additional thirty (30) days, by selecting that option on the Trial. If you would like to use the Solution after the Trial Period, provided that Kytch has made the Solution commercially available, you must purchase such Solution from Kytch.

If the Solution has been disconnected from the Kytch servers for a period of 3 days, or at the conclusion of your Trial Period, you will either (i) immediately cease all use of the Solution, and return the Solution (we will provide you with a free return label you may use), or (ii) promptly purchase and pay for a subscription to the Solution (subject to our standard Kytch Terms of Service) at our then-current monthly pricing (along with all other associated fees) from the Trial end date, unless otherwise agreed in writing (for clarity, upon expiration or termination of any such Solution subscription, your rights thereto shall cease and you shall then promptly return the Solution to Kytch). If the Solution has not been returned within 5 days after the Trial end date or date of disconnection from the Kytch servers, you will be considered to have purchased a subscription to the Solution and you shall pay the full listed non-discounted price of such Solution for the Trial Period. If you have submitted your credit card information, we will charge your credit card.

At any time and without notice, Kytch reserves the right to (i) modify the terms and conditions of the Trial offer, or (ii) cancel and terminate such Trial and this Agreement for any reason.

C. Rights Granted

For the duration of the Trial Period, you have the nonexclusive, nontransferable, non-assignable, non-sublicensable limited right to use the Solution at the approved locations identified in Exhibit A to this Agreement in accordance with Kytch's documentation, subject to the terms of this Agreement, and solely for your internal business purposes to evaluate Kytch's Solution and not for any production or commercial purposes. You may allow your users to use the Solution solely for this purpose and you are responsible and liable for your users' compliance with this Agreement.

You do not acquire any right or license to use the Solution in excess of the scope and/or duration of the Trial defined in this Agreement. Upon the termination or expiration of this Agreement or the Trial Period, your right to access or use the Kytch Solution shall immediately terminate.

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

D. Ownership and Restrictions

Kytch or its licensors retain all right, title and interest (including all intellectual property rights) in and to the Kytch Solution, including all improvements, enhancements and derivative works thereof, and anything else developed or provided by Kytch under this Agreement.

You shall not, and shall not cause or permit others to:

> • remove or modify any Solution markings or any notice of Kytch's or its licensors' proprietary rights;

> • modify, make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute or republish all or any part of the Solution, or otherwise access or use the Solution in order to build or support, and/or assist a third party in building or supporting, products or services competitive to any Kytch Solution;

> • disclose results of any benchmark tests or performance tests of the Kytch Solution without Kytch's prior written consent;

> • perform or disclose any of the following security testing of the Solution (or associated systems, services or infrastructure): network discovery, port and service identification, vulnerability scanning, password cracking, remote access testing, or penetration testing; and

> • license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit timesharing or service bureau use, or otherwise commercially exploit or make the Kytch Solution available to (or use such Solution for the benefit of) any third party.

E. Disclaimers and Exclusion of Warranties

THE SOLUTION IS PROVIDED TO YOU ON AN "AS IS" AND "AS AVAILABLE" BASIS, AND KYTCH HEREBY DISCLAIMS ALL EXPRESS OR IMPLIED REPRESENTATIONS, WARRANTIES, GUARANTEES, AND CONDITIONS WITH REGARD TO (A) THE SOLUTION, INCLUDING BUT NOT LIMITED TO SOFTWARE, HARDWARE, SYSTEMS, NETWORKS OR ENVIRONMENTS AND (B) MERCHANTABILITY, SATISFACTORY QUALITY, NONINFRINGEMENT, AND FITNESS FOR A PARTICULAR PURPOSE.

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

KYTCH DOES NOT GUARANTEE THAT (A) THE SOLUTION WILL BE ERROR-FREE OR UNINTERRUPTED, OR THAT KYTCH WILL CORRECT ALL ERRORS; (B) THE SOLUTION WILL OPERATE IN COMBINATION WITH YOUR CONTENT OR YOUR APPLICATIONS, OR WITH ANY OTHER SOFTWARE, HARDWARE, SYSTEMS, OR DATA; (C) YOUR CONTENT AND YOUR APPLICATIONS WILL BE SECURE OR NOT OTHERWISE LOST OR DAMAGED; AND (D) THE SOLUTION, INFORMATION OR OTHER MATERIAL YOU OBTAIN OR PURCHASE FROM KYTCH UNDER THIS AGREEMENT, WILL MEET YOUR REQUIREMENTS OR EXPECTATIONS. YOU ACKNOWLEDGE THAT KYTCH DOES NOT CONTROL THE TRANSFER OF DATA OVER COMMUNICATIONS FACILITIES, INCLUDING THE INTERNET, AND THAT THE SOLUTION MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF SUCH COMMUNICATIONS FACILITIES. KYTCH IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS.

YOU AGREE TO INDEMNIFY KYTCH FROM ANY DAMAGES, LIABILITIES, COSTS AND EXPENSES OR THE SETTLEMENT AGREED TO BY YOU, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY OF YOUR CONTENT OR APPLICATIONS OR NON-KYTCH SOFTWARE OR TECHNOLOGY. KYTCH IS NOT RESPONSIBLE FOR THE SECURITY OF ANY CONTENT, APPLICATION OR SOFTWARE THAT YOU LOAD INTO OR CREATE WITHIN THE TRIAL ENVIRONMENT.

KYTCH RESERVES THE RIGHT TO MAKE CHANGES OR UPDATES TO THE KYTCH SOLUTION AND TRIAL AT ANY TIME WITHOUT NOTICE. KYTCH MAY TERMINATE THE TRIAL FOR ANY REASON, AT ANY TIME.

F. User Accounts

To use the Solution, you must have an Kytch.com account. Access to and use of password protected or secure areas of the Trial site is restricted to authorized users only. You may not share your password(s), account information, or access to the Trial site. You are responsible for identifying and authenticating all users, for approving access by such users to the Solution, for controlling against unauthorized access by users, and for maintaining the confidentiality of usernames, passwords and account information. By federating or otherwise associating your and your users' Single Sign-On with Kytch, you accept responsibility for timely and proper termination of user records in your local (intranet) identity infrastructure and on your local computers. Kytch is not liable for any harm caused by users, including individuals who were not authorized to have access to the Solution but who were able to gain access because usernames, passwords or accounts were not terminated on a timely basis in your local identity management

Redacted Version Filed 04/29/2022 -- Page 110 of 224

infrastructure or your local computers. You are responsible for all activities that occur under your and your users' passwords or accounts or as a result of your or your users' access to the Trial, and agree to notify Kytch immediately of any unauthorized use. You agree to make every reasonable effort to prevent unauthorized third parties from accessing the Trial.

G. Support Services

The Kytch Trial provides an opportunity for current and potential Kytch customers to experience Kytch Solution before purchasing the Solution. The Trial is provided as a convenience and you agree that Kytch is not obligated to provide any technical support, phone support, or updates for the Kytch Solution accessed or used within the Trial environment.

H. End of Agreement

The Solution provided under this Agreement shall be provided for the Trial Period defined above unless earlier terminated in accordance with this Agreement. At the end of the Trial Period, all rights to access or use the Solution shall immediately terminate.

You may discontinue your use of the Solution at any time. Kytch may terminate your password, account, and access to or use of the Solution at any time for any reason. You acknowledge and agree that Kytch has no obligation to retain your content, data and applications, and that your content, data and applications will be irretrievably deleted, following the termination of the Trial.

If you cancel the Trial before the end of the Trial Period, all your rights to any remaining free Trial Period will be waived and you will not be eligible to participate in any further trials, except as allowed by Kytch in its sole discretion.

At termination of the Trial, if you choose not to buy the Solution, you must return all elements of the Kytch Solution (and all related materials) in your possession or control within five (5) days.

Provisions that survive termination or expiration of this Agreement are those which by their nature are intended to survive.

I. Fees and Taxes

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

The Solution provided under this Agreement is provided to you free of charge during the Trial Period.

J. Nondisclosure

By virtue of this Agreement, you will have access to information that is confidential to Kytch, including but not limited to all aspects of the Solution and all information relating to its features, specifications, functionality and performance ("Kytch Confidential Information"). Kytch Confidential Information shall not include information which: (a) is or becomes a part of the public domain through no act or omission of yours; or (b) was in your lawful possession prior to the disclosure and had not been obtained by you either directly or indirectly from Kytch; or (c) is lawfully disclosed to you by a third party without restriction on disclosure; or (d) is independently developed by you without use of or reference to Kytch Confidential Information. You agree, both during the term of this Agreement and for a period of five years after termination of this Agreement, to hold Kytch's Confidential Information in strict confidence using no less than a reasonable degree of care, not to disclose Kytch Confidential Information to any third party (other than your users) and not to use Kytch Confidential Information for any purpose other than your evaluation of the Solution as part of the Trial.

K. Terms and Privacy

The terms, EULA and privacy agreements located at Kytch's website at https://kytch.com/tos are incorporated into this Agreement.

L. Entire Agreement

You agree that this Agreement including the information which is incorporated into this Agreement by written reference (including reference to information contained in a URL or referenced policy), is the complete agreement with respect to the subject matter hereof, and that this Agreement supersedes all prior or contemporaneous agreements or representations, written or oral, regarding such subject matter. If any term of this Agreement is found to be invalid or unenforceable, the remaining provisions will remain effective and such term shall be replaced with a term consistent with the purpose and intent of this Agreement. It is expressly agreed that the terms of this Agreement shall supersede the terms in any purchase order or other non-Kytch document and no terms included in any such purchase order or other non-Kytch document shall apply to the Solution or Trial. This Agreement may not be modified and the rights and

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

restrictions may not be altered or waived except in a writing signed by authorized representatives of you and of Kytch.

M. Limitation of Liability

IN NO EVENT SHALL KYTCH BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, OR ANY LOSS OF REVENUE OR PROFITS, DATA, OR DATA USE, ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT OR TORT, OR OTHERWISE, EVEN IF KYTCH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL KYTCH'S TOTAL LIABILITY TO YOU UNDER THIS AGREEMENT FOR ALL DAMAGES EXCEED THE AMOUNT OF ONE THOUSAND UNITED STATES DOLLARS ($1,000.00).

N. Other

•      Kytch is an independent contractor and we each agree that no partnership, joint venture, or agency relationship exists between us. We each will be responsible for paying our own employees, including employment related taxes and insurance. Kytch reserves the right to provide the Solution from locations, and/or through use of affiliates and subcontractors, worldwide.

•      You are responsible for obtaining at your sole expense any rights and consents from third parties necessary for your content, your applications, and other vendors' products provided by you and used with the Trial environment, including all rights and consents to such content, applications and products necessary for Kytch to provide the Solution.

•      This Agreement is governed by the substantive and procedural laws of the State of California and you and Kytch agree to submit to the exclusive jurisdiction of, and venue in, the courts in Alameda county in California in any dispute arising out of or relating to this Agreement. If you have a dispute with Kytch, you will promptly send written notice to legal@kytch.com. Kytch may give notice applicable to Kytch's Solution customer base by means of a general notice on the Kytch portal for the Solution, and notices specific to you by electronic mail to your e-mail address on record in Kytch's account information or by written communication sent by first class mail or pre-paid post to your address on record in Kytch's account information.

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

•   You may not assign this Agreement or give or transfer the Solution or an interest in them to another individual or entity.  Kytch may assign this Agreement to any affiliate or successor to its assets or business.

•   Except for actions for violation or misappropriation of Kytch's intellectual property or proprietary rights, no action, regardless of form, arising out of or relating to this Agreement may be brought by either party more than two years after the cause of action has accrued.

•   Kytch may use software tools to audit and otherwise request information from you regarding your use of the Solution. You agree to cooperate with Kytch's audit and provide reasonable assistance and access to information.

•   The Uniform Computer Information Transactions Act does not apply to this Agreement or orders placed under it. You understand that Kytch's business partners, including any third party firms retained by you to provide computer consulting services, are independent of Kytch and are not Kytch's agents. Kytch is not liable for nor bound by any acts of any such business partner, unless the business partner is providing services as an Kytch subcontractor on an engagement ordered under this Agreement.

O. Force Majeure

Neither of us shall be responsible for events outside the reasonable control of the obligated party. We both will use reasonable efforts to mitigate the effect of a force majeure event.

P. Feedback

"Feedback" shall mean any input, comments, suggestion or feedback regarding Kytch's Solution, the Trial and/or Kytch Confidential Information, including changes or suggested changes to Kytch's current or future Solutions and/or other products or services. Notwithstanding anything that you may note or state in connection with providing Feedback, all Feedback provided by you shall not be considered confidential information and shall be received and treated by Kytch on a non-confidential and unrestricted basis. You agree that Kytch shall exclusively own (and you hereby assign to Kytch)  all right, title and interest (including all intellectual property rights)  in and to any Feedback provided by you or any other party, and acknowledge that Kytch may (but is not obligated to) use the Feedback for any purpose, including but not limited to incorporation or implementation of such Feedback into the Kytch Solution or other products or services, and to display, market, sublicense and distribute such Feedback as incorporated or embedded in any Solution, product or service distributed or offered by Kytch.

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

This Agreement is effective as of _____03 / 19 / 2020_____, 2020 (the "Effective Date"), by and between:

*J Tyler Gamble*

_____

Signature

J Tyler Gamble

_____

Name

Owner / McDonald's

_____

Title/Company


*Melissa Nelson*

_____

Signature

Melissa Nelson

_____

Name

Co-CEO / KYTCH,INC.

_____

Title/Company

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

EXHIBIT A


Approved Trial locations to be listed here


McDonald's 1108 South Cass Street Corinth MS 38834, McDonald's 2586 Anderson Ave Brownsville TN 38012,  McDonald's 1705 South Highland Ave Jackson TN 38301, McDonald's 4101 B Highway 412 S Bells TN 38006.

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Kytch Trial Agreement |
| **FILE NAME** | KYTCH TRIAL AGREEMENT__2020.docx |
| **DOCUMENT ID** | 6cad3831ad2aabcfba975dac3d13596153a13446 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

**SENT**

**03 / 19 / 2020**
18:30:52 UTC

Sent for signature to Tyler Gamble (tgamblemcd@gmail.com)
and Melissa Nelson (Melissa@kytch.com) from
allison@kytch.com
IP: 71.202.29.169

**VIEWED**

**03 / 20 / 2020**
02:23:22 UTC

Viewed by Tyler Gamble (tgamblemcd@gmail.com)
IP: 205.185.229.140

**VIEWED**

**03 / 20 / 2020**
03:28:57 UTC

Viewed by Melissa Nelson (melissa@kytch.com)
IP: 73.15.84.205

**SIGNED**

**03 / 20 / 2020**
02:26:22 UTC

Signed by Tyler Gamble (tgamblemcd@gmail.com)
IP: 205.185.229.140

**SIGNED**

**03 / 20 / 2020**
03:29:52 UTC

Signed by Melissa Nelson (melissa@kytch.com)
IP: 73.15.84.205

**COMPLETED**

**03 / 20 / 2020**
03:29:52 UTC

The document has been completed.

Powered by **HELLOSIGN**



# Kytch, Inc. Terms of Service

**Last Updated: July 3, 2020**

**IMPORTANT NOTICE: THIS AGREEMENT IS SUBJECT TO A WAIVER OF CLASS ACTION RIGHTS AS DETAILED IN THE DISPUTE RESOLUTIONS SECTION.**

**ACCEPTANCE OF TERMS OF SERVICE**

Kytch, Inc., its parent, Frobot, Inc., and affiliates (collectively, "Kytch" "We," "Us," or "Our") provide (1) the Kytch website located at www.kytch.com, and all associated sites linked to www.kytch.com, including the Kytch user account website that may be accessed at www.kytch.com ("Sites") (2) any services accessible through the Sites, including any Trial period and Kytch Gold ("Web Apps"), (3) software that may be downloaded to Your smartphone or tablet to access services ("Mobile Apps"), and (4) any subscription services, including services that can be accessed using the Web Apps and Mobile Apps ("Subscription Services"), all for use in conjunction with Kytch hardware products ("Products") and in other ways that Kytch provides. The term "Services" means the Sites, Web Apps, Mobile Apps, and Subscription Services.

Please read these Terms of Service ("Terms") carefully before you begin using Our Products and Services or any Third Party Services. By clicking "Login", "Create Account", "Sign In" "Sign Up", "Start Free Trial", creating a user account, placing an order, or otherwise using the Products and Services, you agree to accept and be bound by these Terms, along with the Kytch End User License Agreement, Kytch Trial Agreement, Kytch Privacy Policy, and the Kytch Privacy Statement, which are all taken together and incorporated by reference into these Terms, and govern Your use of the Products and Services and constitute a binding legal agreement between You and Kytch, (the "Agreement"). If any of the provisions of these Terms directly conflict with those applicable to individual Products or Services, the provisions applicable to the specific Products or Services will prevail. If you do not agree to the Agreement, do not access or use our Products or Services or any Third Party Services. Certain features of the Services may also be subject to additional guidelines, terms or rules, which will be posted on the Services in connection with such features. Please read these Terms carefully, as they contain important information about a class action waiver and a binding arbitration provision, requiring you to arbitrate any claims you may have against Kytch on an individual basis. ARBITRATION ON AN INDIVIDUAL BASIS MEANS THAT YOU WILL NOT HAVE, AND YOU WAIVE, THE RIGHT FOR A JUDGE OR JURY TO DECIDE YOUR CLAIMS, AND THAT YOU MAY NOT PROCEED IN A CLASS, CONSOLIDATED, OR REPRESENTATIVE CAPACITY.

THESE TERMS ARE A BINDING LEGAL AGREEMENT. BY ACCEPTING THESE TERMS AND ACCESSING AND USING THE PRODUCTS OR SERVICES IN ANY WAY YOU ARE ACCEPTING AND AGREEING TO THESE TERMS ON BEHALF OF YOURSELF OR THE ENTITY THAT YOU REPRESENT IN CONNECTION WITH THE ACCESS AND USE OF THE PRODUCTS AND SERVICES. YOU REPRESENT AND WARRANT THAT YOU HAVE THE RIGHT, AUTHORITY AND CAPACITY TO ACCEPT AND AGREE TO THESE TERMS ON BEHALF OF YOURSELF OR THE ENTITY THAT YOU REPRESENT. YOU REPRESENT THAT YOU ARE, OF SUFFICIENT LEGAL AGE IN YOUR JURISDICTION OR RESIDENCE TO USE OR ACCESS THE PRODUCTS AND SERVICES AND TO ENTER INTO THIS AGREEMENT.

AS DESCRIBED BELOW, YOU ARE CONSENTING TO AUTOMATIC SOFTWARE UPDATE OF THE SERVICES AND OF THE PRODUCTS CONNECTED TO THE SERVICES. IF YOU DO NOT AGREE, YOU SHOULD NOT USE OUR PRODUCTS OR SERVICES.

SECTIONS 4 AND 5 BELOW DESCRIBE IMPORTANT LIMITATIONS OF THE PRODUCTS AND SERVICES, ESPECIALLY IN CONNECTION WITH LIFE SAFETY AND CRITICAL USES. PLEASE READ THESE DISCLOSURES CAREFULLY, WHICH, BY YOUR USE OF THE PRODUCTS AND SERVICES, YOU AGREE TO ACCEPT.

**GENERAL**

The terms "You," "Your," or "Yours" as used in these Terms, means any person or entity who: (1) accesses or uses any of our Products or Services; and (2) creates or accesses an Account, (as defined in Section 2(a) including, but not limited to Account Owners and Authorized Users (as defined in Section 2(b).These Terms give you specific legal rights. In addition, you may also have other legal rights which vary from jurisdiction to jurisdiction. The disclaimers, exclusions, mandatory and binding arbitration, limitations of liability, indemnification, waiver of jury trial, waiver of class action and waiver of punitive damages under these Terms will not apply to the extent prohibited by applicable law. Some jurisdictions do not allow the exclusion of implied warranties or the exclusion or limitation of incidental or consequential damages or other rights, so those provisions of these Terms may not apply to you.

**NOTICE**

**BY ACCESSING THE PRODUCTS AND SERVICES OR CREATING ANY ACCOUNT, YOU REPRESENT, WARRANT, AND AGREE THAT YOU ARE AN ACCOUNT OWNER OR AN AUTHORIZED USER AND ARE ACCESSING THE PRODUCTS, SERVICES, AND ANY ACCOUNT FOR A PERMITTED PURPOSE. YOU UNDERSTAND AND AGREE THAT UNAUTHORIZED ACCESS OR EXCEEDING AUTHORIZED ACCESS TO THE PRODUCTS, SERVICES OR ANY ACCOUNT, WILL VIOLATE THESE TERMS OF SERVICE AND MAY ALSO VIOLATE CERTAIN LAWS INCLUDING, BUT NOT LIMITED TO, THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 et seq., THE COPYRIGNT ACT, 17 U.S.C. § 101 et seq., THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832 et seq. THE CALIFORNIA COMPREHENSIVE DATA ACCESS AND FRAUD ACT, Cal. Penal Code § 502, THE CALIFORNIA UNIFORM TRADE SECRETS ACT Cal. Civil Code § 3426 et seq., AND MAY ALSO CONSTITUTE COMMON LAW MISAPPROPRIATION, UNFAIR COMPETITION, TRESPASS TO CHATTELS, UNJUST ENRICHMENT, AND IS A BREACH OF THESE TERMS OF SERVICE. BY ACCESSING THE PRODUCTS, SERVICES, AND ACCOUNTS, YOU HEREBY EXPRESSLY CONSENT TO KYTCH, INC.'S MONITORING OF YOUR USE OF THE PRODUCTS, SERVICES, AND ACCOUNTS, INCLUING THROUGH THE USE OF SOFTWARE TOOLS. KYTCH, INC. WILL UTILIZE ANY AND ALL LEGAL REMEDIES TO WHICH IT IS ENTITLED TO ENFORCE ITS RIGHTS. BY ACCESSING THE PRODUCTS, SERVICES, OR ANY ACCOUNT YOU REPRESENT, WARRANT, AND AGREE THAT YOU HAVE BEEN PROVIDED WITH NOTICE OF THIS WARNING.**

## 1. Eligibility; Trials; Subscriptions; Customer Service; Term and Termination

**(a) Eligibility.** (i) You may use the Products and Services only if you have the legal capacity to form a binding contract with Kytch. Only individuals aged 18 and older are permitted to act as Account Owners of Kytch Accounts. The Products and Services are not available to any users previously prohibited from using the Products and Services by Kytch.

**(b) Subscriptions.** We offer different subscription plans for our Subscription Services.

**(c) Continuous Subscriptions.** When you purchase any of our Subscription Services, you expressly acknowledge and agree that (1) Kytch is authorized to charge you an annual subscription service fee (in addition to any applicable taxes) for as long as your subscription continues, and (2) your subscription is continuous until you cancel it or such Subscription Service is suspended, discontinued or terminated in accordance with these Terms.

**(d) Billing.** We automatically bill the payment method associated with your Kytch account on the day you purchase the subscription. We utilize a third party payment provider: Stripe. In the event you later decide to purchase additional Subscription Services (each, an "Add-On Service"), your payment for such Add-On Service will be prorated to the renewal date of your initial Subscription Service and the full amount of the add-on service will be charged on your subscription renewal date. You acknowledge that the amount billed may vary due to promotional offers, changes in your Subscription Services plan and changes in applicable taxes, and you authorize us to charge your payment method for the corresponding amounts.

**(e) Cancellations and Refunds.** Once you order your Subscription Service or any Add–On Service, you will be charged the full annual subscription fee which is non–refundable, even if you wish to cancel your subscription.

**(f) Pre-paid Subscription Services.** We may offer Products that include pre-paid Subscription Services, either included in the purchase price or as a Bundle. Pre-paid Subscription Services may not be used with Products other than the Product with which those pre-paid Subscription Services were purchased. If you purchase such Products, the pre-paid Subscription Services will begin on the date you pair your Product with your Account and end on the date noted in your Account following activation. If you cancel your pre-paid Subscription Services, those Subscription Services will be canceled permanently, and you will not receive a refund. Pre-paid Subscription Services are subject to the same terms and conditions as other Subscription Services, including Kytch's right to suspend, discontinue or terminate the Subscription Services in accordance with these Terms.

**(g) Trials.** If you are using the Products and Services on a trial basis, Your use of the Products and Services is also governed by the Kytch Trial Agreement and you may only use the Products and Services for the limited Trial Period specified by Kytch in writing or on the Web Apps at the time of Your order, solely for purpose of evaluating suitability. The Products must be installed at Your designated location.  Once installed, if the Products have been disconnected from the Kytch servers for a period of 3 days for any reason whatsoever, or, if the Products are shipped to You and You do not install the products within three (3) days after We send a notice to You that you have not installed the Products, or at the conclusion of Your Trial Period, you will either (i) immediately cease all use of the Products and Services, and return the Products in accordance with these Terms, or (ii) promptly purchase a subscription of the Services from the Trial end date, and begin paying for the Services. If the Products have not been returned to Kytch within fourteen (14) days of the Trial Period end date or date of disconnection from the Kytch servers, or they are not installed within three (3) days after We send a notice to You that You have not installed the Products, You hereby affirm and agree that You will be considered to have purchased a subscription to the Services and You agree that you shall pay the full listed non–discounted price of the Product and Services for the Trial Period. If you have submitted Your credit card information, You agree that we will charge Your credit card on file and you hereby give Us permission to do so.

When using the Products and Services through a Trial or Subscription, You may not and you many not directly or indirectly, cause, permit, or allow others to:

- remove or modify any program or services markings or any notice of Kytch's proprietary rights;
- make the Products or Services, including any Kytch programs or materials to which you are provided access, available in any manner to any third party;
- modify, make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute, republish or download any part of the Products and Services, or access or use the services in order to build or support, and/or assist a third party in building or supporting, Products or Services competitive to Kytch;
- disclose the results of the performance of the Products and Services without Kytch's prior written consent;
- license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit timesharing, or otherwise commercially exploit or make the Products and Services, Kytch programs or materials available, to any third party.

**(h) Authorized Users.** To use the Products and Services you must have a kytch.com account. Access to and use of the Web Apps is restricted to Account Owners and Authorized Users only. You may not share Your password(s), account information, or access to the Web Apps or any Accounts. You are responsible for identifying and authenticating all Authorized Users, for approving access by such Authorized Users to the Services, for controlling against un-authorized users, and for maintaining the confidentiality of usernames, passwords and account information. Kytch is not liable for any harm caused by Authorized Users, including

any individuals who were not authorized to have access to the Products and Services but who were able to gain access because usernames, passwords or accounts were not terminated on a timely basis. You are responsible for all activities that occur under Your and Your Authorized Users' passwords or accounts or as a result of Your and Your Authorized Users' access to the Web Apps, and agree to notify Kytch immediately of any unauthorized access. You agree to make every reasonable effort to prevent unauthorized third parties from accessing the Web Apps.

If you cancel the trial before the end of the trial period, all Your rights to any remaining free trial period will be waived and you will not be eligible to participate in any further trials, except as allowed by Kytch in its sole discretion.

At any time and without notice, Kytch reserves the right to (i) modify the terms and conditions of the trial offer, or (ii) cancel such trial for any reason. Cancellations can be emailed to support@kytch.com. The other sections of Kytch's Terms of Service, Terms of Sale, EULA and Privacy Policies apply.

**(i) Kytch Gold.** As part of the Services, You may sign up for Kytch Gold. Kytch Gold allows You to see the physical address of the location of Your equipment and whether the equipment is available to serve product. You may choose to make this information available to users of the Kytch Services. If you choose to share this information, you hereby give your consent to Kytch to make it available without limitation.

**(j) Customer Service.** If you have any questions or concerns regarding the Products, the Services or these Terms, please contact Kytch. You understand and agree that customer service and any customer care and support offered and provided by Kytch is not a technician service or dispatch center, an emergency service provider or dispatch service.

**(k) Term and Termination.** These Terms will remain in full force and effect as long as you continue to access or use the Products and Services, or until terminated in accordance with the provisions of the Agreement. At any time, Kytch may (i) suspend or terminate Your rights to access or use the Products and Services, or (ii) terminate these Terms with respect to you if Kytch, in good faith, believes that you have used the Products and Services in violation of these Terms, including any incorporated guidelines, terms or rules. You may not give, sell, loan or transfer the Product to any other person or entity. Upon termination or expiration of these Terms for any reason, you must return the Product to Kytch in accordance with these Terms.

**(l) Effect of Termination.** Upon termination of these Terms for any reason, Your Account and Your right to use the Products and Services will automatically cease, and Kytch shall have no further obligation to You.

**(m) Ownership of Products and Product Software.** Products includes any Products provided or leased to You by Kytch with or without a separate fee in connection with the Services. You agree that the Product Software and Products will remain the property of Kytch and You will not acquire any ownership or other interest in them by virtue of this Agreement or attachment of the Products to Your equipment as a result of this Agreement. The Product Software is further governed by the EULA. You agree that the Products will not be deemed fixtures or in any way part of Your location. You agree to use the Products only for accessing the Service(s) provided by Kytch pursuant to these Terms. You must follow all instructions from Kytch regarding the installation and use of the Products.

**(n) Upgrades.** Kytch may upgrade, replace, remove, add or otherwise change the Products at its sole discretion at any time during the Agreement or following its termination. You consent to such changes including Kytch Platform, firmware and other code or software updates or downloads, including updates and downloads by Kytch's third-party suppliers, with or without notice to You, which may alter, add to, or remove features or functionalities of the Products or the Services. You acknowledge and understand that the Products may receive remote updates of software, firmware, or operating systems by Kytch's third-party suppliers. You acknowledge and agree that Kytch's or Kytch's third-party suppliers' updates, or Kytch's addition or removal of or change to the Products may interrupt access to the Services. Kytch may, at its sole discretion, fix the Products, install new or reconditioned Products, including replacing the existing Products, as Kytch deems necessary, at any time for which You may incur a separate fee. If Kytch requests

that You replace, or offers to replace the Products in order to provide the Services, and You fail to do so, Kytch is not responsible for any resulting degradation of the Services or any security vulnerabilities. If Kytch requires that You add or replace the Products and You fail to do so, Kytch may terminate the Agreement at its sole discretion.

**(o) Unauthorized Use; Prohibition on Tampering.** You are responsible and shall be liable for all Products at Your location and in Your possession. You may not sell, lease, abandon, or give away the Products. You agree that You will not, and You will not permit others, to use, rearrange, disconnect, abandon, remove, relocate, repair, service, alter, modify, tamper or otherwise interfere with any of the Products. Such prohibition includes, without limitation, attaching or, permitting others to attach any unauthorized devices to the Products, using or permitting others to use the Products that causes interference with the Products or Services, or altering identifying information such as serial numbers or logos. If You make or assist any person to make any unauthorized connection or modification to the Products, Product Software, the Kytch Platform or the Service(s) Kytch may terminate the Agreement and recover such damages as may result from Your actions. You also agree that Kytch may recover damages from You for tampering with the Products, Product Software, the Kytch Platform, the Services or utilizing them for purposes other than those contemplated by the Agreement. You agree that You will not allow anyone other than Kytch or its agents to service the Products.

**(p) Payment for Damage to or Loss of the Products.** You agree to pay the full retail cost for the repair or replacement of any Products or part that are lost, stolen, damaged, modified, sold, transferred, leased, encumbered or assigned together with any costs incurred by Kytch in obtaining or attempting to obtain possession of any Products.

**(q) Return of Products.** You agree that in the event the Agreement is terminated for any reason, You will return, either in person, or via first class mail, all of the Products to Kytch within fourteen (14) days of the effective date of termination of the Agreement, unless otherwise instructed in writing by Kytch. The returned Products must be in good condition and without any encumbrances, except for ordinary wear and tear resulting from proper use. If You fail to return the Products as provided herein, additional charges may apply. If You return the Products to Kytch by mail, You will be responsible for (i) any damage to the Products as assessed by Kytch upon receipt, (ii) the replacement cost of such Products that are lost, misplaced, not delivered or stolen during transit, and (iii) shipping/handling costs, unless Kytch provides written notice in advance that it will pay such costs.

**(r) Relocation of Products.** The Products may only be used in the designated business Location(s). You agree that You will not remove any of the Products from the business Location(s) without Kytch's prior consent. YOU UNDERSTAND AND ACKNOWLEDGE THAT IF YOU ATTEMPT TO INSTALL OR USE THE PRODUCTS OR SERVICE(S) AT A LOCATION OTHER THAN THE BUSINESS LOCATION(S) DESIGNATED BY YOU, WHEN YOU ENTERED INTO THIS AGREEMENT, THE SERVICE(S) MAY FAIL TO FUNCTION OR MAY FUNCTION IMPROPERLY. If You relocate to a new address, You may be charged a fee to relocate the Products.

**(s) Compliance and Auditing Rights** You acknowledge and agree that Kytch may monitor your use of the Kytch Products and Services remotely and in person, to ensure your compliance with the Terms. You hereby agree to cooperate with Kytch and to allow Kytch to remotely monitor your use of the Kytch Products. You also agree to allow Kytch to physically inspect your facilities and records that relate to the Kytch Products and Services and your use of the same and to verify your full compliance with the terms of these Terms. You agree to cooperate with Kytch and provide reasonable assistance and access to such information. You and Kytch agree to determine a mutually agreeable time and date for such inspection which shall take place within five (5) business days after written demand by Kytch therefor. In lieu of an inspection, if Kytch so requests, an officer or other authorized representative of your business entity shall certify in writing to Kytch that you are in full compliance with the Terms. You agree that Kytch shall not be responsible for any

of your costs incurred in cooperating with the audit. You agree to immediately pay any fees applicable to your use of the Kytch Products and Services in excess of the rights granted to you pursuant to the Terms. Failure of You to pay shall constitute a material breach of these Terms.

## 2. Accounts

**(a) Your Account.** To use certain Products and Services you must register for a user account ("Account") and provide certain information about Yourself, as prompted by the applicable registration form. You represent, warrant, and agree that: (a) all required registration information that you submit is truthful and accurate; (b) you will maintain the accuracy of such information; and (c) Your use of the Products and Services will not violate any applicable federal, state, local, or international law or regulation, including, without limitation, any laws regarding the export of data or software to and from the U.S. and other countries (e.g., you are not located in an embargoed country or are not listed as a prohibited or restricted party under applicable export control laws and regulations); and (d) that you have agreed to these Terms. You are entirely responsible for maintaining the confidentiality of Your Account login credentials and for all activities that occur under Your Account. You agree to use "strong" passwords (passwords that use a combination of upper- and lower-case letters, numbers and symbols) with Your Account and to maintain Your password securely to prevent others from gaining access. You agree to immediately notify Kytch of any unauthorized use or suspected unauthorized use of Your Account, or any other breach of security. Kytch is not liable for any loss or damage arising from Your failure to comply with the above requirements.

**(b) The individual who creates an Account** is the "Account Owner" of that Account and, if obtaining Products as part of the Services is also the lessee of the Products associated with that Account. Individuals who are authorized to access an Account Owner's Products and Services are those individuals who are employees of the Account Owner who require access to the Account as part of their job functions and only for the Permitted Purpose ("Authorized Users"). Authorized Users may have the ability to use the Services and monitor and control the Products (for example, an Authorized User can change Your settings). Authorized Users may also have the ability to view information (including personal information) and Content across all of an Account Owner's Products and Services (for example, an Authorized User will receive email alerts or can view Your history). Authorized Users are responsible for their own actions in connection with the Products and Services, but the Account Owner also hereby warrants and agrees to be jointly and severally liable for all actions taken by all Authorized Users relating to the Account Owner's Products, Services and Account. If you are an Account Owner who invites or enables an Authorized User, you acknowledge and agree that said Authorized User may subsequently invite or enable other Authorized Users with the same access and ability to use Your Products and Services set out above. As a result, if you are an Account Owner, you should only authorize those individuals whom you trust to access Your Account, Products and Services.

**(c) Warranties by Account Owner.** ccount Owner represents, warrants, and agrees that: (i) Account Owner is fully responsible for the use, security, and integrity of their Account and will only allow Authorized Users to access the Account and shall instruct Authorized Users that they may not share Account login credentials with anyone other than other Authorized Users; (ii) Account Owner is responsible for Authorized User's access to the Account; and (iii) violation of these Account Owner's warranties constitutes a material breach of these Terms.

## 3. Access to Services

**(a) Access and Use.** Subject to these Terms, Kytch grants you a limited, non-transferable, non-exclusive, non-assignable right (without the right to sub-license) to access and use the Services in the United States by (i) using the Web Apps in connection with, and solely for the purpose of, controlling and monitoring the Products you are authorized to control and monitor or otherwise accessing the Services provided by Kytch for Your use (the "Permitted Purpose") ; (ii) installing and using the Mobile Apps solely on Your own handheld mobile device (e.g., iPhone, iPad or Android smartphone) solely for the Permitted Purpose; and (iii) accessing the Sites solely for the Permitted Purpose.

**(b) Automatic Software Updates.** Kytch may, from time to time, develop patches, bug fixes, updates, upgrades and other modifications to improve the performance of the Services and/or the Product Software ("Updates"). These may be automatically installed without providing any additional notice or receiving any additional consent. You consent to this automatic update. If you do not want such Updates, Your remedy is to terminate Your Account and stop using the Products and Services. If you do not terminate a previously created Account, you will receive Updates automatically. You acknowledge that you may be required to install Updates to use the Products and Services and you agree to install any Updates that Kytch provides promptly. Your continued use of the Products and Services is Your agreement – (i) to these Terms with respect to the Products and Services, and (ii) to the End User License Agreement with respect to updated Product Software; and (iii) any change or updates that Kytch may make to these Terms or the End User License Agreement in the future.

**(c) Kytch-provided interface to Third-Party Products and Services.** Over time, Kytch may provide the opportunity for you to interface the Products and Services to one or more third-party products and services, through and using the Services, for example through the Works with Kytch platform ("Third-Party Products and Services"). You decide whether you want to interface, and with which Third-Party Products and Services you want to interface. Your explicit consent and authorization are required for this interface and is revocable by you at any time. Once Your consent is given for a particular Third-Party Product and Service, you agree that Kytch may exchange information and control data regarding you and Your products, including Your personal information, pursuant to our Privacy Policy in order to enable the interface that you have authorized. Once this information is shared with the particular Third-Party Product and Service, its use will be governed by the third party's privacy policy and not by Kytch's privacy documentation. You acknowledge and agree that Kytch makes no representation or warranty about the quality or safety of any Third-Party Products or Services or the interface with Product and Services. Accordingly, Kytch is not responsible for Your use of any Third-Party Product or Service, or any personal injury, death, property damage (including, without limitation, to Your home), or other harm or losses arising from or relating to Your use of any Third-Party Products or Services. You should contact the third party with any questions about their Third-Party Products and Services.

**(d) Content. Certain materials may be displayed, performed, or provided through your access and use of the Products and Services,** including, but not limited to, text, graphics, articles, photographs, video, images, reports. and illustrations ("Content")). The Content supplied by Us is owned exclusively by Us, and You obtain no right, title, or interest in or to the Content. The Content may also include information that You may provide through the Services including, without limitation, feedback, comments, questions, video, or other information which is shared with other users in the course of using the Products and Services (collectively, "User Submissions"), which we may also use to provide, maintain and improve the Services. Some Content may be visible to others. You are solely responsible for all User Submissions that You upload, post, email, transmit or otherwise disseminate using, or in connection with, the Services, or that You contribute in any manner to the Services; You represent and warrant that You have all rights necessary to do so, in the manner in which You contribute it; and You license to Kytch all patent, trademark, trade secret, copyright or other proprietary rights in and to such User Submissions for publication on the Service pursuant to these Terms. You shall abide by all copyright notices, trademark rules, information and restrictions contained in any Content accessed through the Services, and shall not use, copy, reproduce, modify, translate, publish, broadcast, transmit, distribute, perform, upload, display, license, sell or otherwise exploit for any purposes whatsoever any Content or third-party submissions or other proprietary rights not owned by You: (i) without the express prior written consent of the respective owners, and (ii) in any way that violates any third-party right. Kytch reserves the right to remove any Content, including User Submissions, from the Services at any time, for any reason (including, but not limited to, upon receipt of claims or allegations from third parties or authorities relating to such Content or if we are concerned that You may have breached the immediately preceding sentence), or for no reason at all. Additionally, any User Submissions You submit on or through the Services or otherwise (except for personal information as described in the Privacy Policy) will

be considered non–confidential and non–proprietary. YOU AGREE TO INDEMNIFY AND HOLD HARMLESS KYTCH FROM ANY THIRD PARTY CLAIMS, OF WHATEVER NATURE, BASED OR ARISING FROM ANY USER SUBMISSIONS OR OTHER CONTENT YOU PROVIDE.

**(e) Certain Restrictions.** The rights granted to You in these Terms are subject to the following restrictions: (i) You agree not to license, sell, rent, lease, transfer, assign, distribute, host or otherwise commercially exploit the Products and Services; (ii) You agree not to modify, make derivative works of, disassemble, reverse–compile or reverse–engineer any part of the Products and Services; (iii) You agree not to access the Products and Services in order to build a similar or competitive service or product; (iv) except as expressly stated herein, no part of the Products and Services may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means; (v) You agree not to upload, transmit or distribute any computer viruses, worms or any software intended to damage or alter a computer or communications network, computer, handheld mobile device, data, the Services, the Products, the Product Software or any other system, device or property; (vi) You agree not to interfere with, disrupt or attempt to gain unauthorized access to the servers or networks connected to the Services or violate the regulations, policies or procedures of such networks; (vii) You agree not to access (or attempt to access) any of the Services by means other than through the interface that is provided by Kytch; and (viii) You agree not to remove, obscure or alter any proprietary rights notices (including copyrights and trademark notices) that may be contained in, or displayed in connection with, the Products and Services. Any future release, update or other addition to functionality of the Services shall be subject to these Terms.

**(f) Privacy.** Please review the Privacy Policy for Kytch Web Sites and the Privacy Statement for Kytch Products and Services. These documents describe practices regarding the information that You or Kytch may collect from users of the Products and Services, including any Content or User Submissions.

**(g) Security.** We attempt to implement appropriate security measures. However, Kytch cannot guarantee that unauthorized third parties will never be able to defeat our security measures or use Your personal information for improper purposes. You acknowledge that You provide Your personal information at Your own risk.

**(h) Modification.** Kytch reserves the right, at any time, to modify, suspend or discontinue the Services or any part thereof with or without notice. You agree that Kytch will not be liable to You or to any third party for any modification, suspension or discontinuance of the Services or any part thereof.

**(i) Access Outside Certain Countries.** Although the Sites are accessible worldwide, the Products and Services provided or accessed through or on the Sites are not available to all persons or in all countries and are only intended for access through the United States and Canada. If You choose to access the Sites from outside a country in which Kytch supports the Product and Services listed here ("Target Country"), You do so on Your own initiative and You are solely responsible for complying with applicable local laws in Your country. You understand and accept that the Sites are not designed for use in a non–Target Country and that some, or all, of the features of the Sites may not work or be appropriate for use in such a country. To the extent permissible by law, Kytch accepts no responsibility or liability for any damage or loss caused by Your access or use of the Sites or Kytch Products in a non–Target Country. You will be bound by these Terms wherever You access or use the Sites or the Services.

## 4. Agreed Usage and Limitations of Kytch Products and Services

**(a) Intended Use of Kytch Services.** The Services are intended to be accessed and used for non–time–critical information and control of Kytch Products. While we aim for the Services to be highly reliable and available, they are not intended to be reliable or available 100% of the time. The Services are subject to sporadic interruptions and failures for a variety of reasons beyond Kytch's control, including Wi–Fi intermittency, service provider uptime, mobile notifications and operators, among others. You acknowledge these limitations and agree that Kytch is not responsible for any damages allegedly caused by the failure or delay of the Services.

Redacted Version Filed 04/29/2022 -- Page 125 of 224

**(b) Reliability of Services.** You acknowledge that the Services, including remote access and mobile notifications, are not error-free or 100% reliable and 100% available. Proper functioning of the Services relies and is dependent on, among other things, the transmission of data through Your wi-fi network, enabled wireless device (such as a phone or tablet) and broadband internet access and internet service providers, or optional Cellular Backup service, for which neither Kytch nor any wireless or data carrier is responsible, and may be interrupted, delayed, refused, or otherwise limited for a variety of reasons, including insufficient coverage, power outages, termination of service and access, environmental conditions, interference, non-payment of applicable fees and charges, unavailability of radio frequency channels, system capacity, upgrades, repairs or relocations, and priority access by emergency responders in the event of a disaster or emergency (collectively, "Service Interruptions"). You understand that Service Interruptions may result in the Services being unreliable or unavailable for the duration of the Service Interruption. We cannot and do not guarantee that you will receive notifications within any given time, or at all.

**(c) Service Interruptions;** no refund or rebate. The Services may be suspended temporarily, without notice, for security reasons, systems failure, maintenance and repair, or other circumstances. You agree that you will not be entitled to any refund or rebate for such suspensions. Kytch does not offer any specific uptime guarantee for the Services.

**(d) System Requirements.** The Services will not be accessible without: (i) a working Wi-Fi network in Your store that is positioned to communicate reliably with the Products; (ii) an Account; (iii) an enabled and supported wireless device, such as a phone or tablet (required for some features and functionalities of the Service); (iv) always-on broadband Internet access in Your store with bandwidth sufficient to support the Products you use; and (v) other system elements that may be specified by Kytch. It is Your responsibility to ensure that you have all required system elements and that they are compatible and properly configured. You acknowledge that the Services may not work as described when the requirements and compatibility have not been met. If you modify, substitute, move, or otherwise change any of the required system elements, it is Your sole duty and responsibility to be sure they are compatible and properly configured to work with the Products and Services. In addition, you acknowledge that Kytch may activate Bluetooth on Your smartphone or tablet, with or without prior notification, in order to facilitate proper operation of the Services, enable communication with Kytch Products connected to the same Kytch account and enable certain features.

**(e) No Benefits.** Kytch does not guarantee or promise any specific monetary benefit from the use of the Products or Services or any feature thereof. From time to time, Kytch may use the Services to provide you with information that is unique to you and Your Business. We do this to highlight an opportunity based on our analysis and information about you and Your business.

**(f) The Services Provide You with Information** Concerning your equipment. All information is provided "as is" and "as available". We cannot guarantee that it is correct or up to date. Accessing Information through the Services is not a substitute for direct access of the information at the equipment location.

**(g) All information Publicly Posted or Privately Transmitted** through the Services is the sole responsibility of the person from whom (or from whose Account) such Content originated and Kytch will not be liable for any errors or omissions in any Content. Kytch cannot guarantee the identity of any other users with whom You may interact while using the Services. In addition, we cannot guarantee the authenticity of any data that users or merchants may provide about themselves. You acknowledge that all Content accessed by You using the Services is at Your own risk and You will be solely responsible for any damage or loss to any party resulting therefrom. We cannot control and have no duty to take any action regarding how You may interpret and use the Content or what actions You may take as a result of having been exposed to the Content, and You hereby release us from all liability for You having acquired or not acquired Content through the Services.

**(h) You warrant, represent and agree that You will not contribute** any Content or otherwise use the Products and Services in a manner that (i) infringes or violates the intellectual property rights or proprietary rights, rights of publicity or privacy or other rights of any third party; (ii) violates any law, statute, ordinance or regulation or is otherwise illegal; (iii) is harmful, fraudulent, deceptive, threatening, abusive, harassing, tortious, defamatory, vulgar, obscene, libelous or otherwise objectionable; (iv) impersonates any person or entity, including, without limitation, any employee or representative of Kytch; (v) contains a virus, Trojan Horse, worm, time bomb or other harmful computer code, file or program; (vi) jeopardizes the security of Your Kytch Account or anyone else's Account (such as allowing someone else to log into the Services as You); (vii) attempts, in any manner, to obtain or access the password, account, products, devices, systems, or other security information from any other user or third party; (viii) violates the security of any computer network or cracks any passwords or security encryption codes; (ix) runs Maillist, Listserv or any form of auto-responder or "spam" on the Services or any processes that otherwise interfere with the proper working of the Services (including by placing an unreasonable load on the Services' infrastructure); (x) copies or stores any significant portion of the Content; (xi) decompiles, reverse-engineers or otherwise attempts to obtain the source code or underlying ideas or information of or relating to the Services; (xii) allows access to the Account by anyone other than an Account Owner or Authorized User; (xiii) is not for a Permitted Purpose; or (xiv) denigrates or disrupts any network capacity or functionality.

**(i) Privacy and Data Protection Laws.** Kytch Products and Services are primarily intended for purely personal and business use. Nonetheless, data protection and privacy laws where You live may impose certain responsibilities on You and Your use of the Products and Services. Where Kytch is acting as a processor of data You have collected through its Products and Services, it will explicitly state this in the Kytch Privacy Statement for Products and Services. In these situations, Kytch will attempt to: (i) only process data at Your instruction; (ii) ensure that persons permitted to process data through us on Your behalf are committed to confidentiality; (iii) only engage a third party service provider (sub-processor) that provide an equivalent level of protection as set forth herein; (iv) engage a new third-party service provider (sub-processor) only after Kytch has provided notice of such changes by posting to the website listed below and allowed You ten (10) calendar days to object after notice is given. In the event You do object, Kytch will make reasonable efforts to address Your objection. After this process, if a resolution has not been agreed to within five (5) calendar days, Kytch will proceed with engaging the third-party service provider. You will have the opportunity to terminate Your use of Products and Services without penalty. Kytch sub-processors include Amazon Web Services. It is Your responsibility to check this website regularly for updates; (v) to the extent applicable and possible, assist You with any individual rights requests or other compliance obligations; and (vi) delete or return Your data upon termination.

**(j) Installation, Test and Use.** It is Your responsibility to install and use the Products and Services pursuant to the applicable manual and instructions. IF A PRODUCT IS NOT PROPERLY INSTALLED, OR IF A PRODUCT OR ANY OF ITS SENSORS ARE OUTSIDE THE DETECTION RANGE OR HINDERED OR OBSTRUCTED, YOU MAY EXPERIENCE FALSE ALARMS OR DETECTION FAILURES. It is Your responsibility to test the Products once installed to be sure the Products (and any related sensors, components and peripherals) are functioning and communicating as intended and designed, and then regularly test and maintain the Products after installation. There may be laws in the jurisdiction that you install a particular Product applicable to where and how to install that Product. You should check to ensure that you are in compliance with all relevant laws in your jurisdiction. Kytch is not responsible for any injury or damage caused by self-installation. Kytch maintains a list of recommended installers of the Products on its website. These installers are not Kytch employees and are not affiliated with Kytch. Kytch is not responsible for any conduct of or liability associated with these installers. You should conduct your own due diligence to select one that best fits your needs.

**(k) Compatibility. KYTCH DOES NOT SUPPORT EVERY MAKE AND MODEL SOFT SERVE EQUIPMENT. BEFORE USING THE SERVICES, PLEASE ENSURE YOUR EQUIPMENT IS SUPPORTED.** You acknowledge that you have verified the compatibility of the Products you are purchasing with your equipment. You are solely

responsible for determining the compatibility of the Products with your equipment, and you accept that lack of compatibility is not a valid claim under the warranty provided with your Products and does not otherwise constitute a basis for receiving a refund.

## 5. Limitations of Kytch Services Due to Third Parties

**(a) General.** Kytch Services rely on or inter-operate Third Party Products and Services. These Third Party Products and Services are beyond Kytch's control, but their operation may impact on, or be impacted by, the use and reliability of the Kytch Services. You acknowledge and agree that: (i) the use and availability of the Services is dependent on third-party product vendors and service providers, (ii) these third-party products and services may not operate in a reliable manner 100% of the time and they may impact on the way that the Kytch Services operate, and (iii) Kytch is not responsible for damages and losses due to the operation of these third-party products and services.

**(b) Third-Party Service Providers Used By Kytch.** You acknowledge that Kytch uses third-party service providers to enable some aspects of the Services – such as, for example, data storage, Cellular Back-up, synchronization and communication through Amazon Web Services and mobile device notifications through mobile operating system vendors and mobile operators. YOU AGREE NOT TO RELY ON THE SERVICES FOR ANY LIFE SAFETY OR TIME-CRITICAL PURPOSES. FURTHER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU AGREE TO RELEASE AND HOLD HARMLESS THIRD-PARTY SERVICE PROVIDERS FROM ALL LIABILITY, DAMAGES OR LOSSES OF ANY KIND OR SORT, PERSONAL INJURY OR LOSS OF LIFE ARISING FROM YOUR USE OF THE PRODUCTS AND SERVICES.

**(c) Equipment, ISP and Operator.** You acknowledge that the availability of the Services is dependent on (i) Your computer, mobile device, building wiring, business Wi-Fi network, Bluetooth connection and other related equipment ("Equipment"), (ii) Your Internet service provider ("ISP") and (iii) Your mobile device operator ("Operator"). You acknowledge that You are responsible for all fees charged by Your ISP and Operator in connection with Your use of the Services. You also acknowledge that You are responsible for compliance with all applicable agreements, terms of use/service and other policies of Your ISP and Operator.

**(d) App Stores.** You acknowledge and agree that the availability of the Mobile Apps is dependent on the third-party websites from which You download the Mobile Apps, e.g., the Google Play Store from Google or the App Store from Apple (each an "App Store"). You acknowledge that these Terms are between You and Kytch and not with an App Store. Each App Store may have its own terms and conditions to which You must agree before downloading Mobile Apps from it. You agree to comply with such App Store terms and conditions, and Your license to use the Mobile Apps is conditioned upon Your compliance with such App Store terms and conditions. To the extent that such other terms and conditions from such App Store are less restrictive than or otherwise conflict with the terms and conditions of these Terms, the more restrictive or conflicting terms and conditions in these Terms apply.

**(e) Third-Party Website Links and Referrals.** The Sites may contain links to other websites operated by third parties ("Third-Party Sites") and referrals to third-party vendors ("Referred Vendors"). Such Third-Party Sites and Referred Vendors are not under our control. Kytch provides these links and referrals only as a convenience and does not review, approve, monitor, endorse, warrant or make any representations with respect to such Third-Party Sites or Referred Vendors. Your use of these Third-Party Sites is at Your own risk.

**(f) Authorized Users.** Kytch is not responsible for any Account Owner or Authorized User's behavior, or for any personal injury, death, property damage (including, without limitation, to Your home), or other harm or losses arising from or relating to their use of the Services.

**(g) Release Regarding Third Parties.** Kytch is not responsible for third parties or their products and services, including, without limitation, the App Stores, Third-Party Products and Services, Third-Party Sites, Referred Vendors, Equipment, ISP and Operators. Kytch hereby disclaims, and you hereby discharge, waive and release Kytch and its licensors and suppliers from any past, present and future claims, liabilities and

damages, known or unknown, arising out of or relating to Your interactions with such third parties and their products and services. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU HEREBY WAIVE CALIFORNIA CIVIL CODE SECTION 1542 IN CONNECTION WITH THE FOREGOING, WHICH STATES: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOUR AT THE TIME OF EXECUTING THE RELEASE WHICH, IF KNOWN BY HIM OR HER, MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." YOU HEREBY WAIVE ANY SIMILAR PROVISION IN ANY OTHER JURISDICTION.

## 6. Ownership and Intellectual Property

**(a) Kytch Property.** You acknowledge that all intellectual property rights, including, without limitation, copyrights, patents, trademarks and trade secrets, in the Product, Product Software and Services (i.e., the Sites, Web Apps and Mobile Apps) are owned by Kytch or its affiliates or our licensors. Your possession, access to and use of the Product, Product Software and Services do not transfer to you or any third party any rights, title or interest in or to such intellectual property rights. Kytch, and its affiliates and licensors and suppliers, reserve all rights not granted in these Terms. The Services are licensed to you, not sold, under these Terms. Nothing on or in the Products or Services shall be construed as conferring any license under any intellectual property right, including any right in the nature of trademark or copyright, of Kytch or any third party, whether by estoppel, implication or otherwise. All trademarks and trade names are the property of their respective owners.

You may not use the Content of the Services in any other public or commercial way, nor may you copy or incorporate any of the content of the Services into any other work, including Your own website, without the written consent of Kytch. You must have a license from us before you can post or redistribute any portion of the Services. Kytch retains full and complete title to all Content on the Services, (except User Submissions, for which you have granted Kytch an irrevocable license to use as set forth in these Terms), including any downloadable software and all data that accompanies it. You must not copy, modify or in any way reproduce or damage the structure or presentation of the Services, or any Content therein.

**(b) Feedback.** You may choose to or Kytch may invite you to submit comments, suggestions or ideas about the Products or Services, including how to improve the Products or Services ("Ideas"). By submitting any Ideas, you agree that Your submissions are voluntary, gratuitous, unsolicited and without restriction, and will not place Kytch under any fiduciary or other obligation and Kytch will be under no obligation to pay you any compensation for said Ideas. Kytch owns all right, title, and interest in and to said "Ideas." Kytch may use, copy, modify, publish or redistribute the submission and its contents for any purpose and in any way without any compensation to you and at its sole discretion. You also agree that Kytch does not waive any rights to use similar or related ideas previously known to Kytch, developed by its employees or obtained from other sources.

**(c) User Submissions.** You hereby grant us a non-exclusive, worldwide, royalty-free, perpetual, irrevocable, sub-licensable and transferable right to access, display or otherwise use, copy, modify, and create derivative works of, Your User Submissions (including all related intellectual property rights). You also hereby do and shall grant to each user of the Services a non-exclusive license to access and use Your User Submissions through the Services and as permitted through the functionality of the Services and under these Terms. Furthermore, you understand that we retain the right to reformat, modify, create derivative works of, excerpt and translate any User Submissions submitted by you. For clarity, the foregoing license grant to Kytch does not affect Your ownership of or right to grant additional licenses to the material in Your User Submissions, unless otherwise agreed in writing. Kytch is not responsible or liable to any third-party for the content or accuracy of any User Submissions provided by You or any other user of the Services and You agree to indemnify, defend, and hold harmless the Kytch for any and all claims, actions, losses, and damages, of any kind, including reasonable attorney fees, arising from Your User Submissions. Although are not required to do so, we have the right to take any action with respect to any User Submissions that we deem necessary or appropriate in Our sole discretion, including if we believe that such User Submissions

have violated these Terms, violates any intellectual property rights or other rights of any person or entity, threatens the personal safety of users of the Services or the public or could create liability for Kytch. We also reserve the right to take appropriate legal action, including referral to law enforcement authorities for any illegal or unauthorized use of the Services and to terminate or suspend Your access to the Services, in Our sole discretion, for violating these Terms.

**(d) Confidentiality.** By virtue of Your use and access to the Products and Services, you may have access to information that is confidential to Kytch, including but not limited to aspects of the Products and information relating to its features, specifications, functionality and performance ("Kytch Confidential Information"). Kytch Confidential Information shall not include information which: (a) is or becomes a part of the public domain through no act or omission of yours; or (b) was in your lawful possession prior to the disclosure and had not been obtained by you either directly or indirectly from Kytch; or (c) is lawfully disclosed to you by a third party without restriction on disclosure; or (d) is independently developed by you without use of or reference to Kytch Confidential Information. You agree, both during the term of the Agreement and for a period of five years after its termination, for any reason, to hold Kytch's Confidential Information in strict confidence using no less than a reasonable degree of care, not to disclose Kytch Confidential Information to any third party (other than Your Authorized Users) and not to use Kytch Confidential Information for any purpose other than for the Permitted Purpose.

## 7. INDEMNIFICATION

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU AGREE TO INDEMNIFY, DEFEND, RELEASE AND HOLD HARMLESS FROM AND AGAINST (I) ANY AND ALL CLAIMS, COSTS, EXPENSES, LOSSES, ACTIONS, LAWSUITS, JUDGMENTS, LIABILITYS DAMAGES, SUITS, OR CAUSES OF ACTION, AND ANY OTHER LEGAL ACTION BROUGHT BY ANY THIRD PARTY AGAINST KYTCH, ITS LICENSORS, SUPPLIERS, SUBSIDIARIES AND AFFILLIATES (INCLUDING THEIR RESPECTIVE DIRECTORS, EMPLOYEES, OFFICERS, SHAREHOLDERS, MEMBERS, SUCCESSORS, AND AGENTS ) (COLLECTIVELY THE "KYTCH PARTIES") ARISING FROM OR RELATING TO (A) YOUR USE AND EACH AUTHORIZED USER'S USE OF THE PRODUCTS OR SERVICES; (B) YOU OR YOUR AUTHORIZED USERS' VIOLATION OF THESE TERMS; (C) YOUR USER SUBMISSIONS OR FEEDBACK OR ANY OTHER CONTENT SUPPLIED BY YOU; (D) PROPERTY DAMAGE, PERSONAL INJURY OR DEATH (INCLUDING, WITHOUT LIMITATION CLAIMS BROUGHT BY AND LIABILITIES TO YOUR EMPLOYEES, SUBCONTRACTORS, AGENTS, REPRESENTATIVES, OR ANY THIRD PARTIES) OR (E) YOU OR YOUR AUTHORIZED USERS' VIOLATION OF ANY LAW OR THE RIGHTS OF ANY THIRD–PARTY (COLLECTIVELY, "THIRD PARTY ACTIONS"); AND (II) ANY AND ALL RELATED LOSSES, DAMAGES, SETTLEMENTS AND JUDGEMENTS (INCLUDING PAYMENT OF THE KYTCH PARTIES' ATTORNEYS' FEES AND COSTS) INCURRED BY ANY OF THE KYTCH PARTIES, ASSESSED OR FOUND AGAINST ANY OF THE KYTCH PARTIES, OR MADE BY ANY OF THE KYTCH PARTIES, RELATING TO OR ARISING FROM ANY SUCH THIRD PARTY ACTION ("THIRD PARTY RELATED LOSSES"). YOU UNDERSTAND AND AGREE THAT YOUR INDEMNIFICATION OBLIGATION TO THE KYTCH PARTIES APPLIES EVEN IF SUCH THIRD–PARTY ACTION AND THIRD PARTY RELATED LOSSES ARISE FROM THE NEGLIGENCE OF ANY KIND OR DEGREE, BREACH OF CONTRACT OR WARRANTY, STRICT LIABILITY, NON–COMPLIANCE WITH APPLICABLE LAW, OR OTHER FAULT OR WRONGDOING OF ANY OF THE KYTCH PARTIES. HOWEVER, NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO REQUIRE ANY INDEMNIFICATION WHICH WOULD RENDER OR MAKE THIS CLAUSE, IN WHOLE OR IN PART, VOID AND/OR UNENFORCEABLE UNDER APPLICABLE LAW. FURTHER, YOUR INDEMNIFICATION OBLIGATION SHALL NOT APPLY TO ANY WILLFUL, WANTON, INTENTIONAL OR RECKLESS MISCONDUCT OF THE KYTCH PARTIES, OR GROSS NEGLIGENCE OF THE KYTCH PARTIES IN THOSE STATES THAT DO NOT PERMIT INDEMNIFICATION FOR GROSS NEGLIGENCE. "THIRD PARTY" IS DEFINED HEREIN TO INCLUDE, WITHOUT LIMITATION, AN ACCOUNT OWNER, AN AUTHORIZED USER, AN UNAUTHORIZED USER, A SPOUSE, PARTNER, FAMILY MEMBER, GUEST, NEIGHBOR, TENANT, EMPLOYEE OR INSURANCE COMPANY. Kytch reserves the right, at Your expense, to assume the exclusive defense and control of any matter for which you are required to indemnify Kytch, and you agree to

cooperate with our defense of such claims. You agree not to settle any such claim without Kytch's prior written consent. Kytch will use reasonable efforts to notify you of any such claim, action or proceeding upon becoming aware of it.

## 8. Warranty Disclaimers

THE WARRANTIES FOR THE PRODUCT AND PRODUCT SOFTWARE ARE SET FORTH IN THE LIMITED WARRANTY AND THE END USER LICENSE AGREEMENT, RESPECTIVELY.

THE SERVICES ARE PROVIDED FOR YOUR CONVENIENCE, "AS IS" AND "AS AVAILABLE", AND WITH ALL FAULTS, AND KYTCH, AND OUR LICENSORS AND SUPPLIERS, EXPRESSLY DISCLAIM ANY WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY AND NON-INFRINGEMENT.

KYTCH, AND OUR LICENSORS AND SUPPLIERS, MAKE NO WARRANTY THAT DEFECTS WILL BE CORRECTED OR THAT THE SERVICES: (I) WILL MEET YOUR REQUIREMENTS; (II) WILL BE COMPATIBLE WITH YOUR NETWORK, COMPUTER OR MOBILE DEVICE; (III) WILL BE AVAILABLE ON AN UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE BASIS; OR (IV) WILL BE ACCURATE OR RELIABLE. NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY YOU FROM KYTCH OR THOUGH THE SERVICES, SHALL CREATE ANY WARRANTY.

KYTCH DOES NOT WARRANT, ENDORSE, GUARANTEE OR ASSUME RESPONSIBILITY FOR ANY SERVICE ADVERTISED OR OFFERED BY A THIRD PARTY THROUGH, OR IN CONNECTION WITH, THE PRODUCTS OR SERVICES, OR ANY HYPERLINKED WEBSITE OR SERVICE, AND KYTCH WILL NOT BE A PARTY TO, OR IN ANY WAY MONITOR, ANY TRANSACTION BETWEEN YOU AND THIRD-PARTY PROVIDERS OF SUCH PRODUCTS OR SERVICES.

KYTCH MAKES NO REPRESENTATIONS CONCERNING ANY CONTENT CONTAINED IN OR ACCESSED THROUGH THE SERVICES, AND KYTCH WILL NOT BE RESPONSIBLE OR LIABLE FOR THE ACCURACY, COPYRIGHT COMPLIANCE, LEGALITY OR DECENCY OF MATERIAL CONTAINED IN OR ACCESSED THROUGH THE SERVICES. KYTCH MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING SUGGESTIONS OR RECOMMENDATIONS OF PRODUCTS AND SERVICES OFFERED OR PURCHASED THROUGH THE SERVICES.

THE SERVICES MAY PROVIDE YOU INFORMATION REGARDING YOUR EQUIPMENT OR OTHER PERIPHERALS CONNECTED TO YOUR EQUIPMENT. WITHOUT LIMITING THE GENERALITY OF THE DISCLAIMERS ABOVE, ALL INFORMATION IS PROVIDED FOR YOUR CONVENIENCE ,"AS IS" AND "AS AVAILABLE". KYTCH DOES NOT REPRESENT, WARRANT, OR GUARANTEE THAT INFORMATION WILL BE AVAILABLE, ACCURATE, OR RELIABLE.

## 9. Other Disclaimers

WHEN YOU INSTALL, SETUP OR USE THE PRODUCTS AND SERVICES YOU ARE GIVEN THE OPPORTUNITY TO CHANGE DEFAULTS OR CHOOSE PARTICULAR SETTINGS. THE CHOICES YOU MAKE CAN CAUSE NON-RECOMMENDED OR UNINTENDED OPERATION OR NON-OPERATION OF YOUR PRODUCTS AND SERVICES AND ANY CONNECTED EQUIPMENT OR SYSTEMS. YOU ASSUME ALL LIABILITY FOR ANY DAMAGES AND LOSSES CAUSED BY, OR RELATED TO, THE CHOICES YOU MAKE FOR THE PARTICULAR SETTINGS FOR THE PRODUCTS AND SERVICES, AND SETTING OR CHANGING DEFAULTS. YOU UNDERSTAND AND AGREE THAT SOME OF THE PRODUCTS AND SERVICES ARE NOTIFICATION, SIGNALLING AND DETECTION PRODUCTS AND SERVICES. THOSE PRODUCTS AND SERVICES DO NOT ELIMINATE OCCURRENCES OF EVENTS. FURTHER, YOU UNDERSTAND AND AGREE THAT THOSE PRODUCTS AND SERVICES MAY NOT AVERT OR MINIMIZE SUCH OCCURRENCES OF EVENTS, OR THEIR CONSEQUENCES, AND, THEREFORE, KYTCH MAKES NO EXPRESS OR IMPLIED

WARRANTY OR REPRESENTATION (INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE) THAT THOSE PRODUCTS AND SERVICES WILL SO AVERT OR MINIMIZE SUCH OCCURRENCES OF EVENTS, OR THEIR CONSEQUENCES.

## 10. Waiver of Subrogation

You should protect against any risk of loss with the appropriate insurance coverage, and you are responsible for obtaining all insurance coverage you believe is necessary. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND THE APPLICABLE POLICY OR POLICIES OF INSURANCE YOU OBTAIN AND MAINTAIN, YOU RELEASE KYTCH AND ITS LICENSORS AND SUPPLIERS FROM ALL LIABILITY FOR ANY LOSS, OCCURRENCE, EVENT OR CONDITION COVERED BY YOUR INSURANCE.

## 11. Limitation of Liability

Nothing in these Terms and, in particular, within this "Limitation of Liability" clause, shall be interpreted or construed to limit or exclude liability that cannot be so limited or excluded under applicable law.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN ADDITION TO THE WARRANTY AND OTHER DISCLAIMERS IN THESE TERMS, IN NO EVENT WILL (A) KYTCH BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, SPECIAL OR INCIDENTAL DAMAGES, INCLUDING, WITHOUT LIMITATION, ANY DAMAGES FOR LOST DATA OR LOST PROFITS ARISING FROM OR RELATING TO THE SERVICES OR THE PRODUCTS, EVEN IF KYTCH KNEW, OR SHOULD HAVE KNOWN, OF THE POSSIBILITY OF SUCH DAMAGES, AND (B) KYTCH'S TOTAL CUMULATIVE LIABILITYARISING FROM OR RELATED TO THE SERVICES OR THE PRODUCTS, WHETHER IN CONTRACT OR TORT OR OTHERWISE, SHALL BE LIMITED TO AN AMOUNT NEVER TO EXCEED THE FEES ACTUALLY PAID BY YOU TO KYTCH DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE EVENTS GIVING RISE TO THE SUBJECT CLAIM (IF ANY). KYTCH DISCLAIMS ALL LIABILITY OF ANY KIND OF KYTCH'S LICENSORS AND SUPPLIERS. UNDER NO CIRCUMSTANCES WILL KYTCH BE LIABLE IN ANY WAY FOR ANY CONTENT, INCLUDING, BUT NOT LIMITED TO, ANY ERRORS OR OMISSIONS IN ANY CONTENT OR ANY LOSS OR DAMAGE OF ANY KIND INCURRED IN CONNECTION WITH USE OF, OR EXPOSURE TO, ANY CONTENT POSTED, EMAILED, ACCESSED, TRANSMITTED OR OTHERWISE MADE AVAILABLE VIA THE SERVICES.

YOU UNDERSTAND AND AGREE THAT THIS LIMITATION OF LIABILITY IN THIS SECTION SHALL APPLY EVEN IF KYTCH IS FOUND LIABLE FOR ANY LOSS OR DAMAGE DUE TO BREACH OF CONTRACT, BREACH OF EXPRESS OR IMPLIED OR LIMITED WARRANTY, NEGLIGENCE OF ANY KIND OR DEGREE, STRICT PRODUCT LIABILITY, SUBROGATION, INDEMNIFICATION OR CONTRIBUTION, OR ANY OTHER THEORY OF LIABILITY. HOWEVER, THIS LIMITATION OF LIABILITY SHALL NOT APPLY TO ANY WILFUL, WANTON, INTENTIONAL OR RECKLESS MISCONDUCT OF KYTCH OR GROSS NEGLIGENCE OF KYTCH IN THOSE STATES THAT DO NOT PERMIT LIMITATION OF LIABILITY FOR GROSS NEGLIGENCE.

## 12. Fees and Payment

Certain Services may be provided for a fee. You shall pay all applicable fees in connection with the Services selected by you in accordance with the Terms and your Subscription Plan.

## 13. Disputes

Any dispute, controversy or claim arising out of or in connection with these Terms that relates to (a) a Party's breach of confidentiality obligations; (b) infringement or misappropriation of intellectual property rights; or (c) requests for injunctive relief of any kind including, without limitation, the right of a Party to seek a temporary restraining order, preliminary injunctive or other equitable relief to preserve the status quo or prevent irreparable harm, shall be submitted to and finally resolved by a court of competent jurisdiction in the State of California, Santa Clara County. Each Party hereby submits to the exclusive jurisdiction of those courts for the purposes of any such proceeding. Each party hereby waives any claim that any legal proceeding (including any tort claim) has been brought in an inconvenient forum or that the

venue of that proceeding is improper. Disputes, claims or controversies other than those specified above arising out of or relating to this Agreement (hereinafter "Arbitration Claims") that cannot otherwise be resolved by good faith negotiations of the Parties, shall, at the sole option of Kytch, be settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association ("AAA") that are then in effect. The Parties shall attempt to agree upon the selection of a single arbitrator who is unrelated to either Party and has demonstrable experience in the area of commercial law. In the event the Parties are unable to select a mutually acceptable arbitrator, the arbitrator shall be appointed by the AAA, with instruction that such selected arbitrator shall be one with at least five–years experience in commercial law. All arbitration proceedings shall be held in Santa Clara County, California. The arbitrator's costs shall be borne equally by the Parties and each Party shall be responsible for its own preparation, discovery, and internal and external costs incurred to prosecute or defend the Arbitration Claim. The prevailing Party in any arbitration proceeding will be entitled to, in addition to any other relief granted, recover its reasonable costs and attorney's fees, as determined by the arbitrator. The arbitrator shall be bound by the express provisions of this Agreement in deciding any Arbitration Claim. The determination of the arbitrator shall be final, and except as provided by law, shall not be subject to appeal or judicial review. Any court of competent jurisdiction may enforce any award or determination rendered by the arbitrator. The arbitrator shall not have the authority to award damages for lost profits or consequential damages, or special, punitive, or other exemplary damages of any sort.

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE, LAW, YOU UNDERSTAND AND AGREE THAT WE ARE EACH (A) WAIVING THE RIGHT TO A TRIAL BY JURY; (B) WAIVING THE RIGHT TO PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION; AND (C) WAIVING THE RIGHT TO CLAIM OR RECOVER PUNITIVE DAMAGES AGAINST THE OTHER. These Terms evidence a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision.

If, for any reason, a claim proceeds in court rather than in arbitration, we each waive our right to a jury trial.

**(a) Notice of Disputes.** You and Kytch agree to provide the other with notice in writing of any dispute. ("Notice of Dispute"). The notice to Kytch should be sent to: Kytch Legal Department, 3327 Seldon Court, Fremont, CA 94539, USA. Kytch will send notice to you at the email and/or mailing addresses associated with Your account. Your notice to Kytch must (a) provide Your name, mailing address, and email address; (b) describe the dispute; and (c) state the relief you are requesting.

**(b) Class Action Waiver**  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU AND KYTCH AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED GROUP LITIGATION OR PRIVATE ATTORNEY GENERAL PROCEEDING. Further, unless all affected parties agree otherwise, the arbitrator may not consolidate more than one person's claims and may not otherwise preside over any form of a representative or group proceeding. If a court decides that applicable law precludes enforcement of any of this subsection's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from the arbitration and may be brought in court.

## 14. Digital Millennium Copyright Act

**(a)** If you are a copyright owner or an agent thereof and believe that any Content infringes Your copyrights, you may submit a notification pursuant to the Digital Millennium Copyright Act ("DMCA") by providing our Copyright Agent with the following information in writing (see 17 U.S.C §512[c][3] for further details): (i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed; (ii) Identification of the copyrighted work claimed to have been infringed or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site; (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed, or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material; (iv) Information reasonably sufficient to permit the service provider to contact you, such as an address, telephone number and, if

available, an electronic mail; (v) A statement that you have a good-faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent or the law; and (vi) A statement that the information in the notification is accurate and, under penalty of perjury, that you are authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**(b)** Kytch's designated Copyright Agent to receive notifications of claimed infringement is Copyright Agent – Attention Legal, 3327 Seldon Court, Fremont, CA 94539, USA; Legal@kytch.com. For clarity, only DMCA notices should go to the Copyright Agent; any other feedback, comments, requests for technical support and other communications should be directed to Kytch customer service through https://kytch.com/support/. You acknowledge that if you fail to comply with all the requirements of this Section Your DMCA notice may not be valid.

**(c)** Counter-Notice. If you believe that the Content that was removed (or to which access was disabled) is not infringing, or that you have the authorization from the copyright owner, the copyright owner's agent or pursuant to the law to post and use the material in Your Content, you may send a counter-notice containing the following information to the Copyright Agent: (i) Your physical or electronic signature; (ii) Identification of the Content that has been removed, or to which access has been disabled, and the location at which the Content appeared before it was removed or disabled; (iii) A statement that you have a good-faith belief that the Content was removed or disabled as a result of mistake or misidentification of the Content; and (iv) Your name, address, telephone number and email address, a statement that you consent to the jurisdiction of the federal court in San Francisco, California, USA and a statement that you will accept service of process from the person who provided notification of the alleged infringement.

**(d)** If a counter-notice is received by the Copyright Agent, Kytch may send a copy of the counter-notice to the original complainant informing that person that they may replace the removed Content or cease disabling it in 10 working days. Unless the copyright owner files an action seeking a court order against the Content provider, member or user, the removed Content may be replaced, or access to it restored, in 10 to 14 working days or more after receipt of the counter-notice, at Kytch's sole discretion.

## 15. General

**(a) Changes to These Terms.** Kytch reserves the right to make changes to these Terms. Kytch will post notice of changes to any one or more of the following: this page, a Site, Web Apps, or Mobile Apps. You should ensure that you have read and agree with the most recent Terms when you use the Products and Services. Continued use of the Products and Services following notice of such changes shall indicate Your acknowledgment of such changes and agreement to be bound by the revised Terms. IF YOU DO NOT AGREE WITH ANY OF THE CHANGES TO ANY OF THE TERMS, YOU SHOULD DISCONNECT YOUR PRODUCTS FROM YOUR ACCOUNT AND CEASE ACCESSING OR USING THE PRODUCTS AND SERVICES AND RETURN THE PRODUCT AS SET FORTH IN THESE TERMS.

**(b) Governing Law.** These Terms, and the Agreement and any claim, dispute, action, cause of action, issue, or request for relief arising out of or relating to these Terms or Your use of the Products and Services shall be governed by the laws of the State of California without giving effect to any conflict of laws principles that may provide the application of the law of another jurisdiction. The courts in some states and countries may not apply California law to some types of dispute. If you reside in one of those states or countries, then where California law is excluded from applying, Your state's or country's laws will apply. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU AGREE TO SUBMIT TO THE PERSONAL JURISDICTION OF THE STATE AND FEDERAL COURTS IN OR FOR SANTA CLARA COUNTY, CALIFORNIA FOR THE PURPOSE OF LITIGATING ALL SUCH CLAIMS OR DISPUTES, UNLESS SUCH CLAIM OR DISPUTE IS REQUIRED TO BE ARBITRATED AS SET FORTH IN AN ABOVE SECTION.

**(c) Protection of Confidentiality and Intellectual Property Rights.** Notwithstanding the foregoing, Kytch may seek injunctive or other equitable relief to protect its confidential information and intellectual property rights or to prevent loss of data or damage to its servers in any court of competent jurisdiction and You agree that

Redacted Version Filed 04/29/2022 -- Page 134 of 224

Kytch may do so without the need to post bond or other surety.

**(d) Entire Agreement/Severability.** These Terms and the Agreement constitute the entire agreement between you and Kytch regarding the use of the Products and Services. Any failure by Kytch to exercise or enforce any right or provision of these Terms shall not operate as a waiver of such right or provision. The section titles in these Terms are for convenience only and have no legal or contractual effect. If any provision of these Terms is, for any reason, held to be invalid or unenforceable, the other provisions of these Terms will be unimpaired and the invalid or unenforceable provision will be deemed modified so that it is valid and enforceable to the maximum extent permitted by law. Neither party is an agent or partner of the other party.

**(e) Survivability.** The obligations in these Terms which would naturally survive termination or expiration shall survive, including, without limitation, Sections 1(g) and (q), 3(d) and (e), 4, 6, 7, 8, 9, 10, 11, 13 and 15.

**(f) Assignment.** These Terms, and any associated rights or obligations, may not be assigned or otherwise transferred by you without Kytch's prior written consent. These Terms may be assigned by Kytch without restriction. These Terms are binding upon any permitted assignee.

**(g) Notifications.** Kytch may provide notifications to you as required by law, or for marketing or other purposes, via (at its option) email to the primary email associated with Your Account, mobile notifications, hard copy or posting of such notice on www.Kytch.com. Kytch is not responsible for any automatic filtering that you or Your network provider may apply to email notifications. Kytch recommends adding @kytch.com email addresses to Your email address book to help ensure that you receive email notifications from Kytch. You agree and warrant that You have provided the correct contact information and will keep Kytch updated should that information change. Kytch shall not be responsible for notices not received by You.

**(h) Disclosures.** Kytch's address is 3327 Seldon Court, Fremont, CA 94539, USA. If you are a resident of California, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them, in writing, at 400 R Street, Sacramento, CA 95814, USA, or by telephone on (800) 952-5210.

**(i) Copyright/Trademark Information.** Copyright © 2019, Kytch, Inc. All rights reserved. All trademarks, logos and service marks ("Marks") displayed on the Services are the property of Kytch or of their respective holders. You are not permitted to use any of the Marks without the applicable prior written consent of Kytch or such respective holders. Kytch reserves the right to alter product and services offerings, specifications and pricing at any time, without notice, and is not responsible for typographical or graphical errors that may appear in this or in related documents.

**(j) Third Party Rights.** Except as expressly set forth herein, nothing in this Agreement shall be construed as giving any person or entity, other than the parties hereto and their successors and permitted assigns, any right, remedy or claim under or in respect of this Agreement or any provision hereof.

**(k) No Agency.** Nothing contained in this Agreement will be deemed to create any agency, joint venture, partnership or similar relationship between the parties to this Agreement. Nothing contained in this Agreement will be deemed to authorize either party to this Agreement to bind or obligate the other party. Kytch is an independent contractor, and neither Kytch nor its employees are, or shall be deemed, Your employees.

**(l) Force Majeure.** Kytch will not be liable or responsible for any failure to perform, or delay in performance of, any of our obligations under a contract that is caused by an act or event beyond our reasonable control, including without limitation acts of God, strikes, lock-outs or other industrial action by third parties, civil commotion, riot, terrorist attack, war, fire, explosion, storm, flood, earthquake, epidemic or other natural disaster, failure of public or private telecommunications networks or impossibility of the use of railways, shipping, aircraft, motor transport or other means of public or private transport.

4822-8210-1953, v. 1

Redacted Version Filed 04/29/2022 -- Page 135 of 224

## Product

Pricing
Platform
Kytch Kit

## Company

Partner With Kytch
About Us
Careers
Privacy
Terms

## Support

FAQs
Contact Us

Download App

## Get Kytch updates here

Copyright © Kytch, Inc. 2021. All Rights Reserved.

3327 Seldon Ct. Fremont, CA 94539

# Exhibit 2

**PUBLIC VERSION**
REDACTS MATERIAL UNDER SEAL  PER
COURT'S JULY 30, 2021 ORDER

1   Jason Sheasby SBN 205455
    jsheasby@irell.com
2   IRELL & MANELLA
    1800 Avenue of the Stars, Suite 900
3   Los Angeles, California 90067-4267
    Telephone: (310) 277-1010
4   Facsimile:  (310) 203-7199

5   Elizabeth M. Locke, P.C.* (*pro hac vice* to be filed)
    libby@clarelocke.com
6   Daniel P. Watkins* (*pro hac vice* to be filed)
    daniel@clarelocke.com
7   CLARE LOCKE LLP
    10 Prince Street
8   Alexandra, VA 22314
    Telephone: (202) 628-7400
9   Facsimile:  (202) 478-0475

10  *Attorneys for Plaintiff Kytch, Inc.*

11

12              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                    **FOR THE COUNTY OF ALAMEDA**

14

15  KYTCH, INC.,                          CASE NO:

16              Plaintiff,                **DECLARATION OF MELISSA NELSON
                                          IN SUPPORT OF PLAINTIFF'S**
17  v.                                    **APPLICATION FOR TEMPORARY
                                          RESTRAINING ORDER AND ORDER TO**
18  JONATHAN TYLER GAMBLE; J.L. GAMBLE    **SHOW CAUSE**
    MANAGEMENT LLC DBA MCDONALD'S;
19  TFGROUP LLC; AND TAYLOR               [Filed Concurrently with Plaintiff's Complaint,
    COMMERCIAL FOODSERVICE, LLC DBA       *Ex Parte* Application for TRO and OSC and
20  TAYLOR COMPANY,                       Related Notice of Lodging Conditionally
                                          Under Seal]
21              Defendants.

22

23
        **PUBLIC - REDACTS MATERIALS FROM CONDITIONALLY SEALED RECORD**
24

25

26

27

28

                                    - 0 -

I, Melissa Nelson, hereby declare the following:

1.     Jeremy O'Sullivan and I co-founded Kytch.  I manage the day-to-day operations of the company.  I have personal knowledge of the content of this declaration, and I can and will competently testify to the truth of the matters stated herein.

2.     Kytch Co-Founder Jeremy O'Sullivan and I launched the product trial for the Kytch Solution in July 2019.  The Kytch Solution is designed to optimize soft-serve machines, primarily those made by Taylor Company ("Taylor").  Our first device was activated at Tesla's Factory in Lathrop, California, and we expanded to fast-food restaurants in the broader San Francisco metropolitan area a short time later.  Super Duper Burgers was one of our earliest trial participants.

3.     In August of 2019, we expanded to Burger King locations.  Our customers' responses to the product trial were overwhelmingly positive.  We received numerous reports that the Kytch Solution Device reduced downtimes and helped our customers' soft-serve machines operate more smoothly.

4.     One of our strongest selling points is that Kytch pays for itself by cutting down on unnecessary overhead costs to repair and maintain machines.  Not to mention the increase in revenue Kytch delivers through the sales of additional frozen treats.

***Kytch's Product Development Process Is Extensive and Iterative***

5.     Kytch's approach to fixing the problematic Taylor machines has always been a data-driven, iterative process that relies on the collection and analysis of large amounts of data.  We were only able to develop Kytch's proprietary combination of hardware, software, and machine learning to demystify the finicky machines after years of product testing and trial-and-error.

6.     Before starting Kytch, Jeremy O'Sullivan and I launched Frobot, Inc. in 2011.  Frobot is a fully robotic frozen yogurt dispenser that produces frozen confections made to order.  Frobot is designed to interact with soft-serve machines made by Taylor.

7.     Frobot first approached Taylor in May 2013 at the National Restaurant Association Show in Chicago.  We informed Taylor's leadership that we were developing a device that promised to augment the capabilities of Taylor's machines, including extending automation and increasing safety offerings.

- 1 -

8.     Taylor expressed interest, and within a few months we were invited to present a prototype of our machine at Taylor's Rockton, Illinois headquarters.  Our goal was to create a device that allowed Taylor's machines to operate as a standalone product to be used unattended in retail spaces.

9.     Taylor's response to our prototype was positive, and years—and hundreds of thousands of dollars—of product development and safety testing followed.

10.    Our fleet of Taylor machines was relatively small.  Still, they required frequent and expensive service visits to keep the machines up and running.

11.    The finicky software was constantly causing outages, and it became obvious to Kytch's team that Taylor's digital machines were not very robust.

12.    In 2018, Jeremy O'Sullivan and I launched our second venture, Kytch, Inc. as a subsidiary of Frobot.  We originally designed Kytch as a safety add-on to Taylor's soft-serve machine.  We transitioned from Frobot's mission of automating the machine and focused on data and software to optimize the machines.

13.    We built Kytch to be a platform for the entire kitchen (***Kytch*** is short for ***Kytchen***). And though the original design was made to apply to soft-serve machines, we intended to continue to develop our offerings to work on other devices such as grills and fryers.

14.    Relying on the cloud, a new software suite, and data-driven decision-making and logic trees, we knew that we could design systems and technologies to transform static kitchens into intelligent, efficient ecosystems.

### *Kytch's Innovative Technology*

15.    The Kytch Solution device (the "Kytch Solution Device") is our flagship invention that is designed to be installed on soft-serve machines.  It is a small computer with software to understand the communication between the logic board and the interface of the soft-serve machine. When the Kytch Solution is connected to the internet, the software sends messages to our platform at www.Kytch.com (the "Kytch Solution Platform").  Kytch Trial participants use login credentials to access the Kytch Solution Platform.  The Kytch Solution Device is depicted below in the "Kytch Kit."



16.    There is nothing like the Kytch Solution Device on the market, a competitor could obtain an extraordinary head start in creating a competitive device if they were able to access and test the Kytch Solution Platform.

17.    The Kytch Solution works with custom-made ███████████████████ ███████████████████████████████████████████████████ ████████ We defined the Kytch Solution's unique physical attributes and capabilities only after years of experimentation and design.

18.    ████████████████████    █████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████

19.    Kytch's technology and wrap-around software and online platform improve the limited and simplistic interfaces of many appliances.  Taylor machines are designed to be used by technical experts.  But we changed that by making a user-friendly interface that is accessible to people without any technical training.

20.    Generally speaking, Kytch collects three types of proprietary data for the soft-serve machines.

21.     The first datatype is ███████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████

22.     This is a unique selection of data for at least two reasons. First, Taylor makes it extremely difficult, if not impossible, for owners of the device to access detailed information on the device without the assistance of a trained technician.  Kytch changed all that.  Second, it was only after extensive analysis of massive amounts of data that we identified these factors as relevant for making decisions on the machine.

23.     The second datatype is related to machine settings, including ████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████ This is a unique selection data for at least two reasons.  First, Taylor makes it extremely difficult, if not impossible, for owners of the device to access detailed information on device settings without the assistance of a trained technician.  Second, it was only after extensive analysis of massive amounts of data that we identified these factors as relevant for making decisions on the machine.

24.     The third datatype is production data.   This includes ███████████████
███████████████████████████ To capture the necessary data, Kytch employs scripts to programmatically enter the menu without human assistance. This is unique because normally a

- 4 -

human operator must press a minimum of 12 buttons just to open the Manager's Menu.  Kytch has spent years developing and pioneering the sole method for accessing the menu, navigating it, retrieving necessary data, and exiting without disrupting the machine while it is actively in use in the restaurant.

25.     Another innovative component of Kytch's trade secrets is the remote method for interacting with kitchen devices that we pioneered using a universal master operating system to serve as our user interface and communication system.   This is discussed in greater detail below.

26.     All of this is made possible through a man-in-the-middle cable and software for securely inserting the Kytch Solution Device to read and write data to and from the control panel assembly of the appliance, without exposing users, employees, or technicians to the potential of high voltage shocks or other related hazards.

27.     The man-in-the-middle software code allows Kytch ███████████████████████ ███████████████████████████████████████████████████████████████ ███████████████.  The software then communicates messages from the device to Kytch's cloud system for data analytics and navigation.

28.     We review our customers' reported errors, and all of these readings and related notifications that Kytch provides are available for our customers to review on our online platform. By detecting anomalous appliance behavior, we are able to build preference models and to enhance our business analytics to predict customers' needs.

29.     Part of our proprietary technology is discriminating between the substantial amount of data that we gather from customers' machine usage.  Kytch sends customers only select machine metrics, typically based on thresholds that we have set based on the historical performance and error rates of the machines plugged into our systems.  As a result, the time and nature of our updates, instructions, and error information reveals an extraordinary amount of our hard-gained knowledge about the behavior of the Taylor Machines.

30.     If the machine's AUTO function is disabled, ████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████

DECLARATION OF MELISSA NELSON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
Redacted Version Filed 04/29/2022 -- Page 143 of 224

31.     We also constructed ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

32.     The Taylor machines' heat cycle commonly fails, and this is often not addressed quickly enough by restaurant staff.  Alternatively, the staff lacks the technical know-how to mitigate this failure. Kytch Assist functions as a human-assisted automation service.

33.     We manage heat cycle ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

34.     We discovered that the machines' heat cycle commonly fails ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Kytch then sends a notification ██████████████████████

██████████ and explains the reason for the change.  The discovery of the role of ███████████

in machine performance and the solution employed by Kytch are proprietary.

### *The Kytch Online Platform & Notification System*

35.     Working in tandem with Kytch's data retrieval and data analytics systems, the Kytch Solution Platform—which is proprietary and confidential—available to Kytch trial participants at www.Kytch.com provides customers with more ways to understand and interact with the soft-serve machines.

36.     The Kytch Solution Platform, which includes the acquisition of proprietary selections of data, the reporting of information on errors and potential problems based on the analysis of that data, the provision of specific instructions to address these errors and potential

- 6 -

1  problems, and ███████████████████████████████████ to address these errors and

2  problems is a closely guarded trade secret.

3      37.    There is nothing like the Kytch Solution Platform on the market, and the ability of a

4  competitor to access and observe in real time the operation of the Kytch Solution Platform allows

5  them to obtain an extraordinary head start in the creation of a competing device.

6      38.    Kytch sends its customers' daily reports regarding machine usage.  One example is

7  the Servings Summary, which contains the number of shakes and soft-serve products produced each

8  day.  This information is available only through the proprietary script the Kytch Solution employed

9  to programmatically open Taylor's menu.

10
11
12
13

**Servings Summary**
May 26, 2020

| Kytch Name | Shake | Soft Serve |
| --- | --- | --- |
| Taylor | 88 | 91 |
| Amherst | 51 | 42 |
| Cane Run | 77 | 94 |
| Portland | 78 | 87 |

14
15
16
17
18
*servings count procurement interrupted
19
20

© 2020 Kytch, Inc.
Privacy Policy  |  Terms & Conditions

21      39.    Another function available on Kytch.com is "Kytch Rewind." ████████

22  ███████████████████████████████████████████████████ The visualization is

23  similar to a video rewind function.

24      40.    The genesis for Kytch Rewind took place during product testing at Tesla.  We needed

25  a way to correlate the data from the machines to identifiable recurring events—either with the

26  machine itself, or through human interactions.

27
28

41. So we developed Kytch by ████████████████████████████████████
████████████████████████████████████████████████████████ A useful byproduct of this monitoring process was our new method to troubleshoot errors in a data-driven manner.

42. By ████████████████ we were able to determine whether a particular outage was caused by human error—such as loading frozen ice cream mix into the machine—or a software bug.

43. When we realized how useful this tool was, we developed Kytch Rewind to empower our customers to better understand their machines.

44. Kytch Rewind allows the user ██████████████████████████████████
██████████████ ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

45. ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████

46. After reviewing and analyzing these patterns, we are able to continue to improve the machines and to select the optimal parameters for functioning. In tandem, this saves our customers outages and costly service appointments. A screenshot of the rewind function is below:

47.     In this example, Kytch Rewind shows the user the contents of the machine's menu at 5:59 a.m. ET.  At that time, the machine was in "HEAT MODE" while the right hopper had low mix.

48.     Another feature of our notification system is Kytch Assist.  Kytch Assist uses human-assisted experience to make decisions to keep Taylor machines up and running.  ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

49.     The interaction of these files and the methodology and processes for keeping the system stable and functional has taken a substantial amount of time and money to develop and perfect.  We spent a total of $1.3 million to bring the Kytch Solution to market.  An example notification from Kytch Assist is depicted below.



- 9 -

50.     This notification describes a common error that frustrates many of our clients: the heat cycle fails because the hopper missed the target temperature required by the heat phase by approximately one degree.

51.     Based on ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ Kytch Assist ████████████ ████ to avert machine outages.

52.     This is important because our data analysis has confirmed ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ This means less downtime than waiting for an employee to get around to pressing the button during a lunch rush.

53.     Additionally, our data capture exposes when employees misuse the soft-serve machines.  For example, ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████

54.     Kytch sends ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████

55.     Kytch also notifies users when there are potential issues ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████

56.     Kytch notifies its users ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████

DECLARATION OF MELISSA NELSON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
Redacted Version Filed 04/29/2022 -- Page 148 of 224

57.     Kytch notifies the user ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

58.     Kytch sends productivity alerts. ████████████████████████
████████████████████████████████████████████████████████████
██████████████

59.     Kytch provides real-time alerts on ██████████████████████
████████████████████████████████████████████████████████████
██████████████

60.     Kytch also provides informative warning alerts in order to prevent damage to the machine ████████████████████████████████████████████████████

61.     One of the most important features to our platform is the Remote Control application and interface.  This permits our customers to access Taylor's machines and to optimize the functionality of their machines even when they are not on site.

62.     After many hundreds of hours of data analysis on hundreds of machines, Kytch has determined that many of the issues with the machines can be corrected by using the controls and menu on the Taylor machine.

63.     Thermistor probes measure temperatures within the machine.  Kytch discovered that ████████████████████████████████████████████████████████████████
████████████████████████████     ████████████████████████████████
████████████████████████████████████

64.     Kytch also discovered a cryptic message, "E7," that displayed on the "brush clean" counter, because Taylor's software was unable to display a three-digit number.  Kytch's software determined that "E7" indicated that 147 machine hours had passed since the freezer door was last removed.  Because this health notification was buried within a cryptic message, employees continued to operate the machines and serve customers.  In simple terms, this means that the machines were designed to serve ice cream without complying with the mandatory brush-cleaning schedules required by public health and safety standards. ████████████████████████████

65. ███████████████████████████████████████████

66. The ability to control the machines remotely creates a power shift, as one operator or their in-house technician can now access all of their machines from one location.

67. By way of example only, a franchisee in San Antonio, Texas, may have 40 machines. Before the Kytch Remote Control, the franchisee and their team would physically need to visit each location to determine the issue with Taylor's machines. But Kytch's innovative solutions changed that, placing all of the necessary data and control mechanisms in the palm of each user's hand.

68. This reduces travel time and has the potential to significantly decrease the need to hire Taylor technicians to conduct costly service appointments.

69. Our remote control hosted on www.Kytch.com is designed to capture the front panel of the Taylor machines, and it allows users to quickly understand how to use the equipment. Kytch also provides ████████████████████████████████ The image below depicts the remote-control feature on www.Kytch.com.

- 12 -

70.     Customers often praise the proactive flagging of software bugs that our notification systems and data analytics provide.  Kytch tracks all temperatures and alerts across each machine connected to our system.

71.     Because there are hundreds of devices on our network, we can analyze the data and flag software errors within Taylor's product.

72.     Our ultimate goal was to create a stable software version that was direct-to-consumer and included updates to eliminate these bugs.  When we discover common or disruptive bugs, we notify users about the issue, and we try to implement automation features to counteract the errors.

73.     One such error is ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

74.     Kytch flags this problem for its customers in advance and Kytch provides them with detailed, user-friendly instructions on how to fix the issue.  Many of these notifications include explanations of autonomous repairs that Kytch has developed and implemented.

DECLARATION OF MELISSA NELSON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
Redacted Version Filed 04/29/2022 -- Page 151 of 224

1    75. 

2

3

4

5

6

7    76.    Kytch's real-time notifications, sent via text and email, include, Kytch Health Alerts,

8    mix alerts, alerts for heat cycle failures, downtime, weekly summaries, and issue-spotting alerts.

9    77.    Kytch Health Alerts include detail on machine malfunctions and provides tips on

10   how to correct the malfunctions. Kytch also provides explanations for heat cycle failures

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -



78.     One of Kytch's Weekly Summary notifications is depicted below.  The weekly summary email ███████████████████████████████████████ that appear on the front panel of the machine.

1
2
3
4
5
6
7
8
9
10
11



12    79.    Through the Kytch.com platform, users are able to see █████████
13    ████████████████████████    This information, alone, is incredibly valuable.  And
14    in the aggregate, it enables us to identify problems and potential issues long before Taylor and its
15    certified technicians.

16    80.    Importantly, Kytch.com also allows customers to invite team members to manage
17    and navigate the online interface.

18    81.    The data Kytch has collected has enabled the company to perform market
19    assessments to anticipate shifting demands, to develop pricing strategies, to decide when and where
20    to launch products, and to inform its investments in product development and new technologies.

21    82.    **Exhibit 1** consists of the hardware specifications and firmware for the
22    Kytch Solution Device.  Together these describe at a reasonable level of detail the operation of the
23    device.  ████████████████████████████    █████████████
24    ████████████████████████████████████████████████
25    ██████████████████████████████    The device is only
26    available under strict non-disclosure agreements that carefully constrain use of the device and
27    prevent any experimentation, or reverse engineering of the device.  The Kytch Solution Device is

28

1   unique in the industry.  Access to this device by a competitor would give them a dramatic head start

2   in creating a competing device.

3        83.    **Exhibit 2** consists of data provided on the Kytch Solution Platform to the account of

4   Tyler Gamble, as well as the information conveyed by these data.  These data are only available

5   under strict non-disclosure of agreements that carefully constrain what use can be made of the data.

6   The Kytch Solution Platform is unique in the industry.  Access to this Platform by a competitor

7   would give them a dramatic head start in creating a competing platform.  **Exhibit 2** does not reflect

8   the complete universe of proprietary information present on the Kytch Solution Platform.  These

9   data are reflected in the source code and libraries for the Kytch Solution Platform, which are

10  available for examination by outside defense counsel in a secure environment.

11       ***Tyler Gamble Discloses Kytch Network and Assist System, Thus Providing Unlawful***

12       ***Access to Kytch Trade Secrets and Confidential Information***

13       84.    The Kytch Solution Device uses the analysis of vast amounts of data to create

14  decision trees of monitoring machine behavior, correcting machine behavior, and correcting human

15  behavior.  If a competitor gains access to the Kytch Solution Platform and Kytch Solution Device,

16  they can reverse engineer a substantial portion of our source code and decision trees.

17       85.    It is for this reason that Kytch takes considerable efforts to maintain the secrecy of

18  its confidential and proprietary information related to the Kytch Trial.  The governing contract is

19  the "Kytch Trial Agreement," and it is attached to this Declaration as **Exhibit 3.**  All Kytch Trial

20  participants, including Gamble, executed binding Kytch Trial Agreements.

21       86.     The Kytch Trial Agreement incorporates "Terms of Service."  That document

22  contains binding confidentiality, non-compete, and nondisclosure obligations.  The binding Terms

23  of Service are attached to this Declaration as **Exhibit 4.**

24       87.    The Kytch Trial Agreement requires trial participants to protect Kytch's

25  "Confidential Information." "Confidential Information," as defined by the Kytch Trial Agreement,

26  includes "all aspects of the Solution and all information relating to its features, specifications,

27  functionality and performance."

28

88.     The "Solution" refers to "the hardware and software products owned or distributed by Kytch and related cloud services, programs, technology platform and other materials," including "user guides" and any related "program updates."

89.     The Kytch Trial Agreement also requires trial participants to "promptly return the Solution to Kytch" after the trial is complete, at which time the participants' "right to access or use the Kytch Solution" immediately ends.  Each trial participant also agreed to "use the Solution" *only* at "approved locations identified in Exhibit A" to the agreement.

90.     By signing the Kytch Trial Agreement, trial participants covenanted that they would not: (1) "modify, make derivative work of, disassemble, reverse compile, reverse engineer, reproduce, distribute or republish all or any part of the Solution, or otherwise access or use the Solution in order to build or support, and/or assist a third party in building or supporting, products or services competitive to any Kytch solution" or (2) "disclose results of any benchmark tests or performance tests of the Kytch Solution."

91.     The Kytch Trial Agreement also contains the following confidentiality undertaking: "You agree, both during the term of this Agreement and for a period of five years after termination of this Agreement, to hold Kytch's Confidential Information in strict confidence using no less than a reasonable degree of care, not to disclose Kytch Confidential Information to any third party (other than your users) and not to use Kytch Confidential Information *for any purpose* other than your evaluation of the Solution as part of the Trial."

92.     As an additional security feature, Kytch users are automatically signed out of the online platform every 90 minutes to prevent unauthorized use.  Kytch tracks its devices using credentials (a key and secret key pair) assigned to each device.  Kytch also collects metadata associated with the device and its usage.

93.     During user authentication, the key and secret pair assigned to a remembered device are used to authenticate the device to verify that it is the same device previously tied to the user.

94.     IP addresses are captured for each device that successfully logs in to Kytch's online interface.  Each device has a unique MAC address (a hardware identification number that uniquely identifies each device on a network).  This unique identifier is registered in the Kytch database

1   before the Kytch Solution Device is shipped to the trial participant.  Upon receipt, each customer

2   must enter the unique 7-digit Kytch ID that is assigned to the device to gain access to the machine's

3   data.  A duplicated device with a different MAC address will not connect to the platform.

4       95.     To further optimize security, Kytch uses serverless architecture that is distributed,

5   thus, there is no direct access to Kytch's servers without Kytch's authorization.

6       96.     Kytch maintains physical security in its buildings, monitors computer access, and

7   requires all individuals who receive Kytch's trade secrets to execute strict confidentiality, non-

8   disclosure, and non-compete agreements.

9       97.     Kytch limits access to its trade secrets and confidential information to employees and

10  contractors who (1) have a demonstrable need to know of such information and (2) have signed

11  confidentiality agreements with Kytch.

12      98.     Due to Kytch's security measures, Kytch's trade secrets are not available to the

13  public or to Kytch's competitors through any legitimate means, including but not limited to the

14  information misappropriated by Defendants.

15      99.     Kytch also protects trade secrets through other electronic security measures,

16  including but not limited to ensuring that networks hosting trade secrets are encrypted, require

17  passwords, and require dual-factor authentication for access.

18      100.    The Kytch Solution Device and Platform derive independent economic value from

19  not being generally known to, and not being readily ascertainable through proper means by, another

20  person who could obtain economic value from the disclosure or use of the information.

21          ***Attempts by Taylor Company and Others to Obtain the Kytch Solution***

22      101.    Part of Kytch's security measures includes vetting the people who try to purchase

23  the Kytch Solution.  In April 2019, we learned that one of Taylor's employees named Heather Jordan

24  attempted to order the Kytch solution on our website, www.Kytch.com.

25      102.    We canceled her order after discovering (1) that she was employed as Taylor's

26  Distributor Technology Manager and (2) that she requested delivery to Taylor's Rockton, Illinois

27  headquarters.  A true and accurate copy of the receipt showing the canceled order is below and

28  attached to this Declaration as **Exhibit 5.**

DECLARATION OF MELISSA NELSON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
Redacted Version Filed 04/29/2022 -- Page 157 of 224

1

2



3

4

5

6

7

8

9

10

11

12

13

14

15      103.    Before canceling the order, we emailed Ms. Jordan to further investigate her interest

16   in the Kytch Solution.  She provided no response.

17      104.    A few weeks later, we received another order to be delivered to an address outside

18   of Chicago, IL, this time for Stephen Smith, an IP lawyer at Brinks Gilson and Lione, the law firm

19   that represents Taylor.  A true and accurate copy of the receipt showing the canceled order is below

20   and attached to this Declaration as **Exhibit 6.**

21

22

23

24

25

26

27

28

- 20 -

105.  He used his work email address, sxsmith@brinksgilson.com, to complete the order.

106.  Shortly after this intellectual property lawyer associated with Taylor tried to purchase the Kytch Solution, we received more purchase requests that were linked back to two private investigators who recently appeared on the docket in cases involving intellectual property law, specifically on behalf of Quarles & Brady LLP. *See ReBath LLC v. HD Solutions LLC, et al.*, Case No. 2:19-v-04872. That same firm recently appeared in a case involving Taylor Company. *Elliot et al. v. BASF Corp.*, Case No. 1:2018-cv-02904, (S.D. Ind. 2018).

107.  Similarly, McDonald's Corp. made attempts to purchase the Kytch Solution, to no avail. McDonald's Corp.'s Regional Deployment Manager Michael Cousins emailed Kytch, saying he was "[i]interested in the product." A short time later, Josh Drake—a "McDonald's Operations Technology Professional"—attempted to enroll in the Kytch Trial and he did not disclose that he was employed by McDonald's Corp. or that he was trying to obtain devices on behalf of McDonald's Corp.

108.   We denied his application after determining the stores in Drake's application were corporate-owned McDonald's locations.

***Tyler Gamble Breaches the Kytch Trial Agreement***

109.   In 2020, the Kytch Solution enrolled trial participants in Arkansas, California, Connecticut, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carina, Tennessee, Texas, Washington, and Wisconsin.

110.   The Kytch Trial was incredibly popular at several different fast-food restaurant chains throughout the United States.  At one point in 2020, we were told that Kytch was the largest independent Internet of Things connectivity software vendor used for the shake machine in the McDonald's system.

111.   Tyler Gamble enrolled in the trial on March 18, 2020.

112.   McDonald's and Taylor announced that Tyler Gamble's Equipment Team was working to develop a competing product called Taylor Shake Sundae Connectivity ("TSSC"). According to the description, TSSC was set for release in Q1 2021.

113.   This is when we learned that Tyler Gamble was developing a competing product while he was enrolled in the Kytch Trial.  In March and April 2021, we conducted an investigation to review Tyler Gamble's activities on our online platform and with the Kytch Solution devices he possessed.

114.   I led Kytch's investigation into Tyler Gamble, and the following conclusions are based on documentary evidence and data logs that we keep for our customers.

115.   On May 27, 2020, Tyler Gamble's Kytch Solution, identified as "Brownsville," went offline.  I reviewed the log history for this Kytch Solution, and Tyler Gamble emailed Kytch ***eight months later,*** on February 1, 2021, to report that he had plugged in the device.  But because the machine did not receive any software updates during that time period it can no longer connect to the Kytch platform.

116.    When the device was connected to the internet again, its SD card was 90% full.  A forensic review of the Brownsville Kytch Solution's data logs indicate that the device was powered on and used for weeks after going offline, but the Kytch cables were disconnected periodically so the device could not retrieve information or connect to the internet.  The use log for the Brownsville Kytch Solution is attached as **Exhibit 7.**



117.    On April 10, 2021, Kytch learned from Darcy Bretz, the Director of Corporate Communications of Middleby Corporation—Taylor's parent company—that a servicer for Taylor's "Tennessee distributor"—TFGroup LLC—possessed a Kytch device, after the technician removed the Kytch Solution from the store location.  In an April 8, 2021 email Ms. Bretz wrote: "our Tennessee distributor reported to Taylor that its servicer removed a Kytch device from a customer location in order to service our product."  Taylor's website identifies TFGroup LLC as its "Tennessee distributor."

118.    In the same communication, Middleby Corporation failed to deny that months earlier Taylor's outside counsel and private investigators had used fake names to obtain the Kytch Solution.

119.    Approximately two weeks after the Brownsville Kytch Solution was disconnected, Tyler Gamble invited someone using the alias "Matt Wilson" to access his Kytch account.  This includes all notifications, the remote control—and ultimately Kytch Rewind—using Gamble's account.  Gamble sent two invitations, first on June 10, 2020, and the second on August 27, 2020.  The unauthorized invitations are attached as **Exhibit 8.**

120.    Throughout this time period, Tyler Gamble made representations to Kytch that he was working hard to expand Kytch to more retail locations throughout the United States.

121.    "Matt Wilson" registered the account using the email address "mwilson970@gmail.com," and the phone number 504.415.2795.

122.    Years ago, Matthew "Blaine" Martin emailed a predecessor company of Kytch (Frobot) about our products and pricing.  The same telephone number listed above appeared in his email signature.  Blaine Martin is Managing Partner of TFGroup LLC.  TFGroup LLC is a franchised servicer and distributor for Taylor and its machines.

123.    Our security features require that the invitation link be accepted by an existing account with an email address that matches the email address provided for the invitation.  That means that Tyler Gamble, the account holder, is contractually responsible for the invitations to his account and to Kytch.com.

124.    In March of 2021, I searched public records using the number "Matt Wilson" registered on Kytch.com.  A screenshot of the results is below.



125.    Public records that I reviewed at TruePeopleSearch.com indicate that the number associated with user "Matt Wilson" is registered to Matthew Blaine Martin.

DECLARATION OF MELISSA NELSON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
Redacted Version Filed 04/29/2022 -- Page 162 of 224

126.   On its LinkedIn page, TFGroup LLC describes itself as "[a] leader in the foodservice equipment segment," and that "TFGroup utilizes analytical advances to ensure speed of service, reduction of equipment downtime and labor savings."[1]

127.   In October of 2019, Kytch had a booth at a conference hosted by McDonald's in Dallas, Texas.  The Kytch Trial and Kytch Solution were topics of conversation.  Mr. Martin and TFGroup LLC attended, and Mr. Martin sat near our booth throughout the event.

128.   Records indicate that the TFGroup LLC account proceeded to login to Kytch's online platform and accessed proprietary and confidential information via Tyler Gamble's account on www.Kytch.com.  The TFGroup LLC account also accessed all of the notifications the machines received since beginning the Kytch Trial.  This customer data and information derives independent economic value because it provides metrics regarding machine functionality and common or recurring bugs and errors that cause outages and failures.   The customer information that Tyler Gamble disclosed to the TFGroup LLC account is depicted in at least **Exhibit 2.**

129.   The TFGroup LLC account continued to log in and access this information at a minimum of four separate sessions, continuing through January 17, 2021.  According to the IP address records in Kytch's database, the logins occurred from Little Rock, Ponchatoula, Louisiana, and New Orleans.

130.   On January 29, 2021, right around the time they were contacted about another Business Insider article covering Kytch, Tyler Gamble and his father Jeff Gamble both logged in to the Kytch Platform and deleted the unauthorized users (including Blaine Martin and others) that they had invited to access Kytch's trade secret information.[2]

131.   The **_day before_** one article about Kytch was scheduled to be released, Tyler Gamble emailed Kytch and said that the same device that had been offline since May 27, 2020, was "connected properly and whitelisted."

---

[1] TFG Companies, *TFGROUP EXPANDING TAYLOR BRAND INTO ARKANSAS AND N. LOUISIANA MARKETS*, LinkedIn (Apr. 16, 2021), https://www.linkedin.com/posts/tfgcompanies_tfgroup-expanding-taylor-brand-into-arkansas-activity-6788613873491603456-1Zam.

[2] **Exhibit 8.**

DECLARATION OF MELISSA NELSON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
Redacted Version Filed 04/29/2022 -- Page 163 of 224

132.    This was not the only peculiarity that our investigation uncovered when we looked into Tyler Gamble's account activity.  One week after Gamble's Brownsville Kytch went offline, Kytch issued a real-time alert from Gamble's Kytch Solution identified as Stonebrook 1.  The alert stated, "L PRODUCT TOO VISC" was occurring frequently.  ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████    Kytch also provided specific tips on how to correct the problem.  An explanation of Kytch's notifications is set forth in **Exhibit 2**.

133.    This problem was appearing in numerous Taylor machines throughout Kytch's online network**.** But a short time after Kytch provided this notification to Gamble, the "PRODUCT TOO VISC" alert rarely appeared in any Taylor machine.

134.    Our past experiences with Taylor indicated that they tested their software in a constrained setting across a half dozen machines.  And they relied on their technicians to report common bugs.

135.    During our product testing and development, we have reviewed datasets and notifications from Taylor indicating that it can take the company years to correct a relatively straightforward bug.  But with the "PRODUCT TOO VISC" alert, it took Taylor only a few months to solve a problem that we had recently flagged and explained to Tyler Gamble during the time the TFGroup LLC account was accessing his Kytch Solution device and the Kytch platform.

136.    In addition to these regularities, Kytch's investigation revealed more suspicious activities from trial participants connected to McDonald's National Supply Leadership Council ("NSLC").  One such participant is Sellia Group, which executed the Kytch Trial Agreement on August 17, 2020, and operates 18 locations in Massachusetts and Rhode Island, not far from the headquarters of Kytch-competitor Powerhouse Dynamics.

137.    David Balducci works through the Sellia Group and he is a member of McDonald's Equipment Team.  On March 20, 2021, Sellia Group's Kytch account was accessed from Chicago, Illinois, and the Bronx using a VPN, shortly before a login was registered from Milford, MA, the area where the account was registered.

*Kytch Suffered Irreparable Harm Following Gamble's Improper Disclosures*

138.    Kytch is an early-stage company that relies on investment capital to survive.  Kytch was involved in fundraising at the time the theft of our confidential information and trade secrets occurred.  The fact that Taylor and McDonald's subsequently announced their own competing device has made it extremely difficult to continue fundraising, because this competing product will decimate our potential market.

139.    Moreover, the loss of this market is not just reflected in lost revenue.  Kytch uses the data generated from its customers to further improve and expand the Kytch Solution.  Without access to the data, because Taylor devices will be used instead, the R&D process at Kytch will dramatically slow.  We will not be able to improve the Kytch Solution or expand it to other kitchen devices.  Our innovation process is based on collecting as much data as feasible and using it to inform behavior.  Taylor's launch of competing devices chokes off this opportunity.

140.    The IoT market in industrial kitchens is a relatively new field, and it is growing quickly. The Kytch Solution Device is designed to be a scalable hub for a wired kitchen.  Once Taylor's competing devices enter this space, there will be no room for the Kytch Solution.  And once we lose the toehold into the kitchen, we will be at a competitive disadvantage to expand to other devices beyond the Taylor machine.

141.    By exploiting Kytch's trade secrets and Confidential Information, Defendants have caused harm to Kytch and eroded the fair and competitive industry.  Defendants' conduct ultimately caused our salesman to quit.

142.    Because of the nature of these harms, monetary compensation years from now will not unravel the harm caused to Kytch directly and indirectly by Defendants' conduct.

143.    With respect to Kytch's trade secrets, there is also the threat that Kytch's confidential and proprietary information will be disclosed by Defendants, which will destroy the trade secret value of the technology.

144.    I believe that the competing product, originally described as TSSC, is being rolled out through a Taylor-affiliate entity called Powerhouse Dynamics and its "Open Kitchen" concept.

145.   In January of 2021, Powerhouse Dynamics released images of the new device, and its offerings and trade dress are similar to the machine depicted in a Kytch user-video that was released years earlier.

146.   Specifically, of the hundreds of device functions within the respective products, the three functions Powerhouse Dynamics decided to animate in its marketing materials are identical to the functions depicted in Kytch's rendering.

147.   The rendering from Powerhouse Dynamics bears a striking resemblance to Kytch's earlier drawing.





148.   Additionally, although the competing device from Powerhouse Dynamics has not yet been released, information about the product that is publicly available demonstrates that all of the features in the Powerhouse Dynamics device are already within Kytch's product offerings.

| Features | Kytch.com | Powerhouse Dynamics |
|---|---|---|
| Servings Reports | ✓ | ✓ |
| Real-Time Text Alerts | ✓ | ✓ |
| Machine Status Updates | ✓ | ✓ |
| Machine History | ✓ | ✓ |

- 28 -

149. Powerhouse Dynamics's product offers servings reports closely resemble Kytch's method for programmatically opening the menu to retrieve the data at a specified time each day, saving the data, and displaying the data on a website or email notification.

150. Much like the Kytch Solution Device's Rewind feature, Powerhouse Dynamics offers a visual representation of the machine's time on various modes.

151. Powerhouse Dynamics also offers real time alerts via text message on soft and hard locks presented on the front panel of the machine. Kytch's innovations involve reading messages on the screen and sending real-time alerts regarding those messages.

152. Powerhouse Dynamics's version of Kytch references all of Kytch's landmark features, its design, and several components that were subject to binding non-disclosure agreements and that were not publicly available.

153. The fact that Powerhouse Dynamics graphics highlight the display of the hopper temperatures provides further evidence of overlap from Kytch's earlier offering. Displaying hopper temperatures is ***not*** permissible in the default setting of the Taylor machines. Indeed, the display of hopper temperatures deviates from Taylor service manuals. One of Kytch's innovation was delivering its users information related to hopper temperatures, and this fact was only shared as Confidential Information to trial participants.

154. If one of Kytch's competitors had access to the Kytch Solution and Kytch Solution Platform, they would be able to obtain a significant head start on our technology and trade secrets by reverse engineering our design.

155. Powerhouse Dynamics's website indicates that the competing device is being tried out with McDonald's franchise operator and Equipment Team co-lead Louis Buono, Jr. His co-lead is Tyler Gamble.

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 6th day of May 2021, in Fremont, California

_____
Melissa Nelson

- 29 -

# EXHIBIT 1

PUBLIC –  REDACTS MATERIAL
UNDER SEAL UNDER PER
COURT'S JULY 30, 2021 ORDER


Pages 31-110

Redacted Version Filed 04/29/2022 -- Page 168 of 224

# EXHIBIT 2

PUBLIC – REDACTS MATERIALS
UNDER SEAL UNDER PER
COURT'S JULY 30, 2021 ORDER

Pages 112 - 169

# EXHIBIT 3

Redacted Version Filed 04/29/2022 -- Page 170 of 224

KYTCH TRIAL AGREEMENT

PLEASE READ ALL OF THE FOLLOWING TERMS OF USE CAREFULLY. THIS IS A
LEGAL AGREEMENT ("AGREEMENT") BETWEEN YOU AND KYTCH, INC. STATING
THE TERMS AND CONDITIONS THAT GOVERN YOUR USE OF THE KYTCH
SOLUTION DURING THE TRIAL. IF YOU ARE ENTERING INTO THIS AGREEMENT
ON BEHALF OF A COMPANY OR LEGAL ENTITY, YOU REPRESENT THAT YOU
HAVE THE AUTHORITY TO BIND SUCH ENTITY TO THESE TERMS AND
CONDITIONS, IN WHICH CASE THE TERMS "YOU" AND "YOUR" SHALL REFER TO
SUCH ENTITY. BY SIGNING BELOW OR BY USING THE KYTCH SOLUTION, YOU
ARE AGREEING TO ALL OF THE TERMS AND CONDITIONS STATED HEREIN. IF
YOU DO NOT AGREE TO THESE TERMS, DO NOT SIGN BELOW AND YOU SHALL
NOT HAVE THE RIGHT TO ACCESS OR USE THE KYTCH SOLUTION.

A. Agreement Definitions

"Kytch" refers to Kytch, Inc. "You" and "your" refers to the individual or entity that has ordered
the Kytch Trial by having signed below or otherwise having used the Kytch Trial.

The terms "Kytch Trial," or the "Trial," means your use of the Kytch Solution during the Trial
Period solely for your internal evaluation and testing and not for commercial or production
purposes.

The term "Kytch Solution"  or "Solution" refers to the hardware and software products owned or
distributed by Kytch and related cloud services, programs, technology platform and other
materials to which Kytch grants you access as part of the Trial, including user guides, and any
program updates provided as part of the Solution.

The term "users" means only your employees who have a reasonable need to have access to the
Kytch Solution solely for internal evaluation in connection with the Trial.

B. Trial Period

Redacted Version Filed 04/29/2022 -- Page 171 of 224

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

This Agreement is effective on the Effective Date (defined below) and will terminate six (6) months from the date Kytch ships you the Solution, unless earlier terminated (the "Trial Period"). Certain Kytch Trials may permit you a one-time option to extend the Trial Period by an additional thirty (30) days, by selecting that option on the Trial. If you would like to use the Solution after the Trial Period, provided that Kytch has made the Solution commercially available, you must purchase such Solution from Kytch.

If the Solution has been disconnected from the Kytch servers for a period of 3 days, or at the conclusion of your Trial Period, you will either (i) immediately cease all use of the Solution, and return the Solution (we will provide you with a free return label you may use), or (ii) promptly purchase and pay for a subscription to the Solution (subject to our standard Kytch Terms of Service) at our then-current monthly pricing (along with all other associated fees) from the Trial end date, unless otherwise agreed in writing (for clarity, upon expiration or termination of any such Solution subscription, your rights thereto shall cease and you shall then promptly return the Solution to Kytch). If the Solution has not been returned within 5 days after the Trial end date or date of disconnection from the Kytch servers, you will be considered to have purchased a subscription to the Solution and you shall pay the full listed non-discounted price of such Solution for the Trial Period. If you have submitted your credit card information, we will charge your credit card.

At any time and without notice, Kytch reserves the right to (i) modify the terms and conditions of the Trial offer, or (ii) cancel and terminate such Trial and this Agreement for any reason.

C. Rights Granted

For the duration of the Trial Period, you have the nonexclusive, nontransferable, non-assignable, non-sublicensable limited right to use the Solution at the approved locations identified in Exhibit A to this Agreement in accordance with Kytch's documentation, subject to the terms of this Agreement, and solely for your internal business purposes to evaluate Kytch's Solution and not for any production or commercial purposes. You may allow your users to use the Solution solely for this purpose and you are responsible and liable for your users' compliance with this Agreement.

You do not acquire any right or license to use the Solution in excess of the scope and/or duration of the Trial defined in this Agreement. Upon the termination or expiration of this Agreement or the Trial Period, your right to access or use the Kytch Solution shall immediately terminate.

Page 172

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

D. Ownership and Restrictions

Kytch or its licensors retain all right, title and interest (including all intellectual property rights) in and to the Kytch Solution, including all improvements, enhancements and derivative works thereof, and anything else developed or provided by Kytch under this Agreement.

You shall not, and shall not cause or permit others to:

- remove or modify any Solution markings or any notice of Kytch's or its licensors' proprietary rights;

- modify, make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute or republish all or any part of the Solution, or otherwise access or use the Solution in order to build or support, and/or assist a third party in building or supporting, products or services competitive to any Kytch Solution;

- disclose results of any benchmark tests or performance tests of the Kytch Solution without Kytch's prior written consent;

- perform or disclose any of the following security testing of the Solution (or associated systems, services or infrastructure): network discovery, port and service identification, vulnerability scanning, password cracking, remote access testing, or penetration testing; and

- license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit timesharing or service bureau use, or otherwise commercially exploit or make the Kytch Solution available to (or use such Solution for the benefit of) any third party.

E. Disclaimers and Exclusion of Warranties

THE SOLUTION IS PROVIDED TO YOU ON AN "AS IS" AND "AS AVAILABLE" BASIS, AND KYTCH HEREBY DISCLAIMS ALL EXPRESS OR IMPLIED REPRESENTATIONS, WARRANTIES, GUARANTEES, AND CONDITIONS WITH REGARD TO (A) THE SOLUTION, INCLUDING BUT NOT LIMITED TO SOFTWARE, HARDWARE, SYSTEMS, NETWORKS OR ENVIRONMENTS AND (B) MERCHANTABILITY, SATISFACTORY QUALITY, NONINFRINGEMENT, AND FITNESS FOR A PARTICULAR PURPOSE.

Redacted Version Filed 04/29/2022 -- Page 173 of 224
Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

KYTCH DOES NOT GUARANTEE THAT (A) THE SOLUTION WILL BE ERROR-FREE OR UNINTERRUPTED, OR THAT KYTCH WILL CORRECT ALL ERRORS; (B) THE SOLUTION WILL OPERATE IN COMBINATION WITH YOUR CONTENT OR YOUR APPLICATIONS, OR WITH ANY OTHER SOFTWARE, HARDWARE, SYSTEMS, OR DATA; (C) YOUR CONTENT AND YOUR APPLICATIONS WILL BE SECURE OR NOT OTHERWISE LOST OR DAMAGED; AND (D) THE SOLUTION, INFORMATION OR OTHER MATERIAL YOU OBTAIN OR PURCHASE FROM KYTCH UNDER THIS AGREEMENT, WILL MEET YOUR REQUIREMENTS OR EXPECTATIONS. YOU ACKNOWLEDGE THAT KYTCH DOES NOT CONTROL THE TRANSFER OF DATA OVER COMMUNICATIONS FACILITIES, INCLUDING THE INTERNET, AND THAT THE SOLUTION MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF SUCH COMMUNICATIONS FACILITIES. KYTCH IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS.

YOU AGREE TO INDEMNIFY KYTCH FROM ANY DAMAGES, LIABILITIES, COSTS AND EXPENSES OR THE SETTLEMENT AGREED TO BY YOU, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY OF YOUR CONTENT OR APPLICATIONS OR NON-KYTCH SOFTWARE OR TECHNOLOGY. KYTCH IS NOT RESPONSIBLE FOR THE SECURITY OF ANY CONTENT, APPLICATION OR SOFTWARE THAT YOU LOAD INTO OR CREATE WITHIN THE TRIAL ENVIRONMENT.

KYTCH RESERVES THE RIGHT TO MAKE CHANGES OR UPDATES TO THE KYTCH SOLUTION AND TRIAL AT ANY TIME WITHOUT NOTICE. KYTCH MAY TERMINATE THE TRIAL FOR ANY REASON, AT ANY TIME.

F. User Accounts

To use the Solution, you must have an Kytch.com account. Access to and use of password protected or secure areas of the Trial site is restricted to authorized users only. You may not share your password(s), account information, or access to the Trial site. You are responsible for identifying and authenticating all users, for approving access by such users to the Solution, for controlling against unauthorized access by users, and for maintaining the confidentiality of usernames, passwords and account information. By federating or otherwise associating your and your users' Single Sign-On with Kytch, you accept responsibility for timely and proper termination of user records in your local (intranet) identity infrastructure and on your local computers. Kytch is not liable for any harm caused by users, including individuals who were not authorized to have access to the Solution but who were able to gain access because usernames, passwords or accounts were not terminated on a timely basis in your local identity management

Page 174

Redacted Version Filed 04/29/2022 -- Page 174 of 224

infrastructure or your local computers. You are responsible for all activities that occur under your and your users' passwords or accounts or as a result of your or your users' access to the Trial, and agree to notify Kytch immediately of any unauthorized use. You agree to make every reasonable effort to prevent unauthorized third parties from accessing the Trial.

G. Support Services

The Kytch Trial provides an opportunity for current and potential Kytch customers to experience Kytch Solution before purchasing the Solution. The Trial is provided as a convenience and you agree that Kytch is not obligated to provide any technical support, phone support, or updates for the Kytch Solution accessed or used within the Trial environment.

H. End of Agreement

The Solution provided under this Agreement shall be provided for the Trial Period defined above unless earlier terminated in accordance with this Agreement. At the end of the Trial Period, all rights to access or use the Solution shall immediately terminate.

You may discontinue your use of the Solution at any time. Kytch may terminate your password, account, and access to or use of the Solution at any time for any reason. You acknowledge and agree that Kytch has no obligation to retain your content, data and applications, and that your content, data and applications will be irretrievably deleted, following the termination of the Trial.

If you cancel the Trial before the end of the Trial Period, all your rights to any remaining free Trial Period will be waived and you will not be eligible to participate in any further trials, except as allowed by Kytch in its sole discretion.

At termination of the Trial, if you choose not to buy the Solution, you must return all elements of the Kytch Solution (and all related materials) in your possession or control within five (5) days.

Provisions that survive termination or expiration of this Agreement are those which by their nature are intended to survive.

I. Fees and Taxes

Page 175

Redacted Version Filed 04/29/2022 -- Page 175 of 224

The Solution provided under this Agreement is provided to you free of charge during the Trial Period.

## J. Nondisclosure

By virtue of this Agreement, you will have access to information that is confidential to Kytch, including but not limited to all aspects of the Solution and all information relating to its features, specifications, functionality and performance ("Kytch Confidential Information"). Kytch Confidential Information shall not include information which: (a) is or becomes a part of the public domain through no act or omission of yours; or (b) was in your lawful possession prior to the disclosure and had not been obtained by you either directly or indirectly from Kytch; or (c) is lawfully disclosed to you by a third party without restriction on disclosure; or (d) is independently developed by you without use of or reference to Kytch Confidential Information. You agree, both during the term of this Agreement and for a period of five years after termination of this Agreement, to hold Kytch's Confidential Information in strict confidence using no less than a reasonable degree of care, not to disclose Kytch Confidential Information to any third party (other than your users) and not to use Kytch Confidential Information for any purpose other than your evaluation of the Solution as part of the Trial.

## K. Terms and Privacy

The terms, EULA and privacy agreements located at Kytch's website at https://kytch.com/tos are incorporated into this Agreement.

## L. Entire Agreement

You agree that this Agreement including the information which is incorporated into this Agreement by written reference (including reference to information contained in a URL or referenced policy), is the complete agreement with respect to the subject matter hereof, and that this Agreement supersedes all prior or contemporaneous agreements or representations, written or oral, regarding such subject matter. If any term of this Agreement is found to be invalid or unenforceable, the remaining provisions will remain effective and such term shall be replaced with a term consistent with the purpose and intent of this Agreement. It is expressly agreed that the terms of this Agreement shall supersede the terms in any purchase order or other non-Kytch document and no terms included in any such purchase order or other non-Kytch document shall apply to the Solution or Trial. This Agreement may not be modified and the rights and

Page 176

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

restrictions may not be altered or waived except in a writing signed by authorized representatives of you and of Kytch.

M. Limitation of Liability

IN NO EVENT SHALL KYTCH BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, OR ANY LOSS OF REVENUE OR PROFITS, DATA, OR DATA USE, ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT OR TORT, OR OTHERWISE, EVEN IF KYTCH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL KYTCH'S TOTAL LIABILITY TO YOU UNDER THIS AGREEMENT FOR ALL DAMAGES EXCEED THE AMOUNT OF ONE THOUSAND UNITED STATES DOLLARS ($1,000.00).

N. Other

• Kytch is an independent contractor and we each agree that no partnership, joint venture, or agency relationship exists between us. We each will be responsible for paying our own employees, including employment related taxes and insurance. Kytch reserves the right to provide the Solution from locations, and/or through use of affiliates and subcontractors, worldwide.

• You are responsible for obtaining at your sole expense any rights and consents from third parties necessary for your content, your applications, and other vendors' products provided by you and used with the Trial environment, including all rights and consents to such content, applications and products necessary for Kytch to provide the Solution.

• This Agreement is governed by the substantive and procedural laws of the State of California and you and Kytch agree to submit to the exclusive jurisdiction of, and venue in, the courts in Alameda county in California in any dispute arising out of or relating to this Agreement. If you have a dispute with Kytch, you will promptly send written notice to legal@kytch.com. Kytch may give notice applicable to Kytch's Solution customer base by means of a general notice on the Kytch portal for the Solution, and notices specific to you by electronic mail to your e-mail address on record in Kytch's account information or by written communication sent by first class mail or pre-paid post to your address on record in Kytch's account information.

Page 177

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

•      You may not assign this Agreement or give or transfer the Solution or an interest in them to another individual or entity.  Kytch may assign this Agreement to any affiliate or successor to its assets or business.

•      Except for actions for violation or misappropriation of Kytch's intellectual property or proprietary rights, no action, regardless of form, arising out of or relating to this Agreement may be brought by either party more than two years after the cause of action has accrued.

•      Kytch may use software tools to audit and otherwise request information from you regarding your use of the Solution. You agree to cooperate with Kytch's audit and provide reasonable assistance and access to information.

•      The Uniform Computer Information Transactions Act does not apply to this Agreement or orders placed under it. You understand that Kytch's business partners, including any third party firms retained by you to provide computer consulting services, are independent of Kytch and are not Kytch's agents. Kytch is not liable for nor bound by any acts of any such business partner, unless the business partner is providing services as an Kytch subcontractor on an engagement ordered under this Agreement.

O. Force Majeure

Neither of us shall be responsible for events outside the reasonable control of the obligated party. We both will use reasonable efforts to mitigate the effect of a force majeure event.

P. Feedback

"Feedback" shall mean any input, comments, suggestion or feedback regarding Kytch's Solution, the Trial and/or Kytch Confidential Information, including changes or suggested changes to Kytch's current or future Solutions and/or other products or services. Notwithstanding anything that you may note or state in connection with providing Feedback, all Feedback provided by you shall not be considered confidential information and shall be received and treated by Kytch on a non-confidential and unrestricted basis. You agree that Kytch shall exclusively own (and you hereby assign to Kytch)  all right, title and interest (including all intellectual property rights)  in and to any Feedback provided by you or any other party, and acknowledge that Kytch may (but is not obligated to) use the Feedback for any purpose, including but not limited to incorporation or implementation of such Feedback into the Kytch Solution or other products or services, and to display, market, sublicense and distribute such Feedback as incorporated or embedded in any Solution, product or service distributed or offered by Kytch.

Page 178

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

This Agreement is effective as of _____03 / 19 / 2020_____, 2020 (the "Effective Date"), by and between:

*J Tyler Gamble*

_____

Signature

J Tyler Gamble

_____

Name

Owner / McDonald's

_____

Title/Company

*Melissa Nelson*

_____

Signature

Melissa Nelson

_____

Name

Co-CEO / KYTCH,INC.

_____

Title/Company

Page 179

Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

EXHIBIT A


Approved Trial locations to be listed here


McDonald's 1108 South Cass Street Corinth MS 38834, McDonald's 2586 Anderson Ave
Brownsville TN 38012,  McDonald's 1705 South Highland Ave Jackson TN 38301, McDonald's
4101 B Highway 412 S Bells TN 38006.

Redacted Version Filed 04/29/2022 -- Page 180 of 224
Doc ID: 6cad3831ad2aabcfba975dac3d13596153a13446

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Kytch Trial Agreement |
| **FILE NAME** | KYTCH TRIAL AGREEMENT__2020.docx |
| **DOCUMENT ID** | 6cad3831ad2aabcfba975dac3d13596153a13446 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| SENT | **03 / 19 / 2020**<br>18:30:52 UTC | Sent for signature to Tyler Gamble (tgamblemcd@gmail.com) and Melissa Nelson (Melissa@kytch.com) from allison@kytch.com<br>IP: 71.202.29.169 |
| VIEWED | **03 / 20 / 2020**<br>02:23:22 UTC | Viewed by Tyler Gamble (tgamblemcd@gmail.com)<br>IP: 205.185.229.140 |
| VIEWED | **03 / 20 / 2020**<br>03:28:57 UTC | Viewed by Melissa Nelson (melissa@kytch.com)<br>IP: 73.15.84.205 |
| SIGNED | **03 / 20 / 2020**<br>02:26:22 UTC | Signed by Tyler Gamble (tgamblemcd@gmail.com)<br>IP: 205.185.229.140 |
| SIGNED | **03 / 20 / 2020**<br>03:29:52 UTC | Signed by Melissa Nelson (melissa@kytch.com)<br>IP: 73.15.84.205 |
| COMPLETED | **03 / 20 / 2020**<br>03:29:52 UTC | The document has been completed. |

Powered by **HELLOSIGN**

Redacted Version Filed 04/29/2022 -- Page 181 of 224

# EXHIBIT 4

Redacted Version Filed 04/29/2022 -- Page 182 of 224



# Kytch, Inc. Terms of Service

**Last Updated: July 3, 2020**

**IMPORTANT NOTICE: THIS AGREEMENT IS SUBJECT TO A WAIVER OF CLASS ACTION RIGHTS AS DETAILED IN THE DISPUTE RESOLUTIONS SECTION.**

**ACCEPTANCE OF TERMS OF SERVICE**

Kytch, Inc., its parent, Frobot, Inc., and affiliates (collectively, "Kytch" "We," "Us," or "Our") provide (1) the Kytch website located at www.kytch.com, and all associated sites linked to www.kytch.com, including the Kytch user account website that may be accessed at www.kytch.com ("Sites") (2) any services accessible through the Sites, including any Trial period and Kytch Gold ("Web Apps"), (3) software that may be downloaded to Your smartphone or tablet to access services ("Mobile Apps"), and (4) any subscription services, including services that can be accessed using the Web Apps and Mobile Apps ("Subscription Services"), all for use in conjunction with Kytch hardware products ("Products") and in other ways that Kytch provides. The term "Services" means the Sites, Web Apps, Mobile Apps, and Subscription Services.

Please read these Terms of Service ("Terms") carefully before you begin using Our Products and Services or any Third Party Services. By clicking "Login", "Create Account", "Sign In" "Sign Up", "Start Free Trial", creating a user account, placing an order, or otherwise using the Products and Services, you agree to accept and be bound by these Terms, along with the Kytch End User License Agreement, Kytch Trial Agreement, Kytch Privacy Policy, and the Kytch Privacy Statement, which are all taken together and incorporated by reference into these Terms, and govern Your use of the Products and Services and constitute a binding legal agreement between You and Kytch, (the "Agreement"). If any of the provisions of these Terms directly conflict with those applicable to individual Products or Services, the provisions applicable to the specific Products or Services will prevail. If you do not agree to the Agreement, do not access or use our Products or Services or any Third Party Services. Certain features of the Services may also be subject to additional guidelines, terms or rules, which will be posted on the Services in connection with such features. Please read these Terms carefully, as they contain important information about a class action waiver and a binding arbitration provision, requiring you to arbitrate any claims you may have against Kytch on an individual basis. ARBITRATION ON AN INDIVIDUAL BASIS MEANS THAT YOU WILL NOT HAVE, AND YOU WAIVE, THE RIGHT FOR A JUDGE OR JURY TO DECIDE YOUR CLAIMS, AND THAT YOU MAY NOT PROCEED IN A CLASS, CONSOLIDATED, OR REPRESENTATIVE CAPACITY.

THESE TERMS ARE A BINDING LEGAL AGREEMENT. BY ACCEPTING THESE TERMS AND ACCESSING AND USING THE PRODUCTS OR SERVICES IN ANY WAY YOU ARE ACCEPTING AND AGREEING TO THESE TERMS ON BEHALF OF YOURSELF OR THE ENTITY THAT YOU REPRESENT IN CONNECTION WITH THE ACCESS AND USE OF THE PRODUCTS AND SERVICES. YOU REPRESENT AND WARRANT THAT YOU HAVE THE RIGHT, AUTHORITY AND CAPACITY TO ACCEPT AND AGREE TO THESE TERMS ON BEHALF OF YOURSELF OR THE ENTITY THAT YOU REPRESENT. YOU REPRESENT THAT YOU ARE, OF SUFFICIENT LEGAL AGE IN YOUR JURISDICTION OR RESIDENCE TO USE OR ACCESS THE PRODUCTS AND SERVICES AND TO ENTER INTO THIS AGREEMENT.

AS DESCRIBED BELOW, YOU ARE CONSENTING TO AUTOMATIC SOFTWARE UPDATE OF THE SERVICES AND OF THE PRODUCTS CONNECTED TO THE SERVICES. IF YOU DO NOT AGREE, YOU SHOULD NOT USE OUR PRODUCTS OR SERVICES.

Page 183

SECTIONS 4 AND 5 BELOW DESCRIBE IMPORTANT LIMITATIONS OF THE PRODUCTS AND SERVICES, ESPECIALLY IN CONNECTION WITH LIFE SAFETY AND CRITICAL USES. PLEASE READ THESE DISCLOSURES CAREFULLY, WHICH, BY YOUR USE OF THE PRODUCTS AND SERVICES, YOU AGREE TO ACCEPT.

**GENERAL**

The terms "You," "Your," or "Yours" as used in these Terms, means any person or entity who: (1) accesses or uses any of our Products or Services; and (2) creates or accesses an Account, (as defined in Section 2(a) including, but not limited to Account Owners and Authorized Users (as defined in Section 2(b).These Terms give you specific legal rights. In addition, you may also have other legal rights which vary from jurisdiction to jurisdiction. The disclaimers, exclusions, mandatory and binding arbitration, limitations of liability, indemnification, waiver of jury trial, waiver of class action and waiver of punitive damages under these Terms will not apply to the extent prohibited by applicable law. Some jurisdictions do not allow the exclusion of implied warranties or the exclusion or limitation of incidental or consequential damages or other rights, so those provisions of these Terms may not apply to you.

**NOTICE**

**BY ACCESSING THE PRODUCTS AND SERVICES OR CREATING ANY ACCOUNT, YOU REPRESENT, WARRANT, AND AGREE THAT YOU ARE AN ACCOUNT OWNER OR AN AUTHORIZED USER AND ARE ACCESSING THE PRODUCTS, SERVICES, AND ANY ACCOUNT FOR A PERMITTED PURPOSE. YOU UNDERSTAND AND AGREE THAT UNAUTHORIZED ACCESS OR EXCEEDING AUTHORIZED ACCESS TO THE PRODUCTS, SERVICES OR ANY ACCOUNT, WILL VIOLATE THESE TERMS OF SERVICE AND MAY ALSO VIOLATE CERTAIN LAWS INCLUDING, BUT NOT LIMITED TO, THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 et seq., THE COPYRIGNT ACT, 17 U.S.C. § 101 et seq., THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832 et seq. THE CALIFORNIA COMPREHENSIVE DATA ACCESS AND FRAUD ACT, Cal. Penal Code § 502, THE CALIFORNIA UNIFORM TRADE SECRETS ACT Cal. Civil Code § 3426 et seq., AND MAY ALSO CONSTITUTE COMMON LAW MISAPPROPRIATION, UNFAIR COMPETITION, TRESPASS TO CHATTELS, UNJUST ENRICHMENT, AND IS A BREACH OF THESE TERMS OF SERVICE. BY ACCESSING THE PRODUCTS, SERVICES, AND ACCOUNTS, YOU HEREBY EXPRESSLY CONSENT TO KYTCH, INC.'S MONITORING OF YOUR USE OF THE PRODUCTS, SERVICES, AND ACCOUNTS, INCLUING THROUGH THE USE OF SOFTWARE TOOLS. KYTCH, INC. WILL UTILIZE ANY AND ALL LEGAL REMEDIES TO WHICH IT IS ENTITLED TO ENFORCE ITS RIGHTS. BY ACCESSING THE PRODUCTS, SERVICES, OR ANY ACCOUNT YOU REPRESENT, WARRANT, AND AGREE THAT YOU HAVE BEEN PROVIDED WITH NOTICE OF THIS WARNING.**

## 1. Eligibility; Trials; Subscriptions; Customer Service; Term and Termination

**(a) Eligibility.** (i) You may use the Products and Services only if you have the legal capacity to form a binding contract with Kytch. Only individuals aged 18 and older are permitted to act as Account Owners of Kytch Accounts. The Products and Services are not available to any users previously prohibited from using the Products and Services by Kytch.

**(b) Subscriptions.** We offer different subscription plans for our Subscription Services.

**(c) Continuous Subscriptions.** When you purchase any of our Subscription Services, you expressly acknowledge and agree that (1) Kytch is authorized to charge you an annual subscription service fee (in addition to any applicable taxes) for as long as your subscription continues, and (2) your subscription is continuous until you cancel it or such Subscription Service is suspended, discontinued or terminated in accordance with these Terms.

**(d) Billing.** We automatically bill the payment method associated with your Kytch account on the day you purchase the subscription. We utilize a third party payment provider: Stripe. In the event you later decide to purchase additional Subscription Services (each, an "Add-On Service"), your payment for such Add-On Service will be prorated to the renewal date of your initial Subscription Service and the full amount of the add-on service will be charged on your subscription renewal date. You acknowledge that the amount billed may vary due to promotional offers, changes in your Subscription Services plan and changes in applicable taxes, and you authorize us to charge your payment method for the corresponding amounts.

Page 184

**(e) Cancellations and Refunds.** Once you order your Subscription Service or any Add-On Service, you will be charged the full annual subscription fee which is non-refundable, even if you wish to cancel your subscription.

**(f) Pre-paid Subscription Services.** We may offer Products that include pre-paid Subscription Services, either included in the purchase price or as a Bundle. Pre-paid Subscription Services may not be used with Products other than the Product with which those pre-paid Subscription Services were purchased. If you purchase such Products, the pre-paid Subscription Services will begin on the date you pair your Product with your Account and end on the date noted in your Account following activation. If you cancel your pre-paid Subscription Services, those Subscription Services will be canceled permanently, and you will not receive a refund. Pre-paid Subscription Services are subject to the same terms and conditions as other Subscription Services, including Kytch's right to suspend, discontinue or terminate the Subscription Services in accordance with these Terms.

**(g) Trials.** If you are using the Products and Services on a trial basis, Your use of the Products and Services is also governed by the Kytch Trial Agreement and you may only use the Products and Services for the limited Trial Period specified by Kytch in writing or on the Web Apps at the time of Your order, solely for purpose of evaluating suitability. The Products must be installed at Your designated location.  Once installed, if the Products have been disconnected from the Kytch servers for a period of 3 days for any reason whatsoever, or, if the Products are shipped to You and You do not install the products within three (3) days after We send a notice to You that you have not installed the Products, or at the conclusion of Your Trial Period, you will either (i) immediately cease all use of the Products and Services, and return the Products in accordance with these Terms, or (ii) promptly purchase a subscription of the Services from the Trial end date, and begin paying for the Services. If the Products have not been returned to Kytch within fourteen (14) days of the Trial Period end date or date of disconnection from the Kytch servers, or they are not installed within three (3) days after We send a notice to You that You have not installed the Products, You hereby affirm and agree that You will be considered to have purchased a subscription to the Services and You agree that you shall pay the full listed non-discounted price of the Product and Services for the Trial Period. If you have submitted Your credit card information, You agree that we will charge Your credit card on file and you hereby give Us permission to do so.

When using the Products and Services through a Trial or Subscription, You may not and you many not directly or indirectly, cause, permit, or allow others to:

- remove or modify any program or services markings or any notice of Kytch's proprietary rights;
- make the Products or Services, including any Kytch programs or materials to which you are provided access, available in any manner to any third party;
- modify, make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute, republish or download any part of the Products and Services, or access or use the services in order to build or support, and/or assist a third party in building or supporting, Products or Services competitive to Kytch;
- disclose the results of the performance of the Products and Services without Kytch's prior written consent;
- license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit timesharing, or otherwise commercially exploit or make the Products and Services, Kytch programs or materials available, to any third party.

**(h) Authorized Users.** To use the Products and Services you must have a kytch.com account. Access to and use of the Web Apps is restricted to Account Owners and Authorized Users only. You may not share Your password(s), account information, or access to the Web Apps or any Accounts. You are responsible for identifying and authenticating all Authorized Users, for approving access by such Authorized Users to the Services, for controlling against un-authorized users, and for maintaining the confidentiality of usernames, passwords and account information. Kytch is not liable for any harm caused by Authorized Users, including

Redacted Version Filed 04/29/2022 -- Page 185 of 224

any individuals who were not authorized to have access to the Products and Services but who were able to gain access because usernames, passwords or accounts were not terminated on a timely basis. You are responsible for all activities that occur under Your and Your Authorized Users' passwords or accounts or as a result of Your and Your Authorized Users' access to the Web Apps, and agree to notify Kytch immediately of any unauthorized use. You agree to make every reasonable effort to prevent unauthorized third parties from accessing the Web Apps.

If you cancel the trial before the end of the trial period, all Your rights to any remaining free trial period will be waived and you will not be eligible to participate in any further trials, except as allowed by Kytch in its sole discretion.

At any time and without notice, Kytch reserves the right to (i) modify the terms and conditions of the trial offer, or (ii) cancel such trial for any reason. Cancellations can be emailed to support@kytch.com. The other sections of Kytch's Terms of Service, Terms of Sale, EULA and Privacy Policies apply.

**(i) Kytch Gold.** As part of the Services, You may sign up for Kytch Gold. Kytch Gold allows You to see the physical address of the location of Your equipment and whether the equipment is available to serve product. You may choose to make this information available to users of the Kytch Services. If you choose to share this information, you hereby give your consent to Kytch to make it available without limitation.

**(j) Customer Service.** If you have any questions or concerns regarding the Products, the Services or these Terms, please contact Kytch. You understand and agree that customer service and any customer care and support offered and provided by Kytch is not a technician service or dispatch center, an emergency service provider or dispatch service.

**(k) Term and Termination.** These Terms will remain in full force and effect as long as you continue to access or use the Products and Services, or until terminated in accordance with the provisions of the Agreement. At any time, Kytch may (i) suspend or terminate Your rights to access or use the Products and Services, or (ii) terminate these Terms with respect to you if Kytch, in good faith, believes that you have used the Products and Services in violation of these Terms, including any incorporated guidelines, terms or rules. You may not give, sell, loan or transfer the Product to any other person or entity. Upon termination or expiration of these Terms for any reason, you must return the Product to Kytch in accordance with these Terms.

**(l) Effect of Termination.** Upon termination of these Terms for any reason, Your Account and Your right to use the Products and Services will automatically cease, and Kytch shall have no further obligation to You.

**(m) Ownership of Products and Product Software.** Products includes any Products provided or leased to You by Kytch with or without a separate fee in connection with the Services. You agree that the Product Software and Products will remain the property of Kytch and You will not acquire any ownership or other interest in them by virtue of this Agreement or attachment of the Products to Your equipment as a result of this Agreement. The Product Software is further governed by the EULA. You agree that the Products will not be deemed fixtures or in any way part of Your location. You agree to use the Products only for accessing the Service(s) provided by Kytch pursuant to these Terms. You must follow all instructions from Kytch regarding the installation and use of the Products.

**(n) Upgrades.** Kytch may upgrade, replace, remove, add or otherwise change the Products at its sole discretion at any time during the Agreement or following its termination. You consent to such changes including Kytch Platform, firmware and other code or software updates or downloads, including updates and downloads by Kytch's third-party suppliers, with or without notice to You, which may alter, add to, or remove features or functionalities of the Products or the Services. You acknowledge and understand that the Products may receive remote updates of software, firmware, or operating systems by Kytch's third-party suppliers. You acknowledge and agree that Kytch's or Kytch's third-party suppliers' updates, or Kytch's addition or removal of or change to the Products may interrupt access to the Services. Kytch may, at its sole discretion, fix the Products, install new or reconditioned Products, including replacing the existing Products, as Kytch deems necessary, at any time for which You may incur a separate fee. If Kytch requests

Page 186

that You replace, or offers to replace the Products in order to provide the Services, and You fail to do so, Kytch is not responsible for any resulting degradation of the Services or any security vulnerabilities. If Kytch requires that You add or replace the Products and You fail to do so, Kytch may terminate the Agreement at its sole discretion.

**(o) Unauthorized Use; Prohibition on Tampering.** You are responsible and shall be liable for all Products at Your location and in Your possession. You may not sell, lease, abandon, or give away the Products. You agree that You will not, and You will not permit others, to use, rearrange, disconnect, abandon, remove, relocate, repair, service, alter, modify, tamper or otherwise interfere with any of the Products. Such prohibition includes, without limitation, attaching or, permitting others to attach any unauthorized devices to the Products, using or permitting others to use the Products that causes interference with the Products or Services, or altering identifying information such as serial numbers or logos. If You make or assist any person to make any unauthorized connection or modification to the Products, Product Software, the Kytch Platform or the Service(s) Kytch may terminate the Agreement and recover such damages as may result from Your actions. You also agree that Kytch may recover damages from You for tampering with the Products, Product Software, the Kytch Platform, the Services or utilizing them for purposes other than those contemplated by the Agreement. You agree that You will not allow anyone other than Kytch or its agents to service the Products.

**(p) Payment for Damage to or Loss of the Products.** You agree to pay the full retail cost for the repair or replacement of any Products or part that are lost, stolen, damaged, modified, sold, transferred, leased, encumbered or assigned together with any costs incurred by Kytch in obtaining or attempting to obtain possession of any Products.

**(q) Return of Products.** You agree that in the event the Agreement is terminated for any reason, You will return, either in person, or via first class mail, all of the Products to Kytch within fourteen (14) days of the effective date of termination of the Agreement, unless otherwise instructed in writing by Kytch. The returned Products must be in good condition and without any encumbrances, except for ordinary wear and tear resulting from proper use. If You fail to return the Products as provided herein, additional charges may apply. If You return the Products to Kytch by mail, You will be responsible for (i) any damage to the Products as assessed by Kytch upon receipt, (ii) the replacement cost of such Products that are lost, misplaced, not delivered or stolen during transit, and (iii) shipping/handling costs, unless Kytch provides written notice in advance that it will pay such costs.

**(r) Relocation of Products.** The Products may only be used in the designated business Location(s). You agree that You will not remove any of the Products from the business Location(s) without Kytch's prior consent. YOU UNDERSTAND AND ACKNOWLEDGE THAT IF YOU ATTEMPT TO INSTALL OR USE THE PRODUCTS OR SERVICE(S) AT A LOCATION OTHER THAN THE BUSINESS LOCATION(S) DESIGNATED BY YOU, WHEN YOU ENTERED INTO THIS AGREEMENT, THE SERVICE(S) MAY FAIL TO FUNCTION OR MAY FUNCTION IMPROPERLY. If You relocate to a new address, You may be charged a fee to relocate the Products.

**(s) Compliance and Auditing Rights** You acknowledge and agree that Kytch may monitor your use of the Kytch Products and Services remotely and in person, to ensure your compliance with the Terms. You hereby agree to cooperate with Kytch and to allow Kytch to remotely monitor your use of the Kytch Products. You also agree to allow Kytch to physically inspect your facilities and records that relate to the Kytch Products and Services and your use of the same and to verify your full compliance with the terms of these Terms. You agree to cooperate with Kytch and provide reasonable assistance and access to such information. You and Kytch agree to determine a mutually agreeable time and date for such inspection which shall take place within five (5) business days after written demand by Kytch therefor. In lieu of an inspection, if Kytch so requests, an officer or other authorized representative of your business entity shall certify in writing to Kytch that you are in full compliance with the Terms. You agree that Kytch shall not be responsible for any

Redacted Version Filed 04/29/2022 -- Page 187 of 224

of your costs incurred in cooperating with the audit. You agree to immediately pay any fees applicable to your use of the Kytch Products and Services in excess of the rights granted to you pursuant to the Terms. Failure of You to pay shall constitute a material breach of these Terms.

## 2. Accounts

**(a) Your Account.** To use certain Products and Services you must register for a user account ("Account") and provide certain information about Yourself, as prompted by the applicable registration form. You represent, warrant, and agree that: (a) all required registration information that you submit is truthful and accurate; (b) you will maintain the accuracy of such information; and (c) Your use of the Products and Services will not violate any applicable federal, state, local, or international law or regulation, including, without limitation, any laws regarding the export of data or software to and from the U.S. and other countries (e.g., you are not located in an embargoed country or are not listed as a prohibited or restricted party under applicable export control laws and regulations); and (d) that you have agreed to these Terms. You are entirely responsible for maintaining the confidentiality of Your Account login credentials and for all activities that occur under Your Account. You agree to use "strong" passwords (passwords that use a combination of upper- and lower-case letters, numbers and symbols) with Your Account and to maintain Your password securely to prevent others from gaining access. You agree to immediately notify Kytch of any unauthorized use or suspected unauthorized use of Your Account, or any other breach of security. Kytch is not liable for any loss or damage arising from Your failure to comply with the above requirements.

**(b) The individual who creates an Account** is the "Account Owner" of that Account and, if obtaining Products as part of the Services is also the lessee of the Products associated with that Account. Individuals who are authorized to access an Account Owner's Products and Services are those individuals who are employees of the Account Owner who require access to the Account as part of their job functions and only for the Permitted Purpose ("Authorized Users"). Authorized Users may have the ability to use the Services and monitor and control the Products (for example, an Authorized User can change Your settings). Authorized Users may also have the ability to view information (including personal information) and Content across all of an Account Owner's Products and Services (for example, an Authorized User will receive email alerts or can view Your history). Authorized Users are responsible for their own actions in connection with the Products and Services, but the Account Owner also hereby warrants and agrees to be jointly and severally liable for all actions taken by all Authorized Users relating to the Account Owner's Products, Services and Account. If you are an Account Owner who invites or enables an Authorized User, you acknowledge and agree that said Authorized User may subsequently invite or enable other Authorized Users with the same access and ability to use Your Products and Services set out above. As a result, if you are an Account Owner, you should only authorize those individuals whom you trust to access Your Account, Products and Services.

**(c) Warranties by Account Owner.** ccount Owner represents, warrants, and agrees that: (i) Account Owner is fully responsible for the use, security, and integrity of their Account and will only allow Authorized Users to access the Account and shall instruct Authorized Users that they may not share Account login credentials with anyone other than other Authorized Users; (ii) Account Owner is responsible for Authorized User's access to the Account; and (iii) violation of these Account Owner's warranties constitutes a material breach of these Terms.

## 3. Access to Services

**(a) Access and Use.** Subject to these Terms, Kytch grants you a limited, non-transferable, non-exclusive, non-assignable right (without the right to sub-license) to access and use the Services in the United States by (i) using the Web Apps in connection with, and solely for the purpose of, controlling and monitoring the Products you are authorized to control and monitor or otherwise accessing the Services provided by Kytch for Your use (the "Permitted Purpose") ; (ii) installing and using the Mobile Apps solely on Your own handheld mobile device (e.g., iPhone, iPad or Android smartphone) solely for the Permitted Purpose; and (iii) accessing the Sites solely for the Permitted Purpose.

Redacted Version Filed 04/29/2022 -- Page 188 of 224

**(b) Automatic Software Updates.** Kytch may, from time to time, develop patches, bug fixes, updates, upgrades and other modifications to improve the performance of the Services and/or the Product Software ("Updates"). These may be automatically installed without providing any additional notice or receiving any additional consent. You consent to this automatic update. If you do not want such Updates, Your remedy is to terminate Your Account and stop using the Products and Services. If you do not terminate a previously created Account, you will receive Updates automatically. You acknowledge that you may be required to install Updates to use the Products and Services and you agree to install any Updates that Kytch provides promptly. Your continued use of the Products and Services is Your agreement – (i) to these Terms with respect to the Products and Services, and (ii) to the End User License Agreement with respect to updated Product Software; and (iii) any change or updates that Kytch may make to these Terms or the End User License Agreement in the future.

**(c) Kytch-provided interface to Third-Party Products and Services.** Over time, Kytch may provide the opportunity for you to interface the Products and Services to one or more third-party products and services, through and using the Services, for example through the Works with Kytch platform ("Third-Party Products and Services"). You decide whether you want to interface, and with which Third-Party Products and Services you want to interface. Your explicit consent and authorization are required for this interface and is revocable by you at any time. Once Your consent is given for a particular Third-Party Product and Service, you agree that Kytch may exchange information and control data regarding you and Your products, including Your personal information, pursuant to our Privacy Policy in order to enable the interface that you have authorized. Once this information is shared with the particular Third-Party Product and Service, its use will be governed by the third party's privacy policy and not by Kytch's privacy documentation. You acknowledge and agree that Kytch makes no representation or warranty about the quality or safety of any Third-Party Products or Services or the interface with Product and Services. Accordingly, Kytch is not responsible for Your use of any Third-Party Product or Service, or any personal injury, death, property damage (including, without limitation, to Your home), or other harm or losses arising from or relating to Your use of any Third-Party Products or Services. You should contact the third party with any questions about their Third-Party Products and Services.

**(d) Content. Certain materials may be displayed, performed, or provided through your access and use of the Products and Services,** including, but not limited to, text, graphics, articles, photographs, video, images, reports. and illustrations ("Content")). The Content supplied by Us is owned exclusively by Us, and You obtain no right, title, or interest in or to the Content. The Content may also include information that You may provide through the Services including, without limitation, feedback, comments, questions, video, or other information which is shared with other users in the course of using the Products and Services (collectively, "User Submissions"), which we may also use to provide, maintain and improve the Services. Some Content may be visible to others. You are solely responsible for all User Submissions that You upload, post, email, transmit or otherwise disseminate using, or in connection with, the Services, or that You contribute in any manner to the Services; You represent and warrant that You have all rights necessary to do so, in the manner in which You contribute it; and You license to Kytch all patent, trademark, trade secret, copyright or other proprietary rights in and to such User Submissions for publication on the Service pursuant to these Terms. You shall abide by all copyright notices, trademark rules, information and restrictions contained in any Content accessed through the Services, and shall not use, copy, reproduce, modify, translate, publish, broadcast, transmit, distribute, perform, upload, display, license, sell or otherwise exploit for any purposes whatsoever any Content or third-party submissions or other proprietary rights not owned by You: (i) without the express prior written consent of the respective owners, and (ii) in any way that violates any third-party right. Kytch reserves the right to remove any Content, including User Submissions, from the Services at any time, for any reason (including, but not limited to, upon receipt of claims or allegations from third parties or authorities relating to such Content or if we are concerned that You may have breached the immediately preceding sentence), or for no reason at all. Additionally, any User Submissions You submit on or through the Services or otherwise (except for personal information as described in the Privacy Policy) will

Page 189

Redacted Version Filed 04/29/2022 -- Page 189 of 224

be considered non-confidential and non-proprietary. YOU AGREE TO INDEMNIFY AND HOLD HARMLESS KYTCH FROM ANY THIRD PARTY CLAIMS, OF WHATEVER NATURE, BASED OR ARISING FROM ANY USER SUBMISSIONS OR OTHER CONTENT YOU PROVIDE.

**(e) Certain Restrictions.** The rights granted to You in these Terms are subject to the following restrictions: (i) You agree not to license, sell, rent, lease, transfer, assign, distribute, host or otherwise commercially exploit the Products and Services; (ii) You agree not to modify, make derivative works of, disassemble, reverse-compile or reverse-engineer any part of the Products and Services; (iii) You agree not to access the Products and Services in order to build a similar or competitive service or product; (iv) except as expressly stated herein, no part of the Products and Services may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means; (v) You agree not to upload, transmit or distribute any computer viruses, worms or any software intended to damage or alter a computer or communications network, computer, handheld mobile device, data, the Services, the Products, the Product Software or any other system, device or property; (vi) You agree not to interfere with, disrupt or attempt to gain unauthorized access to the servers or networks connected to the Services or violate the regulations, policies or procedures of such networks; (vii) You agree not to access (or attempt to access) any of the Services by means other than through the interface that is provided by Kytch; and (viii) You agree not to remove, obscure or alter any proprietary rights notices (including copyrights and trademark notices) that may be contained in, or displayed in connection with, the Products and Services. Any future release, update or other addition to functionality of the Services shall be subject to these Terms.

**(f) Privacy.** Please review the Privacy Policy for Kytch Web Sites and the Privacy Statement for Kytch Products and Services. These documents describe practices regarding the information that You or Kytch may collect from users of the Products and Services, including any Content or User Submissions.

**(g) Security.** We attempt to implement appropriate security measures. However, Kytch cannot guarantee that unauthorized third parties will never be able to defeat our security measures or use Your personal information for improper purposes. You acknowledge that You provide Your personal information at Your own risk.

**(h) Modification.** Kytch reserves the right, at any time, to modify, suspend or discontinue the Services or any part thereof with or without notice. You agree that Kytch will not be liable to You or to any third party for any modification, suspension or discontinuance of the Services or any part thereof.

**(i) Access Outside Certain Countries.** Although the Sites are accessible worldwide, the Products and Services provided or accessed through or on the Sites are not available to all persons or in all countries and are only intended for access through the United States and Canada. If You choose to access the Sites from outside a country in which Kytch supports the Product and Services listed here ("Target Country"), You do so on Your own initiative and You are solely responsible for complying with applicable local laws in Your country. You understand and accept that the Sites are not designed for use in a non-Target Country and that some, or all, of the features of the Sites may not work or be appropriate for use in such a country. To the extent permissible by law, Kytch accepts no responsibility or liability for any damage or loss caused by Your access or use of the Sites or Kytch Products in a non-Target Country. You will be bound by these Terms wherever You access or use the Sites or the Services.

## 4. Agreed Usage and Limitations of Kytch Products and Services

**(a) Intended Use of Kytch Services.** The Services are intended to be accessed and used for non-time-critical information and control of Kytch Products. While we aim for the Services to be highly reliable and available, they are not intended to be reliable or available 100% of the time. The Services are subject to sporadic interruptions and failures for a variety of reasons beyond Kytch's control, including Wi-Fi intermittency, service provider uptime, mobile notifications and operators, among others. You acknowledge these limitations and agree that Kytch is not responsible for any damages allegedly caused or caused by the failure or delay of the Services.

Page 190

Redacted Version Filed 04/29/2022 -- Page 190 of 224

**(b) Reliability of Services.** You acknowledge that the Services, including remote access and mobile notifications, are not error-free or 100% reliable and 100% available. Proper functioning of the Services relies and is dependent on, among other things, the transmission of data through Your wi-fi network, enabled wireless device (such as a phone or tablet) and broadband internet access and internet service providers, or optional Cellular Backup service, for which neither Kytch nor any wireless or data carrier is responsible, and may be interrupted, delayed, refused, or otherwise limited for a variety of reasons, including insufficient coverage, power outages, termination of service and access, environmental conditions, interference, non-payment of applicable fees and charges, unavailability of radio frequency channels, system capacity, upgrades, repairs or relocations, and priority access by emergency responders in the event of a disaster or emergency (collectively, "Service Interruptions"). You understand that Service Interruptions may result in the Services being unreliable or unavailable for the duration of the Service Interruption. We cannot and do not guarantee that you will receive notifications within any given time, or at all.

**(c) Service Interruptions;** no refund or rebate. The Services may be suspended temporarily, without notice, for security reasons, systems failure, maintenance and repair, or other circumstances. You agree that you will not be entitled to any refund or rebate for such suspensions. Kytch does not offer any specific uptime guarantee for the Services.

**(d) System Requirements.** The Services will not be accessible without: (i) a working Wi-Fi network in Your store that is positioned to communicate reliably with the Products; (ii) an Account; (iii) an enabled and supported wireless device, such as a phone or tablet (required for some features and functionalities of the Service); (iv) always-on broadband Internet access in Your store with bandwidth sufficient to support the Products you use; and (v) other system elements that may be specified by Kytch. It is Your responsibility to ensure that you have all required system elements and that they are compatible and properly configured. You acknowledge that the Services may not work as described when the requirements and compatibility have not been met. If you modify, substitute, move, or otherwise change any of the required system elements, it is Your sole duty and responsibility to be sure they are compatible and properly configured to work with the Products and Services. In addition, you acknowledge that Kytch may activate Bluetooth on Your smartphone or tablet, with or without prior notification, in order to facilitate proper operation of the Services, enable communication with Kytch Products connected to the same Kytch account and enable certain features.

**(e) No Benefits.** Kytch does not guarantee or promise any specific monetary benefit from the use of the Products or Services or any feature thereof. From time to time, Kytch may use the Services to provide you with information that is unique to you and Your Business. We do this to highlight an opportunity based on our analysis and information about you and Your business.

**(f) The Services Provide You with Information** Concerning your equipment. All information is provided "as is" and "as available". We cannot guarantee that it is correct or up to date. Accessing Information through the Services is not a substitute for direct access of the information at the equipment location.

**(g) All information Publicly Posted or Privately Transmitted** through the Services is the sole responsibility of the person from whom (or from whose Account) such Content originated and Kytch will not be liable for any errors or omissions in any Content. Kytch cannot guarantee the identity of any other users with whom You may interact while using the Services. In addition, we cannot guarantee the authenticity of any data that users or merchants may provide about themselves. You acknowledge that all Content accessed by You using the Services is at Your own risk and You will be solely responsible for any damage or loss to any party resulting therefrom. We cannot control and have no duty to take any action regarding how You may interpret and use the Content or what actions You may take as a result of having been exposed to the Content, and You hereby release us from all liability for You having acquired or not acquired Content through the Services.

Page 191

**(h) You warrant, represent and agree that You will not contribute** any Content or otherwise use the Products and Services in a manner that (i) infringes or violates the intellectual property rights or proprietary rights, rights of publicity or privacy or other rights of any third party; (ii) violates any law, statute, ordinance or regulation or is otherwise illegal; (iii) is harmful, fraudulent, deceptive, threatening, abusive, harassing, tortious, defamatory, vulgar, obscene, libelous or otherwise objectionable; (iv) impersonates any person or entity, including, without limitation, any employee or representative of Kytch; (v) contains a virus, Trojan Horse, worm, time bomb or other harmful computer code, file or program; (vi) jeopardizes the security of Your Kytch Account or anyone else's Account (such as allowing someone else to log into the Services as You); (vii) attempts, in any manner, to obtain or access the password, account, products, devices, systems, or other security information from any other user or third party; (viii) violates the security of any computer network or cracks any passwords or security encryption codes; (ix) runs Maillist, Listserv or any form of auto-responder or "spam" on the Services or any processes that otherwise interfere with the proper working of the Services (including by placing an unreasonable load on the Services' infrastructure); (x) copies or stores any significant portion of the Content; (xi) decompiles, reverse-engineers or otherwise attempts to obtain the source code or underlying ideas or information of or relating to the Services; (xii) allows access to the Account by anyone other than an Account Owner or Authorized User; (xiii) is not for a Permitted Purpose; or (xiv) denigrates or disrupts any network capacity or functionality.

**(i) Privacy and Data Protection Laws.** Kytch Products and Services are primarily intended for purely personal and business use. Nonetheless, data protection and privacy laws where You live may impose certain responsibilities on You and Your use of the Products and Services. Where Kytch is acting as a processor of data You have collected through its Products and Services, it will explicitly state this in the Kytch Privacy Statement for Products and Services. In these situations, Kytch will attempt to: (i) only process data at Your instruction; (ii) ensure that persons permitted to process data through us on Your behalf are committed to confidentiality; (iii) only engage a third party service provider (sub-processor) that provide an equivalent level of protection as set forth herein; (iv) engage a new third-party service provider (sub-processor) only after Kytch has provided notice of such changes by posting to the website listed below and allowed You ten (10) calendar days to object after notice is given. In the event You do object, Kytch will make reasonable efforts to address Your objection. After this process, if a resolution has not been agreed to within five (5) calendar days, Kytch will proceed with engaging the third-party service provider. You will have the opportunity to terminate Your use of Products and Services without penalty. Kytch sub-processors include Amazon Web Services. It is Your responsibility to check this website regularly for updates; (v) to the extent applicable and possible, assist You with any individual rights requests or other compliance obligations; and (vi) delete or return Your data upon termination.

**(j) Installation, Test and Use.** It is Your responsibility to install and use the Products and Services pursuant to the applicable manual and instructions. IF A PRODUCT IS NOT PROPERLY INSTALLED, OR IF A PRODUCT OR ANY OF ITS SENSORS ARE OUTSIDE THE DETECTION RANGE OR HINDERED OR OBSTRUCTED, YOU MAY EXPERIENCE FALSE ALARMS OR DETECTION FAILURES. It is Your responsibility to test the Products once installed to be sure the Products (and any related sensors, components and peripherals) are functioning and communicating as intended and designed, and then regularly test and maintain the Products after installation. There may be laws in the jurisdiction that you install a particular Product applicable to where and how to install that Product. You should check to ensure that you are in compliance with all relevant laws in your jurisdiction. Kytch is not responsible for any injury or damage caused by self-installation. Kytch maintains a list of recommended installers of the Products on its website. These installers are not Kytch employees and are not affiliated with Kytch. Kytch is not responsible for any conduct of or liability associated with these installers. You should conduct your own due diligence to select one that best fits your needs.

**(k) Compatibility. KYTCH DOES NOT SUPPORT EVERY MAKE AND MODEL SOFT SERVE EQUIPMENT. BEFORE USING THE SERVICES, PLEASE ENSURE YOUR EQUIPMENT IS SUPPORTED.** You acknowledge that you have verified the compatibility of the Products you are purchasing with your equipment. You are solely

Page 192

Redacted Version Filed 04/29/2022 -- Page 192 of 224

responsible for determining the compatibility of the Products with your equipment, and you accept that lack of compatibility is not a valid claim under the warranty provided with your Products and does not otherwise constitute a basis for receiving a refund.

## 5. Limitations of Kytch Services Due to Third Parties

**(a) General.** Kytch Services rely on or inter-operate Third Party Products and Services. These Third Party Products and Services are beyond Kytch's control, but their operation may impact on, or be impacted by, the use and reliability of the Kytch Services. You acknowledge and agree that: (i) the use and availability of the Services is dependent on third-party product vendors and service providers, (ii) these third-party products and services may not operate in a reliable manner 100% of the time and they may impact on the way that the Kytch Services operate, and (iii) Kytch is not responsible for damages and losses due to the operation of these third-party products and services.

**(b) Third-Party Service Providers Used By Kytch.** You acknowledge that Kytch uses third-party service providers to enable some aspects of the Services – such as, for example, data storage, Cellular Back-up, synchronization and communication through Amazon Web Services and mobile device notifications through mobile operating system vendors and mobile operators. YOU AGREE NOT TO RELY ON THE SERVICES FOR ANY LIFE SAFETY OR TIME-CRITICAL PURPOSES. FURTHER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU AGREE TO RELEASE AND HOLD HARMLESS THIRD-PARTY SERVICE PROVIDERS FROM ALL LIABILITY, DAMAGES OR LOSSES OF ANY KIND OR SORT, PERSONAL INJURY OR LOSS OF LIFE ARISING FROM YOUR USE OF THE PRODUCTS AND SERVICES.

**(c) Equipment, ISP and Operator.** You acknowledge that the availability of the Services is dependent on (i) Your computer, mobile device, building wiring, business Wi-Fi network, Bluetooth connection and other related equipment ("Equipment"), (ii) Your Internet service provider ("ISP") and (iii) Your mobile device operator ("Operator"). You acknowledge that You are responsible for all fees charged by Your ISP and Operator in connection with Your use of the Services. You also acknowledge that You are responsible for compliance with all applicable agreements, terms of use/service and other policies of Your ISP and Operator.

**(d) App Stores.** You acknowledge and agree that the availability of the Mobile Apps is dependent on the third-party websites from which You download the Mobile Apps, e.g., the Google Play Store from Google or the App Store from Apple (each an "App Store"). You acknowledge that these Terms are between You and Kytch and not with an App Store. Each App Store may have its own terms and conditions to which You must agree before downloading Mobile Apps from it. You agree to comply with such App Store terms and conditions, and Your license to use the Mobile Apps is conditioned upon Your compliance with such App Store terms and conditions. To the extent that such other terms and conditions from such App Store are less restrictive than or otherwise conflict with the terms and conditions of these Terms, the more restrictive or conflicting terms and conditions in these Terms apply.

**(e) Third-Party Website Links and Referrals.** The Sites may contain links to other websites operated by third parties ("Third-Party Sites") and referrals to third-party vendors ("Referred Vendors"). Such Third-Party Sites and Referred Vendors are not under our control. Kytch provides these links and referrals only as a convenience and does not review, approve, monitor, endorse, warrant or make any representations with respect to such Third-Party Sites or Referred Vendors. Your use of these Third-Party Sites is at Your own risk.

**(f) Authorized Users.** Kytch is not responsible for any Account Owner or Authorized User's behavior, or for any personal injury, death, property damage (including, without limitation, to Your home), or other harm or losses arising from or relating to their use of the Services.

**(g) Release Regarding Third Parties.** Kytch is not responsible for third parties or their products and services, including, without limitation, the App Stores, Third-Party Products and Services, Third-Party Sites, Referred Vendors, Equipment, ISP and Operators. Kytch hereby disclaims, and you hereby discharge, waive and release Kytch and its licensors and suppliers from any past, present and future claims, liabilities and

Page 193

damages, known or unknown, arising out of or relating to Your interactions with such third parties and their products and services. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU HEREBY WAIVE CALIFORNIA CIVIL CODE SECTION 1542 IN CONNECTION WITH THE FOREGOING, WHICH STATES: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOUR AT THE TIME OF EXECUTING THE RELEASE WHICH, IF KNOWN BY HIM OR HER, MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." YOU HEREBY WAIVE ANY SIMILAR PROVISION IN ANY OTHER JURISDICTION.

## 6. Ownership and Intellectual Property

**(a) Kytch Property.** You acknowledge that all intellectual property rights, including, without limitation, copyrights, patents, trademarks and trade secrets, in the Product, Product Software and Services (i.e., the Sites, Web Apps and Mobile Apps) are owned by Kytch or its affiliates or our licensors. Your possession, access to and use of the Product, Product Software and Services do not transfer to you or any third party any rights, title or interest in or to such intellectual property rights. Kytch, and its affiliates and licensors and suppliers, reserve all rights not granted in these Terms. The Services are licensed to you, not sold, under these Terms. Nothing on or in the Products or Services shall be construed as conferring any license under any intellectual property right, including any right in the nature of trademark or copyright, of Kytch or any third party, whether by estoppel, implication or otherwise. All trademarks and trade names are the property of their respective owners.

You may not use the Content of the Services in any other public or commercial way, nor may you copy or incorporate any of the content of the Services into any other work, including Your own website, without the written consent of Kytch. You must have a license from us before you can post or redistribute any portion of the Services. Kytch retains full and complete title to all Content on the Services, (except User Submissions, for which you have granted Kytch an irrevocable license to use as set forth in these Terms), including any downloadable software and all data that accompanies it. You must not copy, modify or in any way reproduce or damage the structure or presentation of the Services, or any Content therein.

**(b) Feedback.** You may choose to or Kytch may invite you to submit comments, suggestions or ideas about the Products or Services, including how to improve the Products or Services ("Ideas"). By submitting any Ideas, you agree that Your submissions are voluntary, gratuitous, unsolicited and without restriction, and will not place Kytch under any fiduciary or other obligation and Kytch will be under no obligation to pay you any compensation for said Ideas. Kytch owns all right, title, and interest in and to said "Ideas." Kytch may use, copy, modify, publish or redistribute the submission and its contents for any purpose and in any way without any compensation to you and at its sole discretion. You also agree that Kytch does not waive any rights to use similar or related ideas previously known to Kytch, developed by its employees or obtained from other sources.

**(c) User Submissions.** You hereby grant us a non-exclusive, worldwide, royalty-free, perpetual, irrevocable, sub-licensable and transferable right to access, display or otherwise use, copy, modify, and create derivative works of, Your User Submissions (including all related intellectual property rights). You also hereby do and shall grant to each user of the Services a non-exclusive license to access and use Your User Submissions through the Services and as permitted through the functionality of the Services and under these Terms. Furthermore, you understand that we retain the right to reformat, modify, create derivative works of, excerpt and translate any User Submissions submitted by you. For clarity, the foregoing license grant to Kytch does not affect Your ownership of or right to grant additional licenses to the material in Your User Submissions, unless otherwise agreed in writing. Kytch is not responsible or liable to any third-party for the content or accuracy of any User Submissions provided by You or any other user of the Services and You agree to indemnify, defend, and hold harmless the Kytch for any and all claims, actions, losses, and damages, of any kind, including reasonable attorney fees, arising from Your User Submissions. Although are not required to do so, we have the right to take any action with respect to any User Submissions that we deem necessary or appropriate in Our sole discretion, including if we believe that such User Submissions

Page 194

have violated these Terms, violates any intellectual property rights or other rights of any person or entity, threatens the personal safety of users of the Services or the public or could create liability for Kytch. We also reserve the right to take appropriate legal action, including referral to law enforcement authorities for any illegal or unauthorized use of the Services and to terminate or suspend Your access to the Services, in Our sole discretion, for violating these Terms.

**(d) Confidentiality.** By virtue of Your use and access to the Products and Services, you may have access to information that is confidential to Kytch, including but not limited to aspects of the Products and information relating to its features, specifications, functionality and performance ("Kytch Confidential Information"). Kytch Confidential Information shall not include information which: (a) is or becomes a part of the public domain through no act or omission of yours; or (b) was in your lawful possession prior to the disclosure and had not been obtained by you either directly or indirectly from Kytch; or (c) is lawfully disclosed to you by a third party without restriction on disclosure; or (d) is independently developed by you without use of or reference to Kytch Confidential Information. You agree, both during the term of the Agreement and for a period of five years after its termination, for any reason, to hold Kytch's Confidential Information in strict confidence using no less than a reasonable degree of care, not to disclose Kytch Confidential Information to any third party (other than Your Authorized Users) and not to use Kytch Confidential Information for any purpose other than for the Permitted Purpose.

## 7. INDEMNIFICATION

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU AGREE TO INDEMNIFY, DEFEND, RELEASE AND HOLD HARMLESS FROM AND AGAINST (I) ANY AND ALL CLAIMS, COSTS, EXPENSES, LOSSES, ACTIONS, LAWSUITS, JUDGMENTS, LIABILITYS DAMAGES, SUITS, OR CAUSES OF ACTION, AND ANY OTHER LEGAL ACTION BROUGHT BY ANY THIRD PARTY AGAINST KYTCH, ITS LICENSORS, SUPPLIERS, SUBSIDIARIES AND AFFILLIATES (INCLUDING THEIR RESPECTIVE DIRECTORS, EMPLOYEES, OFFICERS, SHAREHOLDERS, MEMBERS, SUCCESSORS, AND AGENTS ) (COLLECTIVELY THE "KYTCH PARTIES") ARISING FROM OR RELATING TO (A) YOUR USE AND EACH AUTHORIZED USER'S USE OF THE PRODUCTS OR SERVICES; (B) YOU OR YOUR AUTHORIZED USERS' VIOLATION OF THESE TERMS; (C) YOUR USER SUBMISSIONS OR FEEDBACK OR ANY OTHER CONTENT SUPPLIED BY YOU; (D) PROPERTY DAMAGE, PERSONAL INJURY OR DEATH (INCLUDING, WITHOUT LIMITATION CLAIMS BROUGHT BY AND LIABILITIES TO YOUR EMPLOYEES, SUBCONTRACTORS, AGENTS, REPRESENTATIVES, OR ANY THIRD PARTIES) OR (E) YOU OR YOUR AUTHORIZED USERS' VIOLATION OF ANY LAW OR THE RIGHTS OF ANY THIRD–PARTY (COLLECTIVELY, "THIRD PARTY ACTIONS"); AND (II) ANY AND ALL RELATED LOSSES, DAMAGES, SETTLEMENTS AND JUDGEMENTS (INCLUDING PAYMENT OF THE KYTCH PARTIES' ATTORNEYS' FEES AND COSTS) INCURRED BY ANY OF THE KYTCH PARTIES, ASSESSED OR FOUND AGAINST ANY OF THE KYTCH PARTIES, OR MADE BY ANY OF THE KYTCH PARTIES, RELATING TO OR ARISING FROM ANY SUCH THIRD PARTY ACTION ("THIRD PARTY RELATED LOSSES"). YOU UNDERSTAND AND AGREE THAT YOUR INDEMNIFICATION OBLIGATION TO THE KYTCH PARTIES APPLIES EVEN IF SUCH THIRD–PARTY ACTION AND THIRD PARTY RELATED LOSSES ARISE FROM THE NEGLIGENCE OF ANY KIND OR DEGREE, BREACH OF CONTRACT OR WARRANTY, STRICT LIABILITY, NON–COMPLIANCE WITH APPLICABLE LAW, OR OTHER FAULT OR WRONGDOING OF ANY OF THE KYTCH PARTIES. HOWEVER, NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO REQUIRE ANY INDEMNIFICATION WHICH WOULD RENDER OR MAKE THIS CLAUSE, IN WHOLE OR IN PART, VOID AND/OR UNENFORCEABLE UNDER APPLICABLE LAW. FURTHER, YOUR INDEMNIFICATION OBLIGATION SHALL NOT APPLY TO ANY WILLFUL, WANTON, INTENTIONAL OR RECKLESS MISCONDUCT OF THE KYTCH PARTIES, OR GROSS NEGLIGENCE OF THE KYTCH PARTIES IN THOSE STATES THAT DO NOT PERMIT INDEMNIFICATION FOR GROSS NEGLIGENCE. "THIRD PARTY" IS DEFINED HEREIN TO INCLUDE, WITHOUT LIMITATION, AN ACCOUNT OWNER, AN AUTHORIZED USER, AN UNAUTHORIZED USER, A SPOUSE, PARTNER, FAMILY MEMBER, GUEST, NEIGHBOR, TENANT, EMPLOYEE OR INSURANCE COMPANY. Kytch reserves the right, at Your expense, to assume the exclusive defense and control of any matter for which you are required to indemnify Kytch, and you agree to

Page 195

cooperate with our defense of such claims. You agree not to settle any such claim without Kytch's prior written consent. Kytch will use reasonable efforts to notify you of any such claim, action or proceeding upon becoming aware of it.

## 8. Warranty Disclaimers

THE WARRANTIES FOR THE PRODUCT AND PRODUCT SOFTWARE ARE SET FORTH IN THE LIMITED WARRANTY AND THE END USER LICENSE AGREEMENT, RESPECTIVELY.

THE SERVICES ARE PROVIDED FOR YOUR CONVENIENCE, "AS IS" AND "AS AVAILABLE", AND WITH ALL FAULTS, AND KYTCH, AND OUR LICENSORS AND SUPPLIERS, EXPRESSLY DISCLAIM ANY WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY AND NON-INFRINGEMENT.

KYTCH, AND OUR LICENSORS AND SUPPLIERS, MAKE NO WARRANTY THAT DEFECTS WILL BE CORRECTED OR THAT THE SERVICES: (I) WILL MEET YOUR REQUIREMENTS; (II) WILL BE COMPATIBLE WITH YOUR NETWORK, COMPUTER OR MOBILE DEVICE; (III) WILL BE AVAILABLE ON AN UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE BASIS; OR (IV) WILL BE ACCURATE OR RELIABLE. NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY YOU FROM KYTCH OR THOUGH THE SERVICES, SHALL CREATE ANY WARRANTY.

KYTCH DOES NOT WARRANT, ENDORSE, GUARANTEE OR ASSUME RESPONSIBILITY FOR ANY SERVICE ADVERTISED OR OFFERED BY A THIRD PARTY THROUGH, OR IN CONNECTION WITH, THE PRODUCTS OR SERVICES, OR ANY HYPERLINKED WEBSITE OR SERVICE, AND KYTCH WILL NOT BE A PARTY TO, OR IN ANY WAY MONITOR, ANY TRANSACTION BETWEEN YOU AND THIRD-PARTY PROVIDERS OF SUCH PRODUCTS OR SERVICES.

KYTCH MAKES NO REPRESENTATIONS CONCERNING ANY CONTENT CONTAINED IN OR ACCESSED THROUGH THE SERVICES, AND KYTCH WILL NOT BE RESPONSIBLE OR LIABLE FOR THE ACCURACY, COPYRIGHT COMPLIANCE, LEGALITY OR DECENCY OF MATERIAL CONTAINED IN OR ACCESSED THROUGH THE SERVICES. KYTCH MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING SUGGESTIONS OR RECOMMENDATIONS OF PRODUCTS AND SERVICES OFFERED OR PURCHASED THROUGH THE SERVICES.

THE SERVICES MAY PROVIDE YOU INFORMATION REGARDING YOUR EQUIPMENT OR OTHER PERIPHERALS CONNECTED TO YOUR EQUIPMENT. WITHOUT LIMITING THE GENERALITY OF THE DISCLAIMERS ABOVE, ALL INFORMATION IS PROVIDED FOR YOUR CONVENIENCE ,"AS IS" AND "AS AVAILABLE". KYTCH DOES NOT REPRESENT, WARRANT, OR GUARANTEE THAT INFORMATION WILL BE AVAILABLE, ACCURATE, OR RELIABLE.

## 9. Other Disclaimers

WHEN YOU INSTALL, SETUP OR USE THE PRODUCTS AND SERVICES YOU ARE GIVEN THE OPPORTUNITY TO CHANGE DEFAULTS OR CHOOSE PARTICULAR SETTINGS. THE CHOICES YOU MAKE CAN CAUSE NON-RECOMMENDED OR UNINTENDED OPERATION OR NON-OPERATION OF YOUR PRODUCTS AND SERVICES AND ANY CONNECTED EQUIPMENT OR SYSTEMS. YOU ASSUME ALL LIABILITY FOR ANY DAMAGES AND LOSSES CAUSED BY, OR RELATED TO, THE CHOICES YOU MAKE FOR THE PARTICULAR SETTINGS FOR THE PRODUCTS AND SERVICES, AND SETTING OR CHANGING DEFAULTS. YOU UNDERSTAND AND AGREE THAT SOME OF THE PRODUCTS AND SERVICES ARE NOTIFICATION, SIGNALLING AND DETECTION PRODUCTS AND SERVICES. THOSE PRODUCTS AND SERVICES DO NOT ELIMINATE OCCURRENCES OF EVENTS. FURTHER, YOU UNDERSTAND AND AGREE THAT THOSE PRODUCTS AND SERVICES MAY NOT AVERT OR MINIMIZE SUCH OCCURRENCES OF EVENTS, OR THEIR CONSEQUENCES, AND, THEREFORE, KYTCH MAKES NO EXPRESS OR IMPLIED

Page 196

Redacted Version Filed 04/29/2022 -- Page 196 of 224

WARRANTY OR REPRESENTATION (INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE) THAT THOSE PRODUCTS AND SERVICES WILL SO AVERT OR MINIMIZE SUCH OCCURRENCES OF EVENTS, OR THEIR CONSEQUENCES.

## 10. Waiver of Subrogation

You should protect against any risk of loss with the appropriate insurance coverage, and you are responsible for obtaining all insurance coverage you believe is necessary. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND THE APPLICABLE POLICY OR POLICIES OF INSURANCE YOU OBTAIN AND MAINTAIN, YOU RELEASE KYTCH AND ITS LICENSORS AND SUPPLIERS FROM ALL LIABILITY FOR ANY LOSS, OCCURRENCE, EVENT OR CONDITION COVERED BY YOUR INSURANCE.

## 11. Limitation of Liability

Nothing in these Terms and, in particular, within this "Limitation of Liability" clause, shall be interpreted or construed to limit or exclude liability that cannot be so limited or excluded under applicable law.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN ADDITION TO THE WARRANTY AND OTHER DISCLAIMERS IN THESE TERMS, IN NO EVENT WILL (A) KYTCH BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, SPECIAL OR INCIDENTAL DAMAGES, INCLUDING, WITHOUT LIMITATION, ANY DAMAGES FOR LOST DATA OR LOST PROFITS ARISING FROM OR RELATING TO THE SERVICES OR THE PRODUCTS, EVEN IF KYTCH KNEW, OR SHOULD HAVE KNOWN, OF THE POSSIBILITY OF SUCH DAMAGES, AND (B) KYTCH'S TOTAL CUMULATIVE LIABILITYARISING FROM OR RELATED TO THE SERVICES OR THE PRODUCTS, WHETHER IN CONTRACT OR TORT OR OTHERWISE, SHALL BE LIMITED TO AN AMOUNT NEVER TO EXCEED THE FEES ACTUALLY PAID BY YOU TO KYTCH DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE EVENTS GIVING RISE TO THE SUBJECT CLAIM (IF ANY). KYTCH DISCLAIMS ALL LIABILITY OF ANY KIND OF KYTCH'S LICENSORS AND SUPPLIERS. UNDER NO CIRCUMSTANCES WILL KYTCH BE LIABLE IN ANY WAY FOR ANY CONTENT, INCLUDING, BUT NOT LIMITED TO, ANY ERRORS OR OMISSIONS IN ANY CONTENT OR ANY LOSS OR DAMAGE OF ANY KIND INCURRED IN CONNECTION WITH USE OF, OR EXPOSURE TO, ANY CONTENT POSTED, EMAILED, ACCESSED, TRANSMITTED OR OTHERWISE MADE AVAILABLE VIA THE SERVICES.

YOU UNDERSTAND AND AGREE THAT THIS LIMITATION OF LIABILITY IN THIS SECTION SHALL APPLY EVEN IF KYTCH IS FOUND LIABLE FOR ANY LOSS OR DAMAGE DUE TO BREACH OF CONTRACT, BREACH OF EXPRESS OR IMPLIED OR LIMITED WARRANTY, NEGLIGENCE OF ANY KIND OR DEGREE, STRICT PRODUCT LIABILITY, SUBROGATION, INDEMNIFICATION OR CONTRIBUTION, OR ANY OTHER THEORY OF LIABILITY. HOWEVER, THIS LIMITATION OF LIABILITY SHALL NOT APPLY TO ANY WILFUL, WANTON, INTENTIONAL OR RECKLESS MISCONDUCT OF KYTCH OR GROSS NEGLIGENCE OF KYTCH IN THOSE STATES THAT DO NOT PERMIT LIMITATION OF LIABILITY FOR GROSS NEGLIGENCE.

## 12. Fees and Payment

Certain Services may be provided for a fee. You shall pay all applicable fees in connection with the Services selected by you in accordance with the Terms and your Subscription Plan.

## 13. Disputes

Any dispute, controversy or claim arising out of or in connection with these Terms that relates to (a) a Party's breach of confidentiality obligations; (b) infringement or misappropriation of intellectual property rights; or (c) requests for injunctive relief of any kind including, without limitation, the right of a Party to seek a temporary restraining order, preliminary injunctive or other equitable relief to preserve the status quo or prevent irreparable harm, shall be submitted to and finally resolved by a court of competent jurisdiction in the State of California, Santa Clara County. Each Party hereby submits to the exclusive jurisdiction of those courts for the purposes of any such proceeding. Each party hereby waives any claim that any legal proceeding (including any tort claim) has been brought in an inconvenient forum or that the

Page 197

venue of that proceeding is improper. Disputes, claims or controversies other than those specified above arising out of or relating to this Agreement (hereinafter "Arbitration Claims") that cannot otherwise be resolved by good faith negotiations of the Parties, shall, at the sole option of Kytch, be settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association ("AAA") that are then in effect. The Parties shall attempt to agree upon the selection of a single arbitrator who is unrelated to either Party and has demonstrable experience in the area of commercial law. In the event the Parties are unable to select a mutually acceptable arbitrator, the arbitrator shall be appointed by the AAA, with instruction that such selected arbitrator shall be one with at least five–years experience in commercial law. All arbitration proceedings shall be held in Santa Clara County, California. The arbitrator's costs shall be borne equally by the Parties and each Party shall be responsible for its own preparation, discovery, and internal and external costs incurred to prosecute or defend the Arbitration Claim. The prevailing Party in any arbitration proceeding will be entitled to, in addition to any other relief granted, recover its reasonable costs and attorney's fees, as determined by the arbitrator. The arbitrator shall be bound by the express provisions of this Agreement in deciding any Arbitration Claim. The determination of the arbitrator shall be final, and except as provided by law, shall not be subject to appeal or judicial review. Any court of competent jurisdiction may enforce any award or determination rendered by the arbitrator. The arbitrator shall not have the authority to award damages for lost profits or consequential damages, or special, punitive, or other exemplary damages of any sort.

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE, LAW, YOU UNDERSTAND AND AGREE THAT WE ARE EACH (A) WAIVING THE RIGHT TO A TRIAL BY JURY; (B) WAIVING THE RIGHT TO PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION; AND (C) WAIVING THE RIGHT TO CLAIM OR RECOVER PUNITIVE DAMAGES AGAINST THE OTHER. These Terms evidence a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision.

If, for any reason, a claim proceeds in court rather than in arbitration, we each waive our right to a jury trial.

**(a) Notice of Disputes.** You and Kytch agree to provide the other with notice in writing of any dispute. ("Notice of Dispute"). The notice to Kytch should be sent to: Kytch Legal Department, 3327 Seldon Court, Fremont, CA 94539, USA. Kytch will send notice to you at the email and/or mailing addresses associated with Your account. Your notice to Kytch must (a) provide Your name, mailing address, and email address; (b) describe the dispute; and (c) state the relief you are requesting.

**(b) Class Action Waiver**  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU AND KYTCH AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED GROUP LITIGATION OR PRIVATE ATTORNEY GENERAL PROCEEDING. Further, unless all affected parties agree otherwise, the arbitrator may not consolidate more than one person's claims and may not otherwise preside over any form of a representative or group proceeding. If a court decides that applicable law precludes enforcement of any of this subsection's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from the arbitration and may be brought in court.

## 14. Digital Millennium Copyright Act

**(a)** If you are a copyright owner or an agent thereof and believe that any Content infringes Your copyrights, you may submit a notification pursuant to the Digital Millennium Copyright Act ("DMCA") by providing our Copyright Agent with the following information in writing (see 17 U.S.C §512[c][3] for further details): (i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed; (ii) Identification of the copyrighted work claimed to have been infringed or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site; (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed, or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material; (iv) Information reasonably sufficient to permit the service provider to contact you, such as an address, telephone number and, if

Page 198

available, an electronic mail; (v) A statement that you have a good–faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent or the law; and (vi) A statement that the information in the notification is accurate and, under penalty of perjury, that you are authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**(b)** Kytch's designated Copyright Agent to receive notifications of claimed infringement is Copyright Agent – Attention Legal, 3327 Seldon Court, Fremont, CA 94539, USA; Legal@kytch.com. For clarity, only DMCA notices should go to the Copyright Agent; any other feedback, comments, requests for technical support and other communications should be directed to Kytch customer service through https://kytch.com/support/. You acknowledge that if you fail to comply with all the requirements of this Section Your DMCA notice may not be valid.

**(c)** Counter–Notice. If you believe that the Content that was removed (or to which access was disabled) is not infringing, or that you have the authorization from the copyright owner, the copyright owner's agent or pursuant to the law to post and use the material in Your Content, you may send a counter-notice containing the following information to the Copyright Agent: (i) Your physical or electronic signature; (ii) Identification of the Content that has been removed, or to which access has been disabled, and the location at which the Content appeared before it was removed or disabled; (iii) A statement that you have a good–faith belief that the Content was removed or disabled as a result of mistake or misidentification of the Content; and (iv) Your name, address, telephone number and email address, a statement that you consent to the jurisdiction of the federal court in San Francisco, California, USA and a statement that you will accept service of process from the person who provided notification of the alleged infringement.

**(d)** If a counter–notice is received by the Copyright Agent, Kytch may send a copy of the counter–notice to the original complainant informing that person that they may replace the removed Content or cease disabling it in 10 working days. Unless the copyright owner files an action seeking a court order against the Content provider, member or user, the removed Content may be replaced, or access to it restored, in 10 to 14 working days or more after receipt of the counter–notice, at Kytch's sole discretion.

## 15. General

**(a) Changes to These Terms.** Kytch reserves the right to make changes to these Terms. Kytch will post notice of changes to any one or more of the following: this page, a Site, Web Apps, or Mobile Apps. You should ensure that you have read and agree with the most recent Terms when you use the Products and Services. Continued use of the Products and Services following notice of such changes shall indicate Your acknowledgment of such changes and agreement to be bound by the revised Terms. IF YOU DO NOT AGREE WITH ANY OF THE CHANGES TO ANY OF THE TERMS, YOU SHOULD DISCONNECT YOUR PRODUCTS FROM YOUR ACCOUNT AND CEASE ACCESSING OR USING THE PRODUCTS AND SERVICES AND RETURN THE PRODUCT AS SET FORTH IN THESE TERMS.

**(b) Governing Law.** These Terms, and the Agreement and any claim, dispute, action, cause of action, issue, or request for relief arising out of or relating to these Terms or Your use of the Products and Services shall be governed by the laws of the State of California without giving effect to any conflict of laws principles that may provide the application of the law of another jurisdiction. The courts in some states and countries may not apply California law to some types of dispute. If you reside in one of those states or countries, then where California law is excluded from applying, Your state's or country's laws will apply. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU AGREE TO SUBMIT TO THE PERSONAL JURISDICTION OF THE STATE AND FEDERAL COURTS IN OR FOR SANTA CLARA COUNTY, CALIFORNIA FOR THE PURPOSE OF LITIGATING ALL SUCH CLAIMS OR DISPUTES, UNLESS SUCH CLAIM OR DISPUTE IS REQUIRED TO BE ARBITRATED AS SET FORTH IN AN ABOVE SECTION.

**(c) Protection of Confidentiality and Intellectual Property Rights.** Notwithstanding the foregoing, Kytch may seek injunctive or other equitable relief to protect its confidential information and intellectual property rights or to prevent loss of data or damage to its servers in any court of competent jurisdiction and You agree that

Page 199

Redacted Version Filed 04/29/2022 -- Page 199 of 224

Kytch may do so without the need to post bond or other surety.

**(d) Entire Agreement/Severability.** These Terms and the Agreement constitute the entire agreement between you and Kytch regarding the use of the Products and Services. Any failure by Kytch to exercise or enforce any right or provision of these Terms shall not operate as a waiver of such right or provision. The section titles in these Terms are for convenience only and have no legal or contractual effect. If any provision of these Terms is, for any reason, held to be invalid or unenforceable, the other provisions of these Terms will be unimpaired and the invalid or unenforceable provision will be deemed modified so that it is valid and enforceable to the maximum extent permitted by law. Neither party is an agent or partner of the other party.

**(e) Survivability.** The obligations in these Terms which would naturally survive termination or expiration shall survive, including, without limitation, Sections 1(g) and (q), 3(d) and (e), 4, 6, 7, 8, 9, 10, 11, 13 and 15.

**(f) Assignment.** These Terms, and any associated rights or obligations, may not be assigned or otherwise transferred by you without Kytch's prior written consent. These Terms may be assigned by Kytch without restriction. These Terms are binding upon any permitted assignee.

**(g) Notifications.** Kytch may provide notifications to you as required by law, or for marketing or other purposes, via (at its option) email to the primary email associated with Your Account, mobile notifications, hard copy or posting of such notice on www.Kytch.com. Kytch is not responsible for any automatic filtering that you or Your network provider may apply to email notifications. Kytch recommends adding @kytch.com email addresses to Your email address book to help ensure that you receive email notifications from Kytch. You agree and warrant that You have provided the correct contact information and will keep Kytch updated should that information change. Kytch shall not be responsible for notices not received by You.

**(h) Disclosures.** Kytch's address is 3327 Seldon Court, Fremont, CA 94539, USA. If you are a resident of California, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them, in writing, at 400 R Street, Sacramento, CA 95814, USA, or by telephone on (800) 952-5210.

**(i) Copyright/Trademark Information.** Copyright © 2019, Kytch, Inc. All rights reserved. All trademarks, logos and service marks ("Marks") displayed on the Services are the property of Kytch or of their respective holders. You are not permitted to use any of the Marks without the applicable prior written consent of Kytch or such respective holders. Kytch reserves the right to alter product and services offerings, specifications and pricing at any time, without notice, and is not responsible for typographical or graphical errors that may appear in this or in related documents.

**(j) Third Party Rights.** Except as expressly set forth herein, nothing in this Agreement shall be construed as giving any person or entity, other than the parties hereto and their successors and permitted assigns, any right, remedy or claim under or in respect of this Agreement or any provision hereof.

**(k) No Agency.** Nothing contained in this Agreement will be deemed to create any agency, joint venture, partnership or similar relationship between the parties to this Agreement. Nothing contained in this Agreement will be deemed to authorize either party to this Agreement to bind or obligate the other party. Kytch is an independent contractor, and neither Kytch nor its employees are, or shall be deemed, Your employees.

**(l) Force Majeure.** Kytch will not be liable or responsible for any failure to perform, or delay in performance of, any of our obligations under a contract that is caused by an act or event beyond our reasonable control, including without limitation acts of God, strikes, lock-outs or other industrial action by third parties, civil commotion, riot, terrorist attack, war, fire, explosion, storm, flood, earthquake, epidemic or other natural disaster, failure of public or private telecommunications networks or impossibility of the use of railways, shipping, aircraft, motor transport or other means of public or private transport.

4822-8210-1953, v. 1

Redacted Version Filed 04/29/2022 -- Page 200 of 224

## Product

Pricing

Platform

Kytch Kit

## Company

Partner With Kytch

About Us

Careers

Privacy

Terms

## Support

FAQs

Contact Us

Download App

**Get Kytch updates here**

Copyright © Kytch, Inc. 2021. All Rights Reserved.

3327 Seldon Ct. Fremont, CA 94539

# EXHIBIT 5

Redacted Version Filed 04/29/2022 -- Page 202 of 224

Case 2:21-cv-02174-ILRL-DPC   Document 14-2   Filed 08/03/22   Page 204 of 227

💳 **PAYMENT**                                                      ch_1ESS2LHkryebfB9VSMkgYkiz

# $499.00 USD   Refunded ↩

| Date | Customer | Payment method | Risk evaluation |
|------|----------|----------------|-----------------|
| Apr 23, 2019, 10:04 AM | heather.jordan@taylor-company.com | VISA •••• 2782 | 🛡 Normal |

## Timeline

📝 **Cancelled**
Apr 30, 2019, 3:28 PM by melissa@frobot.net

↻ **Payment refunded**
Apr 30, 2019, 3:28 PM

✓ **Payment succeeded**
Apr 23, 2019, 10:04 AM

## Payment details

| | |
|---|---|
| Statement descriptor | KYTCH.COM |
| Amount | $499.00 |
| Refunded | $499.00 |
| Fee | $0.00 ⓘ |
| Net | $0.00 |
| Status | Refunded |
| Description | Payment for devices  ✏ Edit |

## Payment method

| | | | |
|---|---|---|---|
| ID | card_1ESS2KHkryebfB9V07AC6jreb | Address | 750 N. Blackhawk Blvd. |
| Number | •••• 2782 | | Rockton, IL, 61072, US |
| Fingerprint | dH7v5Tlh63zHT3cx | Origin | United States 🇺🇸 |
| Expires | 09 / 2022 | CVC check | Passed ✓ |
| Type | Visa credit card | Street check | Passed ✓ |

Page 203

Redacted Version Filed 04/29/2022 -- Page 203 of 224

Issuer                     U.S. Bank National Association-Check          Passed
                                                         Zip Check

# EXHIBIT 6

Redacted Version Filed 04/29/2022 -- Page 205 of 224

11/10/2020                                     Payments – Kytch – Stripe

🗂 **PAYMENT**                                          ch_1EcHMMHkryebfB9Vcb02Q7WY 🗑

# $499.00 USD   Refunded ↩

| Date | Customer | Payment method | Risk evaluation |
|---|---|---|---|
| May 20, 2019, 12:41 PM | sxsmith@brinksgilson.com | 🔵 •••• 1998 | 🛡 Normal |

## Timeline

🗋 **Other**
Jun 6, 2019, 12:12 PM by melissa@frobot.net

🔄 **Payment refunded**
Jun 6, 2019, 12:12 PM

✓ **Payment succeeded**
May 20, 2019, 12:41 PM

## Payment details

| | |
|---|---|
| Statement descriptor | KYTCH.COM |
| Amount | $499.00 |
| Refunded | $499.00 |
| Fee | $0.00 ⓘ |
| Net | $0.00 |
| Status | Refunded |
| Description | Payment for devices  ✏ Edit |

## Payment method

| | | | |
|---|---|---|---|
| ID | card_1EcHMLHkryebfB9VIDAddres8 | | 515 S. Beverly Lane |
| Number | •••• 1998 | | Arlington Heights, IL, 60005, US |
| Fingerprint | 2gr87ZROWvWIB7ig | | |
| Expires | 12 / 2023 | Origin | United States 🇺🇸 |
| Type | Visa credit card | CVC check | Passed ✓ |
| Issuer | JPMorgan Chase Bank N.A. | Street check | Passed ✓ |

✅Page 208

Redacted Version Filed 04/29/2022 -- Page 206 of 224

Zip check                              Passed

https://dashboard.stripe.com/payments/ch_1EcHMMHkryebfB9VebO2Q7WY

Redacted Version Filed 04/29/2022 -- Page 207 of 224

# EXHIBIT 7

## PUBLIC – REDACTS MATERIALS UNDER SEAL UNDER PER COURT'S JULY 30, 2021 ORDER

### Pages 209 - 556

Redacted Version Filed 04/29/2022 -- Page 208 of 224

# EXHIBIT 8

Redacted Version Filed 04/29/2022 -- Page 209 of 224

Tyler Gamble Invitations

| inviter | kitchenName | name | email | note | date |
|---------|-------------|------|-------|------|------|
| **Tyler Gamble** | Brownsville | Anthony | agravesmcd@gmail.com | | 5/11/20 |
| **Tyler Gamble** | Brownsville | Jeff | jeff.gamble@partners.mcd.com | | 5/11/20 |
| **Tyler Gamble** | Brownsville | Cedric | ckooncemcd@gmail.com | | 5/12/20 |
| **Tyler Gamble** | Stonebrook 1 | Jeff | Jeff.gamble@partners.mcd.com | shake machine monitor | 4/14/20 |
| **Tyler Gamble** | Stonebrook 1 | Mike | mike.zagorski@us.mcd.com | Kytch invite for Gamble | 4/14/20 |
| **Tyler Gamble** | Stonebrook 1 | Clint | csmithmcd@gmail.com | shake machine monitor | 4/14/20 |
| **Tyler Gamble** | Stonebrook 1 | William | william_p@eplus.net | | 5/12/20 |
| **Tyler Gamble** | Stonebrook 1 | Matt | mwilson970@gmail.com | | 6/10/20 |
| **Tyler Gamble** | Stonebrook 1 | Brooke | brookesims91@gmail.com | | 12/20/20 |
| **Tyler Gamble** | Stonebrook 1 | Anthony | agravesmcd@gmail.com | | 12/20/20 |
| **Tyler Gamble** | Stonebrook 1 | Clint | csmithmcd@gmail.com | | 12/20/20 |
| **Tyler Gamble** | SoJax | Jeff | jeff.gamble@partners.mcd.com | sojax shake machine monitor | 4/14/20 |
| **Tyler Gamble** | SoJax | Clint | csmithmcd@gmail.com | Sojax shake machine monitor | 4/14/20 |
| **Tyler Gamble** | SoJax | Debbie | dbowdenmcd@gmail.com | | 5/12/20 |
| **Tyler Gamble** | Corinth | Jeff | jeff.gamble@partners.mcd.com | | 5/12/21 |
| **Tyler Gamble** | Corinth | Clint | csmithmcd@gmail.com | | 5/12/20 |
| **Tyler Gamble** | Corinth | Gretchan | gretchanshields@yahoo.com | | 5/12/20 |
| **Tyler Gamble** | Corinth | Matt | mwilson970@gmail.com | | 8/27/20 |
| **Tyler Gamble** | Corinth | Gretchanshields@yahoo.com | gretchanshields@yahoo.com | | 12/20/20 |

1

Redacted Version Filed 04/29/2022 -- Page 210 of 224

# Exhibit 3

Placeholder for Document
Filed Under Seal Pursuant to the
Court's July 30, 2021 Order

# Exhibit 4



**ELIZABETH M. LOCKE, P.C.**
libby@clarelocke.com
(202) 628-7402

10 Prince Street
Alexandria, Virginia 22314

(202) 628-7400

www.clarelocke.com

**DANIEL P. WATKINS**
daniel@clarelocke.com
(202) 628-7407

December 7, 2020

**Via Email and Federal Express**

Mr. Timothy FitzGerald
Chairman, President and CEO
The Middleby Corporation
1400 Toastmaster Drive
Elgin, Illinois 60120
TFitzgerald@middleby.com

> **Re:**   **Taylor Company's Fraudulent Concealment of Known Software Bugs and Related Smear Campaign Against Kytch.**

Dear Mr. FitzGerald:

My law firm represents Frobot, Inc., and its affiliate entity, Kytch.

This letter serves as notice to The Middleby Corporation ("Middleby Corp.") that its subsidiary Taylor Commercial Foodservice, LLC[1] has engaged in a pattern of unlawful and anti-competitive business activities.  Specifically, Taylor falsely claimed that Kytch's device "presents a safety risk" and "can cause serious human injury."  Taylor then threatened to breach its customers' product warranties unless they stopped using Kytch in their restaurants.

Make no mistake, documentary evidence confirms that Taylor's statements are false.  Kytch's products are not dangerous—indeed, they were specifically designed to complement and enhance the features of Taylor's machines.  There has never been a single report of an adverse safety event in company history.  But Taylor knew these facts all along because it collaborated with Kytch founders Jeremy O'Sullivan and Melissa Nelson years before they launched the company.  Still, Taylor chose to disregard the truth because Kytch's innovative offerings threatened to expose Taylor's scheme to profit off of software bugs by requiring customers to pay costly—and completely unnecessary—fees to Taylor's service business.

---

[1] This organization conducts business under the trade name Taylor Company ("Taylor").

Redacted Version Filed 04/29/2022 -- Page 213 of 224



For these reasons and those set forth more fully below, Kytch formally demands that Middleby Corp. intervene and require Taylor to (1) cease and desist using software that causes unnecessary product malfunctions; (2) retract its false claims that Kytch's products are unsafe and that they void Taylor's warranties; (3) issue a public apology acknowledging that Kytch's products are safe; (4) discontinue its unlawful, anti-competitive conduct; (5) return all Kytch devices that Taylor has illegally obtained; and (6) compensate Kytch for the permanent and irreparable damage caused by Taylor's smear campaign.[2]

**I.    Taylor's Long History of Manufacturing Defective Ice Cream Machines and Failure to Resolve Known Functionality Problems and Software Bugs.**

Taylor manufactures soft-serve machines that multinational fast-food companies use in their quick-serve restaurants ("QSRs").  Two of its highest-paying customers are McDonald's and Burger King, and Taylor's machines are used throughout the world.  Despite its outsized market-share, Taylor's soft-serve machines have been known to be unreliable and "notorious for constantly breaking down."[3]  A recent article in *The Wall Street Journal* explained that "[t]he interruption in ice cream, milkshake, and McFlurry service is so widespread that it has spawned an avalanche of social-media complaints in the U.S. and abroad—and conspiracy theories."[4]  Other newspapers have printed similar stories.



---

[2] For the avoidance of doubt, this constitutes Frobot's and Kytch's formal retraction demand under applicable statute or rule of court.

[3] Shoshy Cement, *McDonald's and Burger King Franchisees Are Raving About a New Device that Can Update Their Notoriously Broken Soft-Serve Machines*, BUSINESS INSIDER (Feb. 11, 2020, 6:22 a.m.), https://www.businessinsider.com.au/mcdonalds-burger-king-soft-serve-machines-getting-tech-upgrade-2020-2.

[4] Julie Jargon, *Why Is the McFlurry Machine Down Again?*, THE WALL STREET JOURNAL (Jan. 19, 2017, 11:41 a.m.), https://www.wsj.com/articles/six-horrifying-words-the-mcflurry-machine-is-down-again-1484840520.

Redacted Version Filed 04/29/2022 -- Page 214 of 224



Indeed, the machines[5] malfunction so frequently that mocking the problems with soft-serve ice cream at McDonald's has turned into something of a cultural phenomenon. Taylor has responded to these widespread complaints by trying to deny responsibility. Company leadership has recently claimed that the problems resulted from "human error" or a debunked "heat cycle" theory. Even Taylor COO James Minard has taken to social media platforms to try to discredit *The Wall Street Journal's* reporting on the matter.



Taylor's pattern of denial continued for years—until a software engineer launched [McBroken](#), a website that compiles statistics reflecting the number of soft-serve machines that are out of commission at any one moment. At the time of this writing, for instance, McBroken reports that almost 9% of all of McDonald's U.S. locations have broken machines. McBroken's current data also indicates that more than *22% of McDonald's ice cream machines in the Boston metropolitan area alone are out of service*. Separately, the machine outages have cost QSR operators millions of dollars in lost revenue. It is no surprise, then, that McDonald's franchisees have gone on the record to confirm the obvious: Taylor's "machines are temperamental and expensive to repair."

   A. <u>Taylor Defrauds Customers by Programming Software Bugs that Cause Costly Malfunctions and Widespread Outages.</u>

It is surprising that Taylor has failed to remedy these failures given the fact that they damage McDonald's brand—and by extension Taylor's reputation because it manufactures the overwhelming majority of ice cream machines McDonald's uses. But Kytch has gathered data sufficient to show that Taylor, itself, programmed the software bugs that cause the machines to fail. These bugs have generated hundreds of millions of dollars in unnecessary repair and service fees for Taylor's lucrative service business.

The data in Kytch's possession has also raised red flags regarding the safety of Taylor's machines. For instance, reports show that up to 20% of Taylor's soft-serve machines currently operate with a "manual switch or similar device" that bypasses the machines' critical safety functions.[6] This "bypass" directly violates NSF International's food safety requirements and may endanger patrons of QSRs that operate Taylor's soft-serve machines. This is just one example out of the scores of defects that Kytch has detected.

---

[5] Data from Taylor's other product lines—from ice blenders to grills—indicate that these software issues are not confined to its ice cream machines.

[6] Kytch has confirmed that many Taylor machines have a jumper placed on the W2 pins on the rear of the machine that disables necessary safety mechanisms. Documentary evidence confirms that Taylor has been aware of this hazard for years but has taken no action to correct this defect.

3



Until recently, Taylor has successfully concealed these defects by keeping separate menus: one for its own factory-trained technicians and a limited manager's menu for everyone else. The technician's menu displays accurate software information and permits technicians to access data that corresponds with the wide spectrum of operational capacities of each machine.  But the customer menu provides only a rudimentary interface that does not permit franchisees access to critical features like glycol temperature controls, agitator operations, or compressor run times.  The customer menu typically does not even identify the correct version of the software system that is actually running the machine.  This makes it difficult—if not impossible—for independent technicians to troubleshoot or identify Taylor's programmed bugs.  What's worse, without knowing which software version they are operating, franchisees are sometimes unable to identify the selection of features their machines can accommodate.

One recent update is emblematic of Taylor's software accessibility problem.  Taylor rolled out a new upgrade that improves the machines' cleaning cycle.  Customers soon learned, however, that they are unable to activate this feature without paying for a Taylor technician to complete a service.  Its two-tiered menu system enables Taylor to charge millions of dollars in service fees just so customers can access software fixes that should have been installed, at no charge, in the regular course of business.

Other complaints from QSR operators further illuminate Taylor's servicing scheme.  Earlier this year, a franchisee reported that his restaurant's soft-serve machine stopped working after a Taylor technician installed "software upgrades" without his knowledge or consent.  Data Kytch collected from this particular machine indicates that the malfunctions were indeed caused by the technician's "upgrade."  To add insult to injury, Taylor charged hundreds of dollars in "service fees" for the installation, even though it was the software upgrade that triggered the malfunction in the first place.

These failures are not just isolated events. The bugs in Taylor's programs are so severe and pervasive that one of its technicians in Norway recently posted a YouTube video explaining that several machine failures were caused by another one of Taylor's "software upgrades." This particular error—which Kytch flagged before the Norwegian video was posted—causes the soft-serve machine to freeze the mix in a manner that renders the machine unusable.  This is only a small sample of the software bugs that Kytch has uncovered.

The key to Kytch's competitive edge in the food service industry is that all of its products are driven by data.  Kytch now has data confirming that Taylor has engaged in years-long processes to "correct" myriad software bugs that were known to cause machine outages (and expensive service appointments). But instead of actually fixing these issues, Taylor permitted the errors to continue and profited from the increased service and repair revenue.

Based on the pervasiveness of Taylor's software bugs and performance failures, it is striking that Taylor's Operator Manual fails to make mention of these problems.  But Taylor's consumer-facing documents shift the blame for its products defects to "improper assembly" or other "human errors," and run-of-the-mill mechanical issues.  Taylor's failure to disclose the product defects is glaring, especially considering the fact that data Kytch collected from Taylor's machines confirms that Taylor has been aware of widespread software-based errors for years.  And even though Taylor has published extensive marketing materials trumpeting their costly service and maintenance

4



packages, the company has taken painstaking efforts to conceal that its programming errors are endemic.

B. Taylor's Scheme Violates Unfair Competition Laws and Anti-Fraud Regulations.

The data in Kytch's possession—combined with statements and invoices provided by franchisee operators—establishes that Taylor's misconduct constitutes actionable fraud. Consequently, Taylor has legal exposure for a panoply of class and individual tort and statutory claims.

By way of example, a majority of state legislatures have passed consumer protection and anti-fraud statutes creating private causes of action for unfair business activities like those present here. In California alone there are at least four different statutory regimes that prohibit the various aspects of Taylor's scheme: (1) California False Advertising Law; (2) California Consumer Legal Remedies Act; (3) Computer Fraud and Abuse Act; and (4) California Computer Data Access and Fraud Act. These laws require manufacturers to pay substantial damages for failing to disclose "known safety hazards" and all known "central function defects."[7]

Product manufacturers have paid billions of dollars for failing to disclose defects. Companies have also been required to reimburse customers for repair costs and related damages that were caused by the defective software.

- LG recently settled a multi-million-dollar class action lawsuit over refrigerator defects after complaints alleged that the company knowingly sold refrigerators with cooling defects and subsequently failed to provide adequate repair services.

- Apple agreed to pay up to $500 million to settle class action claims that it slowed down iPhones to mask battery issues and drive users to purchase new devices.[8] The company paid an additional $113 million to states attorneys general.[9]

- Google agreed to pay $7.5 million after the company allegedly failed to disclose security defects that exposed users' data to third parties.[10]

With these cases in mind, we have instructed Frobot and Kytch to preserve all documents and information that may be related to civil claims that Taylor's customers may assert against Taylor for its fraudulent activities.  Kytch is prepared to produce evidence that will undoubtedly expose decades of Taylor's deceptive business practices that resulted in overcharging QSR operators millions of dollars—purportedly for service and maintenance—due to the bugs that Taylor intentionally programmed into its software.

---

[7] *See Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 980 (N.D. Cal. 2018) (plaintiff's allegation that defendant's defective software that "render[ed] those products incapable of use" was sufficient to support claims against the product manufacturer).

[8] *In re Apple Inc. Device Performance Litig.*, No. 5:18-md-02827 (N.D. Cal. Feb. 28, 2020), ECF No. 416.

[9] Bobby Allen, *Apple Agrees to Pay $113 Million to Settle 'Batterygate' Case Over iPhone Slowdowns*, NPR (Nov. 18, 2020, 3:31 p.m.), https://www.npr.org/2020/11/18/936268845/apple-agrees-to-pay-113-million-to-settle-batterygate-case-over-iphone-slowdowns.

[10] *In re Google Plus Profile Litig.*, No. 5:18-cv-06164 (N.D. Cal. Nov. 19, 2020).

Redacted Version Filed 04/29/2022 -- Page 217 of 224



## II.    Frobot—and Subsequently Kytch—Developed Devices to Optimize Taylor's Machines.

Now that you are aware of the pertinent facts regarding Taylor's potential liability, we will briefly describe Frobot's collaborative efforts with Taylor and the subsequent development of Kytch.

Frobot was founded by Mr. O'Sullivan and Ms. Nelson to automate the delivery of frozen yogurt via standalone, unattended machines.  Frobot first approached Taylor in May of 2013 at the National Restaurant Association (NRA) Show in Chicago, Illinois.  Taylor expressed interest after Frobot informed leadership of its plans to develop a device to augment the capabilities of Taylor's frozen yogurt machines.  A few months later, Frobot presented its prototype at Taylor's headquarters in Rockton, Illinois.  Frobot's goal was to create a standalone product that would allow Taylor's machines to be used in retail spaces, completely unattended.  Frobot's groundbreaking self-service model required the company to undergo rigorous safety testing to ensure that safety measures were sufficient to guard against the hazard associated with serving dairy products to the general public.

Taylor's response to Frobot's presentation was positive, and the two companies entered into a cooperation agreement a short time later.  Years of product development followed. Throughout this process, Frobot and Taylor remained in close contact, and Taylor's feedback and cooperation played an integral role in developing Frobot.  Taylor also provided operator manuals and even shipped machine components to Frobot's headquarters to enable Frobot to collect data and ensure that the new device was 100% compatible with Taylor's existing software.[11]  Taylor representatives were intimately familiar with Frobot's safety protocols and its intention to obtain NSF food safety certification.

Frobot's efforts ultimately proved successful.  The company created the first device in the industry to serve non-prepackaged dairy products with zero human attendants.  Frobot showcased its product at Taylor's booths at the North American Association of Food Equipment Manufacturers (NAFEM) convention and at the NRA Show in 2017.  Pictures from that event are reflected below.





---

[11] October 2016 email correspondence with Taylor COO Jim Minard confirms these facts and describes the "extra control boards" that Taylor sent for data extraction purposes.

Redacted Version Filed 04/29/2022 -- Page 218 of 224



On the last day of the 207 NRA Show, abruptly and without explanation, Taylor informed Frobot that it was no longer welcome to showcase products at Taylor's booths.  Middleby acquired Taylor a short time later.

A.  <u>Kytch's Product Trials Prove Successful and Franchisees Flock to Purchase the Device</u>

Shortly after the unceremonious end to Frobot's relationship with Taylor, Jeremy O'Sullivan and Melissa Nelson launched Kytch in 2018 as a subsidiary of Frobot.  They fully expected Taylor's leadership to collaborate just as they had with Frobot; especially since Kytch's goals were aligned with Frobot's earlier mission to improve Taylor's machines.  Kytch was designed to identify and troubleshoot common malfunctions associated with soft-serve machines.   The idea is straightforward: Kytch is an add-on to existing machines that conducts real-time analytics, which allows Kytch to optimize the machine's energy saving, cleaning, and operating functionality.

Building off of Frobot's earlier successes, Kytch has even more potential to "transform dumb kitchens into intelligent, efficient ecosystems."  Kytch can be attached directly to the soft-serve machines; it connects to the internet via Wi-Fi and begins to monitor the machine's operations.  In effect, Kytch intercepts the dialogue between the front control panel and the machine's logic board, providing customers a user-friendly interface to navigate the communications.  Kytch was originally configured to complement one of Taylor's fully automated frozen yogurt machines.  The purpose of the first device was safety: it was designed to shut off service capabilities whenever the machine reached unsafe temperatures.  Over time, Kytch continued to develop its devices and expand capabilities to further optimize ice cream machines.

Kytch's functionality is depicted in the diagrams below.

**Real-Time Alerts**





7



**Customer Preference Data**



B. <u>Even Though Taylor Had a Longstanding Relationship with Kytch's Founders, Taylor Tried to Intercept Kytch's Product Covertly.</u>

Kytch launched "Kytch Solution" in April 2019 to optimize Taylor's soft-serve machines. Mr. O'Sullivan and Ms. Nelson presumed that this would have piqued Taylor's interest, and they were somewhat surprised when Taylor's leadership did not contact them to discuss the potential to collaborate. But Kytch's team learned a short time later that Taylor took painstaking efforts to surreptitiously purchase Kytch Solution.

The first of these efforts took place in April of 2019 when a low-level Taylor employee named Heather Jordan attempted to order Kytch Solution. Less than a month later, Taylor attempted another purchase, this time through its outside legal counsel, Stephen Smith of Brinks Gilson. But this was just the beginning of Taylor's mission to obtain Kytch Solution. Documents revealed in our investigation indicate that Taylor also hired at least two investigators—Madeline Taylor and Porscha Imperial of Marksmen, Inc.—who used false names to try to purchase Kytch's device. In total, Taylor representatives—often using aliases—attempted to buy Kytch Solution almost a dozen times. Relatedly, statements from a QSR operator in the southeast region suggests that Taylor has somehow taken possession of one or more of Kytch's device and related proprietary information. **Please instruct Taylor to return Kytch's property without delay.**

In May of 2019, the company rolled out its first device, Kytch Solution, on a limited trial basis (the "Kytch Trial") at select McDonald's and Burger King locations in the United States. Each participant in the Kytch Trial executed a binding agreement, whereby they were granted limited rights of use to evaluate and test the product. The Agreement also includes strict non-disclosure requirements.

Customer acquisition, using the Kytch Trial, was incredibly successful—until Taylor's defamatory publications about Kytch's product. QSR operators were excited as they watched, in real time, as Kytch Solution provided an instant value-add. Despite Taylor's programmed bugs, Kytch improved the machines' uptime and significantly reduced outages and related maintenance costs. Trial participants gave rave reviews because Kytch Solution was effective, and the product delivered results that enabled franchisees to "keep [their] machine[s] up and running." One franchisee explained that Kytch is so effective because it "provides increased awareness and results in faster

8



reaction times when a problem does occur." He went on to say that Kytch reflects "best thinking as it relates to the industry," and that "this device can reduce complexity in [] restaurants, make the lives of [franchisee's] teams easier, and help drive cash flow" by reducing unnecessary outages.

Demand for Kytch exploded as word started to spread that Kytch Solution actually works around many of Taylor's software bugs. Kytch quickly enrolled trial participants in restaurants in Arkansas, California, Connecticut, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Washington, and Wisconsin. As a result of this massive expansion, Kytch quickly became the largest non-approved vendor in the McDonald's system.

By all appearances, Kytch Solution was a viable remedy to many of the problems that had troubled soft-serve machines and frustrated customers for years.



### III.    As Kytch Continued Its Exponential Growth, Taylor Perpetrated an Anti-Competitive, Defamatory Smear Campaign Against Kytch because Its Success Threatened to Expose Taylor's Service Scheme.

The primary reason demand for Kytch's devices skyrocketed is that the products pay for themselves in two independent ways. *First*, by reducing outage times, Kytch Solution enables QSR operators to increase revenue through an uptick in soft-serve-related purchases. *Second*, by lowering



repair costs and enhancing troubleshooting, Kytch is able to save QSR operators significant overhead associated with costly service repairs. Thus, QSR operators have welcomed Kytch's innovative tools.

It would seem that Taylor would encourage this advancement because Kytch developed a work-around for critical bugs that have caused mass interruptions of its machines. Not so. When Taylor realized how quickly Kytch was growing, it engaged in an anti-competitive misinformation campaign to (1) falsely accuse Kytch Solution of being a safety hazard and (2) unlawfully threaten to void product warranties for all QSR operators that used Kytch's add-ons.

A. Taylor Spreads Misinformation about Kytch to Burger King Representatives.

Kytch first learned that Taylor representatives were making false claims about the safety of Kytch Solution in October of 2019, shortly after Burger King hosted its Global Convention in Miami, Florida. By that time, Kytch had expanded to a number of Burger King franchisees across the country, and the Kytch Trial was gaining traction as it increased restaurant operators' profitability by driving up sales of soft-serve ice cream products. In the days after the convention, Kytch discovered that Taylor pressured Burger King franchisees to sever ties with Kytch by citing phony safety and warranty concerns that Taylor invented out of whole cloth. Multiple witnesses have also confirmed that Taylor made similar disparaging remarks to The Coca-Cola Company and that Taylor plans to develop its own real-time monitoring device—which appears to be strikingly similar to Kytch's products—that will likely be rolled out in 2021.

Myriad Burger King franchisees withdrew from the Kytch Trial as a result of Taylor's coercion and unfair attacks against my client. Put simply, Taylor's defamatory statements ruined Kytch's relationships with Burger King's QSR operators. Despite their initially positive impressions of the product, customer after customer explained that the pressure from Taylor caused them to cancel their contracts with Kytch.

B. Taylor Threatened to Void Kytch Customers' Warranties and Made False Claims Regarding the Safety of Kytch's Products.

Emboldened by its success with Burger King and even more determined to neutralize Kytch's growth, Taylor continued to peddle lies about Kytch to McDonald's franchisees via so-called "safety alerts." Earlier this month, Taylor caused an **"IMPORTANT NOTE"** to be published to every single operator of the 13,000 McDonald's restaurants in the United States.[12] Even though the **NOTE** was sent under the guise of promoting safety, the messages contain overt threats that Taylor will void product warranties unless QSR operators agree to remove Kytch Solution from their machines.

> **IMPORTANT NOTE:** We have become aware that a few operators may be using an unapproved aftermarket technology, Kytch, on their Shake Sundae machine. As a reminder, any operator that is using this aftermarket "add-on" to any of their machines, will completely void an existing OEM equipment

---

[12] It is of no consequence that McDonald's transmitted the defamatory message. Under well-settled law, a defamer is liable for damages caused by repetitions that were reasonably foreseeable, or the natural and probable consequence of his original statement.



There is simply no basis for Taylor to represent that using Kytch would retroactively void Taylor's express and implied product warranties. But after threatening to rescind these warranties, Taylor falsely claimed that Kytch's devices were hazardous and that they are known "to cause serious human injury."

> Taylor [has] recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may allow the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury.
>
> ***As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use, and is reminding you that any continued use is not approved and is at your sole risk.***

This is pure fiction. There is absolutely zero support, whatsoever, for Taylor's claim that Kytch "creates a potential very serious safety risk" or its accusation that Kytch "can cause serious human injury." Tellingly, Taylor has failed to even attempt to corroborate its prevarications about Kytch's safety record. In fact, Kytch underwent extensive product testing and certification at Intertek during product development to ensure that it satisfies all Underwriters Laboratories (UL) electrical safety requirements.[13] There have not been any reported "human injur[ies]" of any kind that were caused by Kytch's devices. To be clear, Kytch does not permanently alter the machine, and it certainly does not disable or otherwise negate any of the machine's factory-installed safety mechanisms. The opposite is true: Kytch warns the user when a particular component of the machine may fail and it monitors how often and effectively each machine is cleaned, thus optimizing operating conditions. Moreover, Kytch was designed to complement the existing safety tools, including but not limited to quality control of the ice cream's temperatures.

The **"IMPORTANT NOTICE"** fails to provide substantive details regarding what supposedly makes Kytch unsafe to operate. It does, however, claim that Kytch is "creating potential equipment reliability issues without the restaurant's knowledge or ability to stop it." This is a complete fabrication. Rather, ***Taylor*** has intentionally created "equipment reliability issues" for years, and its service department has charged hundreds of millions of dollars in fees for repairs that Taylor itself caused. Taylor's claim that Kytch's remote-control capabilities present a safety hazard is also manifestly false. Kytch's functionality only permits users to control a machine in the same way that the machine is operated without Kytch. For example, just like a human operator, Kytch can only utilize the same functions that are available to workers using a Taylor machine ***without*** Kytch. In other words, Kytch is restricted by all of the same safety mechanisms that constrain human operators.

The defamatory statements that Taylor published have had a devastating impact on Kytch's reputation and its business on a going-forward basis. After Kytch's customers learned about Taylor's false claims regarding Kytch's safety record and Taylor's threat to cancel their warranties, they, very predictably, severed ties with Kytch.

---

[13] Kytch conforms to ULL STD 62368-1 and has successfully completed EMC testing consistent with the requirements of 47 CFR Subpart B §§ 15.101 - 15.123.

Redacted Version Filed 04/29/2022 -- Page 223 of 224



***

You now have written notice of the falsity of Taylor's claims that Kytch is a "very serious safety risk" that "can cause human injury." And those claims are not only false, but defamatory, and because they accuse Kytch of selling a product that endangers consumers' health, they are defamatory *per se*. Moreover, it is clear that Taylor made these statements knowing that they are false or, at minimum, with reckless disregard for their falsity, *i.e.*, with actual malice.

**Kytch formally demands that Taylor immediately retract its false statements, including by removing them from any locations in which they are published, and cease and desist from publishing or republishing any of them.** Failure to issue a retraction will constitute additional evidence of actual malice.

We trust that you understand the gravity of the issues raised in this letter and will treat them with the attention and seriousness that Kytch and the public deserve. Kytch has dedicated itself to being a responsible company that adheres to the highest standards of business conduct and ethics, and by publishing false and defamatory statements and implications misrepresenting the safety of Kytch's product, you have caused (and continue to cause) substantial damage to Kytch.

Finally, in light of the above and until all issues regarding Taylor's unlawful conduct are fully resolved, we require that you preserve and retain all documents, data, and electronically stored information relating in any way to Frobot, Kytch, their products, or your attempts to damage Kytch's business reputation and professional standing. These items should be preserved regardless of the medium, format, or device on which they are stored or hosted, and regardless of whether they appear in documents, drafts, notes, emails, text messages, voicemail messages, social media posts, or in any other form. Failure to adhere to this request could subject you to significant penalties, including claims and sanctions for spoliation. Please let us know if this request is in any way unclear.

This is not a full statement of Frobot's or Kytch's rights and remedies, all of which are expressly reserved. We look forward to your prompt response.

Sincerely,

Elizabeth M. Locke, P.C.

Daniel P. Watkins

12

1

## **PROOF OF SERVICE**

2

    I am a partner at Clare Locke LLP in Alexandria, Virginia.  I am over the age of 18 and not a party to the within action.  My business address is 10 Prince Street, Alexandria, Virginia 22314.

3

On  April  29,  2022,  I  served  the  document  titled  **PLAINTIFF  KYTCH,  INC.'S**

4

**REDACTED FIRST AMENDED COMPLAINT.**

5

6

on each interested party, as stated on the attached service list.

7

8

    ☒       (BY ELECTRONIC MAIL) I caused the foregoing document to be served electronically by electronically  mailing a true and correct copy through Irell &

9

Manella LLP's electronic mail system to the e-mail address(es), as stated on the attached service list, and the transmission was reported as complete and no error

10

was reported.

11

    Executed on April 29, 2022, at Alexandria, Virginia.

12

    I  declare  under  penalty  of  perjury  under  the  laws  of  the  State  of  California  that  the foregoing is true and correct.

13

14

              Daniel P. Watkins                  */s/ Daniel P. Watkins*

15

          (Type or print name)               (Signature)

16

17

18

19

20

21

22

23

24

25

26

27

28

| | | |
|---|---|---|
| 1 | **SERVICE LIST** | |
| 2 | *Kytch, Inc. v. Jonathan Tyler Gamble, et al.*<br>*Alameda County Superior Court Case No. RG21099155* | |

| Defendant Name | Defendant Counsel |
|---|---|
| **Jonathan Tyler Gamble** | David V. Roth SBN 194648<br>*dvr@manningllp.com*<br>Anthony J. Ellrod SBN 136574<br>*aje@manningllp.com*<br>Natalya Vasyuk SBN 307419<br>*ndv@manningllp.com*<br>**Manning & Kass, Ellrod, Ramirez,<br>Trester LLP**<br>One California Street, Suite 900<br>San Francisco, California 94111<br>Telephone: ( 415) 217-6990<br>Facsimile:  (415) 217-6999<br><br>Assistants:<br>Mireya Linares MXD@manningllp.com<br>Norma Limon nxl@manningllp.com<br>Diana Norton dln@manningllp.com |
| **TFGroup, LLC** | Tim M. Agajanian<br>**Ropers Majeski**<br>445 South Figueroa Street, 30th Floor<br>Los Angeles, California 90071<br>Telephone: (213) 312-2010<br>tim.agajanian@ropers.com<br><br>Kevin W. Isaacson<br>**Ropers Majeski**<br>333 W. Santa Clara Street, Suite 910<br>San Jose, California 95113<br>Telephone: (408) 947-4816<br>kevin.isaacson@ropers.com |
| **Taylor Commercial Foodservice LLC dba<br>Taylor Company** | Lance A. Etcheverry, Esq.<br>**Skadden Arps Slate Meagher & Flom**<br>525 University Avenue<br>Palo Alto, California 94301<br>Telephone: (650) 470-3170<br>Facsimile:  (650) 798-6570<br>Lance.Etcheverry@skadden.com<br><br>Abraham A. Tabaie, Esq.<br>**Skadden Arps Slate Meagher & Flom**<br>525 University Avenue<br>Palo Alto, California 94301<br>Abraham.Tabaie@skadden.com<br><br>Doug Nolan<br>Doug.Nolan@skadden.com |