# Exhibit A

1 | TIM M. AGAJANIAN (SBN 130508)
ERNEST E. PRICE (SBN 164534)
2 | KEVIN W. ISAACSON (SBN 281067)
PAULA B. NYSTROM (SBN 329651)
3 | ROPERS MAJESKI PC
801 S. Figueroa Street, Suite 2100
4 | Los Angeles, CA  90017
Telephone:  (213) 312-2000
5 | Facsimile:  (213) 312-2001
Email:  tim.agajanian@ropers.com
6 | ernest.price@ropers.com
kevin.isaacson@ropers.com
7 | paula.nystrom@ropers.com

8 | Attorneys for Defendant
TFGROUP LLC

9

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**12/28/2023 at 05:49:25 PM**
By: Anita Dhir,
Deputy Clerk

10 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

11 | COUNTY OF ALAMEDA

12

13 | KYTCH, INC.,

14 | Plaintiff,

15 | v.

16 | JONATHAN TYLER GAMBLE; J.L.
GAMBLE MANAGEMENT LLC DBA
17 | MCDONALD'S; TFGROUP LLC; and
TAYLOR COMMERCIAL FOODSERVICE,
18 | LLC DBA TAYLOR COMPANY,

19 | Defendants.

Case No. RG21099155
*[Assigned for All Purposes to
Hon. Michael M. Markman and
Hon. Jenna Whitman, Department 14]*

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT TFGROUP'S RENEWED
MOTION FOR SUMMARY JUDGMENT
OR, ALTERNATIVELY, FOR
SUMMARY ADJUDICATION**

Date:          March 12, 2024
Time:          10:00 a.m.
Dept.:          14

**Reservation No.:     A-21099155-047**

Trial Date:          May 6, 2024
Date Action Filed:     May 10, 2021

20

21

22

23

24

25

26

27

28

**REDACTED [PUBLIC]**

4884-9564-2007.7

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

**TABLE OF CONTENTS**

Page

I.     OVERVIEW ............................................................................................................ 1

II.    SUMMARY OF ARGUMENT ............................................................................... 2

III.   CONTEXTUAL BACKGROUND.......................................................................... 3

       A.     TFGROUP'S LIMITED ROLE SERVICING GAMBLE'S TAYLOR
              MACHINES.................................................................................................. 3

              1.     NO PROOF THAT TFGROUP ACCESSED A "PROTECTED"
                     DEVICE ............................................................................................ 3

              2.     TFGROUP'S MAINTENANCE SERVICE DID NOT UTILIZE A
                     KYTCH DEVICE ............................................................................. 5

       B.     PROCEDURAL HISTORY ........................................................................ 5

IV.    ARGUMENT ........................................................................................................... 6

       A.     STANDARD FOR SUMMARY JUDGMENT & TFG'S FINITE ROLE............ 6

       B.     TFGROUP SEEKS SUMMARY JUDGMENT OR, ALTERNATIVELY,
              SUMMARY ADJUDICATION. ................................................................. 6

       C.     TFGROUP'S LACK OF INVOLVEMENT IS NOT ACTIONABLE. ................. 6

              1.     TFGROUP'S WAS NOT INVOLVED IN ANY MAINTENANCE
                     OF TAYLOR MACHINES........................................................... 7

              2.     TFG TN'S SERVICE OF TAYLOR MACHINES WAS
                     STANDARD AND ROUTINE........................................................ 8

       D.     NO PROOF EXISTS OF TORTIOUS INTERFERENCE OF CONTRACT
              WITH A FRANCHISEE............................................................................. 10

              1.     TFGROUP UNAWARE OF A CONTRACT BETWEEN
                     PLAINTIFF AND GAMBLE. ....................................................... 10

              2.     NO PROOF EXISTS THAT TFGROUP UNLAWFULLY
                     INDUCED GAMBLE TO BREACH. ............................................ 11

              3.     NO EVIDENCE EXISTS OF ACTUAL DISRUPTION OF ANY
                     CONTRACTUAL RELATIONSHIP. ........................................... 12

       E.     TFGROUP HAS NOT MISAPPROPRIATED AN IDENTIFIABLE
              KYTCH TRADE SECRET........................................................................ 12

              1.     KYTCH LACKS EVIDENCE TO ESTABLISH THE
                     EXISTENCE OF A TRADE SECRET........................................... 13

              2.     KYTCH LACKS EVIDENCE THAT TFGROUP
                     MISAPPROPRIATED ANY TRADE SECRET. .......................... 14

       F.     NO PROOF OF A VIOLATION OF THE COMPUTER DATA ACCESS
              AND FRAUD ACT. .................................................................................. 16

              1.     NO KNOWING ACCESS "WITHOUT PERMISSION" OF
                     COMPUTER SYSTEMS ............................................................... 16

              2.     KYTCH CANNOT SHOW IMPROPER "USE" ................................. 17

       G.     TFGROUP DID NOT BREACH ANY IDENTIFIABLE CONTRACT. ............ 19

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3

V.   CONCLUSION ................................................................................................... 20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT TFGROUP'S RENEWED
MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR SUMMARY ADJUDICATION

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Aguilar v. Atlantic Richfield* (2001)
  25 Cal.4th 826 ...................................................................................................................6

*Brodsky v. Apple Inc.*,
  445 F. Supp. 3d 110 (N.D. Cal. 2020) ...........................................................................18

*Brookhouser v. State of California* (1992)
  10 Cal.App.4th 1665 .........................................................................................................7

*Chrisman v. City of Los Angeles* (2007)
  155 Cal.App.4th 29 .........................................................................................................18

*Crown Imps., LLC v. Superior Ct.*,
  223 Cal.App.4th 1395 (2014) .........................................................................................11

*Facebook, Inc. v. Power Ventures, Inc.* (9th Cir. 2016)
  844 F.3d 1058 ..................................................................................................................17

*IDX Systems Corp. v. Epic Systems Corp.* (7th Cir. 2002)
  285 F.3d 581 ....................................................................................................................14

*Imax Corp. v. Cinema Techs., Inc.* (9th Cir. 1998)
  152 F.3d 1161 ..................................................................................................................13

*In re Facebook Priv. Litig.* (N.D. Cal. 2011)
  791 F. Supp. 2d 705 .........................................................................................................17

*Ixchel Pharma, LLC v. Biogen, Inc.* (2020)
  9 Cal.5th 1130 .................................................................................................................10

*MAI Sys. Corp. v. Peak Comput., Inc.*
  991 F.2d 511 (9th Cir. 1993)...........................................................................................13

*Miller v. Department of Corrections* (2005)
  36 Cal.4th 445 ...................................................................................................................6

*Oasis W. Realty, LLC v. Goldman* (2011)
  51 Cal. 4th 811 ................................................................................................................19

*Padilla v. Rodas* (2008)
  160 Cal.App.4th 742 .........................................................................................................7

- iii -

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

**TABLE OF AUTHORITIES**
(continued)

Page

*People v. Hawkins* (2002)
    98 Cal. App. 4th 1428 ................................................................16

*People v. Tillotson* (2007)
    157 Cal. App. 4th 517 ...............................................................16

*Reeves v. Hanlon* (2004)
    33 Cal.4th 1140 .............................................................10, 11, 12

*Sargent Fletcher, Inc. v. Able Corp.* (2003)
    110 Cal.App.4th 1658 ........................................................12, 15

*Sunbelt Rentals, Inc. v. Victor* (N.D. Cal. 2014)
    43 F. Supp. 3d 1026 ...................................................................16

*United States v. Christensen* (9th Cir. 2015)
    828 F.3d 763 (*United States v. Christensen* (9th Cir. 2015) 828 F.3d 763,
    789[citing Cal. Penal Code § 502(c)(2)].).................................16

*Van Buren v. United States* (2021)
    141 S.Ct. 1648 ...........................................................................18

*Williams v. Facebook, Inc.* (N.D. Cal. 2018)
    384 F. Supp. 3d 1043 .................................................................17

*Winchester Mystery House, LLC v. Glob. Asylum, Inc.* (2012)
    210 Cal.App.4th 579 ........................................................10, 11, 12

**STATUTES**

Civ. Code, § 3426.1 ...........................................................12, 13, 14

Code Civ. Pro. § 437c ....................................................................6

Cal. Penal Code § 502(b)(1).........................................................16

Cal. Penal Code § 502(c)(3)...............................................16, 17, 18

California Computer Data Access and Fraud Act....................3, 16, 17, 18, 19

**OTHER AUTHORITIES**

CACI 1812 ...................................................................................17

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

The spin-off company of an automated frozen yogurt machine company alleges trade secrets designed to remotely control soft serve machines were misappropriated by a soft serve machine manufacturer, a soft serve machine owner, and a repair company that services the owner's machines. That repair company, TFGroup, LLC ("TFGroup") respectfully moves for summary judgment on all causes of action, or, in the alternative, for summary adjudication ("Motion"):

I.   **OVERVIEW**

The material facts of this case demonstrate no qualifying trade "secret" exists and that Plaintiff's co-founder himself improperly built a device based on an soft serve manufacturer's technology without the manufacturer's knowledge or consent. In essence, Plaintiff projects "skullduggery" by creating a form of 'spyware' to be used in the soft serve machine while claiming any effort by the soft serve manufacturer or a service provider to monitor and service *their customers' machines* to be an act of illegal spying and misappropriation.

"Frobot" was a company operated by Plaintiff's principal, Mr. Jeremy O'Sullivan. Frobot focused on developing automated frozen yogurt machines. Starting in 2013, Frobot through Mr. O'Sullivan mechanically modified a **Taylor Commercial Foodservice** (Defendant or "Taylor") soft serve machine to dispense frozen yogurt through an automated process.

Mr. O'Sullivan had an ongoing business relationship with Taylor spanning from before 2014 to further develop Frobot's automation process. This relationship was memorialized by a series of written, mutual non-disclosure agreements beginning in 2014 and spanning through 2017. From these NDAs, O'Sullivan agreed to safeguard access to Taylor's technology and proprietary trade information for a period of at least 5 years.

Mr. O'Sullivan later created a Frobot subsidiary spin-off, Kytch, Inc. (Plaintiff or "Kytch") in 2018. O'Sullivan did not disclose to Taylor his plans for repurposing the technology developed by Frobot with Taylor's cooperation for use on Taylor's own machines.

By June 2019, Taylor noted that Kytch was displaying Taylor machines at industry trade shows and communicated a cease and desist letter to Kytch regarding its trade dress concerns. By February 2020, Kytch was still an unsponsored device, but continued to market directly to McDonald's franchisees without approval, claiming its device would not affect Taylor warranties.

4884-9564-2007.7

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

ROPERS
MAJESKI
A Professional Corporation
Los Angeles

1    Starting in May 2020, a third-party repair company Taylor Fortune Group Tennessee LLC

2    ("TFG TN") commenced repair work on a McDonald's franchisee's (Defendant Tyler Gamble)

3    Taylor soft serve machine in which a Kytch device was installed.  Repairs to the machine were not

4    financially viable, so the machine remained in TFG TN's Memphis warehouse from May 2020 to

5    January 2021.  The soft serve machine was replaced, with the Kytch device transferred, and

6    returned for use to the franchisee.  During this down time, Kytch claims **TFGroup** (not TFG TN)

7    and Taylor improperly accessed and reverse engineered the Kytch device.

8    By November 2020, Taylor and Kytch openly disagreed as to the propriety of using a Kytch

9    device monitoring Taylor soft serve machines – with Kytch claiming Taylor's warnings to be false.

10    The Kytch "device" was improperly developed from Taylor technology without Taylor's

11    permission, undermining any claim that the device's technology can qualify as trade secrets.

12    **II.    <u>SUMMARY OF ARGUMENT</u>**

13    After three years of litigation, despite dense rhetorical outrage, Kytch has yet to disclose

14    requisite proof to support its claims of a conspiracy of 'trade secret theft' against Defendant

15    TFGroup, LLC, against McDonald's franchisee Defendant Tyler Gamble ("**Gamble**") or against

16    the soft serve machine manufacturer, Defendant Taylor.  Kytch's claims, in large part, should be

17    mitigated by the doctrine of unclean hands, but is not the focus of this particular Motion.

18    The foundation for Plaintiff's products and services – "the Kytch Solution" – is an ████

19    ███████████████████████████████████████████████████████████████████████████

20    ████    Kytch leveraged Frobot's, its parent company, prior relationship with Taylor by

21    remaining silent on its early development and use of machine data from Taylor soft serve ice cream

22    machines intended for use for the original Frobot frozen yogurt venture. The Kytch device was

23    designed to be an interim monitoring system which Kytch hoped would – unbeknownst to Taylor

24    – eventually replace the existing Taylor-approved repair systems with its own soft serve repair

25    services. But by omission and by distorting Kytch's relationship with Taylor to potential customers,

26    Kytch's suppresses that its device is in essence a derivative product of Taylor technology.

27    <u>Important for this particular Motion</u>: TFGroup was and is not involved in any conduct

28    remotely sufficient to support any claim in this action and is therefore entitled to summary

- 2 -

1  judgement. As will be discussed, Kytch cannot offer proof against TFGroup for: (1) Tortious

2  Interference of Contract; (2) Misappropriation of Trade Secrets; (3) Intentional Interference with

3  Business Expectancy; (4) Violation of the California Computer Data Access and Fraud Act; or

4  (5) Breach of Contract.  Despite eye-popping allegations, there is no actual evidence of nefarious

5  corporate espionage or TFGroup's involvement in any conspiracy to misappropriate trade secrets.

6  In the final analysis, Kytch's suit is a not-so-veiled anticompetitive effort to prevent Taylor to

7  monitor *its own machines* with natively-created monitoring devices.

8  **III.   CONTEXTUAL BACKGROUND**

9     TFGroup is a Louisiana limited liability company that deals in foodservice equipment sales,

10  services, and distributing parts.  (*See*, Declaration of Matthew Blaine Martin [ISO MSJ] ("Martin

11  Decl."), ¶¶ 2, 6.)  TFGroup is an independent distributor and service provider of Taylor Company's

12  frozen beverage equipment, frozen dessert equipment and other equipment (or the "Taylor

13  Equipment" or "Taylor Machines").  (Martin Decl., ¶¶ 2, 16.)  From its inception in 2012 until

14  April 2021, TFGroup's area of operation included Louisiana and some parts of Mississippi.  (Martin

15  Decl., ¶ 4.)  Prior to April 2021, <u>another company</u>, TFG TN's, had an area of operation within

16  Tennessee, Arkansas and some parts of Mississippi.  (Martin Decl., ¶ 5.)

17     **A.    TFGroup's Limited Role Servicing Gamble's Taylor Machines**

18     Pertinent to Plaintiff's Second Amended Complaint ("SAC"), including all of 2020 and

19  through April 15, 2021, franchisee Gamble's McDonald's locations were serviced exclusively by

20  TFG TN or a third-party provider.  (Martin Decl. ¶¶ 24 - 27.)  Yet, TFG TN's servicing of Gamble's

21  McDonald's locations – including repairing broken soft serve machines and troubleshooting a novel

22  "error code" – has oddly led to a suit against TFGroup.  (Martin Decl. ¶¶ 29 - 83.)  While providing

23  similar service, TFGroup and TFG TN are fully separate entities.  (Martin Decl.  ¶¶ 4 – 18.)  At all

24  times described in the SAC, Gamble was TFG TN's exclusive customer and TFGroup was not

25  involved in any service to Gamble, including at Gamble's Brownsville, Stonebrook, and Corinth

26  locations.  (Martin Decl. ¶¶ 24 – 25.)

27     **1.    *No Proof that TFGroup Accessed a "Protected" Device***

28     <u>Neither TFGroup nor TFG TN have ever had any direct interactions with Plaintiff.</u>  (Martin

- 3 -

ROPERS MAJESKI
A Professional Corporation
Los Angeles

1   Decl. ¶¶ 19 - 23.)  Neither TFGroup nor TFG TN have ever attempted to do business with Plaintiff

2   or procure goods or services from Plaintiff.  (*Id.*)  After previous interactions in 2017 with one of

3   Plaintiff's founders, Mr. O'Sullivan, neither <u>TFGroup nor TFG TN had any further communication</u>

4   <u>with Mr. O'Sullivan, including anything regarding Kytch, the Kytch Device or its platform</u>.  (*Id.*)

5   Mr. Martin did observe a Kytch presentation once at an open conference in October 2019.  (*Id.*)

6   From attending this conference, Mr. Martin understood that the Kytch Device was designed to

7   assist Taylor Equipment owners keep their Taylor Equipment operational, including prompting

8   service when the device gave a notification.  (*Id.*).

9       Pertinent here, on various occasions, Gamble contacted TFG TN to provide repair service

10  for Taylor Equipment, some of which had Kytch Devices installed.  (Martin Decl. ¶¶ 27 - 83.)

11  However, <u>no evidence exists to demonstrate that either TFG TN or TFGroup ever accessed a Kytch</u>

12  <u>Device to provide service</u>.  (Martin Decl. ¶ 28.)  Rather, TFG TN always provided its services in

13  the same fashion, regardless of the presence of a Kytch Device, first by providing phone service,

14  and then a visit to the machine if necessary.  (Martin Decl. ¶¶ 29 - 81.)

15      In May 2020, after attempting several in-store repairs on the Taylor Machine at Gamble's

16  Brownsville, Tennessee location, TFG TN took possession of a Taylor Machine that had a Kytch

17  Device installed.  (Martin Decl., ¶ 23.)  TFG TN followed its standard practice to provide one of

18  its loaner Taylor Machines to minimize down time.  (*Id.*)  TFG TN expended many hours

19  attempting to repair Gamble's Taylor Machine.  (*Id.* at ¶ 24 - 56; Declaration of Benjamin Rhodes

20  [ISO MSJ] ("Rhodes Decl."), ¶¶ 9-29; Declaration of Scott Johnson [ISO MSJ] ("Johnson Decl."),

21  ¶ 8 - 19; Declaration of Tim Bradley [ISO MSJ] ("Bradley Decl."), ¶¶ 7-16.)

22      However, after months of servicing, TFG TN determined the machine would require costly

23  repairs and Gamble decided to replace the machine.  (Martin Decl., ¶¶ 24-25.)  Gamble requested

24  TFG TN transfer the Kytch Device to the replacement Taylor Machine.  (Martin Decl., ¶ 25.)  TFG

25  TN did so, a process that took less than five minutes.  (Martin Decl., ¶ 25; Johnson Decl. ¶14.)

26  TFG TN did nothing else with the Kytch Device.  (*Id.*)  There was no attempt to disassemble,

27  access, download, reverse engineer, reproduce, distribute, photograph, collect information, connect

28  to an external device or otherwise take any other action with regard to the Kytch Device.  (Martin

- 4 -

4884-9564-2007.7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT TFGROUP'S RENEWED
MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR SUMMARY ADJUDICATION

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

Decl., ¶¶ 25, 31, 33; Rhodes Decl., ¶¶ 27 - 29; Johnson Decl., ¶¶ 15; Bradley Decl., ¶¶ 15-16.)

### 2. *TFGroup's Maintenance Service did not Utilize a Kytch Device*

Maintenance requests for two other Gamble locations – Stonebrook and Corinth – informed TFG TN that a Kytch Device had provided Gamble with information. (Martin Decl., ¶¶ 59 - 83.) As TFG TN was unfamiliar with some of these notifications, TFG TN requested access to the Kytch Platform to see if there was pertinent information that could assist in servicing Gamble's equipment. (*Id*. at ¶¶ 59 – 72.) TFG TN believed that Gamble was authorized to allow access to the Kytch Platform to service his Taylor Machines. (*Id*. at ¶ 83.) TFG TN did not obtain new information from the Kytch Platform to aid in its service that could not otherwise be obtained from the Taylor Machine through standard phone service. (*Id*. at ¶¶ 71-79.) TFG TN utilized its standard process to service Gamble's equipment. (*Id*. at ¶¶ 59 – 79. .) Again, TFG TN did **not** use the Kytch Device to provide service Gamble's Taylor Equipment. (*Id*. at ¶¶ 72, 89.)

Since January 17, 2021, neither TFGroup nor TFG TN has had possession, custody, or control of a Kytch Device or access to non-public portions of Kytch's website. (Martin Decl. ¶ 84.) TFGroup and TFG TN were never aware of or had reason to know of any Kytch and Gamble's contractual agreements. (*Id*. at ¶ 84 - 85.) Lastly, neither TFGroup nor TFG TN ever received Gamble's Kytch login credentials to access a Kytch Platform. (*Id*. at ¶¶ 67, 84, 93.)

The foregoing in mind, no disputed material fact exists to indicate TFGroup made any effort to misappropriate an identifiable trade secret[1].

### B. <u>Procedural History</u>

This Action commenced in May 2021. On March 4, 2022, the Court denied Kytch's motion for a preliminary injunction against TFGroup, holding that "Kytch lacks evidence that either TFGroup or Taylor acquired a Kytch trade secret." (RJN ¶ 3, Exh. 50 at p. 5.) In particular, the

---

[1] Material to this Motion, respectfully, the Court should be aware that neither TFGroup nor TFG TN *ever communicated with Plaintiff, conducted business with Plaintiff, solicited business from Plaintiff, advertised or promoted goods or services to Plaintiff, or sought to distribute, service or otherwise conduct business with a device created by Plaintiff.* (Martin Decl., ¶¶ 19 - 23.) Neither TFGroup nor TFG TN ever participated in presentations or focus groups concerning Kytch, including an alleged video conference meeting on June 23, 2020. *Id*., ¶ 87. Neither TFGroup nor TFG TN ever made presentations to any person or entity, including Taylor, concerning Kytch or its products. (*Id*.) As a matter of reality, all TFG TN has done, for which TFGroup has been accused of (by association) is provide dedicated maintenance and service to Gamble's Taylor Machines.

- 5 -

4884-9564-2007.7

ROPERS MAJESKI

A Professional Corporation
Los Angeles

1    Court found Kytch "lacks evidence that TFGroup acquired anything that could be considered a

2    trade secret or improperly disclosed information that could be a trade secret to Taylor," (*Id.* at 16.)

3    On September 6, 2022, Kytch filed its SAC.  Kytch thereafter disclosed an operative "Third

4    Amended Identification of Trade Secrets" on December 29, 2022.

5    **IV.    ARGUMENT**

6        **A.    Standard for Summary Judgment & TFG's Finite Role.**

7        Summary judgment should be granted "if all the papers submitted show that there is no

8    triable issue as to any material fact" such that "the moving party is entitled to judgment as a matter

9    of law." (Code Civ. Proc., § 437c(c).)  Summary adjudication shall be granted when there is no

10   triable issue of material fact, and the moving party is entitled to adjudication of an entire cause of

11   action as a matter of law.  (Code Civ. Proc., § 437c(f)(1).)  Defendants "bear the burden of showing

12   the court that the plaintiff has not established, and cannot reasonably expect to establish, a prima

13   facie case."  (*Miller v. Department of Corrections* (2005) 36 Cal.4th 445, 460.)  Moreover, a

14   defendant moving for summary judgment or adjudication does not need to "conclusively negate an

15   element of the plaintiff's cause of action" they only need to show that an element cannot be

16   established or there is a complete defense.  (*Aguilar v. Atlantic Richfield* (2001) 25 Cal.4th 826,

17   853.)  The burden then shifts to the plaintiff to show the existence of a triable issue, which cannot

18   be mere allegations or denials.  The plaintiff needs to present "specific facts showing that a triable

19   issue of material fact exists as to that cause of action."  (Code Civ. Pro. § 437c(p)(2).)

20       **B.    TFGroup Seeks Summary Judgment or, Alternatively, Summary**
21       **Adjudication.**

22       Due to an absolute lack of admissible evidence demonstrating any degree of liability,

23   TFGroup is respectfully entitled to summary judgment as to the entirety of Plaintiff's SAC, or, in

24   the alternative, entitled to summary adjudication as to Plaintiff's respective Second, Third, Seventh

25   and/or Ninth Causes of Action.

26       **C.    TFGroup's Lack of Involvement Is Not Actionable.**

27       TFGroup is a service and repair company for ice cream machines, that is all.  Simply

28   because a Kytch device was attached to a Taylor machine during a service cycle does not equate

- 6 -

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1   to TFGroup participating in some vast conspiracy.  "It is axiomatic that a defendant cannot be

2   held liable in tort for an injury he or she did not cause."  (*Brookhouser v. State of California*

3   (1992) 10 Cal.App.4th 1665, 1677; *Padilla v. Rodas* (2008) 160 Cal.App.4th 742, 752 ("To

4   establish the element of actual causation, it must be shown that the defendant's act or omission

5   was a substantial factor in bringing about the injury.")(citation omitted).)  TFGroup did not

6   "cause anything" but render service to Taylor **soft serve** machines **after April 2021**.

### 1.     *TFGroup's Was Not Involved in Any Maintenance of Taylor Machines*

8   Summary judgment should be entered in favor of TFGroup where the alleged conduct

9   giving rise to Plaintiff's claims was performed, if at all, by another wholly separate, third-party

10   entity, here TFG TN.  Plaintiff cannot maintain claims against TFGroup if acts or omissions were

11   allegedly caused by another entity.  TFGroup and TFG TN are **separate** legal entities.

12   TFGroup is a foodservice equipment sales, service, and parts distributor that distributes

13   and/or services equipment produced by independent manufacturers, including Defendant, Taylor.

14   (*See*, concurrently filed Statement of Undisputed Material Fact "UMF" 1.)  TFGroup is a Louisiana

15   limited liability company that was formed on or around September 4, 2012, with its headquarters

16   and principal place of business in Louisiana. UMF 2.)  Mr. Matthew Blaine Martin is a managing

17   member of TFGroup and the Operations Manager who oversees all of the equipment sales, parts

18   sales, and service activities of TFGroup.  (Martin Decl. ¶ 1.)

19   In contrast, TFG TN is a Louisiana limited liability company formed on or around

20   December 8, 2009, *roughly three years before* TFGroup.  (UMF 2.)  TFG TN's headquarters and

21   principal place of business is located in a different State, **Tennessee**.  (UMF 2.)  Mr. Martin is a

22   managing member of TFG TN and serves as its Operations Manager, overseeing its sales and

23   service activities.  (Martin Decl. ¶ 5.)  Despite similar sounding names, TFGroup and TFG TN are

24   independent service providers for the Taylor Company's frozen beverage equipment, frozen dessert

25   equipment, and other equipment ("Taylor Equipment" or "Taylor Machines").  (UMF 8.)

26   During the relevant period of time, including before 2019 and through April 2021, TFGroup

27   and TFG TN had separate Distributor Agreements with Taylor Company.  (UMF 1.)  Under these

28   respective agreements, TFGroup and TFG TN had separate, exclusive territories in which each was

*ROPERS MAJESKI*

A Professional Corporation
Los Angeles

- 7 -

the only equipment distributor and warranty service provider authorized by Taylor.  (UMF 1.)

At all times relevant here, including before 2019 and through April 2021, TFGroup's exclusive territory as the authorized distributor for the Taylor Equipment included Louisiana and Southern Mississippi. (UMF 1.) On the other hand, during this time, TFG TN's exclusive territory as the authorized distributor for the Taylor Equipment included parts of Northern Mississippi not covered by TFGroup, some counties within Arkansas, and Central and Western Tennessee. (UMF 1.) TFGroup and TFG TN maintain separate physical locations. (UMF 2.) They own or lease separate tools, equipment, and vehicles and maintain separate inventories of parts. (UMF 2.) In addition to separate territories, TFGroup and TFG TN are not parent/subsidiary entities and neither entity holds an ownership interest in the other. (UMF 2.) Since their inception, they have maintained separate finances, with separate federal tax identification numbers, bank accounts, accounts payable, and separate payrolls for their own, separate employees. (UMF 2.) TFGroup's operations are managed by Nick Shelton who is employed and paid exclusively by TFGroup. (UMF 3.) In comparison, TFG TN's operations are managed by Dhari Alqiasi who is employed and paid exclusively by TFG TN.  (*Id.*)

TFGroup and TFG TN separately invoice their own exclusive set of customers, which are separated primarily by location, and deposit payments into separate bank accounts.  (UMF 2.)  They generate their own profits and losses and maintain separate accounting records.  (UMF 2.)

### 2.    *TFG TN's Service of Taylor Machines Was Standard and Routine*

The foregoing considered, McDonald's Franchisee Gamble was the exclusive customer of TFG TN.  (UMF 4, 34.)  It is believed that Gamble owns and operates McDonald's restaurants in Brownsville, Tennessee; Jackson, Tennessee (including Stonebrook); Corinth, Mississippi; Bells, Tennessee, and other locations in Tennessee (the "Gamble Locations").  (UMF 4.)  Plaintiff's contentions arise from services performed on Gamble's locations for Taylor Equipment used at **(a)** Brownsville, Tennessee, **(b)** Jackson, Tennessee (including Stonebrook, and **(c)** Corinth, Mississippi (at times, "Gamble Locations").  (SAC ¶¶ 23; 183 – 91; 198 – 202, 205; Exh. 1.)  Given these locations within exclusive territories prior to April 20, 2021, services were provided by either TFG TN or another third-party service provider.  (UMF 4.)

- 8 -

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

ROPERS MAJESKI

M A J E S K I

A Professional Corporation
Los Angeles

Again, the defendant here, TFGroup, <u>never</u> distributed products or provided services to any of the Gamble Locations before April 16, 2021.  (UMF 4.)  More specifically, TFGroup did not provide services to Taylor Equipment at the Gamble Locations *until* April 20, 2021 – a time period ***after*** the operative allegations in the SAC.  (UMF 4 – 5.)  Prior to 2020 and continuing through at least 2021, Gamble made service requests to TFG TN through various methods, including phone calls and text messages.  (UMF 5.)

On several days between May 19 and 23, 2020, Gamble contacted Mr. Martin and TFG TN employee Ben Rhodes via text messages and informed them the C602 Taylor Machine at the Gamble Location in Brownsville, Tennessee (the "**Original Brownsville Unit**") was malfunctioning.  (UMF 6.)  On May 22 and 23, 2020, TFG TN service technicians examined the Original Brownsville Unit and determined that it likely needed a new compressor.  (UMF 6.)  Because TFG TN did not have the part in stock to perform the necessary repairs, TFG TN provided the Brownsville location with one of TFG TN's temporary replacement unit (a "Loaner Brownsville Unit") and took the Original Brownsville Unit to its Memphis, Tennessee warehouse.  (UMF 6.)

TFG TN provided Gamble with a quote for the repair of the Original Brownsville Unit but he decided to replace it with another C602 Taylor Machine that was in use at the time at another McDonald's location (a "**Replacement Brownsville Unit**").  (UMF 6.)  When the Replacement Brownsville Unit became available, TFG TN cleaned, repaired, and installed the unit at Gamble's Brownsville location on January 14, 2021.  (UMF 6.)   All of the work related to Gamble's Brownville Taylor equipment was performed by TFG TN's employees and is reflected on work orders and invoices issued by "TFG TN LLC."  (UMF 7.)

Gamble also contacted TFG TN on or about May 28, 2020 and requested service on his C602 Taylor Machine at his Jackson, Tennessee ("**Stonebrook**") location.  Next, Gamble contacted TFG TN on or about August 27, 2020 and requested service on the Taylor C602 Machine at his **Corinth**, Mississippi location.  (UMF 8 – 9.)  The issues with the Taylor Equipment at Gamble's Stonebrook and Corinth locations were resolved by TFG TN employees following the requests for service.  (UMF 8 – 9.)  In the course of these repair services, Plaintiff contends that Mr. Martin accessed information through its Kytch website *without authorization*.  (*See* SAC ¶¶ 185 - 190.)

- 9 -

4884-9564-2007.7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT TFGROUP'S RENEWED
MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR SUMMARY ADJUDICATION

1   <u>No proof of this exists</u>.  Rather, the undisputed material facts demonstrate that Mr. Martin

2   accessed information through Kytch's website on behalf of TFG TN to provide service *at Gamble's*

3   *request* as invited by Kytch.  (UMF 10.)  <u>Such directed access itself is not improper</u> – Kytch cannot

4   demonstrate legal impropriety – and Mr. Martin did not access or retrieve information beyond what

5   was needed to address the service requested.  (UMF 10, 23.)  Kytch cannot demonstrate otherwise.

6   In sum, the Gamble Locations were TFG TN's exclusive customers and the work performed

7   at those locations giving rise to Plaintiff's claims was performed by TFG TN, not TFGroup.  Any

8   harm Plaintiff complains of, should it even exist (it does not) was not caused by acts or breaches of

9   any agreement by TFGroup.  TFGroup is entitled to summary judgment as a matter of law.

10      **D.      <u>No Proof Exists of Tortious Interference of Contract with a Franchisee.</u>**

11      Kytch cannot demonstrate TFGroup had knowledge of any terms or agreements between

12   Gamble and Plaintiff, nor that TFGroup engaged in an independently wrongful act to induce breach

13   or a disruption of the contractual relationship[2].  Summary adjudication on this claim is appropriate.

14          **1.      *TFGroup Unaware of a Contract Between Plaintiff and Gamble.***

15      Plaintiff lacks evidence that any franchisee disclosed terms of a contractual relationship

16   between them and Kytch. This is significant. (*See Winchester Mystery House, LLC v. Glob. Asylum,*

17   *Inc.*, (2012) 210 Cal.App.4th 579, 596-98 ("*Winchester*") [affirming summary adjudication where

18   defendant was not aware that a contract existed between plaintiff and third parties.])

19      TFGroup's only experience with Kytch was witnessing a presentation made by Kytch at a

20   large conference open to McDonald's franchisees and industry third parties.  (UMF 11.)  TFGroup

21   has never directly interacted or done business with Kytch.  (UMF 11.)  Alternatively, even if Kytch

22   somehow implies TFGroup had tangential knowledge of the Terms of Service (it did not), Kytch's

23   Terms of Service explicitly incorporate other separate agreements (a Kytch End User License

24   Agreement, a Kytch Trial Agreement, a Kytch Privacy Policy, and a Kytch Privacy Statement) for

25

26   [2]   To prevail on a cause of action for tortious interference with contract, a plaintiff must demonstrate (1)
     the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that
27   contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual
     relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. (*Reeves*
28   *v. Hanlon* (2004) 33 Cal.4th 1140, 1148.)  Further, a plaintiff must allege that the defendant engaged in an
     "independently wrongful act."  (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1148.)

- 10 -

4884-9564-2007.7

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1   which TFGroup had <u>no</u> knowledge of or access to.  (UMF 11.)  In short, no proof exists to

2   demonstrate TFGroup or TFG TN had knowledge of any complete terms or agreements between

3   Gamble – or any other McDonald's Franchise Operator – with Kytch.  Summary Judgment is

4   appropriate.

5                **2.        *No Proof Exists That TFGroup Unlawfully Induced Gamble to Breach.***

6           A prospective plaintiff must also demonstrate that a defendant's interference, if there is

7   interference, was itself independently unlawful, or "proscribed by some constitutional, statutory,

8   regulatory, common law, or other determinable legal standard." (*Winchester*, 210 Cal.App.4th at

9   596.)  "[T]he alleged interference must have been wrongful by some measure beyond the fact of

10  the interference itself." (*Crown Imps., LLC v. Superior Ct.*, 223 Cal.App.4th 1395, 1404 (2014).)

11  Here, even assuming knowledge of agreement terms with Franchise Operators (there was not ),

12  there is equally no evidence TFG TN or TFGroup took any action that was "wrongful by some

13  measure beyond the fact of the interference itself."  Rather, all evidence confirms just the opposite,

14  that TFG TN's (and/or TFGroup's) interactions with Gamble were performed to provide service to

15  malfunctioning Taylor ice cream machines, as requested by Gamble.  (UMF 12 – 20, 23.)  Routine

16  maintenance and repair service of equipment is not improper conduct "proscribed by some

17  constitutional, statutory, regulatory, common law, or other determinable legal standard."

18  (*Winchester*, 210 Cal.App.4th at 596.)  And TFG TN's  (and/or TFGroup's) service to Gamble was

19  not "intentional acts designed to induce a breach or disruption of the contractual relationship"

20  between Kytch and Gamble.  (*Reeves,* 33 Cal.4th at 1148.)  Of note, this Court has previously

21  concluded that Plaintiff lacked evidence to support such an argument when denying Kytch's motion

22  for preliminary injunction.  (UMF 23; RJN ¶ 3, Exh. 50 at p. 16.)

23          <u>Correlation is not causation</u>: Kytch simply speculates that TFGroup "reverse engineered"

24  its device.  (SAC ¶¶ 61, 202, 511 – 12, 17.)  For example, Kytch claims it discovered when Gamble

25  returned a Kytch device previously attached to an Original Brownsville Unit, the data logs for the

26  device were allegedly manually deleted off log file entries between June 21, 2020 and January 14,

27  2021. (UMF 16.) Kytch believes someone erased entries by connecting the device to some external

28  system and then "highlighting the section of the log file containing the information sought to be

                                                    - 11 -

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1  destroyed [and] pressing the delete button." (UMF 16.) No witness or forensic expert evidence

2  exists to support such a contention. (*See*, e.g., *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110

3  Cal.App.4th 1658, 1673: "plaintiffs in trade secret cases usually have access to technical experts

4  who can interpret the information acquired in discovery.") The only "fact" Kytch can assert against

5  TFGroup (or TFG TN) is a one-time transfer of a device from one of Gamble's Taylor C602

6  Machines to a replacement machine, a process that took less than 5 minutes. (UMF 16, 27.)

7  Otherwise, the Kytch Device was left untouched, unconnected to the internet, and was never

8  connected to anything other than the Brownsville C602 machines themselves. (UMF 14.) <u>No

9  forensic analysis has been made by Kytch to demonstrate that TFGroup (or TFG TN) "reverse

10  engineered" Plaintiff's devices or services, obtained an identifiable trade secret, or did anything

11  else with Plaintiff's devices,</u> including evidence TFGroup (or TFG TN) was responsible for

12  apparent 'deleted information' from data logs. (RJN ¶ 3, Exh. 50 at p. 15; Isaacson Decl. ¶ 2, Exh.

13  51, AmSROG 1 at p. 142:25 – 43:3; 146:11 – 49:8; SAC ¶¶ 190 – 91.) Therefore, TFGroup (and

14  TFG TN's) routine repair services cannot now be mischaracterized as some constitutional,

15  statutory, regulatory, common law, or other determinable legal standard" or "designed to induce a

16  breach or disruption of the contractual relationship." (*Winchester*, 210 Cal.App.4th at 596; *Reeves*,

17  33 Cal.4th at 1148.)

18        **3.**     ***No Evidence Exists of Actual Disruption of any Contractual Relationship.***

19        Kytch not only lacks evidence of wrongful conduct, but also lacks evidence any conduct by

20  TFGroup "caused" an actual "disruption" or breach of an economic or contractual relationship

21  between McDonald's Owners/Operators and Kytch. (UMF 21 – 23.) For instance, Kytch cannot

22  offer any degree of proof that TFGroup acquired and used "proprietary information" to aid Kytch's

23  competitors to develop a competing product. (UMF 23.) No evidence of disruption exists or can

24  be anticipated. Summary adjudication is appropriate.

25        **E.**     <u>**TFGroup Has Not Misappropriated an Identifiable Kytch Trade Secret.**</u>

26        Kytch must demonstrate, *inter alia*, that TFGroup misappropriated information qualifying as

27  trade secret. (Cal. Civ. Code §3426.1(b), (d).) Misappropriation occurs, generally, through

28  disclosure or use of a trade secret by one who: (1) improperly acquired a trade secret, (2) knowingly

- 12 -

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1  discloses or uses trade secret information improperly, or (3) had reason to know trade secret

2  information had been obtained by accident or mistake.   Kytch lacks proof of any *and all* such

3  requirements.

4      **1.**      ***Kytch Lacks Evidence to Establish the Existence of a Trade Secret.***

5      First and foremost, a "trade secret" is: "information, including a formula, pattern,

6  compilation, program, device, method, technique, or process, that: (1) derives independent

7  economic value, actual or potential, from not being generally known to the public or to other

8  persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts

9  that are reasonable under the circumstances to maintain its secrecy."  (Civ. Code § 3426.1(d).)

10     This in mind, Kytch alleges its trade secrets are composed of: ███████████

11  █████████████████████████████████████████████████

12  █████████████████████████████████████████████████

13  █████████████████████████████████████████████████

14  █████████████████████████████████████████████████

15  █████████████████████████████████████████████████

16  █████████████████████████████████████████████████

17  ███████████████████████████████████  ("Third Amended Trade

18  Secret Identification", § 2019.210, pp. 2:19-27-3:1-8.)(cumulatively "Identification").

19     Much of the foregoing is simply opaque "generalities."  It is Kytch's burden to sufficiently

20  identify a trade secret and demonstrate they actually exist.  (*MAI Sys. Corp. v. Peak Comput., Inc*.,

21  991 F.2d 511, 522 (9th Cir. 1993).)  "The plaintiff 'should describe the subject matter of the trade

22  secret with ***sufficient particularity*** to separate it from matters of general knowledge in the trade or

23  of special knowledge of those persons . . . skilled in the trade.'"  (*Imax Corp. v. Cinema Techs.,*

24  *Inc.* (9th Cir. 1998) 152 F.3d 1161, 1164–65 (bold added)(citation omitted).)  When a party fails to

25  identify its trade secrets with particularity, summary judgment is appropriate.  (*Id.* at 1162.)

26     Yet, Kytch's "Identification" claims ████████████████████████

27  ██████████████████████████████████████████ (UMF

28  24.)  Plaintiff's Identification claims ███████████ (*See* §4.2-4.3), but becomes circular

- 13 -

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

by also referring to ████████████████████████ (*See*, *e.g.* §§4.3.19, 4.3.21, 4.3.22; UMF 24.)  Specifically, claiming ████████ or "data-entry screens, are exceedingly hard to call trade secrets: things that any user or passer-by sees at a glance are 'readily ascertainable by proper means.'"  (*IDX Systems Corp. v. Epic Systems Corp.* (7th Cir. 2002) 285 F.3d 581, 584.)  Kytch then claims that ████████████ constitutes a trade secret individually and collectively.  No evidence of safeguards regarding such ████████ exist, much less how or whether TFGroup had nefariously bypassed such safeguards.  As this Court long ago determined by way of its Order regarding Kytch's Motion for Preliminary Injunction, "individual text alerts are not trade secrets, though a compilation of them might be considered one."  (RJN ¶ 3, Exh. 50; March 4, 2022 Order at p. 16.).  More to the point here, no proof of further definition exists to qualify "what compilation" (should it even be identified or claimed) as a bona fide secret, much less how any such compilation was even accessed or acquired by TFGroup.

**2.   *Kytch Lacks Evidence that TFGroup Misappropriated any Trade Secret.***

Kytch's SAC alleges an entire set of manners by which TFGroup allegedly misappropriated[3] its trade secrets, including: "(1) viewing Confidential Information and trade secrets on the Kytch Solution Platform during the June 23, 2020 Zoom meeting with Gamble and Taylor; (2) repeatedly interviewing Gamble and other Kytch customers during regularly schedule focus group sessions to obtain proprietary insight into Kytch's confidential activities and findings; and (3) directing Tyler Gamble and other Kytch customers to use Kytch's Confidential Information to help Taylor and PHD develop its competing product."  (SAC, ¶ 445.)

Each of Plaintiff's contentions have no evidentiary basis, and do not even apply to TFGroup.

---

[3]   "Misappropriation" means: (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: (A) Used improper means to acquire knowledge of the trade secret; or (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. (Civ. Code, § 3426.1.) "Improper means" typically includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. (Civ. Code § 3426.1(a).) Of note, "reverse engineering or independent derivation shall not be considered improper means." (*Id.*)

- 14 -

ROPERS MAJESKI

A Professional Corporation
Los Angeles

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1    First, neither TFGroup nor TFG TN ever attended the Zoom conference on June 23, 2020. (UMF

2    25.)   Second, neither TFGroup nor TFG TN attended any focus group sessions "to obtain

3    proprietary insight into Kytch's confidential activities and findings." (UMF 25.)  Neither TFGroup

4    nor TFG TN gave nor attended any presentations or discussions with representatives from Taylor

5    and/or McDonald's about Kytch or its products and services.  (UMF 25.)  In short, Kytch merely

6    speculates that TFGroup, as a service repair company reversed engineered its device.

7    　　　Plaintiff claims it discovered that when Gamble returned the Kytch Device that was

8    previously attached to the Brownsville C602, the data logs for the Kytch Device was allegedly

9    manually deleted of log file entries between June 21, 2020 and January 14, 2021.  (Isaacson Decl.

10   ¶ 2, Exh. 51 at p. 142:25 – 43:3, 146:11 – 49:8.)  Plaintiff believes the only explanation for this is

11   someone erased the entry by connecting the Kytch Device to some external system and then

12   "highlighting the section of the log file containing the information sought to be destroyed [and]

13   pressing the delete button."  (Isaacson Decl. ¶ 2, Exh. 51 at p. 146:23 – 47:2.)

14   　　　Again, no forensic effort directly exists to verify Kytch's layered suspicions.  (*See* RJN ¶ 3,

15   Exh. 50; March 4, 2022 Order at p. 15; SAC ¶¶ 190 – 91; *e.g., Sargent Fletcher,* 110 Cal.App.4th

16   at 1673.)  The only interaction with an actual Kytch Device that Plaintiff can assert against TFGroup

17   or TFG TN is a one-time transfer of the device from one Gamble C602 unit to another Replacement

18   C602 unit, a process that took less than five minutes.  (UMF 26 – 27.)  Otherwise, the only Kytch

19   Device ever in TFG TN's possession was left untouched, unconnected to the internet, and never

20   connected to anything other than the Brownsville C602 machines.  (UMF 26.)  Likewise, the limited

21   interactions Mr. Martin, TFG TN, and/or TFGroup had with the kytch.com account created by Mr.

22   Martin are inadequate to demonstrate trade secret misappropriation.  (UMF 28.)  Such conduct was

23   limited to providing service to Gamble's equipment and did not reverse engineering or

24   misappropriate anything from Plaintiff.  (UMF 28 – 29.)  As the Court noted previously, evidence

25   of text messages or the limited access to kytch.com do not raise to the level of trade secret

26   misappropriation.  (RJN ¶ 3, Exh. 50; March 4, 2022 Order at p. 16.)

27   　　　Nothing has changed since the Court's March 2022 Order.  Kytch possesses no evidence

28   that TFGroup or TFG TN ever reverse engineered Plaintiff's devices or services, obtained a trade

- 15 -

4884-9564-2007.7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT TFGROUP'S RENEWED
MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR SUMMARY ADJUDICATION

1   secret, or did anything else with Plaintiff's devices and services – to include evidence that TFGroup

2   or TFG TN actually deleted information from any alleged data logs.  Since Plaintiff lacks requisite

3   proof that TFGroup misappropriated a valid trade secret, TFGroup is entitled to judgment on

4   Plaintiff's third claim.

5   **F.    No Proof of a Violation of the Computer Data Access and Fraud Act.**

6       Plaintiff's Seventh Cause of Action is based on an alleged violation of the California

7   Computer Data Access and Fraud Act ("CDAFA"), including California Penal Code §502(c)(1, 2,

8   3, 6, and 7)[4].  The SAC claims that TFGroup "took multiple specific acts to access the computer

9   networks and data of Kytch without permission".  (SAC ¶ 494.)  In the present case, Kytch bears

10  the burden to demonstrate TFGroup's conduct was knowing and without permission.  Yet, after

11  years of discovery propounded, Kytch is unable.

12  **1.    *No Knowing Access "Without Permission" of Computer Systems*.**

13      Definition of "access" within section 502 is "to gain entry to, instruct, cause input to, . . . or

14  communicate with, the . . . memory function resources of a computer, computer system, or

15  computer network." (Cal. Penal Code § 502(b)(1).)  The focus of an unlawful access centers around

16  whether "the person 'without permission takes, copies, or makes use of' data on the computer. A

17  plain reading of the statute demonstrates that its focus is on unauthorized taking or use of

18  information." (*United States v. Christensen* (9th Cir. 2015) 828 F.3d 763, 789 (*United States v.*

19  *Christensen* (9th Cir. 2015) 828 F.3d 763, 789[citing Cal. Penal Code § 502(c)(2)].)  Kytch cannot

20  demonstrate that TFGroup knowingly accessed Plaintiff's computer systems without permission or

21  wrongfully take Plaintiff's data in violation of California Penal Code Section 502[5].  As such,

22  ─────────────────

23  [4]  To bring a claim under the CDAFA, the "three elements necessary to establish liability [are]: (1) the
defendant knowingly accesses a computer system; and (2) the defendant without permission alters, damages,
deletes, destroys, or otherwise uses the data obtained from such access; and (3) the defendant alters,

24  damages, deletes, destroys, or otherwise uses the data obtained from such access for either the purpose of
devising or executing a scheme or artifice to defraud, deceive, or extort, or for the purpose of wrongfully
controlling or obtaining money, property, or data." (*People v. Tillotson* (2007) 157 Cal. App. 4th 517, 538.)

25  [5]  In *People v. Hawkins*, the Court of Appeal explained that "knowingly" mens rea for Penal Code section
502 applies to the entire offense.  (*People v. Hawkins* (2002) 98 Cal. App. 4th 1428, 1439.)  A defendant

26  must have "awareness of the facts" or act with "awareness, deliberateness, or intention." (*Id.* at 1439.)  In
other words, **one cannot violate section 502 "by accident"** (bold added). Section 502 also protects against

27  acts "without permission" when accessing computer systems, computers, or networks.  (Cal. Penal Code §
502(c).)  Courts defined this as circumventing "technical or code-based barriers in place to restrict or bar a

28  user's access."  (*Sunbelt Rentals, Inc. v. Victor* (N.D. Cal. 2014) 43 F. Supp. 3d 1026, 1032; *Williams v.*
*Facebook, Inc.* (N.D. Cal. 2018) 384 F. Supp. 3d 1043, 1053; *In re Facebook Priv. Litig.* (N.D. Cal. 2011)

- 16 -

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1   violation of the CDAFA is erroneous.

2   *Facebook v. Power Ventures* is instructive. There, the court ruled that "because [the

3   defendant] had implied authorization to access [the plaintiff]'s computers, it did not, at first, violate

4   the [CDAFA]" However, after the Defendants were notified through a cease and desist letter, it

5   knew that access into plaintiff's computer, taking, and copying of plaintiff's data was now without

6   permission. (*Facebook, Inc. v. Power Ventures, Inc.* (9th Cir. 2016) 844 F.3d 1058, 1069.)  Here,

7   Mr. Martin did not hack into a kytch.com account or steal another's password to gain wrongful

8   access. (UMF 30.)  He and TFG TN were granted access to Gamble's machine via Gamble's request

9   to Kytch.  (UMF 30 – 33.)  An actual invitation from "invitation@kytch.com" was provided and

10   TFG TN then proceeded in good faith belief that it was authorized to proceed by Kytch. (Martin

11   Decl. ¶¶ 34– 41, 45 – 49.)  Mr. Martin created the kytch.com account through a process he

12   understood to have been created by Plaintiff.  (UMF 31 – 33.)

13   Mr. Martin had no knowledge of or reason to know the terms of any agreement between

14   Gamble and Plaintiff, including any reason to know or believe that Gamble could not allow access.

15   (UMF 31.)  After receiving a direct invitation from Kytch to create an account, TFG TN did nothing

16   more than access the information Kytch made available to it.  (UMF 31 – 33.)  Mr. Martin then had

17   no knowledge of or reason to know the terms of any agreement *between Gamble and Plaintiff*,

18   including any reason to know or believe that Gamble itself could not prompt access. (UMF 31.)

19   All evidence to date indicates TFG TN acted in good faith regarding this access which was invited

20   by Plaintiff.  (UMF 30 – 33.)  Mr. Martin and TFG TN did not create a kytch.com account with the

21   intent to take away information – *nor can Kytch demonstrated protected information taken*. Rather

22   TFG TN's purpose was to simply repair Gamble's machine.  (UMF 32 – 33.)  As a matter of

23   undisputed material fact, unlawful "knowing access" did not occur.

24   **2.   *Kytch Cannot Show Improper "Use"***

25   Section 502(c)(3) also requires knowing and without permission ***use*** of computer services.

26   (Cal. Penal Code § 502(c)(3).)  *Chrisman v. City of Los Angeles* explains the difference between

27

28   791 F. Supp. 2d 705, 716.)  Equally, Courts have held there is no violation where an accused has implied authorization to access a computer. (CACI 1812 quoting *Facebook, Inc. v. Power Ventures, Inc.* (9th Cir. 2016) 844 F.3d 1058, 1069.)

4884-9564-2007.7

- 17 -

ROPERS
MAJESKI
A Professional Corporation
Los Angeles

1   accessing a computer and *using* a computer without permission.   (*Chrisman v. City of Los Angeles*

2   (2007) 155 Cal.App.4th 29, 34.)   There, the Court specifically addressed that accessing a

3   computer's "logical, arithmetical, or memory function is different from the ordinary, everyday *use*

4   of a computer to which people are accustomed when they speak of "using" a computer, another

5   subdivision criminalizes "us[ing] or caus[ing] to be used computer services" without permission."

6   (*Id.*)   Further, to the extent Plaintiff seeks to base its CDAFA claims on its website's terms of

7   service, courts have routinely refused to turn the CDAFA into a "sweeping Internet-policing

8   mandate."   (*Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 129 (N.D. Cal. 2020).)   "[T]he [federal

9   counterpart to CDAFA, the CFAA] was enacted 'primarily to address the growing problem of

10   computer hacking,'" – where the Ninth Circuit also concurs – "'the CFAA's focus on hacking rather

11   than turning it into a sweeping Internet policing mandate.'"   (*Brodsky v. Apple Inc.*, 445 F. Supp.

12   3d 110, 129 (N.D. Cal. 2020)(citation omitted).)

13        No evidence exists that TFGroup or any entity associated with TFGroup "hacked" Kytch's

14   system or accessed its system without credentials.   (UMF 30.)   Of note, Mr. Martin has been

15   accused of using a pseudonym email address when abiding by Gamble's request to access Kytch's

16   system.   (SAC ¶ 185.)   However, use of alternative email addresses itself is not illegal or even

17   improper, so long as the invitee abides by Kytch's terms of service or access protocols, which do

18   not forbid use of an alternative email address or even a psuedonym[6].   More to the point, no legal

19   authority has been located to indicate use of alternative email address or even a psuedonym qualifies

20   as criminalized use of a website or that exceeds authorized access under the CFAA or being

21   "without permission" under the CDAFA.   (*See Van Buren*, 141 S.Ct. 1648, 1661 (rejecting the

22   government's interpretation of an "exceeds authorized access" clause of the CFAA because such

23   broad application would "criminalize everything from embellishing an online-dating profile to

24   using a pseudonym on Facebook.")   Since no evidence exists that Mr. Martin and/or TFGroup

25

26   _____

[6]   The U.S. Supreme Court recently explained that statutes like the CDAFA and its federal counterpart cannot be interpreted to criminalize every violation of a website's terms of service. (*Van Buren v. United States* (2021) 141 S.Ct. 1648, 1661.) Were the CDAFA were to apply to any violation of a terms of service, then "millions of otherwise law-abiding citizens are criminals." (*Id.*) Rather than focusing on the terms of service of a website or a computer system, the Supreme Court focused on access rights**: violations only arise from "entering a part of the system to which a computer-user lacks access privileges."** (*Id.* at 1658 (bold added).)

- 18 -

4884-9564-2007.7

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1  accessed data, computer or networks for which he/it were not granted access privileges by Plaintiff

2  (via its invitation@kytch.com email), Plaintiff cannot show that there was usage "without

3  permission". (UMF 30 – 33.) The CDAFA claim fails.

4  **G.      TFGroup Did Not Breach Any Identifiable Contract.**

5  Plaintiff's Ninth Cause of Action asserts TFGroup allegedly breached its Terms of Service[7].

6  (SAC ¶ 506, Exh. 1.) Kytch's cause of action for breach of contract fails on at least two elements:

7  (1) the existence of the contract and (3) the defendant's breach.

8  First, Mr. Martin's creation of a kytch.com account did not involve TFGroup. The creation

9  to service Gamble's equipment was initiated exclusively by TFG TN. (UMF 34.) There is no

10  contract between TFGroup and Kytch. And without a contract, TFGroup could not have breached

11  the Kytch Terms of Service agreement. Even if TFGroup (as opposed to TFG TN) agreed to the

12  Terms of Service when creating a kytch.com account, there was no identifiable breach of any Terms

13  of Services. Kytch contends a claim of breach was based upon TFGroup "participating in the

14  development of the competing device", "assisting in the disassembly, reverse engineering and

15  distribution of KSDs", "giving McDonald's and other third-parties access to the Kytch Solution

16  Platform" (SAC ¶ 517.) and also claims that TFGroup took and retains "Proprietary Information"

17  and "Confidential Information." (SAC ¶¶ 518-19.) These vague generalities, as damning as they

18  may sound, don't correspond to any proof or to any terms of service to demonstrate breach of

19  contract. For instance, to date, Kytch has produced no proof that TFGroup: "modif[ied], make

20  derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute, [or]

21  republish" any part of Plaintiff's devices or services. (SAC ¶ 512, UMF 36.) TFG TN's access to

22  a kytch.com account was only simply service Gamble's machines. (UMF 35.) No proof exists that

23  TFGroup "transfer[ed]", "distribute[d]", or "disclose" any part of Plaintiff's devices or services to

24  "any third party." (SAC ¶ 513, UMF 36.) TFGroup has never "commercially exploit[ed]"

25  Plaintiff's devices or services in any way. (SAC ¶ 514, UMF 36.) And TFGroup did not use

26  anything from Plaintiff's devices or services in connection with the development of a competing

27

28

---

[7] To claim a breach of contract, the plaintiff would need to show: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis W. Realty, LLC v. Goldman* (2011) 51 Cal. 4th 811, 821.)

ROPERS
MAJESKI
A Professional Corporation
Los Angeles

1   device. (SAC ¶ 517, UMF 36.)

2       TFGroup did not disassemble, reverse engineer or distribute Plaintiff's devices or services.

3   (SAC ¶ 517, UMF 37.)  Also, TFGroup did not give McDonald's or any other third-party access to

4   Plaintiff's devices or services.  (SAC ¶ 517, UMF 37.)  Finally, TFGroup did not take Plaintiff's

5   "Proprietary Information" or "Confidential Information" for any purpose.  (SAC ¶ 518-19, UMF

6   38.)  TFG TN and TFGroup did not share their access to kytch.com or a Kytch device to any third-

7   party and merely accessed an account to continue repairing Gamble's machine.  (UMF 35 – 38.)

8   In all, even if TFGroup is found to have agreed to the Terms of Service, forming a "contract" (it

9   did not), there is no evidence that TFGroup breached any identifiable term of service.  Absent any

10  credible showing by Kytch in opposition to this Motion, the Motion must be granted.

11  **V.    CONCLUSION**

12      For the foregoing reasons based on the undisputed material facts of this action, TFGroup

13  respectfully requests summary judgment on all causes of action, or alternatively, summary

14  adjudication.

15

16  Dated: December 28, 2023                    Respectfully submitted,

17                                              ROPERS MAJESKI PC

18

19  By: _____
                                                TIM M. AGAJANIAN
20                                              ERNEST E. PRICE
                                                KEVIN W. ISAACSON
21                                              PAULA B. NYSTROM
                                                Attorneys for Defendant
22                                              TFGROUP LLC

23

24

25

26

27

28

ROPERS MAJESKI

A Professional Corporation
Los Angeles

4884-9564-2007.7

- 20 -